# EXHIBIT    1

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 329910 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
    United States District Court, N.D. Illinois, Eastern
                            Division.
Savino LATUGA and David Gonzalez, individually
    and as representatives of a plaintiff class of
        similarly situated persons, Plaintiffs,
                            v.
    HOOTERS, INC., and Hooters of Orland Park,
                    Inc., Defendants.
                    **No. 93 C 7709.**

                        July 8, 1994.

                *MEMORANDUM OPINION*

KOCORAS, District Judge:
*1 This matter is before the Court on a motion to
compel brought by the defendants. For the reasons
stated below, the motion is granted in part and
denied in part.

                    DISCUSSION

Defendants' counsel brought this motion to compel
one of plaintiffs' counsel to testify at a deposition
and to produce certain documents. Deposing
opposing counsel is an extreme step and one which
we do not believe is warranted in this situation.
The issue about which defendants wish to depose
plaintiffs' counsel is what involvement counsel had
with the plaintiffs' preparation of their EEOC
charges. This issue arose because we dismissed
much of the original complaint as being
unsupported by the EEOC charge, under the
assumption that the charge was prepared with the
assistance of counsel and thus was not entitled to a
liberal construction. This assumption flowed from
the fact that on the EEOC charge form, Latuga
checked the "yes" box next to a question
concerning whether he had consulted with an

attorney. When EEOC charges are prepared by lay
persons, they are entitled to a more liberal
construction than when they are prepared by or with
assistance of counsel.

Latuga sought leave to file an Amended Complaint
reviving much of what had been dismissed. The
motion explained that although Latuga and an
added plaintiff, David Gonzalez, had retained
attorney Jeffrey Brown prior to filing their EEOC
charges, Brown did not prepare the charges or play
a role in their preparation that would preclude the
application of the liberal construction rule.

Defendants subpoenaed Brown to appear for a
deposition concerning his role in the preparation of
the EEOC charges. Other lawyers for the plaintiffs
objected to the propriety of the deposition, but did
not formally oppose it. They offered a stipulation
that Brown would testify about the relevant issue
but that his testimony would not be treated as
having waived the attorney-client privilege.
Defendants did not agree to the stipulation, and at
the deposition, Brown invoked the attorney-client
privilege and refused to answer questions about
what he and the plaintiffs discussed prior to the
filing of the EEOC charge. Plaintiffs point out that
one of the plaintiffs' attorneys asked Brown on
cross-examination if he participated in the
preparation of either of the plaintiffs' EEOC charges
and he answered that he did not. Pl. Response at 9.
Defendants now move to compel Brown to answer
several questions which they have identified in the
deposition transcript.

Defendants correctly assert that the attorney-client
privilege cannot be used as both a sword and a
shield. Where the plaintiff puts a matter in issue,
he cannot invoke the attorney-client privilege to
prevent the defendant from obtaining information
necessary to his defense. However, deposing the
plaintiffs' attorney is not the preferred method of
obtaining such information. Here, the clients-the
plaintiffs themselves-can be asked whether Brown

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 329910 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

advised them on how to prepare the EEOC charges.

*2 The plaintiffs seek the protection of certain conditions and submit a draft order containing those conditions. Essentially, the conditions are that the answering of questions concerning Brown's role in the preparation of the EEOC charges will not later be construed as a waiver of work product protections or attorney-client privilege. We will not enter the draft order, but will assure the plaintiffs that we are cognizant of the narrowness of the waiver occasioned by the assertion in the Amended Complaint that Latuga and Gonzalez prepared, completed, and filed their EEOC charges without the assistance of counsel. See Am.Compl. ¶ 29(a).

We will not compel attorney Jeffrey Grant Brown to be deposed or to answer certain questions in a deposition. The information sought is available from the plaintiffs. We will compel the plaintiffs to answer deposition questions on the subject of attorney assistance in the preparation of the EEOC charges, as follows:
Did attorney Jeffrey G. Brown advise you on who to name in your EEOC charge? [FN1]
Did attorney Jeffrey G. Brown advise you on what to write in the text of the charge? [FN2]

These questions are based on questions put to Brown during his deposition. While we will not forbid other questions, we do not anticipate a need for many more questions. Limiting the scope of the questions to the narrow issue raised in the Amended Complaint is appropriate and it will not result in a broad waiver. The defendants are not entitled to be made privy to the content of all conversations between the plaintiffs and their lawyer.

