IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| BELINDA STOUGH, | : |
| | : |
|    Plaintiff, | : |
| | : |
| v. | :   CASE NO. 3:05cv421-W |
| | : |
| JAMESON INNS, a company owned or operated by KITCHIN HOSPITALITY, LLC, | : |
| | : |
|    Defendant. | : |

## JAMESON'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

In support of its motion for summary judgment, Defendant Jameson Inns ("Jameson") submits this numbered and supported statement of material facts as to which there is no genuine issue to be tried.

1.  Jameson hired Plaintiff Belinda Stough ("Stough") as a desk clerk at its hotel in Alexander City, Alabama in May 2000 at a wage of $5.75 an hour (Stough Dep. p. 76, l. 22 – p. 77, l. 23; Dft. Exh. 7, Stough Dep.).

2.  The Alexander City property is a 60-room, exterior corridor hotel (Winey Dep. p. 112, ll. 16-18).

3.     The hotel's General Manager ("GM") left in December 2000, and Stough became the acting Assistant General Manager ("AGM") (Stough Dep. p. 80, l. 14 – p. 81, l. 16, p. 83, l. 22 – p. 84, l. 10).

4.     Thereafter Charles Woods, the District Manager ("DM") over the Alexander City property and Stough's direct supervisor, oversaw the running of the property with Stough, visiting the property two or three days a week from his home location in Ozark, Alabama (Stough Dep. p. 84, l. 6 – p. 85, l. 5; Woods Dep. p. 36, l. 10 – p. 37, l. 3, p. 53, l. 5 – p. 54, l. 4, p. 68, ll. 19-23, p. 70, l. 20 – p. 71, l. 12).

5.     During 2001 regions within the company were re-aligned, and Woods no longer had direct responsibility for Alexander City, but upon his recommendation Stough was made interim GM at Alexander City sometime in mid-2001 at an annual salary of $21,000 (Stough Dep. p. 85, l. 6 – p. 88, l. 7; Winey Dep. p. 174, ll. 9-19; Plt. Exh. 16, Winey Dep.; Woods Dep. p. 71, l. 22 – p. 72, l. 19).

6.     GM salaries can vary greatly and are generally determined by the individual's experience, the market where the property is located, and the revenues of the property (Winey Dep. p. 17, l. 14 – p. 24, l. 16).

7.     In mid-2002 Woods re-assumed responsibility for Alexander City and, upon seeing an organizational chart that listed Stough as the

"Interim GM" for that location, he recommended that the "interim" designation be removed and Stough be designated the GM for the hotel, which was done (Woods Dep. p. 74, l. 23 – p. 75, l. 21).

8. Stough's salary remained at $21,000, but she became eligible to receive bonuses based on performance, and she thereafter received some bonuses (Winey Dep. p. 174, ll. 9-15; Plt. Exhs. 8, 9, Winey Dep.).

9. In early 2002, Jameson instituted an indefinite salary freeze company-wide, primarily as a result of the negative effect of the events of September 11, 2001 on travel and tourism (Winey Dep. p. 38, l. 12 – p. 40, l. 3, p. 45, l. 3 – p. 47, l. 3; Plt. Exh. 3, Winey Dep.).

10. During her employment Stough signed a company document entitled "Commitment to Quality," in which Stough acknowledged her duty to ensure that Jameson Inns' high standards of cleanliness and hospitality are met (Stough Dep. p. 55, l. 2 – p. 56, l. 10; Dft. Exh. 6, Stough Dep.).

11. Stough acknowledges that cleanliness is a very important issue at Jameson Inns and that this was a particularly important part of her job when she assumed the GM role (Stough Dep. p. 55, l. 23 – p. 56, l. 10).

12. Greg Winey, Jameson's director of operations, inspected the Alexander City property with Woods when Stough was in charge and

observed that many of the guest rooms were very dirty (Winey Dep. p. 129, ll. 1-10, p. 131, l. 6 – p. 132, l. 23).

13. During that visit, Winey and Woods talked to Stough and showed her the dirty rooms, and Stough agreed there were cleanliness issues with the rooms (Winey Dep. p. 133, ll. 1-7, p. 135, l. 23 – p. 137, l. 7).

14. Jameson inspects its hotels at least once a quarter for cleanliness and general adherence to company standards using a "Product Evaluation" form, and these inspections are referred to in company parlance as "quality assurance" or "QA" reviews (Stough Dep. p. 100, l. 22 – p. 101, l. 9; Winey Dep. p. 48, l. 2 – p. 49, l. 21; Dft. Exh. 10, Stough Dep.).

