FOSHEE & TURNER COURT REPORTERS

---

**Page 1**

1    UNITED STATES DISTRICT COURT
2    MIDDLE DISTRICT OF ALABAMA
3         EASTERN DIVISION
4    CASE NUMBER: 3:05 CV421-W
5    BELINDA STOUGH,
6         Plaintiff,
7         vs.
8    JAMESON INNS, a company
9    owned or operated by
10   KITCHIN HOSPITALITY, LLC,
11        Defendant.
12   DEPOSITION OF BELINDA STOUGH
13        In accordance with
14   Rule 5 (d) of The Alabama Rules of
15   Federal Procedure, as Amended, effective
16   May 15, 1988, I, ELLEN DYE, am hereby
17   delivering to Mr. Gary R. Kessler, the
18   original transcript of the oral testimony
19   taken on the 24th day of February, 2006,
20   along with exhibits.
21        Please be advised that
22   this is the same and not retained by the
23   Court Reporter, nor filed with the Court.

---

**Page 2**

1        S T I P U L A T I O N S
2        IT IS STIPULATED AND
3    AGREED by and between the parties through
4    their respective counsel, that the
5    deposition of BELINDA STOUGH may be taken
6    before ELLEN DYE, Commissioner, at the
7    offices of Wiggins, Childs,
8    Quinn & Pantazis, L.L.C., The Kress
9    Building, 301 19th Street North,
10   Birmingham, Alabama 35203, on the 24th
11   day of February, 2006.
12        IT IS FURTHER STIPULATED
13   AND AGREED that the signature to and the
14   reading of the deposition by the witness
15   is waived, the deposition to have the
16   same force and effect as if full
17   compliance had been had with all laws and
18   rules of Court relating to the taking of
19   depositions.
20        IT IS FURTHER STIPULATED
21   AND AGREED that it shall not be necessary
22   for any objections to be made by counsel
23   to any questions except as to form or

---

**Page 3**

1    leading questions, and that counsel for
2    the parties may make objections and
3    assign grounds at the time of the trial,
4    or at the time said deposition is offered
5    in evidence, or prior thereto.
6        IT IS FURTHER STIPULATED
7    AND AGREED that the notice of filing of
8    the deposition by the Commissioner is
9    waived.
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

**Page 4**

1        I N D E X
2    EXAMINATION BY:        PAGE NUMBER:
3    Mr. Kessler          9 and 292
4    Mr. Goldfarb          290
5
6    DEFENDANT'S EXHIBITS
7    1              25
8    2              35
9    3              48
10   4              40
11   5              51
12   6              55
13   7              77
14   8              78
15   9             108
16   10            139
17   11            142
18   12            162
19   13            167
20   14            173
21   15            176
22   16            177
23   17            181

1 (Pages 1 to 4)

FOSHEE & TURNER COURT REPORTERS

Page 25

1     Q    Okay. The charge of
2  discrimination that you filed with the
3  EEOC?
4     A    Yes, sir, that's correct.
5     Q    In speaking to that
6  charge let me show it to you since I want
7  to ask you a question about it.
8              (Defendant's Exhibit
9              No. 1 was marked
10             for identification.)
11    Q    Ms. Stough, let me hand to you
12 what's been marked as Defendant's Exhibit
13 No. 1 and ask you if that's your
14 signature on the bottom left-hand corner?
15    A    Yes, sir.
16    Q    And this is your EEOC charge?
17 You have to say yes.
18    A    Yes, sir.
19    Q    And weren't you represented by
20 a lawyer at the time that you filled this
21 out?
22    A    Yes, sir.
23    Q    And the lawyer's name was E.

Page 26

1  Paul --
2     A    Jones.
3     Q    E. Paul Jones?
4     A    Yes, sir.
5     Q    Is that correct?
6     A    Yes, sir.
7     Q    In drafting this charge did
8  you work with Mr. Jones?
9     A    Yes, sir, I did.
10    Q    Okay. And Mr. Jones is a
11 lawyer in Alex City?
12    A    He is now the District
13 Attorney.
14    Q    Okay. But then --
15    A    At the time he was, yes, sir.
16    Q    At that time he was a lawyer
17 in Alex City?
18    A    Yes, sir.
19    Q    How long did Mr. Jones
20 represent you?
21    A    Oh, about two years. About
22 two years.
23    Q    In this matter?

Page 27

1     A    About a year.
2     Q    Okay. And then after
3  Mr. Jones stopped being your lawyer then
4  Ms. Hill became your lawyer; is that
5  correct?
6     A    Yes, sir.
7     Q    And then Ms. Hill, does she
8  currently represent you?
9     A    She has currently represented
10 me.
11    Q    I'm not sure when you say she
12 has currently does that mean she does now
13 or she does not?
14    A    She does still. I think she
15 had turned it over to Mr. Goldfarb.
16         MR. GOLDFARB: She's still on.
17 I didn't take her off the pleadings.
18    A    I'm not sure how that went.
19    Q    (BY MR. KESSLER:) I
20 understand. All right. But anyway I
21 guess the EEOC charge was this filed by
22 you or by Mr. Jones on your behalf?
23    A    He asked me to write up a

Page 28

1  letter and to put the information in and
2  just kind of explain to him everything so
3  that he could file the EEOC charge.
4     Q    What do you mean by write up a
5  letter?
6     A    He wanted me to write up and
7  tell him exactly what had happened and
8  why I had felt --
9         MR. GOLDFARB: Be careful to
10 tell what he told you to do. It's all
11 privileged so don't talk about what the
12 lawyer told you to do or what you told
13 the lawyer.
14    A    Okay.
15    Q    (BY MR. KESSLER:) Well, did
16 you write a letter?
17    A    I wrote a letter.
18         MR. GOLDFARB: To your lawyer?
19    A    To the lawyer, correct. To my
20 lawyer.
21         MR. GOLDFARB: So I'm telling
22 you don't tell him what's in the letter.
23    A    Okay.

7 (Pages 25 to 28)

FOSHEE & TURNER COURT REPORTERS

Page 33

1   female?
2       A    I'm sorry?
3       Q    Did you explain in the letter
4   the basis for why you believe you were
5   being discriminated against because you
6   were a female?
7       A    Yes, sir, to the fact that I
8   felt like I was discriminated against
9   because I was a female and I wasn't a
10  male and that I felt like that I wasn't
11  given a fair pay.
12      Q    Did you state any facts or
13  anything in the letter that led you to
14  believe that the reason you were being
15  treated the way you were was because you
16  were a female?
17      A    I don't understand.
18      Q    I know you're saying you
19  believe that you were treated the way you
20  were because you were a female, okay?
21      A    Correct.
22      Q    And my question is did you
23  have any facts in there, any events in

Page 34

1   there upon which you said this
2   demonstrates why I think that I was
3   treated this way because I'm a female?
4       A    I still don't understand
5   exactly what you want. I mean --
6       Q    Maybe I'm not asking the
7   question clearly. I apologize. Other
8   than saying I believe I've been
9   discriminated against because I'm a
10  female and, you know, on the pay issue I
11  think that you know Mark Fetner should
12  not have been paid the same thing, were
13  there any other facts? You know what a
14  fact is?
15      A    Right.
16      Q    Any other facts that you had
17  in the letter that supported your belief
18  that you were being discriminated against
19  because you were a woman?
20      A    Because I was the general
21  manager and he was an assistant manager.
22  I felt like he should not be getting
23  equal pay when he had just come on board

Page 35

1   on the company and I had been there over
2   three and a half, four years.
3       Q    Okay. Fair enough. Any I'm
4   trying to find out what was in the
5   letter. Anything else in the letter?
6           MR. GOLDFARB: That you can
7   recall that's in the letter.
8       A    Other than -- well, to recall
9   what else was in the letter. That
10  basically would have covered it.
11      Q    Okay. I want to make sure we
12  get your best recollection today.
13      A    Yes, sir.
14      Q    Thank you.
15              (Defendant's Exhibit
16              No. 2 was marked
17              for identification.)
18      Q    All right.
19      A    I'm sorry, is there any way
20  that I can add something to the
21  statement?
22      Q    Sure.
23      A    I felt like with the situation

Page 36

1   with me being a female and I felt like
2   that there may have been some
3   discrimination or there was some
4   discrimination because I was a female. I
5   mean I felt like that some remarks to the
6   fact that I was a woman and that
7   sometimes women get over emotional and
8   that we tend to overreact. That was a
9   comment that was made by Mr. Woods and I
10  did put that in there and I did forget
11  that and I apologize.
12      Q    That's okay. I appreciate you
13  adding that.
14      A    I'm just trying to remember
15  because it was so long ago when I had
16  wrote the letter up and I don't have a
17  copy of it.
18      Q    Right. And Mr. Woods made
19  the comment to you and I want to make
20  sure that I get your best recollection.
21      A    Correct.
22      Q    That you're over emotional or
23  that women can be over emotional?

9 (Pages 33 to 36)

FOSHEE & TURNER COURT REPORTERS

Page 37

1    A    Some women can be over
2    emotional.
3    Q    Okay.
4    A    And sometimes that they
5    overreact. And there was other comments
6    that was made to the fact as to a desk
7    clerk, how is your husband, left for
8    Iraq, how is your hammer hanging. A
9    remark was made about one of my desk
10   clerks about she was pregnant. We were
11   having a conversation, myself and
12   Mr. Woods, and we were talking about her
13   being pregnant and that I was excited
14   about her being pregnant and a remark was
15   made about her breasts getting bigger.
16   Charles Woods would come in and he would
17   give us hugs and massage our shoulders
18   and all that was in the letter.
19   Q    Okay.
20   A    And I do apologize. I was
21   trying to sit here and think.
22   Q    Let me go through that. When
23   you claim that he made the comment about

Page 38

1    someone can overreact and be over
2    emotional do you recall what the
3    circumstances were under which that
4    comment was made?
5    A    No, sir. I believe we were
6    having a discussion but I cannot recall
7    exactly what it was about. I know it was
8    in late 2003.
9    Q    And do you recall whether he
10   was talking about you or someone else?
11   A    Pardon?
12   Q    Was he talking about anyone in
13   particular?
14       MR. GOLDFARB: Object to form.
15   A    I'm sorry?
16       MR. GOLDFARB: I objected to
17   the form. Go ahead and answer.
18   A    Okay. If he was talking
19   about me or someone else?
20   Q    (BY MR. KESSLER:) Right.
21   A    Women in particular. I felt
22   like it was me and women in particular.
23   Q    Okay. All right. But you

Page 39

1    don't recall the circumstances of what
2    was -- what the topic was or what was
3    going on or what led to that comment?
4    A    No, sir, I do not.
5    Q    Where did this conversation
6    allegedly occur?
7    A    It was at the hotel, Jameson
8    Inn in Alex City.
9    Q    And you claim that he made the
10   comment how is your hammer hanging?
11   A    He had made that remark to one
12   of my desk staff also.
13   Q    Who is the desk staff person?
14   A    Linda Peppers.
15   Q    Linda Peppers?
16   A    Yes, sir.
17   Q    And how was your hammer
18   hanging?
19   A    Uh-hmm.
20   Q    Do you recall when this
21   statement was allegedly made?
22   A    Oh, it had to have been late
23   2003.

Page 40

1    Q    And is this something you
2    actually heard or is this something
3    Ms. Peppers told you?
4    A    Ms. Peppers had put
5    Mr. Woods on hold and had told me what he
6    had said.
7    Q    Okay. So you didn't actually
8    hear it?
9    A    No, sir.
10   Q    This is Linda Peppers telling
11   you?
12   A    Yes, sir, I did not actually
13   hear it but she got off the phone and she
14   was highly upset.
15   Q    Do you have an understanding
16   as to what how is your hammer hanging
17   means?
18   A    No.
19   Q    Do you think it has some kind
20   of sexual aspect to it?
21   A    Yes, sir. The statement she
22   asked -- was asked was is your husband
23   gone, has he already gone and she said

10 (Pages 37 to 40)

FOSHEE & TURNER COURT REPORTERS

Page 41

1  yes and he said well, I guess, you're
2  kind of lonely and she said, yes, sir,
3  and then the remark was well how is your
4  hammer hanging. I still don't know what
5  that meant.
6      Q    Okay. And what did
7  Ms. Peppers say to you?
8      A    I said well what does that
9  mean and she said it's a sexual comment.
10  I said what do you mean and she said it
11  means like not having sex or to that
12  aspect. I can't exactly remember what
13  she said but it was something to do with
14  sex, a sexual remark, because I had never
15  heard the phrase before.
16      Q    Okay. So, fair enough. Have
17  you ever heard it since then?
18      A    No, sir, not that I'm aware
19  of.
20      Q    And then you said that there
21  was a desk clerk who was pregnant and
22  there was a comment about her breasts
23  getting larger?

Page 42

1      A    Correct.
2      Q    Who was the desk clerk?
3      A    Her name was Christa Foster.
4      Q    And do you know when these
5  comments were allegedly made?
6      A    Early 2003.
7      Q    And who was it who made this
8  comment?
9      A    Mr. Woods.
10      Q    What exactly did he say?
11      A    We were talking on the
12  telephone and I told him, I said Christa
13  is pregnant. I don't remember exactly if
14  I told him the due date or anything like
15  that because I don't remember. And he
16  said well I'm glad to hear that she's
17  pregnant. Is she doing well. I said,
18  yes, sir, and he said my goodness he
19  said -- said to the point where I bet you
20  her breasts are going to get larger and I
21  just said okay and he kind of laughed
22  about it and I said -- and then we gone
23  on to the other conversations with the

Page 43

1  hotel.
2      Q    And was there anything else
3  said about that?
4      A    No, sir.
5      Q    Other than that one comment?
6      A    No, sir, that was the comment.
7      Q    He laughed about it when he
8  said it?
9      A    Uh-hmm, yes, sir.
10      Q    And did you say anything to
11  him in response to that?
12      A    No, sir.
13      Q    Okay. And then you said he
14  gives hugs? He's given you hugs in the
15  past?
16      A    Uh-hmm.
17      Q    What kind of circumstances
18  would he give you hugs?
19      A    When he would come into the
20  property he would give me a hug and when
21  he would leave the property he would give
22  hugs.
23      Q    Would these just be to you or

Page 44

1  to other employees also?
2      A    To me and some of the other
3  female employees, yes, sir.
4      Q    Did that offend you in any
5  way?
6      A    I felt a little
7  uncomfortable. I just didn't feel
8  comfortable with it. I felt very uneasy
9  about it.
10      Q    Did you ever say anything or
11  report it to anyone to complain about it?
12      A    No, sir.
13      Q    I guess that was really two
14  questions. Did you ever say anything to
15  anybody about it?
16      A    No, sir.
17      Q    Did you ever report it to
18  anyone with Jameson Inns that made you
19  feel uncomfortable?
20      A    No, sir.
21      Q    And you said also that
22  sometimes there would be a massage of
23  one's shoulders; is that correct?

