IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CIVIL ACTION NO.: 3:05-CV-421-W

BELINDA STOUGH,
Plaintiff,
vs.
JAMESON INNS, A COMPANY OWNED AND OPERATED BY KITCHIN HOSPITALITY, L.L.C.,
Defendant.

DEPOSITION OF: GREGORY WINEY
9:10 A.M.
APRIL 21, 2006

In accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as Amended, effective May 15, 1988, I, Cindy C. Goldman, am hereby delivering to Mr. Jon C. Goldfarb the original transcript of the oral testimony taken on the 21st day of April, 2005, along with exhibits.

STIPULATIONS

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of Gregory Winey, a witness in the above-entitled cause may be taken before Cindy C. Goldman, a Court Reporter and Notary Public for the State of Alabama, at 3060 Peachtree Road, Suite 1050, Atlanta, Georgia, on the 21st day of April, 2006, commencing at 9:10 a.m., pursuant to the Alabama Rules of Civil Procedure.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of court relating to the taking of the depositions.

STIPULATIONS
(continued)

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that the notice of filing of the deposition is waived.

APPEARANCES

Appearing On Behalf Of The Plaintiff:
WIGGINS, CHILDS, QUINN & PANTAZIS
Mr. Jon C. Goldfarb
420 20th Street North
Suite 1400
Birmingham, Alabama 35203-3204

Appearing On Behalf Of The Defendant:
IRVIN, STANFORD & KESSLER, L.L.P.
Mr. Gary R. Kessler
Ms. Ann Hale-Smith
One Buckhead Plaza
3060 Peachtree Road
Suite 1050
Atlanta, Georgia 30305

Reported By:
Cindy C. Goldman
Freedom Court Reporting
367 Valley Avenue
Birmingham, Alabama 35209

friendliness, and profitable.
Q. When you were a regional manager, did you decide raises for people?
A. No, because under that structure, it was -- GMs were compensated differently when the structure changed.
Q. You mean when you were there --
A. Correct.
Q. -- as a regional manager?
A. Yeah.
Q. How was it different than when you left?
A. GMs were originally at a base pay plus bonus that was -- that had changed and evolved over time.
Q. What did it change to when you left?
A. It was based on experience, market conditions, and revenues of the property.
Q. Did you have a formula or something?

A. We would do market surveys at times. You know, I don't think there was any particular form that was used. I think we tried to determine salaries based on the size of the property, the location of the property, the revenues of the property, the experience of the general manager or individual in that position?
Q. What different sizes of properties did you have?
A. We had with Jameson 40 rooms and 60 rooms. And later, in upwards of 80 rooms. The 60 and 40 were exterior corridor. The 80s were interior corridor. And Signature Inns were between 90 or so rooms and in upwards of 180, I believe, it was, and all interior corridor properties.
Q. Do you look at the pay differently for a 40-room versus a 60-room?
A. It really depended on market,

what the market was and how well the hotel was doing financially.
Q. Well, if they're in the same market, the 40 and the 60, you said you looked at size?
A. We wouldn't have two hotels in the same market.
Q. Same -- how do you define a market?
A. As an example, if you said in Alabama, you would look at Oxford, Alabama, as a market, and then you might look at Florence, Alabama, as a market. So, in terms of where they were located.
Q. Located is how you define it?
A. Correct.
Q. Are some markets the same?
A. Each market is different.
Q. All right. What decides -- what difference does size make when you determine a salary? You said size before.
A. Again, if the market -- it

depends on the market. If the market has a certain amount of revenues, and the general manager has a certain level of experience, and determining on what the market would generally pay for that type of position, we would make a decision based on salary in regard to that.
Q. Does size have anything -- any factor in your decision of what to pay a salary?
A. It can. It can, depending on the market.
Q. Okay. Why would size factor into salary?
A. Again, because of the revenues and our capacity to pay the general manager based on the revenues of the hotel.
Q. Because revenue would be more because you can have more people staying at a larger property?
A. Well, it's -- no. It depends, again, on how much demand generators are

on that market.
If the hotel is running 80 percent occupancy versus a hotel running 30 percent occupancy, your capacity to make that business profitable is encumbered if you're running 30 percent occupancy.
Q. Okay. But if you've got a 40-room property running 80 percent and a 60-room property running 80 percent, does size matter?
A. We would have definitely the capacity to pay more in that 60-room property.
Q. Because it would have more revenue?
A. It would have more revenue, correct.
Q. Okay. In October of '98, you became the director of operations. What job did you move to next?
A. The vice president of operations.

