**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| BELINDA STOUGH, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )   **CIVIL ACTION NO.:** |
| JAMESON INN, a company owned | )   **3:05cv421-W** |
| and/ or operated by KITCHIN | ) |
| HOSPITALITY, LLC, | ) |
| | ) |
|     **Defendants.** | ) |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.    PLAINTIFF'S STATEMENT OF FACTS**

    **A.    Introduction**

In this lawsuit the plaintiff asserts the following claims: (1)  discriminatory pay in violation of Title VII; (2) violation of the Equal Pay Act; (3) discriminatory evaluations and inspections; (3) discriminatory discharge; (4) retaliatory discharge.   The plaintiff, Belinda Stough, worked for the defendant, Jameson Inn, from May 10, 2000 until she was fired on February 18, 2004.  (Winey Depo. exhibit 16 Salary Chart)  Jameson Inn is a hotel chain which consists of about 135 properties collectively selling a million and a half rooms a year. (Winey Depo. p. 108, l. 12 – 109, l. 2)  The plaintiff  worked at the Alexander City location of the defendant, which was a sixty (60) room exterior corridor hotel.  (Winey Depo. p. 112, l.16-18)  Stough was paid a salary of $21,000 the entire time she was a General Manager, which was lower than any other male General Manager at a sixty (60) room property. (EX 17 – Compensation History Report)  Stough's complaints concern discriminatory pay,

1

inspection and discharge decisions made, in whole or in part, by her supervisor, District Manager Charles Woods. District Manager Woods "supervised Plaintiff from the time she became General Manager until her termination." (EX 10 Def. Supp. Rsp. To Plf. First Int. p. 3; Woods Depo. p. 163-164, 196, 199) District Manager Woods made the decision to terminate the plaintiff.[1] (Woods Depo. exhibit 10 p. 8)

### B.   District Manager Charles Woods and His Comments Indicative of His Bias Against Women Who Work

Because District Manager Charles Woods is the focus of Stough's complaints, his own employment history is relevant. Woods worked for the defendant from 1995 as a General Manager of the Ozark Alabama location until being promoted in 1997 to District Manager. (Woods Depo. p. 27 l. 4-9; 34 l. 14-17) The defendant went through Regional Manager turnovers, region realignments and other changes that resulted in Woods' supervisory duties changing. (Woods Depo. p. 38 l. 2-13; 54 l. 11 - 56 l. 21; 62 l. 16 - 64 l. 10; 69 l. 6-22; 199 l. 8 -200 l. 20) For much of 2001 and up to the second quarter of 2002 Woods shared responsibility of supervising Stough with another District Manager. (Woods Depo. p. 162 l. 6 -164 l. 15, 199 l. 21) In the second or third quarter of 2002, after certain district managers and regional managers left, Woods had sole responsibility for supervising Stough and all other managers in the same district, and Woods reported

---

[1]Int. 9 Identify by name and job title every person who was involved in the decision to terminate the plaintiff.

Response to Interrogatory No. 9:        Charles Woods (District Director) was decision -maker. . .

(See Woods Depo. exhibit 9 p. 8)

2

directly to Vice President Greg Winey.[2]  (Woods Depo. p. 164 l. 7-15, 198 l. 5-16)

As stated in the defendant's facts, Woods made comments to Stough such as "sometimes women get overemotional and that we tend to overreact." (Stough Depo. p. 36 l. 5-8) This comment was made in late 2003.  (Stough Depo. p. 38 l. 5-8)  Not mentioned in the defendant's statement of undisputed facts, but quoted in its argument section, Woods made the following remarks to Stough often when he criticized her:  "(S)ome women can't handle the work.  They need to be home and be mothers" (Stough Depo. p. 115 l. 15-18); "(S)ome women can't handle the work force.  They need to stay home and be mothers"  (Stough Depo. p. 120 l. 3-6);  "Some women can't handle the work place as well as a man and they should be at home and not in the work force.   They can't handle it, don't do it..." (Stough p, 122 l. 12-17)    Woods made these remarks to Stough on numerous occasions during her employment with the defendant, including late December 2003, which was less than two months before she was fired.  (EX 6 Stough Declaration Par. 1)  Woods often uttered such comments when he was falsely criticizing Stough.  (EX 6 Stough Declaration Par. 1)  These comments have not been denied by Woods.

The plaintiff is not the only person who has heard Woods utter such gender biased comments.  A former employee named Faye Bennett heard Woods state in 2000 that "Women don't have any damn business working anyway.  They need to be home with the kids.  A man's place is to be working because this is a man's world." (EX 9  Bennett Declaration Par. 2)  Bennett reported these comments to the company HR Manager and

---

[2]Greg Winey started working for the defendant as the Regional Manager in April 1998, in October 1998, he became the Director of Operations and around October 2001 he became the Vice President of Operations. (Winey Depo. p. 14-15, 21-22)

to Greg Winey, who was the Director of Operations at the time and later became the VP of Operations. (EX 9 Bennett Declaration Par. 3)  In early 2004, while Stough was out on approved vacation,  another employee named Sue Gabbard heard Woods state that  "I think women just need to stay home and take care of their families." (EX 7 Gabbard Declaration Par. 5)  Also in early 2004 just before Stough's termination, Woods saw Gabbard on a ladder fixing a down-spout and told her that it was a man's job to do that. (EX 7  Gabbard Declaration Par. 6)   A fourth employee named Regina New also heard Woods express his negative attitude towards women at work.  In particular, around 2003 or early 2004, when Woods was talking about his wife staying home and taking care of his household, he said that women should be at home.  (EX 8 New Declaration Par. 2)  In early 2004 when Woods saw New on a ladder changing an outside lightbulb, he told her that she did not need to be on that ladder because she was a woman. (EX 8 New Declaration Par. 3)  Woods further told New that Stough needed to get a man to do electrical things, because women did not need to be doing such work.  (EX 8 New Declaration Par. 3)

C.    **Defendant's Conflicting Accounts of Stough's Advancement from Desk Clerk to General Manager**

Stough began working for the defendant on May 10, 2000, when she was hired by General Manager Bill Plummer as a Front Desk Clerk. (Stough Depo. p. 72 l. 13-18; p. 77 l. 17-20)  On August 11, 2000, Stough was given a raise to $6.50 an hour, because the manager, Bill Plummer, had been moved, leaving Stough to assist the Acting General Manager Deborah Schweir, run the hotel.  (Def. EX 7, Stough Depo. p. 79 l. 15-80 l. 80 l. 18; Woods Depo. p. 45 l. 6 - 47 l. 20)  Although Schwier did not hold the General Manager

4

title, she was the manager on duty and had the same duties as the General Manager. (Woods Depo. p. 47 l. 21 -50 l. 15, 100 l. 13-18)   Schwier ran the hotel for five or six months. (Woods Depo. p. 49 L. 12-14)

### 1.    Defendant's First Story of Stough's Advancement – Stough Became GM in August 2000

The defendant's initial account of Stough's history is she was the General Manager from August 1, 2000 until her termination on February 18, 2004.  (Winey Depo. exhibit 16 – Salary Chart)  Also, in its EEOC position statement the defendant states that Stough was promoted to General Manager in August of 2000 by District Manager Charles Woods.

> Complainant began her employment as a Front Desk Associate at the Hotel on May 10, 2000 and her employment was terminated on or about February 18, 2004.  She was hired by former General Manager, William Plummer (male), and was paid on an hourly basis at the rate of $5.75 per hour.  Her hourly rate was later increased to $6.50.  Mr. Plummer was subsequently transferred to another Jameson Inn, **and in August 2000 Complainant was promoted to General Manager of the Hotel by Charles Woods**, the District Manager who supervised the district that included the Hotel.  Upon promotion to General Manager, Complainant was paid an annual salary of $21,000 and was eligible to receive performance based bonuses.  The decision to terminate Ms. Stough's employment at the Hotel was made by Mr. Woods.

(EX Winey EX 15 p. 2– Response to EEOC)(emphasis added)

### 2.    Defendant's Second Story of Stough's Advancement – Stough Was an Interim GM Before Becoming GM 3rd Quarter 2002

District Manager Woods includes an additional step in Stough's advancement to General Manager, calling her the Interim General Manager.  Woods testified that when Deborah Schwier left, Belinda Stough replaced her because she was the "last person standing."   (Woods Depo. p. 53 l. 9-13) District Manager Woods, along with Regional Manager Kevin Durben, were involved in allowing Stough to step in and oversee the hotel.

(Woods Depo. p. 54 l. 5-10)  According to District Manager Woods, in January 2001 when Stough took over the hotel, she was the front desk clerk or manager on duty. (Woods Depo. p. 71 l. 1-6)   District Manager Woods further explained that in late 2001, DM Komancki and Regional Manager Smith made Stough the Interim General Manager. (Woods Depo. p. 72 l. 11-19, 197 l. 9-14) District Manager Woods stated that Stough remained the Interim General Manager until sometime in the third quarter of 2002 when he promoted her to General Manager.  (Woods Depo. p. 74 l. 23 - 75 l. 16).  Woods initially testified that he had congratulated Stough when he promoted her from Interim General Manager to General Manager, but he later admitted he had no memory of telling Stough she was the Interim General Manager or even telling her she had moved to General Manager. (Woods Depo. p. 75 l. 20 - 76 l. 6;  86 l. 2 - 14 - 87 l. 4)

In the defendant's Second Supplemental Responses to Plaintiff's First Interrogatories, the defendant adopted Woods' "Interim General Manager" step in Stough's employment history.   The defendant states that District Manager Paul Komancki "recommended that Belinda Stough be placed in the interim General Manager position, apparently in late 2000, and that her interim General Manager salary be set at $21,000." (EX 11 p.  3   Defendant's Second Supplemental Response to Plaintiff's First Interrogatories)

The actual organizational charts that Woods looked at when he decided to promote Stough from Interim General Manager to General Manager tell a different story.  According to the defendant's organizational charts that the defendant was able to locate, the plaintiff became a General Manager on June 18, 2001, became an Interim General Manager on November 15, 2001, and became a General Manager again on April 3, 2003.  (EX 12

6

Organizational Charts) [3]

In the defendant's position statement to the EEOC, in the salary chart it provided, and in its in its Compensation History Report the defendant states that Stough was only a General Manager from August 2000 to February 2004, and never mentioned the Interim General Manager title.  (Winey Depo. exhibits 15 p. 2 and 16; EX 17 p. 36)[4]

> **3.    Defendant's Third Story of Stough's Advancement to GM – Stough was an Assistant GM, and When She Became a GM, She Continued to Be Paid as a Assistant GM**

The defendant's payroll records tell the real story of Stough's employment history, a story which differs greatly from the defendant's two accounts stated in the above sections of this brief.[5]  According to the defendant's payroll records, Stough worked as a front desk clerk (job code 200) at a salary of $615.00 every two weeks or $15,990 annually until she was promoted to Assistant General Manager (job code 120) on July 21, 2001 at a salary of $807.69 or $21,000 annually.  (Winey Depo. exhibit 1 week 18-32 for year 2001;  EX 16 Job Code E-Mail;  EX 15 Personal Change Report)

Although this July 2001 date is consistent with the date Stough understood her probationary status of Acting General Manager ended and when she became a General Manager, what Stough did not realize is she was only promoted to Assistant General

---

[3]The defendant is missing charts from 2002, and the 2001 charts incorrectly spell Stough's last name.

