# Exhibit 1
# Deposition of Belinda Stough

0001
1          UNITED STATES DISTRICT COURT
2          MIDDLE DISTRICT OF ALABAMA
3              EASTERN DIVISION
4   CASE NUMBER:  3:05 CV421-W
5   BELINDA STOUGH,
6          Plaintiff,
7          vs.
8   JAMESON INNS, a company
9   owned or operated by
10  KITCHIN HOSPITALITY, LLC,
11          Defendant.
12       DEPOSITION OF BELINDA STOUGH
13              In accordance with
14  Rule 5 (d) of The Alabama Rules of
15  Federal Procedure, as Amended, effective
16  May 15, 1988, I, ELLEN DYE, am hereby
17  delivering to Mr. Gary R. Kessler, the
18  original transcript of the oral testimony
19  taken on the 24th day of February, 2006,
20  along with exhibits.
21              Please be advised that
22  this is the same and not retained by the
23  Court Reporter, nor filed with the Court.
0002
1      S T I P U L A T I O N S
2              IT IS STIPULATED AND
3   AGREED by and between the parties through
4   their respective counsel, that the
5   deposition of BELINDA STOUGH may be taken
6   before ELLEN DYE, Commissioner, at the
7   offices of Wiggins, Childs,
8   Quinn & Pantazis, L.L.C., The Kress
9   Building, 301 19th Street North,
10  Birmingham, Alabama 35203, on the 24th
11  day of February, 2006.
12              IT IS FURTHER STIPULATED
13  AND AGREED that the signature to and the
14  reading of the deposition by the witness
15  is waived, the deposition to have the
16  same force and effect as if full
17  compliance had been had with all laws and
18  rules of Court relating to the taking of
19  depositions.
20              IT IS FURTHER STIPULATED

21  AND AGREED that it shall not be necessary
22  for any objections to be made by counsel
23   to any questions except as to form or
0003
 1  leading questions, and that counsel for
 2  the parties may make objections and
 3  assign grounds at the time of the trial,
 4  or at the time said deposition is offered
 5  in evidence, or prior thereto.
 6          IT IS FURTHER STIPULATED
 7  AND AGREED that the notice of filing of
 8  the deposition by the Commissioner is
 9  waived.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
0004
 1          I N D E X
 2  EXAMINATION BY:        PAGE NUMBER:
 3  Mr. Kessler            9 and 292
 4  Mr. Goldfarb           290
 5
 6  DEFENDANT'S EXHIBITS
 7  1                 25
 8  2                 35
 9  3                 48
10  4                 40
11  5                 51
12  6                 55
13  7                 77
14  8                 78
15  9                 108
16  10                139
17  11                142

18  12          162
19  13          167
20  14          173
21  15          176
22  16          177
23  17          181
0005
 1  DEFENDANT'S EXHIBITS CONTINUED
 2  18          190
 3  19          191
 4  20          196
 5  21          197
 6  22          203
 7  23          242
 8  24          256
 9  25          260
10  26          264
11  27          281
12  28          284
13
14
15
16
17
18
19
20
21
22
23
0006
 1  BEFORE:
 2       ELLEN DYE, Commissioner
 3  APPEARANCES:
 4       WIGGINS, CHILDS,
 5  QUINN & PANTAZIS, L.L.C., by
 6  Mr. Jon C. Goldfarb, The Kress Building,
 7  301 19th Street North, Birmingham,
 8  Alabama 35203, appearing on behalf of the
 9  Plaintiff.
10       IRVIN, STANFORD & KESSLER,
11  LLP, by Mr. Gary R. Kessler, One Buckhead
12  Plaza, 3060 Peachtree Road, Suite 1050,
13  Atlanta, Georgia 30305, appearing on
14  behalf of the Defendant.

15
16
17
18
19
20
21
22
23
0007
1            I, ELLEN DYE, a Court
2   Reporter of Birmingham, Alabama, acting
3   as Commissioner, certify that on this
4   date, as provided by the Alabama Rules of
5   Federal Procedure and the foregoing
6   stipulation of counsel, there came before
7   me at the offices of Wiggins, Childs,
8   Quinn & Pantazis, L.L.C., The Kress
9   Building, 301 19th Street North,
10  Birmingham, Alabama 35203, beginning at
11  9:30 a.m., BELINDA STOUGH, witness in the
12  above cause, for oral examination,
13  whereupon the following proceedings were
14  had:
15            BELINDA STOUGH,
16  being first duly sworn, was examined and
17  testified as follows:
18        THE COURT REPORTER: Usual
19  stipulations?
20        MR. KESSLER:  Yes, that's
21  fine, usual stipulations.  Before we
22  start the deposition I just want to
23  establish on the record since I didn't
0008
1   have a cover sheet when I produced the
2   documents yesterday I just wanted to go
3   on the record and say that yesterday in
4   response to Mr. Goldfarb's letter of
5   several days ago requesting additional
6   documents that yesterday I dropped by his
7   office, which would have been
8   February 23, '06 and today is
9   February 24, '06.  I dropped by his
10  office an Associate Handbook from Jameson
11  Hospitality, LLC, operating statements

12  for facilities within Mr. Woods' district
13  at the time that he was district manager
14  which includes Alexander City,
15  Greenville, Auburn, Ozark, and Eufala.
16  And these are statements from 2000, 2001,
17  2002 and 2005.  We provided what we've
18  been able to locate concerning Charles
19  Woods' personnel file and we also
20  provided to Mr. Goldfarb payroll records
21  for Alex City from April 28, 2001 through
22  February 4, 2006.  So, I just wanted it
23  to be in the record that we dropped these
0009
 1  documents by Mr. Goldfarb's office
 2  yesterday.
 3  EXAMINATION BY MR. KESSLER:
 4      Q   Ms. Stough, my name is Gary
 5  Kessler, and I represent Jameson Inns in
 6  the lawsuit that you filed against
 7  Jameson Inns arising out of your
 8  employment and the termination of your
 9  employment from Jameson Inns in Alex
10  City, Alabama.
11              I'm going to be asking
12  you a number of questions today
13  concerning your employment and
14  circumstances surrounding your
15  employment.  And if at any time you don't
16  understand my question, if it's unclear,
17  if you're not sure what I'm asking, if
18  you would ask me to repeat it, rephrase
19  it or say it differently.  Is that fair
20  enough?
21      A   Yes, sir.
22      Q   Okay.  And when you respond to
23  the question can I assume that you
0010
 1  understand the question that I'm asking?
 2      A   Yes, sir.
 3      Q   Okay.  Have you had your
 4  deposition taken before?
 5      A   Yes, sir.
 6      Q   How long ago was that
 7  deposition?
 8      A   2004.

9    Q    And what kind of case was it?
10    A    It was a Jameson Inn case
11  involving a guest that had stayed on my
12  property that had been bitten by ants.
13        MR. GOLDFARB: And, Gary, the
14  interrogatories had to be corrected on
15  one question about the lawsuits and she
16  can tell you about that.  There was a
17  couple of auto wrecks in her past and
18  this lawsuit here with Jameson.
19    Q    (BY MR. KESSLER:) We will get
20  to that.  So, having been deposed before
21  you're familiar with the procedure that I
22  ask you questions and that you're under
23  oath and you're required under the
0011
1  penalties of perjury of answering the
2  questions truthfully?
3    A    Yes, sir.
4    Q    Okay.  Tell me where you live,
5  please.
6    A    I live in Goodwater, Alabama.
7    Q    What's your address?
8    A    Route 3, Box 206, K-1,
9  Goodwater.
10    Q    And how long have you lived
11  there?
12    A    I've lived there since 1997.
13    Q    Are you married?
14    A    Yes, sir.
15    Q    Kids?
16    A    Yes, sir.
17    Q    How old are your kids?
18    A    I have one son.  He's 26.
19    Q    Where does your son live?
20    A    He lives in Alexander City.
21    Q    What is his name?
22    A    Mark.
23    Q    Mark Stough?
0012
1    A    Snell.
2    Q    S-n-e-l-l?
3    A    Yes, sir.
4    Q    What is your husband's name?
5    A    Dennis.

6    Q    Dennis Stough?

7    A    Yes, sir.

8    Q    And how long have you been

9  married?

10    A    March will be eighteen years.

11    Q    So that would be 1988?

12    A    Yes, sir.

13    Q    And is your husband in the

14  military?

15    A    He's in a reserve unit, Army

16  Reserve Unit.

17    Q    Is he currently in Iraq?

18    A    No, sir.  He's home right now.

19    Q    But he's been to Iraq?

20    A    Yes, sir.

21    Q    How many times did he go to

22  Iraq?

23    A    Twice.  He was in the '92

0013

1  Gulf War and then was in Iraq in 2003.

2    Q    And do you know the dates that

3  he was in Iraq in 2003?

4    A    Yes, sir.  He left on March

5  18th of 2003.

6    Q    And how long did he stay?

7    A    He was there until

8  May -- around May 27th of 2004.

9    Q    So he was gone for about a

10  year?

11    A    Yes, sir, about fifteen

12  months.

13    Q    Does your son live with you?

14    A    No, sir.

15    Q    That's right.  You said he was

16  in Alex City.  Where did you grow up?

17    A    I grew up in Jacksonville,

18  Florida.

19    Q    How long have you lived in the

20  Alex City, Goodwater area?

21    A    I've lived here since 1992.

22    Q    Where did you move from before

23  you moved to Alex City?

0014

1    A    Beaufort, South Carolina.

2    Q    What brought you to Alex City?

3     A    I had some relatives that
4  lived here.
5     Q    And who were the relatives?
6  I'm looking for their last names.
7     A    Okay.  My sister,
8  Ms. Pike.
9     Q    What's her first name?
10     A    Bobbie.
11     Q    Bobbie Pike, P-i-k-e?
12     A    Yes, sir.
13     Q    Who else?
14     A    I have another sister,
15  Virginia Thomas.
16     Q    And any other relatives that
17  you have?  Any other blood relatives that
18  you have at the Alexander City area?
19     A    My parents.
20     Q    What's their name?
21     A    Jim and Sue Gabbard.  And I
22  have a brother and a sister
23  also that's there.  Another sister and
0015
1  brother.
2     Q    What are their names?
3     A    Two brothers as a matter of
4  fact.  John Thomas, Mike Parsons and
5  Shirley Graham.
6     Q    What was your maiden name?
7     A    Nettle.
8     Q    Are there any Nettles living
9  in the Alex City area, central Alabama?
10     A    No, sir, not that I'm aware
11  of.
12     Q    Not that you're aware of?
13     A    No, sir.
14     Q    What about your husband, is he
15  from the Alex City area?
16     A    No, sir.
17     Q    Where is he from?
18     A    He's from Virginia Beach,
19  Virginia.
20     Q    Any other relatives other than
21  brothers or sister or parents that you
22  have living in the Alex City area?  For
23  example, cousins?

0016
1    A    No, sir.
2    Q    No cousins?
3    A    No, sir.
4    Q    Any in-laws?
5    A    Yes, sir.  My husband's
6  brother lives there.
7    Q    What's his name?
8    A    Richard.
9    Q    Richard Stough?
10    A    Yes, sir.
11    Q    Anyone else?
12    A    No, sir.
13    Q    Are you related in any way to
14  the Peppers?
15    A    No, sir.
16    Q    Okay.  What's your date of
17  birth?
18    A    5-17-60.
19    Q    So you would be 45?
20    A    Yes, sir, I am.
21    Q    45 years old?  Graduated from
22  high school?
23    A    Yes, sir, I did.
0017
1    Q    In Jacksonville?
2    A    Yes.
3    Q    Graduated in 1988?
4    A    No, sir.  Graduated in 1979,
5  yes, sir.
6    Q    And after you graduated from
7  high school did you seek any further
8  education?
9    A    No, sir, not at that time.
10    Q    Did there come a time when you
11  did?
12    A    Yes, sir.  I went to it was
13  called General Business Schools.
14    Q    General Business Schools?
15    A    Yes, sir.
16    Q    Where was that located?
17    A    That was in Jacksonville,
18  Florida.
19    Q    Is that a private school or a
20  public school?

21     A    It was basically to help small
22  businesses learn how to manage their
23  bookkeeping and their payroll and
0018
 1  telephone etiquette.  It was basic school
 2  that we paid for so that I could go and
 3  learn to do the books and help with my
 4  husband's business.
 5     Q    So this was like a proprietary
 6  school?
 7     A    Yes, sir, exactly.
 8     Q    In Jacksonville?
 9     A    Yes, sir.
10     Q    Is it still in business, do
11  you know?
12     A    I have no idea at this point.
13     Q    Where in Jacksonville was it
14  located?
15     A    It was over on the south side
16  of town on, I believe, University
17  Boulevard.  It was in the very early
18  eighties when I went and did that.
19     Q    What were the years that you
20  attended?
21     A    Oh, gosh, it was the early
22  eighties.  I can't remember exact dates.
23  I'm going to say about '85, '86,
0019
 1  somewhere in that area.
 2     Q    How long did you attend there?
 3     A    About eight months.
 4     Q    What kind of courses did you
 5  take there?
 6     A    Bookkeeping, how to set up
 7  payroll and employee files.  Just general
 8  business school, business courses on how
 9  to do spread sheets, basic accounting.
10     Q    And did they give you like a
11  degree or certificate or something like
12  that?
13     A    Certificate.
14     Q    Did you get a certificate?
15     A    Yes, sir, I got a certificate
16  of completion of the course.
17     Q    Was it one course you took or

18  multiple?
19      A    They kind of just put it all
20  into one.  It was multiple courses but it
21  was all in one course, I guess you could
22  say.  They just called it general
23  business classes is what it was.
0020
 1      Q    And then any other education
 2  other than high school and general
 3  business schools?
 4      A    No, sir.
 5      Q    As we sit here today is there
 6  anything that, in your view, effects your
 7  ability to recollect the facts regarding
 8  your employment at Jameson or events
 9  which have occurred since then?  For
10  example, are you taking any kind of
11  prescription drugs or any kind of
12  substance or do you have any kind of
13  health condition that effects your
14  memory?
15      A    No, sir, not that I'm aware
16  of.
17      Q    So, as we sit here today we're
18  obtaining your best recollection of the
19  facts in this case?
20      A    Yes, sir.
21      Q    Are you taking any kind of
22  prescription drugs?
23      A    Yes, sir.
0021
 1      Q    Tell us what they are, please.
 2      A    I do take Celebrex and I take
 3  muscle relaxers because I do have
 4  arthritis and fibromyalgia.
 5      Q    What is Celebrex for?
 6      A    It's for the arthritis and
 7  fibromyalgia.  It helps with the pain.
 8      Q    Do you have any other
 9  physical conditions, any other physical
10  conditions, any disabilities or maladies
11  or anything like that?
12      A    No, sir.
13      Q    So, how long ago were you
14  diagnosed with arthritis?

15    A    In the end of 2004.
16    Q    And which doctor diagnosed you
17  with arthritis?
18    A    Dr. Powers.
19    Q    Where is he located?
20    A    In Alexander City.
21  Dr. Almakkee had sent me to him in the
22  beginning.  He was my medical doctor.
23    Q    Dr. Powers, do you know his
0022
1  first name?
2    A    No, sir, I cannot remember his
3  first name but I was sent through
4  Dr. Almakkee, which is now Dr. Atassi's
5  office.  He's the one that recommended me
6  to go see him.
7    Q    And then Dr. Powers, does he
8  continue to treat you for the arthritis?
9    A    No, sir.  I see Dr. Atassi.
10    Q    How do you spell Atassi?
11    A    A-t-a-s-s-i.
12    Q    And he's in Goodwater?
13    A    Yes, sir.
14    Q    And then who diagnosed your
15  fibromyalgia?
16    A    Dr. Powers.
17    Q    When was that diagnosed?
18    A    The same time the arthritis,
19  2004.  I seen him three times.
20    Q    You've seen Dr. Powers three
21  times?
22    A    That was it, yes, sir.
23    Q    When was the most recent time
0023
1  that you saw him?
2    A    December of 2004.
3    Q    What did you do to prepare for
4  your deposition today to get ready for
5  the testimony?  Did you talk to anyone?
6    A    No, sir.
7    Q    Did you talk to your lawyer?
8    A    Other than my attorney, yes,
9  sir.
10    Q    How long?  I don't want to
11  know about the substance of the

12  conversations with Mr. Goldfarb or anyone
13  else in his firm but how long did you
14  meet with him or other people?
15     A    You mean today?
16     Q    Well, either today or
17  yesterday?  I don't know when you came up
18  here.  For example, when did you come to
19  Birmingham for this?
20     A    When did I come to Birmingham?
21  We came last night and stayed the night.
22  And I came in this morning and spoke with
23  Mr. Goldfarb.
0024
 1     Q    How long did that meeting
 2  last?
 3     A    An hour and a half.
 4     Q    Was anyone else in that
 5  meeting?
 6     A    No, sir.
 7     Q    And then in preparation for
 8  your testimony today did you look at any
 9  documents or read anything to get ready?
10     A    Just kind of glanced over.
11     Q    What did you glance over?
12     A    My answers on my
13  interrogatories and about the discussion
14  about the lawsuits and we needed to
15  correct that.
16     Q    Anything else?  Any other
17  documents other than the interrogatories
18  that you looked at?
19     A    I'm trying to think.  Just
20  basically my EEOC documents.
21     Q    EEOC charge?
22     A    Yes, sir.  Yes, sir.  EEOC,
23  yes, sir.
0025
 1     Q    Okay.  The charge of
 2  discrimination that you filed with the
 3  EEOC?
 4     A    Yes, sir, that's correct.
 5     Q    In speaking to that
 6  charge let me show it to you since I want
 7  to ask you a question about it.
 8               (Defendant's Exhibit

9              No. 1 was marked

10             for identification.)

11    Q    Ms. Stough, let me hand to you

12  what's been marked as Defendant's Exhibit

13  No. 1 and ask you if that's your

14  signature on the bottom left-hand corner?

15    A    Yes, sir.

16    Q    And this is your EEOC charge?

17  You have to say yes.

18    A    Yes, sir.

19    Q    And weren't you represented by

20  a lawyer at the time that you filled this

21  out?

22    A    Yes, sir.

23    Q    And the lawyer's name was E.

0026

1  Paul --

2    A    Jones.

3    Q    E. Paul Jones?

4    A    Yes, sir.

5    Q    Is that correct?

6    A    Yes, sir.

7    Q    In drafting this charge did

8  you work with Mr. Jones?

9    A    Yes, sir, I did.

10    Q    Okay.  And Mr. Jones is a

11  lawyer in Alex City?

12    A    He is now the District

13  Attorney.

14    Q    Okay.  But then --

15    A    At the time he was, yes, sir.

16    Q    At that time he was a lawyer

17  in Alex City?

18    A    Yes, sir.

19    Q    How long did Mr. Jones

20  represent you?

21    A    Oh, about two years.  About

22  two years.

23    Q    In this matter?

0027

1    A    About a year.

2    Q    Okay.  And then after

3  Mr. Jones stopped being your lawyer then

4  Ms. Hill became your lawyer; is that

5  correct?

6    A    Yes, sir.
7    Q    And then Ms. Hill, does she
8  currently represent you?
9    A    She has currently represented
10  me.
11    Q    I'm not sure when you say she
12  has currently does that mean she does now
13  or she does not?
14    A    She does still. I think she
15  had turned it over to Mr. Goldfarb.
16    MR. GOLDFARB: She's still on.
17  I didn't take her off the pleadings.
18    A    I'm not sure how that went.
19    Q    (BY MR. KESSLER:) I
20  understand. All right. But anyway I
21  guess the EEOC charge was this filed by
22  you or by Mr. Jones on your behalf?
23    A    He asked me to write up a
0028
1  letter and to put the information in and
2  just kind of explain to him everything so
3  that he could file the EEOC charge.
4    Q    What do you mean by write up a
5  letter?
6    A    He wanted me to write up and
7  tell him exactly what had happened and
8  why I had felt --
9    MR. GOLDFARB: Be careful to
10  tell what he told you to do. It's all
11  privileged so don't talk about what the
12  lawyer told you to do or what you told
13  the lawyer.
14    A    Okay.
15    Q    (BY MR. KESSLER:) Well, did
16  you write a letter?
17    A    I wrote a letter.
18    MR. GOLDFARB: To your lawyer?
19    A    To the lawyer, correct. To my
20  lawyer.
21    MR. GOLDFARB: So I'm telling
22  you don't tell him what's in the letter.
23    A    Okay.
0029
1    MR. KESSLER: If she doesn't
2  want to produce it that's fine.

3       MR. GOLDFARB: Do you have that
4   letter?
5       A    I do not have the letter.
6       Q    (BY MR. KESSLER:) Do you know
7   whether Mr. Jones has the letter?
8       A    I do not know if he does.
9       MR. GOLDFARB: He might have
10  sent it to the EEOC.
11      MR. KESSLER: Well, that's what
12  I'm saying.
13      MR. GOLDFARB: Yeah.  Ask her.
14  I don't know if he sent it to the EEOC.
15  Ask her.
16      Q    (BY MR. KESSLER:) Do you know
17  if he sent it to the EEOC?
18      A    No, sir, because a lot of
19  the -- a lot of the things that were in
20  the letter is not in the claim.
21      Q    Right, but we don't know what
22  the letter says do we?
23      MR. GOLDFARB: Ask it.  I don't
0030
1   care.  Ask her about it.  I don't want to
2   waive attorney-client privilege but I
3   will let you get into the letter that she
4   wrote.
5       Q    (BY MR. KESSLER:) Well, first
6   let me ask you these questions and I
7   appreciate that.  You don't have a copy
8   of the letter do you?
9       A    No, sir, I do not.
10      Q    Since you sent this letter to
11  Mr. Jones you've never seen the letter
12  since then?
13      A    No, sir, I have not.
14      Q    Have you looked through the
15  EEOC file?
16      A    Pardon?
17      Q    Have you looked through the
18  EEOC file?
19      A    The whole file?
20      Q    Yes.
21      A    No, sir.
22      Q    Okay.  So, did you send a copy
23  of the letter to anyone else other than

0031
1  Mr. Jones?
2      A    No, sir.
3      Q    During the time that you were
4  represented by Ms. Hill did you ever see
5  the letter?
6      A    No, sir.
7      Q    During the time that you've
8  been represented by Mr. Goldfarb have you
9  seen the letter?
10     A    No, sir.
11     Q    So other than sending the
12  letter to Mr. Jones you just haven't seen
13  it since then?
14     A    I sat and wrote it in his
15  office.
16     Q    Right.  But you haven't seen
17  it since then?
18     A    No, sir, I have not.
19     Q    And so this would have been
20  in -- when did you write this letter?
21     A    When I filed the claim which
22  was in August I do believe.
23     Q    August '04?
0032
1      A    Yes, sir.
2      Q    So it was almost two years
3  ago?  About a year and a half ago?
4      A    Yes, sir.
5      Q    So what did the letter say?
6      A    Pretty much the conversation
7  that I had with Mr. Woods about the pay
8  and the discrimination that I felt like I
9  had been discriminated against because I
10  was a female and that I was aware by the
11  payroll records that Mark Fetner, which
12  was at that time my assistant manager,
13  was making the same pay that I was making
14  and I questioned that.
15     Q    Anything else in the letter?
16     A    No, sir, other than the fact
17  that I felt like I had been discriminated
18  against because I was a female and I felt
19  the pay discrimination was unfair.
20     Q    Did you explain it in any way

21  in this letter that you claim that you
22  wrote as to why you believe you were
23  discriminated against because you were a
0033
 1  female?
 2      A    I'm sorry?
 3      Q    Did you explain in the letter
 4  the basis for why you believe you were
 5  being discriminated against because you
 6  were a female?
 7      A    Yes, sir, to the fact that I
 8  felt like I was discriminated against
 9  because I was a female and I wasn't a
10  male and that I felt like that I wasn't
11  given a fair pay.
12      Q    Did you state any facts or
13  anything in the letter that led you to
14  believe that the reason you were being
15  treated the way you were was because you
16  were a female?
17      A    I don't understand.
18      Q    I know you're saying you
19  believe that you were treated the way you
20  were because you were a female, okay?
21      A    Correct.
22      Q    And my question is did you
23  have any facts in there, any events in
0034
 1  there upon which you said this
 2  demonstrates why I think that I was
 3  treated this way because I'm a female?
 4      A    I still don't understand
 5  exactly what you want.  I mean --
 6      Q    Maybe I'm not asking the
 7  question clearly.  I apologize.  Other
 8  than saying I believe I've been
 9  discriminated against because I'm a
10  female and, you know, on the pay issue I
11  think that you know Mark Fetner should
12  not have been paid the same thing, were
13  there any other facts?  You know what a
14  fact is?
15      A    Right.
16      Q    Any other facts that you had
17  in the letter that supported your belief

18  that you were being discriminated against
19  because you were a woman?
20     A    Because I was the general
21  manager and he was an assistant manager.
22  I felt like he should not be getting
23  equal pay when he had just come on board
0035
 1  on the company and I had been there over
 2  three and a half, four years.
 3     Q    Okay.  Fair enough.  Any I'm
 4  trying to find out what was in the
 5  letter.  Anything else in the letter?
 6         MR. GOLDFARB: That you can
 7  recall that's in the letter.
 8     A    Other than -- well, to recall
 9  what else was in the letter.  That
10  basically would have covered it.
11     Q    Okay.  I want to make sure we
12  get your best recollection today.
13     A    Yes, sir.
14     Q    Thank you.
15         (Defendant's Exhibit
16          No. 2 was marked
17          for identification.)
18     Q    All right.
19     A    I'm sorry, is there any way
20  that I can add something to the
21  statement?
22     Q    Sure.
23     A    I felt like with the situation
0036
 1  with me being a female and I felt like
 2  that there may have been some
 3  discrimination or there was some
 4  discrimination because I was a female.  I
 5  mean I felt like that some remarks to the
 6  fact that I was a woman and that
 7  sometimes women get over emotional and
 8  that we tend to overreact.  That was a
 9  comment that was made by Mr. Woods and I
10  did put that in there and I did forget
11  that and I apologize.
12     Q    That's okay.  I appreciate you
13  adding that.
14     A    I'm just trying to remember

15  because it was so long ago when I had
16  wrote the letter up and I don't have a
17  copy of it.
18      Q    Right.  And Mr. Woods made
19  the comment to you and I want to make
20  sure that I get your best recollection.
21      A    Correct.
22      Q    That you're over emotional or
23  that women can be over emotional?
0037
1      A    Some women can be over
2  emotional.
3      Q    Okay.
4      A    And sometimes that they
5  overreact.  And there was other comments
6  that was made to the fact as to a desk
7  clerk, how is your husband, left for
8  Iraq, how is your hammer hanging.  A
9  remark was made about one of my desk
10  clerks about she was pregnant.  We were
11  having a conversation, myself and
12  Mr. Woods, and we were talking about her
13  being pregnant and that I was excited
14  about her being pregnant and a remark was
15  made about her breasts getting bigger.
16  Charles Woods would come in and he would
17  give us hugs and massage our shoulders
18  and all that was in the letter.
19      Q    Okay.
20      A    And I do apologize.  I was
21  trying to sit here and think.
22      Q    Let me go through that.  When
23  you claim that he made the comment about
0038
1  someone can overreact and be over
2  emotional do you recall what the
3  circumstances were under which that
4  comment was made?
5      A    No, sir.  I believe we were
6  having a discussion but I cannot recall
7  exactly what it was about.  I know it was
8  in late 2003.
9      Q    And do you recall whether he
10  was talking about you or someone else?
11      A    Pardon?