Defendants also seek the production of certain documents from Brown. Again, we do not find that requesting opposing counsel to divulge the fruits of his research is appropriate in this instance. However, Brown has indicated his willingness to produce the documents for in camera review. Although we rarely undertake in camera inspection of discovery materials, we will do so in this instance. The number of documents is small and

we hope that our participation in resolving this dispute can help restore a more trusting and cooperative atmosphere between opposing counsel. Accordingly, Brown shall produce documents designated as A-1 through A-8, B-1A, B-1B, and B-1C on Monday, July 11 for in camera inspection and shall produce his notes of his January 18, 1993 meeting with Latuga for in camera inspection as soon as such notes are located.

## CONCLUSION

For the reasons stated above, defendants' motion to compel Jeffrey Grant Brown to answer certain deposition questions is denied. The plaintiffs are compelled to answer deposition questions on the assistance of counsel issue, as framed above. Defendants' motion to compel the production of documents is denied, but Brown is ordered to produce the documents listed above for in camera review.

> FN1. This question is based on the question designated as number 10 in the defendants' motion to compel. See Brown Dep. at 39 (attached as Exh. A to Def.Memo.).

> FN2. This question is based on questions designated 14 and 15 in the defendants' motion to compel.

N.D.Ill.,1994.
Latuga v. Hooters, Inc.
Not Reported in F.Supp., 1994 WL 329910 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:93CV07709 (Docket) (Dec. 23, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2**

Westlaw.

Slip Copy

Page 1

Slip Copy, 2006 WL 122430 (C.A.11 (Fla.))
(Cite as: Slip Copy)

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently
available.This case was not selected for publication
in the Federal Reporter.Please use FIND to look at
the applicable circuit court rule before citing this
opinion. Eleventh Circuit Rule 36-2. (FIND CTA11
Rule 36-2.)
    United States Court of Appeals,Eleventh Circuit.
    Carl B. HILLEMANN, Jr., Plaintiff-Appellant,
                            v.
    UNIVERSITY OF CENTRAL FLORIDA,
                    Defendant-Appellee.
                      No. 04-15153
                Non-Argument Calendar.
    D.C. Docket No. 02-01225-CV-ORL-28-JGG.

                    Jan. 18, 2006.

**Background:** Job applicant brought action against
university employer, alleging age discrimination
under the Age Discrimination in Employment Act
(ADEA), and Title VII race and gender
discrimination. The United States District Court for
the Middle District of Florida dismissed ADEA
claim, and granted summary judgment in favor of
employer on Title VII claims. Applicant appealed.

**Holdings:** The Court of Appeals held that:

1(1) submission of form stipulating to dismissal of
age discrimination claims was sufficient to support
voluntary dismissal of ADEA claims;

2(2) age and gender discrimination claims were
procedurally barred; and

3(3) employer's proffered reasons for not hiring
applicant were not pretext for either gender or race
discrimination.

Affirmed.

**[1] Civil Rights 78 ☞0**

78 Civil Rights
Submission of form stipulating to dismissal of age
discrimination claims arising from university
employer's alleged failure to hire job applicant for
certain positions at the university was sufficient to
support voluntary dismissal of ADEA claims, where
job applicant signed the form and court approved
dismissal. Age Discrimination in Employment Act
of 1967, § 4, 29 U.S.C.A. § 623; Fed.Rules
Civ.Proc.Rule 41(a), 28 U.S.C.A.

**[2] Civil Rights 78 ☞0**

78 Civil Rights
Job applicant's Title VII gender and race
discrimination claims against university employer,
arising from university's failure to hire him, were
procedurally barred, where the charge filed by the
applicant with the Equal Employment Opportunity
Commission only asserted age discrimination. Civil
Rights Act of 1964, § 703 et seq., 42 U.S.C.A. §
2000e-2 et seq.

**[3] Civil Rights 78 ☞0**

78 Civil Rights
State university employer's proffered reasons for not
hiring job applicant, that applicant had no ties to
area, and that one interviewer found applicant to be
boring and unenthusiastic, were not pretext for
either gender or race discrimination, as would prove
violation of Title VII, absent showing that employer
lied about those reasons.

Appeal from the United States District Court for the
Middle District of Florida.