15. Woods performed a QA review of the Alexander City hotel on March 5, 2003, and the property received a "Needs Improvement" score, primarily due to guest room cleanliness issues (Stough Dep. p. 108, l. 19 – p. 110, l. 14; Dft. Exh. 9, Stough Dep.).

16. Woods performed a follow-up QA review on April 3, 2003, and the property received an "Average" score (Stough Dep. p. 142, l. 20 – p. 143, l. 10; Dft. Exh. 11, Stough Dep.).

17. Woods performed the next quarterly QA review on June 11, 2003, and the property again received a "Needs Improvement" score (Stough Dep. p. 162, l. 12 – p. 163, l. 11; Dft. Exh. 12, Stough Dep.).

18.     On June 17, 2003, Woods placed Stough on a Performance Improvement Plan due to her recent "Needs Improvement" scores and warned Stough that if she continued to exhibit performance deficiencies, her employment was subject to termination (Stough Dep. p. 176, ll. 12-23; Dft. Exh. 15, Stough Dep.).

19.     On the same date Woods issued a reprimand to Stough about being absent from work without notice and warned Stough that further violations could result in her discharge, and he informed her that from then on he expected her to provide him with a weekly work schedule (Stough Dep. p. 167, ll. 7-12, p. 173, l. 16 – p. 174, l. 5; Dft. Exhs. 13, 14, Stough Dep.).

20.     Woods performed another QA review on August 7, 2003, and the property received an "Average" score, with Woods complimenting Stough and her staff on improvements in cleanliness (Stough Dep. p. 178, ll. 2-17; Dft. Exh. 16, Stough Dep.).

21.     Woods performed a quarterly QA review on November 26, 2003, and the property received a "Failure" score due to room cleanliness issues (Stough Dep. p. 181, l. 17 – p. 182, l. 11; Dft. Exh. 17, Stough Dep.).

22. Woods noted in the QA review of November 26 that he had informed Stough he was interviewing for an AGM for the Alexander City property (Dft. Exh. 17, Stough Dep.).

23. Woods performed a follow-up QA review on December 19, 2003, and the property received a "Needs Improvement" score, with Woods noting that there were still too many cleanliness deductions for the property (Stough Dep. 190, ll. 4-16; Dft. Exh. 18, Stough Dep.).

24. On December 29, 2003, Woods issued Stough a "Constructive Action Notice" of unsatisfactory performance due to her QA results, and he warned Stough that failure to improve could result in termination of her employment (Stough Dep. p. 191, l. 23 – p. 192, l. 5; Dft. Exh. 19, Stough Dep.).

25. Stough concedes that, when she received this Constructive Action Notice, she knew her continued employment was in serious jeopardy (Stough Dep. p. 194, l. 15 – p. 195, l. 11).

26. Stough went on vacation during much of January and into early February 2004, and when she returned on February 4, 2004, she found that Woods had hired Mark Fetner as AGM at Alexander City (Stough Dep. p. 158, ll. 1-20; Dft. Exh. 20, Stough Dep.).

27. On February 6, 2004, Woods issued Stough a warning memorandum entitled "Accountability," in which he addressed a number of performance deficiencies, including but not limited to her unacceptable QA scores, and again warned Stough that her employment was at risk (Stough Dep. p. 197, l. 17 – p. 198, l. 4; Dft. Exh. 21, Stough Dep.).

28. On February 14 or 15, 2004, around payday, Stough saw the pay roster and saw that Fetner was receiving the same annual salary as she, i.e., $21,000 (Stough Dep. p. 223, l. 18 – p. 225, p. 2).

29. Stough called Woods to complain about Fetner making the same salary as she, complaining to Woods that she thought that was sexual pay discrimination, and Woods said he did not have time to discuss it right then; that was the extent of the conversation (Stough Dep. p. 224, l. 18 – p. 225, l. 21).[1]

30. Woods had set Fetner's salary without giving any thought to what Stough's salary was (Woods Dep. p. 106, l. 15 – p. 107, l. 16).

31. AGMs are not eligible to receive bonuses (Woods Dep. p. 287, l. 16 – p. 288, l. 9).

32. On February 18, 2004, Woods performed another QA review, and the property received a "Failure" score, whereupon Woods met with

---

[1] Jameson concedes this fact solely for purposes of this motion.