11 (Pages 41 to 44)

FOSHEE & TURNER COURT REPORTERS

Page 45

1    A    Yes, sir, that is correct.
2    Q    Would that be of your
3  shoulders or someone else's?
4    A    Mine and some of my desk
5  clerks and my housekeepers.
6    Q    How often do you think -- this
7  was done by Mr. Woods?
8    A    Yes, sir.
9    Q    How often do you think he
10  would massage your shoulders?
11    A    He had done it on a couple of
12  occasions when I would be sitting at the
13  computer.
14    Q    You say a couple?
15    A    A few occasions, yes, sir.
16    Q    Like two, three, four?
17    A    Five, six times. A half a
18  dozen times or so.
19    Q    And that was over what period
20  of time?
21    A    Over the time of my
22  employment. Probably about six months to
23  a year after I had started there.

Page 46

1    Q    You started in 2000, I think?
2    A    May of 2000, yes, sir.
3    Q    So it started in early 2001?
4    A    Pretty much after I went into
5  management with Charles because his self
6  and I were managing the property.
7    Q    And when did you become the
8  general manager?
9    A    I believe late 2000 or early
10  2001.
11    Q    And then you left the general
12  manager position in February of 2004?
13    A    Correct.
14    Q    So that was a span of about
15  three years?
16    A    Three and a half years or so,
17  yes, sir.
18    Q    When he would massage your
19  shoulders about half a dozen times?
20    A    Yes. Some of my employees
21  also.
22    Q    Did you ever complain to
23  anyone in any way within Jameson about

Page 47

1  these shoulders massages?
2    A    No, sir.
3    Q    Did you ever ask Mr. Woods not
4  to massage your shoulders?
5    A    I would kind of just get up
6  and walk away. I didn't want to offend
7  him. I didn't know what to say to him.
8    Q    Okay. So I guess the answer
9  is no?
10    A    Yes, sir. I'm sorry. Yes,
11  sir.
12        MR. GOLDFARB: Object to form.
13    Q    (BY MR. KESSLER:) In any of
14  these situations that you talk  about the
15  over emotional or overreacting or a
16  comment about how your hammer is hanging
17  the comment about the breasts, the hugs
18  or the massages, did you ever complain to
19  anyone within Jameson Inns about any of
20  those instances?
21    A    No, sir.
22    Q    I want to hand you
23  Defendant's No. 2. Is that the

Page 48

1  employment application you filled out
2  with the Jameson Operating Company?
3    A    Yes, sir.
4    Q    And that is your signature on
5  the last page?
6    A    Yes, sir.
7    Q    And everything in here was to
8  the best of your recollection true and
9  accurate?
10    A    Yes, sir.
11    Q    Okay. You weren't trying to
12  puff anything on your resume were you?
13    A    No, sir.
14    Q    You wouldn't do that?
15    A    No, sir. I wanted the job.
16    Q    Right.
17        (Defendant's Exhibit
18        No. 3 was marked
19        for identification.)
20    Q    Let me hand to you
21  what's been marked as Defendant's
22  Exhibit No. 3 and ask you if that's your
23  signature?

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 49

1   A   Yes, sir, it is.
2   Q   All right. And this is an
3 Employee Acknowledgment, right?
4   A   Yes, sir.
5   Q   It's dated May 10, 2000?
6   A   Yes, sir.
7   Q   And it says, "I acknowledge
8 that I have received a copy of the
9 Jameson Operating Company Employee
10 Handbook"?
11   A   Yes, sir.
12   Q   Do you remember when you
13 started working with Jameson in May 2000
14 that you received a copy of the employee
15 handbook?
16   A   Yes, sir.
17   Q   You had a chance to look at it
18 and ask any questions about it?
19       MR. GOLDFARB: Object to form.
20   A   Yes, sir.
21   Q   (BY MR. KESSLER:) There's a
22 general manager's signature. Who was
23 that?

Page 50

1   A   That was William Plummer.
2   Q   He was the general manager
3 when you started working there?
4   A   Yes, sir, he was.
5       (Defendant's Exhibit
6       No. 4 was marked
7       for identification.)
8   Q   Let me hand to you what's
9 been marked as Defendant's Exhibit No. 4,
10 Ms. Stough. Is that also your signature?
11   A   Yes, sir.
12   Q   And that's dated August
13 10, 2000?
14   A   Yes, sir.
15   Q   And it's a document entitled
16 Associate Acknowledgement?
17   A   Yes, sir.
18   Q   And this acknowledges that you
19 received a copy of the Associate
20 Handbook, right?
21   A   Yes, sir.
22   Q   Do you recall receiving it?
23   A   We had one on the property

Page 51

1 that I glanced through at the time that I
2 had come on board and was hired. We were
3 out of the handbooks. Later on Deborah
4 Schwier had ordered some.
5       (Defendant's Exhibit
6       No. 5 was marked
7       for identification.)
8   Q   Let me hand to you what's
9 been marked as the Jameson Employee
10 Handbook and would you agree that this is
11 the handbook that you acknowledged
12 receipt of in Defendant's Exhibit No. 4?
13   A   Yes, sir, it was a smaller
14 version but this was it. This looks like
15 the one that --
16       MR. GOLDFARB: Object to form.
17   A   It was just in a smaller
18 version.
19       MR. KESSLER: To my question or
20 to her answer?
21       MR. GOLDFARB: Your question.
22       MR. KESSLER: That's fine.
23 That's enough.

Page 52

1   Q   (BY MR. KESSLER:) Let me ask
2 you you had a chance to look at this
3 handbook, didn't you?
4   A   Briefly.
5   Q   Whether you looked at it
6 briefly or not you had a chance to look
7 at it as long as you wanted to?
8       MR. GOLDFARB: Object to form.
9   A   Yes, sir.
10   Q   (BY MR. KESSLER:) Okay. Let
11 me ask you to turn to page -- I guess
12 it's after Page 4. It's called Company
13 Policy Statement. Do you see that?
14   A   Yes, sir. It says --
15   Q   Company Policy Statement?
16   A   Page 4.
17   Q   It's right after Page 4?
18   A   Okay. Yes, sir, I see it.
19   Q   And in capital letters on the
20 second paragraph it says, "No member of
21 management is ever too busy to hear
22 problems or complaints from any
23 associate"?

FOSHEE & TURNER COURT REPORTERS

Page 53

1    A    Yes, sir.
2    Q    Do you see that? You had an
3    opportunity to read this page at the time
4    that you reviewed the handbook, didn't
5    you?
6    A    I believe so, yes, sir.
7    Q    And it says if you do not
8    feel -- this is paragraph two on that
9    page. "If you feel that your supervisor
10    has not fairly or satisfactorily handled
11    your situation you may request a meeting
12    with the Regional Manager." Do you see
13    that?
14    A    Yes, sir.
15    Q    Did you ever, whether in
16    response to any of this stuff -- I mean
17    you knew there was a policy that you
18    could complain to somebody within Jameson
19    about any uncomfort that you had, didn't
20    you, regarding any comments or any
21    conduct by Mr. Woods?
22    A    Yes, sir.
23    Q    Okay. And you didn't use that

Page 54

1    policy did you?
2    A    No, sir.
3    Q    Okay. And then let me ask you
4    to turn to and these are unnumbered
5    pages, and I apologize, but it's the
6    policy that's entitled No Harassment
7    Policy. It's maybe ten or twelve pages
8    into the handbook. Do you see it?
9    A    Yes, sir.
10    Q    I think we're looking at the
11    same page. It's entitled No Harassment
12    Policy?
13    A    Yes, sir.
14    Q    You also had a chance to
15    review and read this policy at the time
16    you reviewed the handbook?
17    A    Yes, sir, I do believe so.
18    Q    And you didn't utilize this
19    policy at any time during the time that
20    you were employed by Jameson did you?
21    A    No, sir.
22        (Defendant's Exhibit
23        No. 6 was marked

Page 55

1        for identification.)
2    Q    Let me hand to you,
3    Ms. Stough, a document that's marked as
4    Defendant's Exhibit No. 6 and ask you if
5    that's your signature?
6    A    Yes, sir, it is.
7    Q    And this is a document
8    entitled Commitment To Quality?
9    A    Yes, sir.
10    Q    And in the third
11    paragraph -- well, strike that.
12        Do you recall the
13    circumstances under which you signed
14    this, whether you signed it as an
15    employee or when you became general
16    manager?
17    A    I don't remember.
18    Q    Okay. But regardless of
19    whether you were employed as an employee
20    or the general manager is it fair to say
21    that you were committed to quality?
22    A    Yes, sir.
23    Q    And that Jameson expected you,

Page 56

1    as an employee of Jameson, to be
2    committed to quality?
3    A    Yes, sir.
4    Q    And quality and cleanliness
5    was a very important issue at Jameson
6    wasn't it?
7    A    Yes, sir.
8    Q    And that particularly became
9    true when you were general manager?
10    A    Yes, sir.
11    Q    Go back, if you would, to your
12    employment application which we had
13    marked as Defendant's Exhibit No. 2,
14    please. And if you turn over to the
15    third page I want to ask you a few
16    questions about your pre-Jameson
17    employment.
18    A    All right.
19    Q    You have listed, I guess, the
20    most recent was Holiday Inn Express?
21    A    Yes, sir.
22    Q    And the most distant was
23    Skinners Furniture?

14 (Pages 53 to 56)

FOSHEE & TURNER COURT REPORTERS

Page 73

1    Q    We just a took about a ten,
2    fifteen-minute break. Is there anything
3    you want to change or add to from your
4    testimony earlier this morning?
5    A    No, sir.
6    Q    Okay. I think we were talking
7    about you applying at Jameson?
8    A    Yes, sir.
9    Q    It's kind of the next area
10   that we want to get into. And you said
11   that Bill Plummer wanted you to start as
12   soon as possible because Deborah
13   Schwier --
14   A    Schwier.
15   Q    She was on vacation?
16   A    Yes, sir.
17   Q    And what was the position that
18   you started into?
19   A    Desk clerk position.
20   Q    Okay. Not a supervisor or
21   anything like that?
22   A    No, sir, not at that time.
23   Q    But you said that when you

Page 74

1    worked at the Holiday Inn Express you
2    worked as the front desk manager?
3    A    Yes, sir.
4    Q    When you were front desk
5    manager did you supervise anybody?
6    A    Yes, sir.
7    Q    How many people did you
8    supervise on the average during the time
9    that you were a manager there?
10   A    Between four and six. It
11   would have been the desk staff.
12   Q    And during the time that you
13   worked at Holiday Inn Express did you
14   receive performance evaluations, written
15   performance evaluations?
16   A    No, sir.
17   Q    Were you ever given any kind
18   of warnings or reprimands or anything
19   like that regarding your performance or
20   attendance or anything in that regard?
21   A    No, sir.
22   Q    So, if we looked at your file
23   from the Holiday Inn then it would be a

Page 75

1    clean personnel file?
2    A    Yes, sir.
3    Q    As far as you know?
4    A    As far as I know. At this
5    point, yes, sir it would be.
6    Q    And I think I asked you the
7    following question but I didn't really
8    follow up on it. I think you said that
9    Carol Smith-Barnes was your supervisor at
10   the time that you left the Holiday Inn
11   Express; is that correct?
12   A    That is correct.
13   Q    But you had other supervisors
14   during the time you worked there?
15   A    Yes, sir.
16   Q    And who were the other
17   supervisors?
18   A    Jay Patell.
19   Q    A family member --
20   A    Yes, sir.
21   Q    -- of the Patells?
22   A    Yes, sir.
23   Q    Like son or what was --

Page 76

1    A    He was the brother to the
2    owner's wife.
3    Q    The brother-in-law?
4    A    Yes, sir.
5    Q    Who else supervised you?
6    A    Narandra, he was the owner of
7    the company.
8    Q    Okay.
9    A    And Rohini, she was the
10   owner's wife, R-o-h-i-n-i. She was the
11   owner's wife.
12   Q    And then how long were
13   supervised by Ms. Barnes?
14   A    Oh, gosh, I'm going to say six
15   months.
16   Q    Do the Patells own any other
17   hotels in Alex City?
18   A    No, sir, not right they don't.
19   Q    Did they during the time that
20   you worked at the Holiday Inn?
21   A    No, sir.
22   Q    So you came to Jameson as a
23   desk clerk?

19 (Pages 73 to 76)

FOSHEE & TURNER COURT REPORTERS

Page 77

1    A    Yes, sir.
2    Q    Well, do you recall what your
3    salary was?
4    A    At that time, no, sir, I
5    don't.
6         (Defendant's Exhibit
7         No. 7 was marked
8         for identification.)
9    Q    Let me hand to you,
10   Ms. Stough, what's been marked as
11   Defendant's Exhibit No. 7 and ask you if
12   you've seen this document before?
13   A    Yes, sir.
14   Q    Okay. This is a Personnel
15   Action for Belinda Stough, right?
16   A    Yes, sir.
17   Q    And it says that you're a new
18   hire on May 10, 2000. You were paid
19   5.75 an hour?
20   A    Yes, sir.
21   Q    Does that refresh your
22   recollection?
23   A    That looks correct, yes, sir.