Q. When was that move?
A. I maintained the position for three years. So --
Q. 2001?
A. Going backwards, yes, from when I left three years prior to that.
Q. October of '98 to October of 2001, does that sound about right?
A. Three years as director of ops and three years as VP. That's essentially correct.
Q. How did your duties change when you became the VP of operations, if at all?
A. It really didn't.
Q. Okay. You just got a titling change?
A. For the most part, correct.
Q. Did your duties expand in any way?
A. No, not really. In fact, they contracted.
Q. Why did they contract?

A. I was not directly over capital refurbishment.
Q. What does that mean?
A. Hotels get capitalized. We maintain a reserve of our revenues to refurbish the hotels on an annual basis.
Q. What were your duties during the time you were a director of operations and VP of operations, excluding the capital refurbishment duties?
A. In a nutshell, to make the hotels profitable, to drive the service levels of the hotel, and to ensure the product quality of the hotels was up to company standard.
Q. What were your duties to deciding salaries for general managers?
A. I would take the recommendations of the regional district or area manager, and they would present that to me.
Q. And you would do what with it?
A. 99.9 percent of the time, approve it.

Q. Was there a guideline for determining salaries that the GMs use?
A. None other than I mentioned, size of property, experience of the GM, and revenue of the hotels.
Q. I mean, was there a range of salaries for GMs during --
A. It varied.
Q. -- 2001?
A. It varied. Because, again, if you ask me what we might pay a 40-room general manager that has the worse revenues in the company versus an 180-room general manager that has decent revenues and much greater responsibility, those salaries are going to vary greatly.
Q. I mean, is there anything in writing indicating how salaries should be --
A. Nothing to my knowledge.
Q. -- arranged or anything like that?
A. Nothing to my knowledge.

you have any authority over HR?
A. No.
Q. That's completely separate?
A. Correct.
Q. Who would be over HR as a VP?
A. With Rose, was Steve Curlee.
Q. And what's his job?
A. Legal counsel.
Q. When you left, was there a director of HR?
A. I believe Jeff Hurley has that title as well as assist with legal matters.
Q. Is he a lawyer?
A. Yes.
Q. Okay.
A. Yes, sir.
Q. Was he there in 2004?
A. Correct.
Q. After Rose left, was there anybody between Rose and Jeff as HR director?
A. No, not to my knowledge.

Q. As far as you know, Jeff took over Rose's duties?
A. Yes.
Q. Was Jeff there at the same time as Rose for a while?
A. I believe a short period of time. I don't recall, though, quite honestly.
Q. Why did Rose leave?
A. I don't know the details of her departure.
Q. You mentioned that there was this salary freeze?
A. Uh-huh (affirmative).
Q. And when was the salary freeze?
A. I believe it was 2001, 2002, but it was right during the time of 9/11.
Q. Yeah. I've got some memos.
A. And the two years, I believe, after that.
Q. I got some documents either last night or the night before from your lawyers -- as Exhibit 3.

(Plaintiff's Exhibit No. 3 was marked for identification.)
MR. KESSLER: Night before.
MR. GOLDFARB: Night before.
MR. KESSLER: Wednesday afternoon.
Q. (By Mr. Goldfarb) And these memos relate to --
MR. KESSLER: Are you going to mark them?
MR. GOLDFARB: Yeah. I'm sorry. It's Exhibit 3.
Q. These memos relate to the salary freeze?
A. Okay.
Q. Are there any other documents related to the salary freeze other than these?
A. I wouldn't know.
Q. Okay. Did you write either of these?
A. No.
Q. Have you seen these before

today?
A. I imagine I would have read them.
Q. All right. I mean, you're over the operations, which include the payment of salaries?
A. I'm not over HR or payroll.
Q. But you have duties with respect to paying salaries to your general managers?
A. No. I mean, I didn't handle the payment of those salaries.
Q. You signed off and approved it?
A. I would sign off on salaries for GMs.
Q. What about regional managers?
A. Yes. Yes.
Q. Did you decide the salaries for the regional managers?
A. By and large, yes.
Q. Did you decide the salaries for the district managers?
A. Yes.