[4]If Stough truly held the Interim  General Manager job title, the Compensation History Report would have indicated that as her title as it did for the names of Jodi Smith and Tammy Snead. (EX 17 Compensation History Report p. 35 and 36)

[5]The payroll records contain position codes that indicate the particular job an employee holds along with their rate of pay.    (Winey Depo. exhibit 1 Week 8/4/01-8/10/01)  Stough worked in ignorance of these payroll records, position codes and the meaning of those codes because they were never shown to her.   (EX 6 Stough Declaration Par. 13)

Manager, not General Manager in August 2001.  (EX 6 Stough Declaration Par. 3)  The payroll records show that Stough's title remained Assistant General Manager (job code 120) until  March 2, 2002 when her job code changed from 120 to 100, which is the job code for General Manager.   (Winey Depo. exhibit 1 week 32 2001 – week 10 2002; EX 16 Job Code e-mail)   The defendant never informed Stough that it had promoted her from Assistant General Manager to General Manager in March 2002.  (EX 6 Stough Declaration Par. 4)  The defendant's secret March 2002 promotion of Stough from Assistant General Manager to General Manager remained unknown to Stough, because Stough's salary remained the same as it had been while she was an Assistant General Manager – $21,000 a year. (Winey Depo. exhibit 1 week 32 2001 - week 10 2002)  Stough continued to earn an Assistant General Manager salary of $21,000 until the defendant terminated her on February 18, 2004.  (Winey Depo. exhibit 16 – Chart)

### 4.     What the Defendant Led Stough to Believe about her Advancement to GM  – She Was a GM as of August 2001

Stough's own recollection of her advancement to General Manager differs from the defendant's various accounts, and no one ever told her she was an Interim General Manager or an Assistant General Manager. (EX 6 Stough Declaration Par. 2 & 3)  According to Stough, in early 2001, District Manager Paul Komanecky and Regional Manager Hal Smith informed her of her promotion to an Acting General Manager position, which Stough understood was a probationary position she held for six months before being promoted to General Manager, around July  2001. (Stough Depo. p. 85 l. 10 - 88 l. 20)  Stough understood that District Manager Woods recommended her for that promotion. (Stough Depo. p. 87 l. 1-6)  As of July or August 2001, after the expiration of the six

months period, Stough understood that she was the General Manager as she had been told. (Stough Declaration Par. 2)

### D. Defendant Paid Stough an Assistant General Manager Salary to Serve as a General Manager

When Stough's title changed from Assistant General Manager (job code 120) to General Manager (job code 100) in March 2002, that constituted a promotion which should have included a pay increase. (Winey Depo. exhibit 16 week 8-10 2001, Winey Depo. p. 190 l. 18-21)  Vice President Winey admitted that Assistant General Managers were paid lower salaries than the General Managers. (Winey Depo. p. 190 l. 18-21)    Indeed, male Assistant General Managers who have been promoted to General Managers receive substantial raises.[6]   When Stough's replacement, Mark Fetner, moved from Assistant General Manager to General Manager his salary increased from $21,000 to $32,000. (Winey Depo. exhibits 11 and 16)  Similarly, when Fetner's replacement Robbie Patterson moved from Assistant General Manager to General Manager, his salary increased from $21,000 to $30,000.[7] (Fetner Depo. exhibit 25, bates # 1408, Patterson Depo. p. 16, l. 8 - 16)

Assuming that the testimony from Woods and the defendant's second supplemental discovery responses are correct and Woods moved from Interim General Manager to

---

[6]Greg Anderson p. 1, received a $14,000 raise; Dennis Cannon p. 6, received a $12, 000 raise; Corey DeGroot p. 10, received a $7,500 raise; Bryan Hass p. 17, received a $12,000 raise; Robert Macfarlane p. 24, received a $18,000 raise; Randy McMillion p. 25, received a $15,000 raise; Matthew Nash p. 27, received a $12,000 raise; Elbert O'Steen p. 28, received a $13,000 raise; Derrick Powell p. 29, received a $17,000 raise; and Fredric Stott p. 36, received a $14,000 raise. (EX 17 Compensation History Report)

[7]Although the PAF form indicates Patterson started as a GM at $28,000; Patterson testified he started as a GM $30,000 and defendant's own chart shows him starting at $30,000. (Patterson Depo. p. 16, Winey Depo. exhibit 11, Fetner EX 26)

General Manager, that still constitutes a promotion that the defendant kept secret from

Stough.  Woods testified as follows:

> Q     Did you make her GM?  Did you **promote** her to GM in the third
> quarter of 2002?
>
> A     I guess you could say that.
>
> Q     Why?
>
> A     Why what.
>
> Q     Why did you **promote** her to GM in the third quarter of 2002?
>
> A     I had seen her name tag on the org. chart which is an organizational
> chart  that shows hotels and who's running hotels and who's doing
> what.  And I had seen interim in front of her name for a long time and
> felt like the interim ought to at least come off.

(Woods Depo. p. 75 l. 5 -19)  District Manager Woods "objective was simply to remove the

interim" in front of the General Manager title on the organizational chart. (Woods Depo. p.

185 l. 3-7)

When an interim General Manager moves to General Manager they typically receive

an increase in their salary.  (Woods Depo. p. 189 l. 16-22)  Other than Stough, Woods did

not know of any other employee of the defendant who had held an "interim" job title.

(Woods Depo. p. 189-190) Woods initially testified he did not review Stough's salary at the

time he moved her from interim General Manager to General Manager.  (Woods Depo. p.

186 l. 17-19)  However, Woods subsequently admitted that when he moved Stough from

Interim General Manager to General Manager that he looked at her salary, and did not feel

it warranted a raise.

> Q.   My question is -- I'm asking you for a particular occasion when you
> reviewed Ms. Stough's salary and made a decision to give her a raise or not

*give her a raise.*

A.   I'm sure at that point when she moved from an interim to GM, I'm sure at  that point, I would have looked at it.

*Q.   Why is that?*

A.   Well, it was actually a show of  confidence in her as far as -- because I think that you can -- you know, I can work with you and make you a better manager.  So I think it's -- I think that was the time to look at it.  But I just didn't feel like it warranted it.

 *Q.   Was she paid a general manager's salary at that particular time?*

A.   Yes.  I think she was already being paid.

*Q   Did you have anybody else making that salary?*

A.   I'm not sure.

*Q.   Have you ever had anybody else since 2002 to 2005 make twenty-one thousand  dollars a year in the job title of general manager or interim general manager?*

A.   Likely that there was some that weren't making that kind of money in the interim position.

*Q.   And when they became general  manager, they get paid more?*

A.   I don't recall any that were -- I  considered Belinda on the low end of the GM's as well.

(Woods Depo. p. 187 l. 23 – 189 l. 10)

Similar to Stough's ignorance that the defendant had made her an Assistant General Manager and promoted her in 2002 to General Manager, Stough never knew she was an Interim General Manager, and never knew she was promoted from Interim General Manager to General Manager in 2002.  (Stough Declaration Par. 2)

**E.    Stough's Secret Promotion From Assistant GM to GM Renders Her an Exception to Salary Freeze and Entitled to a Salary Increase**

Stough's employment history is particularly important because the defendant claims that starting in 2002 it instituted a salary freeze for all of its salaried employees. (Winey Depo. p. 38 l. 12 - 20, Winey Depo. exhibit 3)  Unless an employee received a promotion, moved to a larger property or the defendant had to correct an employee's temporary salary, no raises were allowed during the pendency of the salary freeze. (Winey Depo. p. 53-56, 163-164; Winey Depo. exhibit 14 p. 3)

The defendant clarified that "Wage/salary increases are authorized only in connection with a bona fide promotion, as evidenced by a job code change." (Winey Depo. exhibit 3, second memo; Woods Depo. p. 54 l. 4 - 55 l. 8 )  When the defendant secretly changed Stough's job title from Assistant General Manager to General Manager in March 2002, her job code changed from 120 to 100, therefore qualifying her as an exception to the salary freeze and rendering her eligible for a raise. (Winey Depo. exhibit 16 Week 8-10 2002)  Woods was made aware of these exceptions to the salary freeze. (Woods Depo. p. 111 l. 5-19)

Stough's promotion from Assistant General Manager (job code 102) to General Manager (job code 100) should have resulted in a raise just as several other Assistant General Managers received raises when they moved from Assistant General Managers to General Managers during the Freeze.  The following male Assistant General Managers were promoted to General Manager between January 2002 and April 2004 and received raises as follows:  Robert Macfarlane was promoted on 6/8/03 and his salary increased from $17,000.00 to $35,000.00;  Elbert T. O'Steen was promoted on 2/6/04 and his salary

increased from $22,000.00 to $35,000.00; Edgar S. Sharpe was promoted on 8/5/03 and his salary increased from $22,000.00 to $26,000.00 and increased to $35,000.00 on 9/28/03; and Gary Theus was promoted on 2/6/04 and his salary increased from $25,000.04 to $34,000.00. (EX 17)

Contrary to the defendant's contention that no raises were given during the freeze except for promotions, movement to a larger property or the need to correct an employee's temporary salary, some male General Managers received raises during this alleged salary freeze period from January 1, 2002 to April 1, 2004, without falling into any of these exceptions.  These individuals are as follows: Anthony A. Boyd received a raise on 3/13/02 and his salary increased from $18,000.06 to $26,999.96; Curtis Coyne received a raise on 1/27/02 and his salary increased from $40,760.20 to $44,086.12 and on 1/5/04 from $44,086.12 to $48,000.00; Dean Duggins received a raise on 1/7/02 and his salary increased from $29,000.00 to $30,449.90; Robert C. Eaton received a raise on 2/20/03 and his salary increased from $31,000.06 to $38,000.00 (both Trussville and Oxford are 60 room properties); Matthew T. Grafton received a raise on 11/17/02 and his salary increased from $39,000.00 to $47,000.00; Christopher J. Latka received a raise on 4/15/02 and his salary increased from $36,000.00 to $42,000.00 and on 5/13/02 he received a raise from $42,000 to $50,000;  Kurtis M. Reynolds received a raise on 9/29/02 and his salary increased from $22,500.00 to 34,000.00 (Eastman and Thomasville are both 40 room properties);  Edgar S. Sharpe received a raise on 9/28/03 and his salary increased from $26,000.00 to $35,000.00 (Jacksonville and Lake City are both 60 room interiors); and Justin Smith received a raise on 7/27/02 and his salary increased from $37,740.00 to $43,000.00.  (EX 17 Compensation History Report)

13

### F.    DM Woods Determines Salary of GM's and AGM's

In 2003, Jameson made an effort "to establish consistent and uniform policies for all salaried personnel in the company."[8] (Winey Depo. exhibit 3, p. 2 -- Salary Freeze Memo)  In its EEOC position statement, the defendant explained how salary was reviewed at all of its properties and adjusted according to the size of the property. (Winey Depo. exhibit 15)  In particular the defendant stated as follows to the EEOC:

> In late 2003, Respondent reviewed its compensation polices for the General Managers and Assistant General Managers at all of its Jameson Inns.  This review resulted in plans to implement significant increases in the base salary of many of its General Managers and Assistant General Managers, such that a 60-room Jameson Inn the range of the base salary for the General Manager was increased in most locations to $26,000 to $32,000, and for Assistant General Manager was increased in most locations to $18,000 to $24,000.

(Winey Depo. exhibit 15 p. 2 – Response to EEOC) According to VP Winey, the size of the property, 40 room or 60 room, is one of the factors used in determining salary, and because a 60 room property can generate more revenue, its general managers can receive a higher salary. (Winey Depo. p. 18 l. 20 -21 l. 14)   During the defendant's salary freeze period running from early 2002 until April 2004 that resulted from 9-11, the defendant only allowed raises "for promoted employees or those managers transferred to larger properties. . ."  (Winey Depo. exhibit 14 p. 3)  When asked how he decided what salary to pay his General Managers, Woods testified as follows:

> Q    Do you decide what salary to start your GM's at?
>
> A    I make a recommendation based on how I feel about the employee

---

[8]However, the only thing Operations Manager Winey knew the company did towards that uniform policy, is have a nationwide salary freeze in 2002 for salaried employees. (Winey Depo. p. 45 l. 3 - 46 l. 10)

after interviews and background and things of that sort, yes.