12    Q    Was he talking about anyone in
13  particular?
14        MR. GOLDFARB: Object to form.
15    A    I'm sorry?
16        MR. GOLDFARB: I objected to
17  the form.  Go ahead and answer.
18    A    Okay.  If he was talking
19  about me or someone else?
20    Q    (BY MR. KESSLER:) Right.
21    A    Women in particular.  I felt
22  like it was me and women in particular.
23    Q    Okay.  All right.  But you
0039
1   don't recall the circumstances of what
2   was -- what the topic was or what was
3   going on or what led to that comment?
4     A    No, sir, I do not.
5     Q    Where did this conversation
6   allegedly occur?
7     A    It was at the hotel, Jameson
8   Inn in Alex City.
9     Q    And you claim that he made the
10  comment how is your hammer hanging?
11    A    He had made that remark to one
12  of my desk staff also.
13    Q    Who is the desk staff person?
14    A    Linda Peppers.
15    Q    Linda Peppers?
16    A    Yes, sir.
17    Q    And how was your hammer
18  hanging?
19    A    Uh-hmm.
20    Q    Do you recall when this
21  statement was allegedly made?
22    A    Oh, it had to have been late
23  2003.
0040
1     Q    And is this something you
2   actually heard or is this something
3   Ms. Peppers told you?
4     A    Ms. Peppers had put
5   Mr. Woods on hold and had told me what he
6   had said.
7     Q    Okay.  So you didn't actually
8   hear it?

9    A    No, sir.
10    Q    This is Linda Peppers telling
11  you?
12    A    Yes, sir.  I did not actually
13  hear it but she got off the phone and she
14  was highly upset.
15    Q    Do you have an understanding
16  as to what how is your hammer hanging
17  means?
18    A    No.
19    Q    Do you think it has some kind
20  of sexual aspect to it?
21    A    Yes, sir.  The statement she
22  asked -- was asked was is your husband
23  gone, has he already gone and she said
0041
1  yes and he said well, I guess, you're
2  kind of lonely and she said, yes, sir,
3  and then the remark was well how is your
4  hammer hanging.  I still don't know what
5  that meant.
6    Q    Okay.  And what did
7  Ms. Peppers say to you?
8    A    I said well what does that
9  mean and she said it's a sexual comment.
10  I said what do you mean and she said it
11  means like not having sex or to that
12  aspect.  I can't exactly remember what
13  she said but it was something to do with
14  sex, a sexual remark, because I had never
15  heard the phrase before.
16    Q    Okay.  So, fair enough.  Have
17  you ever heard it since then?
18    A    No, sir, not that I'm aware
19  of.
20    Q    And then you said that there
21  was a desk clerk who was pregnant and
22  there was a comment about her breasts
23  getting larger?
0042
1    A    Correct.
2    Q    Who was the desk clerk?
3    A    Her name was Christa Foster.
4    Q    And do you know when these
5  comments were allegedly made?

6     A    Early 2003.
7     Q    And who was it who made this
8  comment?
9     A    Mr. Woods.
10     Q    What exactly did he say?
11     A    We were talking on the
12  telephone and I told him, I said Christa
13  is pregnant.  I don't remember exactly if
14  I told him the due date or anything like
15  that because I don't remember.  And he
16  said well I'm glad to hear that she's
17  pregnant.  Is she doing well.  I said,
18  yes, sir, and he said my goodness he
19  said -- said to the point where I bet you
20  her breasts are going to get larger and I
21  just said okay and he kind of laughed
22  about it and I said -- and then we gone
23  on to the other conversations with the
0043
1  hotel.
2     Q    And was there anything else
3  said about that?
4     A    No, sir.
5     Q    Other than that one comment?
6     A    No, sir, that was the comment.
7     Q    He laughed about it when he
8  said it?
9     A    Uh-hmm, yes, sir.
10     Q    And did you say anything to
11  him in response to that?
12     A    No, sir.
13     Q    Okay.  And then you said he
14  gives hugs?  He's given you hugs in the
15  past?
16     A    Uh-hmm.
17     Q    What kind of circumstances
18  would he give you hugs?
19     A    When he would come into the
20  property he would give me a hug and when
21  he would leave the property he would give
22  hugs.
23     Q    Would these just be to you or
0044
1  to other employees also?
2     A    To me and some of the other

3  female employees, yes, sir.
4     Q    Did that offend you in any
5  way?
6     A    I felt a little
7  uncomfortable.  I just didn't feel
8  comfortable with it.  I felt very uneasy
9  about it.
10    Q    Did you ever say anything or
11  report it to anyone to complain about it?
12    A    No, sir.
13    Q    I guess that was really two
14  questions.  Did you ever say anything to
15  anybody about it?
16    A    No, sir.
17    Q    Did you ever report it to
18  anyone with Jameson Inns that made you
19  feel uncomfortable?
20    A    No, sir.
21    Q    And you said also that
22  sometimes there would be a massage of
23  one's shoulders; is that correct?
0045
1     A    Yes, sir, that is correct.
2     Q    Would that be of your
3  shoulders or someone else's?
4     A    Mine and some of my desk
5  clerks and my housekeepers.
6     Q    How often do you think -- this
7  was done by Mr. Woods?
8     A    Yes, sir.
9     Q    How often do you think he
10  would massage your shoulders?
11    A    He had done it on a couple of
12  occasions when I would be sitting at the
13  computer.
14    Q    You say a couple?
15    A    A few occasions, yes, sir.
16    Q    Like two, three, four?
17    A    Five, six times.  A half a
18  dozen times or so.
19    Q    And that was over what period
20  of time?
21    A    Over the time of my
22  employment.  Probably about six months to
23  a year after I had started there.

0046
1      Q     You started in 2000, I think?
2      A     May of 2000, yes, sir.
3      Q     So it started in early 2001?
4      A     Pretty much after I went into
5    management with Charles because his self
6    and I were managing the property.
7      Q     And when did you become the
8    general manager?
9      A     I believe late 2000 or early
10   2001.
11     Q     And then you left the general
12   manager position in February of 2004?
13     A     Correct.
14     Q     So that was a span of about
15   three years?
16     A     Three and a half years or so,
17   yes, sir.
18     Q     When he would massage your
19   shoulders about half a dozen times?
20     A     Yes. Some of my employees
21   also.
22     Q     Did you ever complain to
23   anyone in any way within Jameson about
0047
1    these shoulders massages?
2      A     No, sir.
3      Q     Did you ever ask Mr. Woods not
4    to massage your shoulders?
5      A     I would kind of just get up
6    and walk away. I didn't want to offend
7    him. I didn't know what to say to him.
8      Q     Okay. So I guess the answer
9    is no?
10     A     Yes, sir. I'm sorry. Yes,
11   sir.
12           MR. GOLDFARB: Object to form.
13     Q     (BY MR. KESSLER:) In any of
14   these situations that you talk  about the
15   over emotional or overreacting or a
16   comment about how your hammer is hanging,
17   the comment about the breasts, the hugs
18   or the massages, did you ever complain to
19   anyone within Jameson Inns about any of
20   those instances?

21    A    No, sir.
22    Q    I want to hand you
23    Defendant's No. 2.  Is that the
0048
1    employment application you filled out
2    with the Jameson Operating Company?
3    A    Yes, sir.
4    Q    And that is your signature on
5    the last page?
6    A    Yes, sir.
7    Q    And everything in here was to
8    the best of your recollection true and
9    accurate?
10    A    Yes, sir.
11    Q    Okay.  You weren't trying to
12    puff anything on your resume were you?
13    A    No, sir.
14    Q    You wouldn't do that?
15    A    No, sir.  I wanted the job.
16    Q    Right.
17        (Defendant's Exhibit
18         No. 3 was marked
19         for identification.)
20    Q    Let me hand to you
21    what's been marked as Defendant's
22    Exhibit No. 3 and ask you if that's your
23    signature?
0049
1    A    Yes, sir, it is.
2    Q    All right.  And this is an
3    Employee Acknowledgment, right?
4    A    Yes, sir.
5    Q    It's dated May 10, 2000?
6    A    Yes, sir.
7    Q    And it says, "I acknowledge
8    that I have received a copy of the
9    Jameson Operating Company Employee
10    Handbook"?
11    A    Yes, sir.
12    Q    Do you remember when you
13    started working with Jameson in May 2000
14    that you received a copy of the employee
15    handbook?
16    A    Yes, sir.
17    Q    You had a chance to look at it

18   and ask any questions about it?
19        MR. GOLDFARB: Object to form.
20     A    Yes, sir.
21     Q    (BY MR. KESSLER:) There's a
22   general manager's signature.  Who was
23   that?
0050
 1     A    That was William Plummer.
 2     Q    He was the general manager
 3   when you started working there?
 4     A    Yes, sir, he was.
 5          (Defendant's Exhibit
 6           No. 4 was marked
 7           for identification.)
 8     Q    Let me hand to you what's
 9   been marked as Defendant's Exhibit No. 4,
10   Ms. Stough.  Is that also your signature?
11     A    Yes, sir.
12     Q    And that's dated August
13   10, 2000?
14     A    Yes, sir.
15     Q    And it's a document entitled
16   Associate Acknowledgement?
17     A    Yes, sir.
18     Q    And this acknowledges that you
19   received a copy of the Associate
20   Handbook, right?
21     A    Yes, sir.
22     Q    Do you recall receiving it?
23     A    We had one on the property
0051
 1   that I glanced through at the time that I
 2   had come on board and was hired.  We were
 3   out of the handbooks.  Later on Deborah
 4   Schwier had ordered some.
 5          (Defendant's Exhibit
 6           No. 5 was marked
 7           for identification.)
 8     Q    Let me hand to you what's
 9   been marked as the Jameson Employee
10   Handbook and would you agree that this is
11   the handbook that you acknowledged
12   receipt of in Defendant's Exhibit No. 4?
13     A    Yes, sir, it was a smaller
14   version but this was it.  This looks like

15  the one that --
16        MR. GOLDFARB: Object to form.
17    A    It was just in a smaller
18  version.
19        MR. KESSLER: To my question or
20  to her answer?
21        MR. GOLDFARB: Your question.
22        MR. KESSLER: That's fine.
23  That's enough.
0052
1    Q    (BY MR. KESSLER:) Let me ask
2  you you had a chance to look at this
3  handbook, didn't you?
4    A    Briefly.
5    Q    Whether you looked at it
6  briefly or not you had a chance to look
7  at it as long as you wanted to?
8        MR. GOLDFARB: Object to form.
9    A    Yes, sir.
10    Q    (BY MR. KESSLER:) Okay.  Let
11  me ask you to turn to page -- I guess
12  it's after Page 4.  It's called Company
13  Policy Statement.  Do you see that?
14    A    Yes, sir.  It says --
15    Q    Company Policy Statement?
16    A    Page 4.
17    Q    It's right after Page 4?
18    A    Okay.  Yes, sir, I see it.
19    Q    And in capital letters on the
20  second paragraph it says, "No member of
21  management is ever too busy to hear
22  problems or complaints from any
23  associate"?
0053
1    A    Yes, sir.
2    Q    Do you see that?  You had an
3  opportunity to read this page at the time
4  that you reviewed the handbook, didn't
5  you?
6    A    I believe so, yes, sir.
7    Q    And it says if you do not
8  feel -- this is paragraph two on that
9  page.  "If you feel that your supervisor
10  has not fairly or satisfactorily handled
11  your situation you may request a meeting

12  with the Regional Manager."  Do you see
13  that?
14      A    Yes, sir.
15      Q    Did you ever, whether in
16  response to any of this stuff -- I mean
17  you knew there was a policy that you
18  could complain to somebody within Jameson
19  about any uncomfort that you had, didn't
20  you, regarding any comments or any
21  conduct by Mr. Woods?
22      A    Yes, sir.
23      Q    Okay.  And you didn't use that
0054
 1  policy did you?
 2      A    No, sir.
 3      Q    Okay.  And then let me ask you
 4  to turn to and these are unnumbered
 5  pages, and I apologize, but it's the
 6  policy that's entitled No Harassment
 7  Policy.  It's maybe ten or twelve pages
 8  into the handbook.  Do you see it?
 9      A    Yes, sir.
10      Q    I think we're looking at the
11  same page.  It's entitled No Harassment
12  Policy?
13      A    Yes, sir.
14      Q    You also had a chance to
15  review and read this policy at the time
16  you reviewed the handbook?
17      A    Yes, sir, I do believe so.
18      Q    And you didn't utilize this
19  policy at any time during the time that
20  you were employed by Jameson did you?
21      A    No, sir.
22          (Defendant's Exhibit
23           No. 6 was marked
0055
 1           for identification.)
 2      Q    Let me hand to you,
 3  Ms. Stough, a document that's marked as
 4  Defendant's Exhibit No. 6 and ask you if
 5  that's your signature?
 6      A    Yes, sir, it is.
 7      Q    And this is a document
 8  entitled Commitment To Quality?

9    A    Yes, sir.
10    Q    And in the third
11  paragraph -- well, strike that.
12            Do you recall the
13  circumstances under which you signed
14  this, whether you signed it as an
15  employee or when you became general
16  manager?
17    A    I don't remember.
18    Q    Okay.  But regardless of
19  whether you were employed as an employee
20  or the general manager is it fair to say
21  that you were committed to quality?
22    A    Yes, sir.
23    Q    And that Jameson expected you,
0056
1  as an employee of Jameson, to be
2  committed to quality?
3    A    Yes, sir.
4    Q    And quality and cleanliness
5  was a very important issue at Jameson
6  wasn't it?
7    A    Yes, sir.
8    Q    And that particularly became
9  true when you were general manager?
10    A    Yes, sir.
11    Q    Go back, if you would, to your
12  employment application which we had
13  marked as Defendant's Exhibit No. 2,
14  please.  And if you turn over to the
15  third page I want to ask you a few
16  questions about your pre-Jameson
17  employment.
18    A    All right.
19    Q    You have listed, I guess, the
20  most recent was Holiday Inn Express?
21    A    Yes, sir.
22    Q    And the most distant was
23  Skinners Furniture?
0057
1    A    Yes, sir.
2    Q    At Skinners Furniture you were
3  a bookkeeper?
4    A    Yes, sir.
5    Q    Was that the position that you

6  started in?

7      A    Yes, sir.

8      Q    And you worked there between

9  December of '96 and May 1997?

10     A    Yes, sir.

11     Q    For a total of six months?

12     A    Yes, sir.

13     Q    And you were temporary help?

14     A    Yes, sir.

15     Q    Can you estimate how many

16  hours a week you worked there?

17     A    Forty.

18     Q    And then did you leave on your

19  own or did they ask you to leave or what

20  were the circumstances under which you

21  departed from Skinner?

22     A    I had went in the hospital.  I

23  had lost a child when I come out of the

0058

1  hospital.

2      Q    I'm sorry.

3      A    When I come out of the

4  hospital they were in the process of

5  closing the business so I started looking

6  because I knew I would not be employed

7  too much longer and it wasn't very much

8  longer and they had closed the doors to

9  the store.

10     Q    Understood.  And then you

11  further state that in January 1997 you

12  worked at Horseshoe Inn?

13     A    Yes, sir.

14     Q    And temporary help on the

15  front desk?

16     A    Yes, sir.

17     Q    And you worked there for a

18  total of eight months -- excuse me, seven

19  months?

20     A    That would have been right.

21  About seven months, yes, sir.

22     Q    All right.  Did you work full

23  time?

0059

1  A    Yes, sir, I did.

2      Q    And what was the reason for

3  you leaving Horseshoe Inn?
4     A    I had took the position to
5  help out the manager at that point
6  because she was short staffed but I was
7  going through training with Holiday Inn
8  Express.  I had accepted the position
9  with them but we had not opened the hotel
10  as of yet.
11     Q    So the Holiday Inn Express, I
12  guess, opened in July of '97 or sometime
13  around then?
14     A    Yes, sir, sometime around
15  there.
16     Q    And what was the position you
17  were hired into?
18     A    I was front desk manager.
19     Q    Was that the position you were
20  hired into?
21     A    Yes, sir.
22     Q    And you continued working
23  there for about two and a half years?
0060
1     A    Yes, sir, that's correct.
2     Q    And your supervisor was Carol
3  Smith-Barnes?
4     A    Correct.
5     Q    Was that the whole time that
6  you worked there?
7     A    No, sir.
8     Q    Was Ms. Barnes the supervisor
9  at the time left?
10     A    Yes, sir.
11     Q    Was she the one who demoted
12  you?
13     A    Yes, sir.
14     Q    And you state in the reason
15  for leaving demotion in title after I
16  returned off sick leave?
17     A    Yes, sir.
18     Q    Explain the circumstances
19  about your sick leave and tell us about
20  that.  Why were you off of work?
21     A    I had to have an emergency
22  hysterectomy.
23     Q    So that would have been, I

0061
1  guess, in February 2000?
2      A    Yes, sir.  Actually it was in
3  January of 2000 I had the hysterectomy
4  and I had some complications and was out
5  longer than what I anticipated being out.
6      Q    How long were you out of work?
7      A    I was out of work right at six
8  or seven weeks total.
9      Q    And then when you came back to
10  work did that absence effect the position
11  you held when you came back to work?
12      A    Yes, sir, because
13  Ms. Barnes wanted me coming back to work
14  about three weeks after my hysterectomy
15  and three weeks after my hysterectomy I
16  developed some problems with my bladder
17  and was unable to come back to work.  And
18  she questioned me on why I could not come
19  back to work because another employee had
20  come back earlier after her hysterectomy
21  and I explained to her that I had some
22  more medical problems and my doctor at
23  that time would not release me to go back
0062
1  to work.
2      Q    So, when you finally came back
3  to work what happened about your job?
4      A    She called me into her office
5  a couple of days after I returned to work
6  and said that I was not going to be able
7  to continue as the desk clerk manager
8  because of the time that I had missed and
9  that she was concerned that I may miss
10  more time.  And she handed me a badge
11  that said desk clerk and asked for my
12  front desk manager badge.
13      Q    Okay.  And did you continue
14  working or what did you do?
15      A    No, sir.  I gave her a notice
16  and told her I would not continue to work
17  under her.
18      Q    Was that effecting your pay?
19      A    Pardon?
20      Q    Was that effecting your pay,

21  the change in this position?
22    A    No, sir, it did not effect my
23  pay.
0063
1    Q    So, you quit your job?
2    A    I gave her notice and left,
3  yes, sir.
4    Q    Is that the same as quitting?
5    A    Well, I didn't quit.  She more
6  or less told me that I had to make a
7  decision if I wanted to stay on the front
8  desk that I was going to have to make
9  some changes and follow her rules and
10  procedures and I went to the owner of the
11  company and had a long talk with him and
12  I stayed on, I believe, another week and
13  then I resigned.  I left.
14    Q    Okay.  So you resigned?
15    A    Yes, sir.
16    Q    Nobody asked you to resign?
17    A    No, sir.
18    Q    Nobody threatened to fire you?
19    A    No, sir.  It just got to the
20  point with her that I could
21  not -- everything I did was not to her
22  standards and it just become an issue and
23  I left.
0064
1    Q    So was it fair to say that
2  Ms. Barnes was not satisfied with your
3  performance?
4        MR. GOLDFARB: Object to form.
5    Q    (BY MR. KESSLER:) Based on
6  what you told her?
7        MR. GOLDFARB: Object to form.
8    A    No, sir, I don't think it was
9  that.  It was more or less the fact that
10  we just didn't see eye to eye on some
11  policies and some things that she was
12  doing and I brought it to her attention
13  and told her this is how that we do this.
14  I've been with the company -- can I
15  please show you how that Narandra and Jay
16  would like it done and she kind of did
17  not like that.

18    Q    So --
19    A    I trained her on the front
20  desk.  I trained her on night audit.
21    Q    What was her position?
22    A    Her position when she first
23  came there was a night auditor.  I
0065
 1  trained her on the front desk.  I gave
 2  her the normal -- showed her how to do
 3  pretty much the night audit.  I
 4  recommended her for the position of
 5  general manager of Holiday Inn because at
 6  that time I wasn't able to take it
 7  because I had been ill and I had custody
 8  of my niece and nephew and they were
 9  small children at that time.
10    Q    So, if I understand your
11  testimony, and tell me if this is
12  accurate, you and Ms. Barnes were not
13  seeing eye to eye on issues because of
14  that?  You were demoted and then you
15  decided to leave?
16         MR. GOLDFARB: Object to the
17  form.
18    Q    (BY MR. KESSLER:) Is that an
19  accurate summary?
20         MR. GOLDFARB: Object to the
21  to form.
22    A    No, sir.  It was more or less
23  there was some things that she wasn't
0066
 1  doing that was company policy that needed
 2  to be and I brought it to her attention
 3  and she didn't like it.  And it just
 4  caused not a good working environment for
 5  her and I.
 6    Q    (BY MR. KESSLER:) Do you
 7  believe that she resented you telling her
 8  that?
 9    A    Yes, sir, I do.
10    Q    Okay.  After that she kind of
11  got her back up and then y'all didn't get
12  along?
13    A    Yes, sir.
14    Q    Do you know if Ms. Barnes

15  still works at the Holiday Inn?
16      A     No, she does not.
17      Q     Do you know where she works?
18      A     No, sir, I do not.
19      Q     Do you know if she's in Alex
20  City?
21      A     No, sir, I could not answer
22  that either.  I have no idea where she
23  is.
0067
1      Q     But your testimony is that you
2  don't think you were about to be fired?
3      A     Oh, no, sir.
4      Q     Who is the owner of the
5  Holiday Inn?
6      A     Narandra Patell.
7      Q     Did Ms. Patell try to get you
8  to stay?
9      A     Yes, sir, they did.  They
10  asked me to stay and I said that I just
11  could not work with Carol.  We did not
12  see eye to eye on some things and
13  Narandra said, well, I'm going to give
14  her a chance and I said -- well, Narandra
15  and I, we parted on a good relationship.
16  I told him that I had nothing against
17  him.  It's just I could not work with
18  Carol any longer.
19      Q     Do the Patells still own the
20  Holiday Inn in Alex City?
21      A     Yes.
22      Q     It's Narandra?  It's a male?
23      A     A male, yes, sir.
0068
1      Q     So according to your
2  application you left there on
3  February 21, 2000?
4      A     Yes, sir.  That's about right.
5      Q     On the first page of your
6  application, and this is Defendant's
7  No. 2, under education you have College
8  or University and then General Business.
9  Is that Jacksonville?
10      A     That's Jacksonville, Florida.
11      Q     JAX University?

12      A      Jacksonville, Florida is what
13  it was.  That does say JAX University.
14      Q      Okay.  General Business was
15  not a university was it?
16      A      No, sir.  It was a business
17  school.  It was something that JAX
18  University had created.  It wasn't
19  actually the university.  I did not go to
20  the university.  I just went to the
21  little business school.
22      Q      And then you say in here the
23  last grade completed two years?
0069
 1      A      About two years because I
 2  went to the business schools with a
 3  correspondence course with Chicago
 4  Business Schools.  I took bookkeeping and
 5  accounting there.  It was a
 6  correspondence course.  It was a total of
 7  two years for both.
 8      Q      So when you have two years on
 9  this application really what you're
10  referring to is the total time in general
11  business in Chicago Business School?
12      A      Yes, sir.
13      Q      So, tell us about your Chicago
14  Business School correspondence course.
15      A      It was a correspondence
16  course.  I took some bookkeeping and
17  accounting.  That was basically it.
18      Q      Is this the name of the
19  school, Chicago Business School?
20      A      It is.
21      Q      I assume it's in Chicago?
22      A      Chicago, Illinois.
23      Q      There's a Virginia College in
0070
 1  Birmingham so --
 2      A      Exactly.  No, sir, this was a
 3  correspondence school that I took,
 4  classes that I took.  At that time I
 5  didn't have a computer but I did it
 6  through the mail, by mail.
 7      Q      Do you have an address for
 8  this school?

9     A    No, sir, I don't.
10    Q    Do you know whether it still
11  exists?
12    A    No, sir, I don't.
13    Q    Did you get a certificate or
14  some kind of documentation concerning
15  what you did?
16    A    Certificate of completion.
17    Q    Have you still got that?
18    A    I may have it still at home.
19  I cannot guarantee you I do.  I have done
20  a lot of moving.
21    Q    How many courses did you take
22  from Chicago Business School?
23    A    Just the bookkeeping and
0071
1  payroll.  It was kind of combined,
2  bookkeeping, payroll.
3    Q    So it was one course?
4    A    Yes, sir.
5    Q    And then what was it that got
6  you applying to Jameson?
7    A    Mr. Plummer, William Plummer,
8  I had talked to him.  I had known him for
9  awhile before I had went to work with
10  Jameson.  And I had been talking to him
11  and he explained to me that some of his
12  desk clerks had left due to the fact that
13  they had put computers in the company and
14  a lot of them did not understand the
15  computer system and Ms. Schwier, Deborah
16  Schwier, was on vacation and he needed
17  some help ASAP and he said how quick can
18  you start.  I said I can start tomorrow.
19  He said, fine, come in.  Fill out your
20  application.  Let's see what we can do.
21    Q    So your application
22  date -- I'm looking at Defendant's No. 2
23  on the last page February 24.  You put
0072
1  1900.  It's probably 2000?
2    A    Yes, sir, it is.
3    Q    It was early in the century?
4    A    Right.
5    Q    And then you think you started

6  the next day?
7     A    I had filled this out.
8     Q    Pretty soon after that?
9     A    I did fill this out in
10  February.  This is before he needed the
11  help.  It was filled out prior to me
12  coming to work.
13     Q    I see.  And then actually you
14  started in May, 2000?
15     A    I started in May, 2000, I
16  believe around the 10th or between the
17  10th and the 13th.  I can't remember the
18  exact day.
19       MR. KESSLER: Why don't we take
20  about a five-minute break.
21       MR. GOLDFARB:  Okay.
22         (A break was
23          taken.)
0073
1     Q    We just a took about a ten,
2  fifteen-minute break.  Is there anything
3  you want to change or add to from your
4  testimony earlier this morning?
5     A    No, sir.
6     Q    Okay.  I think we were talking
7  about you applying at Jameson?
8     A    Yes, sir.
9     Q    It's kind of the next area
10  that we want to get into.  And you said
11  that Bill Plummer wanted you to start as
12  soon as possible because Deborah
13  Schwier --
14     A    Schwier.
15     Q    She was on vacation?
16     A    Yes, sir.
17     Q    And what was the position that
18  you started into?
19     A    Desk clerk position.
20     Q    Okay.  Not a supervisor or
21  anything like that?
22     A    No, sir, not at that time.
23     Q    But you said that when you
0074
1  worked at the Holiday Inn Express you
2  worked as the front desk manager?