Carl B. Hillemann, Jr., Saint Charles, MO, pro se.
Paul S. Jones, Luks, Santaniello, Perez, Petrillo &

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 122430 (C.A.11 (Fla.))
(Cite as: **Slip Copy**)

Gold, Orlando, FL, for Defendant-Appellee.

Before EDMONDSON, Chief Judge, ANDERSON
and WILSON, Circuit Judges.

PER CURIAM:

*1 Plaintiff-Appellant Carl Hillemann appeals *pro se*
the district court's dismissal of his claims against
the University of Central Florida Board of Regents (
"UCF") for age discrimination under the Age
Discrimination in Employment Act ("ADEA"), 29
U.S.C. § 623, and grant of summary judgment to
UCF for his race and sex discrimination and
retaliation claims under Title VII, 42 U.S.C. §
2000e-2, 2000e-3. No reversible error has been
shown; we affirm. Because we affirm the district
court's decision, we determine that Defendants'
motion to strike Plaintiff's supplemental authorities
is moot.

Plaintiff is a white male and is over seventy years
old. Plaintiff's complaint alleged that, because of
age, race, and gender discrimination, UCF refused
to hire him for three positions with its Marketing
Department and approximately [FN1] fifteen
positions with its Small Business Department.
Plaintiff additionally alleged UCF refused to hire
him for the three Marketing positions in retaliation
for Plaintiff's complaints that UCF had
discriminated previously against Plaintiff because
of his age by failing to hire him for two Small
Business positions.

The district court dismissed Plaintiff's age
discrimination claims under the ADEA as barred by
the Eleventh Amendment. The district court
determined UCF was entitled to summary judgment
on Plaintiff's race and gender discrimination and
retaliation claims because (1) Plaintiff was
procedurally barred from raising race and gender
discrimination claims about most of the Small
Business positions and Plaintiff stipulated to the
dismissal of the claims about the remaining two
Small Business positions; and (2) Plaintiff was
procedurally barred from bringing race or gender
discrimination or retaliation claims about the
Marketing Positions and/or failed to create a
question of material fact about whether UCF's
proffered reasons for not hiring him for the

Marketing positions were pretextual.

We review *de novo* a district court's dismissal of a
complaint on Eleventh Amendment grounds. *In re
Employment Discrimination Litig. against State of
Ala.*, 198 F.3d 1305, 1310 (11th Cir.1999). We
review a district court's grant of summary judgment
*de novo*, viewing the facts-supported by evidence in
the record-and reasonable inferences from those
facts in the light most favorable to the nonmoving
party. *Young v. City of Palm Bay, Fla.*, 358 F.3d
859, 860 (11th Cir.2004).

The district court properly dismissed Plaintiff's age
discrimination claims under the ADEA. The ADEA
prohibits employers, including states and state
entities, from refusing to hire persons because of
their age. 29 U.S.C. §§ 623(a)(1), 630(b). But,
although the statute's language expressly allows
suits against state entities, the Supreme Court has
determined that the ADEA does not abrogate state
entities' Eleventh Amendment immunity because the
ADEA is grounded in Congress's Article I powers,
not Congress's powers to enforce the Fourteenth
Amendment. *Kimel v. Fla. Bd. of Regents*, 528 U.S.
62, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000).
Therefore, because UCF is a state entity, it is
immune from ADEA discrimination claims; and
Plaintiff's ADEA claims were properly dismissed.

*2 Likewise, the district court properly granted
summary judgment on Plaintiff's claims about the
Small Business and Marketing positions. We first
address Plaintiff's discrimination claims about the
Small Business positions, then Plaintiff's
discrimination and retaliation claims about the
Marketing positions.

### 1) The Small Business Claims

Before filing a Title VII action in district court, a
plaintiff must file a charge of discrimination with
the EEOC. *Gregory v. Ga. Dep't of Human Res.*,
355 F.3d 1277, 1279 (11th Cir.2204). Courts are "
extremely reluctant" to bar Title VII claims based
on procedural technicalities and will allow judicial
claims that "amplify, clarify, or more clearly focus"
the EEOC complaint allegations. *Id.* Still, "[a]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3

Slip Copy, 2006 WL 122430 (C.A.11 (Fla.))
(Cite as: Slip Copy)

plaintiff's judicial complaint is limited by the scope
of the EEOC investigation which can reasonably be
expected to grow out of the charge of
discrimination." *Gregory,* 355 F.3d at 1280.
Plaintiffs may not raise "[a]llegations of new acts of
discrimination" in the judicial proceedings. *Wu v.
Thomas,* 863 F.2d 1543, 1547 (11th Cir.1989).