Stough and terminated her employment (Stough Dep. p. 203, l. 7 – p. 204, l. 14; Dft. Exh. 22, Stough Dep.).

33. Upon Stough's discharge, Fetner was promoted to GM at the Alexander City property (Fetner Dep. p. 74, l. 19 – p. 78, l. 2).

34. The company-wide salary freeze was lifted during the second or third quarter of 2004, after Stough's employment was terminated (Woods Dep. p. 110, ll. 12-22).

35. Stough was aware that other female GMs under Woods' supervision were paid more than Stough even though they worked at smaller hotels (Stough Dep. p. 230, l. 18 – p. 235, l. 1; Plt. Exh. 16, Winey Dep.).

36. A number of GMs, both male and female, have been terminated from employment for poor performance (Winey Dep. p. 144, l. 3 – p. 153, l. 9; Woods Dep. p. 113, l. 7 – p. 116, l. 8, p. 121, l. 13 – p. 122, l. 20, p. 126, l. 21 – p. 127, l. 21, p. 128, l. 8 – p. 129, l. 2).

37. Stough thinks Woods had discriminatory animus towards women because: he made a comment that some women can be overemotional and sometimes women overreact; because when she told him an Alexander City employee was pregnant, Woods said he was glad to hear it and that the pregnant employee's breasts would probably get larger; because Woods would hug Stough and others upon arriving and leaving

Alexander City; and because Woods sometimes massaged Stough's shoulders when she was sitting at the computer (Stough Dep. p. 35, l. 23 – p. 36, l. 11, p. 37, ll. 9-18, p. 41, l. 20 – p. 45, l. 23).

38.   Stough never complained to anyone in company management that any of these comments or actions by Woods offended her or made her uncomfortable (Stough Dep. p. 43, l. 17 – p. 44, l. 20, p. 46, l. 18 – p. 47, l. 21, p. 51, l. 8 – p. 54, l. 21; Dft. Exhs. 4, 5, Stough Dep.).

39.   Stough also thought Woods did not like her because she did not like to go to bars and drink and therefore did not "fit in" (Stough Dep. p. 115, l. 3 – p.117, l. 11, p. 154, l. 17 – p. 156, l. 19).

40.   In Stough's opinion, every QA review that Woods conducted on the Alexander City property while she was GM should have received a higher score, and Stough argued with Woods about every QA score she received (Stough Dep. p. 139, l. 15 – p. 140, l. 12, p. 142, ll. 13-16).

41.   Stough thought that her QA scores should have been higher because she receiving passing scores on county health department inspections, but Stough concedes there are differences between Jameson standards and county health standards (Stough Dep. p. 126, l. 17 – p. 127, l. 19, p. 139, l. 4 – p. 140, l. 5, p. 180, l. 14 – p. 181, l. 13).

42.     Stough thought Woods was being nit-picky on her QA reviews because she was a woman, but Stough has pointed to no evidence that any male GMs under Woods' supervision were graded on their QA reviews more leniently or were not disciplined and/or terminated for receiving similarly low QA scores (Stough Dep. p. 113, l. 15 – p. 114, l. 9, p. 125, l. 1 – p. 126, l. 11, p. 133, l. 21 – p. 134, l. 16).

43.     In August 2004 Stough filed a charge of sex discrimination and retaliation with the EEOC, alleging discrimination because of Fetner's AGM salary and retaliation because she complained to Woods about it (Stough Dep. p. 25, ll. 11-18; Dft. Exh. 1, Stough Dep.).

This the twenty-sixth day of May, 2006.

                Respectfully submitted,

                IRVIN, STANFORD & KESSLER, LLP

By:   /s/ Gary R. Kessler
        Alabama Bar No. ASB-0251-L52G
        3060 Peachtree Road, N.W.
        Suite 1050
        Atlanta, Georgia  30305
        404-237-1020 (office)
        404-237-1047 (facsimile)
        gkessler@isklaw.com
        COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

This is to certify that I have this day electronically filed the foregoing *Jameson's Statement Of Material Facts As To Which There Is No Genuine*

*Issue To Be Tried* with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

    Angela J. Hill, Esq.
    Jon C. Goldfarb, Esq.
    Kell Ascher Simon, Esq.
    Maury Steven Weiner, Esq.

This the twenty-sixth day of May, 2006.

                                                          /s/ Gary R. Kessler