Page 78

1    Q    All right. And so starting
2    out at 5.75 an hour sounded right?
3    A    Yes, sir.
4    Q    Let me hand to you what's been
5    marked as Defendant's Exhibit No. 8 and
6    this is also a Personnel Action Form with
7    your name on it. Have you seen this
8    document before?
9    A    Yes, sir, I have.
10        (Defendant's Exhibit
11        No. 8 was marked
12        for identification.)
13   Q    And this shows a pay raise to
14   6.50 with an effective date of -- excuse
15   me, August 11?
16   A    Yes, sir.
17   Q    Do you know what year this
18   would have been? For example, you
19   started in May?
20   A    Yes, sir. This was in 2002
21   also.
22   Q    Two thousand and --
23   A    I mean -- excuse me. 2000

Page 79

1    rather.
2    Q    So, about three months after
3    you started there you were then increased
4    to 6.50 from 5.75 an hour?
5    A    Yes, sir.
6    Q    Was that the end of your
7    probationary period or introductory
8    period?
9    A    Yes, sir, I believe that's
10   correct.
11   Q    So you made it through that
12   and then you were raised to 6.50 an hour?
13   A    Yes, sir.
14   Q    Still working as a desk clerk?
15   A    Let's see. I believe at this
16   time that Bill had gotten a promotion and
17   he was moving on, I believe, to the Selma
18   property at this time. And I was going
19   to step up and help Deborah with running
20   the property and I believe this is what
21   that was.
22   Q    That was the reason for the
23   pay increase?

Page 80

1    A    Yes, sir. It was like a
2    promotion. Bill had come in and talked
3    with me and spoke to me and asked me that
4    he was moving on and that Deborah is
5    going to be the acting GM and did I have
6    a problem with stepping in and helping
7    her run the property.
8    Q    Okay. So Mr. Plummer was
9    going to Selma?
10   A    I believe it was Selma or
11   don't quote me on that but I believe
12   that's where he had went to Selma,
13   Alabama to run that property down there.
14   Q    Okay. And then the general
15   manager became Deborah Schwier?
16   A    She was the acting general
17   manager, yes, sir.
18   Q    And this facility has sixty
19   rooms?
20   A    Yes, sir.
21   Q    Alex City?
22   A    Yes, sir.
23   Q    And did she ever become

20 (Pages 77 to 80)

FOSHEE & TURNER COURT REPORTERS

Page 81

1  general manager?
2      A    I believe she did.
3      Q    Do you know when she became
4  general manager?
5      A    No, sir, I do not remember the
6  dates.
7      Q    Had you become aware that she
8  became a general manager?
9      A    Pardon?
10     Q    Had you become aware that she
11  became general manager rather than just
12  acting general manager?
13     A    I believe Mr. Woods had come
14  and talked to her about the general
15  manager position because she was the
16  acting general manager at that time.
17     Q    But how did you know that?
18  Did you sit in on the conversation?
19     A    No, sir.  She let me know.
20     Q    So Ms. Schwier?
21     A    Ms. Schwier told me that, yes,
22  sir.
23     Q    And what was your position?

Page 82

1  What was your title after Mr. Plummer
2  left and Ms. Schwier became the acting
3  general manager?
4      A    I guess I could say I was the
5  acting assistant manager with her or
6  acting co-manager because we had been
7  running the property after Mr. Plummer
8  had left.
9      Q    Did you ever see anything in
10  writing from the company or anyone else
11  which said you were either acting
12  assistant general manager or acting
13  co-manager?
14     A    I don't remember.
15     Q    But you're kind of thinking
16  that that's the position -- that's what
17  it ought to be called based on what you
18  were doing?
19     A    Well, I believe Mr. Woods had
20  let the new regional supervisor know that
21  Deborah Schwier and I had been running
22  the property.
23     Q    And how did you know that?

Page 83

1      A    I believe it was on one of our
2  QA's or in a letter.  I don't remember
3  exactly.
4      Q    So there was some document
5  that --
6      A    I remember.
7      Q    Let me finish my question.
8      A    I'm sorry.
9      Q    There's some document that
10  leads you to believe that you were
11  mentioned as one of the people running
12  the property?
13     A    Yeah.  That was what Deborah
14  had told me, yes, sir.
15     Q    Did you actually see the
16  document or is this what Deborah Schwier
17  told you?
18     A    I have never actually seen it.
19     Q    This is what Deborah Schwier
20  told you?
21     A    Right.
22     Q    And then how long did Deborah
23  Schwier stay at the Alex City property?

Page 84

1      A    I believe she left in December
2  of 2000.
3      Q    And then after she left were
4  you promoted or did your position change
5  in some way?
6      A    I became acting assistant
7  manager and around about that time
8  Mr. Woods was the general manager.  He
9  was overseeing my property.  We managed
10  it together at that point.
11     Q    Now, Mr. Woods lived in Ozark?
12     A    Yes, sir, he did.
13     Q    Do you know how far Ozark is
14  in from Alex City?
15     A    About -- I'm going to say
16  about an hour, hour and a half.
17     Q    And would he come up to Alex
18  City periodically?
19     A    Yes, sir.  Anywhere between
20  two and three days a week.  Maybe some --
21  maybe more if I needed him to come up.
22     Q    But often?
23     A    Yes, sir.  He did come on a

21 (Pages 81 to 84)

FOSHEE & TURNER COURT REPORTERS

Page 85

1  weekly basis.
2      Q    And this would have been
3  starting in early 2001?
4      A    Yes, sir, I believe that's
5  correct.
6      Q    And then did there come a time
7  when you became the general manager in
8  Alex City?
9      A    Yes, sir.
10     Q    And when did that happen?
11     A    I'm going to say mid 2001. I
12 may be off on my dates but I believe
13 that's when it was.
14     Q    For example on 9-11 were you
15 the general manager?
16     A    Yes, sir, I was.
17     Q    And who promoted you into the
18 general position manager?
19     A    Paul Comanecky and Hal Smith.
20     Q    What position did
21 Mr. Comanecky have with Jameson?
22     A    He was the district manager in
23 Region 1.

Page 86

1      Q    Was Alex City in Region 1?
2      A    We had been put in Region 1.
3  We had been in Region 2 and they
4  dissolved Region 2 and combined Region 2
5  into Region 1.
6      Q    And so was Mr. Woods the
7  district manager over Alex City at that
8  time?
9      A    When we went from Region 1
10 into Region 2, yes, sir.
11     Q    But at the time you were
12 promoted to general manager was he the
13 district manager over Alex City?
14     A    I do not remember but I do not
15 think so at that time he wasn't. He had
16 taken over the Ozark property.
17     Q    So, you just don't recall?
18     A    I just can't remember exact
19 dates. I know at one point he wasn't and
20 then he was.
21     Q    Well, do you know whether he
22 had anything to do with your promotion?
23     A    Yes, sir, he did.

Page 87

1      Q    What did he have to do with
2  it?
3      A    He recommended me for the
4  position.
5      Q    Mr. Woods did?
6      A    Yes, sir.
7      Q    And what kind of role, if
8  any, did Hal Smith have regarding your
9  promotion?
10     A    He was the regional manager.
11     Q    Do you know who Mr. Woods
12 recommended you to for the promotion to
13 general manager?
14     A    I believe it was to Hal Smith
15 and Paul Comanecky and he had recommended
16 me for the acting GM at that point.
17     Q    So did he recommend you for
18 acting GM or for GM or both?
19     A    Both basically because I had
20 to -- I was on a six months -- I believe
21 six months probation.
22     Q    So for six months you were
23 acting GM?

Page 88

1      A    I was under review, yes, sir
2  for GM.  Then I was promoted to GM.
3      Q    So that I understand for six
4  months you were acting GM?
5      A    Right, with Charles.
6      Q    With Charles Woods?
7      A    Correct.
8      Q    Okay.  And then after that
9  it's your understanding he recommended
10 you for general manager?
11     A    Correct.
12     Q    So this would have been in mid
13 2001 when he recommended you for general
14 manager or acting manager?
15     A    General manager.
16     Q    So you had already been acting
17 general manager for about six months at
18 that time?
19     A    I believe that's correct, yes,
20 sir.
21     Q    I want to talk about your
22 functions as a general manager.
23     A    Okay.

22 (Pages 85 to 88)

FOSHEE & TURNER COURT REPORTERS

Page 97

1  that you were general manager?
2  A    No, sir.
3  Q    Okay.  But eventually there
4  came to be an assistant general manager
5  named Mark Fetner who worked there during
6  that time that you were there, wasn't
7  there?
8  A    That's correct.
9  Q    The last three or four weeks?
10  A    About, yes, sir, about the
11  lasts two weeks of my employment.
12  Q    You didn't have anything to do
13  with him being hired did you?
14  A    No, sir.
15  Q    And during the time that the
16  two of you all worked together,
17  Mark Fetner and you, did y'all get along?
18  A    Somewhat.
19  Q    What do you mean "somewhat"?
20  A    There was some problems there.
21  Q    So what were the problems from
22  your viewpoint?
23  A    Well, we had a problem with

Page 98

1  the fact is that he dictated what he was
2  going to work and what he wasn't going to
3  work.
4  Q    Well, he came in the latter
5  part of January 2004 didn't he?
6  A    Yes, sir, I guess so.  I knew
7  nothing about him.  I was never told that
8  there was one hired until I met him.
9  Q    He was hired as far as you
10  know by Mr. Woods?
11  A    Yes, sir, I assume.
12  Q    And during the time that you
13  were general manager was there a slot
14  open for an AGM, assistant general
15  manager?
16  A    Yes.
17  Q    A budgeted position?
18  A    Yes, sir.
19  Q    So you could have hired one?
20  A    No, sir.
21  Q    Well, if there was a slot and
22  it was budgeted why could you not have
23  hired one?

Page 99

1  A    Mr. Woods said he was going to
2  do that.
3  Q    When did he first tell you
4  that he was going to hire an assistant
5  general manager?
6  A    I don't remember the exact
7  date but I had asked for one on several
8  occasions.
9  Q    And so didn't he tell you a
10  couple months before Mr. Fetner was hired
11  that he was going to hire an assistant
12  general manager?
13  MR. GOLDFARB: Object to form.
14  A    He told me he was looking for
15  one.  I submitted several of my
16  employees' names for the position because
17  they knew the property and I felt like
18  they would have -- we would have worked
19  well together because we were working
20  together and he said that he was going to
21  find one.  I said, well, can I be a part
22  of making that decision and he said he
23  was going to hunt and hire the assistant

Page 100

1  manager.
2  Q    Did you have a problem with
3  that?
4  A    I did.
5  Q    What was the problem?
6  A    That I felt like if that
7  person was going to be working with me
8  then I should have some say so in who
9  that person should be.
10  Q    Well, the fact is at the time
11  that Mr. Woods talked to you about hiring
12  an assistant general manager you had
13  received some less than satisfactory QA
14  evaluations, hadn't you?
15  MR. GOLDFARB: Object to form.
16  A    Yes, sir, but I feel like it
17  was done unfairly.
18  Q    (BY MR. KESSLER:) Well, let's
19  look at them, okay?
20  A    Okay.
21  Q    See what you have to say.
22  Now, as your supervisor, Mr. Woods, he
23  was the district manager and when he

25 (Pages 97 to 100)

FOSHEE & TURNER COURT REPORTERS

Page 101

1  would come into, for example, the
2  Alex City facility to do a QA evaluation
3  he would do it about once a quarter
4  wouldn't he?
5      A    Yes, sir, once a quarter.
6      Q    So once about every three
7  months or so he would come in and
8  evaluate your facility?
9      A    That's correct.
10     Q    When he would be doing the
11 evaluation you would go around with him
12 and see what he was doing?
13     A    That is correct.
14     Q    And so certainly that was
15 your -- that was kind of a check that you
16 were able to have to make sure that he
17 was giving you a fair evaluation?
18     A    Correct.
19         MR. GOLDFARB: Object to form.
20     A    Correct.
21     Q    (BY MR. KESSLER:) And every
22 evaluation that he gave you of your
23 facility you actually went around with

Page 102

1  him, isn't that correct?
2      A    That's correct.
3         MR. GOLDFARB: Object to form.
4         MR. KESSLER: She already
5  answered.
6      A    Well, there was -- I can --
7         MR. GOLDFARB: Well --
8         MR. KESSLER: Counsel, let's
9  not coach the witness.
10        MR. GOLDFARB: I didn't coach
11 her. Don't accuse me of something I
12 didn't do and let her answer the
13 question.
14        MR. KESSLER: Well, she had
15 already answered the question.
16        MR. GOLDFARB: I didn't coach
17 her and she's answering your question.
18 If you don't want her to answer the
19 question that's in the deposition then do
20 something else. Answer the question.
21        MR. KESSLER: Let's not coach
22 the witness.
23        MR. GOLDFARB: I'm not coaching

Page 103

1  her. Don't accuse me of coaching her.
2  Have him stop glaring at her and
3  intimidating her and making her upset.
4  He is staring at her and glaring at her
5  and she is getting upset and it's very
6  hard for her to concentrate with the way
7  he's behaving.
8         MR. WOODS: I haven't.
9         MR. KESSLER: He's not done
10 anything and --
11        MR. GOLDFARB: I'm telling you
12 I've been watching him. She keeps asking
13 me on the breaks is there any way we can
14 make him stop. I say said stop looking
15 at her.
16        MR. KESSLER: Do you want him
17 to look somewhere else?
18        MR. GOLDFARB: He's doing this
19 and hitting with his pen and all. It's
20 upsetting her.
21        MR. KESSLER: Well, we don't
22 need to upset the witness at all.
23        MR. GOLDFARB: Absolutely. She

Page 104

1  needs to be able to recall as best she
2  can and make it as comfortable as you
3  can. You're being very nice and I
4  appreciate it.
5         MR. WOODS: I am trying to be
6  nice.
7         MR. GOLDFARB: You might not be
8  doing it intentionally. For whatever
9  reason it's upsetting her.
10     Q    (BY MR. KESSLER:) Go ahead. I
11 was asking you a question -- I asked you
12 the question of you went around and you
13 were with Mr. Woods every time he gave
14 you an evaluation and you said yes. Your
15 counsel made a comment and now are you
16 changing your answer?
17     A    No, sir. That is correct
18 except for the last evaluation.
19     Q    Did you go around with him
20 then?
21     A    No, sir, I did not.
22     Q    Did you have an opportunity to
23 go around with him?