particular process for determining that or recommendations.
Q. Did you, as the operations VP, know of anything that the company had done at this -- in 2002 to establish uniform -- establish consistent and uniform policies for all salaried personnel?
A. None other than the salary freeze when this was written.
Q. Okay. Well, that would be freeze it for everybody?
A. Yeah, basically. Exactly.
Q. Okay. Okay. And it says, "Kitchin Hospitality, L.L.C. Executive Management." Would that include you?
A. Correct.
Q. Did you decide that there would be no increases in annual salaries for GMs?
A. No.
Q. Who decided that?
A. I believe that was determined

through the CEO and CFO.
Q. Who is the CEO?
A. Tom Kitchin.
Q. Is he still there?
A. Correct.
Q. And who is the CFO?
A. Craig Kitchin.
Q. So, they told you that we're going to have a freeze?
A. I believe that's right.
Q. Did you have anything to do with coming up with the idea of the freeze?
A. No.
Q. Did the freeze affect regional managers also?
A. Correct.
Q. Because it only says GM and assistant GM.
A. No, everybody.
Q. Every salaried person?
A. As I understand.
Q. Everywhere in the country?
A. As I remember.

Q. Were there any exceptions to the freeze?
A. Not that I recall.
Q. I understand there's some -- if you got a promotion, you'd get an increase; is that right?
A. That would seem right.
Q. Okay. There's a couple -- but I'm talking about did anybody that's in the same job receive a raise while they stayed in the same job during the freeze?
A. Not to my knowledge.
Q. It mentions a couple of -- a little further down, it says, "In addition, annual employee performance reviews for all general managers." What is an annual employee performance review?
A. It's a review of their performance.
Q. And does that come out every year?
A. As I said, at times, it was a formal process, and at other times, it

was an informal process.
Q. But that's not the same as a quality assurance; right?
A. It encompassed that aspect of quality assurance, I believe.
Q. Do you know what I'm talking about when you go through there and you do the quality assurance review?
A. Yes. Yes.
Q. I want to make sure that that's not the annual performance review?
A. It's encompassed in there.
Q. Or you could have five quality assurance reviews in a year, I guess, or three?
A. In a nutshell, you would look at quality assurance, you would look at profitability, you would look at, you know, a variety of different things.
Q. All right. This is already entered as Exhibit 10 to defendant's deposition. This is a -- it's called a product evaluation?

A. Yes.
Q. That's what I understood was a quality assurance review; right?
A. It's a QA.
Q. QA?
A. Yes.
Q. Okay. You call it a QA?
A. A QA, correct.
Q. That's different than an annual review?
A. It's different. But in an annual review, this would be part of it, correct.
Q. Right. Right. But that's -- and it looks different, the annual review, than the quality assurance review, Exhibit 10, which has the -- all this little particular details about what's wrong with the property when you go through it and inspect it; right?
A. Yes.
Q. Okay. It's a different form?
A. Yes.

Q. Okay. Should there be one on all your general managers if they've been there for a few years?
A. Be one what?
Q. An annual review.
A. There should be an annual review. I don't know if there was a formal annual review. But, again, as I said earlier, there were times when that was formal and times when it was not.
Q. Okay. Well, when it was not formal, what would it be like?
A. The regional district or area manager would approach me via phone and say, "You know, I think we need to re-evaluate this person."
Q. Do you recall any annual reviews done on Belinda Stough?
A. I don't recall.
Q. If there's nothing in writing, then the only ones that would exist would have been, I guess, the informal ones when somebody would talk to you?

A. Yes.
Q. And you don't remember Charles talking to you about any annual review for Belinda Stough; correct?
A. No.
Q. Is that right?
A. I don't recall any.
Q. Okay. Do you know of any reason Belinda Stough would not receive an annual review during the time she was a general manager?
A. Other than the fact if it wasn't a formal process that year as far as doing it in writing?
Q. Any informal or formal?
A. No, I don't know.
Q. I mean, is it true that when there's not a formal process like when you have this general review -- annual review form you fill out, do you have a -- you would still have an informal process where the regional manager would call you annually and report to you on a

particular GM; is that correct?
A. Yeah. There wasn't any specific date set aside for that for, you know, a GM. But I think when it came to that point, yes, the regional, district, or area would call me and say, "You know, I'd like to talk about this person."
Q. Okay. When it came to what point?
A. To your point, an annual review.
Q. Okay. And anyway, that sentence -- and I didn't get very far into it. It says, "Managers have been rescheduled for January 2003." So, I guess, does that mean that the annual review and the performance review will be in January 2003?
A. Based on that memo, it would seem that way.
Q. Okay. "And will not be conducted during the remainder of 2002 so that all salaried management employees will receive their annual reviews at the