(Woods Depo. p. 99 l. 1-6)  Woods further testified that he had authority to recommend

raises, and he remembered doing that for General Manager James Goodman. (Woods

Depo. p. 100 l. 4-12)

Vice President Winey approved salaries for General Managers by relying on the

recommendations of the Regional District or Area manager that were presented to him.

(Winey Depo. p. 23 l. 16-23, 167 l. 5 -168 l. 15)  Winey followed the lower managers'

recommendations 99.9 percent of the time.  (Winey Depo. p. 23 l. 16-23; 41-42 l. 11-21)

Winey also signed off on merit increases to salaries only after the regional, district or area

manager made the recommendation. (Winey Depo. p. 31 l. 11-15)

Turning to the salary at issue in this case, Stough earned $21,000 annually. (Winey

Depo. exhibit 16)  The undisputed evidence shows that Stough was paid a lower salary

than any other male General Manager in the entire country at a similar sixty (60) room

exterior corridor property.  (EX 16 Comp History, Winey Depo. 112 l. 17-18, Winey Depo.

p. 109 l. 3 - 126 l. 23) The following men were General Managers of sixty (60) room

exterior corridor hotels on February 18, 2004, the date of the plaintiff's termination, and

they all received higher salaries than Stough:

| Eric B. Adelman | Johnson City | $31,500 | Kevin Howington | Dalton | $33,000 |
| John H. Arrington | Gaffney | $31,000 | Elbert T. O'Steen | Valdosta | $35,000 |
| Steven T. DeLoach | Waycross | $32,000 | William A. Plummer | Selma | $36,771 |
| John C. Demary | Meridian | $42,000 | William E. Roberts | Warner Robins | $43,713 |
| Robert C. Eaton | Oxford | $38,000 | | | |

Other females working as General Managers at the same time as the plaintiff were also

15

paid low salaries. [9]

Salary decisions begin with recommendations from District or Regional Managers, such as Charles Woods, but they require approval from corporate, such as Vice President Winey.  (Woods Depo. p. 99 l. 1 - 100 l. 12)   District Manager Woods' explanation of his role in recommending salary decisions for General Managers shows corporate is also involved in salary decisions:

Q.   Do you decide what salary to start  your GM's at?

A.  I make a recommendation based on  how I feel about the employee after interviews and background and things of that sort, yes.

Q.  And you decide to raise their  salaries if you want to raise their  salaries?

A.   It would probably be extenuating  circumstances for that kind of thing. Typically that's -- typically -- and it's  been interrupted over time.  But the company  will evaluate or do an evaluation  periodically for that.  They look at a lot  of things.

Q.   Do you have authority to give somebody a raise?

A.  I've got authority to recommend somebody.

Q.   Okay.

A.  To get a raise.

Q.   Have you done that in the past?

A.  Yes.

Q.   To who?

---

[9]Other female General Managers at the time the plaintiff understood she was a General Manager (August 2001 to February 2004), were also paid low salaries including the following:  Lisa Ball, GM from July 2001 to September 2002 at a 40 room property was paid $21,000; Teressa Davis GM from June 2002 to January 2003 paid $19,160 from June 2002 until January 2003 and $20,000 from January 2003 until June 2004 in an interior corridor 55 room property; Linda Pai GM from May 2001 to May 2002 paid $21,999 at a 60 room property.  (EX 17)

A.  I'm not sure exactly.

Q.  *Did you recommend James Goodman getting a raise?*

A.  Yes, I have.

Q.  *Okay. So how do you go about recommending somebody get a raise? If they are currently a GM, what do you do?*

A.  Generally refer it to the VP of operations or whoever is in charge and make a case for it.

(Woods Depo. p. 99 l. 1 - 100 l. 12)  VP Winey confirmed that he would receive recommendations from District or Regional Managers concerning raises for General Managers, and he would approve them.  But he did have authority to reject the recommendation. (Winey Depo. p. 41 l. 11-21)

DM Woods knew that Stough was the lowest paid General Manager that he had in his District. (Woods Depo. p. 107 l. 2-12)  The $21,000 annual salary was well below the minimum level of $26,000 for a sixty (60) room property, but it was perfectly in-line for an Assistant General Manager salary for that size property.  (EX 15 p. 2; 17)  Winey testified that he did not know what Stough's salary was and, because he did not review existing salaries, he did not have an opportunity to review it.  (Winey Depo. p. 153 l. 13 -154 l. 18)  The only time Winey may have possibly seen Stough's salary was when she was originally hired, but he further testified he did not review the original salaries. (Winey Depo. p. 154 l. 2-13)

**G.    DM Woods Hinders Plaintiff's Performance by Denying her an Assistant General Manager, Denying her a Maintenance Person and Erroneously Down-Grading her Property**

**1.    No Assistant General Manager**

The Alexander City location where Stough worked was a sixty (60) room property, and sixty room properties are budgeted for Assistant General Managers. (Woods Depo. p. 33 l. 18-20; Fetner Depo. p. 113 l. 12-13)   Stough had no Assistant General Manager when she worked there until Mark Fetner was hired during the final two weeks of her employment. (Stough Depo. p. 96 l. 22-97 l. 8)   Woods testified that General Managers hire their Assistant General Managers, and that he had told Stough to hire an Assistant Manager.  (Woods Depo. p. 79 l. 1-8)  Although Woods testified that he told Stough to go pick an Assistant General Manager for her hotel, he admitted he would not allow Stough to hire who she had wanted to hire as an Assistant General Manager. (Woods Depo. p. 79 l. 23-80 l. 6)   In truth, Woods never told Stough she could hire an Assistant General Manager despite her constantly asking for one. (EX 6 Stough Declaration Par. 11)  Indeed, Stough had been asking Woods for an Assistant General Manager to help her and suggested several of her employees as Assistant General Managers; however, Woods would not hire any of them.  (Stough Depo. p. 99 l. 6 - 100 l. 1, 187 l. 4 -189 l. 3)   Woods admitted that Stough had suggested several of her employees to be promoted to Assistant General Managers, but he "didn't think much of" the two females that Stough suggested, Linda Peppers and Crystal Foster, for the Assistant General Manager position. (Woods Depo. p. 79 l. 23 - 81 l. 18)

Woods refused to allow Stough to be involved in selecting her Assistant General

Manager; when Stough asked if she could be involved in picking her Assistant General Manager, Woods told Stough he would handle it. (Stough Depo. p. 99 l. 14 - 100 l. 1) Woods alone selected Fetner as Stough's Assistant General Manager; Stough had nothing to do with the hiring of Fetner. (Stough Depo. p. 97 l. 12-14) Fetner was hired on January 19, 2004 as an Assistant General Manager. (Winey Depo. exhibit 16) After he was hired, Fetner went through one week of training at the Auburn store and two weeks of training at the Eufala Store. (Fetner Depo. p. 78 l. 3 - 79 l. 2) Fetner started working at the Alexander City location around the second or third week of February. (Fetner Depo. p. 82 l. 11-23) When Fetner started working for Stough, he said there were no problems the first day or two. (Fetner Depo. p. 80 p. 6-7) Fetner only worked with Stough three or four days. (Fetner Depo. p. 88 l. 17-22) During those few days, Fetner refused to listen to Stough, deciding what he was going to do himself. (Stough Depo. p. 97 l. 23-98 l. 3; , 148 l. 7-23)

### 2.    No Maintenance Help

When Stough originally went to work for the defendant, there was a maintenance person working 15 hours a week, but when she was the General Manager, the maintenance position was taken out of her budget. (Stough Depo. p. 90 l. 5-18) Stough had asked Woods for a maintenance person, but Woods refused to allow her to hire one. (EX 6 Stough Declaration Par. 14) One of the areas Stough was down graded in her evaluations relates to capital budget (Stough Depo. p. 112 l. 5 -113 l. 14) Capital deficiencies concern items that need replacing. (Winey Depo. p. 66 l. 20 -67 l. 3) Whether a property had a maintenance person to repair capital items depended on the budgets, which are initially decided by Regional Managers and reviewed at the corporate office. (Winey Depo. p. 68 l. 2-12) Stough's male replacement, Charles Fetner, was allowed to

hire a maintenance person without the approval of Charles Woods. (Fetner Depo. p. 95 l. 12 - 96 l. 6)  Fetner's male replacement, Robbie Patterson, also had a maintenance person assigned to his property. (Fetner Depo. p. 27 l. 13-15)

### 3.    Any Evidence of Poor Performance Through Woods Alone – Winey Saw Nothing

In its fact numbers 12 and 13, the defendant asserts it is undisputed that Winey observed dirty rooms at the motel and spoke to Stough concerning them. (Def. Facts p. 3-4)  Winey testified that at the time he visited the motel he was the Director of Operations, which would mean he visited prior to October 2001.[10]   (Winey Depo. p. 129 l. 7 -133 l. 23) Winey does not know what job Stough held at the time of his visit. (Winey Depo. p. 137 l. 17-19)  And, when he visited, Winey complimented Stough's job performance, including telling her that the "rooms were nice and clean."  (Stough Depo. p. 295 l. 2-17)

### 4.    Woods Discriminatory Quality Assessment Production Evaluations

During Stough's employment, DM Woods conducted the Product evaluations, also known as Quality Assurance (QA)Evaluations, on the Alexander City property where Stough was the General Manager. (Woods Depo. p. 243 l 10-12)  The defendant uses QA Evaluations to grade the properties with a set scoring system; the more graded areas a property receives the lower the property scores. (Winey Depo. exhibit 6, Woods Depo. p. 213 l. 1-6)  The grading of these evaluations is based on points received for deficiencies along with a listing of items that automatically drop the score. (Winey Depo. exhibit 6, Winey depo. p. 74 l. 20 -75 l. 7)  When an employee receives two needs improvement

---

[10]At the very latest, the very latest Winey would have visited the location was before February 14, 2002.

scores in a row they are written up. (Woods 262 l. 16-23;  265 l. 6-23)

Because of the sexist comments Woods made to her when he graded her property, Stough testified that Woods was nit-picking her property because she was a woman and discriminated against her in the evaluations. (Stough Depo. p. 115 l. 3 - 116 l. 9; 164 l. 7-167 l. 1;  Stough Declaration Par. 1)

> I just felt like I was being picked on because of the fact that I was a woman. . I felt like as a woman I was being discriminated against.  I felt like I was being picked on.  I felt like nothing I did was good enough.  And I felt this way because of conversations that we had.  There were remarks made that some women can't handle the work.  They need to be home and be mothers.