3     A    Yes, sir.
4     Q    When you were front desk
5  manager did you supervise anybody?
6     A    Yes, sir.
7     Q    How many people did you
8  supervise on the average during the time
9  that you were a manager there?
10     A    Between four and six.  It
11  would have been the desk staff.
12     Q    And during the time that you
13  worked at Holiday Inn Express did you
14  receive performance evaluations, written
15  performance evaluations?
16     A    No, sir.
17     Q    Were you ever given any kind
18  of warnings or reprimands or anything
19  like that regarding your performance or
20  attendance or anything in that regard?
21     A    No, sir.
22     Q    So, if we looked at your file
23  from the Holiday Inn then it would be a
0075
1  clean personnel file?
2     A    Yes, sir.
3     Q    As far as you know?
4     A    As far as I know.  At this
5  point, yes, sir it would be.
6     Q    And I think I asked you the
7  following question but I didn't really
8  follow up on it.  I think you said that
9  Carol Smith-Barnes was your supervisor at
10  the time that you left the Holiday Inn
11  Express; is that correct?
12     A    That is correct.
13     Q    But you had other supervisors
14  during the time you worked there?
15     A    Yes, sir.
16     Q    And who were the other
17  supervisors?
18     A    Jay Patell.
19     Q    A family member --
20     A    Yes, sir.
21     Q    -- of the Patells?
22     A    Yes, sir.
23     Q    Like son or what was --

0076
1    A    He was the brother to the
2  owner's wife.
3    Q    The brother-in-law?
4    A    Yes, sir.
5    Q    Who else supervised you?
6    A    Narandra, he was the owner of
7  the company.
8    Q    Okay.
9    A    And Rohini, she was the
10  owner's wife, R-o-h-i-n-i.  She was the
11  owner's wife.
12    Q    And then how long were
13  supervised by Ms. Barnes?
14    A    Oh, gosh, I'm going to say six
15  months.
16    Q    Do the Patells own any other
17  hotels in Alex City?
18    A    No, sir, not right they don't.
19    Q    Did they during the time that
20  you worked at the Holiday Inn?
21    A    No, sir.
22    Q    So you came to Jameson as a
23  desk clerk?
0077
1    A    Yes, sir.
2    Q    Well, do you recall what your
3  salary was?
4    A    At that time, no, sir, I
5  don't.
6        (Defendant's Exhibit
7         No. 7 was marked
8         for identification.)
9    Q    Let me hand to you,
10  Ms. Stough, what's been marked as
11  Defendant's Exhibit No. 7 and ask you if
12  you've seen this document before?
13    A    Yes, sir.
14    Q    Okay.  This is a Personnel
15  Action for Belinda Stough, right?
16    A    Yes, sir.
17    Q    And it says that you're a new
18  hire on May 10, 2000.  You were paid
19  5.75 an hour?
20    A    Yes, sir.

21     Q    Does that refresh your
22  recollection?
23     A    That looks correct, yes, sir.
0078
 1     Q    All right.  And so starting
 2  out at 5.75 an hour sounded right?
 3     A    Yes, sir.
 4     Q    Let me hand to you what's been
 5  marked as Defendant's Exhibit No. 8 and
 6  this is also a Personnel Action Form with
 7  your name on it.  Have you seen this
 8  document before?
 9     A    Yes, sir, I have.
10            (Defendant's Exhibit
11             No. 8 was marked
12             for identification.)
13     Q    And this shows a pay raise to
14  6.50 with an effective date of -- excuse
15  me, August 11?
16     A    Yes, sir.
17     Q    Do you know what year this
18  would have been?  For example, you
19  started in May?
20     A    Yes, sir.  This was in 2002
21  also.
22     Q    Two thousand and --
23     A    I mean -- excuse me.  2000
0079
 1  rather.
 2     Q    So, about three months after
 3  you started there you were then increased
 4  to 6.50 from 5.75 an hour?
 5     A    Yes, sir.
 6     Q    Was that the end of your
 7  probationary period or introductory
 8  period?
 9     A    Yes, sir, I believe that's
10  correct.
11     Q    So you made it through that
12  and then you were raised to 6.50 an hour?
13     A    Yes, sir.
14     Q    Still working as a desk clerk?
15     A    Let's see.  I believe at this
16  time that Bill had gotten a promotion and
17  he was moving on, I believe, to the Selma

18  property at this time.  And I was going
19  to step up and help Deborah with running
20  the property and I believe this is what
21  that was.
22      Q    That was the reason for the
23  pay increase?
0080
1      A    Yes, sir.  It was like a
2  promotion.  Bill had come in and talked
3  with me and spoke to me and asked me that
4  he was moving on and that Deborah is
5  going to be the acting GM and did I have
6  a problem with stepping in and helping
7  her run the property.
8      Q    Okay.  So Mr. Plummer was
9  going to Selma?
10      A    I believe it was Selma or
11  don't quote me on that but I believe
12  that's where he had went to Selma,
13  Alabama to run that property down there.
14      Q    Okay. And then the general
15  manager became Deborah Schwier?
16      A    She was the acting general
17  manager, yes, sir.
18      Q    And this facility has sixty
19  rooms?
20      A    Yes, sir.
21      Q    Alex City?
22      A    Yes, sir.
23      Q    And did she ever become
0081
1  general manager?
2      A    I believe she did.
3      Q    Do you know when she became
4  general manager?
5      A    No, sir, I do not remember the
6  dates.
7      Q    Had you become aware that she
8  became a general manager?
9      A    Pardon?
10      Q    Had you become aware that she
11  became general manager rather than just
12  acting general manager?
13      A    I believe Mr. Woods had come
14  and talked to her about the general

15  manager position because she was the
16  acting general manager at that time.
17      Q    But how did you know that?
18  Did you sit in on the conversation?
19      A    No, sir.  She let me know.
20      Q    So Ms. Schwier?
21      A    Ms. Schwier told me that, yes,
22  sir.
23      Q    And what was your position?
0082
1   What was your title after Mr. Plummer
2   left and Ms. Schwier became the acting
3   general manager?
4       A    I guess I could say I was the
5   acting assistant manager with her or
6   acting co-manager because we had been
7   running the property after Mr. Plummer
8   had left.
9       Q    Did you ever see anything in
10  writing from the company or anyone else
11  which said you were either acting
12  assistant general manager or acting
13  co-manager?
14      A    I don't remember.
15      Q    But you're kind of thinking
16  that that's the position -- that's what
17  it ought to be called based on what you
18  were doing?
19      A    Well, I believe Mr. Woods had
20  let the new regional supervisor know that
21  Deborah Schwier and I had been running
22  the property.
23      Q    And how did you know that?
0083
1       A    I believe it was on one of our
2   QA's or in a letter.  I don't remember
3   exactly.
4       Q    So there was some document
5   that --
6       A    I remember.
7       Q    Let me finish my question.
8       A    I'm sorry.
9       Q    There's some document that
10  leads you to believe that you were
11  mentioned as one of the people running

12  the property?
13      A    Yeah.  That was what Deborah
14  had told me, yes, sir.
15      Q    Did you actually see the
16  document or is this what Deborah Schwier
17  told you?
18      A    I have never actually seen it.
19      Q    This is what Deborah Schwier
20  told you?
21      A    Right.
22      Q    And then how long did Deborah
23  Schwier stay at the Alex City property?
0084
 1      A    I believe she left in December
 2  of 2000.
 3      Q    And then after she left were
 4  you promoted or did your position change
 5  in some way?
 6      A    I became acting assistant
 7  manager and around about that time
 8  Mr. Woods was the general manager.  He
 9  was overseeing my property.  We managed
10  it together at that point.
11      Q    Now, Mr. Woods lived in Ozark?
12      A    Yes, sir, he did.
13      Q    Do you know how far Ozark is
14  in from Alex City?
15      A    About -- I'm going to say
16  about an hour, hour and a half.
17      Q    And would he come up to Alex
18  City periodically?
19      A    Yes, sir.  Anywhere between
20  two and three days a week.  Maybe some --
21  maybe more if I needed him to come up.
22      Q    But often?
23      A    Yes, sir.  He did come on a
0085
 1  weekly basis.
 2      Q    And this would have been
 3  starting in early 2001?
 4      A    Yes, sir, I believe that's
 5  correct.
 6      Q    And then did there come a time
 7  when you became the general manager in
 8  Alex City?

9    A    Yes, sir.
10    Q    And when did that happen?
11    A    I'm going to say mid 2001.  I
12  may be off on my dates but I believe
13  that's when it was.
14    Q    For example on 9-11 were you
15  the general manager?
16    A    Yes, sir, I was.
17    Q    And who promoted you into the
18  general position manager?
19    A    Paul Comanecky and Hal Smith.
20    Q    What position did
21  Mr. Comanecky have with Jameson?
22    A    He was the district manager in
23  Region 1.
0086
1    Q    Was Alex City in Region 1?
2    A    We had been put in Region 1.
3  We had been in Region 2 and they
4  dissolved Region 2 and combined Region 2
5  into Region 1.
6    Q    And so was Mr. Woods the
7  district manager over Alex City at that
8  time?
9    A    When we went from Region 1
10  into Region 2, yes, sir.
11    Q    But at the time you were
12  promoted to general manager was he the
13  district manager over Alex City?
14    A    I do not remember but I do not
15  think so at that time he wasn't.  He had
16  taken over the Ozark property.
17    Q    So, you just don't recall?
18    A    I just can't remember exact
19  dates.  I know at one point he wasn't and
20  then he was.
21    Q    Well, do you know whether he
22  had anything to do with your promotion?
23    A    Yes, sir, he did.
0087
1    Q    What did he have to do with
2  it?
3    A    He recommended me for the
4  position.
5    Q    Mr. Woods did?

6     A    Yes, sir.
7     Q    And what kind of role, if
8  any, did Hal Smith have regarding your
9  promotion?
10    A    He was the regional manager.
11    Q    Do you know who Mr. Woods
12  recommended you to for the promotion to
13  general manager?
14    A    I believe it was to Hal Smith
15  and Paul Comanecky and he had recommended
16  me for the acting GM at that point.
17    Q    So did he recommend you for
18  acting GM or for GM or both?
19    A    Both basically because I had
20  to -- I was on a six months -- I believe
21  six months probation.
22    Q    So for six months you were
23  acting GM?
0088
1     A    I was under review, yes, sir
2  for GM.  Then I was promoted to GM.
3     Q    So that I understand for six
4  months you were acting GM?
5     A    Right, with Charles.
6     Q    With Charles Woods?
7     A    Correct.
8     Q    Okay.  And then after that
9  it's your understanding he recommended
10  you for general manager?
11    A    Correct.
12    Q    So this would have been in mid
13  2001 when he recommended you for general
14  manager or acting manager?
15    A    General manager.
16    Q    So you had already been acting
17  general manager for about six months at
18  that time?
19    A    I believe that's correct, yes,
20  sir.
21    Q    I want to talk about your
22  functions as a general manager.
23    A    Okay.
0089
1     Q    And please understand that I'm
2  not in the hotel business nor have I ever

3  been so I will ask you a number of
4  questions that someone in your position
5  may seem fairly elementary.  Is a general
6  manager -- what different departments at
7  the hotel did you have responsibility
8  for?
9      A    I had responsibility for the
10  everyday running of the hotel,
11  maintenance, housekeeping, front desk
12  staff, guess services, payroll and then
13  just everyday running of the hotel.  Any
14  kind of problems that arose, if any, did
15  I did address that.
16      Q    Maintenance, what kind of
17  responsibilities would you have as
18  maintenance or for maintenance?
19      A    To maintain -- we had a toilet
20  that tore up.  We would have to fix it or
21  fix something that staff could not do.
22  We would get permission to have somebody
23  come in such as we had a toilet that went
0090
1  bad and was cracked.  We had to bring
2  somebody in to fix the toilet because
3  obviously we were not able to do that
4  because we were not plumbers.
5      Q    Did you have a maintenance
6  person?
7      A    Not when I was there.  When I
8  went to work there there was a
9  maintenance person fifteen hours a week
10  but that didn't last very long.
11      Q    So there used to be when you
12  first started working there as a front
13  desk clerk, a maintenance person who
14  worked fifteen hours a week but then that
15  person's position was eliminated?
16      A    Yes, sir.  The re-budgeting
17  and all and it was not in the budget to
18  have a maintenance person.
19      Q    I understand.  So to have
20  maintenance, to have something maintained
21  through maintenance would you have to
22  bring somebody in from the outside?
23      A    We had to do it or we would

0091
1  have to get permission.  And a lot of
2  times we did it.
3      Q    Did you ever hire a
4  maintenance person during the time that
5  you were there or place somebody in a
6  maintenance position?
7      A    No, sir.
8      Q    During the entire time that
9  you were there except for this fifteen
10  hours that the person who was working
11  fifteen hours you did not have a
12  dedicated maintenance person?
13      A    No, sir, I did not.
14      Q    And as far as you know that
15  was the same at other similarly sized
16  Jameson Inns?
17          MR. GOLDFARB: Object to the
18  form.
19      A    Yes, sir.
20      Q    (BY MR. KESSLER:) Okay.  I
21  mean your place was not being treated any
22  differently was it?
23          MR. GOLDFARB: Object to the
0092
1  form.
2      Q    (BY MR. KESSLER:) To your
3  knowledge?
4      A    Not to my knowledge.
5      Q    Housekeeping, was there a
6  housekeeping staff?
7      A    Yes, sir.
8      Q    And how many people would
9  normally be in the housekeeping staff?
10      A    It would vary.  Housekeeping
11  was a very hard position to keep full.
12  You could have anywhere between five to
13  ten housekeepers at a time.
14      Q    To be fully staffed how many
15  housekeepers would you have?
16      A    You would always need at least
17  ten.
18      Q    Ten housekeepers?
19      A    For a sixty room property.
20      Q    How many -- on the average day

21   how many rooms would a housekeeper clean?
22      A    On an average day anywhere
23   between eight to ten rooms.  Sometimes
0093
 1   twelve rooms if we were short staffed.
 2      Q    I see.  So you need ten
 3   because of vacations and off days?
 4      A    Yes, sir.  And it's also
 5   according to your occupancy.
 6      Q    All right.  And then was there
 7   a housekeeping supervisor?
 8      A    Yes, sir.
 9      Q    Okay.  And the entire time
10   that you were either acting or actually
11   the general manager there was a
12   housekeeping supervisor?
13      A    No, sir, not the whole time.
14   We were able to bring one in, I believe,
15   it was 2001 -- the end of 2001, the
16   beginning of 2002.
17      Q    Who were the housekeeping
18   supervisors who worked there during the
19   time that you were either acting general
20   manager or general manager?
21      A    Her name was Thelma Gabbard.
22      Q    Did she work there the whole
23   time?
0094
 1      A    Under my employment?
 2      Q    Yes.  Well, during the time
 3   that you were acting general manager or
 4   general manager?
 5      A    Only when I became general
 6   manager.  She came to work I believe it
 7   was 2002.
 8      Q    So she was hired sometime
 9   after you became general manager?
10      A    Yes, sir.
11      Q    Okay.  And then was she
12   principally responsible for making sure
13   that the rooms were properly cleaned and
14   maintained?
15      A    Yes, sir.
16      Q    That was her job as a
17   housekeeping supervisor?

18     A    Yes, sir.
19     Q    But you supervised her?
20     A    Yes, sir, I did.
21     Q    So you were ultimately
22  responsible?
23     A    Correct.
0095
 1     Q    Ultimately responsible for
 2  making sure that the rooms were cleaned
 3  and properly maintained?
 4     A    Yes.
 5     Q    And up to Jameson's standards?
 6     A    Correct.
 7     Q    And the front desk, did you
 8  have a front desk supervisor or manager
 9  during the time that you were in a
10   management position at Jameson?
11     A    Yes, sir.
12     Q    Who was that?
13     A    Linda Peppers.
14     Q    And was she the front desk
15  manager?  Is it manager or supervisor?
16     A    Supervisor.  I had heard she
17  was like my unofficial assistant manager
18  because I did not have one at that time.
19  And she pretty well handled the front
20  desk and maintained the front desk and
21  helped me out with supervisor.
22     Q    But her title was front desk
23  supervisor?
0096
 1     A    Correct.
 2     Q    Okay.  And how many people
 3  would be on her staff?
 4     A    Probably about four or five.
 5     Q    Is the desk staffed 24 hours
 6  a day?
 7     A    Yes, sir.
 8     Q    Any other supervisor or
 9  managers at the Jameson Inn?
10     A    No, sir.
11     Q    Those were the only positions
12  that we talked about that were
13  supervisory or management positions?
14     A    Yes, sir.

15    Q    So to recap we have the front
16  desk and the people who worked at the
17  front desk?
18    A    Correct.
19    Q    We have housekeeping and the
20  people who worked in housekeeping?
21    A    Yes, sir.
22    Q    And you?  And was there not an
23  assistant general manager during the time
0097
1  that you were general manager?
2    A    No, sir.
3    Q    Okay.  But eventually there
4  came to be an assistant general manager
5  named Mark Fetner who worked there during
6  that time that you were there, wasn't
7  there?
8    A    That's correct.
9    Q    The last three or four weeks?
10    A    About, yes, sir, about the
11  lasts two weeks of my employment.
12    Q    You didn't have anything to do
13  with him being hired did you?
14    A    No, sir.
15    Q    And during the time that the
16  two of you all worked together,
17  Mark Fetner and you, did y'all get along?
18    A    Somewhat.
19    Q    What do you mean "somewhat"?
20    A    There was some problems there.
21    Q    So what were the problems from
22  your viewpoint?
23    A    Well, we had a problem with
0098
1  the fact is that he dictated what he was
2  going to work and what he wasn't going to
3  work.
4    Q    Well, he came in the latter
5  part of January 2004 didn't he?
6    A    Yes, sir, I guess so.  I knew
7  nothing about him.  I was never told that
8  there was one hired until I met him.
9    Q    He was hired as far as you
10  know by Mr. Woods?
11    A    Yes, sir, I assume.

12    Q    And during the time that you
13  were general manager was there a slot
14  open for an AGM, assistant general
15  manager?
16    A    Yes.
17    Q    A budgeted position?
18    A    Yes, sir.
19    Q    So you could have hired one?
20    A    No, sir.
21    Q    Well, if there was a slot and
22  it was budgeted why could you not have
23  hired one?
0099
 1    A    Mr. Woods said he was going to
 2  do that.
 3    Q    When did he first tell you
 4  that he was going to hire an assistant
 5  general manager?
 6    A    I don't remember the exact
 7  date but I had asked for one on several
 8  occasions.
 9    Q    And so didn't he tell you a
10  couple months before Mr. Fetner was hired
11  that he was going to hire an assistant
12  general manager?
13        MR. GOLDFARB: Object to form.
14    A    He told me he was looking for
15  one.  I submitted several of my
16  employees' names for the position because
17  they knew the property and I felt like
18  they would have -- we would have worked
19  well together because we were working
20  together and he said that he was going to
21  find one.  I said, well, can I be a part
22  of making that decision and he said he
23  was going to hunt and hire the assistant
0100
 1  manager.
 2    Q    Did you have a problem with
 3  that?
 4    A    I did.
 5    Q    What was the problem?
 6    A    That I felt like if that
 7  person was going to be working with me
 8  then I should have some say so in who

9   that person should be.

10      Q    Well, the fact is at the time

11   that Mr. Woods talked to you about hiring

12   an assistant general manager you had

13   received some less than satisfactory QA

14   evaluations, hadn't you?

15            MR. GOLDFARB: Object to form.

16      A    Yes, sir, but I feel like it

17   was done unfairly.

18      Q    (BY MR. KESSLER:) Well, let's

19   look at them, okay?

20      A    Okay.

21      Q    See what you have to say.

22   Now, as your supervisor, Mr. Woods, he

23   was the district manager and when he

0101

1   would come into, for example, the

2   Alex City facility to do a QA evaluation

3   he would do it about once a quarter

4   wouldn't he?

5      A    Yes, sir, once a quarter.

6      Q    So once about every three

7   months or so he would come in and

8   evaluate your facility?

9      A    That's correct.

10      Q    When he would be doing the

11   evaluation you would go around with him

12   and see what he was doing?

13      A    That is correct.

14      Q    And so certainly that was

15   your -- that was kind of a check that you

16   were able to have to make sure that he

17   was giving you a fair evaluation?

18      A    Correct.

19            MR. GOLDFARB: Object to form.

20      A    Correct.

21      Q    (BY MR. KESSLER:) And every

22   evaluation that he gave you of your

23   facility you actually went around with

0102

1   him, isn't that correct?

2      A    That's correct.

3            MR. GOLDFARB: Object to form.

4            MR. KESSLER:  She already

5   answered.

6    A    Well, there was -- I can --
7         MR. GOLDFARB:  Well --
8         MR. KESSLER:  Counsel, let's
9  not coach the witness.
10        MR. GOLDFARB: I didn't coach
11  her.  Don't accuse me of something I
12  didn't do and let her answer the
13  question.
14        MR. KESSLER: Well, she had
15  already answered the question.
16        MR. GOLDFARB: I didn't coach
17  her and she's answering your question.
18  If you don't want her to answer the
19  question that's in the deposition then do
20  something else.  Answer the question.
21        MR. KESSLER: Let's not coach
22  the witness.
23        MR. GOLDFARB: I'm not coaching
0103
1  her.  Don't accuse me of coaching her.
2  Have him stop glaring at her and
3  intimidating her and making her upset.
4  He is staring at her and glaring at her
5  and she is getting upset and it's very
6  hard for her to concentrate with the way
7  he's behaving.
8         MR. WOODS: I haven't.
9         MR. KESSLER: He's not done
10  anything and --
11        MR. GOLDFARB: I'm telling you
12  I've been watching him.  She keeps asking
13  me on the breaks is there any way we can
14  make him stop.  I say said stop looking
15  at her.
16        MR. KESSLER: Do you want him
17  to look somewhere else?
18        MR. GOLDFARB: He's doing this
19  and hitting with his pen and all.  It's
20  upsetting her.
21        MR. KESSLER: Well, we don't
22  need to upset the witness at all.
23        MR. GOLDFARB: Absolutely.  She
0104
1  needs to be able to recall as best she
2  can and make it as comfortable as you

3    can.  You're being very nice and I
4    appreciate it.
5            MR. WOODS: I am trying to be
6    nice.
7            MR. GOLDFARB: You might not be
8    doing it intentionally.  For whatever
9    reason it's upsetting her.
10      Q    (BY MR. KESSLER:) Go ahead.  I
11   was asking you a question -- I asked you
12   the question of you went around and you
13   were with Mr. Woods every time he gave
14   you an evaluation and you said yes.  Your
15   counsel made a comment and now are you
16   changing your answer?
17      A    No, sir.  That is correct
18   except for the last evaluation.
19      Q    Did you go around with him
20   then?
21      A    No, sir, I did not.
22      Q    Did you have an opportunity to
23   go around with him?
0105
1    A    No, sir, I did not.
2    Q    Why not?
3    A    He come on the property and he
4    said he was going to do a QA inspection
5    and I said well, I don't have anybody to
6    cover the front desk.  He said that's
7    okay I will do it by myself.
8    Q    Okay.  So, you had an
9    opportunity to go with him but you
10   didn't?
11           MR. GOLDFARB: Object to form.
12      A    No, sir
13           MR. GOLDFARB: Knock it off.
14   You cut her off.  She didn't finish.
15           MR. KESSLER: Can I say what
16   I'm going to say without you interrupting
17   me?
18           MR. GOLDFARB: Go ahead.
19           MR. KESSLER: Every time I ask
20   a question that you get nervous about you
21   make some kind of comment about, you
22   know, objection to form or something like
23   that which I would appreciate it --

0106
1       MR. GOLDFARB: I can certainly
2   object to anything that I want to object
3   to.
4       MR. KESSLER: You can object.
5       MR. GOLDFARB: If you want an
6   explanation to the problem with the form
7   I will give it to you.
8       MR. KESSLER: Jon, I know
9   exactly what you're doing so go ahead and
10  answer the question.
11     A    Okay.  The day he come in to
12  do the QA inspection on February 18th I
13  told him I did not have desk coverage to
14  let me get a desk clerk in there.  He
15  said it is not necessary.  I'm going to
16  do this inspection by myself.  And that
17  was not normal company policy from my
18  understanding.  And he went around.  I
19  was not with him.  I don't know what
20  rooms he went to, what inspections he
21  did, what he did but normally an
22  inspection would take two to two and a
23  half days.  Within about two, three hours
0107
1   he was finished with the inspection.
2     Q    Your testimony is that a
3   normal inspection is two to two and a
4   half days?
5     A    Yes, sir, that's correct.
6     Q    Okay.  So, the last inspection
7   where you say you didn't have a chance to
8   go around and inspect and it took only
9   several hours to do the inspection did
10  you ever complain to anybody within the
11  company about this allegedly unfair
12  inspection?
13    A    No, sir, because I was fired
14  that day.
15    Q    But as a result of being
16  terminated did you ever complain to
17  anybody within the company about the
18  termination?
19    A    Well, I mean I was fired so I
20  didn't know who I could complain to at

21  that point.
22    Q    Did you ever -- my question
23  was --
0108
 1        MR. GOLDFARB: Just answer his
 2  question.
 3    A    I'm kind of confused.  I'm not
 4  sure.
 5    Q    (BY MR. KESSLER:) Listen to my
 6  question.  Did you ever complain to
 7  anybody within the company as a result of
 8  the unfair inspection that you claim you
 9  received on or about February 18, 2004?
10    A    No, sir.
11    Q    Thank you.  So other than that
12  one, other than that inspection you went
13  around with Mr. Woods on every
14  inspection, is that accurate testimony?
15    A    Yes, sir.
16          (Defendant's Exhibit
17           No. 9 was marked
18            for identification.)
19    Q    Let me hand to you what's
20  been marked as Defendant's Exhibit No. 9
21  and this purports to be a product
22  evaluation of the Alex City facility on
23  March 5, 2003, and my question is going
0109
 1  to be have you seen this document?
 2    A    If this document says 3-5 of
 3  '05 but it was -- it looked like '03.
 4        MR. GOLDFARB: Gary, when
 5  you're asking this are asking has she
 6  seen it since you gave it to me?
 7        MR. KESSLER: I will clarify
 8  that.
 9    Q    Have you seen this document
10  before?
11    A    I wasn't employed in
12  two -- whatever.  Let's see.  I guess
13  it's supposed to be 2003.
14    Q    If you look at the signature
15  date on the bottom --
16    A    Okay.
17    Q    -- it's 2003.

18     A    It is 2003.

19     Q    As we know sometimes we write

20  dates down wrong?

21     A    Correct.

22     Q    So on March 5,

23  2003 -- incidentally on Defendant's -- my

0110

1  question was have you seen this document

2  before?

3     A    Yes.

4     Q    Okay.  And this is the QA

5  evaluation of Alex City, right?

6  Is that a yes?

7     A    Yes, sir.

8     Q    And the score was needs

9  improvement?

10    A    Yes, sir.

11    Q    Do you recall receiving a

12  needs improvement in March 5, 2003 for

13  the Alex City facility?

14    A    Yes, sir.

15    Q    Okay.  And the signature at

16  the bottom is whose, do you know?

17    A    I guess that's --

18         MR. GOLDFARB: Don't guess.

19    A    I don't know.  Greg Whiney.

20    Q    (BY MR. KESSLER:) Okay.  You

21  don't know whose it is?

22    A    No, I really don't.

23    Q    All right.  Now, after you

0111

1  have a QA evaluation would you be given a

2  copy of the QA?  Standard procedure was

3  to give you a copy of the QA evaluation?

4     A    Yes, sir.

5     Q    So you knew exactly what had

6  to be done to improve the facility?

7     A    Yes, sir.

8     Q    So, for example, if we turn to

9  the third page of March 5, 2003 it has a

10  list of major operational deficiencies.