Plaintiff's federal court complaint asserted
discrimination claims arising from UCF's refusal to
hire him for approximately fifteen positions in its
Small Business department; Plaintiff's EEOC
however, charge mentioned only two of these
positions. Therefore, the district court properly
determined that Plaintiff's judicial claims about the
Small Business positions Plaintiff did not mention
in his EEOC charge were procedurally barred.

[1] Plaintiff signed and submitted a form
stipulating to the dismissal of the two remaining
Small Business claims. Plaintiff argues that he
changed his mind after signing the stipulation for
dismissal and that he indicated his retraction in
writing on the document. The document in the
record however, contains no such marks; it bears
only the signatures of the parties. The district court
correctly determined this stipulation was sufficient
to dismiss the two remaining Small Business
position claims. Fed.R.Civ.P. 41(a). Because all the
Small Business claims were either procedurally
barred or voluntarily dismissed, the district court
did not err in granting summary judgment to UCF
on these claims.

2) The Marketing Positions

Plaintiff's complaint alleged UCF failed to hire him
for three Marketing positions because of race and
gender discrimination and retaliation. Plaintiff's
EEOC charge about the Marketing positions alleged
only age discrimination under the ADEA. [FN2] This
Court has previously refused to bar a plaintiff's
judicial claims when that plaintiff, not represented
by counsel, inadvertently did not mark her EEOC
charge form as including retaliation claims; the facts
in that plaintiff's EEOC charge indicated she was
fired after complaining about race and gender
discrimination, which reasonably would lead to an

EEOC investigation of retaliation. *Gregory,* 355
F.3d at 1277.

[2] Here, Plaintiff's EEOC charge factually
supports only a claim of age discrimination:
Plaintiff said he believed he was a victim of age
discrimination and, to support this, said that the
hired applicants were younger than he was. The
EEOC charge was silent about race, sex, retaliation
and Title VII. The EEOC could not reasonably be
expected to investigate race and sex discrimination
or retaliation when the charge form presented no
indication that such considerations might have
played a role in UCF's failure to hire Plaintiff.
Therefore, the Marketing position claims were
procedurally barred; and the district court properly
granted summary judgment about these claims to
UCF.

*3 We also note that Plaintiff did not establish a
material question about whether Defendants'
reasons for not hiring him for the Marketing
positions were pretextual. If a plaintiff establishes a
prima facie case of discrimination or retaliation, and
the Defendant responds with a legitimate,
nondiscriminatory reason for not hiring the plaintiff,
the plaintiff must show that the defendant's reasons
were pretext for an illegal motive. *McDonnell
Douglas Corp. v. Green,* 411 U.S. 792, 802-804, 93
S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Rojas v.
Florida,* 285 F.3d 1339, 1342 (11th Cir.2002). A
plaintiff cannot establish pretext merely by showing
he or she was better qualified than the hired
candidate; the plaintiff must show the hiring
decision was made because of an illegal motive. See
*Alexander v. Fulton County,* 207 F.3d 1303, 1339
(11th Cir.2000), overruled on other grounds,
*Manders v. Lee,* 338 F.3d 1304, 1328 (11th
Cir.2000).

UCF offered legitimate, nondiscriminatory reasons
for not hiring Plaintiff: [FN3] Plaintiff had no ties to
central Florida, which UCF sought in hopes of
reducing faculty turnover; and one UCF interviewer
found Plaintiff "boring" and "unenthusiastic."

[3] Plaintiff presented no evidence that UCF lied
about these reasons. Plaintiff merely asserted that he
was the most qualified candidate for the position

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 122430 (C.A.11 (Fla.))
(Cite as: Slip Copy)

and reasoned that this showed UCF's failure to hire
him was discriminatory. But a reasonable employer
could have concluded that Plaintiff's lack of ties to
central Florida and "boring" demeanor negated
Plaintiff's credentials, and the record reflects no
evidence that UCF considered race, sex, or
retaliation in hiring for the Marketing positions.
Therefore, Plaintiff did not establish that UCF's
reasons were pretextual, and the district court
properly granted summary judgment to UCF about
the Marketing position claims.

AFFIRMED.