26 (Pages 101 to 104)

FOSHEE & TURNER COURT REPORTERS

Page 105

1    A    No, sir, I did not.
2    **Q    Why not?**
3    A    He come on the property and he
4    said he was going to do a QA inspection
5    and I said well, I don't have anybody to
6    cover the front desk. He said that's
7    okay I will do it by myself.
8    **Q    Okay. So, you had an**
9    **opportunity to go with him but you**
10   **didn't?**
11   MR. GOLDFARB: Object to form.
12   A    No, sir
13   MR. GOLDFARB: Knock it off.
14   You cut her off. She didn't finish.
15   MR. KESSLER: Can I say what
16   I'm going to say without you interrupting
17   me?
18   MR. GOLDFARB: Go ahead.
19   MR. KESSLER: Every time I ask
20   a question that you get nervous about you
21   make some kind of comment about, you
22   know, objection to form or something like
23   that which I would appreciate it --

Page 106

1    MR. GOLDFARB: I can certainly
2    object to anything that I want to object
3    to.
4    MR. KESSLER: You can object.
5    MR. GOLDFARB: If you want an
6    explanation to the problem with the form
7    I will give it to you.
8    MR. KESSLER: Jon, I know
9    exactly what you're doing so go ahead and
10   answer the question.
11   A    Okay. The day he come in to
12   do the QA inspection on February 18th I
13   told him I did not have desk coverage to
14   let me get a desk clerk in there. He
15   said it is not necessary. I'm going to
16   do this inspection by myself. And that
17   was not normal company policy from my
18   understanding. And he went around. I
19   was not with him. I don't know what
20   rooms he went to, what inspections he
21   did, what he did but normally an
22   inspection would take two to two and a
23   half days. Within about two, three hours

Page 107

1    he was finished with the inspection.
2    **Q    Your testimony is that a**
3    **normal inspection is two to two and a**
4    **half days?**
5    A    Yes, sir, that's correct.
6    **Q    Okay. So, the last inspection**
7    **where you say you didn't have a chance to**
8    **go around and inspect and it took only**
9    **several hours to do the inspection did**
10   **you ever complain to anybody within the**
11   **company about this allegedly unfair**
12   **inspection?**
13   A    No, sir, because I was fired
14   that day.
15   **Q    But as a result of being**
16   **terminated did you ever complain to**
17   **anybody within the company about the**
18   **termination?**
19   A    Well, I mean I was fired so I
20   didn't know who I could complain to at
21   that point.
22   **Q    Did you ever -- my question**
23   **was --**

Page 108

1    MR. GOLDFARB: Just answer his
2    question.
3    A    I'm kind of confused. I'm not
4    sure.
5    **Q    (BY MR. KESSLER:) Listen to my**
6    **question. Did you ever complain to**
7    **anybody within the company as a result of**
8    **the unfair inspection that you claim you**
9    **received on or about February 18, 2004?**
10   A    No, sir.
11   **Q    Thank you. So other than that**
12   **one, other than that inspection you went**
13   **around with Mr. Woods on every**
14   **inspection, is that accurate testimony?**
15   A    Yes, sir.
16   (Defendant's Exhibit
17   No. 9 was marked
18   for identification.)
19   **Q    Let me hand to you what's**
20   **been marked as Defendant's Exhibit No. 9**
21   **and this purports to be a product**
22   **evaluation of the Alex City facility on**
23   **March 5, 2003, and my question is going**

27 (Pages 105 to 108)

FOSHEE & TURNER COURT REPORTERS

Page 109

1  to be have you seen this document?
2      A    If this document says 3-5 of
3  '05 but it was -- it looked like '03.
4      MR. GOLDFARB: Gary, when
5  you're asking this are asking has she
6  seen it since you gave it to me?
7      MR. KESSLER: I will clarify
8  that.
9      Q    Have you seen this document
10  before?
11     A    I wasn't employed in
12  two -- whatever. Let's see. I guess
13  it's supposed to be 2003.
14     Q    If you look at the signature
15  date on the bottom --
16     A    Okay.
17     Q    -- it's 2003.
18     A    It is 2003.
19     Q    As we know sometimes we write
20  dates down wrong?
21     A    Correct.
22     Q    So on March 5,
23  2003 -- incidentally on Defendant's -- my

Page 110

1  question was have you seen this document
2  before?
3      A    Yes.
4      Q    Okay. And this is the QA
5  evaluation of Alex City, right?
6  Is that a yes?
7      A    Yes, sir.
8      Q    And the score was needs
9  improvement?
10     A    Yes, sir.
11     Q    Do you recall receiving a
12  needs improvement in March 5, 2003 for
13  the Alex City facility?
14     A    Yes, sir.
15     Q    Okay. And the signature at
16  the bottom is whose, do you know?
17     A    I guess that's --
18     MR. GOLDFARB: Don't guess.
19     A    I don't know. Greg Whiney.
20     Q    (BY MR. KESSLER:) Okay. You
21  don't know whose it is?
22     A    No, I really don't.
23     Q    All right. Now, after you

Page 111

1  have a QA evaluation would you be given a
2  copy of the QA?  Standard procedure was
3  to give you a copy of the QA evaluation?
4      A    Yes, sir.
5      Q    So you knew exactly what had
6  to be done to improve the facility?
7      A    Yes, sir.
8      Q    So, for example, if we turn to
9  the third page of March 5, 2003 it has a
10  list of major operational deficiencies.
11  Do you see that?
12     A    Yes, sir.
13     Q    And this is a list of items
14  that need to be repaired by the target
15  date of completion?
16     A    Yes, sir.
17     Q    Is that correct? Okay. The
18  list that we have here in the March 6,
19  2003 QA evaluation do you consider this
20  to be a long list or a short list or a
21  normal list of major operational
22  deficiencies?
23     MR. GOLDFARB: Object to the

Page 112

1  form.
2      A    I don't know how to answer
3  that because some of them can be shorter.
4  Some of them can be longer.
5      Q    (BY MR. KESSLER:) Okay. Well,
6  you're the general manager at this time.
7  I'm wondering what was your impression
8  about this list of major operational
9  deficiencies. Did this strike you as
10  maybe there were some problems in the
11  Alex City facility?
12     A    A lot of these had to be
13  addressed with capital issues such as
14  plants and things like that that come
15  into our capital budget. As far as the
16  computer that would have fallen under
17  capital budget, which is money that we
18  requested to buy these new major things
19  like a computer and things like that.
20  These are things that was just --
21     Q    Was that within your
22  responsibility?
23     A    On capital budget -- well, on

28 (Pages 109 to 112)

FOSHEE & TURNER COURT REPORTERS

Page 113

1  the capital budget you did it from year
2  to year but, yes, this was within my
3  responsibility.
4      Q    Turn over to the next page.
5  Capital deficiencies?
6      A    Yes, sir.
7      Q    Okay. That's what you're
8  talking about?
9      A    Capital items, yes, sir.
10     Q    So the major operation
11 deficiencies, weren't you, as a general
12 manager, responsible for minimizing the
13 number of major operational deficiencies?
14     A    Yes, sir.
15     Q    And with the needs improvement
16 score at the Alex City facility received
17 on March 5, 2003 when you were general
18 manager did you think this evaluation was
19 unfair in any way?
20     A    Yes, I did.
21     Q    What was unfair about it?
22     A    I just felt like there was a
23 lot of things that it was just my

Page 114

1  property was nit-picked. There was
2  things that we -- Mr. Woods and I
3  discussed and I argued with him about
4  that I felt like was unfair.
5      Q    So you thought that he
6  nit-picked the property and that he was
7  unfair?
8      A    Yes, sir, I do. And we argued
9  quite often about that issue.
10     Q    Okay. How long had you been a
11 general manager at that time?
12     A    Two years.
13     Q    Do you know how long Mr. Woods
14 had been in the business at that time?
15     A    No, sir. I know he had been
16 with the business awhile.
17     Q    And do you have any opinion as
18 to why he nit-picked your property?
19     A    Let me think about that
20 question a minute.
21         MR. GOLDFARB: Object to form.
22     A    I don't know how you want me
23 to answer that.

Page 115

1      Q    (BY MR. KESSLER:) I just want
2  you to answer truthfully.
3      A    I just felt like that I was
4  being picked on because of the fact of
5  being a woman. And I felt like I did not
6  fit in the little group and the little
7  clicks because there was things that I
8  did not do. There was things that I did
9  not agree with within the company, within
10 our district. I felt as a woman I was
11 being discriminated against. I felt like
12 I was being picked on. I felt like
13 nothing I did was good enough.
14 And I felt this way because of
15 conversations that we had. There were
16 remarks made that some women can't handle
17 the work. They need to be home and be
18 mothers. I just felt like I didn't
19 belong. I felt like I did not fit
20 because I didn't fit into the little
21 clicks. I didn't participate in things
22 that I did not agree with such as when we
23 had managers meetings. A lot of the

Page 116

1  managers, district managers in our
2  district would get together and go
3  drinking and things and I didn't do that
4  kind of stuff and I just felt like I
5  was -- I didn't fit. I didn't belong and
6  I was being discriminated against because
7  of that fact that I was a woman and that
8  I did not participate in things that I
9  did not agree with.
10     Q    Any other reasons why you
11 believe you were being picked on or
12 discriminated against because you were a
13 woman?
14     A    Yes, sir. Incidents happened
15 that we were in Eufala, Alabama and we
16 were at a district manager's meeting. We
17 were getting ready to leave that
18 afternoon and one of the other managers
19 and myself were walking through the
20 hallway or the breezeway there and she
21 grabbed me by my shoulder and got me back
22 and she said Charles and Betty are
23 standing by the truck and she just kissed

29 (Pages 113 to 116)

FOSHEE & TURNER COURT REPORTERS

Page 117

1　him. And I said wait a minute I want to
2　see and I leaned over and I did not see
3　him kiss her but I did see them close
4　together.
5　　Q　It's Betty Sutton?
6　　A　Yes, sir. I'm sorry I did not
7　know the last name. And I just feel like
8　that I just didn't fit because I didn't
9　do things that were inappropriate. I
10　didn't drink. I didn't go to bars. I
11　didn't do that kind of stuff.
12　　Q　Any other reasons why you
13　believe that you were picked on because
14　you were a female?
15　　A　The pay.
16　　Q　Okay.
17　　A　The discrimination on the pay
18　due to the fact that is when Mark Fetner
19　came there he made the same pay I did. I
20　was a manager. He was an assistant
21　manager. And later on I did find out in
22　talking with my attorney that --
23　　　MR. GOLDFARB: Don't tell him

Page 118

1　what I said.
2　　A　Okay. I seen the document --
3　　　MR. KESSLER: It won't be in
4　evidence then.
5　　A　I'm sorry. I seen the
6　documents of the pay roster and I seen
7　where there was male managers in our
8　district that was making higher pay that
9　had come to work later than I did.
10　　Q　Did you see also that female
11　managers were making more than you?
12　　A　I seen that Ms. Sutton made
13　more than I did.
14　　Q　Did you see that Ms. Ellis
15　made more than you did?
16　　A　Ms. Ellis made more but she
17　made less than what Ms. Sutton made and I
18　feel that had --
19　　Q　Had to do with what?
20　　A　The relationship with Charles
21　and Ms. Sutton.
22　　Q　So you believe that based on
23　by seeing them close together on an

Page 119

1　occasion and who was this woman who you
2　were with?
3　　A　Excuse me. Ms. Ellis.
4　　Q　Ms. Ellis said that they
5　kissed and you believe that because of
6　this -- what you believe was a
7　relationship between Charles Woods and
8　Betty Sutton that's why you made less
9　money?
10　　A　I believe there was a
11　relationship that I did not have with
12　Charles that she had with Charles. There
13　were occasions that she came to my
14　property when Charles was on my property
15　and that I did not understand why she
16　came to the property but there were
17　several occasions that she did. I feel
18　like that I was discriminated against
19　because I didn't have that kind of a
20　relationship with him.
21　　Q　What other kind of facts do
22　you believe there are which demonstrate,
23　in your view, that you were being treated

Page 120

1　differently or discriminated against
2　because you were a woman?
3　　A　Remarks. Like I said before
4　the remarks about some women can't handle
5　the work force. They need to stay home
6　and be mothers. Some of the other
7　remarks I had had made previously. Just
8　things changed. After I went to work
9　there things changed. I don't know
10　exactly why. When I first went to work
11　there things went great. All of a sudden
12　things changed and I feel like it had to
13　do with the fact that I'm a female and I
14　felt like I was discriminated against pay
15　wise. It just come to the point that it
16　became a hostile work environment and I
17　feel that's all to do with the fact that
18　I'm a female and I made a remark to
19　Mr. Woods about the reason why I was
20　fired is because I felt like that I was
21　being discriminated against in pay
22　because I was a female and Mr. Fetner was
23　a male and he was making the same amount

30 (Pages 117 to 120)

FOSHEE & TURNER COURT REPORTERS

Page 125

1    Q    So it was after Mr. Woods
2    became your district manager a second
3    time -- did it continue good for a while
4    and then change or did it immediately
5    change?
6    A    The problems started
7    occurring.
8    Q    As soon as he became your
9    general manager or district manager a
10   second time?
11   A    Pretty much, yes, sir.
12   Q    Any ideas as to what caused
13   that change?
14   A    No, sir, I don't.
15   Q    And how did he conduct himself
16   differently which led you to believe that
17   there was a change in the relationship?
18   What did he say or do or how did he act
19   differently?
20   A    Just remarks and come in with
21   the QA inspections. And I just felt like
22   he was being nit-picky. There was a lot
23   of situations like I said that we would

Page 126

1    have serious discussions about my QA.
2    There was a lot of times that him and I
3    would literally argue. I would literally
4    argue with him and just give him my point
5    of view that I felt like that he was
6    being nit-picky about things, things that
7    I felt like that should not have been
8    because they were right. I just felt
9    like there were a lot of the QA
10   inspections were totally, totally,
11   totally, wrong.
12   Q    All right. So, let's look at
13   Defendant's No. 9 that you have in front
14   of you. Can you give us any examples of
15   why you think you should not have
16   received a needs improvement evaluation?
17   A    Yes, sir. For one thing I
18   would on my QA -- on my health
19   inspections the health inspector would
20   come in. He would inspect two to four
21   rooms. He would inspect my breakfast
22   area, the hotel area in general, the
23   guest service area, which would have been

Page 127

1    the lobby and all that and I would score
2    100 with the Health Department.
3    Q    That's the County Health
4    Department?
5    A    Yes.
6    Q    Do you know whether Jameson
7    has higher standards than the County
8    Health Department?
9    A    As in cleaning issues and
10   things like that? Well, I would think
11   they would be the same because they go in
12   and inspect just like a QA inspector
13   would do.
14   Q    My question is do you know
15   whether they're the same? Do you know
16   whether Jameson has higher standards than
17   the County health inspector?
18   A    No, sir, I can't answer that
19   because I don't know.
20   Q    So you just don't know the
21   standard that Jameson was following
22   versus the County health inspector do
23   you?