properties?
A. Properties, roughly speaking.
Q. Exhibit 13, is this a list -- this is bates labelled 1495 through 1499. This is a list of the properties?
A. Yes.
Q. All right. And what I need to understand. It's divided into -- I've got region -- it says Region 1, 2, 3, 4?
A. Yes.
Q. And it goes up to Region 8.
A. Okay.
Q. This says from 1/01/01 to a certain date. And you said the regions have changed?
A. Yes.
Q. I mean, in 2004 when Ms. Stough left and going back to 2002, were there any changes to the regions?
A. There may have been.
Q. Is there documents like this that would indicate -- like this Exhibit 13 that would indicate the regions?

A. Sure. At that time, yes, correct.
Q. Because at this time -- whenever this -- this was in 2001. Region 1 was Georgia -- Albany, Georgia and Alexander City, which is where Ms. Stough worked. Did this region change?
A. Region 1?
Q. Right.
A. During this year?
Q. No, up until 2004.
A. It may have been.
MR. KESSLER: It's Region 2.
THE WITNESS: Region 2 is Alex City.
Q. (By Mr. Goldfarb) Are you reading above it?
A. Yeah.
Q. I'm sorry.
A. Correct.
Q. So, Region 2 -- in 2004, was Albany in Region 2 -- 2003?
A. I don't recall.

Q. Do you know if all these hotels above where it says Region 2 are in Region 2?
A. I assume if they say Region 2 at this time, that's where they were.
Q. Right. I know that in 2001. What I'm trying to figure out is in 2003 --
A. Uh-huh.
Q. -- 2002, 2003, 2003.
A. It changed constantly, so, you know.
Q. Do you know off the top of your head -- well, can you tell me like in Albany, Georgia, is that a 60-room property?
A. 60 room, correct, give or take a few rooms.
Q. Alexander City is 60-room?
A. 60-room, uh-huh.
Q. And Bainbridge is?
A. 60.
Q. And Crestview?

A. Interior corridor, right at 60 or so. A little bit more maybe.
Q. 60-plus maybe?
A. Yeah.
Q. 61?
A. Yeah.
Q. But you say 40 or 60 generally; right?
A. Well, it's either going to be a 40-room --
Q. Or 80?
A. -- exterior corridor hotel, a 60-room exterior corridor hotel or, general speaking, a 60-plus interior corridor hotel.
Q. What was Alexander City?
A. Alex City was a 60-room exterior corridor hotel.
Q. What's the difference between an interior and an exterior?
A. It's fairly significant. The building style aesthetically. All access to the rooms are through the building.

Q. Do you -- can you tell me when Ms. Stough was a manager, how many times you went there?
A. I believe once.
Q. What year was that?
A. I don't recall.
Q. Did you do anything -- remember anything in particular about your visit there?
A. I do, actually.
Q. Tell me what you remember.
A. Coming to the property and --
Q. What year was this?
A. I don't recall.
Q. Do you keep a diary or a calendar or anything?
A. No, I don't.
Q. You schedule when you're going to go somewhere, though; right?
A. Sometimes I do, sometimes I don't.
Q. Did you keep a calendar ever?
A. As far as when I was going to

visit a property?
Q. Well, as far as any -- you know, just keep a desk calendar, here's what I've got to do today?
A. Yes. I mean, on occasion I would write those in. But the properties were situated in such a manner that, geographically, I could drive from Point A to Point B usually in fairly quick order.
However, depending on what I saw at the property, I may stay longer, I may not. I may, you know, move on. It all depends on the view of the hotel.
Q. Well, when did you go to Alex City?
A. I don't recall the specifics.
Q. Okay. You don't recall the year?
A. No.
MR. KESSLER: Jon, that's the third time you've asked him that.
THE WITNESS: No, I don't.

MR. GOLDFARB: It is?
MR. KESSLER: Yeah. You've asked him three times what year it was. He said he didn't know each time.
Q. (By Mr. Goldfarb) All right. But you remember going to Alex City?
A. Yes.
Q. And you were the manager from -- I'm sorry. You were the --
A. Director of operations, I believe.
Q. Was it while you were the VP?
A. I don't believe I was VP at the time.
Q. Okay.
A. I think I was director of operations.
Q. So, you were director of operations?
A. Right.
Q. So, it was sometime during the time period you were the director of operations?