(Stough Depo. p. 115 l. 3 - 116 l. 9)

Stough felt many of the Q&A inspections were totally wrong. (Stough Depo. p. 125 l. 20 - 126 l. 11)  For example, on the March 5, 2003 product evaluation Stough received a needs improvement; however, much of the criticism arose from issues within Stough's capital budget and she had requested money to fix the items. (Stough Depo. p. 112 l. 12 - 113 l. 6)  Indeed, Stough consistently received excellent scores on her county health inspection records regarding the same issues that Woods criticized her for. (Stough Depo. p. 127 l. 20 - 128 l. 20)   When Stough told Woods she disagreed with any of his Quality Assurance evaluations because they were not true, Woods typically responded by making remarks about how women get overemotional and tend to overreact or about how some women can not handle the work place as well as a man and should be at home and not in the work force. (Stough Declaration Par. 16) Woods' criticisms of the Alexander City property while Stough was the General Manager is contradicted by another General Manager telling Fetner that the Alexander City property was one of the cleanest they had. (EX 8 New Declaration Par. 4)

21

**H.    Despite Hurdles Woods Placed In Front of Her, Stough Managed to Obtain Bonuses Based on Profitability**

During Stough's employment, employees received bonuses based on profitability and quality assurance scores.    (Winey Depo. p. 78 l. 9 -82 l. 10)    Other than grading the property which resulted in a Quality Assurance Score, Woods was not directly involved in deciding whether an employee received a bonus, because those calculations are made at the corporate office. (Woods Depo. p. 170 l. 9-13) The purpose of the bonus program was to motivate employees to make the company more money.  (Woods Depo. p. 176 l. 19 -23)

On January 21, 2003, Winey issued a memo explaining that employees were entitled to bonuses if they achieved their budgeted Gross Operating Profit (GOP), but their bonuses were subjected to reduction for receiving a needs improvement QA. (Winey Depo. exhibit 8 1/21/03 bonus memo)  In January 2003, Winey sent Stough a letter congratulating her on receiving a bonus, and Stough continued to receive bonuses through October 31, 2003 for her performance that year. (Winey Deposition exhibit 7; Woods Depo. p. 177 l. 7-16, Woods Depo. exhibit 6)

**I.    Woods Terminates Stough Allegedly for Performance Days After She Complained of Sex Discrimination in Pay**

**1.    Woods Never Evaluated Stough**

Jameson uses annual employee performance reviews to evaluate employees' performance. (Winey Depo. p. 47 l. 13-19) Managers who have been there for a few years should have received annual performance reviews. (Winey Depo. p. 50 l. 1-10)  When there is no formal review done on an employee, the District or Area Manager would approach Operations Director Winey and tell him they needed to do a review. (Winey

22

Depo. p. 50 l. 11-16)

During her entire employment, Stough never received an annual performance review. (Stough Declaration Par. 10)  Winey knows of no reviews done on Stough.  (Winey Depo. p. 50 l. 17-19)   Winey knows of no reason why Charles Woods would not do an annual review on Stough during her employment as a General Manager. (Winey Depo. p. 51 l. 8 - 16; p. 53 l. 1-4)

During this 2002 salary freeze, annual salary reviews were rescheduled for January of 2003, and none would be done in 2002.  (Winey Depo. EX 3)  Woods thought the freeze was going to be lifted at the end of 2003, and testified that he did reviews on all his managers, including Belinda Stough, and sent them to the corporate office. (Woods Depo. p. 207 l. 23 -209 l. 13)  However, Stough never received a performance review. (Stough Declaration Par. 10)

### 2.     Events Leading up to Termination

Stough was written up on June 17, 2003 for being out of work when she had been in the hospital. (Stough Depo. p. 168)  On December 29, 2003, Stough requested and received approval to be off work for nine days in late January and early February for her son's wedding and her husband returning from Iraq for a short leave. (Stough Depo. p. 196 l. 17 - 197 l. 13; Stough Depo. exhibit 20 (submitted by defendant)  After she put in her request, Woods issued Stough an erroneous unsatisfactory performance memo that same day. (Stough Depo. exhibit 19 (submitted by defendant); Woods Depo. p. 266 l. 9 -267 l. 1)   This date is also 10 days after Woods sent in his memo recommending hiring Mark Fetner.  (Winey Depo. exhibit 12)        Stough was out of work on approved vacation for many days from mid to late January to early February because of her son's wedding and

her husband being on a fifteen day leave from Iraq, her last day out on this approved vacation being February 3, 2006.  (Woods Depo. p. 267; Stough Deposition exhibit 20 (submitted by defendant)  A few days after Stough returned to work, Woods issued her another erroneous write-up which stated that he had met with Stough on February 3, 2006. (Stough Depo. EX 21, Woods Depo. p. 268 l. 7-14, Stough Depo. 196 l. 13 - 200 l. 13) Woods admitted in his deposition that Stough was not even at work on February 3, 2006, and that must be an error. (Woods Depo. p. 268 l. 18-23)

>    3.    **Plaintiff Learns about Discriminatory Pay Issues and Complains**

Shortly after Stough returned from being off work, around the 14th or 15th of February, Stough saw payroll documents that showed her Assistant General Manager, Mark Fetner, who was hired while Stough was out on approved vacation, was making the same salary she was making as a General Manager, $21,000. (Stough, 97 l. 3-8; 117 l. 17-21; 224 l. 3 - 15)

That same day Stough learned of the discriminatory pay, Stough called Mr. Woods on the telephone and told him that she had seen the pay roster, was aware that Mark Fetner was making the same pay that she was making, and she felt she was being sexually discriminated against in pay. (Stough Depo. p. 224 l. 3 - 225 l. 2)  Stough told Woods that "I felt like it was sexual discrimination, pay discrimination basically."  (Stough Depo. p. 224 l. 16 - 225 l. 2) Stough told Woods that she felt like she was being sexually discriminated against in pay because she was a female Manager and her male Assistant General Manager, Mr. Fetner, made the same salary as she made. (Stough Depo. p. 120 l. 18 - l. 121 l. 2)

Pretty much the conversation that I had with Mr. Woods about the pay and

> the discrimination that I felt like I had been discriminated against because I was a female and that I was aware by the payroll records that Mark Fetner, which was at that time my assistant manager, was making the same pay that I was making and I questioned that.

(Stough Depo. p. 32 l. 6-14)  Woods responded to Stough's complaint by stating "I don't have time to talk about it right now." (Stough Depo. p. 223 l. 3-9, 225 l. 4-5)

When Woods hired Fetner as the Assistant General Manager, he started him at the same salary that Stough was making as the General Manager, $21,000.  (Winey Depo. exhibit 16)  Vice President Winey admitted that Assistant General Managers were paid lower salaries than the General Managers. (Winey Depo. p. 190 l. 18-21)    Woods could not name a single Assistant General Manager who made the same salary as the General Manager or Interim General Manager over them. (Woods Depo. p. 243 l. 16 - 244 l. 7) The defendant's payroll documents indicate that male General Managers earn a substantially higher salary than the Assistant General Managers working for them.  (EX 17).  Stough did not learn that she was making less than other General Managers like herself until she saw the payroll roster after the lawsuit was filed (Stough Depo. p. 117 l. 17 - 118 l. 9) Vice President Winey could not recall anyone working as a General Manager who was paid less than the $21,000 paid to Stough. (Winey Depo. p. 171 l. 1-9)

### 4.    Woods Issues Stough a Failed QA Report and Fired her

On the final evaluation Woods did on Stough's property on February 18, 2004, Woods would not allow Stough to go around with him as he performed his inspection. (Stough Depo. p. 104 l. 10 -105 l. 12) He instructed Stough to stay on the front desk while he conducted the Quality Assurance investigation.  (Stough Depo. p. 159 l. 3-22) According to Stough, " Mr. Woods told me to stay on  the front desk to stay there and he would go

25

conduct the QA." (Stough Depo. p. 159 l. 20-22)  Stough never saw the final QA evaluation issued on 2/18/05.  (Stough Depo. p. 203 l. 7-21)  The first time she saw it was during her deposition, and she pointed out the numerous errors in it showing why she did not agree with it. (Stough Depo. p. 212 l. 15 - 223 l. 1)  Not allowing the manager to walk around with the assessor during a property evaluation is contrary to company practice, because the property manager needs "to know and see everything that the QA assessor is seeing." (Winey Depo. p. 65 l. 3-23)

Woods testified that after he performed that inspection and gave the plaintiff's property a failing score, he telephoned VP Winey and talked about firing the plaintiff. (Woods Depo. p. 105 l. 11 - 106 l. 2)  Woods recommended terminating Stough and Winey approved it based on Woods' recommendation and without visiting the property. (Winey Depo. p. 151 l. 12-15)  When asked in an interrogatory who made the decision to terminate Stough, defendant answered that "Charles Woods was the decision maker" and Woods verified this interrogatory response.   (Woods Depo. exhibits 10, p. 8 and Depo. exhibit 9)

**J.    Woods Replaced Stough with a Male GM and Subsequently Replaced that GM with Another Male, both of Whom were Paid Significantly Higher Salaries than Stough**

On December 19, 2003, Charles Woods wrote a letter recommending Mark Fetner for the Assistant General Manager of Alex City, emphasizing his supposed B.S. Degree from Troy State and his experience as an administrator of the condominium complex that he lived in. (Winey Depo. exhibit 12;  Woods Depo. p. 244 l. 12 - 245 l. 17;  249 l 16 -250 l. 14)   Other than working in his parent's restaurant, the majority of Fetner's work experience has been bookkeeping.

Q.  But you -- other than the restaurant, you did bookkeeping at the other places?

A.  Right.

*Q.  Only bookkeeping?*

A.  Yes, sir.

(Fetner Depo. p. 56 l. 2-7)  Woods decided the salary at which to start Fetner as an Assistant GM, $21,000, and Winey approved it. (Woods Depo. p. 106 l. 15-17; Winey Depo. p. 107 l. 5-12; Winey Depo. exhibit 16) Fetner began his employment around January 21, 2004, and he went through several weeks of training. (Woods Depo. p. 104 l. 1-7; Woods Depo. exhibit 10 -- Discovery Response)

On February 18, 2004, Woods either terminated Stough, as the interrogatory response he verified states, or recommended the termination of Stough as he and Winey state in their depositions.  (Woods Depo. exhibits 10, p. 8 and 9; Woods Depo. p. 105 l. 11 - 106 l. 2;  Winey Depo. p. 151 l. 12-15)  Woods, with the approval of Winey, replaced Stough with Mark Fetner as the new General Manager of the Alex City property.  (Winey Depo. exhibit 16) Fetner promptly replaced Stough as the Alexander City General Manager. (Woods Depo. p.  100 l. 23 -101 l. 11;  Winey Depo. p. 103 l. 11-21;  Winey Depo. exhibit 11;  Winey Depo. exhibit 16 )

While Stough was out with her husband who was home from Iraq, but still employed as the General Manager, another employee saw Fetner wearing a General Manager name tag, indicating he had replaced Stough.  (EX 8 New Declaration Par. 4) The day after that employee saw Fetner wearing a General Manager name tag, and while Stough was still out from work with her husband, Betty Sutton, the Eufala General Manager, was walking

around the property with Fetner.  (EX 8 New Declaration Par. 4, Winey Depo exhibit 16)
General Manager Sutton asked Fetner how he was going to like running that property, and she further told Fetner that this was one of the cleanest properties that Jameson had. (EX 8 New Declaration Par. 4)

Woods recommended to corporate that Fetner be promoted to General Manager at a salary of $32,000, as compared to Stough's $21,000 salary, based on his alleged college degree and his work experience. (Winey Depo. exhibit 11 & 16;  Woods Depo. p. 152 l. 20 - 153 l. 12; 252 l. 22 - 253 l. 3) However, Woods admitted knowing  that Fetner had no prior hotel or motel experience.  (Woods Depo. p. 249 l. 16 - 18) Moreover, Fetner had neither the education nor the sterling experience upon which Woods' based his alleged recommendation. (Fetner Depo. p. 70 l. 13-19; EX 18)  Concerning the alleged college education, Fetner admitted lying to Woods when he said he had a college degree.