11  Do you see that?

12    A    Yes, sir.

13    Q    And this is a list of items

14  that need to be repaired by the target

15  date of completion?
16      A    Yes, sir.
17      Q    Is that correct?  Okay.  The
18  list that we have here in the March 6,
19  2003 QA evaluation do you consider this
20  to be a long list or a short list or a
21  normal list of major operational
22  deficiencies?
23          MR. GOLDFARB: Object to the
0112
1  form.
2      A    I don't know how to answer
3  that because some of them can be shorter.
4  Some of them can be longer.
5      Q    (BY MR. KESSLER:) Okay.  Well,
6  you're the general manager at this time.
7  I'm wondering what was your impression
8  about this list of major operational
9  deficiencies.  Did this strike you as
10  maybe there were some problems in the
11  Alex City facility?
12      A    A lot of these had to be
13  addressed with capital issues such as
14  plants and things like that that come
15  into our capital budget.  As far as the
16  computer that would have fallen under
17  capital budget, which is money that we
18  requested to buy these new major things
19  like a computer and things like that.
20  These are things that was just --
21      Q    Was that within your
22  responsibility?
23      A    On capital budget -- well, on
0113
1  the capital budget you did it from year
2  to year but, yes, this was within my
3  responsibility.
4      Q    Turn over to the next page.
5  Capital deficiencies?
6      A    Yes, sir.
7      Q    Okay.  That's what you're
8  talking about?
9      A    Capital items, yes, sir.
10      Q    So the major operation
11  deficiencies, weren't you, as a general

12  manager, responsible for minimizing the
13  number of major operational deficiencies?
14      A    Yes, sir.
15      Q    And with the needs improvement
16  score at the Alex City facility received
17  on March 5, 2003 when you were general
18  manager did you think this evaluation was
19  unfair in any way?
20      A    Yes, I did.
21      Q    What was unfair about it?
22      A    I just felt like there was a
23  lot of things that it was just my
0114
 1  property was nit-picked.  There was
 2  things that we -- Mr. Woods and I
 3  discussed and I argued with him about
 4  that I felt like was unfair.
 5      Q    So you thought that he
 6  nit-picked the property and that he was
 7  unfair?
 8      A    Yes, sir, I do.  And we argued
 9  quite often about that issue.
10      Q    Okay.  How long had you been a
11  general manager at that time?
12      A    Two years.
13      Q    Do you know how long Mr. Woods
14  had been in the business at that time?
15      A    No, sir.  I know he had been
16  with the business awhile.
17      Q    And do you have any opinion as
18  to why he nit-picked your property?
19      A    Let me think about that
20  question a minute.
21          MR. GOLDFARB: Object to form.
22      A    I don't know how you want me
23  to answer that.
0115
 1      Q    (BY MR. KESSLER:) I just want
 2  you to answer truthfully.
 3      A    I just felt like that I was
 4  being picked on because of the fact of
 5  being a woman.  And I felt like I did not
 6  fit in the little group and the little
 7  clicks because there was things that I
 8  did not do.  There was things that I did

9  not agree with within the company, within
10  our district.  I felt as a woman I was
11  being discriminated against.  I felt like
12  I was being picked on.  I felt like
13  nothing I did was good enough.
14   And I felt this way because of
15  conversations that we had.  There were
16  remarks made that some women can't handle
17  the work.  They need to be home and be
18  mothers.  I just felt like I didn't
19  belong.  I felt like I did not fit
20  because I didn't fit into the little
21  clicks.  I didn't participate in things
22  that I did not agree with such as when we
23  had managers meetings.  A lot of the
0116
1  managers, district managers in our
2  district would get together and go
3  drinking and things and I didn't do that
4  kind of stuff and I just felt like I
5  was -- I didn't fit.  I didn't belong and
6  I was being discriminated against because
7  of that fact that I was a woman and that
8  I did not participate in things that I
9  did not agree with.
10      Q    Any other reasons why you
11  believe you were being picked on or
12  discriminated against because you were a
13  woman?
14      A    Yes, sir.  Incidents happened
15  that we were in Eufala, Alabama and we
16  were at a district manager's meeting.  We
17  were getting ready to leave that
18  afternoon and one of the other managers
19  and myself were walking through the
20  hallway or the breezeway there and she
21  grabbed me by my shoulder and got me back
22  and she said Charles and Betty are
23  standing by the truck and she just kissed
0117
1  him.  And I said wait a minute I want to
2  see and I leaned over and I did not see
3  him kiss her but I did see them close
4  together.
5      Q    It's Betty Sutton?

6     A     Yes, sir.  I'm sorry I did not
7   know the last name.  And I just feel like
8   that I just didn't fit because I didn't
9   do things that were inappropriate.  I
10  didn't drink.  I didn't go to bars.  I
11  didn't do that kind of stuff.
12    Q     Any other reasons why you
13  believe that you were picked on because
14  you were a female?
15    A     The pay.
16    Q     Okay.
17    A     The discrimination on the pay
18  due to the fact that is when Mark Fetner
19  came there he made the same pay I did.  I
20  was a manager.  He was an assistant
21  manager.  And later on I did find out in
22  talking with my attorney that --
23          MR. GOLDFARB: Don't tell him
0118
1   what I said.
2     A     Okay.  I seen the document --
3           MR. KESSLER: It won't be in
4   evidence then.
5     A     I'm sorry.  I seen the
6   documents of the pay roster and I seen
7   where there was male managers in our
8   district that was making higher pay that
9   had come to work later than I did.
10    Q     Did you see also that female
11  managers were making more than you?
12    A     I seen that Ms. Sutton made
13  more than I did.
14    Q     Did you see that Ms. Ellis
15  made more than you did?
16    A     Ms. Ellis made more but she
17  made less than what Ms. Sutton made and I
18  feel that had --
19    Q     Had to do with what?
20    A     The relationship with Charles
21  and Ms. Sutton.
22    Q     So you believe that based on
23  by seeing them close together on an
0119
1   occasion and who was this woman who you
2   were with?

3   A   Excuse me.  Ms. Ellis.
4   Q   Ms. Ellis said that they
5  kissed and you believe that because of
6  this -- what you believe was a
7  relationship between Charles Woods and
8  Betty Sutton that's why you made less
9  money?
10   A   I believe there was a
11  relationship that I did not have with
12  Charles that she had with Charles.  There
13  were occasions that she came to my
14  property when Charles was on my property
15  and that I did not understand why she
16  came to the property but there were
17  several occasions that she did.  I feel
18  like that I was discriminated against
19  because I didn't have that kind of a
20  relationship with him.
21   Q   What other kind of facts do
22  you believe there are which demonstrate,
23  in your view, that you were being treated
0120
1  differently or discriminated against
2  because you were a woman?
3   A   Remarks.  Like I said before
4  the remarks about some women can't handle
5  the work force.  They need to stay home
6  and be mothers.  Some of the other
7  remarks I had had made previously.  Just
8  things changed.  After I went to work
9  there things changed.  I don't know
10  exactly why.  When I first went to work
11  there things went great.  All of a sudden
12  things changed and I feel like it had to
13  do with the fact that I'm a female and I
14  felt like I was discriminated against pay
15  wise.  It just come to the point that it
16  became a hostile work environment and I
17  feel that's all to do with the fact that
18  I'm a female and I made a remark to
19  Mr. Woods about the reason why I was
20  fired is because I felt like that I was
21  being discriminated against in pay
22  because I was a female and Mr. Fetner was
23  a male and he was making the same amount

0121
1   of money I was making and I told him I
2   felt like it was sexual discrimination.
3       Q    So what other facts do you
4   have -- are there any other facts that
5   you have that lead you to believe you
6   were being discriminated against because
7   of your sex because you're a woman?  Was
8   there anything else?  I want to make sure
9   we have your best recollection of or your
10  complete recollection on this very
11  important issue.
12      A    The pay, the remarks, the
13  relationships.  That just --
14      Q    I understand.  I want to make
15  sure that we have all the facts, all the
16  facts, all the instances, you know.  Have
17  you named all the comments, for example?
18      A    Let me make sure.  I want to
19  answer this truthfully and let's see.
20  Let me think.  I had about the -- so what
21  you're asking me is you need to know any
22  kind of remarks other remarks or other
23  statements that was made or other facts
0122
1   or anything?
2       Q    That's correct.  That lead you
3   to believe you were discriminated against
4   that what happened to you was
5   discrimination against you as a woman?
6       A    Okay.  The touching, the
7   hugging, the remarks.
8       Q    Okay.  You don't have to
9   repeat what you already said.  I'm trying
10  to find out if there's something new,
11  something additional?
12      A    Some women can't handle the
13  work place as well as a man can and that
14  sometimes that the women like that their
15  place should be at home and not in the
16  work force.  They can't handle it, don't
17  do it.
18      Q    Okay.  You told us that, I
19  think, three times.
20      A    I'm sorry.

21    Q    Anything else?

22    A    No, sir.

23    Q    Okay.  This is your best

0123

1    recollection of everything that was said

2    to you by Mr. Woods that leads you to

3    believe you were discriminated against

4    because of your sex?

5    A    Yes, sir.

6    Q    Now, you said -- one thing you

7    did say was that after you became general

8    manager that everything was great or

9    everything was fine for awhile.  Did I

10    understand your testimony correctly?

11    A    Correct.

12    Q    And then how long did it stay

13    good or great or fine?

14    A    Well, when Charles and

15    I -- when he was overseeing me with the

16    property things -- I don't know how to

17    answer that.  I just --

18    Q    Well, let me restate the

19    question.  It may not have been clear.

20    You were supervised by Mr. Woods when you

21    were acting again general manager, right?

22    A    Correct.

23    Q    He recommended you to become

0124

1    general manager?

2    A    Correct.

3    Q    And then how long did your

4    relationship with Mr. Woods continue, in

5    your view, good or great during the time

6    that you were general manager?

7    A    After -- let's see.  We were

8    in Region 1.  Charles had become a

9    general manager at the time.  He was the

10    district manager prior to that.  After he

11    became district manager for the second

12    time that's when the problems began.

13    Now, he had not been my manager very

14    long prior to me receiving the position

15    because he was the general manager at

16    Ozark because we had a district manager

17    and his name at that time was Paul

18  Comanecky.
19     Q     Did Mr. Comanecky, did he
20  treat you fairly?
21     A     Yes, sir.
22     Q     Okay.
23     A     I had QA inspections with him.
0125
 1     Q     So it was after Mr. Woods
 2  became your district manager a second
 3  time -- did it continue good for a while
 4  and then change or did it immediately
 5  change?
 6     A     The problems started
 7  occurring.
 8     Q     As soon as he became your
 9  general manager or district manager a
10  second time?
11     A     Pretty much, yes, sir.
12     Q     Any ideas as to what caused
13  that change?
14     A     No, sir, I don't.
15     Q     And how did he conduct himself
16  differently which led you to believe that
17  there was a change in the relationship?
18  What did he say or do or how did he act
19  differently?
20     A     Just remarks and come in with
21  the QA inspections.  And I just felt like
22  he was being nit-picky.  There was a lot
23  of situations like I said that we would
0126
 1  have serious discussions about my QA.
 2  There was a lot of times that him and I
 3  would literally argue.  I would literally
 4  argue with him and just give him my point
 5  of view that I felt like that he was
 6  being nit-picky about things, things that
 7  I felt like that should not have been
 8  because they were right.  I just felt
 9  like there were a lot of the QA
10  inspections were totally, totally,
11  totally, wrong.
12     Q     All right.  So, let's look at
13  Defendant's No. 9 that you have in front
14  of you.  Can you give us any examples of

15  why you think you should not have
16  received a needs improvement evaluation?
17      A    Yes, sir.  For one thing I
18  would on my QA -- on my health
19  inspections the health inspector would
20  come in.  He would inspect two to four
21  rooms.  He would inspect my breakfast
22  area, the hotel area in general, the
23  guest service area, which would have been
0127
1  the lobby and all that and I would score
2  100 with the Health Department.
3      Q    That's the County Health
4  Department?
5      A    Yes.
6      Q    Do you know whether Jameson
7  has higher standards than the County
8  Health Department?
9      A    As in cleaning issues and
10  things like that?  Well, I would think
11  they would be the same because they go in
12  and inspect just like a QA inspector
13  would do.
14      Q    My question is do you know
15  whether they're the same?  Do you know
16  whether Jameson has higher standards than
17  the County health inspector?
18      A    No, sir, I can't answer that
19  because I don't know.
20      Q    So you just don't know the
21  standard that Jameson was following
22  versus the County health inspector do
23  you?
0128
1      A    I know that the County health
2  inspector's standards were clean
3  efficient rooms.  He checked mattresses.
4  He checked pillows.  He checked bathroom
5  areas, the guest areas.  He checked the
6  breakfast bar making sure all the food
7  was prepared properly.  He checked the
8  public restroom which we really didn't
9  have a public restroom but it was in the
10  office.  He checked cleanliness in the
11  office, cleanliness on the property in

12  general.  He checked like the QA's, the
13  smoke detectors in the room.  He was
14  very, very thorough.
15      Q    How often would the County
16  health inspector come by?
17      A    About once every six months.
18  Maybe a little more.  Maybe a little
19  less.  According to how backed up they
20  were.
21      Q    Any idea why Kitchin would
22  even have spent the time for an
23  inspection program if they could just
0129
 1  have the County health inspector there?
 2          MR. GOLDFARB: Object to the
 3  form.
 4      Q    (BY MR. KESSLER:) Why should
 5  the company even have an inspection
 6  program if you've got the County health
 7  inspector doing it?
 8          MR. GOLDFARB: Object to the
 9  form.
10      A    I can't answer that.  I don't
11  know how to answer that.
12      Q    (BY MR. KESSLER:) That's fair
13  enough.  All right.  So, can you point to
14  anything specific in here that you
15  believe was unfair?  This is Defendant's
16  No. 9?
17      A    Now, you are stating unfair.
18  Can you kind of explain to me what you
19  mean by "unfair"?
20      Q    You talked about you thought
21  he was being nit-picky and unfair in the
22  evaluations and I think those are the
23  words you used?
0130
 1      A    Correct.
 2      Q    So I'm trying to find out as
 3  you look at this performance -- as you
 4  look as this product evaluation what in
 5  here, if anything, do you believe was
 6  nit-picky or unfair?
 7      A    The cleanliness issues of the
 8  rooms.  I mean I had clean rooms.  I

9  never received guest complaints.  Very
10  few, in any.  My rooms were always
11  cleaned.  They always smelled clean.  I
12  had been to other properties where they
13  were lower than what Jameson's standards
14  would have been.  I had a clean property.
15  I had guests that complimented on the
16  rooms and on the clean property.  I
17  strived to be the best and to have clean
18  rooms because I would not want to be in a
19  dirty room.
20     Q    So, for example, on the first
21  page of Defendant's No. 9?
22     A    Yes, sir.
23     Q    On the part under overall
0131
1  summary?
2     A    Okay.
3     Q    It says, "Failed rooms all on
4  one housekeeper run resulting in dropping
5  score one level."  Do you see that?
6     A    Yes, sir.
7     Q    Is that not -- in your view is
8  that not correct?
9     A    No, sir.  I do not feel that
10  it is correct.  We did have an issue with
11  one.  We clarified that issue with that
12  young lady.
13     Q    So when you say that young
14  lady what are you talking?
15     A    A housekeeper.  I do not feel
16  that we failed the housekeeping because
17  of all her rooms.  I don't feel that way.
18     Q    Well, who was your
19  housekeeping supervisor at that time?
20     A    Ms. Gabbard.
21     Q    Are you related to her in any
22  way?
23     A    Yes, sir, I am.
0132
1     Q    What's the relationship?
2     A    She's my mother.
3     Q    So your mother was the
4  housekeeping supervisor?
5     A    Yes, sir, she was.

6     Q    And so I guess you were
7  supervising your mother?
8     A    This is correct.
9     Q    So, when you say that you
10  don't think there were any problems with
11  the rooms you're really talking about
12  your mother being responsible for the
13  room cleaning aren't you?
14     A    Yes, sir.
15     Q    And you love your mother don't
16  you?
17     A    She is my mother, yes, sir.
18     Q    She's your mother and you love
19  your mother don't you?
20          MR. GOLDFARB: Object.  Go
21  ahead.
22     A    Yes, sir, but may I answer
23  that question?
0133
1     Q    (BY MR. KESSLER:) Well, how
2  long -- your counsel can ask you that
3  question.
4          How long did you keep
5  your mother on the payroll as the
6  housekeeping supervisor?
7     A    She was there a year or so.
8     Q    A year or so?
9     A    Yes, sir.  I can't give you
10  exact dates because I don't remember.
11     Q    Well, was she working there at
12  the time that you left?
13     A    Yes, sir, she was.
14     Q    And I think you said you hired
15  her earlier in your testimony.  I think
16  you said Theresa Gabbard in 2002
17  sometime?
18     A    I believe it was in 2002 she
19  came to work.  It may be a little earlier
20  but I'm going to say 2002, yes, sir.
21     Q    So most of the time you were
22  general manager your mother was the
23  housekeeping supervisor?
0134
1     A    Yes, sir.
2     Q    And so you thought that

3  Mr. Woods is being nit-picky and critical
4  about the cleanliness of the rooms that
5  were being supervised by your mother, is
6  that right?
7      A    I am saying that it was --
8      Q    Answer my question and then
9  you can explain.
10      A    Yes, sir.
11      Q    You thought that Mr. Woods was
12  being nit-picky about being critical of
13  the rooms being cleaned by people who
14  were reporting to your mother, is that
15  right?
16      A    That's correct.
17      Q    Now, you can explain.
18      A    When my mother was on as the
19  housekeeping supervisor and she was in my
20  staff if she did something wrong, if
21  there was something out of order she was
22  corrected for it even though she was my
23  mother.
0135
1      Q    You would correct your mother?
2      A    Yes, sir, I did.
3      Q    At the same standard and the
4  same level as other people?
5      A    Yes, sir, I did.  If she done
6  something wrong she was corrected for it.
7      Q    Understood.  Okay.  Anything
8  else you want to say about supervising
9  your mom?
10      A    As me supervising my mom?
11      Q    Yes.
12      A    No, sir.  If I told her to do
13  something she did do it.  Again, I will
14  say if there was a problem she was
15  corrected on it.  She fixed it.
16      Q    Did you have any other
17  relatives working at the Jameson Inn
18  facility in Alex City other than your
19  mom?
20      A    No, sir.
21      Q    And no cousins, no in-laws,
22  nothing like that?
23      A    No, sir.

0136
1    Q    During the entire time you
2  worked there?
3    A    Yes, sir.
4    Q    So, you thought that this
5  evaluation, Defendant's No. 9, was
6  unfair?
7    A    Yes, sir.
8    Q    Okay.  Now, the two earlier
9  evaluations that you had received from
10  Mr. Woods were rated average.  Do you
11  recall those?
12    A    Yes, sir.
13    Q    Did you have any complaints
14  about receiving an average evaluation?
15    A    Yes, sir.
16    Q    You thought you were better
17  than that?
18    A    Yes, sir.
19    Q    How good do you think you
20  were?
21    A    I feel like I was above
22  average.
23    Q    Okay.  You never did receive
0137
1  an above average evaluation from anybody
2  during the time that you worked for
3  Jameson did you?
4    A    I cannot remember the store
5  that Mr. Comanecky had given me on a QA
6  inspection but I believe it was I'm going
7  to say it was an above average.
8    Q    Now, as a result of this
9  nit-picky unfair evaluation which you
10  received which has been marked as
11  Defendant's No. 9 did you ever complain
12  to anybody within Jameson, any Human
13  Resources or the regional manager or the
14  VP of operations or anybody concerning
15  this evaluation?
16    A    No, sir.  I just complained to
17  Charles and we argued about it.
18    Q    In any of the evaluations that
19  you received during the time that you
20  worked for Jameson, which you now tell us

21  you believe were unfair, did you ever
22  complain to anybody internal within the
23  company?
0138
 1      A    No, sir, because Charles was
 2  my supervisor and I felt like that -- I
 3  just felt like I didn't know who to talk
 4  to.  I didn't know because I wanted my
 5  job.  I wanted to keep my job and I just
 6  didn't feel comfortable.
 7      Q    Let me ask you to turn to the
 8  Employee Handbook again.  And we looked
 9  at this earlier, Company Policy
10  Statement.  This is after Page 4.  And it
11  says in the second paragraph, "If you
12  feel that your supervisor has not fairly
13  or satisfactorily handled the situation
14  you may request a meeting with the
15  regional manager."  Do you see that?
16      A    Yes, sir.
17      Q    And then it says that if
18  that's not satisfactory you can go to the
19  Human Relations Manager.  Do you see
20  that?
21      A    Yes, sir.
22      Q    You never did that did you?
23      A    No, sir.
0139
 1              (Defendant's Exhibit
 2              No. 10 was marked
 3               for identification.)
 4      Q    Let me hand to you,
 5  Ms. Stough, what's been marked as
 6  Defendant's Exhibit No. 10 and ask you if
 7  you have seen this evaluation before?
 8      A    Yes, sir.
 9      Q    It's an average evaluation?
10      A    Yes, sir.
11      Q    And this was -- well,
12  certainly it was early in the March 5,
13  2003 you received an average --
14      A    Yes, sir.
15      Q    You believe this was unfair
16  also?
17      A    Yes, sir.  I felt like I

18  deserved better than that.
19      Q    Do you have anything you can
20  show us, any kind of documentation or
21  anything that would support your opinion
22  that you believe that you were better
23  than average?
0140
1      A    No kind of documentation other
2  than what should still be on the wall of
3  Jameson Inn which would have been
4  inspection reports by the Health
5  Department.
6      Q    Got you.  Okay.  Anything
7  other than that?
8      A    Other than arguing with
9  Mr. Woods which we did every time.
10      Q    Okay.
11      A    I felt like it was unfair and
12  I would tell him so.
13      Q    Okay.  But I guess you never
14  wrote it down anywhere or said hey I
15  really think I'm being treated unfairly
16  or anything like that?  I mean here we
17  are almost four years later and you're
18  saying we thought you were better
19  than this evaluation and we're trying to
20  find out, you know, how can you
21  demonstrate that to us?
22      A    I spoke with Mr. Woods about
23  it.  I told him I felt like it wasn't
0141
1  right.  I felt like we deserved better
2  because I maintained a very clean
3  property.  I never had -- I had very few
4  guest complaints about cleanliness issues
5  and things to that nature.  We have a
6  policy or, excuse me, Jameson Inn has a
7  policy, a perfect stay.  If you do not
8  have a perfect stay you refund that
9  guest's money.  We had very few of them
10  because I had a clean property.  I took
11  care of my guests.  My staff took care of
12  my guests.  I prided myself in that.
13      Q    Do you have any reason to
14  believe that Mr. Woods didn't genuinely

15  believe that he was doing the best job he
16  could on the evaluation, Defendant's No.
17  9 or 10?
18        MR. GOLDFARB: Object to form.
19     A    Can you rephrase that?
20     Q    (BY MR. KESSLER:) Do you have
21  any reason to believe that Mr. Woods was
22  not trying to do the best job he could in
23  giving these evaluations whether y'all
0142
1  had a disagreement or not?
2        MR. GOLDFARB: Object to form.
3     A    I don't feel I can answer that
4  because I can't speak for him.
5     Q    (BY MR. KESSLER:) So you
6  don't know whether -- for all you know he
7  probably was trying to do the best job he
8  could do on these?
9        MR. GOLDFARB: Object to form.
10     A    I can't answer that because I
11  can't speak for him.
12     Q    (BY MR. KESSLER:) That's fair
13  enough.  Did he ever give you a QA
14  evaluation at your facility that, in your
15  view, was good enough?
16     A    No.
17           (Defendant's Exhibit
18            No. 11 was marked
19            for identification.)
20     Q    Let me hand to you,
21  Ms. Stough, what's been marked as
22  Defendant's Exhibit No. 11 and ask you if
23  you've seen that before?
0143
1     A    Yes, sir.
2     Q    Now, this was an evaluation
3  about a month after the previous one that
4  we looked at, which was Defendant's No.
5  9?
6     A    Yes, sir.
7     Q    And you got an average
8  evaluation which was a level up from the
9  needs improvement?
10     A    Yes, sir.
11     Q    And on the overall summary

12  could you read that out loud to us,
13  please?
14      A    "Many of the operational
15  issues noted on the original first
16  quarter QA have been addressed.  Those
17  that remain are in the works and will be
18  handled.  Room cleanliness scores
19  indicate a marked improvement over last
20  inspection."
21      Q    Okay.  Do you have any reason
22  to disagree with this evaluation,
23  Defendant's No. 11?
0144
1      A    I agreed with the part because
2  we were doing the inspections and getting
3  everything in order.
4      Q    Okay.
5      A    I still felt like that I could
6  have got an above average because I felt
7  like we exceeded in taking care of all
8  the major issues.
9      Q    Do you have an opinion as to
10  why he gave you an average rather than an
11  above average evaluation?
12          MR. GOLDFARB: Object to form.
13      A    As, again, we argued about it
14  and he said that his final score was
15  going to be an average and I just didn't
16  feel comfortable with it.  He was the
17  supervisor.
18      Q    (BY MR. KESSLER:) All right.
19  He was the supervisor, wasn't he?
20      A    Correct.
21      Q    And he a lot more experience
22  in the industry than you did?
23          MR. GOLDFARB: Object to form.
0145
1      A    Well, I have overall right
2  at twenty -- about twenty years
3  experience in the hotel business also.
4      Q    How long had you been a
5  general manager within the hotel
6  business?
7      A    At this time three years.
8      Q    Okay.  And do you know how

9  long he had been either a general manager
10  or position above that in the hotel
11  business?
12     A    No, sir, but I knew it was for
13  several years.
14     Q    Longer than yours wasn't it?
15     A    Yes.
16     Q    He was your supervisor, wasn't
17  he?
18     A    Yes, sir.
19        MR. GOLDFARB: I have to make a
20  call.
21        MR. KESSLER:  Why don't we
22  take a lunch break.
23           (A lunch break
0146
1           was taken.)
2  CONTINUED EXAMINATION
3  BY MR. KESSLER:
4     Q    We just took a break for lunch
5  and we've been gone for about an hour or
6  so.  Is there anything from your
7  testimony this morning that you want to
8  add to or modify or change in any way?
9     A    You mean with the QA's or
10  anything particular?
11     Q    Anything that you said this
12  morning that, for example, you had a
13  chance to reflect on as you were walking
14  in the restaurant or having lunch or
15  coming back that said, you know, I
16  forgot to say this or what I said was
17  about this was not correct or I want to
18  give you a chance to -- since you've had
19  a chance to reflect on your testimony to
20  add anything based on your testimony this
21  morning?
22     A    Other than there's a couple
23  things that I wanted to say.  On my
0147
1  employees' behalf as you well know we've
2  made it known that my mother was my
3  housekeeping supervisor.  She was treated
4  as well as any employee there.  If she
5  made a mistake she was reprimanded as

6   well as the others.  I had an open door
7   policy with my employees and I just
8   wanted to make -- to clarify that with
9   the fact that my mother and I know she
10  was my mother but when she was on staff
11  she was not my mother.  I feel with the
12  inspections that had I been a male I feel
13  like my evaluations would have been
14  better.  I do feel like that I was
15  discriminated against because I am a
16  female and not complaining to someone
17  higher in authority.  Charles was my
18  supervisor.  I felt like complaining to
19  him and talking with him about this, the
20  situations would be rectified.  Evidently
21  they were not.  I did not have a regional
22  manager at this time.  Our regional
23  manager had stepped down.  We did not
0148
1   have one.  I felt like that I wanted to
2   keep my job.  I wanted to try to stay
3   with Jameson Inn.  I enjoyed my job.  I
4   did not enjoy the discrimination and the
5   harassment but I loved what I did.  I
6   loved the hotel business.
7                And then as far as with
8   we kind of touched base about
9   Mark Fetner.  I did have some problems
10  with Mark.  He did give me some problems
11  as far as with scheduling, did not want
12  to do what I asked him to do.  He very
13  well came in, overrode me, tried to take
14  over.  There were several different
15  occasions I told him, Mark, I am the
16  manager.  I've been doing this a little
17  longer than you.  I feel like that you
18  need to listen to me.  Just different
19  things scheduling, I'm not going to work
20  that.  I'm not going to do it.  Just
21  pretty well come in and just railroaded
22  me.  And with him being a male, you know,
23  I mean I objected to him.  I told him
0149
1   look, I'm the general manager here and it
2   was just -- he just pretty well just took