> FN1. The precise number is irrelevant to
> our resolution of this case.
>
> FN2. Plaintiff filed different EEOC charge
> forms for the Small Business positions and
> the Marketing positions.
>
> FN3. We assume for this analysis, as did
> the Magistrate, that Plaintiff established a
> prima facie case.

C.A.11 (Fla.),2006.
Hillemann v. University of Central Fla.
Slip Copy, 2006 WL 122430 (C.A.11 (Fla.))

Briefs and Other Related Documents (Back to top)

• 04-15153 (Docket) (Oct. 07, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT   3**

Page 108

1          MR. GOLDFARB: Just answer his

2     question.

3          A     I'm kind of confused.  I'm not

4     sure.

5          Q     (BY MR. KESSLER:) Listen to my

6     question.  Did you ever complain to

7     anybody within the company as a result of

8     the unfair inspection that you claim you

9     received on or about February 18, 2004?

10          A     No, sir.

11          Q     Thank you.  So other than that

12     one, other than that inspection you went

13     around with Mr. Woods on every

14     inspection, is that accurate testimony?

15          A     Yes, sir.

16                     (Defendant's Exhibit

17                     No. 9 was marked

18                     for identification.)

19          Q     Let me hand to you what's

20     been marked as Defendant's Exhibit No. 9

21     and this purports to be a product

22     evaluation of the Alex City facility on

23     March 5, 2003, and my question is going

Page 109

1       to be have you seen this document?

2           A       If this document says 3-5 of

3       '05 but it was -- it looked like '03.

4               MR. GOLDFARB: Gary, when

5       you're asking this are asking has she

6       seen it since you gave it to me?

7               MR. KESSLER: I will clarify

8       that.

9           Q       Have you seen this document

10      before?

11          A       I wasn't employed in

12      two -- whatever.  Let's see.  I guess

13      it's supposed to be 2003.

14          Q       If you look at the signature

15      date on the bottom --

16          A       Okay.

17          Q       -- it's 2003.

18          A       It is 2003.

19          Q       As we know sometimes we write

20      dates down wrong?

21          A       Correct.

22          Q       So on March 5,

23      2003 -- incidentally on Defendant's -- my

FOSHEE & TURNER COURT REPORTERS

Page 110

1    question was have you seen this document

2    before?

3         A    Yes.

4         Q    Okay.  And this is the QA

5    evaluation of Alex City, right?

6    Is that a yes?

7         A    Yes, sir.

8         Q    And the score was needs

9    improvement?

10        A    Yes, sir.

11        Q    Do you recall receiving a

12   needs improvement in March 5, 2003 for

13   the Alex City facility?

14        A    Yes, sir.

15        Q    Okay.  And the signature at

16   the bottom is whose, do you know?

17        A    I guess that's --

18             MR. GOLDFARB: Don't guess.

19        A    I don't know.  Greg Whiney.

20        Q    (BY MR. KESSLER:) Okay.  You

21   don't know whose it is?

22        A    No, I really don't.

23        Q    All right.  Now, after you

Page 162

1    time sheets, couldn't we, and find out

2    who was assigned to work that day?

3         A    Yes, sir, you could.

4         Q    What time did Mr. Woods come

5    in on the 18th of February 2004 to

6    conduct the QA inspection?

7         A    In the morning hours.  I'm

8    don't know exactly what time.

9                   (Defendant's Exhibit

10                   No. 12 was marked

11                   for identification.)

12        Q    All right.  Let me hand you

13   what's been marked as Defendant's No. 12

14   and this purports to be a QA Product

15   Evaluation dated June 11, 2003 for the

16   Alex City location with you as GM.  And

17   my question is have you seen this before?

18        A    Yes, sir.

19        Q    And is this the QA evaluation

20   that you received on or about June 11,

21   2003?

22        A    I'm sorry.

23        Q    Is this the QA evaluation you

FOSHEE & TURNER COURT REPORTERS

Page 163

1    received on or about June 11, 2003?

2         A    Yes, sir.

3         Q    You received it from

4    Mr. Woods?

5         A    Yes, sir.

6         Q    And did you walk around with

7    him while he did the evaluation?

8         A    Yes, sir.

9         Q    Okay.  And you received a

10   needs improvement?

11        A    Yes, sir.

12        Q    And what evaluation -- what

13   level do you believe you should have

14   received?

15        A    Average.

16        Q    Okay.

17        A    Or above.

18        Q    Okay.  And what facts do you

19   have that leads you to believe that

20   Mr. Woods unfairly gave you a needs

21   improvement rather than an average

22   evaluation?