Page 128

1    A    I know that the County health
2    inspector's standards were clean
3    efficient rooms. He checked mattresses,
4    He checked pillows. He checked bathroom
5    areas, the guest areas. He checked the
6    breakfast bar making sure all the food
7    was prepared properly. He checked the
8    public restroom which we really didn't
9    have a public restroom but it was in the
10   office. He checked cleanliness in the
11   office, cleanliness on the property in
12   general. He checked like the QA's, the
13   smoke detectors in the room. He was
14   very, very thorough.
15   Q    How often would the County
16   health inspector come by?
17   A    About once every six months.
18   Maybe a little more. Maybe a little
19   less. According to how backed up they
20   were.
21   Q    Any idea why Kitchin would
22   even have spent the time for an
23   inspection program if they could just

32 (Pages 125 to 128)

FOSHEE & TURNER COURT REPORTERS

Page 133

1    Q    (BY MR. KESSLER:) Well, how
2  long -- your counsel can ask you that
3  question.
4          How long did you keep
5  your mother on the payroll as the
6  housekeeping supervisor?
7    A    She was there a year or so.
8    Q    A year or so?
9    A    Yes, sir. I can't give you
10 exact dates because I don't remember.
11   Q    Well, was she working there at
12 the time that you left?
13   A    Yes, sir, she was.
14   Q    And I think you said you hired
15 her earlier in your testimony. I think
16 you said Theresa Gabbard in 2002
17 sometime?
18   A    I believe it was in 2002 she
19 came to work. It may be a little earlier
20 but I'm going to say 2002, yes, sir.
21   Q    So most of the time you were
22 general manager your mother was the
23 housekeeping supervisor?

Page 134

1    A    Yes, sir.
2    Q    And so you thought that
3  Mr. Woods is being nit-picky and critical
4  about the cleanliness of the rooms that
5  were being supervised by your mother, is
6  that right?
7    A    I am saying that it was --
8    Q    Answer my question and then
9  you can explain.
10   A    Yes, sir.
11   Q    You thought that Mr. Woods was
12 being nit-picky about being critical of
13 the rooms being cleaned by people who
14 were reporting to your mother, is that
15 right?
16   A    That's correct.
17   Q    Now, you can explain.
18   A    When my mother was on as the
19 housekeeping supervisor and she was in my
20 staff if she did something wrong, if
21 there was something out of order she was
22 corrected for it even though she was my
23 mother.

Page 135

1    Q    You would correct your mother?
2    A    Yes, sir, I did.
3    Q    At the same standard and the
4  same level as other people?
5    A    Yes, sir, I did. If she done
6  something wrong she was corrected for it.
7    Q    Understood. Okay. Anything
8  else you want to say about supervising
9  your mom?
10   A    As me supervising my mom?
11   Q    Yes.
12   A    No, sir. If I told her to do
13 something she did do it. Again, I will
14 say if there was a problem she was
15 corrected on it. She fixed it.
16   Q    Did you have any other
17 relatives working at the Jameson Inn
18 facility in Alex City other than your
19 mom?
20   A    No, sir.
21   Q    And no cousins, no in-laws,
22 nothing like that?
23   A    No, sir.

Page 136

1    Q    During the entire time you
2  worked there?
3    A    Yes, sir.
4    Q    So, you thought that this
5  evaluation, Defendant's No. 9, was
6  unfair?
7    A    Yes, sir.
8    Q    Okay. Now, the two earlier
9  evaluations that you had received from
10 Mr. Woods were rated average. Do you
11 recall those?
12   A    Yes, sir.
13   Q    Did you have any complaints
14 about receiving an average evaluation?
15   A    Yes, sir.
16   Q    You thought you were better
17 than that?
18   A    Yes, sir.
19   Q    How good do you think you
20 were?
21   A    I feel like I was above
22 average.
23   Q    Okay. You never did receive

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 137

1  an above average evaluation from anybody
2  during the time that you worked for
3  Jameson did you?
4      A    I cannot remember the store
5  that Mr. Comanecky had given me on a QA
6  inspection but I believe it was I'm going
7  to say it was an above average.
8      Q    Now, as a result of this
9  nit-picky unfair evaluation which you
10  received which has been marked as
11  Defendant's No. 9 did you ever complain
12  to anybody within Jameson, any Human
13  Resources or the regional manager or the
14  VP of operations or anybody concerning
15  this evaluation?
16      A    No, sir. I just complained to
17  Charles and we argued about it.
18      Q    In any of the evaluations that
19  you received during the time that you
20  worked for Jameson, which you now tell us
21  you believe were unfair, did you ever
22  complain to anybody internal within the
23  company?

Page 138

1      A    No, sir, because Charles was
2  my supervisor and i felt like that -- I
3  just felt like I didn't know who to talk
4  to. I didn't know because I wanted my
5  job. I wanted to keep my job and I just
6  didn't feel comfortable.
7      Q    Let me ask you to turn to the
8  Employee Handbook again. And we looked
9  at this earlier, Company Policy
10  Statement. This is after Page 4. And it
11  says in the second paragraph, "If you
12  feel that your supervisor has not fairly
13  or satisfactorily handled the situation
14  you may request a meeting with the
15  regional manager." Do you see that?
16      A    Yes, sir.
17      Q    And then it says that if
18  that's not satisfactory you can go to the
19  Human Relations Manager. Do you see
20  that?
21      A    Yes, sir.
22      Q    You never did that did you?
23      A    No, sir.

Page 139

1          (Defendant's Exhibit
2           No. 10 was marked
3           for identification.)
4      Q    Let me hand to you,
5  Ms. Stough, what's been marked as
6  Defendant's Exhibit No. 10 and ask you if
7  you have seen this evaluation before?
8      A    Yes, sir.
9      Q    It's an average evaluation?
10      A    Yes, sir.
11      Q    And this was -- well,
12  certainly it was early in the March 5,
13  2003 you received an average --
14      A    Yes, sir.
15      Q    You believe this was unfair
16  also?
17      A    Yes, sir. I felt like I
18  deserved better than that.
19      Q    Do you have anything you can
20  show us, any kind of documentation or
21  anything that would support your opinion
22  that you believe that you were better
23  than average?

Page 140

1      A    No kind of documentation other
2  than what should still be on the wall of
3  Jameson Inn which would have been
4  inspection reports by the Health
5  Department.
6      Q    Got you. Okay. Anything
7  other than that?
8      A    Other than arguing with
9  Mr. Woods which we did every time.
10      Q    Okay.
11      A    I felt like it was unfair and
12  I would tell him so.
13      Q    Okay. But I guess you never
14  wrote it down anywhere or said hey I
15  really think I'm being treated unfairly
16  or anything like that? I mean here we
17  are almost four years later and you're
18  saying we thought that you were better
19  than this evaluation and we're trying to
20  find out, you know, how can you
21  demonstrate that to us?
22      A    I spoke with Mr. Woods about
23  it. I told him I felt like it wasn't

35 (Pages 137 to 140)

FOSHEE & TURNER COURT REPORTERS

Page 141

1    right. I felt like we deserved better
2    because I maintained a very clean
3    property. I never had -- I had very few
4    guest complaints about cleanliness issues
5    and things to that nature. We have a
6    policy or, excuse me, Jameson Inn has a
7    policy, a perfect stay. If you do not
8    have a perfect stay you refund that
9    guest's money. We had very few of them
10    because I had a clean property. I took
11    care of my guests. My staff took care of
12    my guests. I prided myself in that.
13       Q    Do you have any reason to
14    believe that Mr. Woods didn't genuinely
15    believe that he was doing the best job he
16    could on the evaluation, Defendant's No.
17    9 or 10?
18       MR. GOLDFARB: Object to form.
19    A    Can you rephrase that?
20       Q    (BY MR. KESSLER:) Do you have
21    any reason to believe that Mr. Woods was
22    not trying to do the best job he could in
23    giving these evaluations whether y'all

Page 142

1    had a disagreement or not?
2       MR. GOLDFARB: Object to form.
3    A    I don't feel I can answer that
4    because I can't speak for him.
5       Q    (BY MR. KESSLER:) So you
6    don't know whether -- for all you know he
7    probably was trying to do the best job he
8    could do on these?
9       MR. GOLDFARB: Object to form.
10    A    I can't answer that because I
11    can't speak for him.
12       Q    (BY MR. KESSLER:) That's fair
13    enough. Did he ever give you a QA
14    evaluation at your facility that, in your
15    view, was good enough?
16    A    No.
17          (Defendant's Exhibit
18          No. 11 was marked
19          for identification.)
20       Q    Let me hand to you,
21    Ms. Stough, what's been marked as
22    Defendant's Exhibit No. 11 and ask you if
23    you've seen that before?

Page 143

1    A    Yes, sir.
2       Q    Now, this was an evaluation
3    about a month after the previous one that
4    we looked at, which was Defendant's No.
5    9?
6    A    Yes, sir.
7       Q    And you got an average
8    evaluation which was a level up from the
9    needs improvement?
10    A    Yes, sir.
11       Q    And on the overall summary
12    could you read that out loud to us,
13    please?
14    A    "Many of the operational
15    issues noted on the original first
16    quarter QA have been addressed. Those
17    that remain are in the works and will be
18    handled. Room cleanliness scores
19    indicate a marked improvement over last
20    inspection."
21       Q    Okay. Do you have any reason
22    to disagree with this evaluation,
23    Defendant's No. 11?

Page 144

1    A    I agreed with the part because
2    we were doing the inspections and getting
3    everything in order.
4       Q    Okay.
5    A    I still felt like that I could
6    have got an above average because I felt
7    like we exceeded in taking care of all
8    the major issues.
9       Q    Do you have an opinion as to
10    why he gave you an average rather than an
11    above average evaluation?
12       MR. GOLDFARB: Object to form.
13    A    As, again, we argued about it
14    and he said that his final score was
15    going to be an average and I just didn't
16    feel comfortable with it. He was the
17    supervisor.
18       Q    (BY MR. KESSLER:) All right.
19    He was the supervisor, wasn't he?
20    A    Correct.
21       Q    And he a lot more experience
22    in the industry than you did?
23       MR. GOLDFARB: Object to form.

36 (Pages 141 to 144)

FOSHEE & TURNER COURT REPORTERS

Page 153

```
1      Q     Did you ever accuse him of
2   being gay?
3      A     No, I did not, but my mother
4   did.
5      Q     Okay.
6      A     She told him when he called
7   her the bitch.  She said, "That's okay.
8   I'm not gay."
9      Q     Okay.
10     A     That's what was said in a
11  discussion.  Those were the words that
12  were said.
13     Q     That's fair enough.  You never
14  said that?
15     A     No, sir, I never said
16  anything.  I treated Mark --
17     Q     Your sweet mother said that?
18     A     My mother did say it, yes,
19  sir.  And she will testify to that fact
20  but I treated Mark the way I did all my
21  other employees.
22     Q     Anything else you wanted to
23  say?
```

Page 154

```
1      A     No, sir.  I think that pretty
2   well covered it.
3      Q     You said that you didn't have
4   a regional manager at the time, that
5   during sometime, I guess, at the time you
6   were terminated before that?
7      A     Yes, sir.  It was a while
8   before that, before I was terminated we
9   did not have a regional manager.
10     Q     There was a vice president of
11  operations wasn't there?
12     A     Yes, sir.
13     Q     And there was a Human
14  Resources Department at Jameson wasn't
15  there?
16     A     Yes, sir.
17     Q     You said you felt like you
18  would have received better evaluations if
19  you had been a male?
20     A     Yes, sir.
21     Q     What facts or what events do
22  you base that on?
23     A     Well, I just felt like that I
```

Page 155

```
1   did not get better evaluations because of
2   the fact that I am a female and I did not
3   fit in.  I didn't go -- I don't drink.  I
4   know a lot of that was going on.  I don't
5   drink.  I don't go to lounges and I just
6   felt like I did not fit in.  I didn't
7   participate in some of that that went on
8   with the managers, male managers.
9      Q     Such as?
10     A     Such as drinking and going to
11  bars and --
12     Q     Any of the female managers
13  ever drink or go to bars?
14     A     Yes, sir, I'm sure they did.
15     Q     There's nothing morally wrong
16  with having a beer or a drink is there?
17     A     I don't do that.
18     Q     You may not do it but do you
19  think anything is morally wrong with
20  doing that?
21     A     No, sir, I don't think
22  anything is morally wrong with that.
23     Q     All right.  But did you ever
```

Page 156

```
1   go out to dinner with the other managers
2   in the district?
3      A     We had dinners, yes, sir, we
4   did.  We had dinners when we had our
5   managers meetings.
6      Q     Did you participate in those?
7      A     I did go to dinner.
8      Q     Did people have drinks during
9   those dinners?
10     A     Yes, sir, they did.
11     Q     Did you have a drink?
12     A     No, sir, I did not.
13     Q     Did you have a problem with
14  the other managers having a drink at
15  those dinners?
16     A     No, sir.
17     Q     Did you ever see any managers
18  become intoxicated or drink too much?
19     A     No, sir, not to my knowledge.
20     Q     You say that Mark Fetner tried
21  to take over and was railroading you.
22  What was he doing that you believe
23  constituted a railroading or taking over?
```

39 (Pages 153 to 156)

FOSHEE & TURNER COURT REPORTERS

Page 157

1    A    Well, everything I told him to
2  do he undermined me. He would do the
3  opposite.
4    Q    Such as?
5    A    Such as things that I would
6  ask him to oversee with the housekeeping
7  staff he would go out there and do the
8  opposite. If I told him -- if I would
9  ask him to go back and count the money in
10  the safe he would go to the computer and
11  do something else.
12    Q    Did you ever write him up for
13  that?
14    A    No, sir.
15    Q    You were his supervisor?
16    A    Correct. I gave him verbal
17  warnings.
18    Q    But nothing in writing that he
19  was railroading you and trying to take
20  over and you never put anything in
21  writing to document or reflect that? Do
22  we understand that correctly?
23    A    Correct. Again, I was only