A. Right.
Q. And you went to Alex City?
A. Yes.
Q. And what happened? What did you see?
A. What I remember of that visit is going to what we call the barracks building, which is -- you have a main building, and you have a barracks building, which is perpendicular to the main building and walking with Charles and looking at the barracks building and reviewing rooms at that time and then going from the barracks building to the main building at looking at rooms there.
Q. Okay. Do you remember anything that you saw that was good or bad?
A. Yeah. I remember going to the barracks building, and the rooms, I thought, were generally in pretty good order. And then I remember going to the main building and looking at rooms, and they were very dirty.

Q. Did you talk to anybody about that?
A. Yes, we did.
Q. Who?
A. We talked to Belinda about that.
Q. Okay.
A. And we showed her.
Q. And this was while you were a -- before you became a VP; right?
A. I believe that's correct.
Q. Okay. So, this would have been -- you were a VP up until October of 2000 -- I mean, whatever you told me before?
A. Yeah. Back up three years from the time that I left.
Q. So, this was sometime prior to October of 2000?
A. That would have been director of ops.
Q. Right. Right. And that's when you went there?
A. Yes.

Q. And that's when you talked to Belinda; right?
A. Yes.
Q. Tell me what she said.
MR. KESSLER: Wait. Wait. On the date, ask him again on the date because --
MR. GOLDFARB: He's already answered it, Gary. You have the --
MR. KESSLER: You mislead him.
MR. GOLDFARB: No, I didn't. He answered it directly.
MR. KESSLER: That's fine. I will ask him on direct.
MR. GOLDFARB: If you don't like it, you can fix it later.
THE WITNESS: Well, my records are clear as to when that personnel change took place.
Q. (By Mr. Goldfarb) What records do you have?
A. Well, I would believe that whenever my position -- in fact, it was a

press release.
Q. Okay. There was a press release that went out to the media?
A. Yes.
Q. Like what paper could I pull it up on?
A. You can Google me.
Q. Okay. I haven't done that yet. But somewhere in the world of Google, it will say when you got this job?
A. Absolutely, yes.
Q. Okay.
A. Promoted to on such and such date.
Q. But what newspapers? Was it somewhere in the Atlanta area?
A. It just goes on the newswire.
Q. Business news, stuff like that?
A. I don't know who in particular it went to. You put it on the PR newswire, and it goes out to various publications and of sort.
Q. All right. Tell me -- on this

date that we've talked about when you talked to Ms. Stough, what did you say to her, and what did she say to you?
A. I don't recall the specific conversation. But I do recall that when Charles and I walked, we walked a lot of rooms. We were concerned about the cleanliness of the property, specifically related to the rooms that we looked at.
And the buildings are built in such a manner that you can exit out of the manager's office and be within walking distance a few steps to rooms. So, it's designed that the general manager can actually inspect those rooms very quickly, very quickly.
Q. Did she walk around with you?
A. Yes.
Q. The whole time?
A. I don't recall that she walked the barracks building, but she definitely walked the main building at that time with Charles and I.

Q. Okay. So, she was with you the first time you walked through the main building?

A. I believe, she, yes, looked at the rooms that we had concerns about, and she agreed that there were issues in those rooms.

Q. And did you issue anything in writing to her?

A. I did not specifically.

Q. Did Charles?

A. I don't know.

Q. Did you tell him to?

A. I don't specifically remember telling him to put anything in writing at that time either.

Q. What was her job title at the time?

A. I don't recall.

Q. Did you talk to anybody else other than Belinda on that property?

A. Not that I recall.

Q. Do you remember seeing anybody

other than Belinda working there?

A. I don't remember seeing anybody other than Belinda at that time. There may have been some housekeepers. I'm sure there were somebody cleaning those rooms.

Q. Right. I'm just saying you didn't speak to anybody else?

A. Not that I recall, no.

Q. Did you know Belinda before that date? Had you seen her before?

A. I may have met her in a meeting or two, but I don't recall specifically.

Q. Like a meeting in Alex City?

A. No. We would have had a regional meeting or a company meeting of some sort. I mean, regionals, districts, areas had meetings all the time.

Q. When did you have those? Was there a particular time or year?

A. No, there really wasn't.

Q. Did you have them every year?

A. We had an annual GM conference

ever year.