*Q.  Did you tell him you had a BS  degree?*

A.  Yes, sir.

*Q.  All right.  Did you tell him -- so, you lied to him when you were talking  to him?*

A.  Yes, sir.

(Fetner Depo. p. 70 l. 13-19;  Fetner Depo. exhibit 19)   And concerning the work history, Woods testified that he checked Fetner's employment by calling his previous places of employment, including the administrative position at the condominium complex. (Woods Depo. p. 246 l. 16 - 248 l. 18) Although Woods testified to receiving positive comments on Fetner, a reasonable jury could find that highly unlikely given the circumstances surrounding Fetner's leaving, which included him writing a letter just before his departure wherein he admitted to mishandling funds totaling over seven thousand dollars, agreed to

28

pay back that money and asked for forgiveness. (EX 18 (under seal) [11]

After Stough's termination, Fetner was not able to run the property; therefore, DM Woods along with General Managers Betty Sutton and Jim Goodman came to the Alexander City location to help Fetner several times a week. (EX 7 Declaration of Gabbard Par. 2; Fetner Depo. p. 89 l. 13-23; 90 l. 22 - 91 l. 7; 91 l. 22 - 92 l. 9) Betty Sutton helped with the paperwork, hiring, housekeeping and organization, and Jim Goodman helped with maintenance. (Fetner Depo. p. 152 l. 21 - 154 l. 10)

Fetner held that GM position until he moved to a different GM position in October 2005 in Newman, Georgia, making $40,000 and Robbie Patterson replaced him as the Alex City GM making a $30,000 salary, which was decided by Woods. (Woods Depo. p. 102 l. 1-12; 272 l. 21 - 273 l. 12; Winey Depo. exhibit 16; Fetner Depo. p. 155 l. 3-14; Patterson Depo. p. 16 l. 14-16) Charles Woods and others in the corporate office interviewed Patterson for the Assistant General Manager position. (Woods Depo. p. 15 l. 2-5)

### K.    Comparator Terminations

When asked whether he knew of any General Manager who received more than one failed performance appraisal, Winey pointed to the Prattville GM. (Winey Depo. p. 159 l. 1-18) Bill Plummer is the current manager of that property, and he has received at least two failing evaluations, once while he was the General Manager at Selma and another one while he was the General Manager over Prattville. (EX 14 see Prattville and Selma) The

---

[11]Even after learning that Fetner had lied about his college degree and seeing records revealing the real reason (involving repayment of $7,000 and a request for forgiveness from Fetner) Fetner left the one place the defendant credits Fetner with relevant experience the defendant continues paying Fetner a $40,000 annual salary as general manager. (Winey EX 16)

Prattville hotel is the other 60 room property under Woods and that property had an Assistant General Manager. (Fetner Depo. p. 147 l. 22 -148 l. 1; Winey Depo. p. 218 l. 11-18; Woods Depo. p. 116 l. 9-13; 204 l. 4-14)

## II.    ARGUMENT

In this lawsuit the plaintiff asserts the following claims: (1)  discriminatory pay in violation of Title VII; (2) violation of the Equal Pay Act; (3) discriminatory evaluations and inspections; (3) discriminatory discharge; (4) retaliatory discharge.

### A.    Pay Discrimination in Violation of The Equal Pay Act and Title VII

The undisputed evidence shows that when the plaintiff held the General Manager job title she was paid a lower salary than any male General Manager in the entire country, and she was paid lower than the two males who succeeded her after her termination at the same property where she worked.  (EX 17; Winey Depo. exhibit 16)  The plaintiff's District Manager, Charles Woods testified that the plaintiff was the lowest paid General Manager in his district, despite the fact that she managed the largest property, a sixty (60) room exterior corridor. (Woods Depo. p. 107 l. 2-12)  On the date of her termination, February 18, 2004, the plaintiff earned a substantially lower salary than any male General Manager of a (60) sixty room exterior corridor hotel in the country –  the plaintiff earned $21,000 as compared to male General Managers over the same size property receiving salaries ranging from $31,000 for the manager of the Johnson City property to $42,000 and $43,000 at the Meridian and Warner Robbins properties. (EX 17; Winey Depo. p. 111-127; EX 13)

As explained in the above facts, the reason the plaintiff was the lowest paid General

Manager in the entire country is because, unbeknownst to the plaintiff, the defendant paid her the salary of an Assistant General Manager, not the General Manager title she held. (Winey exhibit 1 – Labor Distribution Report, EX 16 Job Code E-Mail)    The defendant's decision to pay the plaintiff lower than any other general manager without a legitimate reason supporting its decision coupled with the blatant sexist remarks by the decision maker constitutes sufficient evidence to send the plaintiff's Equal Pay Act claim and her Title VII pay discrimination case to the jury.

### 1.    The Equal Pay Act

"The Equal Pay Act prohibits an employer from discriminating on the basis of sex by 'paying wages to employees in such establishments at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work.' 29 U.S.C.A. § 206(d)(1)"  *Ramsey v. State of Alabama Public Service Commission* 86 F.Supp.2d 1124, 1126 (M.D. Ala. 2000).  "In contrast to Title VII, the EPA establishes a form of "strict liability":

> Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a "factor other than sex" is responsible for the differential.  If the defendant fails, the plaintiff wins.  The plaintiff is not required to prove discriminatory intent on the part of the defendant.

*Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1019 (11th Cir. 1994). "To establish a prima facie case under the EPA of 1963, a complainant must show that an employer pays different wages to employees of the opposite sexes for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions."  *Miranda v. B&B Cash Grocery Store, Inc.*,

975 F.2d 1518, 1532 (11th Cir. 1992)(internal quotations and citations omitted). "The plaintiff's required burden of a prima facie violation of the Equal Pay Act consists of a showing that she has been making less money than a male worker who does substantially the same work in a similar position." *Glover* 980 F.Supp. at 443.

The most obvious comparator is the plaintiff's successor, Mark Fetner. "The Equal Pay Act also clearly applies when a plaintiff alleges an inequality between her pay and that of her successor.") *See Arrington* v. Cobb County 139 F.3d 865, 876 n. 22.

> It is well established that a plaintiff may establish an Equal Pay Act violation by comparing her wages to that of an employee of the opposite sex who either preceded or succeeded her; and, when the higher-paid comparator replaces the plaintiff (rather than preceding her), the Equal Pay Act violation obtains during the period when the plaintiff receives a lower wage, even though the comparator has not yet been hired.

*Ramsey,* 86 F.Supp.2d at 1126.

Fetner replaced the plaintiff at the Alexander City location making $11,000 more than the plaintiff – Fetner made $32,000 as a General Manager and the plaintiff made $21,000. Fetner had no hotel experience, and the only related experience was the bookkeeping work he did at the condominium complex that he left after agreeing to repay that complex $7,000 and asking for forgiveness for what he had done. (EX 18; Fetner Depo. p. 56 l. 2-7). Fetner did not have the college degree that he had told Woods he possessed. Had Woods truly done a background check as he testified, he would have quickly discovered this fraud. Even now that the defendant knows of Fetner's lack of a college degree and can see the real reasons he left his position at the condo complex, which was the one job the defendant pointed to as constituting related experience, the defendant continues to pay Fetner, who still works under Woods, $40,000 per year. That

is nearly double the plaintiff's salary.

In this case the evidence is undisputed that the plaintiff's General Manager duties were equal to similarly situated managers of sixty (60) room properties. She was even paid lower than male General Managers of 40 room properties in her own district, such as James Goodman, who was paid $30,000 and hired three years after the plaintiff. (Winey Depo. exhibit 16)  Managers running sixty room properties are entitled to higher salaries than managers running 40 room properties, as evidenced by the defendant's interrogatory response indicating that managers moving to larger properties during the freeze received salary increases.  (Winey Depo. exhibit 14 p. 2)

The defendant's argument that all the properties are different "establishments" and therefore those other general managers are not proper comparators under the EPA contradicts its own position statement to the EEOC.   The defendant boasted to the EEOC about its consistent salary structure at all of its Jameson Inns for positions based on the size of the property.

> In late 2003,Respondent reviewed its compensation polices for the General Managers and Assistant General Managers **at all of its Jameson Inns**. This review resulted in plans to implement significant increases in the base salary of many of its General Managers and Assistant General Managers, such that a 60-room Jameson Inn the range of the base salary for the General Manager was increased in most locations to $26,000 to $32,000, and for Assistant General Manager was increased in most locations to $18,000 to $24,000.

(Winey EX 15 – Response to EEOC)   Moreover, someone at the corporate office, such as Vice President Winey, must approve all salary recommendations it receives on managers from its District and Regional Managers.

The principal authority on the "establishment" issue under § 206 of the Equal Pay

Act holds that "central control and administration of disparate job sites can support a finding of a single establishment for purposes of the EPA" and that "[t]he hallmarks of this standard are centralized control of job descriptions, salary administration, and job assignments or functions." *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 591 (11th Cir. 1994). The Eleventh Circuit's decision in the latter case adopted the earlier decision in *Brennan v. Goose Creek Consol. Ind. Sch. District*, 519 F.2d 53, 55-56 (5th Cir. 1975), which held that a business with multiple locations is a single "establishment" where the "central administration . . . hired the [employees], determined their wages, assigned them to the [place] in which they were to work, and sometimes switched their assignments from one [place] to another." *Goose Creek*, 519 F.2d at 55-56. The Court also looked at whether "the work schedule and the [employee's] daily duties [were] controlled to a large extent by the central administrators [and] do not differ from [place to place]. *Id.* Woods went to great effort in his deposition to say he recommended salary decisions, rather than make them himself, to be approved by VP Winey at the corporate office.

> Q    *Do you decide what salary to start your GM's at?*
>
> A    I make a recommendation based on how I feel about the employee after interviews and background and things of that sort, yes.
>
> Q    *And you decide to raise their salaries if you want to raise their salaries?*
>
> A    It would probably be extenuating circumstances for that kind of thing. Typically that's -- typically -- and it's been interrupted over time. But the company will evaluate or do an evaluation periodically for that. They look at a lot of things.
>
> Q    *Do you have authority to give somebody a raise?*
>
> A    I've got authority to recommend somebody.

Q.    *Okay.*

A      To get a raise.

Q.    *Have you done that in the past?*

A      Yes.

Q      *To who?*

A      I'm not sure exactly.

Q      *Did you recommend James Goodman  getting a raise?*

A      Yes, I have.

Q      *Okay.  So how do you go about  recommending somebody get a raise?  If they are currently a GM, what do you do?*

A      Generally refer it to the VP of  operations or whoever is in charge and make  a case for it.

(Woods Depo. p. 99-100)

"Once a plaintiff makes out a prima facie case, the burden shifts to the employer to prove that the difference in pay is justified by one of the four exceptions in the Equal Pay Act. . ." *Miranda,* 975 F.2d at 1532-1533.  "Under the EPA, the onus is on the employer to establish that the pay differential was premised on a factor other than sex." *Meeks,* 15 F.3d at 1019.   In its brief, the defendant failed to meet its burden to show the difference between what it paid the plaintiff and all the other General Managers was based on a factor other than sex; therefore, summary judgment should be denied.

##        2.    Title VII Pay Discrimination

In proving her Equal Pay claim in this case, Stough has met the easier burden under Title VII.  In contrast to the plaintiff's EPA claim, her Title VII wage discrimination claim

"requires a more relaxed standard of similarity between the jobs." *Glover v. Kindercare Learning Centers* 980 F.Supp. 437, 443 (M.D. Ala. 1997)(internal quotations and citations omitted). As detailed in the above facts, the plaintiff was paid less than any other male general manager in the country when she actually held the General Manager job title. The defendant makes pay decisions based on the size of the property, resulting in 60 room managers making more money than managers of 40 room properties.

The plaintiff's discriminatory pay claim is further supported by the fact that Charles Woods decided to secretly change Stough's job title from Assistant General Manager to General Manger without increasing her salary to the appropriate level; decided to pay Stough's replacement, Mark Fetner, a significantly higher salary than Stough to be the General Manager; and made comments that showed his extreme bias towards women in the work place.