3  it like he could have cared less.
4     Q    Did he argue with you?
5     A    Oh, yes, definitely, quite
6  often.  That was our big thing.  He
7  argued quite often with me.  I know more
8  than you do.  No, you don't.  I've been
9  with this company.
10    Q    You've been in the business
11  longer?
12    A    I had been in the business
13  longer.
14    Q    And plus you are the general
15  manager?
16    A    Correct.
17    Q    And so, you know, when he was
18  arguing with you I mean didn't you say,
19  look, I'm the general manager, you've got
20  to do what I tell you to do?
21    A    I said Mark I have been in
22  this business a long time.  I said we
23  need to work together not against each
0150
1  other.  And on the time I was which was
2  two weeks it was -- it was not good.
3     Q    But since you were his boss I
4  mean you had the right to tell him what
5  to do didn't you?
6     A    I felt like I had the right
7  and I did it in a professional manner.
8     Q    Okay.  Go ahead.  I'm sorry.
9     A    There was an incident that
10  happened after I left there my mother was
11  fired from her position.  I'm not sure
12  all the details.  We went -- she filed
13  for unemployment.  We went to --
14        MR. GOLDFARB: Aren't you just
15  clearing just -- well, go ahead.  You're
16  talking and talking and talking.
17        MR. KESSLER: This is a truth
18  finding exercise.
19    A    Is this okay?
20        MR. KESSLER: Sure.
21    A    Are you sure because I
22  mean --
23    Q    I wanted --

0151
1     A    If I'm out of order --
2     Q    I asked for additional
3  information and sure enough I'm getting
4  it.
5     A    Okay.  I just want to make
6  sure I wasn't out of order.  We had some
7  problems like I said with Mark.  For
8  instance, my mother had filed for
9  unemployment.  It was being fought.  We
10  went to the hearing.  There was another
11  young lady or housekeeper that was there
12  with him.
13     Q    Who?
14     A    Her name was Marilyn Hand.  I
15  was just there for moral support
16  basically.  My mother gave her testimony.
17  Mark gave his.  There was some problems.
18  Marilyn was asked to give her statement
19  and she was talking not in reference to
20  my mother but to me and was saying some
21  things and then when it was all said and
22  done we walked outside.  Marilyn and Mark
23  was talking and my mother said, "Mark, I
0152
1  didn't want this to come to this."  And
2  he called her a bitch.  We got outside.
3  He was in her face and called me and her
4  a bitch.  He said he was going to sue us.
5  And it just escalated from there and I
6  got my mother and put her in the car.
7  That's day won when Mark walked into that
8  property we had problems.
9     Q    After you were terminated you
10  told people in Alex City that Mark Fetner
11  was running a gay hotel at the Jameson
12  Inn?
13     A    No, sir, I never did.
14     Q    Have you ever said anything or
15  told anybody that you thought Mark Fetner
16  was gay?
17     A    No, sir, I did not.
18     Q    Do you deny that under oath?
19     A    Excuse me.  I'm sorry.
20     Q    I said do you deny that under

21  oath?
22      A    I never told anyone that Mark
23  was gay.
0153
 1      Q    Did you ever accuse him of
 2  being gay?
 3      A    No, I did not, but my mother
 4  did.
 5      Q    Okay.
 6      A    She told him when he called
 7  her the bitch.  She said, "That's okay.
 8  I'm not gay."
 9      Q    Okay.
10      A    That's what was said in a
11  discussion.  Those were the words that
12  were said.
13      Q    That's fair enough.  You never
14  said that?
15      A    No, sir, I never said
16  anything.  I treated Mark --
17      Q    Your sweet mother said that?
18      A    My mother did say it, yes,
19  sir.  And she will testify to that fact
20  but I treated Mark the way I did all my
21  other employees.
22      Q    Anything else you wanted to
23  say?
0154
 1      A    No, sir.  I think that pretty
 2  well covered it.
 3      Q    You said that you didn't have
 4  a regional manager at the time, that
 5  during sometime, I guess, at the time you
 6  were terminated before that?
 7      A    Yes, sir.  It was a while
 8  before that, before I was terminated we
 9  did not have a regional manager.
10      Q    There was a vice president of
11  operations wasn't there?
12      A    Yes, sir.
13      Q    And there was a Human
14  Resources Department at Jameson wasn't
15  there?
16      A    Yes, sir.
17      Q    You said you felt like you

18   would have received better evaluations if
19   you had been a male?
20      A    Yes, sir.
21      Q    What facts or what events do
22   you base that on?
23      A    Well, I just felt like that I
0155
1   did not get better evaluations because of
2   the fact that I am a female and I did not
3   fit in.  I didn't go -- I don't drink.  I
4   know a lot of that was going on.  I don't
5   drink.  I don't go to lounges and I just
6   felt like I did not fit in.  I didn't
7   participate in some of that that went on
8   with the managers, male managers.
9      Q    Such as?
10      A    Such as drinking and going to
11   bars and --
12      Q    Any of the female managers
13   ever drink or go to bars?
14      A    Yes, sir, I'm sure they did.
15      Q    There's nothing morally wrong
16   with having a beer or a drink in there?
17      A    I don't do that.
18      Q    You may not do it but do you
19   think anything is morally wrong with
20   doing that?
21      A    No, sir, I don't think
22   anything is morally wrong with that.
23      Q    All right.  But did you ever
0156
1   go out to dinner with the other managers
2   in the district?
3      A    We had dinners, yes, sir, we
4   did.  We had dinners when we had our
5   managers meetings.
6      Q    Did you participate in those?
7      A    I did go to dinner.
8      Q    Did people have drinks during
9   those dinners?
10      A    Yes, sir, they did.
11      Q    Did you have a drink?
12      A    No, sir, I did not.
13      Q    Did you have a problem with
14   the other managers having a drink at

15  those dinners?

16     A    No, sir.

17     Q    Did you ever see any managers

18  become intoxicated or drink too much?

19     A    No, sir, not to my knowledge.

20     Q    You say that Mark Fetner tried

21  to take over and was railroading you.

22  What was he doing that you believe

23  constituted a railroading or taking over?

0157

1     A    Well, everything I told him to

2  do he undermined me.  He would do the

3  opposite.

4     Q    Such as?

5     A    Such as things that I would

6  ask him to oversee with the housekeeping

7  staff he would go out there and do the

8  opposite.  If I told him -- if I would

9  ask him to go back and count the money in

10  the safe he would go to the computer and

11  do something else.

12     Q    Did you ever write him up for

13  that?

14     A    No, sir.

15     Q    You were his supervisor?

16     A    Correct.  I gave him verbal

17  warnings.

18     Q    But nothing in writing that he

19  was railroading you and trying to take

20  over and you never put anything in

21  writing to document or reflect that?  Do

22  we understand that correctly?

23     A    Correct.  Again, I was only

0158

1  there -- he came in on the 4th and on the

2  18th I was dismissed from my position.

3     Q    Was he hired on the 4th?

4     A    I met him on the 4th.  I do

5  not know when he was hired.  Sometime in

6  January.

7     Q    You believe his first date of

8  employment was the 4th, the 4th of

9  February?

10     A    The first day of employment as

11  far as me ever meeting him.  I never met

12  him until the 4th of February.
13      Q    How do you know it was the
14  4th?
15      A    Because that's the day he came
16  to work.  That's the day I came back off
17  vacation.
18      Q    I see.  Okay.  I got you.
19  Fetner was the assistant general manager?
20      A    Correct.
21      Q    And the assistant general
22  manager is it fair to say that his or her
23  principal duties is to work the front
0159
 1  desk?
 2      A    Yes, sir.
 3      Q    Now, you had mentioned, I
 4  think, on the 18th of February, 2004
 5  Mr. Woods came in and conducted the final
 6  QA?
 7      A    Yes, sir.
 8      Q    If I recall your testimony
 9  from before lunch it was that you said
10  that you couldn't find anyone else to
11  work the front desk and therefore you had
12  to stay there and then Mr. Woods
13  conducted the QA?
14      A    Correct.
15      Q    Was there no one else working
16  that day at the front desk?
17      A    Walker is on the front desk.
18      Q    So why did you feel that you
19  had to be there?
20      A    Mr. Woods told me to stay on
21  the front desk to stay there and he would
22  go conduct the QA.
23      Q    I'm sorry.  Maybe I
0160
 1  misunderstood your testimony.  The record
 2  will reflect what you said.
 3      A    Correct.
 4      Q    There were people working the
 5  front desk but your testimony is that
 6  Mr. Woods told you to stay at the front
 7  desk and he conducted the QA?
 8      A    Correct.  He didn't need me to

9  go with him.  I thought that was very odd
10  because that's not the normal procedure.
11     Q    Didn't you testify earlier in
12  your deposition the reason why you didn't
13  go with him because there was no one to
14  work the front desk?
15     A    I was going to call a desk
16  clerk in and he said it wasn't necessary
17  that he would go in and do the QA.
18     Q    Why would you call a desk
19  clerk in if Mark Fetner was there?
20     A    I did not know Mark knew
21  anything.  I did not know until after the
22  fact that he had been training in Auburn
23  and in Eufala.
0161
1     Q    But Mr. Fetner had been there
2  for two and a half weeks by that time?
3     A    No, sir.  I met him on the
4  4th.
5     Q    This was on the 18th?
6     A    Correct.  I just didn't think
7  about it.  I was going to call in a desk
8  clerk that I knew could handle the front
9  desk.
10     Q    And had you and Mr. Fetner
11  already had a lot of conflict up to that
12  time?
13     A    Yes, sir.
14     Q    Because he was trying to take
15  over?
16     A    Yes, sir.
17     Q    And your claim is you don't
18  know what he knew and that's why you
19  stayed at the front desk?
20     A    I found out afterwards that he
21  had been working in Eufala and had been
22  working in Auburn in the Auburn property.
23     Q    But I guess we could look at
0162
1  time sheets, couldn't we, and find out
2  who was assigned to work that day?
3     A    Yes, sir, you could.
4     Q    What time did Mr. Woods come
5  in on the 18th of February 2004 to

6  conduct the QA inspection?

7      A    In the morning hours.  I'm

8  don't know exactly what time.

9            (Defendant's Exhibit

10              No. 12 was marked

11              for identification.)

12     Q    All right.  Let me hand you

13  what's been marked as Defendant's No. 12

14  and this purports to be a QA Product

15  Evaluation dated June 11, 2003 for the

16  Alex City location with you as GM.  And

17  my question is have you seen this before?

18     A    Yes, sir.

19     Q    And is this the QA evaluation

20  that you received on or about June 11,

21  2003?

22     A    I'm sorry.

23     Q    Is this the QA evaluation you

0163

1  received on or about June 11, 2003?

2      A    Yes, sir.

3      Q    You received it from

4  Mr. Woods?

5      A    Yes, sir.

6      Q    And did you walk around with

7  him while he did the evaluation?

8      A    Yes, sir.

9      Q    Okay.  And you received a

10  needs improvement?

11     A    Yes, sir.

12     Q    And what evaluation -- what

13  level do you believe you should have

14  received?

15     A    Average.

16     Q    Okay.

17     A    Or above.

18     Q    Okay.  And what facts do you

19  have that leads you to believe that

20  Mr. Woods unfairly gave you a needs

21  improvement rather than an average

22  evaluation?

23     A    Facts are --

0164

1      Q    Facts?  You know what facts

2  are?

3     A    Yes.
4     Q    F-a-c-t-s?
5     A    Yes.
6     Q    Okay.
7     A    I still feel that my hotel was
8   clean.
9     Q    Okay.
10    A    And up to standards such as
11  the laundry room, it was nice, clean
12  presented clean.  It was always in order.
13    Q    Do you think that it's
14  possible, Ms. Stough, that you and
15  Mr. Woods may have perceived the
16  cleanliness of the hotel differently in
17  good faith?  That it's possible that you
18  may have perceived it differently in good
19  faith?
20        MR. GOLDFARB: Object to form.
21    A    No, sir, I don't.  I feel like
22  it was outright discrimination.
23    Q    (BY MR. KESSLER:) But you
0165
1   don't think that there was any legitimate
2   basis for perhaps Mr. Woods seeing the
3   same situation as you and thinking that
4   it needed improvement rather than you
5   thinking perhaps it was average?
6        MR. GOLDFARB: Object to form,
7   asked and answered.
8     A    No, sir, I don't.  I still
9   stand on the fact that it was pure out
10  discrimination because I am a female.
11  Had I been a male I believe -- I know the
12  the score would have been higher.
13    Q    (BY MR. KESSLER:) Have you
14  told us every fact?  I don't want you to
15  go through them all again.  Have you told
16  us every fact already in your deposition
17  upon which you believe that it evidences
18  the fact that you believe you've been
19  discriminated against because you're a
20  female, because of you being a female?
21  Have you told us all the facts?  I'm
22  trying to understand.  It's one thing to
23  say I think I'm treated differently

0166
1  because I'm a woman.  And that's fine.
2  And I understand that.  But my question
3  is are there any additional facts from
4  those which you've already told us that
5  could persuade the jury and the court
6  that you were treated differently because
7  you were a woman?
8         MR. GOLDFARB: Object to form.
9     A    The only thing that I can say
10  is that I know I was discriminated
11  against because I am a woman and I am not
12  a man.  I stood up for myself.  There
13  were several occasions that we had
14  disagreements.  I felt like -- I know my
15  property was clean.  I know it.  I had
16  high standards.  I put myself and my
17  guests in a position to go into a clean
18  room.  You know, I don't want to stay in
19  a dirty room.  I wouldn't want my guests
20  to stay in a dirty room.  I know I did my
21  job very well.  And when I left the
22  property I left my -- I left there with
23  my head held high knowing I did a good
0167
1  job.
2     Q    Anything else?
3     A    No, sir.
4         (Defendant's Exhibit
5          No. 13 was marked
6          for identification.)
7     Q    Ms. Stough, let me hand to
8  you what's been marked as Defendant's
9  Exhibit No. 13 and ask you if you recall
10  seeing this document on or about June 17,
11  2003?
12    A    I remember this vaguely.
13    Q    Okay.  Now, it says in the
14  first sentence, "I am reprimanding you
15  for not notifying me as to your absence
16  from work.  This is not the first time
17  you have failed to notify me that you
18  would not be at work as scheduled when
19  you know that I require notification when
20  a manager is not going to be on the

21  property."  Do you recall what the
22  circumstances were that led to you
23  receiving this warning?
0168
 1      A    Yes, sir.  I had been involved
 2  in a car accident.
 3      Q    Okay.
 4      A    And I was in -- had been in
 5  the hospital and that was in the evening
 6  time around the 13th.  On the 17th I had
 7  a severe problem with my back hurting and
 8  I went straight to the doctor.
 9      Q    Where were you in the
10  hospital?
11      A    Pardon me?
12      Q    Where were you in the
13  hospital?
14      A    I was at Russell Hospital.  I
15  was discharged after the car accident.
16      Q    Were you in the emergency
17  room?
18      A    Yes, sir, I was.
19      Q    How long did you stay at the
20  hospital?
21      A    About -- I can't remember
22  exactly but it was a few hours.  And as
23  soon as I got out of the hospital I did
0169
 1  notify Mr. Woods.
 2      Q    What time did you go to the
 3  hospital that day?
 4      A    It was about 5:00 in the
 5  evening.
 6      Q    Okay.  And then on the four
 7  days later you missed work and didn't
 8  notify him because of your back?
 9      A    I had went in -- it was
10  related to the car accident.  I had went
11  in and I was in severe pain in my back
12  and my right leg.  And I had, as soon as
13  I got out of the doctor's office, I did
14  call him and notify him.
15      Q    Which doctor did you go to?
16      A    It would have been Goodwater
17  Medical Clinic.  At that time it was

18  Dr. Almakkee but he has since left.
19     Q    Then what time did you notify
20  him that day?
21     A    I do not remember of the time.
22     Q    Do you recall how long it was
23  between when you first went to the
0170
 1  doctor's office versus when you notified
 2  him?
 3     A    No, sir, I don't recall.
 4     Q    How come you didn't call him
 5  beforehand?
 6     A    I just did not even think
 7  about it.  I went straight to the doctor
 8  because I was in some pain.
 9     Q    But you he and he had spoken
10  about your absenteeisms before that
11  hadn't you?
12        MR. GOLDFARB: Object to the
13  form.
14     A    I don't remember but it is in
15  this document.
16     Q    It says, "This is not the
17  first time you have failed to notify me."
18  Do you have any reason to dispute the
19  accuracy of that?
20     A    Pardon?
21     Q    Do you have any reason to
22  dispute the accuracy of what Mr. Woods is
23  saying when he says this is not the first
0171
 1  time you failed to notify me about
 2  absences?
 3        MR. GOLDFARB: Object to form.
 4     A    I don't know how to answer
 5  that.
 6     Q    (BY MR. KESSLER:) Well, I mean
 7  do you have any reason to disagree that
 8  there were previous times when you failed
 9  to notify him about your absences?
10        MR. GOLDFARB: Object to form.
11     A    Yes, sir.  I just felt like
12  this was harassment.
13     Q    On what basis?
14     A    On the facts that -- I don't

15  know.  I don't know how to answer that.
16  I don't know how to answer that.
17      Q    Why do you think he was
18  harassing you with this note?
19      A    Why do you think I -- because
20  of everything that had already gone on.
21  I mean we were with the QA's and
22  everything else.  The discrimination this
23  to me was just another way to upset me
0172
1  and harass me.
2      Q    And how long had this
3  discrimination been going on for at the
4  time that you received this on June 17,
5  '03?
6      A    I don't know how to answer
7  that.  What do you mean?
8      Q    How long had it been going on
9  for like a year, two years, a month?  I'm
10  trying to gain an understanding as to
11  where this came in the chronology of
12  discrimination against you.
13      A    I just felt like it was
14  harassment.
15      Q    I understand that but had it
16  been going on for a year or two years or
17  for a month?
18      A    The discrimination?
19      Q    Yes.
20      A    For a while, yes sir.
21      Q    How long?
22      A    2001.
23      Q    So about two years?
0173
1      A    Yes, sir.
2      Q    And I mean it had been going
3  on for two years?  This was the first
4  write-up that you got?
5      A    That I can recall, yes, sir.
6      Q    So he was discriminating
7  against you for two years and never wrote
8  you up for two years?  Do I understand
9  your testimony?
10      A    This was just to me this was
11  another form of discrimination and

12  harassment.
13          (Defendant's Exhibit
14           No. 14 was marked
15           for identification.)
16     Q    Let me hand to you what's
17  been marked as Defendant's Exhibit
18  No. 14 and ask you if you
19  recall receiving this on or about June
20  17, '03?
21     A    Yes, sir.
22     Q    Okay.  About attendance and
23  punctuality?
0174
1     A    Yes, sir.  This went along
2  with the same document.
3     Q    Both of those came at the same
4  time?
5     A    I believe so.
6     Q    Okay.  And he says in the
7  second paragraph, "Effective immediately
8  I will require a work schedule for the
9  upcoming week from you."  And then it
10  goes on.  Did you submit work schedules
11  to him?
12     A    Yes, sir.
13     Q    Do you believe you received
14  this memo for harassment purposes?
15     A    Yes, I do because there was
16  not a time if I was able to call Charles
17  and I was going to be out that I did so.
18  If I was out of work I presented a
19  doctor's note.
20     Q    If you were out of work you
21  always presented a doctor's note, is that
22  your sworn testimony?
23     A    Yes, sir.  When I would be out
0175
1  if I was going to be sick I would go to
2  the doctor.
3     Q    And you would always get a
4  note and submit it to the company?
5     A    I recall that, yes, sir, as
6  far as I remember.
7     Q    I just want to make sure
8  because remember you're under oath?

9     A    Right.  And every time that I
10  can remember I would get a doctor's note
11  when I was at the doctor if I was sick.
12     Q    Are you saying every time you
13  could remember?
14     A    Every time that I went to the
15  doctor I brought a doctor's note.
16     Q    Without exception?
17     A    Excuse me?
18     Q    Without exception?
19     A    Exception to what?
20     Q    You did it every time?
21     A    When I went to the doctor and
22  I was out and I was sick and I went to
23  the doctor I brought in a doctor's note.
0176
1     Q    Were there times when you were
2  sick when you didn't go to the doctor and
3  therefore didn't get a note?
4     A    I don't remember.
5     Q    So there may or may not have
6  been?
7     A    They may or may not have been,
8  yes, sir.
9            (Defendant's Exhibit
10             No. 15 was marked
11             for identification.)
12     Q    I hand to you this, and this
13  has been marked as Defendant's No. 15,
14  Ms. Stough, and you recall being placed
15  on a performance improvement plan on
16  June 17, 2003?
17     A    I'm sorry, I was reading.
18     Q    My question -- I'm sorry.  My
19  question was do you recall being placed
20  on a performance improvement plan on
21  June 17, 2003?
22     A    Right because this is when I
23  had a needs improvement score.
0177
1     Q    Now, you've already testified
2  about you disagree with the evaluations,
3  the QA evaluations, but wasn't it the
4  company's practice, Jameson's practice,
5  that when a hotel received two needs

6  improvement scores that the general
7  manager was placed on a performance
8  improvement plan?
9        MR. GOLDFARB: Object to form.
10    A   I don't recall.
11    Q    (BY MR. KESSLER:) It may or
12  may not have been that?  You just don't
13  know?
14    A    Correct.  I don't remember.
15  No, sir, I do not.
16    Q    That could have been the
17  practice at Jameson, correct?
18    A    It possibly could have been,
19  yes, sir, but I do not remember.  It's
20  been a while.
21    Q    Fair enough.  I understand.
22        (Defendant's Exhibit
23          No. 16 was marked
0178
1          for identification.)
2    Q    Let me hand to you
3  Defendant's No. 16 and ask if you
4  recognize this as the QA Product
5  Evaluation which was given to you by
6  Mr. Woods based on his QA inspection on
7  August 7, 2003?
8    A   Yes, sir.
9    Q    All right.  What does the
10  first sentence say?
11    A    "Very pleased with the overall
12  cleanliness of property inside and out.
13  Primary deductions are in maintenance and
14  capital area."
15    Q    That's good.  So, he said nice
16  things didn't he?
17    A   Yes, sir.
18    Q    Were you satisfied with this
19  evaluation?
20    A   No.
21    Q    Should have been even higher?
22    A   Uh-hmm.
23        MR. GOLDFARB: Answer out loud.
0179
1    Q    (BY MR. KESSLER:) You need to
2  say yes?

3    A    I'm sorry, yes.  I apologize.

4    Q    That's all right.  So what do

5  you think it should have been?

6    A    Above average.

7    Q    Based on what?

8    A    Based on the cleanliness of my

9  hotel.

10    Q    And can you be more specific

11  than that or is that as specific as you

12  can be?

13    A    I had very clean rooms.  We

14  worked and worked and worked on our

15  floors in our lobby.  We scrubbed them

16  with bleach.  We went through each and

17  every room to make sure everything was up

18  to company standards.  Overall outside

19  appearance was in good condition.  I felt

20  like that my property should have

21  received an above average and I told

22  Mr. Woods that.

23    Q    And is it fair to say that you

0180

1  tried as hard as you could?

2    A    I tried very hard.  I gave

3  that property 110 percent.

4    Q    You gave it your very best

5  effort?

6    A    Yes, sir, I did.

7    Q    You had it, is it fair to say,

8  as clean as you could get it?

9    A    I put it up to company

10  standards, yes, I did.

11    Q    My question was did you have

12  it as clean as you could get it?

13    A    Yes, sir.

14    Q    Then on the last sentence it

15  talks about advised GM to intensify

16  efforts to collect delinquent account

17  from Southeastern Errectors?

18    A    That's correct.

19    Q    Was there a delinquent account

20  with them?

21    A    Yes, sir, there was.

22    Q    Within the evaluation of the

23  hotel is that an issue that's

0181
1  legitimately part of the evaluation?
2      A    Yes, sir.
3      Q    When the health inspector
4  comes in does the health inspector check
5  delinquent accounts?
6      A    No, sir, he does not.
7      Q    So there may be some
8  difference in the areas checked out by
9  Jameson versus what the health inspector
10  checks?  Would you agree with that?
11      A    Yes, sir.
12      Q    When it comes to inspections?
13      A    Yes, sir.
14              (Defendant's Exhibit
15              No. 17 was marked
16              for identification.)
17      Q    I hand you what's been marked
18  as Defendant's Exhibit No. 17, Ms.
19  Stough, and ask you if you recognize this
20  as the QA evaluation which you received
21  in November 2003?
22      A    Yes, sir.
23      Q    And it's a failure, isn't it?
0182
1      A    Yes, sir.
2      Q    And in the second sentence on
3  the overall summary on the first page it
4  says, "Room cleanliness was unacceptable
5  and noted in the inspection."  Do you see
6  that?
7      A    Yes, sir.
8      Q    And that's something that you
9  were responsible for as the general
10  manager?
11      A    Yes, sir.
12      Q    That was something that your
13  mother responsible for as the
14  housekeeping supervisor?
15      A    Yes, sir.
16      Q    You went around with Mr. Woods
17  while this evaluation was done, didn't
18  you?
19      A    Yes, sir.
20      Q    Now, you've testified that

21  every evaluation -- strike that.

22              Every evaluation that

23  I've shown you you thought that you were

0183

1  being harassed or treated unfairly or

2  being nit-picked or Mr. Woods generally

3  was not giving you the kind of evaluation

4  that you should have received.  By this

5  point -- I mean here we are November 2003

6  were you taking notes that you kept or

7  documenting in any way your belief that

8  you were doing a very fine job whereas

9  Mr. Woods was somehow grading you too

10  low?

11     A    Are you asking me if I kept

12  notes on every inspection?  Is that what

13  you're saying or --

14     Q    Well, on this one in

15  particular or really any other

16  inspection?  By now you ought to be -- if

17  your claim has any truth to it that

18  you're being nit-picked by Mr. Woods it

19  seemed like you would start to do

20  something about it?

21              MR. GOLDFARB: Object to form.

22     Q    (BY MR. KESSLER:) My question

23  is were you taking notes?

0184

1  Would you bring somebody else with you

2  like your mom on the inspections?  What

3  would you do to try to protect yourself?

4              MR. GOLDFARB: Object to form.

5     A    No, sir, I didn't take

6  anybody with me.  I didn't make notes.

7     Q    (BY MR. KESSLER:) You did or

8  did not?

9     A    I did not.  I still feel the

10  same.  I still feel that it was due to my

11  being a female and not a male.