23        A    Facts are --

Page 167

1    job.

2        Q       Anything else?

3        A       No, sir.

4                (Defendant's Exhibit

5                No. 13 was marked

6                for identification.)

7        Q       Ms. Stough, let me hand to

8    you what's been marked as Defendant's

9    Exhibit No. 13 and ask you if you recall

10   seeing this document on or about June 17,

11   2003?

12       A       I remember this vaguely.

13       Q       Okay.  Now, it says in the

14   first sentence, "I am reprimanding you

15   for not notifying me as to your absence

16   from work.  This is not the first time

17   you have failed to notify me that you

18   would not be at work as scheduled when

19   you know that I require notification when

20   a manager is not going to be on the

21   property."  Do you recall what the

22   circumstances were that led to you

23   receiving this warning?

Page 173

1       A       Yes, sir.

2       Q       And I mean it had been going

3   on for two years?  This was the first

4   write-up that you got?

5       A       That I can recall, yes, sir.

6       Q       So he was discriminating

7   against you for two years and never wrote

8   you up for two years?  Do I understand

9   your testimony?

10      A       This was just to me this was

11  another form of discrimination and

12  harassment.

13                      (Defendant's Exhibit

14                      No. 14 was marked

15                      for identification.)

16      Q       Let me hand to you what's

17  been marked as Defendant's Exhibit

18  No. 14 and ask you if you

19  recall receiving this on or about June

20  17, '03?

21      A       Yes, sir.

22      Q       Okay.  About attendance and

23  punctuality?

FOSHEE & TURNER COURT REPORTERS

Page 174

1      A      Yes, sir.  This went along

2  with the same document.

3      Q      Both of those came at the same

4  time?

5      A      I believe so.

6      Q      Okay.  And he says in the

7  second paragraph, "Effective immediately

8  I will require a work schedule for the

9  upcoming week from you."  And then it

10  goes on.  Did you submit work schedules

11  to him?

12      A      Yes, sir.

13      Q      Do you believe you received

14  this memo for harassment purposes?

15      A      Yes, I do because there was

16  not a time if I was able to call Charles

17  and I was going to be out that I did so.

18  If I was out of work I presented a

19  doctor's note.

20      Q      If you were out of work you

21  always presented a doctor's note, is that

22  your sworn testimony?

23      A      Yes, sir.  When I would be out

FOSHEE & TURNER COURT REPORTERS

Page 176

1          Q       Were there times when you were

2     sick when you didn't go to the doctor and

3     therefore didn't get a note?

4          A       I don't remember.

5          Q       So there may or may not have

6     been?

7          A       They may or may not have been,

8     yes, sir.

9                          (Defendant's Exhibit

10                          No. 15 was marked

11                          for identification.)

12         Q       I hand to you this, and this

13    has been marked as Defendant's No. 15,

14    Ms. Stough, and you recall being placed

15    on a performance improvement plan on

16    June 17, 2003?

17         A       I'm sorry, I was reading.

18         Q       My question -- I'm sorry.  My

19    question was do you recall being placed

20    on a performance improvement plan on

21    June 17, 2003?

22         A       Right because this is when I

23    had a needs improvement score.

Page 181

1    legitimately part of the evaluation?

2        A    Yes, sir.

3        Q    When the health inspector

4    comes in does the health inspector check

5    delinquent accounts?

6        A    No, sir, he does not.

7        Q    So there may be some

8    difference in the areas checked out by

9    Jameson versus what the health inspector

10   checks?  Would you agree with that?

11       A    Yes, sir.

12       Q    When it comes to inspections?

13       A    Yes, sir.

14                  (Defendant's Exhibit

15                  No. 17 was marked

16                  for identification.)

17       Q    I hand you what's been marked

18   as Defendant's Exhibit No. 17, Ms.

19   Stough, and ask you if you recognize this

20   as the QA evaluation which you received

21   in November 2003?

22       A    Yes, sir.

23       Q    And it's a failure, isn't it?

Page 182

1        A        Yes, sir.

2        Q        And in the second sentence on

3   the overall summary on the first page it

4   says, "Room cleanliness was unacceptable

5   and noted in the inspection."  Do you see

6   that?

7        A        Yes, sir.

8        Q        And that's something that you

9   were responsible for as the general

10  manager?