Page 158

1  there -- he came in on the 4th and on the
2  18th I was dismissed from my position.
3    Q    Was he hired on the 4th?
4    A    I met him on the 4th. I do
5  not know when he was hired. Sometime in
6  January.
7    Q    You believe his first date of
8  employment was the 4th, the 4th of
9  February?
10    A    The first day of employment as
11  far as me ever meeting him. I never met
12  him until the 4th of February.
13    Q    How do you know it was the
14  4th?
15    A    Because that's the day he came
16  to work. That's the day I came back off
17  vacation.
18    Q    I see. Okay. I got you.
19  Fetner was the assistant general manager?
20    A    Correct.
21    Q    And the assistant general
22  manager is it fair to say that his or her
23  principal duties is to work the front

Page 159

1  desk?
2    A    Yes, sir.
3    Q    Now, you had mentioned, I
4  think, on the 18th of February, 2004
5  Mr. Woods came in and conducted the final
6  QA?
7    A    Yes, sir.
8    Q    If I recall your testimony
9  from before lunch it was that you said
10  that you couldn't find anyone else to
11  work the front desk and therefore you had
12  to stay there and then Mr. Woods
13  conducted the QA?
14    A    Correct.
15    Q    Was there no one else working
16  that day at the front desk?
17    A    Walker is on the front desk.
18    Q    So why did you feel that you
19  had to be there?
20    A    Mr. Woods told me to stay on
21  the front desk to stay there and he would
22  go conduct the QA.
23    Q    I'm sorry. Maybe I

Page 160

1  misunderstood your testimony. The record
2  will reflect what you said.
3    A    Correct.
4    Q    There were people working the
5  front desk but your testimony is that
6  Mr. Woods told you to stay at the front
7  desk and he conducted the QA?
8    A    Correct. He didn't need me to
9  go with him. I thought that was very odd
10  because that's not the normal procedure.
11    Q    Didn't you testify earlier in
12  your deposition the reason why you didn't
13  go with him because there was no one to
14  work the front desk?
15    A    I was going to call a desk
16  clerk in and he said it wasn't necessary
17  that he would go in and do the QA.
18    Q    Why would you call a desk
19  clerk in if Mark Fetner was there?
20    A    I did not know Mark knew
21  anything. I did not know until after the
22  fact the he had been training in Auburn
23  and in Eufala.

40 (Pages 157 to 160)

FOSHEE & TURNER COURT REPORTERS

Page 161

1    Q    But Mr. Fetner had been there
2  for two and a half weeks by that time?
3    A    No, sir.  I met him on the
4  4th.
5    Q    This was on the 18th?
6    A    Correct.  I just didn't think
7  about it.  I was going to call in a desk
8  clerk that I knew could handle the front
9  desk.
10    Q    And had you and Mr. Fetner
11  already had a lot of conflict up to that
12  time?
13    A    Yes, sir.
14    Q    Because he was trying to take
15  over?
16    A    Yes, sir.
17    Q    And your claim is you don't
18  know what he knew and that's why you
19  stayed at the front desk?
20    A    I found out afterwards that he
21  had been working in Eufala and had been
22  working in Auburn in the Auburn property.
23    Q    But I guess we could look at

Page 162

1  time sheets, couldn't we, and find out
2  who was assigned to work that day?
3    A    Yes, sir, you could.
4    Q    What time did Mr. Woods come
5  in on the 18th of February 2004 to
6  conduct the QA inspection?
7    A    In the morning hours.  I'm
8  don't know exactly what time.
9        (Defendant's Exhibit
10        No. 12 was marked
11        for identification.)
12    Q    All right.  Let me hand you
13  what's been marked as Defendant's No. 12
14  and this purports to be a QA Product
15  Evaluation dated June 11, 2003 for the
16  Alex City location with you as GM.  And
17  my question is have you seen this before?
18    A    Yes, sir.
19    Q    And is this the QA evaluation
20  that you received on or about June 11,
21  2003?
22    A    I'm sorry.
23    Q    Is this the QA evaluation you

Page 163

1  received on or about June 11, 2003?
2    A    Yes, sir.
3    Q    You received it from
4  Mr. Woods?
5    A    Yes, sir.
6    Q    And did you walk around with
7  him while he did the evaluation?
8    A    Yes, sir.
9    Q    Okay.  And you received a
10  needs improvement?
11    A    Yes, sir.
12    Q    And what evaluation -- what
13  level do you believe you should have
14  received?
15    A    Average.
16    Q    Okay.
17    A    Or above.
18    Q    Okay.  And what facts do you
19  have that leads you to believe that
20  Mr. Woods unfairly gave you a needs
21  improvement rather than an average
22  evaluation?
23    A    Facts are --

Page 164

1    Q    Facts?  You know what facts
2  are?
3    A    Yes.
4    Q    F-a-c-t-s?
5    A    Yes.
6    Q    Okay.
7    A    I still feel that my hotel was
8  clean.
9    Q    Okay.
10    A    And up to standards such as
11  the laundry room, it was nice, clean
12  presented clean.  It was always in order.
13    Q    Do you think that it's
14  possible, Ms. Stough, that you and
15  Mr. Woods may have perceived the
16  cleanliness of the hotel differently in
17  good faith?  That it's possible that you
18  may have perceived it differently in good
19  faith?
20        MR. GOLDFARB: Object to form.
21    A    No, sir, I don't.  I feel like
22  it was outright discrimination.
23    Q    (BY MR. KESSLER:)  But you

41 (Pages 161 to 164)

FOSHEE & TURNER COURT REPORTERS

Page 165

1 don't think that there was any legitimate
2 basis for perhaps Mr. Woods seeing the
3 same situation as you and thinking that
4 it needed improvement rather than you
5 thinking perhaps it was average?
6        MR. GOLDFARB: Object to form,
7 asked and answered.
8    A   No, sir, I don't. I still
9 stand on the fact that it was pure out
10 discrimination because I am a female.
11 Had I been a male I believe -- I know the
12 the score would have been higher.
13    Q   (BY MR. KESSLER:) Have you
14 told us every fact? I don't want you to
15 go through them all again. Have you told
16 us every fact already in your deposition
17 upon which you believe that it evidences
18 the fact that you believe you've been
19 discriminated against because you're a
20 female, because of you being a female?
21 Have you told us all the facts? I'm
22 trying to understand. It's one thing to
23 say I think I'm treated differently

Page 166

1 because I'm a woman. And that's fine.
2 And I understand that. But my question
3 is are there any additional facts from
4 those which you've already told us that
5 could persuade the jury and the court
6 that you were treated differently because
7 you were a woman?
8        MR. GOLDFARB: Object to form.
9    A   The only thing that I can say
10 is that I know I was discriminated
11 against because I am a woman and I am not
12 a man. I stood up for myself. There
13 were several occasions that we had
14 disagreements. I felt like -- I know my
15 property was clean. I know it. I had
16 high standards. I put myself and my
17 guests in a position to go into a clean
18 room. You know, I don't want to stay in
19 a dirty room. I wouldn't want my guests
20 to stay in a dirty room. I know I did my
21 job very well. And when I left the
22 property I left my -- I left there with
23 my head held high knowing I did a good

Page 167

1 job.
2    Q   Anything else?
3    A   No, sir.
4        (Defendant's Exhibit
5        No. 13 was marked
6        for identification.)
7    Q   Ms. Stough, let me hand to
8 you what's been marked as Defendant's
9 Exhibit No. 13 and ask you if you recall
10 seeing this document on or about June 17
11 2003?
12    A   I remember this vaguely.
13    Q   Okay. Now, it says in the
14 first sentence, "I am reprimanding you
15 for not notifying me as to your absence
16 from work. This is not the first time
17 you have failed to notify me that you
18 would not be at work as scheduled when
19 you know that I require notification when
20 a manager is not going to be on the
21 property." Do you recall what the
22 circumstances were that led to you
23 receiving this warning?

Page 168

1    A   Yes, sir. I had been involved
2 in a car accident.
3    Q   Okay.
4    A   And I was in -- had been in
5 the hospital and that was in the evening
6 time around the 13th. On the 17th I had
7 a severe problem with my back hurting and
8 I went straight to the doctor.
9    Q   Where were you in the
10 hospital?
11    A   Pardon me?
12    Q   Where were you in the
13 hospital?
14    A   I was at Russell Hospital. I
15 was discharged after the car accident.
16    Q   Were you in the emergency
17 room?
18    A   Yes, sir, I was.
19    Q   How long did you stay at the
20 hospital?
21    A   About -- I can't remember
22 exactly but it was a few hours. And as
23 soon as I got out of the hospital I did

42 (Pages 165 to 168)

FOSHEE & TURNER COURT REPORTERS

---

Page 173

1    A    Yes, sir.
2    Q    And I mean it had been going
3  on for two years?  This was the first
4  write-up that you got?
5    A    That I can recall, yes, sir.
6    Q    So he was discriminating
7  against you for two years and never wrote
8  you up for two years?  Do I understand
9  your testimony?
10   A    This was just to me this was
11  another form of discrimination and
12  harassment.
13         (Defendant's Exhibit
14            No. 14 was marked
15            for identification.)
16   Q    Let me hand to you what's
17  been marked as Defendant's Exhibit
18  No. 14 and ask you if you
19  recall receiving this on or about June
20  17, '03?
21   A    Yes, sir.
22   Q    Okay.  About attendance and
23  punctuality?

---

Page 174

1    A    Yes, sir.  This went along
2  with the same document.
3    Q    Both of those came at the same
4  time?
5    A    I believe so.
6    Q    Okay.  And he says in the
7  second paragraph, "Effective immediately
8  I will require a work schedule for the
9  upcoming week from you."  And then it
10  goes on.  Did you submit work schedules
11  to him?
12   A    Yes, sir.
13   Q    Do you believe you received
14  this memo for harassment purposes?
15   A    Yes, I do because there was
16  not a time if I was able to call Charles
17  and I was going to be out that I did so.
18  If I was out of work I presented a
19  doctor's note.
20   Q    If you were out of work you
21  always presented a doctor's note, is that
22  your sworn testimony?
23   A    Yes, sir.  When I would be out

---

Page 175

1  if I was going to be sick I would go to
2  the doctor.
3    Q    And you would always get a
4  note and submit it to the company?
5    A    I recall that, yes, sir, as
6  far as I remember.
7    Q    I just want to make sure
8  because remember you're under oath?
9    A    Right.  And every time that I
10  can remember I would get a doctor's note
11  when I was at the doctor if I was sick.
12   Q    Are you saying every time you
13  could remember?
14   A    Every time that I went to the
15  doctor I brought a doctor's note.
16   Q    Without exception?
17   A    Excuse me?
18   Q    Without exception?
19   A    Exception to what?
20   Q    You did it every time?
21   A    When I went to the doctor and
22  I was out and I was sick and I went to
23  the doctor I brought in a doctor's note.

---

Page 176

1    Q    Were there times when you were
2  sick when you didn't go to the doctor and
3  therefore didn't get a note?
4    A    I don't remember.
5    Q    So there may or may not have
6  been?
7    A    They may or may not have been,
8  yes, sir.
9         (Defendant's Exhibit
10            No. 15 was marked
11            for identification.)
12   Q    I hand to you this, and this
13  has been marked as Defendant's No. 15,
14  Ms. Stough, and you recall being placed
15  on a performance improvement plan on
16  June 17, 2003?
17   A    I'm sorry, I was reading.
18   Q    My question -- I'm sorry.  My
19  question was do you recall being placed
20  on a performance improvement plan on
21  June 17, 2003?
22   A    Right because this is when I
23  had a needs improvement score.

---

44 (Pages 173 to 176)

FOSHEE & TURNER COURT REPORTERS

Page 177

1    Q    Now, you've already testified
2    about you disagree with the evaluations,
3    the QA evaluations, but wasn't it the
4    company's practice, Jameson's practice,
5    that when a hotel received two needs
6    improvement scores that the general
7    manager was placed on a performance
8    improvement plan?
9         MR. GOLDFARB: Object to form.
10   A    I don't recall.
11   Q    (BY MR. KESSLER:) It may or
12   may not have been that? You just don't
13   know?
14   A    Correct. I don't remember.
15   No, sir, I do not.
16   Q    That could have been the
17   practice at Jameson, correct?
18   A    It possibly could have been,
19   yes, sir, but I do not remember. It's
20   been a while.
21   Q    Fair enough. I understand.
22        (Defendant's Exhibit
23        No. 16 was marked

Page 178

1         for identification.)
2    Q    Let me hand to you
3    Defendant's No. 16 and ask if you
4    recognize this as the QA Product
5    Evaluation which was given to you by
6    Mr. Woods based on his QA inspection on
7    August 7, 2003?
8    A    Yes, sir.
9    Q    All right. What does the
10   first sentence say?
11   A    "Very pleased with the overall
12   cleanliness of property inside and out.
13   Primary deductions are in maintenance and
14   capital area."
15   Q    That's good. So, he said nice
16   things didn't he?
17   A    Yes, sir.
18   Q    Were you satisfied with this
19   evaluation?
20   A    No.
21   Q    Should have been even higher?
22   A    Uh-hmm.
23        MR. GOLDFARB: Answer out loud.