Q. Where was that held?

A. Various places.

Q. Where was it held in 2005, your last year there? Well, you left in January, didn't you?

A. Yes I did.

Q. 2004, where was it held?

A. 2004. We had regional conferences that year.

Q. Okay.

A. So, they were within those regions. As an example, Region 1, we had in Florida. And -- so, every region had a regional conference.

Q. What region was -- in 2004 was Alex City in?

A. I don't recall.

Q. What about 2003, was it a --

A. I wouldn't know.

Q. No. No. In 2003, the meeting thing that you had, the annual conference, was it a regional one, or was

it everybody?

A. 2003?

Q. It would be the year before the regional one.

A. Yeah. Well, we did it so many different ways from year to year. So, it may have been the Dillard house at that time.

Q. So, that was everybody?

A. Yeah, everybody together as a group.

Q. Where is the Dillard house?

A. Dillard, Georgia.

Q. So, do you recall meeting Ms. Stough then in 2003?

A. No, I don't recall seeing her.

Q. It would be like 130 managers?

A. 150 people, yeah.

Q. Would assistant managers go?

A. No.

Q. So, it would be manager -- general managers and regional managers?

A. Yeah.

Q. And district managers?
A. And vendors and, you know, various corporate personnel.
Q. About 150 people?
A. Roughly speaking.
Q. In the Dillard house?
A. I believe that's correct.
Q. Was there any GMs who were not supposed to go?
A. No. I mean, not that I know of.
Q. Okay. When the GM leaves the property, who runs the property, like if Ms. Stough went to the meeting?
A. Probably her most senior person who ran the desk.
Q. Okay. And before 2003, in 2002, where was the meeting?
A. I don't recall offhand because, again, we had -- at different times, we had regional conferences. At one time, we split the company up in half. Another time, we did Signature conferences. So, there were various conferences.

Q. Did some years you not have a conference for the Jamesons, or did you have a conference every year?
A. To my recollection, we had one every year. But it was, again, in varying capacities, either on a regional basis or a company-wide basis.
Q. Do you have a recollection of talking to Ms. Stough at any meeting and meeting her?
A. Not any particular meeting, I don't recall.
Q. You think you might have met her before you went down there, you're just not sure?
A. Yeah, that's correct.
Q. Did you meet her any other time other than that time you went down there and maybe the meeting?
A. I don't specifically recall talking to her at all.
Q. At the -- what happened at these meetings that you --

A. We kind of give a state of the union for the company, the direction the company was going in. We used it primarily as a vehicle to talk about these things.
Q. Did you do training or anything like that?
A. There was some training, yes.
Q. What kind of training?
A. Guest service training.
Q. What else?
A. I don't recall any other specifics.
Q. What's guest service training, how to treat the guests?
A. Yeah, correct. And there was a director of training.
Q. Is it kind of the guest is always right type of training or something, you know, be nice to the guests?
A. The customer is always the customer kind of training, yes. We might

discuss the nature of our guarantee, things of that nature.
Q. Have you had, like, any occasions that you can think of where you've had to terminate a general manager other than Ms. Stough? Do you know of a general manager whose been terminated for performance?
A. Sure. There were times when GMs were terminated for performance.
Q. Do you know of any others than Ms. Stough? Can you name them?
A. If you gave me the name of the property and the name of the person, I could probably recollect that.
Q. If you look at, like, that list of all these properties, would you be able to tell me somebody's name who got terminated? If you can't, that's fine.
A. No, I understand. Orangeburg, I believe, we terminated that general manager.
Q. Orangeburg, South Carolina?

A. Yes.
Q. For what reason?
A. Improprieties.
Q. Meaning he did something bad?
A. Yes. It wasn't good.
Q. I mean, was it some --
A. We believe he solicited an employee in a room.
Q. Okay.
A. So, he was terminated for that.
Q. You're not allowed to, if you're a manager, have a sexual relationship with an employee that works for you at a Jameson; right?
A. I should hope not, yeah.
Q. Okay. I mean, it's in your policies.
A. Yes. Yes. I mean, that's correct.
Q. No dating relationships with the people who work for you?
A. Absolutely.
Q. Can you date if you're like one

housekeeper and another housekeeper? Is that allowed?
A. I don't think there was anything written against that.
Q. Okay.
A. Yeah. But anybody who you had direct supervisory --
Q. No subordinate subsidiary dating?
A. No. No.
Q. Correct. Okay. So, that's what this Orange -- what did you say?
A. Orangeburg.
Q. Orangeburg. Any other people -- managers, general managers that you know of that have been fired?
A. I believe Albany's general manager simultaneously was, I think, terminated and resigned at the same time. Again, improprieties.
Q. Same type of thing?
A. No, huh-uh. Money, missing money.