When Woods visited Stough's property and conducted inspections he often made comments revealing his highly biased view of females at the workplace. The evidence now stands undisputed that Woods made all of these comments to Stough and others up until 2004:

(1)    In 2003 to Stough – "sometimes women get overemotional and . . . tend to overreact;" (Stough p. 36 l. 5-8)

(2)    In 2003 to Stough – "some women can't handle the work. They need to be home and be mothers" (Stough p. 115);

(3)    In 2003 to Stough – "Some women can't handle the work place as well as a man and they should be at home and not in the work force. They can't handle it, don't do it..." (Stough p, 122);

(4)    In 2000 to Bennett -- "Women don't have any damn business working anyway. They need to be home with the kids. A man's place is to be working

because it this is a man's world."[12] (EX 9  Bennett Declaration Par. 2);

(5)    In 2004 to Gabbard – "I think women just need to stay home and take care of

their families." (EX 7 Gabbard Declaration Par. 5);

(6)    In 2004 told Gabbard that it was a man's job to fix the down spout. (EX 7 Gabbard Declaration Par. 6);

(7)    In 2003 or early 2004 told New that his wife stayed at home and that is where

a woman should be. (EX 8 New Declaration Par. 2);

(8)    In early 2004 told New that Stough needed to get a man to do electrical things, because women did not need to be doing such work.  (EX 8 New Declaration Par. 3);

Statements indicating bias towards women attributed to Woods are  "highly suggestive circumstantial evidence from which a jury could infer discriminatory animus." *Damon v. Fleming Supermarkets of Florida,* 196 F.3d 1354, 1359, 1362 (11th Cir. 1999).

 "(L)anguage not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out a prima facie case." *Id. (quoting Jones v. Bessemer Carraway Medical Ctr.,* 151 F.3d 1321, 1323, n. 11 (11th Cir. 1998)).

Persons involved in an employment decision at issue must be clean of discriminatory animus, because their prejudices infect all decisions they make with bias. In *Ross v. Rhodes Furniture*, 146 F.3d 1286, 1290 (11th Cir. 1998), one of the decision makers made a racial comment in 1990 and, although Rhodes was not fired until 1994, the Eleventh Circuit held that single racial statement constituted circumstantial evidence of discrimination and could persuade a jury to disbelieve the defendant's proffered reason.

---

[12]Bennett reported these comments to the company HR Manager and to Greg Winey, who was the Director of Operations at the time and later became the VP of Operations.  (EX 9 Bennett Declaration Par. 3)

37

*Rhodes,* 1462 F.3d at 1291.  *See also*, *See Ashe v. Aronov Homes, Inc,* 354 F. Supp.2d 1251 (M. D. Ala 2004)(Fuller, J.) and *Herawi v. State of Alabama Dept. of Forensic Sciences*, 311 F.Supp.2d 1335 (M. D. Ala. 2004)(Fuller, J.). "Comments or remarks that suggest discriminatory animus can be sufficient circumstantial evidence to establish pretext." *Herawi* at 1347 (citing *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1362 (11th Cir.1999); *Bonham v. Regions Mortgage, Inc.,* 129 F.Supp.2d 1315, 1332 (M.D.Ala.2001) (Thompson, J.)(*cited in Herawi, supra*).  In *Herawi*, the Court concluded that the comments made by the decision maker might lead a reasonable jury to disbelieve the defendant's proffered reason for firing the plaintiff, rendering summary judgment inappropriate.  *Id.*

If Woods is to be believed in that he only recommended salaries and was not the ultimate decision maker (see above), this does not lessen the effect of his own discriminatory animus on the decision to keep Stough at $21,000 and pay Fetner $32,000 for the exact same job.   While Woods may not have been the ultimate decision maker on Stough's and Fetner's salaries, his substantial input into her deciding salaries of GM's such as Stough, is sufficient to taint the salary decision with discriminatory animus. See, *Herawi v. State of Alabama Dept. of Forensic Sciences*, 311 F.Supp.2d 1335, 1347, n. 24  (M. D. Ala. 2004) (Court found there was sufficient evidence for the case to go to the jury where "there is evidence that [the person making the comments about national origin] had substantial input into the decision by way of her performance appraisal and memoranda" even though she was not the ultimate decisionmaker.  *Herawi*, 311 F.Supp. 2d at 1347, n.24.

The fact that Woods recommended salary decisions as opposed to being the ultimate decision maker does not weaken the plaintiff's case.

> Causation may be established if the plaintiff shows that the decision maker followed the biased recommendation without independently investigating" the intermediate employee's actions. . . The intermediary effectively becomes the decisionmaker, and the "titular 'decisionmaker' is the mere conduit for the [employee's] discriminatory actions.

*Hamilton v. Montgomery County Bd. Of Educ.* 122 F.Supp. 2d 1273, 1287 (M.D. Ala. 2000). The fact that Woods may not have made the ultimate decision concerning the plaintiff's salary should not "cause the court to find that there is no evidence to undermine the legitimate nondiscriminatory reason, given" his involvement promoting the plaintiff without raising her salary. S*ee Gullatte v. Westpoint Stevens, Inc.,* 100 F.Supp.2d 1315 (M.D. Ala. 2000) (citing *Nida v. Echols*, 31 F.Supp.2d 1358 (N.D.Ga. 1998)) (stating that if a subordinate is able to influence a decision, the existence of bias of the subordinate becomes important).

Although these decision maker comment's alone send the plaintiff's Title VII pay discrimination claim to the jury, other factors revealing the defendant's deceptive manner in dealing with Stough's position and pay renders summary judgment improper. In particular, the defendant has misrepresented to Stough, to the EEOC and in other documents that Stough was a General Manager when she was only an Assistant General Manager according to the defendant's own payroll documents until . (Compare Winey exhibits 15 p. 2, 16, and EX 18 to Winey exhibit 1, EX 16, )

The defendant initially stated Stough was the General Manager from August 1, 2000 until the end of her employment. (EX Winey Depo. exhibits 15 (EEOC response) and 16 (salary chart) The defendant later changes its story and states that Stough was not really

39

a General Manager, she was only an Interim General Manager from August 1, 2000 until the third quarter of 2002, when he promoted her to General Manager. (Woods Depo. p. 72, 75, 197, exhibit 11) (Defendant's Second Supplemental Response to Plaintiff's First Interrogatories) The defendant's organizational charts present additional contradictions. Those organizational charts show that Stough was a General Manger from June 2001 until November 2001, an Interim General Manager from November 2001 until April 2003 and a General Manager from April 2003 until her February 18, 2004 termination. (EX 12) The defendant's payroll records contradict the defendant's earlier versions because they show the plaintiff was promoted from Front Desk Clerk ($15,990 annually) to Assistant General Manager ($21,000 annually) on July 21, 2001, and she was not promoted to General Manager until March 2, 2002. (EX Winey EX 1, EX 16 Job Code e-mail)

Regardless of whether the plaintiff was promoted from Interim General Manager to General Manager in the third quarter of 2002 as Woods testified or promoted from Assistant General Manager to General Manager in March 2002 as the payroll records show, Woods never raised Stough's salary to the appropriate level of a General Manager.

> Q. My question is -- I'm asking you for a particular occasion when you reviewed Ms. Stough's salary and made a decision to give her a raise or not give her a raise.
>
> A. I'm sure at that point when she moved from an interim to GM, I'm sure at that point, I would have looked at it.
>
> Q. Why is that?
>
> A. Well, it was actually a show of confidence in her as far as -- because I think that you can -- you know, I can work with you and make you a better manager. So I think it's -- I think that was the time to look at it. But I just didn't feel like it warranted it.

(Woods p. 187-188) Stough was never told she held the position of Interim General

Manager or Assistant General Manager; therefore, she never knew Woods had promoted her to General Manager in 2002 without increasing her salary.  This promotion and job code change renders Stough an exception to the company-wide salary freeze that ran from 2002 to April 2004; however, her salary remained at $21,000.

The defendant's conflicting accounts of Stough's position and her promotion to General Manager provide additional evidence of pretext.  The internal conflict in the defendant's various positions constitutes a quintessential credibility determination reserved solely for the jury.  *Ozark Interiors, Inc. v. Local 978 Carpenters,* 957 F.2d 566, 569 (8th Cir. 1991) ("[a]mbiguities and [ ] conflicts in a deponent's testimony are generally matters for the jury to sort out") (citation omitted).  In *Wiltz v. Mobil Oil Exploration & Producing North America, Inc.,* 938 F.2d 47 (5th Cir. 1991), the Fifth Circuit reversed the directed verdict in light of internally conflicting testimony by a plaintiff:

> In this case, we agree with the appellants that the court impermissibly resolved an internal conflict in Broussard's testimony.  Although he indicated in a deposition and statement that he might have had five minutes before the fire to shut down the engine, at trial he insisted he had insufficient time.  In its brief [appellee] argues that it was "obvious" that Broussard tried to "play dumb throughout his testimony."  Whether Broussard was "playing dumb" was for the jury to decide, not a court.

*Id.* at 50; *cf. Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 431-433.(1st Cir. 2000) (reversing summary judgment where employer gave different reasons at different times for plaintiff's termination; appellate court held that "when a company . . . gives different and arguably inconsistent explanations, a jury may infer that the reasons are pretextual" and that its "recitation of the facts has taken the evidence in the light most favorable to the plaintiff [as] [i]t is not a description of what the jury must find, but is rather a description of

41

the permissible inferences that could be drawn from the facts and that suffice to defeat summary judgment"); *Siegel v. Alpha Wire Corp.,* 894 F.2d 50, 55 (3d Cir. 1990) (at time of plaintiff's discharge, she was told it was due to reorganization; during lawsuit, decisionmaker testified that plaintiff was discharged for poor performance; inferences from this evidence along with evidence of plaintiff's good evaluations was all that was needed to withstand summary judgment); Marsh v. Hog Slat, Inc., 79 F. Supp.2d 1068, 1079-1080 (N. D. Iowa 2000)  (summary judgment denied where resolution of case on summary judgment would require court to credit defendant's testimony and disbelieve plaintiff testimony describing entirely different set of facts from defendant's version). See also, *LaPierre v. Benson Nissan, Inc.,* 86 F.3d 444, 450 (5th Cir. 1996) (genuine issue of fact raised where deposition testimony of most senior official at parent corporation conflicted with defendant's articulated reason for plaintiff's failure to receive promotion); and see, *Pagan v. Shoney's*, Inc., 931 F.2d 334, 338-39 (5th Cir. 1991) (it was for the jury to assess the credibility of a witness who changes her testimony).

Whether the defendant's records contain errors when it calls the plaintiff an Assistant General Manager; whether she became an Interim General Manager; and when she became a General Manager are credibility determinations for the jury to decide, not this Court on summary judgment.  See *Hunt v. Cromartie*, 119 S.Ct. 1545, 1552 (1999) (where reasonable inferences from undisputed facts can lead to either of two conclusions, it is error to resolve this issue of fact by summary judgment).   "The very essence of [the jury's] function is to select among conflicting inferences and conclusions that it considers most reasonable."  *Tennant v. Peoria & P.U.R. Co*., 321 U.S. 29, 35 (1944). As stated in

*Springs Co. v. Edgar*, 99 U.S. 645 (1879), "[i]f the Court admits . . . testimony, then it is for the jury to decide whenever any, and if any what, weight is to be given to the testimony." *Id.* at 658; s*ee also Sioux City & Pacific R.R. Co. v. Stout,* 84 U.S. 657, 664 (1873) ("It is assumed that twelve men know more of the common affairs of life than does one man; that they can draw wiser and safer conclusions from admitted facts thus occurring, than can a single judge").