12     Q    I understand that and you've

13  testified to that but at some point

14  common sense takes over and people start

15  protecting themselves if they genuinely

16  believe they've been treated unfairly or

17  they're being nit-picked or harassed and

18  really my question -- I mean this very
19  genuinely.  What did you do to protect
20  yourself, if anything?
21          MR. GOLDFARB: Object to form.
22      A   I told Mr. Woods I didn't
23  think it was fair.
0185
 1      Q   (BY MR. KESSLER:) You didn't
 2  talk to anybody else?
 3      A   As far as other than Mr. Woods
 4  no, sir.  I mean my staff was aware of
 5  it.
 6      Q   So, here you got your first
 7  failure in Defendant's No. 17, right?
 8      A   Yes, sir.
 9      Q   And you knew that a failure is
10  not good at Jameson, is it?
11      A   That's correct.
12      Q   You had received just five
13  months before this a performance
14  improvement plan, had you not?
15      A   Yes.
16      Q   Defendant's 15?
17      A   Okay.
18      Q   So here you're on a
19  performance improvement plan and you
20  receive a failure?
21      A   Yes, sir.
22      Q   You knew at that point your
23  employment was in jeopardy, didn't you?
0186
 1          MR. GOLDFARB: Object to form.
 2      A   I don't know how to answer
 3  that.
 4      Q   (BY MR. KESSLER:) Did you
 5  think about it?
 6      A   No.  I felt like that, again,
 7  I would go back to the fact that I felt
 8  like I was being harassed and
 9  discriminated against.  I don't know how
10  to answer that.  I don't know.  I don't
11  know how to put into words of how to
12  answer that.
13      Q   Well --
14      A   I mean --

15     Q     Here is your chance to put it
16  into words, Ms. Stough.
17     A     I'm trying to.  I'm trying to
18  understand exactly what answer.
19     Q     Well, let me ask it again,
20  Ms. Stough.
21          MR. GOLDFARB: Just listen to
22  his question.
23     Q     (BY MR. KESSLER:) Here it was
0187
1  June 17, 2003, Defendant's Exhibit 15.
2  You received a performance improvement
3  plan?
4     A     Correct.
5     Q     Right?
6     A     Correct.
7     Q     Whether you thought it was
8  fair or unfair that's not good to receive
9  a performance improvement plan is it?
10     A     No, sir.
11     Q     And so you knew that things
12  had to get better, didn't you?
13     A     Yes, sir.
14     Q     All right.  And so here we are
15  five months later with Defendant's 17 in
16  the QA product evaluation November 26,
17  2003.  Your hotel fails?
18     A     Correct.
19     Q     Whether you agree or disagree
20  but at this point when you're on a
21  performance improvement plan and your
22  hotel fails didn't it occur to you that
23  perhaps your employment was in danger?
0188
1          MR. GOLDFARB: Object to form.
2  It mischaracterizes the evidence.
3     Q     (BY MR. KESSLER:)  Go ahead.
4     A     No, I did not think that my
5  job would be in jeopardy.  I knew that I
6  could turn it around and I knew that
7  there was problems with, as he put it,
8  there with the desk staff.  I talked with
9  him about that and I assured him that it
10  would be taken care of and at that point
11  I did tell him that I needed to have an

12  AGM on property to help with the hours.
13     Q    Sure enough you got one didn't
14  you?
15     A    Yes, sir, after about asking
16  four times for one.
17     Q    But you got one?
18     A    Yep.
19     Q    Did you ever make any efforts
20  to hire an AGM?
21         MR. GOLDFARB: Object to form.
22  Asked and answered.
23     A    I asked if I could.  Mr. Woods
0189
 1  said he would hire one.  He would find
 2  one.  I was never involved in doing any
 3  of the hiring of the AGM.
 4     Q    (BY MR. KESSLER:) So I guess
 5  the answer is that you weren't thinking
 6  that when you received this fails
 7  evaluation that it might effect your
 8  employment with Jameson?
 9     A    No.
10     Q    Okay.  What was your
11  understanding, if any, as to the
12  consequence to a general manager seeing a
13  fails evaluation?
14     A    That we had a total failure
15  around but then, again, I did not feel
16  like my property failed.  I will go back
17  to my statement again of discrimination
18  and harassment because of me being a
19  woman my property should have never
20  gotten a failure.
21     Q    I understand that.  I think
22  you made mention of that before?
23     A    Yes, sir.
0190
 1         (Defendant's Exhibit
 2          No. 18 was marked
 3           for identification.)
 4     Q    All right.  Let me hand to
 5  you Defendant's 18, which is a QA
 6  evaluation of December 19, 2003.  My
 7  question is did you receive this on or
 8  about December 19, 2003?

9     A    Yes, sir.
10     Q    Okay.  And this was a
11  re-visit from Mr. Woods, right?
12     A    Correct.
13     Q    And it was an improvement from
14  the last one?
15     A    Yes, sir.
16     Q    It was a needs improvement.
17  And do you think that you should have
18  gotten a different score on this
19  evaluation?
20     A    Yes, sir, I do.
21     Q    What is the score you think
22  you should have gotten?
23     A    An average or above.
0191
1     Q    Did you put anything in
2  writing anywhere saying that you thought
3  this evaluation was inaccurate?
4     A    No, sir, I did not.
5     Q    I don't think I asked you this
6  about the previous one, Defendant's 17,
7  the one in which you failed, the hotel
8  failed.  Did you put anything in writing
9  saying that you believe that was
10  inaccurate?
11     A    No, sir.
12     Q    Did you keep a diary or any
13  kind of notes or anything that would in
14  any way document any of these issues that
15  you're testifying about today?
16     A    No, sir.
17     Q    Write any e-mails to friends
18  or anything like that?
19     A    No, sir, I did not.
20          (Defendant's Exhibit
21           No. 19 was marked
22           for identification.)
23     Q    Ms. Stough, let me hand you
0192
1  what's been marked as Defendant's Exhibit
2  No. 19 and ask if you recall receiving
3  this Constructive Action Notice on
4  December 29, 2003?
5     A    Yes, sir.

6     Q    Okay.  And did Mr. Woods give
7  this to you in person?
8     A    I believe -- I don't
9  recall but -- no, I don't.  I'm thinking
10  it came from over the internet.  I cannot
11  be sure of that.
12     Q    You think this is an e-mail?
13     A    I don't recall.  I don't
14  recall.
15     Q    So, he may or may not have
16  given it to you in person?
17     A    I just don't recall.  No, sir,
18  I don't.
19     Q    Is there anything in here
20  that you disagree with?
21     A    Yes, sir, the QA score.
22     Q    The what?
23     A    On the quality assurance
0193
1  score.
2     Q    Yes.  All right.  You've
3  already testified about that?
4     A    Yes, sir, I didn't agree with
5  the score.
6     Q    All right.  He also says in
7  here that your personnel received
8  insufficient training or some staff
9  members have received insufficient
10  training when working alone?
11     A    No, sir, I don't agree with
12  that.
13     Q    All right.  He says, "Prior
14  noticing covering QA results and
15  expectation have been sent to you."  Now
16  that is true, isn't it?
17     A    As far as him doing the QA
18  inspection, yes.
19     Q    And then giving you a copy of
20  the inspection?
21     A    Yes.
22     Q    And so you were able to keep a
23  copy of the inspection, right?
0194
1     A    There should have been copies
2  at our hotel.

3    Q    Right.  It was your
4  responsibility to make sure they were
5  there weren't they?
6    A    Yes, sir.  It had to stay in
7  the file.
8    Q    It had a list of stuff that
9  had be to done?
10    A    Yes.
11    Q    So you had clear notice of
12  what you had to do to get the hotel up to
13  standards?
14    A    Yes, sir.
15    Q    Then in the second to last
16  paragraph here it says that basically
17  that the hotel has not met company
18  cleanliness standards and unless it
19  improves that further action will be
20  taken up to and including termination of
21  employment?
22    A    Yes, sir.
23    Q    So, if you didn't know before
0195
1  at this point on December 29, '03 you
2  knew that there was a possibility that
3  your continued employment was in
4  jeopardy?
5    A    Yes, sir, but there, again, I
6  felt like it was harassment and
7  discriminatory.
8    Q    I understand.  But you knew
9  regardless of the reason you knew that
10  your employment was in jeopardy?
11    A    Correct.
12    Q    Okay.  And I guess at this
13  point he had been, based on your
14  testimony, discriminating against you and
15  harassing use for two years, two and a
16  half by now?
17    A    Yes, sir, that would be.
18    Q    And still not the first word
19  written down reflecting all this
20  harassment and discrimination, right?
21    A    No, sir, because I wanted to
22  keep my job.  I did not want to lose my
23  job.

0196
1     Q    When you say "no, sir," you
2   mean you had not written anything down?
3     A    No, sir, I had not.  I had not
4   at that time.
5              (Defendant's Exhibit
6               No. 20 was marked
7               for identification.)
8     Q    Let me hand you what's been
9   marked as Defendant's No. 20, Ms. Stough,
10   and is that your signature in the middle
11   left-hand side?
12    A    Yes, sir.
13    Q    This is dated the same date as
14   the constructive action notice
15   December 29, '03?
16    A    Yes, sir.
17    Q    And there were nine days that
18   you were asking off for January and the
19   3rd of February?
20    A    Yes, sir.
21    Q    Did you take those days off?
22    A    Yes, sir.
23    Q    Do you know what the dates
0197
1   were that your husband was on leave from
2   Iraq?
3     A    Yes, sir.  He came in on, I
4   believe it was, on the 16th because I had
5   to go to Atlanta to get him.
6     Q    16th of?
7     A    January, yes, sir.
8     Q    Then when did your son get
9   married?
10    A    My son got married on the
11   28th.  Well, it was on a Saturday.  The
12   last Saturday of January.  Excuse me.  It
13   was the 24th.  It was on a Saturday.
14             (Defendant's Exhibit
15              No. 21 was marked
16              for identification.)
17    Q    Ms. Stough, let me hand you
18   what's been marked as Defendant's Exhibit
19   No. 21 and ask you if this is a memo that
20   you received from Mr. Woods on or about

21  February 6, 2004?
22      A    Yes, sir.
23      Q    Okay.  And he lists seven
0198
 1   different areas of corporate standards
 2   and expectations that needed to be
 3   improved?
 4      A    Yes, sir.
 5      Q    Okay.  And he sat down and
 6   talked with you about these areas didn't
 7   he?
 8      A    Excuse me.  I'm sorry?
 9      Q    He sat down and talked to you
10   about these areas didn't he?
11      A    I don't recall but -- I don't
12   recall if we sat down.  I don't.
13      Q    Then in the last paragraph it
14   says, "The above are all critical areas
15   and are of grave importance in the
16   successful operation of your hotel."
17   Did you agree with that statement?
18      A    No, sir.
19      Q    You didn't think they were of
20   grave importance?
21      A    No.  I understand that but I
22   don't know how to answer that.  I do
23   understand that it is of grave importance
0199
 1   but I do not feel that these were true
 2   issues.  That's what I'm trying to say.
 3      Q    You think they were just
 4   trumped up issues?  Is that what you're
 5   saying?
 6      A    Yes, sir.
 7      Q    All right.  So, for example,
 8   No. 1 where they talk about customer
 9   aging reports do you think he's factually
10   wrong here or do you think he was just
11   making a big to do out of something
12   that's not really a big deal?
13      A    My customer agings were all in
14   order.
15      Q    Pardon?
16      A    My customer aging accounts
17   were all in order.

18    Q    Had you collected that money
19  from Southeastern Errectors?
20    A    We were in the process of
21  doing so.
22    Q    Had it been collected at the
23  time this memo was --
0200
1    A   I don't recall.
2    Q    So how can you say that all of
3  your costumer aging reports were in
4  order?
5    A    In order as from what I am
6  reading here it's in order as in the
7  bucket, okay, how they are aged in the
8  bucket.  That's what that means.
9    Q    Well, did you think that this
10  was unfair receiving this accountability
11  memo?
12    A    Yes.  I, again, felt like that
13  it was harassment.
14    Q    Right.  And what did you do to
15  protect yourself or demonstrate that this
16  was, in fact, harassment rather than just
17  a legitimate business memo to you about
18  problems at the hotel?
19        MR. GOLDFARB: Object to the
20  form.
21    A    You mean as far as -- I don't
22  understand.  I mean as far I didn't write
23  anything down.
0201
1    Q    (BY MR. KESSLER:) I mean
2  there's nothing that we could look at or
3  nothing that the ladies and gentlemen on
4  the jury could look at to persuade them
5  that Mr. Woods was incorrect with his
6  memo is there?
7        MR. GOLDFARB: Object to the
8  form.
9    Q    (BY MR. KESSLER:) What could
10  people look at to determine that
11  Mr. Woods was not correct with what he
12  has in this memo?
13        MR. GOLDFARB: Object to form.
14    A    I have no documents.  I didn't

15  write anything down.
16    Q    (BY MR. KESSLER:) So, when you
17  tell us that you think this was
18  harassment that's really an opinion,
19  isn't it?
20        MR. GOLDFARB: Object to the
21  form.
22    A    No, sir it's a fact.
23    Q    (BY MR. KESSLER:) Have you
0202
1  told all the facts upon which that is
2  based?
3        MR. GOLDFARB: Object to the
4  form.
5    A    Have I told you all the facts?
6    Q    (BY MR. KESSLER:) Yes.  I want
7  to make sure that when you tell us that
8  discriminatory and harassment that you
9  lay on the record everything -- every
10  fact that you believe supports your claim
11  that it's discriminatory and harassment.
12  You've told us a number of things and if
13  there's anything else I want you to tell
14  us about it.
15        MR. GOLDFARB: Object to form.
16    A    I feel like with the QA's
17  and all they were all -- my opinion and
18  the way I feel it was harassment.  It was
19  discrimination and lies.  And I would
20  object to the QA inspections.  I objected
21  to them on several bases.  I don't know
22  how else to answer that except for that.
23    Q    (BY MR. KESSLER:) That's fair
0203
1  enough.
2    A    That is how I felt.
3    Q    I know that's how you felt.
4        (Defendant's Exhibit
5         No. 22 was marked
6         for identification.)
7    Q    I hand to you, Ms. Stough,
8  Defendant's 22.  This is the QA
9  evaluation which you received on
10  February 18, 2004 from Mr. Woods?
11    A    I never saw this QA.

12    Q    Your sworn testimony is that
13  you never saw this?  He never sat down
14  with you afterwards in the front hall of
15  the Jameson Inn and didn't talk to you
16  about this?
17    A    No, sir, because we were in
18  the living room in 108 when he dismissed
19  me from my position.  I do not recall
20  looking at this QA.  I do not.  I do not
21  recall looking at it.
22    Q    I will remind you that your
23  testimony is sworn.
0204
 1    A    I understand, but I do not
 2  recall looking at this.
 3    Q    When you say you do not
 4  recall -- let me finish?
 5    A    I don't remember looking at
 6  this QA.  I do not.
 7    Q    I'm not sure whether you're
 8  saying you don't have a recollection of
 9  whether you saw it or that you know you
10  did not see it?
11    A    I do not have a
12  recollection.  Let me rephrase it.  I do
13  not have a recollection.  I do not recall
14  looking at this QA.
15    Q    So when you say that just so
16  the record is clear you may have?  You
17  just don't remember?
18       MR. GOLDFARB: Object to form.
19    A    I do not remember because of
20  the fact is that a QA inspection with all
21  of this cannot -- I mean how -- it cannot
22  possibly be done in a matter of a few
23  hours.  I do not remember looking at this
0205
 1  whole QA inspection, no, sir I do not.  I
 2  do not remember.
 3    Q    (BY MR. KESSLER:) Do you
 4  recall seeing part of the QA inspection?
 5    A    No, sir, I don't.
 6    Q    And it was February 18th?
 7    A    Yes, sir.
 8    Q    And your testimony I think was

9  that Mark Fetner was working that day?

10    A    Yes, sir.

11    Q    So you and Mark stayed up at

12  the front desk?

13    A    Yes, sir.

14    Q    How long did the two of you

15  work together that day?

16    A    A few hours.  I can't tell

17  you exactly how long a few hours was but

18  it was a few hours.

19    Q    But for sure the two of y'all

20  worked there together for a while?

21    A    Yes, sir.  He was at the front

22  desk that morning.

23    Q    Did y'all work side by side?

0206

1  I mean clearly you all worked together

2  closely enough during that day when

3  Mr. Fetner would be able to recall that

4  y'all worked together, right?

5        MR. GOLDFARB: Object to form.

6    A    Yes, sir.  I would say so.

7    Q    (BY MR. KESSLER:) And your

8  further testimony is that you didn't go

9  with Mr. Woods while this QA was being

10  conducted?

11    A    That's correct.

12    Q    And how long did you say that

13  it took?

14        MR. GOLDFARB: Just a couple of

15  hours.  I don't remember exactly how long

16  but --

17    Q    (BY MR. KESSLER:) When you say

18  a few or a couple hours I'm not sure what

19  you mean by that.  I mean do you have a

20  recollection of how long or I don't want

21  you to guess but if you know then I want

22  you to tell us.

23    A    Well, he came in that morning.

0207

1    Q    What time?

2    A    I don't remember what time.

3  I was at work.  I don't remember what

4  time, but it was after lunch or right

5  around lunch when him and I sat down and

6  had the talk and --
7     Q    I'm sorry, say that again.
8     A    It was after lunch or right
9  around lunch somewhere.  I did not pay
10  attention to what was on the clock but it
11  was mid day when he called me into the
12  living room and I was terminated.
13     Q    Okay.  Was anybody else
14  present during the termination?
15     A    No, sir.
16     Q    And your sworn testimony is
17  that he did not review the QA evaluation
18  with you before you were terminated?
19     A    I remember him telling me that
20  I had failed the QA but I do not remember
21  going over it, no, sir I do not.  I do
22  not recall.
23     Q    Now, you were terminated
0208
1  twelve days after you received
2  Defendant's 21, the accountability memo?
3     A    Yes, sir.
4     Q    Okay.  Did Mr. Woods ever give
5  you a note or a letter or memo or
6  anything saying that you were terminated?
7     A    No, sir, I don't recall
8  anything like that.
9     Q    Was that your last day of work
10  the 18th?
11     A    Yes, sir.  I do remember going
12  back to the front desk and getting my
13  personal property together.
14        MR. KESSLER: Now, I thought I
15  had copies of these.  These are your
16  interrogatory responses.
17        MR. GOLDFARB: That's all
18  right.
19        MR. KESSLER: I will be happy
20  to pay for the copies.
21        MR. GOLDFARB: Do you need a
22  copy right now?
23        MR. KESSLER: I thought I had
0209
1  copies but I can't find them right now
2  and I wanted to ask her some questions

3  about the interrogatories.
4        MR. GOLDFARB: You want to take
5  a break?
6        MR. KESSLER: Yeah, can we do
7  that and can I get like two copies?
8        MR. GOLDFARB: No problem.
9          (A break was taken.)
10   Q    (BY MR. KESSLER:) All right.
11  You have in front of you 22?
12   A    Yes, sir, I do.
13   Q    When was the first time you
14  saw this, Defendant's 22?
15   A    To my recollection I don't
16  remember if I seen this.  I don't
17  remember.  I know I didn't -- I don't
18  remember seeing it when I was at Jameson
19  and I don't remember -- and I don't
20  remember if I looked through -- I don't
21  remember seeing it.
22   Q    Ever?  So as we sit here today
23  this is the first time you think you've
0210
1  seen it?
2   A    I do believe so because I do
3  not remember seeing it any other time
4   Q    Well, when he told you
5  that -- Mr. Woods told you on the 18th of
6  February 2003 that you had failed the
7  evaluation did you ask to see a copy of
8  it?
9   A    I'm sorry because my heart was
10  broken.
11   Q    Whether your heart was broken
12  or not did you ask to see a copy of this
13  evaluation that broke your heart?
14   A    I did not remember.  I don't
15  recall if I did or didn't.
16   Q    After you had a chance to
17  recover from being terminated did you
18  ever call anybody at Jameson to ask for a
19  copy of this evaluation?
20   A    No, sir, not to my knowledge I
21  did not.
22   Q    Before you filed your EEOC
23  charge did you ask for a copy of this

0211
1  evaluation to see whether it was right or
2  not?
3     A   No, sir.
4     Q    Before you filed your
5  complaint in Federal Court in the Middle
6  District of Alabama did you ask for a
7  copy of this to see whether it was right
8  or not?
9     A   I do not recall doing so.
10    Q    I guess you never asked for a
11  copy of it?
12    A    Not that I remember unless my
13  attorney did.  I did not.
14    Q    So, as we sit here today you
15  don't know whether it's right or wrong do
16  you?
17       MR. GOLDFARB:  Objection.
18    A   I feel it was wrong but I
19  mean I don't know.  I don't know how to
20  answer that because I didn't see it.
21    Q    (BY MR. KESSLER:) Well, I
22  think the question is pretty clear.  As
23  you sit here today you don't know whether
0212
1  this evaluation is accurate or
2  inaccurate?
3       MR. GOLDFARB: Object to form.
4       MR. KESSLER: I will give you a
5  chance to look at if you want.
6       MR. GOLDFARB: Why don't you
7  take your time to go through it and
8  answer his question.
9     A   I don't know how to answer it.
10       MR. GOLDFARB: You can look at
11  it
12    A    Okay.
13       MR. GOLDFARB: Take your time.
14    Q    (BY MR. KESSLER:) Are you
15  finished?
16    A   Yes, sir, I am.
17    Q    My question was what in there
18  do you believe is wrong?
19    A    I don't agree with the
20  cleanliness of the rooms.

21     Q     What else?
22     A     The overall cleanliness of
23  the hotel.
0213
 1     Q     Okay.  Anything else?
 2     A     The overall inspection
 3  itself.
 4     Q     Okay.  Anything else?
 5     A     No, sir.  I apologize.  I
 6  have something in my eye.
 7     Q     Cleanliness in the rooms.
 8  Could you point us to the page?  See
 9  these numbers at the bottom of the page.
10  Point us to the page where you take issue
11  with the evaluation of room cleanliness.
12     A     On Page 2050.
13     Q     All right.  What do you
14  disagree with?
15     A     The whole cleanliness of the
16  different areas.
17     Q     So you disagree?  You don't
18  think there ought to be any X's?
19     A     No, sir, I don't mean that.
20  The cleanliness areas is what I'm
21  objecting to.
22     Q     The C's?
23     A     Well, it's dusting and debris
0214
 1  and cleanliness, yes, sir.
 2     Q     Are you objecting generally or
 3  is there anything specifically?
 4     A     Generally.
 5     Q     You believe the rooms were
 6  better than were rated here?
 7     A     Yes, sir.  Now, as far as with
 8  the replacement issues that was an
 9  ongoing thing.  We tried to fix what was
10  damaged by painting and touching up, you
11  know, everyday usage of hotel rooms
12  they're going to get knocked or whatever,
13  scratched.  And we did go through and you
14  can buy the little furniture markers and
15  we corrected those issues and a lot of
16  them are still on here that should not be
17  there.

18     Q    So, if I understand you
19  generally object to the evaluation but
20  there's nothing specific that you can
21  point to to say this is wrong or that is
22  wrong, is that correct?
23     A    Yes, sir, I can point to the
0215
1  cleanliness issues such as the room odor.
2  I can object to --
3     Q    Were there any X's under room
4  odor?
5     A    Right here it says overall
6  room odor.  I'm sorry.  I looked at the
7  wrong line.  Odor it says.  My rooms
8  never had odors.
9     Q    Let me say this.  There are no
10  X's.
11     A    I'm sorry.  I thought that was
12  an X in there.  I apologize.  My glasses
13  aren't the best.  Ceiling edges we're
14  looking at.  Carpeting, my carpeting was
15  shampooed on a regular basis.  Shades, we
16  replaced shades, lamps, desk and work
17  area.
18     Q    But as you sit here I mean is
19  there anything that we could look at or
20  anything you could point us to that would
21  support your claim that, for example, the
22  carpeting in room 220, which has an X,
23  that it was not graded or substandard
0216
1  during the evaluation?
2         MR. GOLDFARB: Object to form.
3     A    I'm not understanding that
4  question.
5     Q    (BY MR. KESSLER:) Well, for
6  example, in room 220 I'm looking at Page
7  2050, okay, room 220?
8     A    Okay.
9     Q    Under carpeting.
10     A    Okay.
11     Q    Do you see an X?
12     A    Correct.
13     Q    What does that X mean?
14     A    It means that there was an

15  issue with the carpet.
16    Q    Is there anything that you
17  could -- to help us on this is there
18  anything that you can point to that would
19  help persuade us that on the 18th of
20  February, 2004 in room 200 that the
21  carpeting was not graded?
22        MR. GOLDFARB: Objection.
23    A    That the carpeting wasn't
0217
1  graded dirty?
2    Q    (BY MR. KESSLER:) Dirty or
3  substandard?
4    A    Needed to be clean?
5    Q    Whatever deserved to get the X
6  here.
7    A    We have a carpet record should
8  be maintained at the hotel.
9    Q    A carpet record?
10    A    Yes, sir, to show where the
11  carpets were cleaned and they were
12  cleaned on a quarterly basis, yes, sir.
13    Q    So did you maintain this
14  carpet record?
15    A    Yes, sir.
16    Q    Where was it kept?
17    A    In the manager's office.
18    Q    Was it in a notebook?
19    A    Yes, sir.  It was in a
20  notebook.
21    Q    Whether it was clean -- you
22  think that will show -- I mean what that
23  shows is where the carpets were cleaned
0218
1  quarterly, won't it?
2    A    Yes, sir.  It will show where
3  we cleaned it.
4    Q    Fair enough.  So we don't know
5  whether these carpets are actually
6  cleaned quarterly?  We would have to
7  check the records?
8    A    Yes, sir, because I couldn't
9  sit here and tell you that.  I could not
10  recall which ones were done because I
11  done it on a quarterly basis.  I would

12  break them up and give the carpet man
13  that came in that we hired a certain
14  amount of rooms.  He would do them and
15  come back and do another certain amount
16  of rooms.  We rotated it off.
17      Q     But even if they were cleaned
18  quarterly that's not to say that
19  particular room on that day didn't have a
20  dirty carpet?
21      A     If we found spots on our
22  carpets or there was dirt we went and
23  manually did them ourselves.
0219
 1      Q     Always did that?
 2      A     Yes, sir.  That was something
 3  that we did.
 4      Q     So there's no way -- there's
 5  no way that this carpet on this day in
 6  that room could have been substandard?
 7      A     I don't know how to answer
 8  that.  Well, I mean you're looking at
 9  2004.  I don't remember.  I mean I don't
10  remember.
11      Q     Well, wouldn't the best way to
12  have found out would have been to ask for
13  this evaluation right after you were
14  terminated to find out whether this
15  evaluation was accurate or not?
16          MR. GOLDFARB: Object to the
17  form.
18      Q     (BY MR. KESSLER:) Wouldn't
19  that have been the best way?
20          MR. GOLDFARB: Object to form.
21      A     I didn't know I could.  I mean
22  I didn't know I could ask for that after
23  I was terminated.  I didn't know what I
0220
 1  could do.
 2      Q     (BY MR. KESSLER:) You didn't
 3  ask did you?
 4      A     No.
 5          MR. GOLDFARB: Object to form.
 6      A     I didn't think they would let
 7  me have it.
 8      Q     (BY MR. KESSLER:) You didn't

9  ask anybody if you could have the
10  evaluation?
11        MR. GOLDFARB: Object to form.
12  Asked and answered.
13     A   I didn't know who to ask.  I
14  didn't know what to do at that point.  I
15  didn't know.
16     Q   (BY MR. KESSLER:) So, since
17  you didn't ask now we're left with three
18  and a half years later you're saying gee
19  I know this room and this room carpet was
20  clean on that day.  That's what we're
21  left with isn't it?
22        MR. GOLDFARB: Object to form.
23  It's already been asked and answered.
0221
1     A   No, sir.  We checked our
2  rooms.  We checked for carpets.  We
3  checked for damages on drapes or anything
4  else.
5     Q   (BY MR. KESSLER:) Anything
6  else that -- I think you mentioned
7  overall cleanliness?
8     A   Yes, sir.
9     Q   What is it that you disagree
10  with in this report regarding overall
11  cleanliness?
12     A    About the breakfast room area,
13  our coffee earns and utensils and baskets
14  and whatever stuff that we used in our
15  breakfast room was maintained and kept in
16  good condition.  The coffee earns were
17  washed every night.
18     Q   Did you personally do that or
19  have somebody else?
20     A   My night auditors were
21  involved in that and I checked them.  I
22  checked them.
23     Q   You checked them everyday?
0222
1     A   Yes, sir, I did check the
2  coffee earns.
3     Q   What time would you normally
4  get to work?
5     A   Around 7:00, 7:30, in that

6  area.

7  Q    So your testimony is that

8  everyday you checked the coffee earns?

9  A    Yes, sir, because I drank

10  coffee.

11  Q    Wasn't breakfast set up at

12  6:00 a.m.?

13  A    Yes, sir.

14  Q    So, the coffee was already

15  brewing?  You don't know at that point

16  whether it was clean or not?

17  A    When one got emptied and one

18  was brought back in I would check them

19  and the ones that we were not in use were

20  put into the sink and was left to soak.