11       A        Yes, sir.

12       Q        That was something that your

13  mother responsible for as the

14  housekeeping supervisor?

15       A        Yes, sir.

16       Q        You went around with Mr. Woods

17  while this evaluation was done, didn't

18  you?

19       A        Yes, sir.

20       Q        Now, you've testified that

21  every evaluation -- strike that.

22                        Every evaluation that

23  I've shown you you thought that you were

FOSHEE & TURNER COURT REPORTERS

Page 190

1              (Defendant's Exhibit

2                 No. 18 was marked

3                 for identification.)

4      Q    All right.  Let me hand to

5   you Defendant's 18, which is a QA

6   evaluation of December 19, 2003.  My

7   question is did you receive this on or

8   about December 19, 2003?

9      A    Yes, sir.

10     Q    Okay.  And this was a

11  re-visit from Mr. Woods, right?

12     A    Correct.

13     Q    And it was an improvement from

14  the last one?

15     A    Yes, sir.

16     Q    It was a needs improvement.

17  And do you think that you should have

18  gotten a different score on this

19  evaluation?

20     A    Yes, sir, I do.

21     Q    What is the score you think

22  you should have gotten?

23     A    An average or above.

Page 191

1    Q    Did you put anything in

2  writing anywhere saying that you thought

3  this evaluation was inaccurate?

4    A    No, sir, I did not.

5    Q    I don't think I asked you this

6  about the previous one, Defendant's 17,

7  the one in which you failed, the hotel

8  failed.  Did you put anything in writing

9  saying that you believe that was

10  inaccurate?

11    A    No, sir.

12    Q    Did you keep a diary or any

13  kind of notes or anything that would in

14  any way document any of these issues that

15  you're testifying about today?

16    A    No, sir.

17    Q    Write any e-mails to friends

18  or anything like that?

19    A    No, sir, I did not.

20            (Defendant's Exhibit

21             No. 19 was marked

22             for identification.)

23    Q    Ms. Stough, let me hand you

Page 192

1    what's been marked as Defendant's Exhibit

2    No. 19 and ask if you recall receiving

3    this Constructive Action Notice on

4    December 29, 2003?

5        A    Yes, sir.

6        Q    Okay.  And did Mr. Woods give

7    this to you in person?

8        A    I believe -- I don't

9    recall but -- no, I don't.  I'm thinking

10   it came from over the internet.  I cannot

11   be sure of that.

12       Q    You think this is an e-mail?

13       A    I don't recall.  I don't

14   recall.

15       Q    So, he may or may not have

16   given it to you in person?

17       A    I just don't recall.  No, sir,

18   I don't.

19       Q    Is there anything in here

20   that you disagree with?

21       A    Yes, sir, the QA score.

22       Q    The what?

23       A    On the quality assurance

Page 197

1    were that your husband was on leave from

2    Iraq?

3          A    Yes, sir.  He came in on, I

4    believe it was, on the 16th because I had

5    to go to Atlanta to get him.

6          Q    16th of?

7          A    January, yes, sir.

8          Q    Then when did your son get

9    married?

10          A    My son got married on the

11    28th.  Well, it was on a Saturday.  The

12    last Saturday of January.  Excuse me.  It

13    was the 24th.  It was on a Saturday.

14                    (Defendant's Exhibit

15                    No. 21 was marked

16                    for identification.)

17          Q    Ms. Stough, let me hand you

18    what's been marked as Defendant's Exhibit

19    No. 21 and ask you if this is a memo that

20    you received from Mr. Woods on or about

21    February 6, 2004?

22          A    Yes, sir.

23          Q    Okay.  And he lists seven

Page 198

1    different areas of corporate standards

2    and expectations that needed to be

3    improved?

4        A      Yes, sir.

5        Q      Okay.  And he sat down and

6    talked with you about these areas didn't

7    he?

8        A      Excuse me.  I'm sorry?

9        Q      He sat down and talked to you

10   about these areas didn't he?

11       A      I don't recall but -- I don't

12   recall if we sat down.  I don't.

13       Q      Then in the last paragraph it

14   says, "The above are all critical areas

15   and are of grave importance in the

16   successful operation of your hotel."

17   Did you agree with that statement?

18       A      No, sir.

19       Q      You didn't think they were of

20   grave importance?

21       A      No.  I understand that but I

22   don't know how to answer that.  I do

23   understand that it is of grave importance