Page 179

1    Q    (BY MR. KESSLER:) You need to
2    say yes?
3    A    I'm sorry, yes. I apologize.
4    Q    That's all right. So what do
5    you think it should have been?
6    A    Above average.
7    Q    Based on what?
8    A    Based on the cleanliness of my
9    hotel.
10   Q    And can you be more specific
11   than that or is that as specific as you
12   can be?
13   A    I had very clean rooms. We
14   worked and worked and worked on our
15   floors in our lobby. We scrubbed them
16   with bleach. We went through each and
17   every room to make sure everything was up
18   to company standards. Overall outside
19   appearance was in good condition. I felt
20   like that my property should have
21   received an above average and I told
22   Mr. Woods that.
23   Q    And is it fair to say that you

Page 180

1    tried as hard as you could?
2    A    I tried very hard. I gave
3    that property 110 percent.
4    Q    You gave it your very best
5    effort?
6    A    Yes, sir, I did.
7    Q    You had it, is it fair to say,
8    as clean as you could get it?
9    A    I put it up to company
10   standards, yes, I did.
11   Q    My question was did you have
12   it as clean as you could get it?
13   A    Yes, sir.
14   Q    Then on the last sentence it
15   talks about advised GM to intensify
16   efforts to collect delinquent account
17   from Southeastern Errectors?
18   A    That's correct.
19   Q    Was there a delinquent account
20   with them?
21   A    Yes, sir, there was.
22   Q    Within the evaluation of the
23   hotel is that an issue that's

45 (Pages 177 to 180)

FOSHEE & TURNER COURT REPORTERS

Page 181

1  legitimately part of the evaluation?
2    A    Yes, sir.
3    Q    When the health inspector
4  comes in does the health inspector check
5  delinquent accounts?
6    A    No, sir, he does not.
7    Q    So there may be some
8  difference in the areas checked out by
9  Jameson versus what the health inspector
10  checks? Would you agree with that?
11    A    Yes, sir.
12    Q    When it comes to inspections?
13    A    Yes, sir.
14        (Defendant's Exhibit
15        No. 17 was marked
16        for identification.)
17    Q    I hand you what's been marked
18  as Defendant's Exhibit No. 17, Ms.
19  Stough, and ask you if you recognize this
20  as the QA evaluation which you received
21  in November 2003?
22    A    Yes, sir.
23    Q    And it's a failure, isn't it?

Page 182

1    A    Yes, sir.
2    Q    And in the second sentence on
3  the overall summary on the first page it
4  says, "Room cleanliness was unacceptable
5  and noted in the inspection." Do you see
6  that?
7    A    Yes, sir.
8    Q    And that's something that you
9  were responsible for as the general
10  manager?
11    A    Yes, sir.
12    Q    That was something that your
13  mother responsible for as the
14  housekeeping supervisor?
15    A    Yes, sir.
16    Q    You went around with Mr. Woods
17  while this evaluation was done, didn't
18  you?
19    A    Yes, sir.
20    Q    Now, you've testified that
21  every evaluation -- strike that.
22        Every evaluation that
23  I've shown you you thought that you were

Page 183

1  being harassed or treated unfairly or
2  being nit-picked or Mr. Woods generally
3  was not giving you the kind of evaluation
4  that you should have received. By this
5  point -- I mean here we are November 2003
6  were you taking notes that you kept or
7  documenting in any way your belief that
8  you were doing a very fine job whereas
9  Mr. Woods was somehow grading you too
10  low?
11    A    Are you asking me if I kept
12  notes on every inspection? Is that what
13  you're saying or --
14    Q    Well, on this one in
15  particular or really any other
16  inspection? By now you ought to be -- if
17  your claim has any truth to it that
18  you're being nit-picked by Mr. Woods it
19  seemed like you would start to do
20  something about it?
21        MR. GOLDFARB: Object to form.
22    Q    (BY MR. KESSLER:) My question
23  is were you taking notes?

Page 184

1  Would you bring somebody else with you
2  like your mom on the inspections? What
3  would you do to try to protect yourself?
4        MR. GOLDFARB: Object to form.
5    A    No, sir, I didn't take
6  anybody with me. I didn't make notes.
7    Q    (BY MR. KESSLER:) You did or
8  did not?
9    A    I did not. I still feel the
10  same. I still feel that it was due to my
11  being a female and not a male.
12    Q    I understand that and you've
13  testified to that but at some point
14  common sense takes over and people start
15  protecting themselves if they genuinely
16  believe they've been treated unfairly or
17  they're being nit-picked or harassed and
18  really my question -- I mean this very
19  genuinely. What did you do to protect
20  yourself, if anything?
21        MR. GOLDFARB: Object to form.
22    A    I told Mr. Woods I didn't
23  think it was fair.

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 189

1 said he would hire one. He would find
2 one. I was never involved in doing any
3 of the hiring of the AGM.
4    Q    (BY MR. KESSLER:) So I guess
5 the answer is that you weren't thinking
6 that when you received this fails
7 evaluation that it might effect your
8 employment with Jameson?
9    A    No.
10    Q    Okay. What was your
11 understanding, if any, as to the
12 consequence to a general manager seeing a
13 fails evaluation?
14    A    That we had a total failure
15 around but then, again, I did not feel
16 like my property failed. I will go back
17 to my statement again of discrimination
18 and harassment because of me being a
19 woman my property should have never
20 gotten a failure.
21    Q    I understand that. I think
22 you made mention of that before?
23    A    Yes, sir.

Page 190

1         (Defendant's Exhibit
2          No. 18 was marked
3          for identification.)
4    Q    All right. Let me hand to
5 you Defendant's 18, which is a QA
6 evaluation of December 19, 2003. My
7 question is did you receive this on or
8 about December 19, 2003?
9    A    Yes, sir.
10    Q    Okay. And this was a
11 re-visit from Mr. Woods, right?
12    A    Correct.
13    Q    And it was an improvement from
14 the last one?
15    A    Yes, sir.
16    Q    It was a needs improvement.
17 And do you think that you should have
18 gotten a different score on this
19 evaluation?
20    A    Yes, sir, I do.
21    Q    What is the score you think
22 you should have gotten?
23    A    An average or above.

Page 191

1    Q    Did you put anything in
2 writing anywhere saying that you thought
3 this evaluation was inaccurate?
4    A    No, sir, I did not.
5    Q    I don't think I asked you this
6 about the previous one, Defendant's 17,
7 the one in which you failed, the hotel
8 failed. Did you put anything in writing
9 saying that you believe that was
10 inaccurate?
11    A    No, sir.
12    Q    Did you keep a diary or any
13 kind of notes or anything that would in
14 any way document any of these issues that
15 you're testifying about today?
16    A    No, sir.
17    Q    Write any e-mails to friends
18 or anything like that?
19    A    No, sir, I did not.
20         (Defendant's Exhibit
21          No. 19 was marked
22          for identification.)
23    Q    Ms. Stough, let me hand you

Page 192

1 what's been marked as Defendant's Exhibit
2 No. 19 and ask if you recall receiving
3 this Constructive Action Notice on
4 December 29, 2003?
5    A    Yes, sir.
6    Q    Okay. And did Mr. Woods give
7 this to you in person?
8    A    I believe -- I don't
9 recall but -- no, I don't. I'm thinking
10 it came from over the internet. I cannot
11 be sure of that.
12    Q    You think this is an e-mail?
13    A    I don't recall. I don't
14 recall.
15    Q    So, he may or may not have
16 given it to you in person?
17    A    I just don't recall. No, sir,
18 I don't.
19    Q    Is there anything in here
20 that you disagree with?
21    A    Yes, sir, the QA score.
22    Q    The what?
23    A    On the quality assurance

48 (Pages 189 to 192)

FOSHEE & TURNER COURT REPORTERS

Page 193

1  score.
2      Q   Yes. All right. You've
3  already testified about that?
4      A   Yes, sir, I didn't agree with
5  the score.
6      Q   All right. He also says in
7  here that your personnel received
8  insufficient training or some staff
9  members have received insufficient
10  training when working alone?
11      A   No, sir, I don't agree with
12  that.
13      Q   All right. He says, "Prior
14  noticing covering QA results and
15  expectation have been sent to you." Now
16  that is true, isn't it?
17      A   As far as him doing the QA
18  inspection, yes.
19      Q   And then giving you a copy of
20  the inspection?
21      A   Yes.
22      Q   And so you were able to keep a
23  copy of the inspection, right?

Page 194

1      A   There should have been copies
2  at our hotel.
3      Q   Right. It was your
4  responsibility to make sure they were
5  there weren't they?
6      A   Yes, sir. It had to stay in
7  the file.
8      Q   It had a list of stuff that
9  had be to done?
10      A   Yes.
11      Q   So you had clear notice of
12  what you had to do to get the hotel up to
13  standards?
14      A   Yes, sir.
15      Q   Then in the second to last
16  paragraph here it says that basically
17  that the hotel has not met company
18  cleanliness standards and unless it
19  improves that further action will be
20  taken up to and including termination of
21  employment?
22      A   Yes, sir.
23      Q   So, if you didn't know before

Page 195

1  at this point on December 29, '03 you
2  knew that there was a possibility that
3  your continued employment was in
4  jeopardy?
5      A   Yes, sir, but there, again, I
6  felt like it was harassment and
7  discriminatory.
8      Q   I understand. But you knew
9  regardless of the reason you knew that
10  your employment was in jeopardy?
11      A   Correct.
12      Q   Okay. And I guess at this
13  point he had been, based on your
14  testimony, discriminating against you and
15  harassing use for two years, two and a
16  half by now?
17      A   Yes, sir, that would be.
18      Q   And still not the first word
19  written down reflecting all this
20  harassment and discrimination, right?
21      A   No, sir, because I wanted to
22  keep my job. I did not want to lose my
23  job.

Page 196

1      Q   When you say "no, sir," you
2  mean you had not written anything down?
3      A   No, sir, I had not. I had not
4  at that time.
5           (Defendant's Exhibit
6           No. 20 was marked
7           for identification.)
8      Q   Let me hand you what's been
9  marked as Defendant's No. 20, Ms. Stough
10  and is that your signature in the middle
11  left-hand side?
12      A   Yes, sir.
13      Q   This is dated the same date as
14  the constructive action notice
15  December 29, '03?
16      A   Yes, sir.
17      Q   And there were nine days that
18  you were asking off for January and the
19  3rd of February?
20      A   Yes, sir.
21      Q   Did you take those days off?
22      A   Yes, sir.
23      Q   Do you know what the dates

49 (Pages 193 to 196)

FOSHEE & TURNER COURT REPORTERS

Page 197

1    were that your husband was on leave from
2    Iraq?
3        A    Yes, sir.  He came in on, I
4    believe it was, on the 16th because I had
5    to go to Atlanta to get him.
6        Q    16th of?
7        A    January, yes, sir.
8        Q    Then when did your son get
9    married?
10       A    My son got married on the
11   28th.  Well, it was on a Saturday.  The
12   last Saturday of January.  Excuse me.  It
13   was the 24th.  It was on a Saturday.
14           (Defendant's Exhibit
15           No. 21 was marked
16           for identification.)
17       Q    Ms. Stough, let me hand you
18   what's been marked as Defendant's Exhibit
19   No. 21 and ask you if this is a memo that
20   you received from Mr. Woods on or about
21   February 6, 2004?
22       A    Yes, sir.
23       Q    Okay.  And he lists seven

Page 198

1    different areas of corporate standards
2    and expectations that needed to be
3    improved?
4        A    Yes, sir.
5        Q    Okay.  And he sat down and
6    talked with you about these areas didn't
7    he?
8        A    Excuse me.  I'm sorry?
9        Q    He sat down and talked to you
10   about these areas didn't he?
11       A    I don't recall but -- I don't
12   recall if we sat down.  I don't.
13       Q    Then in the last paragraph it
14   says, "The above are all critical areas
15   and are of grave importance in the
16   successful operation of your hotel."
17   Did you agree with that statement?
18       A    No, sir.
19       Q    You didn't think they were of
20   grave importance?
21       A    No.  I understand that but I
22   don't know how to answer that.  I do
23   understand that it is of grave importance

Page 199

1    but I do not feel that these were true
2    issues.  That's what I'm trying to say.
3        Q    You think they were just
4    trumped up issues?  Is that what you're
5    saying?
6        A    Yes, sir.
7        Q    All right.  So, for example,
8    No. 1 where they talk about customer
9    aging reports do you think he's factually
10   wrong here or do you think he was just
11   making a big to do out of something
12   that's not really a big deal?
13       A    My customer agings were all in
14   order.
15       Q    Pardon?
16       A    My customer aging accounts
17   were all in order.
18       Q    Had you collected that money
19   from Southeastern Errectors?
20       A    We were in the process of
21   doing so.
22       Q    Had it been collected at the
23   time this memo was --

Page 200

1        A    I don't recall.
2        Q    So how can you say that all of
3    your costumer aging reports were in
4    order?
5        A    In order as from what I am
6    reading here it's in order as in the
7    bucket, okay, how they are aged in the
8    bucket.  That's what that means.
9        Q    Well, did you think that this
10   was unfair receiving this accountability
11   memo?
12       A    Yes.  I, again, felt like that
13   it was harassment.
14       Q    Right.  And what did you do to
15   protect yourself or demonstrate that this
16   was, in fact, harassment rather than just
17   a legitimate business memo to you about
18   problems at the hotel?
19           MR. GOLDFARB: Object to the
20   form.
21       A    You mean as far as -- I don't
22   understand.  I mean as far I didn't write
23   anything down.

50 (Pages 197 to 200)

FOSHEE & TURNER COURT REPORTERS

Page 201

1      Q    (BY MR. KESSLER:) I mean
2   there's nothing that we could look at or
3   nothing that the ladies and gentlemen on
4   the jury could look at to persuade them
5   that Mr. Woods was incorrect with his
6   memo is there?
7           MR. GOLDFARB: Object to the
8   form.
9      Q    (BY MR. KESSLER:) What could
10  people look at to determine that
11  Mr. Woods was not correct with what he
12  has in this memo?
13          MR. GOLDFARB: Object to form.
14     A    I have no documents. I didn't
15  write anything down.
16     Q    (BY MR. KESSLER:) So, when you
17  tell us that you think this was
18  harassment that's really an opinion,
19  isn't it?
20          MR. GOLDFARB: Object to the
21  form.
22     A    No, sir it's a fact.
23     Q    (BY MR. KESSLER:) Have you

Page 202

1   told all the facts upon which that is
2   based?
3           MR. GOLDFARB: Object to the
4   form.
5      A    Have I told you all the facts?
6      Q    (BY MR. KESSLER:) Yes. I want
7   to make sure that when you tell us that
8   discriminatory and harassment that you
9   lay on the record everything -- every
10  fact that you believe supports your claim
11  that it's discriminatory and harassment.
12  You've told us a number of things and if
13  there's anything else I want you to tell
14  us about it.
15          MR. GOLDFARB: Object to form.
16     A    I feel like with the QA's
17  and all they were all -- my opinion and
18  the way I feel it was harassment. It was
19  discrimination and lies. And I would
20  object to the QA inspections. I objected
21  to them on several bases. I don't know
22  how else to answer that except for that.
23     Q    (BY MR. KESSLER:) That's fair

Page 203

1   enough.
2      A    That is how I felt.
3      Q    I know that's how you felt.
4           (Defendant's Exhibit
5           No. 22 was marked
6           for identification.)
7      Q    I hand to you, Ms. Stough,
8   Defendant's 22. This is the QA
9   evaluation which you received on
10  February 18, 2004 from Mr. Woods?
11     A    I never saw this QA.
12     Q    Your sworn testimony is that
13  you never saw this? He never sat down
14  with you afterwards in the front hall of
15  the Jameson Inn and didn't talk to you
16  about this?
17     A    No, sir, because we were in
18  the living room in 108 when he dismissed
19  me from my position. I do not recall
20  looking at this QA. I do not. I do not
21  recall looking at it.
22     Q    I will remind you that your
23  testimony is sworn.