Q. Missing money?
A. Yes.
Q. Was that a man or a woman?
A. Woman.
Q. And Orangeburg was a guy?
A. Yes. I believe the Prattville GM for -- I don't recall if it was a resignation or a termination.
Q. For what reason?
A. I think there was performance issues.
Q. Anything other than performance?
A. Not that I recall.
Q. Was that a man or woman?
A. Man.
Q. Who was that?
A. I don't recall his last name. First name Arthur, I believe.
MR. KESSLER: By the way, at about a quarter until, which is in about 12 minutes, can we take a ten-minute break because I've got a conference call I've got to do?

MR. GOLDFARB: Sure.
THE WITNESS: Again, I don't remember if it was termination or resignation, but, I think, Garner, again, for improprieties.
Q. (By Mr. Goldfarb) Garner?
A. North Carolina.
Q. North Carolina. What kind of improprieties?
A. I believe there was money involved. I don't recall offhand.
Q. Who was the DM involved at Prattville when Arthur was terminated?
A. I don't recall at that time.
Q. Or the GM. Not the GM, the regional manager?
A. It may have been Sandy McGuffey, but I don't recall specifically.
Q. Is that a woman?
A. Yes.
Q. Sandy McGuffey?
A. Yes. Greenville, North Carolina, improprieties. He was

terminated.

Q. What did he do?

A. I believe it was -- well, I think there was performance plus -- and I don't want to speak out of hand, but I believe we had indications that he was intoxicated on the job.

Q. He wasn't performing well when he was intoxicated?

A. He thought he was.

Again, I don't remember if it was termination or resignation. Lancaster, improprieties.

Q. Do you remember what he did? Or was it a he?

A. He. I don't recall specifically.

Q. Lancaster --

A. Property performance was bad.

Q. The reason you know these that you're telling me is you have to approve of the termination of a GM?

A. I don't have to approve it.

Some things are automatic termination.

Q. Right.

A. So, HR would – if HR were in place --

Q. But performance -- you do approve it?

A. Approve?

Q. The termination.

A. Again, if it was an impropriety and HR was in place, it's an automatic termination --

Q. A nonimpropriety?

A. -- and I don't have to approve it.

Q. A nonimpropriety issue, like, just straight performance, you approve those?

A. It's more a matter of making sure that we handled any process in regard to performance the right way. And I wanted to make sure we were fair.

Q. Right.

A. If someone said, "I recommend

termination," I would ask is the property clean, is it profitable, what's the story? And they would tell me. And then I would say, "Okay. Based on your recommendations." If HR was involved or if HR was there, we would have said, "This is our situation." And HR would have said, "Yes, we need to terminate."

Q. Right. So, Ms. Stough, for example, were you involved in approving the termination of her?

A. Charles would have recommended termination. And based on the information he gave me, I would have made a decision on that.

Q. Did you go visit it before you --

A. No, I did not.

Q. Okay.

A. Yeah.

Q. If Charles -- if Belinda had stolen money or sexually harassed somebody, you generally wouldn't be

involved, that would be an automatic?

A. I would know about it, and the regional would call me.

Q. But it wouldn't be the same as what you just discussed?

A. No, because if you had something that triggers an automatic termination --

Q. Right. Okay. I'm sorry. You got to Lancaster.

A. Uh-huh. I believe Albertville was a termination based on performance.

MR. KESSLER: Albertville?

THE WITNESS: Yeah, Albertville. A gentleman, if I remember correctly.

Q. (By Mr. Goldfarb) Who was that?

A. I don't recall the name.

Q. Who was the regional manager?

A. Sandy McGuffey.

I want to say Tupelo was a termination, although, that may, again, have been a resignation based on performance. Sandy McGuffey would have been the regional.