Although the defendant has not raised a statute of limitations argument concerning her promotion, no such argument would work here because the plaintiff had no reason to even suspect she was being paid less than other General Managers until the 14th or 15th of February 2004, when she saw she made the same salary as her newly hired Assistant General Manager, Mark Fetner.  In fact, Stough did not learn that she was making less than other General Managers like herself until she saw the payroll roster after the lawsuit was filed (Stough Depo. p. 117 l. 17 - 118 l. 9)  Morever, under her Title VII pay claim, the plaintiff is entitled to reach back to the last salary related decision before her 180 day filing period started, which according to the payroll records, the latest date would be March 2002 when the plaintiff was promoted from Assistant General Manager to General Manager while working under Woods, but her salary remained at the Assistant General Manager level.  Because Stough was never even told she was an Assistant General Manager or an Interim General manager, and because she never received any type of annual review, the original decision to pay the plaintiff $21,000 as a General Manager is also subject to challenge.

> Limits on how far into the past the plaintiff can look for an intentionally discriminatory decision are most obviously warranted where, as here the employee's pay level was subjected to periodic re-assessment through

regularly scheduled raise decisions.  In such cases, the timing of the employer's compensation system creates one, obviously preferable opportunity for an employee to make any pay-related complaints: the point at which the employee's salary is reviewed and he or she is dissatisfied with that result.   We think therefore, that at least in cases in which the employer has a system for periodically reviewing and re-establishing employee pay, an employee seeking to establish that his or her pay level was unlawfully depressed may look no further into the past than the last affirmative decision directly affecting the employee's pay immediately preceding the start of the limitations period.

*Ledbetter v. Goodyear Tire and Rubber Company* 421 F.3d 1169, 1182 (11th Cir. 2005)

In summary, the following factors show an ample amount of pretext to send the plaintiff's Title VII pay discrimination claims to the jury:  (1) salary decision maker Woods made numerous derogatory comments concerning females at work;  (2) according to Woods deposition testimony he secretly promoted the plaintiff from Interim General Manager to General Manager in the third quarter of 2002, according to Woods, or April of 2003 according to the organizational charts, without giving her a raise; (3) according to the payroll records Stough was secretly promoted from Assistant General Manager to General Manager in March 2002 and received no salary increase;  and (4) Stough was paid a lower salary than any other male General Manager in the country according to the payroll records.

## III.  Gender Discrimination in Inspections/Evaluations and Discharge

The defendant discriminated against the plaintiff because of her female gender in evaluations/inspections and discharge.[13]

---

[13]The plaintiff never received an evaluation during her employment, which the defendant claims it uses to determine raises.   However, DM Woods did inspect the plaintiff's property in the product evaluations which is sometimes referred to as quality assurance reports.  The defendant relies on those Quality Assurance reports as its basis for terminating the plaintiff's employment, especially the final one issued to her on February 18, 2004.

### A.    The Plaintiff Can Establish A Prima Facie Case Of Sex Discrimination

In its brief the defendant assumes that the plaintiff can establish a prima facie case of sex discrimination; therefore, should this Court require a prima facie case analysis, the plaintiff has placed that in the footnote. (Def. Brf. p. 5).[14]

### B.    The Defendant's Legitimate Non-Discriminatory Reason

In asserting its alleged non-discriminatory reason for terminating Stough, the defendant states that "Stough's employment was terminated when she received a second consecutive quarterly "Failure" grade on the QA inspection of her hotel."  (Def. Brf. p. 5) Actually the sequence of QA inspections can be seen in exhibits 16, 17 and 18 and 22 to Stough's deposition already submitted to this Court.   Those exhibits show that Stough's scores on the last four product evaluations she received were as follows: 8/7/03 -- average; 11/26/03 -- failure; 12/19/03 -- needs improvement; 2/18/03 -- failure.  (See Defendant's EX's 16, 17, 18, and 22 to Stough Deposition)   As the defendant's own documents show, Stough did not receive two failures in a row.  Charles Woods conducted all of Stough's

---

[14]A plaintiff may generally establish a *prima facie* case of sex discrimination under Title VII and § 1981, by showing that (1) she is a member of a protected class;  (2) she was terminated; (3) she was qualified for his position; and (4) she was replaced by someone outside of the protected class. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181 (11th Cir. 1984).  However, in cases where an employee has been terminated from a previously held position, the Eleventh Circuit has articulated a modified version of this rule.  *See Rosenfield v. Wellington Leisure Products,* 827 F.2d 1493, 1495, n.2 (11th Cir. 1987).  The modified rule is that in a termination case where the plaintiff has held a position for a significant amount of time, the plaintiff's qualifications for a position can be inferred. *Crapp v. City of Miami Beach,* 242 F.3d 1017, 1020 (11th Cir. 2001).  The Eleventh Circuit has also stated that "allegations of poor performance against plaintiffs discharged from long-held position may be properly considered.......when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for the termination.  *Id.* (quoting *Damon v. Fleming Supermarkets,* 196 F.3d 1354, 1360 (11th Cir. 1999), *cert. denied,* 529 U.S. 1109, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000).  Since the plaintiff had been in her General Manager position from as early as 2000, according to the defendant,  until February 18, 2004, she should receive the inference of meeting the qualifications.  Alleged performance problems simply do not correlate with qualifications for the position.  Therefore, there is no dispute that the plaintiff has met his *prima facie* case because the plaintiff is obviously a member of the protected class, was terminated and replaced by a male.

product evaluations, including the failure on February 18, 2004, the same day he fired her.

## C.    Pretext

The reason the defendant has put forth to support its decision to terminate the plaintiff is on February 18, 2004 DM Woods gave Stough a failing score on her product evaluation, which led to Woods' decision to fire her that day.    It is undisputed that DM Woods made the decision to fire the plaintiff.  (EX Woods Depo. exhibit 10 --  Interrogatory Response p. 8)

Assuming *arguendo* that defendant has articulated a legitimate, non-discriminatory or retaliatory reason for Stough's termination, the burden then shifts back to Stough to demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's legitimate reasons for its action that a reasonable factfinder could find [all of those reasons] unworthy of credence.'" *Watkins v. Sverdrup Technology, Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998)(*quoting Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)*, cert. denied*, 522 U.S. 1045 (1998)).  As the Eleventh Circuit held in *Hairston*:

> The burden to avoid summary judgment is not to show by a preponderance of the evidence that the reasons stated were pretext. Rather, plaintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of facts, which when taken in the light most favorable to the non-moving party, could allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext, and that the action taken was in retaliation for engaging in the protected activity. Issues of fact and sufficiency of evidence are properly reserved for the jury. The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue.

*Hairston* at 921. Plaintiff has satisfied that burden here.

### 1.    The 2/18/04 Production Evaluation

Woods violated company procedure by refusing to allow Stough to accompany him when he inspected the property on February 18, 2004.  Woods went around the property by himself and never showed Stough the evaluation he did on that property.   Additional evidence uncovered in this case shows why – the decision to terminate the plaintiff and replace her with Mark Fetner had already been made as evidenced by the fact that Fetner was working there and wearing a General Manager name tag before Stough was terminated, and, while Stough was still the General Manager, another General Manager asked Fetner how he was going to like running that property. (EX 8 Declaration of New Par. 4)  In addition, the timing of Woods' issuance of the February 18th 2004 QA evaluation and firing her that day, immediately after he hired Fetner as the first Assistant General Manager that Stough had ever had, could lead a jury to find the defendant's articulated reasons to be false.

Woods issuance of the February 6, 2006 "accountability" to Stough constitutes additional evidence of pretext because it states that Woods had a meeting with Stough on February 3, 2004, wherein he stated that if she failed to adhere to what was stated in that memo, it could lead to her termination.  However, Woods admitted in his deposition that he could not have met with Stough on that day, February 3, 2004, because she was still out of work with her husband who had returned on leave from Iraq.  (See Stough exhibit 21 submitted by the defendant) "The inconsistencies in the evidence and the timing of these negative performance memoranda could lead a reasonable factfinder to conclude that Defendant's proffered reasons for terminating Plaintiff are false or, at least, should not be believed."  *Ashe v. Aronov Homes* 354 F.Supp.2d at 1261.   And finally, male

47

employees such as Bill Plummer, have received two property failures and have not been terminated by Woods or anyone under Winey's control. (EX 14)

Plaintiff's claims are due to go to a jury because the reasons given for plaintiff's termination are unworthy of credence. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination and it may be quite persuasive." *Reeves*, 530 U.S. at 147 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 517 (1993)). Woods act of violating company procedure when he excluded Stough from his February 18, 2004 QA review of her property, which resulted in her discharge, raises sufficient evidence to create an issue of fact for the jury to determine the truth or falsity of Woods' reason for firing the plaintiff.

Even if Stough's evaluation score had some legitimacy, Woods act of denying the plaintiff an Assistant General Manager for her property, which was budgeted for an Assistant General Manager, and Woods refusal to allow the plaintiff to hire a maintenance person increased the difficulty of Stough's job. When Woods finally did hire an Assistant General Manager, he picked Fetner, who only worked with the plaintiff a few days and refused to help her.

## 2.    Decision Maker's Comments Establish Pretext

Charles Woods issued Stough her failed Quality Assurance inspections and made the decision to terminate the her based on those failed Quality Assurance inspections. Charles Woods uttered a stream of derogatory comments concerning women in the workplace which reveal his true discriminatory motivation in attacking the plaintiff's performance and discharging her. Indeed, when the plaintiff challenged Woods on the QA

evaluations he gave her property, Woods typically responded by making remarks about how women get overemotional and tend to overreact or about how some women can not handle the work place as well as a man and should be at home and not in the work force. (EX 6 Stough Declaration Par. 16)   These are not mere stray comments of some co-worker; rather, they reveal the blatant sexist attitude of decision maker DM Woods and the intentional discrimination motivating Woods' decision to downgrade the plaintiff's property, terminate her and replace her with a man.   "It is clearly established that comments or remarks that suggest discriminatory animus can be sufficient circumstantial evidence to establish pretext."  *Ashe v. Aronov Homes* 354 F.Supp at 1262.

In *Herawi* 311 F.Supp. 1335 the plaintiff had "neither evidence that she was replaced by someone who was not a member of her protected class nor evidence that a similarly situated department employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged." *Id* at 1347.   In denying summary judgment the Court found that the discriminatory comments of the decision maker, Dr. Emily Ward sufficient to send the case to the jury.

> The court finds that Ward's comments about Herawi's Iranian origin are sufficient to create the inference of discrimination.  Evidence of even isolated and stray remarks related to a protected characteristic can be sufficient to create a prima-facie case of discrimination. . . . In *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497 (11th Cir. 1991), the court held that the plaintiff had met his burden of establishing a prima-facie case of age discrimination by introducing evidence of his supervisor's comment to the effect that the plaintiff was too old.  Furthermore, as a general rule, remarks that show bias are particularly probative of discrimination when they are made by the person charged with making the employment decision at issue.

*Id.* at 1347.

### 3.    The Replacement

In addition to Woods' comments showing his disapproval of women working, Woods selection of the male replacement named Mark Fetner in and of itself reveals his harried and illogical intent to stuff a male into the General Manager slot at Alex City.   Woods was in such a rush to put a man in that job, that he offered Fetner a significantly higher salary than the plaintiff based on unchecked false information provided by Fetner.  Had Woods really done the background check he claims he did on Fetner before hiring and paying him a salary over a third higher than the plaintiff's (plaintiff was at 21k and Fetner was at 32k), Woods would have easily realized Fetner did not have the college degree he claimed he had, and the only possible relevant experience Fetner had as a part-time bookkeeper at a condo complex was shadowed with him leaving after agreeing to repay $7,000 and asking for forgiveness for what he had done.