21  Q    Anything else that you

22  disagree in this evaluation?

23  A    Overall -- everything.  I mean

0223

1  I just don't agree with any of it.

2  Q    And the first time you ever

3  put anything in writing complaining about

4  your termination was when you filed your

5  EEOC charge wasn't it?

6  A    Yes, sir.

7  Q    That was almost six months

8  after you were terminated?

9  A    Yes, sir.

10  Q    So between February 18, 2004

11  and August 9, 2004 whenever you wrote

12  your EEOC charge you didn't put down

13  anything anywhere complaining about your

14  termination of employment did you?

15  A    You mean at home or wherever?

16  Q    Anywhere?

17  A    No, sir.

18  Q    You said in your interrogatory

19  responses that you complained to Charles

20  Woods about yourself?

21  A    Yes.

22  Q    Now, in your interrogatory

23  response I will hand to you what has been

0224

1  marked as Defendant's Exhibit 22, and let

2  me ask you a question before you look at

3   that.  You say in there that you
4   complained to him on February 14th or
5   15th of 2004?
6      A    Right after pay day when I got
7   the pay roster.
8      Q    What day is pay day?
9      A    I believe it was around the
10   14th or 15th.  Biweekly is what pay day
11   was when I got the payroll roster.
12      Q    At that point you realized
13   what Mr. Fetner was earning?
14      A    Yes, sir.  At that point I
15   realized what Mr. Fetner was earning.
16      Q    What exactly did you say to
17   Mr. Woods?
18      A    I had called and said we need
19   to talk.  And I don't remember what his
20   response was but I said that I seen the
21   pay roster and that I was aware
22   of -- that Mark was making the same pay I
23   was and that I felt like it was sexual
0225
1   discrimination, pay discrimination
2   basically.
3      Q    Okay.  What did Mr. Woods say?
4      A    I don't have time to talk
5   about it right now.
6      Q    Is that it?
7      A    Yes, sir.
8      Q    And was that the end of the
9   conversation?
10      A    Yes, sir.
11      Q    Did you say anything else to
12   him about that?
13      A    No, sir, because all that day
14   when he called he wanted to speak with
15   Mark --
16      Q    Okay.
17      A    -- the rest of the day.  That
18   was the extent of the conversation.
19      Q    Okay.  So that was it?  That
20   was all that was said?
21      A    That I recall, yes, sir.
22      Q    I want to make sure because
23   that's important.

0226
1     A    I don't recall.  I don't
2  remember if he told me or if Mark told me
3  he was going to be coming up or whatever.
4  I don't remember if he told me or if he
5  told Mark and Mark told me.  I don't
6  remember that.
7     Q    And Mark told you that?
8     A    That Charles was coming up.  I
9  don't remember if he told me or if Mark
10  told me that Charles was coming up.  I
11  don't recall him telling me that.
12     Q    But on this conversation where
13  you said that you thought it was sex
14  discrimination, equal pay, you directly
15  had a conversation with Mr. Woods?
16     A    Correct.  I called him on the
17  phone.
18     Q    And do you recall what day of
19  the week that it was?
20     A    No, sir, I don't.  I know it
21  was pay day.
22     Q    Pay day?
23     A    Yes, sir.
0227
1     Q    It was on pay day?
2     A    Yes, sir, because that's how I
3  remember.  I got the paychecks that day
4  along with the pay roster.
5     Q    And then when you saw him on
6  the 18th did you say anything about it,
7  about this pay issue?
8     A    I don't recall.
9     Q    Did he say anything to you
10  about the pay issue on the 18th?
11     A    I don't recall that either.
12     Q    Do you know anything about
13  Mr. Fetner's qualifications in the hotel
14  industry?
15     A    No, sir, I do not.
16     Q    Had you ever seen his resume
17  or his application?
18     A    I can't remember.  No, I don't
19  remember seeing it at the hotel.  I sure
20  don't.

21      Q    Did you ever see it anywhere?
22      A    I don't remember.
23           MR. GOLDFARB: Are you
0228
 1   including my office?
 2           MR. KESSLER: Yes, including --
 3      A    I'm sorry.
 4           MR. GOLDFARB: You can answer
 5   if you've seen stuff.
 6      A    I've seen that but I never
 7   seen it at the property.  I've seen so
 8   much stuff.  I'm trying to remember what
 9   I've seen and what I haven't.
10      Q    (BY MR. KESSLER:) So do you
11   have any idea based on -- I mean whatever
12   information you received what his
13   background was and what his
14   qualifications were?
15      A    I briefly glanced through his
16   application.  I didn't really study it.
17   I know that he told me he had a
18   background in restaurants because he
19   worked for his mother.  He worked for a
20   printing company in Georgia.  Now, this
21   is what Mark had told me.  That's all I
22   remember other than seeing -- I think it
23   was some kind of a timeshare company that
0229
 1   he worked for.  I remember seeing that
 2   in --
 3      Q    Do you know what his
 4   educational background is?
 5      A    I don't recall.  I know I
 6   looked at it but I don't remember exactly
 7   all it said.
 8      Q    And you're not claiming that
 9   you have like two years of college or
10   anything are you?
11      A    No, sir, because I have not.
12      Q    You don't have any college?
13   You've taken a few courses?
14      A    Right.
15      Q    Bookkeeping and things like
16   that?
17      A    Correct.  I do not have a

18  degree in college or anything like that.
19     Q    So it's not like you've
20  completed two years of business courses
21  or college or anything like that?
22     A    No, sir, just the business
23  courses on my resume.
0230
1     Q    You say in your
2  interrogatories that you think a guy
3  named Jim made more than you did?
4     A    Well, after seeing the pay
5  roster I kind of suspected so, yes, sir,
6  that he possibly was making more salary
7  than what I was, yes, sir.
8     Q    Jim Goodman?
9     A    Yes, sir.
10    Q    In Auburn?
11    A    Yes, sir.  The last I knew.  I
12  don't know now.  I don't know if he's
13  still there or not.
14    Q    Do you know anything about his
15  qualifications or education or
16  experience?
17    A    No, sir, I do not.
18    Q    Do you know anything about
19  Betty Sutton's qualifications or
20  educational experience in the hotel
21  industry?
22    A    No, sir.
23    Q    You know Betty makes more than
0231
1  you did?
2    A    Correct.
3    Q    And you knew that Sam Ellis
4  made more than you?
5    A    I did not know that until
6  recently.
7    Q    You know it now don't you?
8    A    Yes, sir.
9    Q    Do you know anything about her
10  experience or background in the hotel
11  industry?
12    A    Sam and I talked.  I want to
13  say she had experience before.  I know
14  she had been with the company a while

15  longer than I had.  I think she had been
16  there five, six years.
17     Q    Do you think it was okay in
18  your view that Sam Ellis was making more
19  than you?
20     A    I don't know.
21     Q    Well --
22     A    I mean --
23     Q    Well, Ms. Stough this is an
0232
1   equal pay claim.  I assume you
2   thought a little bit about salaries.
3   Ms. Ellis was in your district?
4      A    Uh-hmm.
5      Q    And my question is she's
6   running a hotel just like you were and
7   she was making more than you.  Do you
8   think that was okay?
9      A    Well, she was at a forty-room
10  property.  I was at a sixty-room property.
11     Q    She's running a smaller hotel
12  and making more money than you.  Do you
13  think that was okay?
14        MR. GOLDFARB: Object to form.
15     A    No, sir.
16     Q    (BY MR. KESSLER:) Do you think
17  that was sex discrimination?
18     A    I don't know how to answer
19  that.
20     Q    Well, just yes or no.  Do you
21  think it was sex discrimination?
22        MR. GOLDFARB: Object to form.
23     A    She had been with the company
0233
1   longer than I have.  I guess it was fine.
2      Q    (BY MR. KESSLER:) So maybe it
3   was a factor other than sex?
4      A    I don't understand.  When you
5   say "factor" can you explain that?
6        MR. GOLDFARB: Object.  Asking
7   for a legal conclusion.
8      Q    (BY MR. KESSLER:) The word
9   factor is hardly legal.  A reason other
10  than sex that led the company to pay her
11  more than you were paid?

12        MR. GOLDFARB: Object to form.
13   It calls for a legal conclusion.
14      Q    (BY MR. KESSLER:) You don't
15   know?
16      A    I don't know.
17      Q    You don't have any idea do you?
18      A    No.
19      Q    So you really don't have any
20   idea why Jim Goodman was paid more than
21   you do you?
22      A    I never asked him to tell me
23   what he made.  I never asked him his
0234
1   background.  I didn't feel like that was
2   my place.
3      Q    I understand but the point
4   that I'm making is you don't have any
5   opinion about whether Sam Ellis should or
6   should not have made more money than you
7   do you?
8      A    I don't know what to say to
9   that.  I've never thought about it, I
10  guess.  I don't know what to --
11        MR. GOLDFARB: Object to form.
12   I don't understand where this is going.
13      A    I don't understand the
14   question period.  I don't understand.
15      Q    (BY MR. KESSLER:) Well, let
16   me restate it differently.  I apologize.
17   And Sam Ellis is a female, right?
18      A    Correct.
19      Q    And based on the information
20   you've seen she made more than you did?
21      A    Yes, sir.
22      Q    And she was working at a
23   smaller hotel?
0235
1      A    Correct.
2      Q    Okay.  Did you have a problem
3   with the fact that she earned more than
4   you did though she was working at a
5   smaller hotel?
6        MR. GOLDFARB: Object to form.
7      A    I never knew what she made.
8      Q    (BY MR. KESSLER:) Now that you

9  know do you have a problem with it?
10    A    Do I have a problem with it?
11    Q    Yeah.  Do you think it's
12  unfair that she made more money than you
13  did?
14    A    At this point I mean I don't
15  know how to answer that because I just
16  never knew what her pay was.  I never
17  asked her what her pay was.
18    Q    But now you know.  Now you
19  know that she was making more than you
20  were, okay?  As you're sitting here you
21  know today on February 24, 2006 that she
22  was making more than you were in early
23  2004.  And my question is do you think
0236
1  that was unfair?
2        MR. GOLDFARB: Object to form.
3  Asked and answered.
4    Q    (BY MR. KESSLER:) As you sit
5  here today do you think that was unfair?
6        MR. GOLDFARB: Object to form.
7    A    I never thought about it.
8    Q    (BY MR. KESSLER:) Jim Goodman
9  made more than you did and he was working
10  at a smaller property.  Do you think that
11  that was unfair?
12    A    Yes, because he had been there
13  less time than I had been there.
14    Q    Do you know what his
15  background was in the industry?
16    A    No, sir, I do not.
17    Q    So, the basis for your belief
18  that Jim Goodman was -- you were treated
19  unfairly in comparison to Jim Goodman was
20  he was general manager for a shorter time
21  than you were?
22        MR. GOLDFARB: Object to form.
23    A    He's a male.
0237
1    Q    (BY MR. KESSLER:) He's a male?
2    A    Correct.
3    Q    What about Betty Sutton, you
4  know what Betty Sutton's salary is now
5  don't you?

6    A    Yes, sir.
7    Q    And you're aware that all
8  these salary figures are confidential,
9  right?
10    A    Yes.
11    Q    You can't talk to people about
12  that?
13    A    No, sir, I will not do that.
14    Q    Betty Sutton is a female,
15  right?
16    A    Correct.
17    Q    She ran Eufala?
18    A    Yes.
19    Q    Eufala had forty rooms?
20    A    Yes, sir.
21    Q    You know now that Betty Sutton
22  earned more than you did, correct?
23    A    Correct.
0238
1    Q    Do you feel it was unfair that
2  Betty Sutton was making more money than
3  you were?
4        MR. GOLDFARB: Object to form.
5    A    As I said before I felt -- I
6  feel like the pay she made is because of
7  the kind of relationship she had with
8  Mr. Woods.
9    Q    (BY MR. KESSLER:) So what
10  exactly -- what kind of relationship do
11  you think she had with Mr. Woods?
12    A    Well, I don't know how to
13  answer that other than there was a
14  relationship there that was not in my
15  opinion by observing was not professional
16  or because of the closeness of the
17  incident that happened with the kiss when
18  Ms. Ellis had said that they were
19  kissing and she grabbed my arm and pulled
20  me off so they wouldn't see us and when I
21  looked they were close together.  Her
22  head was on his shoulder and they were
23  standing close together.
0239
1    Q    Do you know whether it was a
2  kiss on the cheek or what kind of kiss it

3  was?
4     A    Ms. Ellis said it was on the
5  mouth.
6     Q    She actually said that?
7     A    Yes, sir.
8     Q    You didn't tell us that before
9  did you?
10     A    I just said it was a kiss but
11  that's what she said.
12     Q    So you believe the only reason
13  Ms. Sutton was making more money was
14  because of this alleged relationship that
15  you're now talking about?
16     A    Correct.  Yes, sir.
17     Q    Do you know anything about
18  Ms. Sutton's qualifications?
19     A    No, sir.
20     Q    Do you know anything about her
21  success as a general manager?
22     A    No, sir.
23     Q    And yet you sit here and swear
0240
1  in your testimony that you think the only
2  reason she's making the money she made is
3  because of this relationship that you
4  believe occurred?
5     A    Not only did I believe it
6  occurred there was another manager that
7  also believe it occurred.
8         MR. GOLDFARB:  What did you
9  say?
10     A    I said I was not the only
11  manager that believed it occurred.  There
12  was another manager that believes it
13  occurred and, yes, sir by what I just
14  stated, yes, sir.
15     Q    (BY MR. KESSLER:)  Any other
16  proof that you have that there was this
17  relationship that you're testifying to
18  under oath?
19     A    The only other one is the
20  times when there was times that she came
21  to my property when Charles was present
22  on my property, came up.  I know that
23  when I was on vacation she had came up

0241
1  along with Ms. Ellis and Mr. Woods to the
2  property when I was on vacation.  There
3  have been several other occasions that
4  she had come up on the property.
5      Q    Had other managers come to
6  your property?
7      A    Other than the one time that I
8  was on vacation and this is right before
9  I came back off vacation there was
10  another manager that was there.
11     Q    Who was the other manager?
12     A    It was Sam and I'm not sure
13  about Mr. Goodman.  I wasn't there so I
14  don't remember.  My staff had told me.
15     Q    Any other evidence you have?
16     A    No, sir.
17         MR. KESSLER: Why don't we take
18  a five-minute break.
19           (A break was taken.)
20     Q    These are your interrogatory
21  responses, what's been marked as
22  Defendant's 22?
23     A    Yes, sir.
0242
1         MR. GOLDFARB:  23.
2            (Defendant's Exhibit
3            No. 23 was marked
4            for identification.)
5      A    I didn't know if I could say
6  anything or not.
7      Q    (BY MR. KESSLER:) All right.
8  So the request or the Response to
9  Interrogatories is Defendant's 23 and
10  those are your answers?
11     A    Yes.
12     Q    You looked at them before they
13  were sent out to make sure they were
14  accurate?
15     A    Yes, sir.  And I just kind of
16  overlooked that one.
17     Q    Which interrogatory of the
18  lawsuits?
19     A    It's going to be number
20  thirteen.

21     Q    Where you say plaintiff
22  states, "She has never been arrested or
23  convicted of a felony, nor has she been a
0243
 1  party to or a witness in any legal
 2  proceeding"?
 3     A    Correct.
 4     Q    That's not accurate?
 5     A    No, sir.
 6     Q    So, why was that put down in
 7  the first place?
 8     A    I just overlooked it because I
 9  had been -- I've never been arrested or
10  convicted of a crime.  That part is
11  correct.  It was on the lawsuits.  On the
12  suits if I ever been involved in a
13  lawsuit or --
14     Q    Why did you put that in the
15  first place is my question?
16     A    What do you mean?
17     Q    Why did you put in the first
18  place the response that was incorrect?
19     A    I overlooked it and did not
20  answer it correctly.
21     Q    I know but why did you answer
22  it incorrectly?  Did not remember that
23  you had been involved in a previous
0244
 1  lawsuit?
 2     A    No, sir.  I guess I
 3  looked -- what I did is I looked at the
 4  beginning of it and just answered it not
 5  finishing it out.
 6     Q    Well, but then it says, "Nor
 7  has she ever been a party to or a witness
 8  in any legal proceeding."  You wrote that
 9  out didn't you?
10        MR. GOLDFARB: Object to form.
11     A    I didn't realize -- I guess
12  when I was doing it I just didn't pay
13  attention to the question.  And I
14  overlooked it basically.
15     Q    (BY MR. KESSLER:) Well, my
16  question is I can understand not reading
17  it and not having any response but you

18  affirmatively say that you've never been
19  a party or a witness in any legal
20  proceeding.  My question is that since
21  that's not true or even close to being
22  true why would you have written that in
23  the first place?
0245
1          MR. GOLDFARB: Object to the
2   form.  You know she didn't write that.
3          MR. KESSLER: I don't know
4   that.
5          MR. GOLDFARB: Tell him how
6   this whole thing came about.  It's no
7   secret.
8          MR. KESSLER: You mean she
9   didn't put the answers down herself?
10         MR. GOLDFARB: Tell him.
11     A    What happened was we were
12  trying to get these together and Lisa had
13  called me and I was at work and it was
14  hectic and I just did not finish the
15  question out.
16     Q   (BY MR. KESSLER:) So, these are
17  really the lawyer's answers rather than
18  your answers?
19     A    No, sir, they're my answers.
20  It's just I did not fully answer the
21  question.
22     Q    You're still not making
23  sense.  Where you say, "Nor has she ever
0246
1   been a party to or a witness in any legal
2   proceeding," that is not leaving out an
3   answer.  That is an affirmative
4   misstatement.
5      A    I had told Lisa about being a
6   witness for the Jameson Inn case against
7   the ant bite victim and I told her about
8   the car accidents.  But somehow, some way
9   it just did not get in there.
10     Q    So, you told the lawyers about
11  it but it wasn't put in there?  Is that
12  your answer?
13     A    It was a mistake.  It did not
14  get put in there.

15    Q    Is that the only thing that
16  when you look at this that's inaccurate
17  about these interrogatory responses?
18    A    Yes, sir.  To my knowledge
19  everything that's in here that is
20  correct.
21    Q    Everything else is accurate?
22    A    Yes, sir.
23    Q    So, all right.  So you blame
0247
1  it on the lawyers?
2       MR. GOLDFARB: Good answer.
3    A    I'm sorry.
4       MR. GOLDFARB: Answer
5  truthfully.
6    Q    (BY MR. KESSLER:) But you
7  verify the accuracy of the entire
8  interrogatories except for the lawsuit?
9    A    Yes, sir, and when I
10  discovered that wasn't in here I brought
11  it to Mr. Goldfarb's attention.
12    Q    Did you write these answers or
13  did the lawyers write them and you just
14  said yeah that looks right?
15    A    We did this over the phone.
16    Q    You and the lawyers did it
17  over the phone so you didn't write this
18  stuff down?
19    A    No, sir, I didn't.
20    Q    Who were you talking to when
21  you were talking about the responses?
22  Was it the paralegal or the secretary,
23  Lisa?
0248
1    A    It was Lisa.  She called to
2  ask me some questions because a lot of
3  this when I got it I just didn't know how
4  to answer or what to do with it.
5    Q    So the way this is phrased is
6  not actually your writing, it's the
7  lawyer's writing?  You just talked to him
8  over the phone?
9    A    I gave my answers.
10    Q    You talked to him over the
11  phone and they actually wrote this down,

12  is that correct?
13    A    Yes, sir.
14         MR. KESSLER: Has she signed a
15  verification?
16    A    No.
17         MR. KESSLER: Will she do that?
18         MR. GOLDFARB: Will she?  She
19  will.  I understand.
20    Q    (BY MR. KESSLER:) So you're
21  going to verify the accuracy of these
22  interrogatory responses, right?
23    A    Yes, sir, I will.
0249
 1         MR. GOLDFARB: She's got to fix
 2  it.
 3         MR. KESSLER: She's got to fix
 4  it.
 5    A    We've got to fix it.
 6    Q    So after you were terminated
 7  from your employment at Jameson where was
 8  the next place you worked?
 9    A    I went to work with Financial
10  Store.
11    Q    In Alex City?
12    A    No, sir.  I trained in Alex
13  City but the position was in Sylacauga.
14  There is one in Alex City but I worked
15  in the one in Sylacauga.
16    Q    And did you end up quitting
17  your job there?
18    A    I left due to a medical
19  reason.
20    Q    Is that quitting your job?
21    A    Yes, sir.  I left there.
22    Q    When you say "left" is that
23  the same as quitting?  I want to make
0250
 1  sure we agree.
 2    A    Yes, sir, I told the manager,
 3  too, because I was under medical -- I had
 4  some medical issues.
 5    Q    Okay.  So you started working
 6  there like a week after you left Jameson?
 7    A    It was in March, I believe.
 8    Q    What was the position that you

9  went into?
10    A    I was training for the
11  Sylacauga manager.
12    Q    How much were you being paid
13  there?
14    A    Eight dollars an hour.
15    Q    And how long did you end up
16  working for them?
17    A    Right at a month.
18    Q    And what was the medical issue
19  that caused you to quit your job?
20    A    I was having fainting spells.
21    Q    Fainting?
22    A    Yes, sir.  I was hospitalized.
23  I fainted at work and the supervisor
0251
1  called an ambulance and I was
2  hospitalized.
3    Q    So which doctors did you see
4  to deal with this fainting issue?
5    A    Dr. Almakkee at that time.
6    Q    And were you ever told what
7  they believe the reason was for you
8  fainting?
9    A    Stress and anxiety.
10    Q    And how long were you out of
11  work?
12    A    Let me think.  I believe
13  December.
14    Q    December '04?
15    A    Yes, sir.
16    Q    Okay.  And what was the stress
17  and anxiety, if any, that you were
18  suffering from?
19    A    Suffering from stress and
20  anxiety from the situation with the
21  Jameson Inn.  I was under a lot of stress
22  and a lot of anxiety.  It just kept
23  building up and building up and I got a
0252
1  call from the attorneys that was handling
2  the Jameson Inn on the ant bite case and
3  he knew I was a previous manager.  He
4  told me on the phone that I had to
5  testify and give a deposition and that

6  just created more stress and more anxiety
7  because I didn't feel like I should have
8  to do it but it was my job so I did.
9      Q   So, what was the stress and
10  anxiety that you were suffering from
11  before you fainted at work?
12      A    Just stress and anxiety of
13  losing my job that I liked and the stress
14  and anxiety from that, being fired and
15  the harassment and the
16  embarrassment and the humiliation.  It
17  caused a lot of stress and anxiety on me.
18      Q    Did the fact that your mother
19  was terminated, did that cause any stress
20  or anxiety or embarrassment within your
21  family?
22      A   I can't speak for my mother
23  but I hurt for her, yes, because she was
0253
1  my mother.
2      Q    All right.  Hurt for her
3  because she was also terminated?
4      A    She chose to stay there and I
5  was okay with that.  Mine was because of
6  the fact of what had went on with me and
7  the -- it was mainly because of the
8  embarrassment and humiliation that I went
9  through as a manager because I had a good
10  relationship with the businesses in the
11  city and tourism committee and it was
12  very embarrassing and it caused a lot of
13  anxiety and stress.
14      Q    So was the anxiety and the
15  stress caused because you were no longer
16  the general manager at Jameson?
17      A   Yes, because I loved my job.
18      Q    And so I guess you had to
19  explain to these people why you weren't
20  in the general manager position anymore?
21      A    I never really ran into anyone
22  except for the gentleman that was over
23  the parks and recs.
0254
1      Q    Who was that?
2      A    What was his name?  Let me

3  think.  There's two of them.  Larry -- I
4  cannot think of Larry's last name.
5      Q    Who was it that you spoke
6  with?
7      A    He called and asked me about
8  some reservations and I told him that I
9  would do the reservations.  He said can
10  you take care of the people.  I said,
11  well, I will no longer be here.  And this
12  was on February 18th.  No, it wasn't.  I
13  seen him and he asked me to make
14  reservations for him and I said I was no
15  longer at the Jameson Inn because they
16  had a ball tournament coming in.  I
17  didn't tell him why I wasn't there.
18          MR. GOLDFARB: All he asked is
19  who it was.
20      A    Larry somebody.  I don't know
21  what Larry's name was, Larry's last name
22  was.  I'm sorry, I misunderstood what you
23  said.  I thought you wanted me to say
0255
1  what our conversation was.
2      Q    (BY MR. KESSLER:) That was
3  going to be the next question.
4      A    Okay.
5      Q    So you're doing just fine.
6      A    Okay.
7      Q    Other than talking to Larry
8  at Parks and Recreation did you have to
9  explain to anybody else, you know,
10  business or anything like that as to why
11  you had left Jameson?
12      A    When I applied for the
13  position and I received it with
14  Mr. Woods I just explained to him on my
15  application I just put for personal
16  reasons will explain.
17      Q    Did you explain?
18      A    Yes, sir.
19      Q    What did you say?
20      A    I just told him that I had
21  lost my job with Jameson Inn.  I don't
22  recall everything that the conversation
23  was.  I told him that I was terminated.

0256
1     Q     Who did you tell that to?
2     A     To the gentleman that I talked
3  to with --
4     Q     Financial Store?
5     A     Financial Store, yes, sir.
6            (Defendant's Exhibit
7             No. 24 was marked
8             for identification.)
9     Q     All right.  Let me hand to
10  you No. 24 and ask you if you've seen
11  this document before?
12     A     No, sir, I haven't.
13     Q     Do you know who Judith Woods
14  is?
15     A     Yes, sir.
16     Q     She worked at The Financial
17  Store?
18     A     Yes, sir.
19     Q     Was she your supervisor?
20     A     She was --
21            MR. GOLDFARB: Did you get this
22  by subpoena?
23            MR. KESSLER:  Yes.
0257
1            MR. GOLDFARB: Did you send it
2  to me?
3            MR. KESSLER: Yes.
4            MR. GOLDFARB: I don't think I
5  got it.
6     A     She is the manager in
7  Alexander City.  Her husband was my
8  supervisor at Financial Store.  She runs
9  the one -- she trained me to take over
10  the Sylacauga office.
11     Q     (BY MR. KESSLER:) Judith Woods
12  is in Sylacauga?
13     A     Alexander City.
14     Q     Okay.  And she says in here
15  that you called her on the night of March
16  28th and told her you had been sick over
17  the weekend, no idea when the doctor
18  would let you come back to work and
19  thought it was best that you hire
20  somebody else.  Is that accurate?

21    A    That is right.
22    Q    And then she said I asked that
23   she bring in a letter to my office on
0258
1   Monday stating that she could not work
2   anymore due to illness.  Was that
3   accurate?
4    A    Yes, sir.
5    Q    And then it says -- she said,
6   "Okay, did not come in.  Called her house
7   on Tuesday, 30th of March.
8   Daughter-in-law answered phone and said
9   she was in Carolina with her aunt for a
10   week."  Is that right accurate?
11    A    I don't recall that part.  I
12   do not recall talking to her
13   daughter-in-law now.  I'm not going to
14   tell you I didn't.  I don't recall it.
15    Q    No.  It was Judith Woods who
16   spoke to -- do you have a
17   daughter-in-law?
18    A    Do I have a daughter-in-law,
19   yes, I do.
20    Q    Well, did you go to Carolina
21   for a week to visit your aunt?
22    A    No.  What did that say called?
23   I never knew she talked to my
0259
1   daughter-in-law.
2    Q    Well, you may or may not have
3   but did you bring a note in to Judith
4   Woods stating that you couldn't work?
5    A    The doctor -- my doctor was
6   supposed to have faxed that to her
7   because I talked with the doctor about
8   that.  And from my understanding she
9   received the doctor's note.
10    Q    So, is this based on your
11   information this Ms. Woods' letter is
12   inaccurate?
13    A    I don't know anything about a
14   phone call.
15    Q    This doesn't say that you
16   knew anything about a phone call?
17    A    Okay.