Page 204

1      A    I understand, but I do not
2   recall looking at this.
3      Q    When you say you do not
4   recall -- let me finish?
5      A    I don't remember looking at
6   this QA. I do not.
7      Q    I'm not sure whether you're
8   saying you don't have a recollection of
9   whether you saw it or that you know you
10  did not see it?
11     A    I do not have a
12  recollection. Let me rephrase it. I do
13  not have a recollection. I do not recall
14  looking at this QA.
15     Q    So when you say that just so
16  the record is clear you may have? You
17  just don't remember?
18          MR. GOLDFARB: Object to form.
19     A    I do not remember because of
20  the fact is that a QA inspection with all
21  of this cannot -- I mean how -- it cannot
22  possibly be done in a matter of a few
23  hours. I do not remember looking at this

51 (Pages 201 to 204)

FOSHEE & TURNER COURT REPORTERS

Page 221

1    A    No, sir. We checked our
2    rooms. We checked for carpets. We
3    checked for damages on drapes or anything
4    else.
5    Q    (BY MR. KESSLER:) Anything
6    else that -- I think you mentioned
7    overall cleanliness?
8    A    Yes, sir.
9    Q    What is it that you disagree
10   with in this report regarding overall
11   cleanliness?
12   A    About the breakfast room area,
13   our coffee earns and utensils and baskets
14   and whatever stuff that we used in our
15   breakfast room was maintained and kept in
16   good condition. The coffee earns were
17   washed every night.
18   Q    Did you personally do that or
19   have somebody else?
20   A    My night auditors were
21   involved in that and I checked them. I
22   checked them.
23   Q    You checked them everyday?

Page 222

1    A    Yes, sir, I did check the
2    coffee earns.
3    Q    What time would you normally
4    get to work?
5    A    Around 7:00, 7:30, in that
6    area.
7    Q    So your testimony is that
8    everyday you checked the coffee earns?
9    A    Yes, sir, because I drank
10   coffee.
11   Q    Wasn't breakfast set up at
12   6:00 a.m.?
13   A    Yes, sir.
14   Q    So, the coffee was already
15   brewing? You don't know at that point
16   whether it was clean or not?
17   A    When one got emptied and one
18   was brought back in I would check them
19   and the ones that we were not in use were
20   put into the sink and was left to soak.
21   Q    Anything else that you
22   disagree with in this evaluation?
23   A    Overall -- everything. I mean

Page 223

1    I just don't agree with any of it.
2    Q    And the first time you ever
3    put anything in writing complaining about
4    your termination was when you filed your
5    EEOC charge wasn't it?
6    A    Yes, sir.
7    Q    That was almost six months
8    after you were terminated?
9    A    Yes, sir.
10   Q    So between February 18, 2004
11   and August 9, 2004 whenever you wrote
12   your EEOC charge you didn't put down
13   anything anywhere complaining about your
14   termination of employment did you?
15   A    You mean at home or wherever?
16   Q    Anywhere?
17   A    No, sir.
18   Q    You said in your interrogatory
19   responses that you complained to Charles
20   Woods about yourself?
21   A    Yes.
22   Q    Now, in your interrogatory
23   response I will hand to you what has been

Page 224

1    marked as Defendant's Exhibit 22, and let
2    me ask you a question before you look at
3    that. You say in there that you
4    complained to him on February 14th or
5    15th of 2004?
6    A    Right after pay day when I got
7    the pay roster.
8    Q    What day is pay day?
9    A    I believe it was around the
10   14th or 15th. Biweekly is what pay day
11   was when I got the payroll roster.
12   Q    At that point you realized
13   what Mr. Fetner was earning?
14   A    Yes, sir. At that point I
15   realized what Mr. Fetner was earning.
16   Q    What exactly did you say to
17   Mr. Woods?
18   A    I had called and said we need
19   to talk. And I don't remember what his
20   response was but I said that I seen the
21   pay roster and that I was aware
22   of -- that Mark was making the same pay I
23   was and that I felt like it was sexual

56 (Pages 221 to 224)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 225

1   discrimination, pay discrimination
2   basically.
3       Q    Okay. What did Mr. Woods say?
4       A    I don't have time to talk
5   about it right now.
6       Q    Is that it?
7       A    Yes, sir.
8       Q    And was that the end of the
9   conversation?
10      A    Yes, sir.
11      Q    Did you say anything else to
12  him about that?
13      A    No, sir, because all that day
14  when he called he wanted to speak with
15  Mark --
16      Q    Okay.
17      A    -- the rest of the day. That
18  was the extent of the conversation.
19      Q    Okay. So that was it? That
20  was all that was said?
21      A    That I recall, yes, sir.
22      Q    I want to make sure because
23  that's important.

Page 226

1       A    I don't recall. I don't
2   remember if he told me or if Mark told me
3   he was going to be coming up or whatever.
4   I don't remember if he told me or if he
5   told Mark and Mark told me. I don't
6   remember that.
7       Q    And Mark told you that?
8       A    That Charles was coming up. I
9   don't remember if he told me or if Mark
10  told me that Charles was coming up. I
11  don't recall him telling me that.
12      Q    But on this conversation where
13  you said that you thought it was sex
14  discrimination, equal pay, you directly
15  had a conversation with Mr. Woods?
16      A    Correct. I called him on the
17  phone.
18      Q    And do you recall what day of
19  the week that it was?
20      A    No, sir, I don't. I know it
21  was pay day.
22      Q    Pay day?
23      A    Yes, sir.

Page 227

1       Q    It was on pay day?
2       A    Yes, sir, because that's how I
3   remember. I got the paychecks that day
4   along with the pay roster.
5       Q    And then when you saw him on
6   the 18th did you say anything about it,
7   about this pay issue?
8       A    I don't recall.
9       Q    Did he say anything to you
10  about the pay issue on the 18th?
11      A    I don't recall that either.
12      Q    Do you know anything about
13  Mr. Fetner's qualifications in the hotel
14  industry?
15      A    No, sir, I do not.
16      Q    Had you ever seen his resume
17  or his application?
18      A    I can't remember. No, I don't
19  remember seeing it at the hotel. I sure
20  don't.
21      Q    Did you ever see it anywhere?
22      A    I don't remember.
23           MR. GOLDFARB: Are you

Page 228

1   including my office?
2           MR. KESSLER: Yes, including --
3       A    I'm sorry.
4           MR. GOLDFARB: You can answer
5   if you've seen stuff.
6       A    I've seen that but I never
7   seen it at the property. I've seen so
8   much stuff. I'm trying to remember what
9   I've seen and what I haven't.
10      Q    (BY MR. KESSLER:) So do you
11  have any idea based on -- I mean whatever
12  information you received -- what his
13  background was and what his
14  qualifications were?
15      A    I briefly glanced through his
16  application. I didn't really study it.
17  I know that he told me he had a
18  background in restaurants because he
19  worked for his mother. He worked for a
20  printing company in Georgia. Now, this
21  is what Mark had told me. That's all I
22  remember other than seeing -- I think it
23  was some kind of a timeshare company that

57 (Pages 225 to 228)

FOSHEE & TURNER COURT REPORTERS

Page 229

1  he worked for. I remember seeing that
2  in --
3      Q    Do you know what his
4  educational background is?
5      A    I don't recall. I know I
6  looked at it but I don't remember exactly
7  all it said.
8      Q    And you're not claiming that
9  you have like two years of college or
10 anything are you?
11     A    No, sir, because I have not.
12     Q    You don't have any college?
13 You've taken a few courses?
14     A    Right.
15     Q    Bookkeeping and things like
16 that?
17     A    Correct. I do not have a
18 degree in college or anything like that.
19     Q    So It's not like you've
20 completed two years of business courses
21 or college or anything like that?
22     A    No, sir, just the business
23 courses on my resume.

Page 230

1      Q    You say in your
2  interrogatories that you think a guy
3  named Jim made more than you did?
4      A    Well, after seeing the pay
5  roster I kind of suspected so, yes, sir,
6  that he possibly was making more salary
7  than what I was, yes, sir.
8      Q    Jim Goodman?
9      A    Yes, sir.
10     Q    In Auburn?
11     A    Yes, sir. The last I knew. I
12 don't know now. I don't know if he's
13 still there or not.
14     Q    Do you know anything about his
15 qualifications or education or
16 experience?
17     A    No, sir, I do not.
18     Q    Do you know anything about
19 Betty Sutton's qualifications or
20 educational experience In the hotel
21 industry?
22     A    No, sir.
23     Q    You know Betty makes more than

Page 231

1  you did?
2      A    Correct.
3      Q    And you knew that Sam Ellis
4  made more than you?
5      A    I did not know that until
6  recently.
7      Q    You know it now don't you?
8      A    Yes, sir.
9      Q    Do you know anything about her
10 experience or background in the hotel
11 industry?
12     A    Sam and I talked. I want to
13 say she had experience before. I know
14 she had been with the company a while
15 longer than I had. I think she had been
16 there five, six years.
17     Q    Do you think It was okay in
18 your view that Sam Ellis was making more
19 than you?
20     A    I don't know.
21     Q    Well --
22     A    I mean --
23     Q    Well, Ms. Stough this is an

Page 232

1  equal pay claim. I assume you
2  thought a little bit about salaries.
3  Ms. Ellis was in your district?
4      A    Uh-hmm.
5      Q    And my question is she's
6  running a hotel just like you were and
7  she was making more than you. Do you
8  think that was okay?
9      A    Well, she was at a forty-room
10 property. I was at a sixty-room property.
11     Q    She's running a smaller hotel
12 and making more money than you. Do you
13 think that was okay?
14         MR. GOLDFARB: Object to form.
15     A    No, sir.
16     Q    (BY MR. KESSLER:) Do you think
17 that was sex discrimination?
18     A    I don't know how to answer
19 that.
20     Q    Well, just yes or no. Do you
21 think it was sex discrimination?
22         MR. GOLDFARB: Object to form.
23     A    She had been with the company

58 (Pages 229 to 232)

FOSHEE & TURNER COURT REPORTERS

Page 233

1  longer than I have. I guess it was fine.
2  Q   (BY MR. KESSLER:) So maybe it
3  was a factor other than sex?
4  A   I don't understand. When you
5  say "factor" can you explain that?
6      MR. GOLDFARB: Object. Asking
7  for a legal conclusion.
8  Q   (BY MR. KESSLER:) The word
9  factor is hardly legal. A reason other
10  than sex that led the company to pay her
11  more than you were paid?
12     MR. GOLDFARB: Object to form.
13  It calls for a legal conclusion.
14  Q   (BY MR. KESSLER:) You don't
15  know?
16  A   I don't know.
17  Q   You don't have any idea do you?
18  A   No.
19  Q   So you really don't have any
20  idea why Jim Goodman was paid more than
21  you do you?
22  A   I never asked him to tell me
23  what he made. I never asked him his

Page 234

1  background. I didn't feel like that was
2  my place.
3  Q   I understand but the point
4  that I'm making is you don't have any
5  opinion about whether Sam Ellis should or
6  should not have made more money than you
7  do you?
8  A   I don't know what to say to
9  that. I've never thought about it, I
10  guess. I don't know what to --
11     MR. GOLDFARB: Object to form.
12  I don't understand where this is going.
13  A   I don't understand the
14  question period. I don't understand.
15  Q   (BY MR. KESSLER:) Well, let
16  me restate it differently. I apologize.
17  And Sam Ellis is a female, right?
18  A   Correct.
19  Q   And based on the information
20  you've seen she made more than you did?
21  A   Yes, sir.
22  Q   And she was working at a
23  smaller hotel?

Page 235

1  A   Correct.
2  Q   Okay. Did you have a problem
3  with the fact that she earned more than
4  you did though she was working at a
5  smaller hotel?
6      MR. GOLDFARB: Object to form.
7  A   I never knew what she made.
8  Q   (BY MR. KESSLER:) Now that you
9  know do you have a problem with it?
10  A   Do I have a problem with it?
11  Q   Yeah. Do you think it's
12  unfair that she made more money than you
13  did?
14  A   At this point I mean I don't
15  know how to answer that because I just
16  never knew what her pay was. I never
17  asked her what her pay was.
18  Q   But now you know. Now you
19  know that she was making more than you
20  were, okay? As you're sitting here you
21  know today on February 24, 2006 that she
22  was making more than you were in early
23  2004. And my question is do you think

Page 236

1  that was unfair?
2      MR. GOLDFARB: Object to form.
3  Asked and answered.
4  Q   (BY MR. KESSLER:) As you sit
5  here today do you think that was unfair?
6      MR. GOLDFARB: Object to form.
7  A   I never thought about it.
8  Q   (BY MR. KESSLER:) Jim Goodman
9  made more than you did and he was working
10  at a smaller property. Do you think that
11  was unfair?
12  A   Yes, because he had been there
13  less time than I had been there.
14  Q   Do you know what his
15  background was in the industry?
16  A   No, sir, I do not.
17  Q   So, the basis for your belief
18  that Jim Goodman was -- you were treated
19  unfairly in comparison to Jim Goodman was
20  he was general manager for a shorter time
21  than you were?
22     MR. GOLDFARB: Object to form.
23  A   He's a male.

59 (Pages 233 to 236)