Q. She was over Tupelo also?
A. Yes.
Q. Is she still at the company as far as you know?
A. Yes, uh-huh.
Q. Who was the person?
A. It was a lady, and I don't recall her name. I think that's all I recall at this time.
MR. KESSLER: Could we take that break?
(A short break was taken.)
Q. (By Mr. Goldfarb) Did you know what Ms. Stough's salary was while you were working there?
A. I don't recall knowing her salary, no.
Q. Do you have an opportunity to -- you would review salaries when they would come to you?
A. Right.
Q. But if --
A. I would not review existing

salaries.
Q. And you would review the salary of a newly-hired GM?
A. Correct, right.
Q. But that would be the only reason you would look at Ms. Stough's salary if she didn't receive a raise, it would just have been when she was originally hired?
A. Yeah.
Q. Right?
A. I didn't review the original salaries.
Q. But when they get hired, you'd review it. If a regional manager says, "I'm going to bring this guy in at $50,000," you would review it?
A. Yes, if it's a GM, correct.
Q. Did Greg -- I mean, did Charles Woods come to you and discuss with frequency Ms. Stough's performance?
A. He would have called me regarding that.

Q. My question is different, though. I mean, did he? I mean, you're telling me what he would have. I want to know what you really remember. Did he come to you frequently and talk to you about Ms. Stough's performance?
MR. KESSLER: Objection. Go ahead.
THE WITNESS: I don't remember specific conversations regarding that, but I feel certain he would have called me several times regarding -- I don't remember a specific conversation, but he definitely would have called me regarding her performance if he was concerned about it.
Q. (By Mr. Goldfarb) Right. That's generally the way it happens. I understand that if a DM or a GM has -- I'm sorry -- a regional manager has problems with a general manager's performance, they would call you?
A. Yes.

Q. That's what they're supposed to do?
A. Yes. And, in particular, if there was an issue with a QA for sure.
Q. Right. What your testimony is -- to make sure -- you don't remember specifically or generally him calling, but, generally, what happens is he does call?
A. I remember him calling me in regard to her performance on different occasions, but I don't remember the specifics of the conversation.
Q. Do you remember anything he said?
A. Initially, if I remember correctly, he said that he was concerned and then was going to try to work with her to get to where she needed to get to, give that some time, come back. And then later, he said, "I don't think this is working out."
Q. How long before he said, "I

it says, in 2003 -- you see there --
A. Yes.
Q. -- at the bottom.
A. The respondent reviewed -- the respondent means Jameson. Okay.
Q. Reviewed its compensation policies for general managers and assistant general managers at all of its Jameson Inns. Were you aware of -- you were aware of this review in late 2003 of all of its compensation policies for general managers?
A. What I remember is that we changed base pay for some of the general managers because we changed the bonus structure for the company during that time.
Q. How was the base pay changed?
A. To my knowledge, base pay had been, for quite some time, $18,000 for all general managers.
Q. Uh-huh.
A. And it changed to be geared

toward level of experience, location of the hotel, and what the market might pay for a hotel like that. And, again, general revenues of that property.
Q. So --
A. More market -- it was market -- it changed to market-driven is what we did.
Q. Prior to late 2003, base pay for a general manager 18,000, is that what you're saying?
A. I believe that's correct.
Q. When you say "base pay," is there something added to it?
A. Plus bonus.
Q. Okay. Well, if Ms. Stough was hired at an annual salary of 21,000 --
A. Are you saying we overpaid her?
Q. I'm asking.
A. I don't know what her actual salary was.
Q. So, it's your testimony that up until -- and I want to make sure I'm

clear on this.
A. Sure.
Q. -- until the end of 2003, the base salary for general managers was 18,000?
A. No. What I'm saying is there was a -- when I began with the company --
Q. In '98?
A. Yes. -- there was a period of time that the base salary from general mangers was 18,000 up to a period of time, and I don't recall the specific time period.
And then we reevaluated that, and we began looking at wages based on market-driven circumstance and experience of the general manager.
Q. Do you know how long in terms of years before that change from your hire date of '98 --
A. I don't recall.
Q. So, you don't know if that was before or after 2003?

A. Yeah, I don't recall.
Q. But we could --
A. I know that when I began, that had been the particular policy in place for quite some time prior to me.
And after I began -- after I was promoted to director of operations, we reviewed that, and were wanting to make that market-driven plus change the bonus portion of their pay.
Q. But you don't know when that was?
A. No, I don't recall.
Q. But you think it was after -- the base salary went above $18,000 after -- it wasn't until after you got promoted?
A. I believe that's correct, yes.
Q. Okay. And, so, all new-hire GMs, the pay would be $18,000 up until that point; is that correct?
A. Correct, yes.
Q. Regardless of your experience?