### D.    Retaliation

It is an unlawful employment practice under Title VII for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §§ 2000e-3(a); see also  *Clover v. Total System Servs., Inc.,* 157 F.3d 824, 827 (11th Cir.1998) (quoting 42 U.S.C. §§ 2000e-3(a)). These two forms of statutorily protected activity are known as the "opposition" and "participation" clauses.

Under the opposition clause, a plaintiff engages in "statutorily protected activity" when she protests conduct of the employer, whether or not said conduct was actually

lawful or not, so long as she demonstrates she had "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Tech., Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir.1997).  Under the applicable standard, as set forth in *Little*,

> A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a prima facie case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir.1978). *See also Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981) ("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a prima facie case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), cert. denied, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982).

103 F.3d at 960. The analysis of whether a plaintiff's activities are inclusive of the opposition clause has both a subjective and an objective component:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.*

### 1.    The Plaintiff Can Prove A Prima Facie Case of Retaliation concerning lower evaluations and discharge

"To avoid summary judgment, a plaintiff must establish a prima facie case of retaliation.  This showing contains three elements: first, the plaintiff engaged in statutorily

protected conduct; second, the plaintiff suffered an adverse employment action; and finally, the adverse action was causally related to the protected expression." *Farley v. Nationwide Mutual Ins. Co.* 197 F.3d 1322, 1336 (11th Cir. 1999).   Stough triggered the opposition clause when she complained of discrimination to Woods on February 14th or 15th 2005 . *See e.g.*, *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11thCir. 1998); *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993);  *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918-19 (11th Cir. 1993); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600-601 (11th Cir. 1986).

The defendant argues "her complaint to Woods about Fetner's salary was not a statutorily protected expression" because "a claim of sex discrimination in pay is not actionable if the plaintiff and her male comparator receive the same pay." (Def. Brf. p. 9) The defendant's contention that in order for the plaintiff to have an actionable retaliation complaint she must complain about conduct that is in fact illegal discrimination is incorrect. Whether the underlying activity is complaint satisfies the technical definition of an actionable claim under Title VII, is not at issue in a retaliation case;  the issue is whether the plaintiff had a good faith reasonable belief that she was being discriminated against and she objected to that discrimination. *Little v. United Tech., Carrier Transicold Div.,* 103 F.3d at 960.   Stough told Woods that "I felt like it was sexual discrimination, pay discrimination basically." (Stough p. 224-225)  Plaintiff told Woods that she felt like she was being sexually discriminated against in pay because she was a female Manager and her male Assistant General Manager, Mr. Fetner, made the same salary as she made.

(Stough p. 32, 120)

### a.    Causation in Retaliatory Discharge

On the 14th or 15th of February Stough complained to DM Woods that she was being discriminated against because of her sex in pay. (Stough p. 224-225) Quoting directly from the defendant's brief "causal link requirement is construed broadly and can be established merely by temporal proximity to the adverse action" citing *Farley v. Nationwide Mutual Ins. Co.*, 197 F.3D 1322, 1336 (11th Cir. 1999). Three or four days later on February 18, 2005, Woods conducted a QA investigation of the plaintiff's property, refused to allow her to accompany him and fired her allegedly based on the failed QA inspection. (Woods EX 10, p. 8, Stough p. 104-106, 159, 203). Woods act of refusing to allow Stough to accompany him on that inspection violates the company practice of allowing the General Manger to walk the property with the inspector. (Winey p. 65) A reasonable jury could conclude the reason Woods refused to allow Stough to walk with him on the inspection is he entered false information on the report in order to give her a failing score.

(Stough p. 212-223)

The defendant argues the plaintiff was "already on her last legs with her job and she knew it." (Def. Brf. p. 10) However, in January 2004 the plaintiff had finally been given the Assistant General Manager (Mark Fetner) that her property was budgeted for and she had been requesting for years. The decision to fire the plaintiff did not come until Woods gave the plaintiff the failing QA score and then called VP Winey to tell him that Stough's property received a failing score. (Woods p. 105-106) Woods issued that failing QA score that caused Stough's termination only three or four days after Stough had complained to him

of sex discrimination. Wood's intention to hire Fetner to "help" Stough can not be believed because Fetner only worked with Stough three or four days and he refused to help Stough during those few days.

The Eleventh Circuit has repeatedly interpreted the "causal link requirement" broadly. *See Meeks*, 15 F.3d at 1021; *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993). In *Meeks* and *Reichhold*, the Court stated that "a plaintiff merely has to prove that the protected activity and the negative employment action are **not completely unrelated**." *Meeks*, 15 F.3d at 1021 (emphasis added); *Reichhold*, 988 F.2d at 1571-72. The Eleventh Circuit has further stated that:

> The causal link in the [retaliatory discharge] formula [is not] the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. . . . Rather, we construe the "causal link" element to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated. At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action. (internal cites omitted).

*Hairston*, 9 F.3d at 920.

The Eleventh Circuit has held that "[e]vidence that the adverse treatment followed closely upon the protected activity . . . may be sufficient to establish a causal connection." *Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 627 (11th Cir. 1983)(holding that a causal link may be established upon a showing that only a short period of time passes between the protected activity and the adverse personnel action complained of); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163-64 (11th Cir. 1993); *Donnellon v. Fruehaup Corp.*, 794 F.2d 598, 601 (11th Cir. 1986); *Jordan v. Wilson*, 649 F. Supp. 1038, 1061 (M.D. Ala. 1986).

54

The awareness by the decision-maker of protected conduct, in conjunction with temporal proximity of adverse employment action to protected conduct, is sufficient to create a factual issue about the causal link requirement. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163-1164 (11th Cir. 1993). "The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." *Id.* at 1163 (internal citations omitted)

In this case, the defendant's immediate adverse employment action towards Stough days after she complained of sex discrimination raises a sufficient question of causation for the jury. Whether or not causation exists is frequently decided on timing alone. Courts have found no retaliation when a period of time from six months to one year passed between the protected activity and the adverse employment action. See, *Leslie v. Mobile Transit Authority*, 963 F. Supp. 1142, 1149 (S. D. Ala. 1997); *Valdez v. Mercy Hospital*, 961 F.2d. *Valdez v. Mercy Hospital,* 961 F.2d 1401, 1403 (8th Cir.1992);*Balletti v. Sun-Sentinel Co.,* 909 F. Supp. 1539, 1549 (S.D. Fla.1995); *Juarez v. Ameritech Mobile Communications, Inc.,* 746 F. Supp. 798, 804 (N.D.Ill.1990) *aff'd* 957 F.2d 317 (7th Cir.1992). Conversely, where termination closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision. *Mize v. Jefferson Bd. of Educ.*, 93 F.3d 739 (11th Cir. 1996). *See, e.g. Bechtel Construction Co. v. Secretary of Labor*, 50 F.3d 926, 934 (11th Cir. 1995). In the instant case, within days after the plaintiff complained of sex discrimination to Woods, Woods issued the plaintiff the failing QA score and fired her. (Woods Depo. exhibit 10 p. 8)

### 2.    Defendant's Articulated Reason

"Once a prima facie case has been established, the employer has the burden of articulating a legitimate nondiscriminatory reason for the challenged employment decision." *Farley,* 197 F.3d 1336.    In this case, the defendant must present its legitimate, nondiscriminatory reason for issuing low evaluations and firing the plaintiff.  The defendant has done that by stating it terminated the plaintiff because of her failed QA scores, including the one on the 18th of February, 2004.

### 3.    Pretext

After the defendant articulates its legitimate nondiscriminatory reason for terminating the plaintiff,  "(t)he plaintiff then must 'demonstrate that it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." *Farley,* 197 F.3d at 1336. (citations omitted).  "This is done by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence. . .. The trier of fact may infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Hamilton v. Montgomery County Bd. Of Educ.* 122 F.Supp. 2d 1273, 1281 (M.D. Ala. 2000) (citations omitted).  As the Supreme Court held:

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." . . . Moreover, once the employer's justifications has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its

56

decision.

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 120 S.Ct. 2097, 2101, 147 L.Ed.2d 105 (2000) (internal quotations and citations omitted).

The defendant completely relies on Charles Woods to support its decision to terminate the plaintiff's employment: Woods' testimony, Woods' write-ups of Stough and Woods' QA reports.  The defendant's entire case rests on Woods.    Therefore, the defendant cannot escape the fact that three or four days before Woods fired the plaintiff, she had complained to him of sex discrimination.   In addition, the final QA evaluation that Woods did on the plaintiff raises sufficient questions of fact to allow a jury to find that QA evaluation to be pretextual.  Not only do the plaintiff and the other employees working there at the time state that the property was in good shape, Woods issued that evaluation three or four days after the plaintiff complained to him of sex discrimination.   Woods then violated company procedures by instructing Stough to remain behind the desk while he walked around her property and conducted the QA evaluation.   The timing of this QA evaluation and Woods' act of breaking the rules to keep Stough from looking over his shoulder as he conducted the QA evaluation, raises sufficient questions of fact for a jury to find pretext.

In addition, other employees who have not complained of discrimination have received two or more failed product evaluations but they continue working for the defendant.  On summary judgment, the Eleventh Circuit recognizes "that the 'work rule' defense is arguably pretextual when a plaintiff submits evidence (1) that she did not violate the cited work rule, or (2) that if she violated the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Damon,* 196 F.3d

at 1363. "(T)he phrase 'similarly situated' is the correct term of art in employment discrimination law" to use when comparing the defendant's handling of an act of a party who falls within the protected class to a party outside that class. *Alexander v. Fulton County, Georgia* 207 F.3d 1303, 1333 (11th Cir. 2000). "Moreover, the law does not require that a 'similarly situated' individual be one who has 'engaged in the same or nearly identical conduct' as the disciplined plaintiff. Instead, the law only requires 'similar' misconduct from the similarly situated comparator." *Alexander* 207 F.3d at 1334.

In addition to Bill Plummer, other General Managers have received more than one failure and continue working for the defendant such as Barbara Rhodes receiving two failures in a row in April and August 2005 and a needs improvement in September 2005; and Pat Shaw receiving three failures in a row in January, August and December 2005. (EX 14 Thomaston, Ga, and Waynesboro Ga.) None of these employees have complained of discrimination.

The fact that the failed evaluation happened after Stough's employment ended is irrelevant for purposes of presenting similarly situated comparators.

> It is the rare case indeed in which there is a nearly exact temporal overlap between the allegedly discriminatory conduct and the conduct regarding similarly situated individuals. The last date of the allegedly discriminatory conduct is not a bright line beyond which the conduct of the employer is no longer relevant in a discrimination case. Otherwise, clearly relevant evidence would be arbitrarily excluded; for example, a plaintiff in a race discrimination case would then be precluded from producing evidence that the week after he was fired, a white employee escaped discipline for the exact same conduct. The focus must remain on whether the evidence is relevant to demonstrate that discrimination played a role in the decision, and that determination is not served by a bright line temporal restriction.

*Freeman v. Madison Metropolitan School District*, 231 F.3d 374, 382 (7th Cir. 2000).

58

## III.    CONCLUSION

Based on the foregoing, the defendant's summary judgment motion is due to be denied.

Respectfully submitted,

 s/Jon C. Goldfarb_____
Jon C. Goldfarb
Maury S. Weiner
Counsel for Plaintiff

**OF COUNSEL:**
WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500

Law Office of Angela J. Hill
139 South Broadnax Street
Dadeville, Alabama 36853-1701

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been filed with the Clerk of Court using the CM/ECF system, which will send electronic notification to the following counsel of record:

Gary R. Kessler, Esq.,
Irvin, Stanford & Kessler
3060 Peachtree Road, Suite 1050
Atlanta, Georgia 30305
Telephone No.: (404) 237-1020
Facsimile No.: (404) 237-1047

on this the 23rd day of June, 2006.

 s/Jon C. Goldfarb 
OF COUNSEL