18     Q    It says you were supposed to
19  come in on Monday to bring a doctor's
20  statement and you didn't show?
21     A    I do not remember her telling
22  me to bring a doctor's statement.  I told
23  her I would get one to her but I did not
0260
1  say I was bringing it in because I was
2  having fainting spells and I wasn't
3  driving at that time.  My mom was taking
4  me places.
5     Q    Whether your mom was taking
6  you places or not it sounds like you're
7  saying Ms. Woods' letter is not accurate
8  based on your recollection?
9     A    Yes.  Based on what I recall I
10  don't remember telling her I would bring
11  in a doctor's note.
12              (Defendant's Exhibit
13               No. 25 was marked
14               for identification.)
15     Q    On the second page of
16  Defendant's 25 that I now hand to you,
17  Ms. Stough, there is a job description
18  for a general manager.  Do you see that?
19     A    Yes, sir, I do.
20     Q    And the date on it is
21  July 1, 2003?
22     A    Yes.
23     Q    At the bottom?  You were
0261
1  general manager then?
2     A    2003, yes, I was.
3     Q    And it lists basically six
4  principal things for duties for a general
5  manager and I just want you to look at
6  them real quickly and tell me if this is
7  consistent with your understanding of
8  what you were supposed to do as general
9  manager with Jameson Inn hotel?
10     A    I understand revenues and
11  increased savings.
12     Q    You agree with that one?
13     A    Yes, sir.
14     Q    Number two?

15     A     Maintain and sustain sales and
16  marketing and public relations efforts,
17  yes, sir, I knew that was part of a
18  general manager's job.
19     Q     Number three?
20     A     Implement and preserve of
21  accounting procedures and practices.
22     Q     You agree with that?
23     A     Yes, sir.
0262
1     Q     Okay.
2     A     Maintenance of Quality
3  Standards and Procedures.
4     Q     You agree with that?
5     A     Yes, sir.  Human Resources
6  Training and Development.
7     Q     Agree with that?
8     A     Yes, sir, and other duties.
9     Q     All right.  You agree with
10  that?
11     A     Yes, sir.
12     Q     Have you seen this before,
13  this job description?
14     A     I don't want to say yes.  I
15  don't recall but I -- it's been awhile.
16  It's been awhile.
17     Q     But based on the six principal
18  duties you don't have any disagreement
19  with what your duties were?
20     A     Correct.  I do not.
21     Q     I want to show you your
22  charge of discrimination that you filed.
23  This is Defendant's Exhibit No. 1 that
0263
1  was filed on August 9.
2     A     Excuse me.
3     Q     August 9, 2004?
4     A     Yes, sir.
5     Q     You had been terminated almost
6  six months by the time you wrote out that
7  charge, hadn't you?
8     A     Yes, sir.
9     Q     Why did you wait so long to
10  file your charge?
11     A     Honestly?

12    Q    Yes.
13    A    I prayed about it and I
14  stressed over it and prayed about it and
15  stressed over it.  I went in and talked
16  to Mr. Jones at that point and I
17  explained the situation and all with him
18  and he advised me --
19         MR. GOLDFARB: Don't tell what
20  your lawyer told you to do.
21    A    But we discussed it.  And then
22  I made the decision on what to do from
23  that points.
0264
 1    Q    (BY MR. KESSLER:) When did you
 2  first go in to talk to Mr. Jones?
 3    A    I don't recall the exact date.
 4    Q    Do you recall how long before
 5  that EEOC charge?
 6    A    No, sir.  Actually it might
 7  have been the same day that I talked to
 8  him that I decided to do it.  I called
 9  and made an appointment.
10         (Defendant's Exhibit
11          No. 26 was marked
12          for identification.)
13    Q    Let me hand to you what's been
14  marked as Defendant's Exhibit
15  No. 26 and these are documents we
16  received pursuant to a subpoena from
17  Title Cash?
18    A    Yes, sir.
19    Q    In Alexander City.  You work
20  for Title Cash?
21    A    Yes, sir, I do.
22    Q    Are you currently employed?
23    A    Yes, sir.
0265
 1    Q    By them?
 2    A    Yes.
 3    Q    By Title Cash?  What do you do
 4  for them?
 5    A    I'm an assistant manager.
 6    Q    How much do you make there?
 7    A    $7.38.
 8    Q    Who do you report to?

9     A     I report to our area, our
10   district supervisor is no longer -- she's
11   gone but I report to Diane and I believe
12   her last name is Yeargen, Y-e-a-r-g-a-n.
13   I think that's how you spell it.
14     Q     Have you received any
15   reprimands or warnings from them?
16     A     No, sir.
17     Q     On the second page on your
18   application -- that's your application
19   you filled out with Title?
20     A     Yes, sir.
21     Q     And under schools, so you have
22   General Business Schools JAX 1971?
23     A     Yes, sir.
0266
1      Q     You have years attended two
2    years?
3      A     General Business Schools.
4    Yeah, that was a mistake.
5      Q     Where it says did you graduate
6    you didn't graduate did you?
7      A     It was a graduation.  I got a
8    certificate of completion graduation.
9      Q     So the certificate was a
10   graduation?
11     A     Right.  It showed that I
12   completed the courses.
13     Q     You weren't trying to puff and
14   mislead somebody on your qualifications
15   were you?
16     A     No, sir, I was not.
17     Q     Did you ever go back and tell
18   them that you really had not attended two
19   years of General Business School?
20     A     I told her that it was eight
21   months -- eight or nine months is what I
22   told Amy, which was my supervisor.
23     Q     So even though you put two
0267
1    years on the application you went back
2    and said hey it's really eight months?
3      A     I was just --
4      Q     A mistake?
5      A     Yeah.

6     Q    And then on the next page
7  under Holiday Inn Express?
8     A    Yes, sir.
9     Q    Where you said reason for
10  leaving better job offer?
11     A    Yes, sir.
12     Q    That was not really the reason
13  was it?
14     A    Yes, sir, I was
15  offered -- because I was already gone
16  from Holiday Inn Express.
17     Q    You left because you were
18  demoted?
19     A    Well, I got a better job offer
20  with Jameson Inn.
21     Q    After you left, right?
22     A    Correct.
23     Q    So, when you say that you left
0268
1  the Holiday Inn Express because of a
2  better job offer that really wasn't
3  accurate was it?
4         MR. GOLDFARB: Object to form.
5     A    Yes, sir, because I left
6  Holiday Inn because of it was my own
7  decision to leave and then I talked with
8  Bill Plummer and he gave me the
9  opportunity to come and work with Jameson
10  a few months later.
11     Q    (BY MR. KESSLER:) So you
12  consider this response about leaving
13  Holiday Inn express for a better job
14  offer to be accurate?
15     A    Yes, sir.
16     Q    And then where you say you
17  left Jameson Inn for personal reasons you
18  didn't leave there for personal reasons
19  did you?
20     A    It was personal.  It was
21  personal to me that I was fired.
22     Q    Well, but you don't say in
23  here that you were terminated do you?
0269
1     A    No, sir, but I explained to
2  Amy Allen the situation that went on.

3    Q    I see.  So she knows that you
4  were terminated?
5    A    Yes, she knows the whole
6  situation.
7    Q    When did you tell her that?
8    A    The day of my interview.
9    Q    Did she ask you why you put
10  something different down on your
11  application?
12    A    No, sir, she didn't.
13        MR. GOLDFARB: You sent this to
14  me?  I didn't get it.  I hadn't gotten
15  this.  I know I haven't seen this.
16        MR. KESSLER: We have --
17        MR. GOLDFARB: I will tell you
18  you almost got her fired when you called
19  over there.
20        MR. KESSLER: Well, I'm sorry.
21        MR. GOLDFARB: You really
22  almost got her fired.  It caused a whole
23  mess and we ought to put another claim in
0270
1  here because of what happened.  I don't
2  know if it was you but somebody spoke to
3  the office over there and it was a mess.
4  She really almost got fired.
5        MR. KESSLER: You know we have
6  an absolute right to find out for the
7  mitigation.
8        MR. GOLDFARB: Not to ask them
9  questions about did she answer -- pushing
10  whether this is truthful or whatever.  It
11  was something somebody said to them on
12  the phone almost got her fired and
13  whether you think you've got a right to
14  do that or not I can bring another
15  lawsuit against this company for
16  interfering with her job.
17        MR. KESSLER: Can I say what
18  I'm going to say, Jon?
19        MR. GOLDFARB: Yes.
20        MR. KESSLER: I don't know what
21  exactly was said to somebody over there.
22  It was my assistant trying to get
23  documents before this deposition, okay?

0271
1  And we have an absolute right since we
2  haven't received any mitigation
3  information from y'all we have an
4  absolute right to find out what her
5  current earnings are.  Nothing was said
6  that in any way impuned her integrity.
7  We only were trying to get information
8  which we had a perfect legal right to get
9  and the fact that she may have falsified
10  her application in some regards is her
11  problem and not ours.  We certainly
12  have passed it on.
13        MR. GOLDFARB: If you cause her
14  to lose her job I will bring an
15  interference claim against this company
16  and I can do it.  There's nothing that
17  y'all can do to stop it and it's a pretty
18  good claim.  And she did not tell you
19  anything about the mitigation but she
20  told you where she was working.
21        MR. KESSLER: Tell us.
22        MR. GOLDFARB: It's right in
23  here to the response to the
0272
1  interrogatory.
2        MR. KESSLER: Tell us what the
3  problem that -- what your understanding
4  of the problem at work at Title Cash was
5  caused by any kind of contact that our
6  office had?
7        MR. GOLDFARB: Before you do
8  that you said something that's incorrect.
9  You said there's no mitigation.  Fourteen
10  goes through her -- one of these goes
11  through her mitigation but go ahead and
12  answer.  Number 11 identifies employers
13  that she's had and the wages that she
14  earned.  So that is mitigation right
15  there.
16        MR. KESSLER: It doesn't have
17  dates of employment.
18        MR. GOLDFARB: All you had to
19  do was call and ask me instead of making
20  a mess on her job.  That's what's going

21  to happen if she loses that job, it's
22  going to increases the damages that she's
23  going to seek in this case.  I don't know
0273
 1  why you defendants do this.
 2     Q     (BY MR. KESSLER:) Tell us what
 3  this alleged problem was.
 4     A     My manager of the store --
 5     Q     Who is that?
 6     A     Her name is Jessica.
 7     Q     What's her last name?
 8     A     Nail, N-a-i-l.
 9     Q     All right.
10     A     Got the phone call.
11     Q     From who?
12     A     She said -- I don't know
13  somebody Kessler something, something,
14  something.  She said I don't know all
15  what was said.
16     Q     When did this occur?
17     A     I don't know the date.  I know
18  it was right before that y'all were
19  requesting employee files.  And she said
20  the lady said that she was going to
21  subpoena her and was she aware of
22  the -- something to the fact was she
23  aware of the lawsuit and Jessica said
0274
 1  that was none of her business and that --
 2     Q     None of whose business?
 3     A     Her business, Jessica's
 4  business about any lawsuit and I wasn't
 5  right there when she was talking to her.
 6  I came in from the back room and said
 7  that I don't know how to tell you to get
 8  the employee files other than our home
 9  office.  She said evidently the person on
10  the other line said she was going to send
11  a subpoena to the office there, the local
12  office, and Jessica said I don't know
13  anything about this.  This is her
14  personal business.  I don't get into her
15  personal business.  If it has something
16  to do with Title Cash fine.
17               And so, when the subpoena

18   came I was off that day.  It was my half
19   day or I was in Auburn.  I can't remember
20   because I travel to two different offices
21   and work.  I work the Alex City office as
22   well as another office and she said this
23   subpoena came and she called the regional
0275
1   supervisor and he told her what to do
2   with it.  And I believe the lady's name
3   is Connie at our home office said that if
4   we received any other phone calls from
5   the attorney that we are not to talk to
6   them because they are not to be calling
7   the property.  If they want any
8   information they are to call the HR
9   Department at Hutchens Enterprises.
10      Q    Okay.
11      A    I was very well warned no more
12   phone calls or it could jeopardize my
13   job.
14      Q    All right.  And your employer
15   told you that if our office called Alex
16   City it would jeopardize your job?
17      A    Something to the fact is that
18   it could jeopardize.  They didn't want
19   phone calls on my job from the attorneys.
20   That business needed to be handled
21   outside of the office.
22      Q    After that one phone call from
23   our office, and I don't have any personal
0276
1   knowledge of it, but after that one phone
2   call did our office ever call Alex City
3   again?
4      A    Not that I know of.  If they
5   did I don't know about it.
6      Q    And so your understanding is
7   that we're not supposed to call the Alex
8   City office anymore; is that correct?
9      A    Yes, sir, that's my
10   understanding.
11      Q    And other than what you've
12   already testified -- when you were
13   told -- strike that.
14           You were told that if we

15  called again it would jeopardize your
16  job?
17      A    That the manager told me that
18  she was told by Connie that if the
19  attorneys -- that I am not to have any
20  kind of phone calls from an attorney, the
21  attorney on the job because it was
22  totally -- I don't know exactly.  She
23  didn't know exactly what it was totally
0277
1  against something she said.
2      Q    What was the jeopardy to your
3  job?
4      A    Because of the phone call.
5      Q    One phone call from the
6  lawyers that jeopardized your job?
7      A    It could.  It could jeopardize
8  my job.  Could.  They didn't say it
9  would.  It could.  And I said yes, ma'am,
10  it won't happen anymore.
11          MR. GOLDFARB: Remind me never
12  to call at that place.
13      Q    (BY MR. KESSLER:) Well, had
14  you told them, your boss, about this
15  lawsuit?
16      A    Ms. Allen knew about it.  She
17  was my immediate supervisor.  She was the
18  district manager.  She was aware of what
19  was going on.  When this phone call came
20  to our office Amy -- I believe Amy was
21  already gone by that time.  I don't
22  remember the day.
23      Q    So you had not told Jessica
0278
1  Nail about the lawsuit?
2      A    No.  She was my immediate
3  manager of the property.  She knew about
4  it.  Jessica and Amy Allen knew about it
5  and they were my immediate -- Jessica is
6  the manager of the property that I work
7  on, the office that I work in.  And Amy
8  was the district supervisor.  They both
9  were aware of it.
10      Q    Well, was this phone call that
11  you're talking about, the one phone call,

12  was it in any way disrespectful or rude
13  or anything like that?
14      A    I don't know because Jessica
15  wouldn't talk to me about it other than
16  what she told me.  She was highly upset
17  about it.
18      Q    Jessica was?
19      A    She was upset.  I don't know
20  what all was said.
21      Q    She was upset with who?
22      A    The person that she talked to
23  on the phone.  I don't even know who that
0279
 1  was.
 2      Q    Okay.
 3      A    It could be it just scared
 4  her.  It could be a possibility.  I don't
 5  know.
 6      Q    Was she upset about you suing
 7  a former employer?
 8      A    No.  I guess she was upset
 9  because -- I don't know.  I don't know
10  why.
11      Q    Just asking?
12      A    We didn't discuss it.  After
13  she said what she said I said no problem
14  I'll take care of it.
15      Q    Well, I will say on behalf of
16  my office we certainly didn't mean to
17  cause any problem but that was the
18  address Temp Force at 157 Main Street,
19  Alexander City, Alabama was the address
20  that y'all gave so we didn't know --
21          MR. GOLDFARB: I guess I could
22  have said -- off the record.
23          (A discussion was
0280
 1              held off the
 2              record.)
 3          MR. KESSLER: We're back on the
 4  record.  The only thing I want to say is
 5  the address that y'all gave us for Title
 6  Cash was 909 Cherokee Road, Alex City.
 7  That's why they were called and we didn't
 8  know where else to call.

9        MR. GOLDFARB: That's where she
10  worked.  I gave you that number.
11        MR. KESSLER: Certainly my
12  assistant, Bobbie, who I'm sure is the
13  one who made the phone call, is hardly a
14  person who would upset somebody.  So, for
15  any events which occurred at work we
16  certainly didn't mean to but we were just
17  trying to get some information which
18  we're legally entitled to and not be
19  disruptive in any way.
20        MR. GOLDFARB: You can ask me
21  and I can certainly get it without
22  causing something like this to happen.
23        MR. KESSLER: We will work
0281
1  through your counsel.  We're not trying
2  to have you lose your job.
3        MR. GOLDFARB: Let me know if
4  you get a raise and I will tell him.
5           (Defendant's Exhibit
6            No. 27 was marked
7            for identification.)
8      Q    (BY MR. KESSLER:) I hand you
9  27.  This is what we received from Temp
10  Force.  Did you used to work for Temp
11  Force?
12      A    Yes, sir.  I filled several
13  different capacities there.
14      Q    All right.  And this is your
15  application?
16      A    Yes, sir.
17        MR. GOLDFARB: I've never seen
18  this for the record, never seen it.  I
19  didn't even know you sent out all these
20  subpoenas.  You're supposed to send me a
21  a copy of the subpoena notice.
22  I'm telling you I did not receive it.
23        MR. KESSLER: I will say
0282
1  this --
2        MR. GOLDFARB: I found about
3  this subpoena because I got a frantic
4  call from her.  I sent you a letter
5  saying send me -- I know I sent you a

6  letter saying all the subpoenas you sent
7  out you're supposed to send me.
8        MR. KESSLER: I had instructed
9  my office last week to do this as soon as
10  we got this stuff in.
11        MR. GOLDFARB: It's absolutely
12  in violation of the rules to send out
13  subpoenas without sending copies to me.
14        MR. KESSLER: Well, I will
15  double check but it is our office's firm
16  practice to make sure that when we send
17  out subpoenas the lawyers get copies
18  promptly.  So, if we didn't then we
19  didn't but I apologize.  But my point is
20  on this application under your previous
21  employers?
22    A    Yes, sir.
23    Q    Jameson Inn you say you
0283
1  resigned?
2        MR. GOLDFARB: Object to the
3  form.  Misleading.
4    Q    (BY MR. KESSLER:) It says
5  resign.  Do you see that?  Is that your
6  handwriting?
7    A    Yes, sir, but I did explain
8  when and what had happened.
9    Q    Then you have mutual
10  agreement.  Is that what you explained?
11    A    Mutual agreement.  I explained
12  to her about being terminated.
13    Q    You think she just wrote that
14  down wrong mutual agreement?
15    A    Yes, I think she did because
16  it was a crazy day I know that day.
17    Q    It wasn't you misstating it?
18  It was her writing it down wrong?
19    A    Yes, sir.
20    Q    And then under the name of
21  college and vo-tech you have three years
22  completed at General Business Schools.
23    A    I told her to go back and
0284
1  change it.  That should have been eight
2  months.

3      Q    Another mistake you made?

4      A    Yes, sir, because -- well,

5  altogether with the General Business

6  Schools and the Chicago Business Schools

7  was two years together total.

8      Q    I know you have three.  That

9  was just a mistake wasn't it?

10     A    Yes, sir, it should have been

11  just two.

12     Q    You meant to tell the truth

13  but you weren't --

14          MR. GOLDFARB: Object to form.

15     A    It meant to be two with both

16  schools.

17     Q    (BY MR. KESSLER:)  You weren't

18  trying to puff on your qualifications in

19  any way were you?

20     A    No, sir, because I took -- we

21  sat and talked a long time about it.

22          (Defendant's Exhibit

23           No. 28 was marked

0285

1            for identification.)

2      Q    This is a garnishment?

3      A    Yes, sir.

4      Q    Against you?

5      A    Yes, sir.

6      Q    Do you consider this to be a

7  lawsuit?

8      A    No, sir.

9      Q    Okay.  You knew about this?

10     A    Yes, sir.  This was with

11  Unemployment.

12     Q    So what's Unemployment doing

13  garnishing your wages?

14     A    Because there was a -- this

15  was not -- we had this reversed.  I was

16  making payments to Unemployment and it

17  was not showing and they went in and

18  reversed it immediately.

19     Q    What were you making payments

20  to Unemployment for?

21     A    Because I had received

22  compensation when I left Holiday Inn

23  Express.

0286
1    Q    And how long did you receive
2  it for?
3    A    I don't recall how long,
4  but I was making payments and it was an
5  oversight that should have never been
6  done.
7    Q    So when you left Holiday
8  Inn --
9        MR. GOLDFARB: I don't --
10       MR. KESSLER: Wait a minute.  I
11  think we know what's going on.
12    Q    When you left Holiday Inn you
13  applied for unemployment comp, right?
14    A    Yes, sir.
15    Q    Even though you started
16  working the next week for Jameson?
17    A    I didn't work the next week
18  for Jameson.  I left Holiday Inn Express
19  in February and didn't go to work with
20  Jameson until May.
21    Q    So, did you not notify
22  Unemployment Compensation when you
23  started working at Jameson?
0287
1    A    Yes, sir, I did.
2    Q    Did you continue receiving
3  unemployment compensation?
4    A    No, sir, I did not.
5    Q    So why were you paying back
6  Unemployment Comp?
7    A    Because Carol Barnes
8  went -- we went before a hearing on this
9  and I lost the unemployment thing.  It
10  was just a session with an unemployment
11  person and me and Carol Barnes,
12  Ms. Barnes.
13    Q    Who is Carol Barnes?
14    A    She was this -- she was the
15  general manager of Holiday Inn Express.
16    Q    So, they reversed the
17  unemployment compensation and you were
18  denied unemployment comp; is that
19  correct?
20    A    Correct.  That's exactly

21  right.
22      Q     You had already been paid some
23  unemployment compensation?
0288
1      A    Correct.
2      Q    So you then had to pay it
3  back?
4      A    Correct.
5      Q    But you didn't pay it back?
6      A    I was paying it back.  This
7  was a mistake.  They reversed this.
8      Q    I see.
9      A    Because I got on the phone
10  immediately and spoke with them and they
11  reversed it.
12      Q    So this was somebody else's
13  mistake, not yours?
14      A    It was clerical error is what
15  I was told when I talked to them.
16      Q    Them being the Department of
17  Industrial Relations?
18      A    Correct.  The attorneys for
19  the -- yeah, whoever handles it that's
20  who I talked to.
21      Q    I guess we could look at the
22  file in Coosa County and find out exactly
23  what happened?
0289
1      A    Who the person is?
2      Q    Right.
3      A    And they called them and had
4  this dropped because I never went to
5  court or anything about it because I was
6  making payments.  I talked to a Cathy and
7  she rectified the situation.
8      Q    So are you still making
9  payments on that?
10      A    Yes, sir.
11      Q    How much are you paying?
12      A    Whatever I can afford.
13  Anywhere between ten and twenty dollars a
14  month to get it paid off.
15      Q    And what was the total amount
16  of unemployment comp that you were
17  improperly paid?

18    A    I don't recall how much it
19  was.
20    Q    Other than this have you been
21  garnished in the past?
22    A    No, sir, not to my knowledge.
23  If I have I haven't received it.
0290
1    Q    This is the only garnishment
2  that you know of?
3    A    Yes, sir, this is all I know
4  of.
5        MR. KESSLER:  We're
6  finished.
7  EXAMINATION BY MR. GOLDFARB:
8    Q    These product evaluation
9  reports, are there documents at the hotel
10  that would, as far as you know, that
11  would indicate certain -- that would back
12  up with what they're saying or not what
13  they're saying on certain parts of this
14  such as does the hotel keep books on this
15  guest services sales area where it has,
16  and I'm looking at Exhibit 22, for
17  example, it has got review all reports
18  for completeness.  Are these reports
19  that's kept by the hotel?
20    A    They were supposed to be.  I
21  don't know if they're still there or not.
22    Q    I'm just trying to get an
23  understanding of the documentation.
0291
1    A    Yes.
2    Q    There's documents behind
3  parts of these product evaluations that
4  all of us could look at to verify and not
5  to verify parts of this, correct?
6    A    Correct.
7    Q    Whose signature is on
8  Defendant's Exhibit 18?
9    A    Greg Whiney.
10    Q    Okay.  Whose signature is on
11  Defendant's Exhibit 17?
12    A    Greg Whiney.
13    Q    Whose signature is on
14  Defendant's Exhibit 16?

15   A   Greg Whiney.
16   Q   Whose signature is on 12?
17   A   Greg Whiney.
18   Q   And Defendant's Exhibit 11?
19   A   That would be Greg Whiney.
20   Q   Okay.  Now, you don't know why
21   he signed these do you?
22   A   No, sir.
23   Q   You never talked to him
0292
1   personally about it?
2   A   About these, no.
3      MR. GOLDFARB: That's all I
4   have.
5   FURTHER EXAMINATION BY MR. KESSLER:
6   Q   Did Whiney ever visit your
7   facility that you know of?
8   A   Yes, sir.
9   Q   While you were general
10   manager?
11   A   Yes sir.
12   Q   Earlier when I was asking you
13   about that signature you said you didn't
14   know whose it was?
15   A   It looked Like Greg's so I
16   wasn't --
17      MR. GOLDFARB: Object to the
18   form.
19   Q   (BY MR. KESSLER:) Didn't you
20   say you didn't know whose it was?
21   A   It looked like Greg Whiney's.
22   Q   You said that when I was
23   asking you?
0293
1   A   I think I did.
2      MR. GOLDFARB: She did.
3   Q   (BY MR. KESSLER:) Did she?
4   But you're testifying now thanks to
5   the -- based on the questions from your
6   counsel that you know for sure it's
7   Whiney?
8   A   Looking at it, yes, sir, it's
9   Greg.
10   Q   My point is you didn't
11   know -- you thought maybe it was Whiney's

12  when I asked you.  When he asked you you
13  know for sure it's Whiney's?
14      A    Looking at them and looking at
15  the different ones that you handed me it
16  is his, different ones.
17      Q    Each of these evaluations that
18  Mr. Goldfarb showed you Mr. Whiney was
19  not at your hotel actually evaluating
20  your hotel was he?
21      A    No, sir.
22      Q    And while you were general
23  manager he never personally evaluated
0294
 1  your hotel?
 2      A    He came to my hotel.
 3      Q    But he never personally
 4  evaluated your hotel in a QA evaluation
 5  did he?
 6      A    He looked at the rooms and
 7  overall look.  Are you asking did he do a
 8  structural QA?
 9      Q    Yes.
10      A    No, sir.
11      Q    Okay.  How often did
12  Mr. Whiney come down and actually look at
13  the rooms?
14      A    I seen him one time.
15      Q    One time?
16      A    I believe it was just once.
17      Q    Do you know when that was?
18      A    No, sir, I don't remember
19  exactly what day.
20      Q    I'm not asking you exactly but
21  do you recall whether it was early while
22  you were general manager or late?
23      A    Probably midway in I would
0295
 1  say.
 2      Q    Okay.  Did he make any
 3  comments about the room?
 4      A    Yes, sir.
 5      Q    What did he say?
 6      A    He said the property looked
 7  good, needed to work with the sprinkler
 8  system, which that never worked from the

9   beginning when I went there.  The rooms
10  were nice and clean.  He complimented me
11  on one of my housekeepers, her rooms were
12  exceptionally clean.  And he
13  congratulated me on a good job with the
14  cleanliness issues of the hotel and that
15  was about the end of the conversation
16  because he was moving on to the next
17  hotel.
18      Q    Do you recall which year that
19  was?
20      A    No, sir, I don't.
21      Q    So it could have been '01 or
22  '02 or '03?
23      A    It could have been.
0296
1       Q    You just don't know?
2       A    I just don't remember exactly
3   what year.
4       Q    Okay.
5       A    They all kind of run together.
6           MR. KESSLER: No further
7   questions.
8        FURTHER THE DEPONENT SAITH NOT.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23