# Exhibit 2:
# Deposition of Charles Woods and Certain Attached Exhibits

0001
1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3           EASTERN DIVISION
4
5  BELINDA STOUGH,        )
6          Plaintiff,    )
7  vs.                ) CASE NUMBER:
8  JAMESON INN, a company  )  3:05-CV-421-W
9  owned or operated by    )
10  Kitchin Hospitality, LLC,)
11          Defendant.    )
12
13          DEPOSITION OF CHARLES WOODS
14          In accordance with Rule 5(d) of
15  The Alabama Rules of Civil Procedure, as
16  Amended, effective May 15, 1988, I, Cindy
17  Weldon, am hereby delivering to Jon
18  Goldfarb, the original transcript of the
19  oral testimony taken on the 9th day of May,
20  2006, along with exhibits.
21          Please be advised that this is the
22  same and not retained by the Court Reporter,
23  nor filed with the Court.
0002
1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3           EASTERN DIVISION
4
5  BELINDA STOUGH,        )
6      Plaintiff,        )
7  vs.                ) CASE NUMBER:
8                  )  3:05-CV-421-W
9  JAMESON INN,  a company  )
10  owned or operated by    )
11  Kitchin Hospitality, LLC,)
12      Defendant.        )
13
14          S T I P U L A T I O N
15          IT IS STIPULATED AND AGREED, by
16  and between the parties through their
17  respective counsel, that the deposition of
18  CHARLES WOODS, may be taken before Cindy
19  Weldon, Certified Shorthand Reporter,
20  Commissioner and Notary Public, at the

21  offices of Angela Hill, 139 S. Broadnax
22  Street, Dadeville, Alabama, on May the 9th,
23   2006 at 9:00 a.m.
0003
 1       IT IS FURTHER STIPULATED AND
 2  AGREED that the signature to and the reading
 3  of the deposition by the witness is waived,
 4  the deposition to have the same force and
 5  effect as if full compliance had been had
 6  with all laws and rules of Court relating to
 7  the taking of depositions.
 8       IT IS FURTHER STIPULATED AND
 9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions, except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17        IT IS FURTHER STIPULATED AND
18  AGREED that notice of filing of the
19  deposition by the Commissioner is waived.
20
21
22
23
0004
 1       A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFF:
 4       MR. JON GOLDFARB
 5       THE KRESS BUILDING
 6       301 19TH STREET
 7       BIRMINGHAM, ALABAMA  35203
 8
 9       MS. ANGELA HILL
10       139 S. BROADNAX STREET
11       DADEVILLE, ALABAMA  36853
12
13  FOR THE DEFENDANT:
14       MR. GARY R. KESSLER
15       MS. ANN HALE-SMITH
16       3060 PEACHTREE ROAD SUITE 1050
17       ATLANTA, GEORGIA  30305

18
19
20
21
22
23
0005
1              I N D E X
2
3  EXAMINATION BY:              PAGE
4  MR. GOLDFARB            6, 288
5  MR. KESSLER            287
6
7
8          E X H I B I T S
9                  PAGE
10  PLAINTIFF'S EXHIBIT NO. 1          65
11  PLAINTIFF'S EXHIBIT NO. 2        160
12  PLAINTIFF'S EXHIBIT NO. 3        169
13  PLAINTIFF'S EXHIBIT NO. 4        174
14  PLAINTIFF'S EXHIBIT NO. 5        174
15  PLAINTIFF'S EXHIBIT NO. 6        177
16  PLAINTIFF'S EXHIBIT NO. 7        192
17  PLAINTIFF'S EXHIBIT NO. 8        193
18  PLAINTIFF'S EXHIBIT NO. 9        193
19  PLAINTIFF'S EXHIBIT NO. 10        194
20  PLAINTIFF'S EXHIBIT NO. 11        212
21  PLAINTIFF'S EXHIBIT NO. 12        212
22  PLAINTIFF'S EXHIBIT NO. 13        279
23
0006
1          CHARLES WOODS,
2    after first being duly sworn, testified
3              as follows:
4  EXAMINATION BY MR. GOLDFARB:
5        THE COURT REPORTER:  Usual
6  stipulations?
7        MR. GOLDFARB:  Yes.
8        MR. KESSLER:  Yes.
9    Q.  State your name, please.
10    A.  Charles Woods.
11    Q.  What's your home address?
12    A.  1608 County Road 33, Ozark,
13  Alabama.
14    Q.  The zip is?

15    A.  36360.
16    Q.  What is your date of birth?
17    A.  7-15-53.
18    Q.  And your social security number?
19    A.  ██████████.
20    Q.  How long have you lived in Ozark?
21    A.  Eleven years.
22    Q.  Have you been in a deposition
23  before?
0007
 1    A.  Yes.
 2    Q.  Other than Belinda Stough's?
 3    A.  Yes.
 4    Q.  Have you testified in a deposition
 5  before?
 6    A.  Yes.
 7    Q.  Other than the ant bite case --
 8  Did you testify in that one?
 9    A.  No.
10    Q.  Tell me about your testimony in
11  the past.
12    A.  It was a deposition regarding how
13  we handle maintenance at Sterling
14  Properties, the company I worked for.  I
15  managed actually.
16    Q.  What do you mean how you handle
17  maintenance?  What is that?
18    A.  What our procedures were with
19  maintenance as it was reported.  It was an
20  issue involving one of our tenants.  It was
21  after the fact.  I was not with the company
22  at the time.
23    Q.  Was it an injury case?
0008
 1    A.  No, it wasn't.
 2    Q.  What kind of case was it?
 3    A.  Involving a break-in into the
 4  apartment.
 5    Q.  Okay.
 6    A.  And requesting how -- our
 7  maintenance procedures of the company.
 8    Q.  What other depositions have you
 9  testified in?
10    A.  That's it.
11    Q.  Have you testified it a court

12  before?
13      A.  No, sir.
14      Q.  Have you given testimony under
15  oath on any other occasion?
16      A.  Not that I recall.
17      Q.  Never signed any affidavits or
18  anything like that?
19      A.  What do you mean?
20      Q.  Like signed a declaration or an
21  affidavit or anything like that?
22      A.  I've signed several for this
23  case.  You know that.
0009
 1      Q.  You mean statements?
 2      A.  Affidavits for this case.
 3          MR. KESSLER:  He's talking about
 4  verifications.
 5      Q.  No.  I'm talking about like where
 6  you swear, you take a statement and you --
 7      A.  Not that I recall, no, sir.
 8      Q.  Have you -- What year did you
 9  start working at Jameson?
10      A.  '95.
11      Q.  What was your job when you
12  started?
13      A.  General manager.
14      Q.  Before 1995, where did you work?
15      A.  I was with a company called
16  Sterling Properties.
17      Q.  What does that company do?
18      A.  They owned apartment complexes.
19      Q.  Where did you work?
20      A.  In Atlanta.
21      Q.  What was your job there?
22      A.  General manager.
23      Q.  Of an apartment complex?
0010
 1      A.  Uh-huh.
 2      Q.  Yes?
 3      A.  Yes.
 4      Q.  Why did you leave there?
 5      A.  They had sold most of the
 6  properties that we managed down to only a
 7  few.  And one of the owners stepped back in
 8  to take over.

9    Q.  That was in 1995?
10    A.  Yes.  Somewhere around there, yes,
11  sir.
12    Q.  That was out of Atlanta?
13    A.  It may have been actually the end
14  of '94. It was, yes.
15    Q.  Was the company only based -- Was
16  the company only operating in Atlanta?
17    A.  Yes.
18    Q.  Have you ever heard of Tines
19  Development Corporation?
20    A.  No.
21    Q.  Even Tines (spelled
22  phonetically)?  You never heard of them?
23    A.  No.
0011
1    Q.  Do you know if Sterling Properties
2  is still in existence today?
3    A.  I don't know.
4    Q.  Did you voluntarily leave there?
5    A.  It was a mutual agreement, I
6  guess.
7    Q.  Were you asked to leave?
8    A.  I think it was a case when one of
9  the owners wanted to take over the few
10  remaining properties and felt like there was
11  no need to have somebody at that point.
12    Q.  Who was the owner?
13    A.  Sterling Wharton and Mike Hopper.
14    Q.  They both live in Atlanta?
15    A.  As far as I know.
16    Q.  At that time, they lived in
17  Atlanta; right?
18    A.  They did.
19    Q.  Did you have a disagreement with
20  one of the owners?
21    A.  No.
22    Q.  How long were you off work after
23  leaving there before you went to Jameson?
0012
1    A.  Probably a period of about six
2  months.  And there was an interim position
3  selling yardage guides for golf courses.
4    Q.  How long were you -- When you left
5  Sterling, how long did it take you to get

6  the job with the golf course selling
7  yardage?
8      A.  Shortly thereafter.
9      Q.  How long?
10     A.  I would guess within a month or
11  so.
12     Q.   What was the name of that company?
13     A.  I don't recall.
14     Q.   Who did you work for, the person's
15  name?
16     A.  I'm sorry.  I'm having trouble
17  with his first name.  He was a teaching
18  professional, golf professional.  Had just
19  come up with an idea to sell yardage guides
20  to golf courses and was willing to pay
21  commissions for that.  And I tried that for
22  a short time.
23     Q.   About six months?
0013
1      A.  I probably was in that job but
2  only a couple of months.
3      Q.  Did you hold any other positions
4  between --
5      A.  No, I didn't.
6      Q.  Let me finish the question --
7  between Sterling and Jameson?
8      A.  No.
9      Q.  Who was your supervisor at
10  Sterling?
11     A.  Mike Hopper and Sterling Wharton.
12     Q.   Did you file for unemployment when
13  you left Sterling?
14     A.  I don't recall.
15     Q.  Have you ever filed for
16  unemployment?
17     A.  I have.
18     Q.  I'm sorry?
19     A.  I have.
20     Q.  When did you do that?
21     A.  When I left -- When I left
22  Maryland.  When I was working in Maryland
23  and I left to move to Atlanta, I believe I
0014
1  filed unemployment.
2      Q.  When did you start working at

3   Sterling, what year?
4       A.  I was there seven years.
5       Q.  All right.  Before you worked at
6   Sterling, where did you work?
7       A.  For a company called -- I worked
8   in Atlanta for a company called Productive
9   Staffing.
10      Q.  What does that company do?
11      A.  Employee leasing.
12      Q.  What did you do there?
13      A.  I was an operations manager.
14      Q.  Who was your supervisor there?
15      A.  Hall -- I can't remember his last
16  name.
17      Q.  Where is Sterling Properties
18  located in Atlanta?
19      A.  Where are the apartments?
20      Q.  Is that where you worked out of, a
21  particular complex?
22      A.  I had an office.
23      Q.  What complex did you work out of?
0015
1       A.  I worked out of the Sterling
2   Villa.
3       Q.  Where is that located?
4       A.  Down on Martin Luther King.
5       Q.  Is that where you worked during
6   your entire seven years?  That's where your
7   office was?
8       A.  Uh-huh.
9       Q.  Yes?
10      A.  Yes.
11      Q.  And you were the manager of that
12  complex?
13      A.  That one and several others.
14      Q.  And they sold those off?
15      A.  They did sell those off.  When I
16  started, there was like five hundred total
17  apartments.  And I think when I left, there
18  was about a hundred and something.
19      Q.  When you went to Jameson, you
20  filled out an application?
21      A.  I feel certain I did, yes.
22      Q.  Did you have a resume when you
23  applied at Jameson?

0016
1      A.  Not a current resume.
2      Q.  When you applied at Jameson?
3      A.  Did I have a resume?
4      Q.  Right.
5      A.  Yes.
6      Q.  You submitted that?
7      A.  I'm sure I did.
8      Q.  So before Sterling, you were at
9   Productive Staffing and you did employee
10  leasing work?
11     A.  I did.
12     Q.  How long did you work at
13  Productive Staffing?
14     A.  Probably about seven months.
15     Q.  Why did you leave there?
16     A.  They created the position and
17  brought me in to serve as liaison between
18  the sales, the men in the field, which they
19  had just started, program.
20          They were out of Atlanta working
21  in Atlanta.  And they decided to broaden to
22  other states.  That's why they created the
23  position.  That's why they hired me.
0017
1      Q.  Why did you leave?
2      A.  The sales program in the other
3   states didn't take off like they hoped it
4   would.
5      Q.  Did it work well where you were
6   located, the sales program?
7      A.  I think it was fairly successful
8   in Georgia, yes.
9      Q.  Were you fired?
10     A.  They eliminated the position
11  because of the sales program.  It just
12  didn't do what they hoped it would do.
13     Q.  Well, could you keep working there
14  if you wanted to?
15     A.  I don't think so.  I guess not.
16     Q.  Were you offered another position?
17     A.  No, sir.
18     Q.  Did you apply for unemployment?
19     A.  I don't recall.
20     Q.  So you were terminated from that

21  job, the Productive Staffing; is that right,
22  with the elimination of the position?
23      A.   With the elimination of the sales
0018
1  force, so went the job.
2      Q.   Your job?
3      A.   My job.
4      Q.   Before you worked at Productive
5  Staffing for those seven months, where did
6  you work?
7      A.   A company called GTB,
8  Incorporated.
9      Q.   Where is that located?
10      A.   In Atlanta.
11      Q.   What does that company do?
12      A.   Photography, sales.
13      Q.   What did you do?
14      A.   Office manager.
15      Q.   How long did you work there?
16      A.   About a year.
17      Q.   What did you do as the office
18  manager?
19      A.   I was the liaison between the
20  office and the field reps and salespeople.
21      Q.   What kind of photography did they
22  sell?
23      A.   One end took pictures in the
0019
1  churches and businesses and other types.
2      Q.   That's -- I'm sorry.
3      A.   Right.
4      Q.   That's located in Atlanta you
5  said?
6      A.   Uh-huh.
7      Q.   Yes?
8      A.   Yes.
9      Q.   Where in Atlanta?
10      A.   I don't recall the address.
11      Q.   What street?
12      A.   I don't recall that.
13      Q.   Where was Productive Staffing
14  located?
15      A.   Tucker, Georgia.
16      Q.   Tucker, Georgia?
17      A.   Uh-huh.

18     Q.  Yes?
19     A.  Yes.
20     Q.  Is that in the Atlanta area?
21     A.  It is.
22     Q.  What is the address of Productive
23  Staffing?
0020
 1     A.  Product Staffing?  I don't know.
 2     Q.  Why did you leave GTB, Inc.?
 3     A.  I think that's when I made the
 4  move to Productive Staffing.
 5     Q.  How long were you at GTB?
 6     A.  A little over a year.
 7     Q.  Was it an increase in salary when
 8  you went to Productive Staffing?
 9     A.  Yes.
10     Q.  So you voluntarily left to take
11  the new job?
12     A.  Right.
13     Q.  Was there any time between the two
14  jobs?
15     A.  Not that I recall.
16     Q.  Where did you work before GTB?
17     A.  Dalfour Supply Service.
18     Q.  Where is that located?
19     A.  Rockville, Maryland.
20     Q.  Where in Rockville?
21     A.  I'm not sure.
22     Q.  Do you know what street?
23     A.  No, sir.
0021
 1     Q.  What is Dalfour Supply Service?
 2     A.  A national mail order firm.
 3     Q.  What did you do there?
 4     A.  Director of purchasing.
 5     Q.  Who did you report to there?
 6     A.  Gene Henderson, the president of
 7  the company.
 8     Q.  Why did you leave there?
 9     A.  I wanted to move closer to home.
10     Q.  Did you apply for unemployment
11  when you left there?
12     A.  I don't recall.
13     Q.  You said at some point when you
14  left something -- when you were in Maryland,

15  you applied for unemployment?
16      A.  Right.  I think I did, Jon.
17      Q.  Were you terminated from that job?
18      A.  No, sir.
19      Q.  Is there a way in Maryland that
20  you can get unemployment if you quit
21  voluntarily that you know of?
22      A.  I have no idea.
23      Q.  Did you get unemployment?
0022
1       A.  I don't know.  I don't
2  specifically recall.
3       Q.  How long were you off work before
4  you got the job at GTB?
5       A.  Probably three or four months.
6       Q.  How long had you been at Dalfour?
7       A.  Four years.
8       Q.  In the same job?
9       A.  Yes.
10      Q.  Do you have any idea if Dalfour is
11  still in existence up in Rockville?
12      A.  I don't believe it is.
13      Q.  Was Gene Henderson the owner?
14      A.  I think it was a gentleman named
15  Frank Shoaf that was actually the owner.
16      Q.  Do you know how to spell his last
17  name?
18      A.  That's S-H-O-A-F, I believe.
19      Q.  Are you from the Atlanta area?
20      A.  No.
21      Q.  Where are you from?
22      A.  Ozark.
23      Q.  You wanted to get closer to the
0023
1  south?
2       A.  Yes.
3       Q.  Back in the south?
4       A.  Yes.
5       Q.  Where did you work before Dalfour?
6       A.  Bank of Ozark.
7       Q.  What did you do at the Bank of
8  Ozark?
9       A.  Front line teller position and
10  assistant to the vice-president of the
11  branch there.

12    Q.  Does that bank still exist?
13    A.  I think it's been bought out
14  several times.
15    Q.  Why did you leave the Bank of
16  Ozark?
17    A.  Offered the job in Maryland.  I
18  felt like it was time to leave.
19    Q.  How did you find out about the job
20  in Maryland?
21    A.  I had a brother living there.
22    Q.  Does he still live up there?
23    A.  No.
0024
1    Q.  Did he work at that Dalfour place?
2    A.  He was involved with -- No, he
3  didn't work there.  He was involved and knew
4  the owner or knew the president of the
5  company.  The president was looking for a
6  personal director.
7    Q.  And that's --
8    A.  Asked me to come up and interview.
9    Q.  And that was Mr. Shoaf?
10    A.  Actually Gene Henderson.
11    Q.  Gene was the president?
12    A.  Yes.
13    Q.  What year did you work at the Bank
14  of Ozark?
15    A.  Four years after college.  '76
16  through --
17    Q.  '80?
18    A.  '80.
19    Q.  And did you work while you were in
20  college?
21    A.  Bagged groceries for a while.
22    Q.  Where did you go to college?
23    A.  The University of Alabama.
0025
1    Q.  What year did you graduate?
2    A.  '76.
3    Q.  And you got a degree from there?
4    A.  Yes.
5    Q.  In what?
6    A.  A B.S. in commerce business
7  administration.  Real estate major.
8    Q.  After that, after you got your

9  degree, you went right to the Bank of Ozark?
10    A.  I did.
11    Q.  Has anybody -- putting aside Ms.
12  Stough -- ever complained that you had
13  discriminated against them on any job that
14  you worked on?
15    A.  No, sir.
16    Q.  Has anybody complained that you
17  sexually harassed them other than anything
18  related to Ms. Stough on any job you've ever
19  worked on?
20    A.  No, sir.
21    Q.  Has there been an EEOC charge
22  filed at any place that you have worked at
23  that you know of?
0026
1    A.  No.
2    Q.  Is Ms. Stough the first EEOC
3  charge that you've ever seen, her charge?
4    A.  Yes.
5      MR. KESSLER:  You mean against
6  him?
7      MR. GOLDFARB:  That he's ever
8  seen, yes.
9    A.  Yes.
10    Q.  That's the first time you've ever
11  seen one?
12    A.  Yes.
13    Q.  Okay.
14      MR. KESSLER:  Well, he can see
15  EEOC charges not related to him.  I'm not
16  sure what you mean by that.
17      MR. GOLDFARB:  Well, that's the
18  first one he's ever seen he said.
19    Q.  Have you ever seen -- Other than
20  Ms. Stough, have you ever even seen another
21  EEOC charge?
22    A.  No.
23    Q.  Have you told me about all your
0027
1  employment other than the small jobs you had
2  while in college?
3    A.  That I recall, yes, sir.
4    Q.  When you started at Jameson, your
5  job was a general manager when you started;

6  is that correct?
7      A.  Yes.
8      Q.  And that was in 1995?
9      A.  Yes, sir.
10     Q.  Which location?
11     A.  Ozark.
12     Q.  Who hired you?
13     A.  Sharon Register.
14     Q.  Who is that?
15     A.  Regional manager.
16     Q.  R-E-G-I-S-T-E-R?
17     A.  R-E-G-I-S-T-E-R.  And Bob Oliff.
18  I guess he was an operations director.
19     Q.  Bob -- how do you spell his last
20  name?
21     A.  O-L-I-F-F.
22     Q.  Did you interview with Ms.
23  Register?
0028
1      A.  I did.
2      Q.  Did you interview with Mr. Oliff?
3      A.  I did.
4      Q.  Where did you interview with Ms.
5  Register?
6      A.  At the employment office and then
7  at a hotel.
8      Q.  What employment office?
9      A.  Ozark employment office.
10     Q.  Where did you interview with Mr.
11  Oliff?
12     A.  At a hotel.
13     Q.  Where?
14     A.  Ozark.
15     Q.  Did you interview with anybody in
16  Atlanta?
17     A.  No, sir.
18     Q.  Had you had prior experience
19  managing a hotel at any point before this
20  occasion when you were hired in the Ozark
21  location?
22     A.  No.
23     Q.  Were you hired in as a general
0029
1  manager or an interim general manager or
2  what?

3     A.   General manager.
4     Q.   Do you have a position called
5   interim general manager?
6     A.   It's been used a time or two, yes.
7     Q.   What is that position in
8   comparison to a general manager?  What's the
9   difference?
10     A.   I guess it's viewed by the company
11   as not officially the GM of that hotel.
12     Q.   Are they eligible for bonuses as
13   an interim general manager or do you have to
14   wait until you're a general manager?
15     A.   I don't believe they are.
16     Q.   So once you get to be a general
17   manager, then you get bonuses if you
18   perform?
19     A.   If you're a general manager, you
20   do get bonuses, yes.
21     Q.   But not as an interim?
22     A.   I don't believe so.
23     Q.   And as assistant manager --
0030
1   assistant general manager, you don't get
2   bonuses; right?
3     A.   Correct.
4     Q.   What was the -- How much was your
5   salary when you were hired in as a general
6   manager in 1995, your base?
7     A.   Eighteen thousand.
8     Q.   And then at that point, what I
9   understand is, there was -- general managers
10   had the same base across the board when they
11   were hired in?
12     A.   I don't think that's the case, no,
13   sir.
14     Q.   Do you know what all the other
15   general managers were making?
16     A.   No.
17     Q.   Okay.  You didn't have that
18   information available to you, what all the
19   other GM's were making?
20     A.   No.
21     Q.   But anyway, you get your base and
22   then you're eligible to get bonuses; right?
23     A.   Correct.

0031
1    Q.  Were you immediately eligible to
2  get bonuses when you started?
3    A.  No.
4    Q.  How long was it before you were
5  able to participate in the bonus program?
6    A.  I'm not sure of the waiting
7  period.  I'm not sure what it was.
8    Q.  Do you remember how long before
9  you started getting bonuses?
10    A.  I don't recall getting any bonuses
11  to start with, no.
12    Q.  I know that.  Do you remember --
13  Was it one year, two year, three years or do
14  you remember?
15    A.  I really don't remember.
16    Q.  Okay.
17    A.  I don't remember.
18    Q.  Did your base salary change at
19  some point?
20    A.  It did.
21    Q.  You got a raise; right?
22    A.  I did get a raise.
23    Q.  What year did you first get a
0032
1  raise?
2    A.  I don't recall the year.  But it
3  was probably in the neighborhood of a year,
4  after a year.
5    Q.  Is that generally the period
6  before you get a raise, one year?  You work
7  in a position like general manager and then
8  after a year, you get a raise?
9    A.  Sometimes that's the case.
10    Q.  Is that your experience with a
11  case generally?
12    A.  I think in some cases it applied
13  and some it didn't.  I think it probably had
14  to do with how that was negotiated or
15  discussed when you were hired I guess.
16    Q.  Okay.  For you, it was around a
17  year?
18    A.  I think it was around that.
19    Q.  Did you do any negotiating when
20  you got hired as to when you were going to

21  get a raise?
22      A.  I tried to get them to pay me a
23  little bit more money, yes.
0033
1      Q.  No.  I mean, when you got hired,
2  did you say, okay, in six months or a year,
3  I will be expecting a raise?
4      A.  I'm not sure whether I negotiated
5  or whether they had told me that or
6  something.  I'm not sure about that.
7      Q.  Okay.  The Ozark is a forty room
8  property; right?
9      A.  Yes.
10      Q.  You didn't have an assistant
11  manager; right?
12      A.  No.
13      Q.  Do any of the forty room
14  properties that you've been over, have any
15  of those had assistant managers in addition
16  to the general manager?
17      A.  Not that I can think of.
18      Q.  The sixty room properties, are
19  those budgeted for an assistant manager?
20      A.  Most of the time, yes.
21      Q.  And the eighty room properties --
22  do you have any eighties?
23      A.  I think we've got one eighty room
0034
1  property.
2      Q.  Budgeted.  And they get assistant
3  managers?
4      A.  Yes.  Typically.
5      Q.  Whereas the forty ones generally
6  don't get assistant managers?
7      A.  Right.
8      Q.  So you started off as a general
9  manager in Ozark.  And how long did you hold
10  the general manager job title?
11      A.  Less than two years, I think.
12  Somewhere in that neighborhood.
13      Q.  And what happened?
14      A.  I was promoted to a district
15  manager.
16      Q.  What year, around '97?
17      A.  Yes.

18     Q.   Had you even gotten a raise as a
19   GM to your base salary during that two year
20   period; do you remember?
21     A.   I think so, yes.  Didn't you just
22   ask me that?
23     Q.   Yes.  But now I see it's only two
0035
1   years.  Do you know how many raises you got?
2     A.   No, sir.
3     Q.   So after two years or so, you
4   become a --
5     A.   District manager.
6     Q.   -- DM?  Who promoted you?
7     A.   It would have been Sharon and Bob
8   Oliff.
9     Q.   How did the promotion come about?
10     A.   I think they liked what they saw
11   in the hotel and staff.  They were pleased
12   in what they saw in me as a manager and as a
13   leader and thought I could have more
14   responsibility.
15     Q.   I mean, more of the mechanics of
16   how you got promoted.  Did somebody come to
17   you and tell you you're getting promoted and
18   did you have to go to Atlanta and
19   interview?  Tell me how that process
20   worked.
21     A.   No, I didn't have to go to Atlanta
22   and interview.  And, you know, my best
23   recollection is that I had the discussion
0036
1   with my regional manager and she asked and I
2   accepted.
3     Q.   Okay.  Ms. Register asked if you'd
4   like to move to DM and you said yes?
5     A.   Right.
6     Q.   All right.  And then you -- When
7   you became DM, did you -- were you still
8   responsible for the Ozark property?
9     A.   Yes.
10     Q.   When you first became DM in around
11   '97 -- is that fair, in '97?
12     A.   Uh-huh.
13     Q.   Yes?
14     A.   Yes.

15      Q.  In '97 when you became DM, what
16  properties were under you?
17      A.  At that time, the structure of the
18  region was -- there were almost nineteen
19  hotels under me.
20    Q.  Under you?
21    A.  Yes.
22    Q.  Can you name them?
23    A.  Yes.  I think so.
0037
1    Q.  Okay.
2      A.  A lot of them.  There was Ozark,
3  Eufaula, Greenville, Alex City, Sylacauga,
4  Bessemer, and there was Meridian,
5  Mississippi, Vicksburg, Mississippi, Albany
6  Georgia, Americus, Georgia.  Did I say
7  Bainbridge?
8          MR. KESSLER:  No, sir.
9    Q.  Bainbridge --
10    A.  Georgia.  Selma, Alabama.  You
11  know, that's the best of my recollection of
12  those hotels at that time.
13    Q.  All right.  Hold on one second.
14  This is a daily report back in 2001.  I'm
15  just going to -- it's already entered as
16  Exhibit 1.
17          I'm not going to ask you anything
18  about it.  Just see if that helps you name
19  any other hotels that you were over.
20      A.  I would add Auburn to the list.  I
21  think several were added after they were
22  built.  Like Trussville maybe one time was
23  under me.  That's all I see.
0038
1    Q.  Prattville?
2      A.  Yes.  Sharon was -- She was based
3  out of Prattville.  So at some point,
4  Prattville was one of the hotels, yes.
5    Q.  Under you?
6    A.  Yes.
7    Q.  Does Sharon still work with the
8  company?
9    A.  No.
10    Q.  When did she last supervise you?
11    A.  It would have been in 2000,

12  probably the second quarter of 2000
13  sometime.
14      Q.  Do you know why she left?
15      A.  I believe she -- they had an issue
16  with her borrowing money from hotels.
17      Q.  Embezzlement?
18      A.  I'm not sure that that's how they
19  termed it.  But I think that was one of the
20  issues.
21      Q.  So the second quarter of 2000 is
22  the last time Sharon Register was the area
23  manager over you?
0039
 1      A.  Region manager.
 2      Q.  Regional manager.  Sorry.
 3      A.  Yes.  Sometime in there.
 4  Somewhere in there.
 5      Q.  From '97 until 2000, were all of
 6  these hotels that you listed under you?
 7      A.  Uh-huh.
 8      Q.  Yes?
 9      A.  Yes.
10      Q.  I mean, you said there were about
11  nineteen or whatever.  You've given me
12  fifteen, which is great.  Were those --
13      A.  Yes.  They were part of the
14  region, yes.
15      Q.  What was the region number that
16  you were over?
17      A.  Two.
18      Q.  Sorry?
19      A.  Region two.
20      Q.  Region two.  But the person who
21  was over the region would be Sharon; right?
22      A.  Correct.
23      Q.  And you were under Sharon; right?
0040
 1      A.  Correct.
 2      Q.  Did you have -- Were there more
 3  than one district manager in the region?
 4      A.  No.
 5      Q.  So you and Sharon kind of shared
 6  the whole region as far as supervising it?
 7      A.  Yes.
 8      Q.  All right.  You didn't just have

9   three hotels and another DM had three
10  hotels?
11      A.  No.
12      Q.  Why did you -- Or did some regions
13  have a regional manager and two DM's?
14      A.  Some do.
15      Q.  What's the difference between what
16  Sharon did and what you did other than she
17  was your boss?  Is that right?  She was your
18  boss?
19      A.  Yes.  She reported directly to
20  corporate.
21      Q.  And you reported to?
22      A.  Her.
23      Q.  All right.  When you say you
0041
1   reported to Sharon Register, what did you
2   do?  What did you have to report to her
3   about?
4       A.  Observations at hotels, I guess.
5       Q.  What do you mean observations?
6       A.  I would travel to the various
7   hotels.  Some were in various stages of
8   being completed.  In some cases, line up
9   interviews and interview candidates.
10      Q.  There's a lot of building of new
11  hotels going on?
12      A.  Going on in this period, yes.
13      Q.  What else did you have to report
14  to her about?
15      A.  Our areas that we needed to work
16  on.  Areas that we needed to improve on.
17      Q.  Such as what?
18      A.  Cleanliness of hotels, managers'
19  effectiveness at the hotel.  Whatever.
20      Q.  I'm sorry?
21      A.  Are you waiting for more?
22      Q.  Yes.  I'm letting you tell me
23  everything that you would report to her
0042
1   about.  You said observations of the
2   hotels.  And you've kind of explained to me
3   what you meant by observations.
4       A.  Market.  We talked about what was
5   going on in our markets, our competition.

6   Worked to insure that the hotels were
7   following policy and procedures.  That's
8   about it.
9       Q.   Okay.  What about hiring
10  managers?  What did you have to discuss with
11  her, if anything, concerning if she wanted
12  to hire a GM in a location?
13      A.   I would make recommendations to
14  Sharon for that.
15      Q.   Say you interviewed somebody for a
16  position, what did you do as far as getting
17  that person hired into a general manager's
18  job?
19      A.   Basically recommend that that
20  person be hired.
21      Q.   To Sharon?
22      A.   Uh-huh.
23      Q.   Yes?
0043
1       A.   Yes.
2       Q.   And did Sharon ever say no, I'm
3   not going to hire that person?
4       A.   Well, in a lot of cases, she would
5   interview them herself or in most cases.
6   Maybe all.
7       Q.   Did you -- Were you there when she
8   interviewed the people, also?
9       A.   Sometimes.
10      Q.   Were you involved in hiring
11  Belinda Stough at all?
12      A.   No, sir.
13      Q.   Because she was hired in as a desk
14  clerk is what I understand.  And as a
15  district manager, you're not involved in
16  hiring staff at the hotels; right?
17      A.   Typically no.
18      Q.   Who does that generally?
19      A.   Typically the general manager
20  does.
21      Q.   Is a general manager free to hire
22  whoever they want without coming to you for
23  approval?
0044
1       A.   Yes.
2       Q.   And when you hire a -- When you

3  interview a general manager, you ask your

4  boss during the time you had her, Sharon,

5  and she would interview them herself most of

6  the time; right?

7     A.  A lot of times, yes.

8     Q.  Sometimes she wouldn't?

9     A.  I'm sure there are cases where she

10  didn't.

11     Q.  Did they have to go to Atlanta to

12  interview during that time period?  We're

13  still between '97 and 2000.

14     A.  I don't think so at that time.

15     Q.  All right.  When Sharon Register

16  left, you still were the DM; right?

17     A.  Yes.

18     Q.  Did a new regional manager move

19  in?

20     A.  Not immediately, no.

21     Q.  So she left the second quarter of

22  2000?

23     A.  Somewhere in there, yes.

0045

1     Q.  Which means when?

2     A.  Which means when?

3     Q.  Yes.  I mean what does second

4  quarter mean?

5     A.  April, May, June.

6     Q.  In April, May and -- Well, before

7  2000, who was the general manager of the

8  Alex City location?

9     A.  Before 2000.  Bill Plummer was the

10  GM there for a while.

11     Q.  Okay.  And then who replaced Bill

12  Plummer?

13     A.  I believe it was Deborah Schwier.

14     Q.  S-W --

15     A.  S-C-H-W-I-E-R maybe.

16     Q.  Did you hire Schwier?

17     A.  No.

18     Q.  Was Alex City under you at that

19  time?

20     A.  It was.

21     Q.  First, why did Plummer leave?

22     A.  He moved to another hotel.

23     Q.  You moved him or did he?

0046
1        A.  I think he actually moved while
2  Sharon was still there.
3        Q.  Sharon was still the area manager?
4        A.  Regional manager.
5        Q.  Regional manager?
6        A.  Yes.
7        Q.  Did you have anything to do with
8  Mr. Plummer moving?
9        A.  No.
10       Q.  Do you know why Plummer moved?
11          MR. KESSLER:  He just told you.
12       A.  I think he went to another hotel.
13       Q.  Well, I know that.  Why did he
14  move to another hotel?
15       A.  A bigger market.  Maybe a little
16  more opportunity.
17       Q.  Did he get a promotion in salary?
18       A.  I'm not sure.
19       Q.  And when Plummer moved, Deborah
20  Schwier took over the hotel; is that
21  correct?
22       A.  She did.
23       Q.  Who selected Schwier for that job
0047
1  to replace Plummer?
2        A.  That would have been Sharon.
3        Q.  Why were you involved in those
4  decisions?
5        A.  Why was I involved?
6        Q.  Not involved.
7        A.  I certainly wasn't involved in
8  every decision that was made.  A regional
9  manager could decide and do what they wanted
10  to do.  I don't know.  I don't know why I
11  wasn't involved.  I don't know the answer to
12  that.
13       Q.  I'm sorry?
14       A.  I didn't hire Deborah Schwier.
15       Q.  Was Deborah Schwier already
16  working at Jameson at the time she became
17  the GM?
18       A.  I think so, yes.
19       Q.  Which property?
20       A.  Alex City.

21      Q.   What was her job there?

22      A.   I think she was front desk clerk.

23      Q.   Did somebody promote her to GM?

0048

1       A.   I'm not sure if she ever had an

2   official GM title.

3       Q.   Well, did she take over the duties

4   of a GM?

5       A.   I think she was the manager on

6   duty of that hotel, yes, for a while.

7       Q.   What does that mean when you're

8   the manager on duty?

9       A.   That you're responsible for taking

10   care of things, stay in touch with the

11   district manager, regional.

12      Q.   Is that different than a GM job?

13      A.   Is it different?

14      Q.   Right.  I mean, are your duties

15   different as a manager on duty versus a

16   general manager?

17      A.   Well, you're basically doing a lot

18   of the same things.

19      Q.   Okay.  So the duties are the same?

20      A.   Basically.

21      Q.   When you say basically, how are

22   they different, if they are different?

23      A.   Probably have a lot more

0049

1   involvement from your district managers and

2   a lot more visits to the hotel.  I'm not

3   going to be here today, so you take care of

4   things kind of thing.

5       Q.   Did you visit the hotel a lot?

6       A.   I have visited quite a bit, yes.

7       Q.   During the time that Ms. Schwier

8   was the manager on duty?

9       A.   As much as I could, yes.  I had to

10   go to a lot of other hotels that I had to

11   visit as well.

12      Q.   How long was Ms. Schwier the

13   manager on duty?

14      A.   Probably five, six months.

15      Q.   Why did she stop being manager on

16   duty?

17      A.   I believe she quit and left.

18    Q.  Why did she quit?

19    A.  I'm not sure.

20    Q.  She was not terminated?

21    A.  No.

22    Q.  What was her salary as manager on

23  duty?

0050

1    A.  I'm not sure.

2    Q.  Did she give a notice before she

3  quit?

4    A.  I believe she gave a notice.

5    Q.  Was she ever the general manager

6  or interim general manager?

7    A.  I don't remember her being the

8  general manager of the hotel.

9    Q.  Was she ever the interim general

10  manager?

11    A.  More of a manager on duty I'd say.

12    Q.  What's the difference between

13  interim general manager and manager on duty?

14    A.  I think in one case you're

15  designated and the other you're not.

16    Q.  Are there codes that go with like

17  positions?  One hundred is a manager?  Do

18  you know that?

19    A.  One hundred, no.

20    Q.  Okay.  Do you know -- Have you

21  seen Ms. Schwier in the last several years?

22    A.  No, sir.

23    Q.  Do you know if she left the Alex

0051

1  City area?

2    A.  I don't know for sure.

3    Q.  Do you know what her husband's

4  name is?

5    A.  I'm not sure she was married.  I

6  think she was single.

7    Q.  Did you have any problems with the

8  way Ms. Schwier did her job?

9    A.  I wasn't -- She didn't impress me

10  as a -- she didn't impress me, no.

11    Q.  Why not?

12    A.  Wasn't professional in her

13  approach to the job.

14    Q.  What do you mean by that?

15    A.  Didn't insure that our -- that not
16  only our staff, but I don't believe she
17  dressed as a professional in the job.
18    Q.  How did she dress that was not
19  professional?
20    A.  I believe she had earrings and
21  pierced things and so forth.
22    Q.  Was she a young woman?
23    A.  Middle age probably.
0052
1    Q.  She had multiple earrings, is that
2  what you're saying?
3    A.  That's my best recollection, yes.
4    Q.  Did you tell her that that's
5  against the policy?
6    A.  I'm not sure.
7    Q.  Well, other than the dress, what
8  about her did not impress you?
9    A.  Her hiring decisions I didn't feel
10  like were very good.
11    Q.  So she was able to hire people in
12  that acting role that she held?
13    A.  Uh-huh.
14    Q.  Yes?
15    A.  Yes.
16    Q.  Give me examples of poor hiring
17  decisions, if you can, by Ms. Schwier.
18    A.  I don't recall.
19    Q.  Tell me anything else about Ms.
20  Schwier's performance that was not
21  satisfactory.
22    A.  I don't recall.
23    Q.  Did you ever talk to her about
0053
1  performance issues, dress, anything like
2  that?
3    A.  I don't remember any specific
4  times, no, sir.
5    Q.  When Ms. Schwier left, who took
6  over the duties that she was doing as
7  manager on duty?
8    A.  Belinda.
9    Q.  Who decided to make Belinda the
10  person to take over the duties of Ms.
11  Schwier as manager on duty?

12     A.  I think it was the last person
13  standing kind of thing.
14     Q.  All right.  Well, who -- Did
15  Belinda just step into the job herself or
16  did somebody say, okay, you --
17     A.  I think she and Deborah together
18  worked to keep the hotel -- keep things
19  going there for us.  And Deborah was the
20  stronger of the two.  And Deborah left and
21  Belinda started at that point overseeing the
22  hotel for us at -- with a lot of
23  supervision.
0054
 1     Q.  Were you involved in allowing
 2  Belinda to step in and oversee the hotel for
 3  Jameson?
 4     A.  I would say yes.
 5     Q.  Was anybody other than you
 6  involved in that?
 7     A.  I would have had a regional
 8  manager at that time.
 9     Q.  Who was that?
10     A.  Kevin Durben.
11     Q.  When did Kevin start?
12     A.  The first quarter of 2001.
13     Q.  The same hotels basically that
14  were in the region that you listed, the
15  nineteen or so?
16     A.  Yes.
17     Q.  When you say the first quarter of
18  2001, so we're on the same page, what does
19  that mean?
20     A.  January, February, March.
21     Q.  Do you remember when during that
22  quarter he started?
23     A.  Early.  Early in the quarter.
0055
 1  Probably in January.  I don't think Deborah
 2  left until sometime in January, also.
 3     Q.  So she may have been manager on
 4  duty more than five or six months?
 5     A.  I would -- I think -- I'm not sure
 6  that she -- I think she was still around in
 7  January of 2001.
 8     Q.  When she left -- We're talking

9    about Deborah Schwier?

10    A.  Right.

11    Q.  Was Kevin Durben there when

12   Deborah Schwier left?

13    A.  I'm pretty sure he was.  I'm not

14   positive.

15    Q.  Where had Kevin worked before he

16   took over as regional manager in your area?

17    A.  He had -- Well, I think he was a

18   regional manager at LaQuinta Inns.

19    Q.  So did you have to -- Well, you

20   had more familiarity with Jameson Inn at

21   that time and the hotels under you than

22   Kevin did obviously; right?

23    A.  I thought so anyway.

0056

1    Q.  Did you apply for the regional

2   manager job at that time?

3    A.  I actually was acting regional

4   manager from the time Sharon left until the

5   time Kevin Durben stepped in.

6    Q.  So from somewhere in the spring or

7   summer of 2000 -- from 2000 until January of

8   2001, you were acting GM -- I'm sorry --

9   acting regional manager?

10    A.  Correct.

11    Q.  As an acting regional manager, did

12   you get a bump up in salary to hold that

13   job?

14    A.  I'm not -- I don't recall.  I

15   don't recall that.

16    Q.  Did you have more duties and

17   responsibilities as the acting regional

18   manager than you had as a DM -- I mean --

19   district manager?

20    A.  I felt -- yes.  I reported

21   directly to Greg Winey at that point.

22    Q.  Did you expect to move to the

23   acting regional manager job -- I'm sorry --

0057

1   to the regional manager job?

2    A.  I thought I wanted to do that at

3   one time.

4    Q.  Were you --

5    A.  I sent -- go ahead.  The question,

6  sir?
7     Q.  Well, tell me what happened with
8  not being promoted to regional manager,
9  please.
10    A.  I sent Greg an e-mail and asked --
11  told him I would prefer to continue on as a
12  district manager.
13    Q.  Did Greg ask you if you'd like to
14  be the regional manager?
15    A.  He had a conversation with me
16  about that, yes.  And I told him at the time
17  I felt like I could do that job, yes.
18    Q.  When was that?
19    A.  After Sharon left.
20    Q.  And then you changed your mind?
21    A.  I did.
22    Q.  Why?
23    A.  Too many hotels, not enough
0058
1  support to help cover them.
2     Q.  So what did you do?  Did you
3  contact Greg and tell him you didn't want to
4  be the regional manager?
5     A.  Contacted him and told him I had a
6  change of heart about wanting to be the
7  regional manager, yes.
8     Q.  And what did he say?
9     A.  He said we'd talk about it.
10    Q.  How long did you continue to act
11  as regional manager after that conversation?
12    A.  Until early 2001.
13    Q.  When was that conversation?
14    A.  Probably the fourth quarter of
15  2000.  October, November, December.
16       MR. KESSLER:  When you get to a
17  breaking point, let me take a break for a
18  couple of minutes.
19       MR. GOLDFARB:  We can break now.
20       (Whereupon, a short recess was
21  taken.)
22    Q.  What did you do to get ready for
23  your deposition?
0059
1     A.  I talked with Gary and Ann a
2  little bit yesterday for a couple of hours.

3    Q.   Did you look at any documents?

4    A.   I've seen all the documents so

5 far.

6    Q.   Which ones, everything that's been

7 produced?

8    A.   Yes.

9    Q.   How did you get to see those?

10    A.   They were sent to me.

11    Q.   Everything that's come to me

12 you've seen? Is that what you mean?

13    A.   Yes. Everything that you have

14 seen, I have seen.

15    Q.   I'm sorry. What now?

16    A.   Everything that you have seen, I

17 have seen.

18    Q.   Okay. And you're familiar with

19 what the documents mean?

20      MR. KESSLER: Objection. Go

21 ahead.

22    A.   Well, I've got a general idea of

23 what they mean, yes.

0060

1    Q.   Payroll reports, things like that,

2 you're familiar with those?

3    A.   Somewhat.

4    Q.   Did you meet with anybody other

5 than the attorneys in the last couple of

6 days and discuss this case?

7    A.   No.

8    Q.   Have you had an opportunity to sit

9 in, in any meetings where the attorneys or

10 anybody else was present other than the two

11 attorneys?

12    A.   Robbie, our GM at the hotel, I was

13 in the room with Robbie and the attorneys.

14      MR. KESSLER: Don't talk about

15 what we talked about. You can give the time

16 and all that.

17    A.   Five or ten minutes, I guess.

18    Q.   Anybody else?

19    A.   No, sir.

20    Q.   Did you schedule anybody to meet

21 with the attorneys?

22    A.   No, sir.

23    Q.   And that was yesterday?

0061
1     A.  It was.
2     Q.  And you met with the attorneys in
3  Alex City?
4     A.  I did.
5     Q.  At the hotel?
6     A.  Yes.
7     Q.  That was for about three hours?
8     A.  Couple of hours.
9     Q.  Two hours?
10    A.  Probably.
11    Q.  That was yesterday?
12    A.  Yes.
13    Q.  When you had decided that you did
14  not want to be the regional manager, was
15  there anybody interviewed that you know of
16  for the regional manager job other than
17  Kevin Durben?
18    A.  I don't know.
19    Q.  How did you find out Kevin was
20  going to be regional manager?
21    A.  At a meeting -- At an annual end
22  of year meeting, Greg called me outside and
23  told me that he had hired a regional
0062
1  manager.
2     Q.  Did you meet Kevin Durben at that
3  meeting?
4     A.  I don't believe he was at that
5  meeting, no, sir.
6     Q.  When did you first meet Kevin
7  Durben?
8     A.  I drove out to Mississippi and met
9  him I think in Meridian, Mississippi at a
10  hotel.
11    Q.  Have you ever been at the Alex
12  City property with Kevin Durben?
13    A.  Have I ever been?
14    Q.  Right.
15    A.  I'm not sure.
16    Q.  Kevin doesn't work there anymore;
17  right?
18    A.  Correct.
19    Q.  When did you leave?
20    A.  He was terminated sometime in the

21  second quarter of '01 or maybe it was
22  starting the third.
23      Q.   He worked less than a year; right?
0063
 1      A.  Yes.
 2      Q.  Why was he terminated?
 3      A.  Poor performance.
 4      Q.  Do you know what in particular he
 5  was performing poorly on?
 6      A.  No, sir.
 7      Q.  Who told you he was fired for poor
 8  performance?
 9      A.  That's just the word I guess that
10  we heard.
11      Q.  All right.  You don't know
12  exactly; that's just kind of the rumor mill?
13      A.  Yes.
14      Q.  So Kevin leaves in you think the
15  second quarter or the third quarter?
16      A.  Yes.
17      Q.  August or so of 2001?
18      A.  Yes.  Sometime in June, July.
19  Sometime in there.
20      Q.  But somewhere between June and
21  August?
22      A.  That's my guess, yes.
23      Q.  When Kevin leaves between June and
0064
 1  August of 2001, did you again serve as
 2  acting regional manager?
 3      A.  I reported directly to Sandy
 4  McGuffey at that point.
 5      Q.  Was she in a different region?
 6      A.  She was.
 7      Q.  Okay.  So who was -- Who served as
 8  regional --
 9      A.  Let me stop.  Okay.  No.  When
10  Kevin left, I reported to Hal Smith.
11      Q.  Okay.
12      A.  And he was a regional manager.
13      Q.  When was that?
14      A.  Again, late second quarter, the
15  best I recall.
16          MR. KESSLER:  2001?
17          THE WITNESS:  2001.

18    Q.   Where had Hal been working prior
19  to you reporting to him?
20    A.   He had been -- He was the regional
21  manager over region one.  And I'm not sure
22  where his office was.
23    Q.   Did he continue to be regional
0065
1  manager over region one?
2    A.   He did.
3    Q.   And you were in what region?
4    A.   We were then in region one.
5    Q.   What are you looking at?
6    A.   It's a time line.
7    Q.   Is this helping you remember that
8  --
9    A.   Just helping me remember who was
10  --
11    Q.   Can we enter this as an exhibit?
12    A.   Certainly.
13       MR. KESSLER:  Sure.
14    Q.   This will help you with the dates?
15    A.   Just help me with the dates.
16    Q.   When did you make this?
17    A.   I made it just in putting down my
18  best recollection on when things happened.
19    Q.   Did anybody help you make it?
20    A.   No.
21       (Whereupon, Plaintiff's Exhibit
22  No. 1 was marked for identification.)
23    Q.   I don't need to enter the whole
0066
1  pad, do I?
2    A.   That's my best recollection.
3    Q.   That's fine.  So what you're
4  saying is, in January and March of -- I just
5  want to make sure I can read this.  In
6  January to March, this column is divided
7  into quarters; right?
8    A.   It is.
9    Q.   And you've got Sharon and it says
10  CW, senior district?
11    A.   Right.
12    Q.   What does that mean, CW, senior
13  district?
14    A.   I was senior district under Sharon

15  at that time.
16        MR. KESSLER:  CW is Charles
17  Woods.
18      A.  That's me.
19      Q.  Who's Jim --
20      A.  Jim Augustine.
21      Q.  Who is that?
22      A.  He's the general manager in Ozark
23  or was at that time.
0067
 1      Q.  All right.  So you were -- I
 2  thought you were over Ozark, also?  Am I
 3  wrong there?
 4      A.  I was over Ozark.  There was a
 5  period of time where I was permitted to hire
 6  somebody to take over the hotel.
 7      Q.  How long was Jim there?
 8      A.  A little over a year or so, I
 9  guess.
10      Q.  And you say -- In July and
11  September it says BS.  What does that mean,
12  five seventy-five to six fifty?  Is that
13  Belinda's salary?
14      A.  Yes, it is.
15      Q.  Who said that?
16      A.  I think Bill Plummer was still
17  there at that time.
18      Q.  And Deborah was at eight fifty?
19      A.  Eight fifty, yes.
20      Q.  And that was because she was --
21      A.  Taking the lead role, yes.
22      Q.  What is -- What does Jackson,
23  Mississippi mean in October and December?
0068
 1      A.  That's when I sent Greg an e-mail
 2  saying that I had changed my mind.
 3      Q.  Okay.  And then we go to -- in
 4  2001, Kevin comes.  That's where we are
 5  now.
 6      A.  Yes.
 7      Q.  And you're the senior district
 8  manager; right?
 9      A.  I am.
10      Q.  And who is Deborah --
11      A.  That's when Deborah left.

12    Q.  So Deborah leaves and Kevin comes
13  in?
14    A.  Uh-huh.
15    Q.  Yes?
16    A.  Yes.
17    Q.  But I thought Deborah left -- you
18  said -- before you said Deborah -- I'm
19  sorry.  Deborah Shoaf, okay.  And then
20  that's when Belinda took over as running the
21  place in 2001, beginning of 2001; right,
22  when Deborah left?  Correct?
23    A.  Yes.
0069
 1    Q.  And then it says region two
 2  mergers region one.  Did the regions merge?
 3  Is that what happened?
 4    A.  Yes.  That's the question you just
 5  asked me.
 6    Q.  That's where we are.  Did one and
 7  two merge together?
 8    A.  They did.
 9    Q.  Who was the regional manager?
10    A.  Hal Smith.
11    Q.  Who was the district manager?
12    A.  Paul Komanecky.
13    Q.  And what was your job?
14    A.  Still a district manager.
15    Q.  Over which locations?
16    A.  I didn't really have any specific
17  location because he had his own district
18  manager.
19    Q.  So you held the title, but then
20  you went back and worked at Ozark as a GM?
21  Is that what happened?
22    A.  That's right.
23    Q.  But you still had the district
0070
 1  manager job title?
 2    A.  I did.
 3    Q.  But you were only responsible for
 4  Ozark?
 5    A.  They wanted me to spend a good bit
 6  of time in Alex City at that point.  So I
 7  did.
 8    Q.  You helped in Alex City and in

9  Ozark?

10     A.  That is correct.

11     Q.  Was Hal Smith -- It says Hal in

12  the interim.  What does that mean?

13     A.  I'm not sure what that is.  I'm

14  not sure.

15     Q.  Hal was the regional manager;

16  right?

17     A.  He was.

18     Q.  And then Paul --

19     A.  Was the DM.

20     Q.  -- was the district manager?  So

21  in 2001, what was Belinda's job title in

22  January of 2001?

23     A.  In January of 2001?

0071

1     Q.  January -- The first quarter of

2  2001, what was her job title?

3     A.  I don't know if she had a job

4  title.  Front desk clerk, manager on duty

5  possibly.  I was spending a good bit of time

6  at that hotel during that period of time.

7     Q.  You were helping run that hotel?

8     A.  I was.

9     Q.  How many days a week were you

10  there?

11     A.  Several.  Couple of three days a

12  week possibly.  Two or three.

13     Q.  When you look at the budget for

14  that hotel, was there -- was your salary on

15  that hotel or Ozark's or both?

16     A.  Probably was still budgeted in

17  Ozark.

18     Q.  All right.  So there was no

19  general manager there in the first quarter

20  of 2001; is that correct?

21     A.  That's correct.

22     Q.  All right.  At some point in time,

23  did Belinda's job title -- Do you know what

0072

1  her job title was the first quarter of 2001?

2     A.  Again, I don't think she had a job

3  title.

4     Q.  Did she get a job title at any

5  point in time in 2001?

6      A.  My best recollection of that is
7  that sometime in late 2001 -- and again, I
8  didn't give her any job title at that
9  point.  I didn't -- I was not in a position
10  to do that.
11      Q.  What happened in late 2001?
12      A.  I think in late 2001, my
13  recollection is that Hal and Paul possibly
14  may have made her an interim general
15  manager.
16      Q.  Hal Smith and Paul --
17      A.  Komanecky.
18      Q.  Can you spell that?
19      A.  K-O-M-A-N-E-C-K-Y.
20      Q.  Now, is Hal Smith still there
21  today?
22      A.  No, sir.
23      Q.  When did he leave?
0073
1      A.  Sometime in the middle of the year
2  in 2002.
3      Q.  Why did he leave?
4         MR. KESSLER:  If you know.
5      A.  I don't really know.
6      Q.  What was the rumor mill?
7      A.  It was pretty hush, hush.  I don't
8  really know.
9      Q.  What was his job, regional
10  manager?
11      A.  It was.
12      Q.  Where did he work out of, what
13  location?
14      A.  I want to say he had an office in
15  Brunswick, Georgia.
16      Q.  Why did -- Is Paul Komanecky still
17  there?
18      A.  With the company?
19      Q.  Right.
20      A.  No.
21      Q.  When did he leave?
22      A.  Sometime in 2005.
23      Q.  Why did he leave?
0074
1      A.  I'm not really sure about that
2  either.

3   Q.  Did you hear any rumors?  I mean,
4  was he fired, voluntarily leave, quit?
5   A.  I'm not sure.
6   Q.  Have you talked to him since he
7  left?
8   A.  I have.
9   Q.  When did you talk to him?
10   A.  A month or so back.
11   Q.  What did y'all talk about?
12   A.  I asked him how the job search was
13  going.
14   Q.  What did he tell you?
15   A.  That he had some prospects that he
16  was talking with.
17   Q.  Did you talk to Smith after he
18  left at any time?
19   A.  No, sir.
20   Q.  Where does Komanecky live?
21   A.  Somewhere in the Waycross, Georgia
22  area.
23   Q.  How long was Ms. Stough the
0075
1  interim GM?
2   A.  My best recollection on that is
3  that it was sometime in the third quarter of
4  '02.
5   Q.  Did you make her GM?  Did you
6  promote her to GM in the third quarter of
7  2002?
8   A.  I guess you could say that.
9   Q.  Why?
10   A.  Why what?
11   Q.  Why did you promote her to GM in
12  the third quarter of 2002?
13   A.  I had seen her name on the org
14  chart which is an organizational chart that
15  shows hotels and who's running hotels and
16  who's doing what.
17       And I had seen interim in front of
18  her name for a long time and felt like the
19  interim ought to at least come off.
20   Q.  Did you tell her, Belinda?
21   A.  Yes.
22   Q.  Tell me about this meeting when
23  you told her.

0076
1    A.  I don't really recall any details
2  in the meeting.
3    Q.  Okay.  You just told her she was
4  no longer the interim, she's going to be GM
5  now, congratulations, something like that?
6    A.  Something like that.
7    Q.  Anyway, it was the third quarter
8  of 2002 which means that would have been
9  when in months?
10    A.  I'm not sure of the month.  But
11  just let's say my best recollection is
12  sometime in that time period.
13    Q.  Which would mean July to
14  September?
15    A.  June, July, August, yes.
16    Q.  Okay.
17    A.  Who did you discuss -- Did you
18  discuss moving her into that job with anyone
19  else other than Belinda obviously?
20    A.  You know, my best recollection on
21  it, is that I would have asked that we
22  remove the interim in front of her name and
23  that would have had to come through Greg
0077
1  Winey.
2    Q.  Okay.  Greg Winey at that time was
3  in what job title?
4    A.  He was VP of operations I would
5  say.
6    Q.  I think that's consistent with
7  what they are saying.  Have you talked to
8  Greg Winey since he left?
9    A.  No.
10    Q.  Do you know why Greg left?
11    A.  No, sir.
12    Q.  No rumor mill on him either?
13      MR. KESSLER:  Objection.  Go
14  ahead.
15    Q.  What's the rumor mill on why Greg
16  left?
17    A.  He had gotten -- He demanded
18  perfection out of the GM's.  Put a lot of
19  pressure on the people.
20    Q.  He was hard to work for?

21     A.  Very demanding, yes.
22     Q.  Did you complain about him?
23     A.  Did I complain --
0078
 1     Q.  Did you complain about Greg?
 2     A.  To my fellow employees?
 3     Q.  No.  To Kitchin's and those guys.
 4     A.  No, sir, I didn't.  He brought a
 5  lot of good things to the table as well.
 6     Q.  You haven't talked to him since he
 7  left?
 8     A.  No, I haven't.
 9     Q.  You don't know anything about him
10  leaving his current job or anything like
11  that?
12     A.  No sir.
13     Q.  Did Ms. Stough talk to you about
14  hiring an assistant manager at any time?
15     A.  Over the course of time, we made
16  several attempts to try to hire an assistant
17  manager.
18     Q.  Tell me about those.  This is just
19  you and Ms. Stough?
20     A.  It is.  I think we ran --
21  advertised on a number of occasions and
22  actually interviewed candidates and just
23  didn't find a candidate we felt was right.
0079
 1     Q.  Does the GM hire the assistant
 2  manager?
 3     A.  You hope they can or will.
 4     Q.  I mean, is that part of their
 5  duties and responsibilities, to hire, select
 6  and hire the assistant manager?
 7     A.  You hope they do.  You hope they
 8  can and will do that, yes.
 9     Q.  Did you tell Ms. Stough that, go
10  hire an assistant manager?
11     A.  I have asked -- on several
12  occasions, sure.  We've talked about it.
13     Q.  When did you tell her to do that?
14     A.  Throughout my time with Belinda,
15  we had, I'm sure, a number of conversations
16  where that was my best recommendation.  She
17  needed a good strong AGM here in this hotel.

18    Q.  Did you tell her to go pick
19  somebody?
20    A.  Sure I did.  I told her to find
21  somebody that -- tried to give her every
22  opportunity to find somebody for that hotel.
23    Q.  Did she bring you people that she
0080
1  wanted to select as AGM's?
2    A.  The only people that I ever
3  remember her commenting on as somebody she
4  wanted me to consider for that position were
5  her employees at the hotel that I didn't
6  think much of.
7    Q.  Which employees?
8    A.  There was a young girl named --
9    Q.  Linda Peppers?
10    A.   She may have mentioned Linda's
11  name at one time.
12    Q.  Anybody else?
13    A.  Yes.  There was another person.
14  If I could look at some names, I could tell
15  you who it would be.
16    Q.  When was this approximately?
17    A.  I'm not sure.
18    Q.  All right.  It was in 2002, you
19  think late 2002?  Sound about right?
20    A.  Yes.
21    Q.  Well, here's January of 2003.  See
22  if any of those names help you.
23    A.  Huh-uh.
0081
1    Q.  No?
2    A.  No.  Nobody on that list.
3    Q.  Irene Bass?
4    A.  Huh-uh.
5    Q.  Shirley Ram?
6    A.  No.
7    Q.  Shirley Stewart?
8    A.  No.
9    Q.  How about this?
10    A.  Crystal was her name.  I don't see
11  it on here.
12    Q.  Okay.  So she recommended Linda
13  and Crystal?
14    A.  Right.

15     Q.  And you said no?

16     A.  Correct.

17     Q.  They were not suitable?

18     A.  Correct.

19     Q.  Do you remember what Crystal's job

20  was?

21     A.  Front desk clerk.

22     Q.  Could she have been a person that

23  was there in 2002 and not 2003?

0082

1     A.  She did leave the company and went

2  somewhere else, took other another job.

3  That's possible, yes.

4     Q.  Anybody else that Belinda wanted

5  to make assistant manager that you did not

6  think was suitable?

7     A.  Not that I recall.

8     Q.  Do you have any records that would

9  show how often you had to visit the location

10  where Belinda worked in Alex City?

11     A.  No.

12     Q.  See, the employee roster I've got

13  is from January of '03 to January of '06.  I

14  don't think she'd be on there.  You don't

15  see that?

16     A.  I do not.

17     Q.  I've got something else.  This is

18  Exhibit 1 to Mr. Winey's deposition.

19     A.  There it is.

20     Q.  Crystal Foster?

21     A.  There you go.

22     Q.  That's her name?

23     A.  Yes.

0083

1     Q.  All right.  It looks like Foster

2  left, according to these records, in May of

3  2002.  Does that sound about right?  I mean,

4  if the records show that, you don't have any

5  reason to say otherwise?

6     A.  No.

7     Q.  Do you know why she left?

8     A.  No, sir.

9     Q.  Was it Linda Peppers or Teresa

10  Peppers that Linda recommended?

11     A.  I believe it would be Linda

12  Peppers.
13      Q.  Who's Teresa Peppers?  What was
14  her job; do you know?
15      A.  Desk clerk.
16      Q.  Was she related to Linda?
17      A.  I'm not certain.
18      Q.  Did you know that Belinda's mother
19  worked there?
20      A.  I did.
21      Q.  What was her name?
22      A.  Sue.
23      Q.  Yes, Sue.
0084
 1      A.  Yes.
 2      Q.  You knew that was Belinda's
 3  mother?
 4      A.  I want to say I found out after
 5  the fact on that.
 6      Q.  After she was already working
 7  there?
 8      A.  Yes.
 9      Q.  But anyway, while she was -- while
10  Belinda and her mother were working there,
11  you knew that her mother was working there
12  with Belinda?
13      A.  I do.
14      Q.  Did you tell Belinda that her
15  mother -- she couldn't work with her mother
16  or anything like that, couldn't have her
17  mother working for her?
18      A.  I don't recall telling her that,
19  no.
20      Q.  Did you have any problems with the
21  way Belinda's mother did her job?
22      A.  Yes, I would have to say I did.
23      Q.  Did you meet with Belinda's mother
0085
 1  yourself and talk to her?
 2      A.  No.
 3      Q.  Did you ever meet with the staff
 4  that worked for Belinda and discuss with
 5  them issues of the hotel?
 6      A.  I'm sure there were occasions.
 7  I'm trying to think.  We would cover areas
 8  that needed to be improved on.  I don't

 9  recall those specifically.

10      Q.  Do you know when that happened and

11  what Belinda's job title was during that

12  time period?

13      A.  Not really.  I don't know whether

14  it was the interim position or otherwise.

15      Q.  When Ms. Stough was the interim

16  general manager, did you let her know that

17  she was the interim general manager as

18  opposed to the general manager?

19      A.  I think she probably knew that.

20      Q.  Why do you say that?

21      A.  Because there would be days when I

22  wouldn't be there that she would have to

23  answer questions and handle problems and

0086

 1  guests and so forth.

 2      Q.  My question is, how do you know

 3  that Belinda knew her job title was interim

 4  general manager and not general manager?

 5      A.  You'll have to ask her.  I don't

 6  know.  I don't know.

 7      Q.  Okay.  You can't read her mind

 8  obviously?

 9      A.  Yes.

10      Q.  I just want to know if you had any

11  discussions with her while she was interim

12  general manager and you told her you're just

13  the interim general manager?

14      A.  Not that I recall.

15      Q.  Okay.  We do know at some point

16  she became the general manager and you -- or

17  did you tell her she was or did you just

18  change her title without telling her?  I

19  thought you said you told her.

20      A.  Again, there was a lot of pressure

21  to fill all our hotel positions.  And I just

22  felt like --

23      Q.  I think my question is, did you

0087

 1  meet with her and you remember specifically

 2  meeting with her and talking to her about

 3  moving to the general manager --

 4      A.  No.

 5      Q.  Okay.

6     A.  No.

7     Q.  You just saw the org chart and it

8  kept saying interim and you --

9     A.  That's correct.

10     Q.  -- were like, well, I'll make her

11  general manager?

12     A.  Correct.

13     Q.  The organizational charts that

14  you're talking about, I haven't seen those.

15  When is the last time you looked at the

16  organizational charts from the period when

17  Ms. Stough was the interim general manager?

18     A.  I haven't seen one of those in

19  probably since -- dating back to that time

20  period.  They come out based on changes in

21  the structure of the company.  They come

22  out.

23     Q.  So you as the district manager

0088

1  would receive organizational charts; right?

2     A.  I think it was sent out to the

3  field.  I think everybody got a copy of

4  them.  And it showed regions, districts and

5  hotels because as you see, the hotels moved

6  under from this person to this person.

7        People left and that kind of

8  stuff.  So as GM's and AGM's were moved into

9  position, those names were added and taken

10  out.

11     Q.  Were there other interim general

12  manager positions other than Ms. Stough?

13     A.  I'm sure there were.

14     Q.  Was there a interim regional

15  manager kind of like what you had?

16     A.  I think you could probably

17  classify my position as that.

18     Q.  And then interim DM sometimes?

19     A.  I would say you could.

20     Q.  That's the position used prior to

21  moving into the actual position at Jameson?

22     A.  Yes.  I'm a little gray on how

23  that's used, how it's officially used by the

0089

1  corporate office to be frank.

2     Q.  As to the job codes and things

3   like that you mean?
4       A.   As to what they are -- How it
5   stacks up officially with the corporate
6   office view, I'm just not sure.
7       Q.   What is your job title now?
8       A.   Regional manager.
9       Q.   When did you become officially the
10  regional manager?
11      A.   It would have been to start the
12  second quarter of '05.
13      Q.   Why don't you do this so we'll
14  have it together instead of all over the
15  place in this deposition.  Walk me through
16  starting in 2001.
17          January of 2001, you were the
18  district manager because you're no longer
19  acting as the regional manager.  You're
20  district manager; right?  And you can look
21  at your chart.
22          You had the district realignment
23  going on.  You were DM.  But I want to make
0090
1   sure you were only really responsible for
2   the Ozark store and you helped at the
3   Alexander City store.  You didn't have a
4   scope of stores under you, hotels under you?
5       A.   Correct.  I did help out to a
6   great extent with inspections for those
7   hotels, even some of the -- that I was not
8   directly overseeing.
9       Q.   Okay.  So you would perform the
10  product evaluations and fill out those
11  reports?
12      A.   Typically about ten a quarter
13  during a certain period.
14      Q.   Which hotels did you do that for?
15  And we're in 2001, the year 2001 still.
16      A.   That's hard to say.  But I can
17  tell you some of the ones that I --
18      Q.   Okay.  That's fair.
19      A.   Okay.  I've been asked to go to
20  inspect Waycross, Georgia.  I believe I've
21  done a QA in Brunswick, Georgia, Bainbridge,
22  Georgia.
23      Q.   This is in 2001?

0091
1     A.  Uh-huh.
2     Q.  Okay.
3        MR. KESSLER:  You have to say
4  yes.
5     A.  Yes.
6     Q.  Do you want that list again?
7     A.  No.  They'll come to me.  I
8  continued to do QA's on some of the hotels
9  that were directly reporting to me for a
10  while such as Eufaula and Auburn possibly
11  and Prattville and Valdosta.  That's to name
12  a few.  There were others I'm sure.
13     Q.  That's 2001?
14     A.  Yes.
15     Q.  And obviously when you were a DM
16  prior to 2001 over those nineteen hotels,
17  did you perform product evaluations on those
18  locations?
19     A.  Yes, I did.
20     Q.  In Ozark, that was your own
21  property?
22     A.  It was.
23     Q.  You performed QA on your own
0092
1  property?
2     A.  I have before.
3     Q.  Do you set the budget also for
4  your own property?
5     A.  No.  We have input to that
6  process.  And it's sent to corporate, they
7  reviewed it, studied it and sent back as a
8  final.  It maybe sent back and then back to
9  corporate.  Corporate had the final say on
10  it.
11     Q.  It was sent back and forth to
12  corporate?
13     A.  Yes.
14     Q.  Did you read any depositions to
15  get ready for your deposition today?  Mr.
16  Winey's?
17     A.  To get ready for it?
18     Q.  Have you read Mr. Winey's
19  deposition?
20     A.  I have.

21    Q.  Have you read Mr. Fetner's
22  deposition?
23    A.  Yes.
0093
 1    Q.  And you sat in Ms. Stough
 2  deposition?
 3    A.  I did.
 4    Q.  Who was your GM in Ozark?
 5    A.  Jim Augustine.
 6    Q.  Anybody else serve as GM since
 7  you've been with this company since you've
 8  had the overseeing duties at Ozark?
 9    A.  Harriet Scursey was hired there as
10  a GM.
11    Q.  When was that?  Is this a recent
12  thing?
13    A.  No.  Backing up several years when
14  I became senior district manager.  I would
15  say '99.  Somewhere in '99.
16    Q.  Did you ever drop down from senior
17  district manager to district manager?
18    A.  You know, that senior just kind of
19  got lost somewhere along the way.
20    Q.  Okay.  But you got -- Your pay
21  never dropped down, did it?
22    A.  No, sir.
23    Q.  Anybody else at Ozark?
0094
 1    A.  No.
 2    Q.  Does Harriet -- Harriet doesn't
 3  work there anymore; right?
 4    A.  No.
 5    Q.  Why did she leave?
 6    A.  I'm not sure.  She got married and
 7  didn't have to work.  I'm not sure.  I'm not
 8  sure.
 9    Q.  Who have been your GM's at
10  Eufaula?
11    A.  A girl named Linda started in
12  Eufaula.
13    Q.  You don't remember her last name?
14    A.  No.
15    Q.  Who else in Eufaula?
16    A.  There may be one other one.  Betty
17  Sutton is another one.  She's the current GM

18  in Eufaula.  She's been there seven years.
19    Q.   How long?
20    A.   Seven.
21    Q.   Seven years?
22    A.   Yes.
23    Q.   Anybody else?
0095
 1    A.   No.  That's all I can think of.
 2    Q.   Did Betty replace Linda?
 3    A.   Yes.
 4    Q.   How about Greenville?  Sam Ellis;
 5  right?
 6    A.   Sam Ellis, yes.
 7    Q.   Sam Ellis.  Anybody else before
 8  that when you were over that property?
 9    A.   No.
10    Q.   You didn't have a GM before that?
11    A.   I'm sorry.  Thank you.  There was
12  a Cemira that opened that hotel.  Cemira
13  last name Price I believe was her last name.
14    Q.   Why did she leave?
15    A.   I believe she was terminated.
16    Q.   Did you terminate her?  You were
17  over that --
18    A.   I'm sure I may have made a
19  recommendation that that happen.
20    Q.   Why was she terminated?
21    A.   It was performance related.  But
22  I'm not sure of the details on it.
23    Q.   How do you spell her first name?
0096
 1    A.   C-E-M-I-R-A.
 2    Q.   Cemira Price?
 3    A.   Yes.
 4    Q.   Is that an American name or do you
 5  know?
 6    A.   Well, she was American.  But it's
 7  an unusual first name.
 8    Q.   All right.  Anybody else?  Is Sam
 9  Ellis still there?
10    A.   No.
11    Q.   Where did she go?  Why did she
12  leave?
13    A.   Sam was terminated.
14    Q.   Why was she terminated?

15    A.  She was not getting deposits to
16  the bank on a daily basis.
17    Q.  You terminated her?
18    A.  I recommended that she be
19  terminated, yes.
20    Q.  You had authority to terminate?
21    A.  I have the authority to recommend
22  somebody be terminated, yes.
23    Q.  Have you ever recommended someone
0097
1  get terminated and it not be approved?
2    A.  I'm sure there are cases of that.
3  But I don't recall.
4    Q.  You can't tell me any?
5    A.  I can't tell you any today, no,
6  sir.
7    Q.  All right.  Was there a problem
8  with -- she was fired because -- you fired
9  Sam -- recommended firing Ms. Ellis because
10  she didn't get the bank deposits in on time?
11    A.  That was the gist of it, yes.
12    Q.  Was some of it going in her pocket
13  or was it just --
14    A.  The company requires that our
15  deposits get made daily.  And --
16    Q.  Was there missing money?
17    A.  There was some issues -- We had
18  some integrity issues at that hotel, yes.
19    Q.  Was anybody else terminated
20  because of integrity issues at that hotel
21  other than Ms. Ellis?
22    A.  Other than --
23    Q.  Other than Ms. Ellis.
0098
1    A.  No, sir.
2    Q.  And Ms. Ellis was replaced by who?
3    A.  Josh Smith, the current GM.
4    Q.  Was he the person who replaced
5  her?
6    A.  Yes.
7    Q.  When was -- When did you hire
8  Josh?
9    A.  Josh was hired in -- just recently
10  I think to start this year I believe.  The
11  end of '05, first of '06.

12    Q.   Right.  She left at the end of '05
13  basically?
14    A.   Okay.  Let's just say late '05,
15  December of '05, January of '06.
16    Q.   What salary did you start Josh at?
17    A.   I'm not sure.
18    Q.   Okay.  Josh is still there today?
19    A.   He is.
20    Q.   Did he have some hotel management
21  background?
22    A.   He had pretty extensive apartment
23  management background similar to mine.
0099
1     Q.  Do you decide what salary to start
2   your GM's at?
3     A.   I make a recommendation based on
4   how I feel about the employee after
5   interviews and background and things of that
6   sort, yes.
7     Q.   And you decide to raise their
8   salaries if you want to raise their
9   salaries?
10    A.   It would probably be extenuating
11  circumstances for that kind of thing.
12  Typically that's -- typically -- and it's
13  been interrupted over time.  But the company
14  will evaluate or do an evaluation
15  periodically for that.  They look at a lot
16  of things.
17    Q.  Do you have authority to give
18  somebody a raise?
19    A.   I've got authority to recommend
20  somebody.
21    Q.   Okay.
22    A.   To get a raise.
23    Q.   Have you done that in the past?
0100
1     A.  Yes.
2     Q.  To who?
3     A.  I'm not sure exactly.
4     Q.   Did you recommend James Goodman
5   getting a raise?
6     A.   Yes, I have.
7     Q.   Okay.  So how do you go about
8   recommending somebody get a raise?  If they

9  are currently a GM, what do you do?

10    A.   Generally refer it to the VP of

11  operations or whoever is in charge and make

12  a case for it.

13    Q.   Okay.  Alex City, we know that

14  you've had -- Bill Plummer was the GM and

15  then Deborah Schwier took over as running

16  the place.  Did she ever hold the GM title;

17  do you know?

18    A.   I don't think she did.

19    Q.   Okay.  Then Deborah -- not

20  Deborah.  Then Belinda was interim GM and

21  then she became GM; right?

22    A.   Right.

23    Q.   Then Belinda left and then -- I'm

0101

1  just -- then Mark Fetner took over?

2    A.   He did.

3    Q.   He became the GM; right?

4    A.   He did after a period of time.

5    Q.   After about a month or so, he

6  became GM?

7    A.   More like three, I think.

8    Q.   Well, Belinda left on February

9  18th and in April or so, Mark became the GM

10  somewhere in there; right?

11    A.   Yes.

12    Q.   Whatever the records show; right?

13    A.   Right.

14    Q.   And then Mark Fetner left and

15  Robbie Patterson became the GM?

16    A.   Correct.

17    Q.   Did you hire Mark Fetner for the

18  GM job?

19    A.   I recommended that he be hired,

20  yes.

21    Q.   When you originally hired Mark

22  Fetner, did you intend to put him in an GM

23  job in Alex City?

0102

1    A.   I felt like he was destined to be

2  a GM and I felt like the hotel in Alex City

3  definitely needed some help.  And I had

4  hoped he could come in and help support the

5  hotel and move on and go somewhere else.

6  That was my hope.

7     Q.  Did you -- When you hired him, was
8  it your intention to hire him for the Alex
9  City location?

10    A.  Yes.  He lived in that area.  So I
11 knew that's the hotel he probably needed to
12 get started at.

13    Q.  All right.  When he was hired for
14 the GM job, was Ms. Stough for a period of
15 time out on vacation?

16    A.  I think she was -- had taken time
17 off the first part of the year, yes, sir.

18    Q.  Her husband was home from Iraq and
19 she was being with him or something?

20    A.  That's correct.

21    Q.  Who was running Alex City at that
22 particular time when Ms. Stough was out with
23 her husband?

0103

1     A.  It would have been the front desk
2  staff and me.

3     Q.  How often were you in Alex City?
4  I mean, you had other -- you also had Ozark;
5  right?

6     A.  I did.

7     Q.  And there was no GM in Ozark
8  during that period; right?

9     A.  No.

10    Q.  You were it; right?

11    A.  I was it.

12    Q.  So how often, when Ms. Stough was
13 out on vacation, were you at Alex City?

14    A.  A fair amount.  I don't know
15 exactly.  A fair amount of time I would
16 say.  A couple of days.  Probably a couple
17 of days.

18    Q.  Okay.  But there was no GM in Alex
19 City to train Mr. Fetner; right?

20    A.  That is correct.

21    Q.  So Mr. Fetner during that period
22 trained in Auburn and Eufaula; is that
23 right?

0104

1     A.  Yes.  Jim -- I'm sorry -- Mark had
2  a week of training in Auburn and he had a

3   week or so in Eufaula.
4       Q.   All right.  He said three weeks or
5   so in his deposition.  Is that about right?
6       A.   That's about right.
7       Q.   Of training?
8       A.   And that was probably -- That's
9   changed over time, yes.
10      Q.   And then he says he worked a few
11  days with Belinda and then Belinda was
12  terminated.  Does that sound about right to
13  you?
14      A.   I'm not sure how long a period of
15  time.  He was in there for a little while in
16  the hotel.  Belinda was terminated not too
17  long a period after that.  A short period.
18      Q.   Okay.  And you made the decision
19  to terminate Belinda; right?
20      A.   I recommended that -- I
21  recommended that -- I consulted with
22  corporate with it.
23      Q.   With whom?
0105
1       A.   With Greg.
2       Q.   Did Greg tell you, no, don't
3   terminate her?
4       A.   He did not.
5       Q.   At any point in time -- I mean,
6   had you said I want to terminate her before
7   that date that you went to him and said,
8   okay, let's fire her?
9       A.   No.  I hadn't said I wanted to
10  terminate her, no.
11      Q.   Tell me about your conversation
12  with Mr. Winey considering terminating Ms.
13  Stough from the Alex City location.
14      A.   Okay.  I had done a quality
15  assurance inspection on the hotel.
16      Q.   The one on February 8th or
17  whatever?
18      A.   Right.
19          MR. KESSLER:  The 18th.
20      Q.   February 18th.
21      A.   And the score was a fail.  And I
22  called Greg and told him that the hotel had
23  failed a QA.  And he said, Charles, I think

0106
1  you've done the right thing to that hotel.
2  I think it's time to make a change.
3      Q.  What change did you talk to him
4  about making?
5      A.  Letting go of Belinda.
6      Q.  And putting who in her job?
7      A.  Well, I'm not sure we had that
8  conversation.  I'm sure he knew that we had
9  someone we had just hired available.  I'm
10  sure he expected me to do whatever was
11  necessary to cover the hotel.
12      Q.  That's Fetner you're talking
13  about; right?
14      A.  Correct.
15      Q.  When you hired Fetner, you started
16  him at twenty-one thousand?
17      A.  I guess I did.
18      Q.  Did you know that Belinda was
19  making twenty-one thousand?
20      A.  At the time, no, sir.
21      Q.  What did you think she was making?
22      A.  I didn't really know per se when I
23  made that recommendation what she was
0107
1  making.  I really didn't know.
2      Q.  She was the lowest paid general
3  manager you had; is that correct?
4      A.  I think she probably was.
5      Q.  Of all the general managers that
6  were working under your area of control in
7  2004 and 2003 even into 2004, was anybody
8  paid less than Belinda as a general manager?
9      A.  I don't know.
10      Q.  You don't know of any?
11      A.  No.
12      Q.  You didn't know what her salary
13  was?
14      A.  Well, it certainly wasn't a
15  conscious part of my decision to recommend
16  Mark at twenty-one thousand dollars.
17      Q.  No, no.  My question is, I guess,
18  do you know what your general managers
19  salaries are generally?
20      A.  I could not tell you today what

21  they make, no, sir.
22      Q.  Is there an occasion where you get
23  the reports that allow you to review what
0108
 1  their salaries are?
 2      A.  Yes.  There's documents and ways
 3  that you can find those out, yes.
 4      Q.  Is there something that you see as
 5  part of your job as a district manager that
 6  comes across your desk stating what the --
 7      A.  No.
 8      Q.  Like labor distribution reports,
 9  things like that?
10      A.  No.
11      Q.  You don't review -- Do you ever
12  review those?
13      A.  No.  I think again, there's annual
14  reviews that come up where you might be
15  given that kind of information so you can
16  look at salaries and those kind of things,
17  yes.
18      Q.  You get annual reviews is what
19  you're saying?
20      A.  I do recall maybe an annual review
21  where that information was provided to you.
22      Q.  Concerning Ms. Stough?
23      A.  Well, concerning GM salaries in
0109
 1  general.
 2      Q.  Did you ever get -- Did you ever
 3  do an annual review on Ms. Stough?  I didn't
 4  see any.
 5      A.  Yes, I would have done an annual
 6  review on Ms. Stough.
 7      Q.  Where do you put it when you
 8  finish doing it?  What do you do with it?
 9      A.  Well, these are generally
10  submitted in bulk form to corporate office.
11      Q.  It's a written thing?  You fill
12  out an annual review and you send it to
13  corporate office?
14      A.  Correct.
15      Q.  Where is the general managers'
16  personnel files maintained, in the corporate
17  office?

18      A.  Corporate office, yes.
19      Q.  How many annual reviews did you
20  perform on Ms. Stough?
21      A.  I cannot say for sure.  I don't
22  know for sure.
23      Q.  Is there any reason on a
0110
 1  particular year you would not do an annual
 2  review of a general manager who's been there
 3  the whole year?
 4      A.  Yes.  There would have been
 5  occasions where we didn't do them.
 6      Q.  Why is that?
 7      A.  That was sort of a moving target
 8  to be honest with you.
 9      Q.  What do you mean by that?
10      A.  That means that it was not a
11  formal process if it was done every year at
12  all.  And I think we went through some pay
13  freezes where that was not part of that time
14  period.
15      Q.  When was there a pay freeze?  You
16  can look at your -- it says freeze on
17  there.
18      A.  The first quarter of 2002.
19      Q.  And that ran into when?
20      A.  I don't think they actually paid
21  out -- paid anybody out of that pay freeze
22  until almost the third quarter of '04.
23      Q.  In your area?
0111
 1      A.  In my area, yes.
 2      Q.  I mean, do you know what happened
 3  everywhere else in the country?
 4      A.  No, sir.
 5      Q.  Do you know if there were any
 6  exceptions to the freeze?
 7      A.  I'm sure there were.  I don't know
 8  of any.
 9      Q.  And when did you say it started?
10      A.  The first quarter of 2002.
11      Q.  Did you get a memo telling you
12  that there was a pay freeze or a meeting?
13  How did you learn about it?
14      A.  I believe there was a memo sent

15  out.  I believe there was.
16      Q.   From Mr. Winey or corporate,
17  somebody in corporate?
18      A.   Yes.  I sure think it would come
19  from Greg.
20      Q.   In Alex City, have you told me
21  about all the people that have served as
22  general managers or interim general managers
23  at that location?
0112
 1      A.   I believe so.
 2      Q.   There's a -- In Sylacauga, when
 3  you were over that location, who were your
 4  managers?
 5      A.   There was a Darlene Touart,
 6  T-O-U-A-R-T.  There was a Janet -- I want to
 7  say her last name might have been Riley.
 8  And there was a Joan Robidart.
 9      Q.   R-O --
10      A.   -- B-I-D-A-R-T.
11      Q.   Is she still there, Robidart?
12      A.   I believe, yes, she is still.
13      Q.   Is that a sixty room property?
14      A.   Yes, sir.
15      Q.   Is there an assistant manager
16  there?
17      A.   Yes.  That is -- She is the
18  assistant manager.
19      Q.   Is there a general manager there?
20      A.   Yes.  His name is Corey Degroot,
21  D-E-G-R-O-O-T.
22      Q.   Have you had other general
23  managers -- These ladies you have just
0113
 1  named, were they assistant managers?
 2      A.   No.  They were general managers.
 3      Q.   So Joan is not a general manager?
 4      A.   No.
 5      Q.   She's the assistant manager?
 6      A.   Yes.
 7      Q.   But Janet Riley, is she a general
 8  manager?
 9      A.   She was.
10      Q.   And Darlene --
11      A.   -- Touart, T-O-U-A-R-T.

12    Q.  General manager?
13    A.  Yes.
14    Q.  Did she have an assistant manager?
15    A.  I don't recall.
16    Q.  Did Janet Riley have an assistant
17  manager?
18    A.  I don't remember.
19    Q.  Why did Touart leave?
20    A.  I want to say she gave notice.
21    Q.  What about Riley?
22    A.  I'm not certain about Riley.
23    Q.  Did you fire her?
0114
 1    A.  Let me think for a few minutes.  I
 2  believe there may have been some
 3  improprieties going on.
 4    Q.  So you think you fired her for
 5  doing something bad?
 6    A.  I may have recommended her being
 7  fired.
 8    Q.  When was that?
 9    A.  It would probably be back in --
10  sometime around '99 maybe.
11    Q.  You had a Prattville location
12  under you; right?
13    A.  I did.
14    Q.  And was there -- Who were the
15  general managers there?
16    A.  It was an Arthur Edwards that was
17  there for a while.
18    Q.  He was terminated; right?
19    A.  He was.
20    Q.  Why was Arthur fired,
21  improprieties?
22    A.  I would say that and performance,
23  yes.
0115
 1    Q.  When you say improprieties, you
 2  mean issues with money, things like money
 3  missing?
 4    A.  And/or personal issues possibly
 5  could be the case.
 6    Q.  Behavior with staff?
 7    A.  That's a possible.
 8    Q.  I mean, what did Arthur do?

9      A.  I think that they felt like maybe
10  he was drinking a little bit and it
11  reflected in some of the hotel performance.
12      Q.   How long had Arthur worked at
13  Prattville before you terminated him?
14      A.   A number of years.  Let's say two
15  to three years.
16      Q.   How many failures did he get on a
17  product evaluation form that you do?
18      A.   I'm not sure.  I know he's at
19  least had a failed QA.  Probably -- likely
20  more than that.  But I'm not certain.
21      Q.   Who replaced Arthur?
22      A.   Tracey Brown.
23      Q.   Is she still there as GM?
0116
 1      A.  No, sir.
 2      Q.  Why did Tracey leave?
 3      A.  Poor performance.
 4      Q.  When did she leave?
 5      A.  January of '05 I want to say.
 6      Q.  You terminated her?
 7      A.  I recommended that she be
 8  terminated, yes.
 9      Q.   Okay.  Anybody else at Prattville
10  as a GM during your --
11      A.   Bill Palmer is the GM today.
12      Q.   Bill is there now?
13      A.   Yes.
14      Q.   Anybody other than Arthur and
15  Tracey?
16      A.   No.
17      Q.   So Arthur was there for a while?
18      A.   Yes.
19      Q.   Before 2000 -- When did y'all get
20  to Prattville?
21      A.   Sharon was based out of that
22  hotel.
23      Q.   Okay.  When did Sharon stop
0117
 1  working at that hotel?
 2      A.   For Sharon, it would have been the
 3  third quarter of -- sometime mid year of
 4  2000.
 5      Q.   Okay.  And then Bill took over

6  from 2000 until when?

7      A.  No.  Bill took over --

8      Q.  I'm sorry.  Arthur.

9      A.  I would assume Arthur had been

10  there from that time, yes.

11     Q.  2000 until Tracey took over;

12  right?

13     A.  Yes.

14     Q.  When did Tracey take over?

15     A.  I'm not certain.

16     Q.  Okay.  Well, how long was Tracey

17  there about?

18     A.  A year and a little bit.

19     Q.  Okay.  Tracey is a woman; right?

20     A.  Right.

21     Q.  Okay.  I'm going to ask you about

22  the places.  At the Bessemer location, who

23  are your GM's at Bessemer when you would

0118

1  have been over that location?  Before you do

2  that -- I'm sorry -- Prattville, is that a

3  sixty room?

4      A.  Yes.

5      Q.  Was there an assistant manager

6  there?

7      A.  There is today there.

8      Q.  What about during Arthur's time?

9      A.  I don't recall one being there.

10     Q.  How about Tracey's?

11     A.  No.

12     Q.  And Bill is there now; right?

13     A.  Correct.

14     Q.  Where was Bill before he was at

15  Prattville?

16     A.  Selma.

17     Q.  And he has an assistant manager,

18  too?

19     A.  Yes.

20     Q.  Bessemer location has -- That's a

21  sixty room property?

22     A.  It is.

23     Q.  Who's your manager there?

0119

1      A.  Tim is his first name.  I don't

2  know his last name right this second.

3      Q.  He's your manager now?
4      A.  I'm not over that hotel today.
5      Q.  When you were over that hotel, who
6  were your managers?
7      A.  A Steve -- I can't remember his
8  last name.
9      Q.  Who else?
10     A.  That's all I remember.
11     Q.  Did you terminate Steve?
12     A.  I didn't, no.
13     Q.  You don't know why he left?
14     A.  No.
15     Q.  And Meridian, the hotel in
16  Meridian, Mississippi, who were your general
17  managers there?
18     A.  Jim Hobgood and -- today -- that's
19  not my hotel today.
20     Q.  When you left -- When that hotel
21  left your area of control, did Jim -- was
22  Jim still there?
23     A.  Yes.  I would think he was, yes.
0120
1      Q.  Is that a sixty room property?
2      A.  Yes.
3      Q.  Was there an assistant manager
4  there?
5      A.  I believe he had an assistant
6  manager.
7      Q.  How about at Bessemer, assistant
8  manager there?
9      A.  Officially, I don't think so.
10     Q.  What do you mean by that one?
11  Interim assistant or something?
12     A.  Sometimes you had front desk
13  managers as opposed to assistant general
14  managers.
15     Q.  Did they have a front desk manager
16  at Bessemer?
17     A.  I think he did.
18     Q.  Okay.  And in Vicksburg,
19  Mississippi, is that a sixty room property?
20     A.  Yes.
21     Q.  Was there an assistant manager
22  there?
23     A.  I don't remember the assistant

0121
1  manager, no.
2      Q.   Who was your manager?
3      A.   Marty Crevits.
4      Q.   Was he there when you -- Is that
5  hotel still under your control?
6      A.   No.
7      Q.   When you left that -- When that
8  hotel left your area of control, was Marty
9  still there?
10     A.   I believe he was.
11     Q.   Any other GM's there when that was
12 under your control in Vicksburg?
13     A.   Well, let me back up.  There was a
14 Jim Varnum that managed that hotel for a
15 short period of time.  That would have been
16 after Marty.  It would have to come after
17 Marty.  It would had to have still been when
18 I had some overseeing that hotel.
19     Q.   Did you fire Marty?
20     A.   Didn't fire Marty.  But Jim was
21 there.  And I recommended that Jim Varnum be
22 terminated, yes.
23     Q.   Why?
0122
1      A.   Poor performance.
2      Q.   What else?
3      A.   Basically it.
4      Q.   Well, when was he terminated for
5  poor performance?
6      A.   I don't recall the year, the time
7  frame on him.
8      Q.   What did he do to cause him to get
9  fired?
10     A.   I got a lot of feedback from the
11 staff there that it became obvious that he
12 was not a good leader, a good manager of the
13 hotel.
14     Q.   What did the staff say?
15     A.   That he was not there when he
16 should have been there and just wasn't doing
17 the right things in the hotel.
18     Q.   Did you have some problems there
19 with the hotel?
20     A.   Did I?  Yes, sir.

21     Q.  Did you get complaints?
22     A.  Yes, there were some complaints
23   that were registered.
0123
1     Q.  Customer complaints?
2     A.  Right.
3     Q.  Do you have a bill or a review of
4   customer complaints from hotels?
5     A.  At the time they occur, you do.
6   In most cases or a lot of cases, if they are
7    -- yes.
8     Q.  Have you reviewed customer
9   complaints on the Alexander City location
10   ever?
11     A.  I have.
12     Q.  Do you maintain those sort of
13   complaints somewhere?
14     A.  I do.
15     Q.  What happens to the ones you
16   review?
17     A.  I think you make sure that you
18   have discussed them with the GM, that you've
19    -- you feel like you've taken care of the
20   guests satisfactorily and move on.
21     Q.  Can you tell me in particular
22   about any customer complaints you received
23   during Ms. Stough's tenure of that hotel?
0124
1     A.  That hotel or any other, not
2   today, no, sir.
3     Q.  Where are they kept, the customer
4   complaints?
5     A.  Typically, they would come in in
6   the form of an e-mail probably from
7   corporate and/or the customer comment cards
8   that are sent out periodically in packets to
9   the hotel.
10     Q.  How does that work?  Say I go stay
11   at a hotel and I don't like it, I want to
12   complain, I can fill out a customer comment
13   card?
14     A.  You can.
15     Q.  Where does that go?
16     A.  It's mailed directly to the
17   corporate office.

18    Q.  Then what happens to it?  I'm
19  trying to get at what -- How do you get an
20  opportunity to see it?
21    A.  To see it?
22    Q.  Yes.
23    A.  Corporate office would mail that
0125
 1  out periodically back to you as a -- either
 2  a GM or -- it's kind of hard to mail -- I'm
 3  trying to think.
 4    Q.  But you as the GM, you get a
 5  chance to see it is what I'm trying to
 6  understand?
 7    A.  I guess you don't get to see those
 8  very often except comments from the
 9  corporate office, I guess.  They would have
10  to -- specific out certain ones for you.  If
11  they were bad, sometimes they would call
12  without sending them to you.
13    Q.  Did you get some on Belinda that
14  you can tell me about?
15    A.  I'm sure I've gotten some on that
16  hotel.  But I don't know any specifics to
17  give you today.
18    Q.  All right.  The only one I have
19  seen -- there was one concerning Robbie.
20  Some guy got in a -- got mad with the
21  parking places concerning the fishing
22  tournament.
23        They got in a -- Robbie called and
0126
 1  said something to him and he said something
 2  to Robbie.  Is that something you received?
 3    A.  I would be -- yes.  I would be
 4  notified of something like that in most
 5  cases.  In most cases.
 6    Q.  Is it put in their files when the
 7  complaint is bad enough?
 8    A.  I would sure think that -- not
 9  really.  I don't think it is, no.
10    Q.  That one was in Robbie's file is
11  what I'm --
12    A.  Is that right?  Unless it was
13  something very, very unusual, I wouldn't
14  think it would be.  I mean, I don't keep

15  those files.  You talking about at our hotel
16  level?
17      Q.  What do you keep at a hotel level?
18      A.  Employee files.
19      Q.  General manager files.
20      A.  Oh, okay.  I'm not sure.
21      Q.  Who are your general managers at
22  the Albany location?
23      A.  There was a Millie,
0127
 1  W-H-I-S-D-N-A-N-T I.  There was a Diane
 2  Carpenter.  And today, there's a Ruby Ann
 3  Smith.
 4      Q.  Who?
 5      A.  Ruby Ann.
 6      Q.  Are you over that location now?
 7      A.  Yes.
 8      Q.  Were you involved in terminating
 9  anybody from that location?
10      A.  Yes, sir.  Diane Carpenter.  I
11  recommended that she be terminated.
12      Q.  How about Millie?
13      A.  You know, I don't -- I didn't --
14  Hal Smith was the regional.  I think Hal --
15  she was terminated.  And I believe he took
16  care of that.
17      Q.  Why was Millie terminated?
18      A.  Impropriety dealing with accounts
19  receiveable and so forth.
20      Q.  Why was Diane terminated?
21      A.  Poor performance.
22      Q.  Anybody else work at that location
23  as a GM other than those three?
0128
 1      A.  Not that I recall.
 2      Q.  Is that a sixty room property?
 3      A.  Yes, it is.
 4      Q.  Is there an assistant manager
 5  there or has there been one?
 6      A.  I don't recall any assistant
 7  manager.
 8      Q.  Bainbridge, Georgia, who are your
 9  GM's -- I'm sorry.  Americus, Georgia, who
10  are your GM's there?
11      A.  Wayne -- I don't know his last

12  name.  And Wayne was -- There was a lady
13  named Mary before Wayne.
14      Q.  Who else?
15      A.  That's all I remember.
16      Q.  Why did Mary leave?
17      A.  I don't recall.  I don't think she
18   -- weren't happy with some phases of her
19  management.  I don't know exactly why.
20      Q.  She was terminated?
21      A.  I believe she was.
22      Q.  Performance related?
23      A.  Uh-huh.
0129
 1      Q.  Yes?
 2      A.  Yes.
 3      Q.  But Wayne, I guess he was still
 4  there when --
 5      A.  Brown is his last name.
 6      Q.  Wayne Brown, is he still there?
 7      A.  He is not.
 8      Q.  Why did he leave?
 9      A.  Health issues with his wife and
10  him, I think.
11      Q.  He quit?
12      A.  Yes, he did.
13      Q.  Do you know who replaced Wayne?
14      A.  No one.  It does not have a GM
15  today.
16      Q.  It's vacant?
17      A.  Yes.
18      Q.  And is somebody acting in that
19  capacity?
20      A.  There is.
21      Q.  Who?
22      A.  Someone that's there on a day in,
23  day out basis for us, yes.
0130
 1      Q.  Is that another GM from another
 2  location or is that a person there on --
 3      A.  No.  It's a person there at the
 4  hotel.  Phillis Fine, F-I-N-E.
 5      Q.  What's her regular job title?
 6      A.  Front desk clerk.
 7      Q.  And she's acting as GM?
 8      A.  At this point, yes.

9    Q.  When you act as GM, do you get an
10  increase in your salary?
11    A.  Not automatically.
12    Q.  So she's just helping out, kind of
13  serving as the GM right now while y'all
14  look?
15    A.  She is.
16    Q.  Is she in consideration to be
17  promoted to GM?
18    A.  She is.  But -- yes.
19    Q.  Why haven't you gone ahead and
20  promoted her?
21    A.  I don't feel like she is quite
22  strong enough for that job.
23    Q.  What do you mean by that?  Not
0131
1  physically strong; right?
2    A.  No.  We feel like we need more --
3  a little more experience and talent in there
4  to get the kind of results we want out of
5  that hotel.
6    Q.  And that's the Americus location?
7    A.  Yes.
8    Q.  Is that a sixty room?
9    A.  Eighty.
10    Q.  Is there an assistant manager
11  there?
12    A.  No, sir.
13    Q.  Bainbridge, Georgia, is that a
14  sixty room?
15    A.  Yes.
16    Q.  Assistant manager there?
17    A.  Front desk manager.
18    Q.  Front desk manager.  Is that what
19  she is?  Phillis, is she a front desk
20  manager?  Yes?
21    A.  Likely.  I'm not positive.
22    Q.  Okay.  In Bainbridge, who would
23  have been your general managers?
0132
1    A.  Lori.  And I don't recall her last
2  name.
3    Q.  Why is she no longer there?
4    A.  Moved from -- to another hotel in
5  the company.

6    Q.  Who else has been the GM's there?

7    A.  Lesley Bernier is there today,

8  B-E-R-N-I-E-R.

9    Q.  Any other GM's there?  Between

10  Lori and Lesley or before Lori or after?

11    A.  There was a GM there before Lori

12  who was actually a district manager for a

13  while with the company.  And I don't recall

14  her name.

15    Q.  Did she voluntarily leave?

16    A.  She went to another hotel.

17    Q.  Another chain?

18    A.  Another chain.

19    Q.  And Lesley is there now; right?

20    A.  Yes.

21    Q.  And Lori -- Why did Lori leave?

22    A.  She moved to another hotel within

23  the chain.

0133

1    Q.  Okay.

2    A.  But I don't know.

3    Q.  Any other GM's there in

4  Bainbridge?

5    A.  No.

6    Q.  Who would have been your GM in

7  Selma?

8    A.  Viva Clark is the current GM.

9      MR. KESSLER:  Who?

10    A.  Viva Clark.  Bill Plummer.  There

11  was a female manager in ahead of Bill.  I

12  don't know her name.  I don't remember it.

13    Q.  Why did she leave?

14    A.  I'm not certain.  I don't know.

15  And I believe Sharon Register at one time

16  was the GM there.

17    Q.  Anybody else?

18    A.  That's all I can think of.

19    Q.  And Bill left to go take over what

20  location?

21    A.  Prattville.

22    Q.  All right.  Any other GM's in

23  Selma?

0134

1    A.  None that I can think of.

2    Q.  Who would have been your GM's in

3   Auburn?  It was Goodman; right?
4       A.   Goodman is there today.
5       Q.   You hired him?
6       A.   Actually, no.
7       Q.   Who hired him?
8       A.   Sandy McGuffey hired him.
9       Q.   Were you involved at all in hiring
10  him?
11      A.   No.  I can tell you this.  When
12  the hotel was built, there was a young lady
13  that was a GM there.  I don't know what her
14  name is.
15      Q.   Was that hotel under your control
16  at that time?
17      A.   When it was built, it actually
18  was.
19      Q.   Why did that young lady leave the
20  GM job?
21      A.   She went to work with Honey Baked
22  Ham.  So she left for another job.
23      Q.   Who replaced her?
0135
1       A.   Somebody named Vance -- I don't
2   recall his last name -- for a while was a
3   GM.
4       Q.   Why did Vance leave?
5       A.   He was -- I recommended that he be
6   terminated.
7       Q.   Why?
8       A.   We felt like he was --
9   improprieties.
10      Q.   What did he do?
11      A.   We got wind that we thought he --
12  we thought he was a bookie, was booking,
13  making bets.
14      Q.   Any other GM's at that location at
15  Auburn?
16      A.   Yes.  There was another GM that
17  worked there for a short time.
18      Q.   Who was that?
19      A.   I don't recall his name.
20      Q.   Why did he leave?
21      A.   For another job.
22      Q.   Any other GM's at Auburn?
23      A.   None that I recall.

0136
1      Q.   Trussville, who have been your
2   GM's there?
3      A.   Bill Plummer for a while.  Steve
4   Bond has run that hotel for a while.
5          MR. KESSLER:  Bond, B-O-N-D?
6          THE WITNESS:  Uh-huh.
7      A.   There was another individual, a
8   female, that worked there for a while.  I
9   don't recall her name.
10     Q.   Why did she leave?
11     A.   She left -- performance poor.  And
12  then -- I don't know who the current GM --
13  some -- I don't know who the current GM is
14  today.
15     Q.   Why did Steve leave there, Steve
16  Bond?
17     A.   He moved to another hotel, I
18  believe.
19     Q.   And Bill Plummer had moved; right?
20     A.   Yes.
21     Q.   Are you currently over more hotels
22  than those fifteen?
23     A.   Than those fifteen?
0137
1      Q.   Right.
2      A.   I'm currently over sixteen
3   hotels.  And a lot of those, I'm not over
4   today that I was then.
5      Q.   All right.  How long have you been
6   over these sixteen hotels?
7      A.   That was changed and moved over a
8   course of time.  The list you're showing me
9   represents hotels that I've been over in the
10  past at some point in time.
11     Q.   Right.
12     A.   Okay.
13     Q.   What other hotels are you over
14  now?
15     A.   LaGrange, Georgia, Thomaston,
16  Georgia, Albany, Georgia, Americus, Georgia,
17  and Newnan, Georgia.
18     Q.   Where?
19     A.   Newnan, Georgia.
20     Q.   Waycross?

21     A.  No.
22     Q.  Brunswick?
23     A.  No.
0138
 1     Q.  Brundidge?
 2     A.  No.
 3     Q.  Are you over the Eufaula, Auburn,
 4  Prattville locations?
 5     A.  Yes.
 6     Q.  Valdosta?
 7     A.  No.
 8     Q.  When did you take over LaGrange?
 9     A.  The second quarter of '06.
10     Q.  How about Thomaston?
11     A.  The second quarter of '06.
12     Q.  Albany?
13     A.  '06, second quarter.
14     Q.  How about in '05, what were you
15  over that you haven't told me about?
16     A.  Well, Crestview, I don't guess
17  I've heard you mention that one.
18     Q.  No, you haven't told me about
19  that.  Where is that?
20     A.  Crestview, Florida.
21     Q.  Where else?  What other hotels
22  have you been over that you haven't talked
23  to me about?
0139
 1     A.  I believe you've mentioned most
 2  all the ones that I'm over or have been
 3  over.
 4     Q.  Have you ever been over Waycross,
 5  Georgia?
 6     A.  No.
 7     Q.  You just did QA's there?
 8     A.  Yes.
 9     Q.  And Brunswick, have you been over
10  there?
11     A.  No.
12     Q.  Just QA's's?
13     A.  Yes.
14     Q.  And Brundidge, you've not been
15  over that either?
16     A.  Bainbridge?
17     Q.  Bainbridge.  Have you been over

18  that?
19      A.  Yes.
20      Q.  Any other locations that you have
21  supervised or had supervisory duties over?
22      A.  Other than the ones you just
23  listed.
0140
 1      Q.  Right.  Everything that we've been
 2  talking about so far.
 3      A.  I think that's probably most of
 4  them.  I don't recall any.
 5      Q.  When you've done these QA's, have
 6  you given more than -- an individual more
 7  than two failures?
 8      A.  I don't -- maybe.  Possibly.
 9      Q.  What about the guy in Prattville?
10      A.  Yes.  I've done several of his.  A
11  very unclean hotel most of the time.
12      Q.  When did you learn about the
13  alcohol affecting performance issue?  I mean
14  did, you walk up there one day and find him
15  smelling of alcohol?
16      A.  Probably back through the staff in
17  some way.
18      Q.  You never caught him yourself
19  smelling alcohol?
20      A.  No.
21      Q.  You just heard that's what was
22  going on?
23      A.  Right.
0141
 1      Q.  Did he admit it, drinking on the
 2  job?
 3      A.  Not that I recall.
 4      Q.  Is there a rule in the handbook
 5  about drinking while you're on duty that you
 6  know of?
 7      A.  I'm sure there should be.
 8      Q.  There's a policy manual that y'all
 9  use; right?
10      A.  Yes.
11      Q.  It's already been entered in the
12   -- this is Defendant's Exhibit 5 to Ms.
13  Stough's deposition.  I want to make sure
14  that this is the only handbook that's been

15  in place.  It's already an exhibit,
16  Defendant's Exhibit 5.
17        If you look over on the next page,
18  it says -- there's a July 2000 date.  Is
19  there any other handbooks other than this
20  one that have been in place during Ms.
21  Stough's employment?
22        That's really all I care about.
23  Or is this the handbook that applied during
0142
1  her employment?
2     A.  So you're asking during her
3  employment, 2000 to --
4     Q.  Right.  Until she left in 2004.
5     A.  I don't know for certain.
6     Q.  Do you know of another one that
7  came out at some point in time?
8     A.  It's been updated and revised a
9  number of times.  I'm just not sure.
10    Q.  All right.  This one has got on
11  page -- There's an equal employment
12  opportunity policy just a few pages into
13  it.  Are you familiar with -- it looks like
14  a few pages into it.
15        Are there other policies on equal
16  employment opportunity that's posted at the
17  company other than the EEO type policies on
18  the locations that you know of?
19        MR. KESSLER:  Objection.  Go
20  ahead.
21    A.  There are posters posted in our
22  wash rooms that may cover some of this, yes.
23    Q.  Tell me about those posters.
0143
1  Where are they posted?  In the what room?
2     A.  In a conspicuous place, if you
3  will.
4     Q.  What room?
5     A.  The wash room, the laundry room.
6     Q.  Laundry room area?
7     A.  Yes.
8     Q.  What do they talk about?
9     A.  Basically you're entitled to --
10  you're certainly entitled to the rights you
11  have as an employee, I guess.

12     Q.  Like the EEO, go to the EEOC,
13  posters like that?  Tell me -- Describe the
14  poster for me.  Do that.
15     A.  It's a full size poster.  It's got
16  several miniaturized documents on it.
17     Q.  What color is it?
18     A.  I want to say it's has a blue
19  shade, blue color to it.
20     Q.  Is this a Jameson Inn posting?
21     A.  It is Jameson required posting,
22  yes.
23     Q.  Is it from the company?  Does it
0144
1  say Jameson Inn on it or is this a Federal
2  Government posting?
3     A.  I think it's Federal Government.
4     Q.  Like wage and hours laws and stuff
5  like that?
6     A.  Yes.
7     Q.  Is that what you're talking about?
8     A.  Yes.
9     Q.  Okay.  Is there a Jameson Inn
10  policy, employment policy posted anywhere,
11  you know, stuck on the wall I mean?
12     A.  Not that I know of, no.
13     Q.  Employees get this handbook,
14  though; right?
15     A.  They do.
16     Q.  When do they get the handbook?
17     A.  Typically at the time of
18  employment.
19     Q.  Are they given a copy to take
20  home?
21     A.  They are.  And they are asked to
22  sign that you have read it and understand
23  it.
0145
1     Q.  Do you go over it with the
2  employees?
3     A.  If there are questions, we do.
4     Q.  I mean, can you tell me about any
5   -- like Ms. Stough, did you ever go over
6  this policy with Ms. Stough, the handbook,
7  in any form?
8     A.  I don't recall personally doing

9  it, no.
10      Q.   Whose responsibility is it to go
11  over it with the employees that are hired in
12  a lower level position?
13      A.   The person that hires them
14  typically.  The GM at the hotel.
15      Q.   What about when a GM is hired, who
16  goes over it with them?
17      A.   It would probably be the person
18  doing the hiring.  In my case, it would be.
19      Q.   Have you actually given a handbook
20  to the employees that you have hired?
21      A.   Yes.
22      Q.   Have you discussed it with them?
23      A.   If they have questions.
0146
1      Q.   Have you gone to any training
2  sessions where you've learned about EEO
3  matters?
4      A.   Not specifically that I recall,
5  no.
6      Q.   Like sexual harassment policy?
7      A.   Oh, yes.
8      Q.   Training stuff?
9      A.   Yes.  We've had those type
10  training sessions before, yes.
11      Q.   Covering sex discrimination and
12  race discrimination, stuff like that?
13      A.   Yes.  We've also been given videos
14  and things.
15      Q.   Okay.
16      A.   Yes.
17      Q.   What kind of videos?
18      A.   Covering those type of topics.
19  And distributed by the company.
20      Q.   Who gets to see those?
21      A.   All the employees at the hotel.
22      Q.   All the way to the lowest level?
23      A.   Yes.
0147
1      Q.   Are they given to the hotels and
2  say show this videotape to your employees?
3      A.   Yes.
4      Q.   Okay.  So what's discussed on the
5  tapes generally?  What kind of stuff?

6     A.   Examples of what would be
7  considered discrimination and
8  non-discrimination, things of that sort.
9     Q.   Like --
10    A.   To do's and not to do's kind of
11  things.
12    Q.   For example.  Give me an example
13  of one of the examples.
14    A.   Give you an example of one of the
15  examples?
16    Q.   That you saw on the tape.
17    A.   I think there was a manager and a
18  front desk clerk and they were discussing --
19  and it seems as though the manager was
20  flirting with the desk clerk.
21    Q.   You're talking about sexual
22  harassment type things?
23    A.   Yes.
0148
1     Q.   Other than -- You said
2  discrimination.  Just tell me about the
3  discrimination stuff that you learned.
4     A.   You know, I don't specifically
5  know.
6     Q.   Let me do it this way.  On those
7  tapes and the training sessions you went to,
8  did you learn that it's -- you can't
9  sexually harass somebody on the job?
10    A.   Yes.
11    Q.   And you learned of examples of
12  sexual harassment and stuff like that?
13    A.   Yes.
14    Q.   Okay.  Did you learn about race
15  discrimination, that you can't --
16    A.   Yes.
17    Q.   -- use racial slurs and stuff like
18  that?
19    A.   Yes.
20    Q.   Did you learn that you can't
21  discriminate against somebody and fire them
22  because they are a woman or because they are
23  black?
0149
1     A.   Sure.
2     Q.   Did you learn that you can't pay

3   somebody less because they are a woman or
4   because they are black?
5       A.  Can't discriminate based on wage,
6   yes.
7       Q.  You can't pay somebody less
8   because you're a woman, you can't pay
9   somebody less because you're a black, you
10  can't pay somebody less because of your
11  national origin?
12      A.  Yes.
13      Q.  You learned things like that?
14      A.  Yes.
15      Q.  Okay.  Did you learn -- It wasn't
16  just the videotape.  You've been through
17  some Jameson Inn meetings with other DM's
18  and regional managers where you learned
19  policies and procedures concerning
20  discrimination and harassment and things
21  like that?
22      A.  I'm sure there were, yes.  I'm
23  sure there were.
0150
1       Q.  Do you remember going in any -- Do
2   you have regional meetings?
3       A.  Yes, we do.
4       Q.  Where regional managers attend?
5       A.  Uh-huh.
6       Q.  Yes?
7       A.  Yes.
8       Q.  You have regional meetings where
9   regional managers and district managers and
10  general managers attend?
11      A.  Yes.
12      Q.  What happens at those meetings?
13      A.  Cover new policies that the
14  company may be implementing.  They might
15  talk about strategies for the hotel going
16  forward.  Might cover how to's in certain
17  situations with regard to computer work and
18  entries and how we handle things.
19      Q.  Do you cover discrimination?
20      A.  I think I have a recollection of
21  that being discussed at some of those
22  meetings.
23      Q.  Like have you -- You've been in

0151
1  management a while.
2      A.  I have.
3      Q.  Right.  All right.  You know it's
4  illegal to discriminate against somebody
5  because of their gender and in regards to
6  pay; correct?
7      A.  Period.
8      Q.  What?
9      A.  Period.  It's not right to
10  discriminate against somebody period,
11  whether it's pay or whatever it is.
12      Q.  And you've known that because
13  you've been managing --
14      A.  Yes.
15      Q.  -- management jobs for a long
16  time?
17      A.  Yes.
18      Q.  Okay.  Have you heard of -- Do you
19  need a break?
20      A.  If I could.  Sure.
21         (Whereupon, a short recess was
22  taken.)
23      Q.  Is Fetner still employed?
0152
1      A.  Yes.
2      Q.  If you falsify documents when you
3  fill out forms and stuff and applications
4  and you talk to people about -- you can get
5  fired for that if you lie about it; right?
6      A.  I suspect you could, yes.
7      Q.  Is there exceptions to that?
8      A.  I'm sure there are, yes.
9      Q.  All right.  Fetner didn't tell you
10  that he lied when he filled out his
11  application, did he?
12      A.  No.
13      Q.  He didn't tell you that he lied
14  when he told you he had a college degree,
15  did he?
16      A.  I read that in one of the
17  depositions.
18      Q.  Is that the first time you knew?
19      A.  Yes.
20      Q.  All right.  One of the reasons you

21  hired him and recommended him was you
22  thought he had a college degree; right?
23      A.  Yes.
0153
 1      Q.  Well, you put it in both of your
 2  letters about hiring him, he's got a college
 3  degree and promoting him, he's got a college
 4  degree.  You liked that, didn't you?
 5      A.  I did.
 6      Q.  And you thought that was one of
 7  the justifications for paying him thirty-two
 8  thousand dollars, was the fact that he had a
 9  college degree; right?
10      A.  That was one of the justifications
11  for paying him -- for hiring him and paying
12  him, yes.  Period.
13      Q.  This thing, performance reviews,
14  see there, it's on this handbook.  It
15  doesn't have any page numbers is why I'm
16  having trouble with this.  It's got a
17  section about performance reviews?
18      A.  Right.
19      Q.  And you've done performance
20  reviews on Ms. Stough.  And when you do it,
21  you turn it in to corporate?
22      A.  Yes.  To the operations director.
23      Q.  All right.  I don't have any of
0154
 1  those.
 2          MR. GOLDFARB:  And I guess I'm
 3  speaking to your attorney on Ms. Stough.
 4          MR. KESSLER:  Nor do I.  We
 5  haven't seen any of the forms.
 6      Q.  You're not the keeper of the
 7  performance reviews; right?
 8      A.  No, sir.
 9      Q.  As the district manager, do you
10  have an office other than your -- like the
11  location you're working out of which would
12  have been Ozark?
13      A.  No.
14      Q.  Do you have a -- At the Ozark
15  location, though, do you have a place where
16  you keep all your papers and filings?
17      A.  Today I have a place where I keep

18  some records, yes.
19      Q.  Let's go back to 2004 when Belinda
20  was there.  Did you have a --
21      A.  No.
22      Q.  Where did you put all your stuff?
23  Like when you fill out a performance review
0155
 1  on somebody, what do you do with it?
 2      A.  You might carry it with you for a
 3  while and you might hang on to it for a
 4  while.  But it usually goes to either your
 5  regional manager or to corporate office.
 6      Q.  So you send it all in to either --
 7  generally you send it to corporate office?
 8      A.  Correct.
 9      Q.  And what do they do with it; do
10  you know?
11      A.  No, sir.
12      Q.  When you send it to -- not Winey.
13  You send it to HR; is that right?
14      A.  Probably.  Depending on what it
15  is.  That type document would more than
16  likely go to Greg.
17      Q.  Like a raise type document where
18  you want to evaluate somebody to get a
19  raise?
20      A.  I think that would go to either
21  corporate office or Greg.
22      Q.  Greg is at corporate office;
23  right?
0156
 1      A.  Yes.
 2      Q.  What do you send to the HR folks,
 3  if anything?
 4      A.  They require documents -- If
 5  you're going to raise a salary, they require
 6  a document to be sent to them as well.  But
 7  it has to be signed off by the proper
 8  people.
 9      Q.  Like Greg Winey would sign it?  So
10  you would send it to Greg and Greg would
11  send it to HR?
12      A.  Right.  Or to whom.
13      Q.  Right.  Are you familiar with the
14  progressive disciplinary policy of the

15  company?
16      A.  Not off the top of my head.
17      Q.  Are you familiar with the
18  discipline program in the handbook?
19      A.  As it's stated in the handbook,
20  not without refreshing my memory, no.
21      Q.  When is the last time you've read
22  the handbook?
23      A.  In a number of years.
0157
1       Q.  There's a -- It's called a
2   progressive discipline program.  Have you
3   ever heard of that?
4       A.  Yes, I'm familiar with that.
5       Q.  What's your understanding of the
6   progressive discipline program?
7       A.  That basically you should allow
8   someone the opportunity to improve.
9       Q.  Is there certain steps that you
10  follow in adherence of the progressive
11  discipline program or do you just have this
12  general philosophy?
13      A.  General philosophy.
14      Q.  Okay.  Have you had any training
15  on the company's progressive discipline
16  program?
17      A.  Not that I recall, no.
18      Q.  Before I mentioned it, calling it
19  that, progressive discipline program, is
20  that the first time you've heard that
21  terminology used for a discipline program at
22  Jameson?
23      A.  I may have heard it referred that
0158
1   way before.
2       Q.  Who told you about that?
3       A.  Again, either in reading the
4   handbook myself and/or over the course of
5   time.  I may have -- I don't know
6   specifically.
7       Q.  It's been several years since
8   you've read the handbook; right?
9       A.  From cover to cover, yes.
10      Q.  Well, this Exhibit 16 to Mr.
11  Winey's deposition is the -- it's a chart.

12  Did you make this general manager and
13  assistant manager or whatever?  This is a
14  chart.  Did you make this chart?
15      A.  No.
16      Q.  Do you know who did?
17      A.  I do not.
18      Q.  Have you reviewed it before today?
19      A.  It was part of the documents of
20  the case, was it not?
21      Q.  Yes.
22      A.  Then I have looked at it, yes.
23      Q.  Are these people that -- These are
0159
 1  not the people that -- not all of the
 2  individuals who are under your control and
 3  supervision as a district manager between
 4  July of 2000 and December 31st of 2005;
 5  correct?  There are many more folks that
 6  you've had authority over; right?
 7      A.  Correct.
 8      Q.  And those are all the hotels that
 9  we've gone through and the names that you
10  can remember; right?
11      A.  Yes.
12      Q.  Do you know if these particular
13  stores represent -- as far as you having
14  authority over them at any particular point
15  in time in your career?
16      A.  I don't.
17      Q.  Is there an employee -- Was there
18  an employee named Lisa Roanie?  Do you know
19  Lisa Roanie?
20      A.  Lisa Roanie.  That's a familiar
21  name.
22      Q.  Well, I think she trained Mr.
23  Fetner, gave some help in assisting Mr.
0160
 1  Fetner.  Do you remember her?
 2      A.  Lisa Roanie.  Okay.  She's out of
 3  Eufaula?  Would that be correct?
 4      Q.  I think so.  I know Betty Sutton
 5  was a GM.  What was Lisa's job?
 6      A.  Front desk clerk.
 7      Q.  Who's the GM at Eufaula now?
 8      A.  Betty Sutton.

9      Q.   Is Betty also a DM?

10      A.   She is today, yes, sir.

11      Q.   You promoted her to DM?

12      A.   I made a recommendation that she

13   be promoted, yes.

14      Q.   Do you know of any reason Ms.

15   Ellis would not have a personnel file?

16      A.   No, I don't.

17          (Whereupon, Plaintiff's Exhibit

18   No. 2 was marked for identification.)

19      Q.   Exhibit 2 is -- Well, tell me what

20   is Exhibit 2.  This came from I think Ms.

21   Stough and I gave it to y'all.  It's got a

22   number eleven on it.  What is that?

23      A.   A certificate awarded for

0161

1   completing a hospitality training program.

2      Q.   A general manager class?

3      A.   General manager class is what it

4   says.

5      Q.   Who goes to the general manager

6   classes?

7      A.   Give me one second, please, sir.

8   Typically, newly hired GM's.  Sometimes

9   ADM's.  Sometimes front desk managers, I

10   guess.  Sometimes district managers.

11      Q.   Anybody can go?

12      A.   Well, yes.  I think anybody can

13   go, yes.  I think they've had all kinds in

14   these classes before.

15      Q.   At this point in time, you were

16   over Ms. Stough; right?

17      A.   I'm looking for a date on it.

18      Q.   Well, there's a May 23rd, 2002.

19      A.   2002.

20      Q.   Yes.

21      A.   That would depend on when in 2002

22   this occurred, I guess.

23      Q.   Well, when were you not over Ms.

0162

1   Stough between 2000 and 2005 or 2004, when

2   she left?

3      A.   There's a period of time where --

4   Well, I guess that's the period of time when

5   I was at the hotel a lot.

6    Q.  My question is, from January of
7  2000 to the day she left on February 18,
8  2004, during that block of time, was there a
9  period of time that you did not -- you were
10  not over Ms. Stough as a DM?
11    A.  That is correct, yes, sir.
12    Q.  When were you not over her?
13    A.  That would be the first quarter of
14  2002.  That would be the fourth quarter of
15  2001.  Probably a good bit of the time in
16  the second quarter of 2002.  And April --
17  let's see -- the second quarter of 2001,
18  third quarter of 2001.
19    Q.  So from the second quarter of 2001
20  until part of the second quarter of 2002,
21  you were not -- you had no control over Ms.
22  Stough; is that correct?
23    A.  No, I didn't say that.  There was
0163
1  another district manager that was over that
2  hotel.  That's when I spent a lot of time at
3  that hotel, though.
4    Q.  Who was the other DM?
5    A.  Paul Komanecky.
6    Q.  But you were district manager also
7  during that period of time?
8    A.  I was.
9    Q.  Did you have some control over
10  that hotel that you shared with Paul?
11    A.  I would say I was certainly in a
12  supervisory role there, yes, sir.
13    Q.  Over Ms. Stough?
14    A.  Yes, sir.
15    Q.  What you're saying is you shared
16  some responsibility --
17    A.  Yes, sir.
18    Q.  -- during that time period.  But
19  during -- from January of 2000 until Ms.
20  Stough left, the whole time you had some
21  supervisory control over Ms. Stough, whether
22  you shared it or not; right?
23    A.  I would say that would be
0164
1  accurate, yes.
2    Q.  What you're saying is, between the

3  second quarter of 2001 and the second
4  quarter -- I'm sorry -- yes, the second
5  quarter -- the fourth quarter of 2001 and
6  the second quarter of 2002; right?
7     A.   A good part of 2001 and parts of
8  2002.
9     Q.   You had some shared responsibility
10  with Paul?
11     A.   Yes.
12     Q.   And that ended in the second
13  quarter of 2002; right, the shared
14  responsibility?
15     A.   That is correct.
16     Q.   That's because what happened with
17  Paul?
18     A.   That is because the regional
19  manager left the company and Greg took over
20  as the regional and I got the property back
21  as a district manager and reported directly
22  to Greg.
23     Q.   That was when?
0165
1     A.   That would be the end of the third
2  quarter of 2002.
3     Q.   Beginning of the third quarter of
4  2002?  Is that what you said?
5     A.   Yes.  Somewhere in that time
6  frame.
7     Q.   Who was the regional manager who
8  left again?
9     A.   Hal Smith.
10     Q.   And then from that point on, you
11  did not share responsibility with the
12  district manager during the rest of Ms.
13  Stough's employment; right?
14     A.   Correct.
15     Q.   Anyway, back to the Exhibit 2, Ms.
16  Stough went to some general manager class.
17  Did you send her to this class in May of
18  2002?
19     A.   I don't recall doing that.
20     Q.   Well, how did she get to go to the
21  class generally?  I mean, if you're a
22  general manager and you -- there's a class,
23  how do you attend it?

0166
1       A.   Someone recommends that this
2    person goes to the class to be trained
3    additionally on whatever necessary.
4       Q.   Does it cost money for the company
5    to send her?
6       A.   Depending on where they hold the
7    class.  It may be in one of our own hotels.
8    It may not cost any.
9       Q.   Do you know where this class was
10   held?
11      A.  I do not.
12      Q.   Are you saying you did not
13   recommend or you just don't remember whether
14   you did or didn't?
15      A.  I'm sure -- I mean, I would have
16   recommended her.  I'm sure I would have.
17   But I don't think I recommended her to go to
18   the class.  Where was it held; do you know?
19      Q.  No.  I don't know.
20      A.  I don't know either.
21      Q.   Have you seen certificates like
22   this before?
23      A.  I have.
0167
1       Q.   Is this a standard thing that your
2    general managers go through?
3       A.   Today it certainly is, yes.
4       Q.   Has it been that way since Ms.
5    Stough was employed?
6       A.   I think it's changed a little bit
7    over time.  Gotten a little more formal in
8    the process.
9       Q.   Do you recognize these corporate
10   office participants?  Greg Winey was there.
11   Jeff Hurley.
12      A.   Yes, I do.
13      Q.   Do you know -- Does that help you
14   remember when there was a training session
15   with these guys and the women were there?
16      A.   I'm sorry, no.
17      Q.   So it's your testimony that this
18   class is -- Well, do you know if this class
19   was exclusively for general managers?
20          MR. KESSLER:  I think you've

21  already asked him that.
22     A.  I don't.  I think this is where --
23     Q.  No.  I mean this particular
0168
 1  class.  You don't know who was there, do
 2  you?
 3     A.  I don't.
 4     Q.  You were not there; right?
 5     A.  I don't think I was there, no.  I
 6  don't know where this class was held.  I
 7  don't know what time it was held.
 8     Q.  All I know is that it was on May
 9  of -- what you see there -- May of 2002 and
10  corporate office participants were listed
11  there.
12          Do you remember going to any
13  training session around -- sometime in 2002
14  where these folks were there that's listed
15  as the corporate office participants and
16  Greg was there and some of the others?
17     A.  Not specifically, no.
18     Q.  Have you been to any training
19  classes where Ms. Stough was there with you?
20     A.  I will say that's likely.
21     Q.  How often are general manager
22  classes held?
23     A.  Today, several times a year.
0169
 1     Q.  Is this a typical -- typical areas
 2  that are covered in a general manager class
 3  that are listed on Exhibit 2 there?
 4     A.  I would say so.  Not always the
 5  case, of course.
 6        (Whereupon, Plaintiff's Exhibit
 7  No. 3 was marked for identification.)
 8     Q.  Exhibit 3 is another document that
 9  you gave me.  Are you familiar with this
10  Exhibit 3?  It's called for the record
11  annual general manager bonus program.  Are
12  you familiar with this document?
13     A.  Yes.
14     Q.  Did you fill this out?
15     A.  No, I didn't.
16     Q.  Do you know who did fill this out?
17     A.  I don't.

18     Q.  Do you fill documents out that are
19  like this on people?
20     A.  Every time I've filled out some
21  documents that are -- would ask for -- to
22  grade manager's in certain areas, yes.
23     Q.  Have you filled out one like this?
0170
1     A.  No.
2     Q.  Have you ever seen a document like
3  this before I just showed it to you?
4     A.  Yes, I think so.
5     Q.  Did you fill out any documents
6  that allowed Ms. Stough to receive a bonus?
7     A.  She only calculated through
8  corporate office.
9     Q.  Are you involved in determining
10  whether an employee receives a bonus or not
11  or is that done through corporate office?
12     A.  It's done through corporate
13  office.
14     Q.  Did you know that Ms. Stough
15  received bonuses?
16     A.  I think she's got a bonus or two,
17  yes.
18     Q.  Have you looked at her payroll
19  records to determine how many bonuses she's
20  received ever?
21     A.  No.
22     Q.  When you were a GM, did you get
23  bonuses?
0171
1     A.  Yes.
2     Q.  Typically, how much bonus would a
3  GM receive if they do a good job in a sixty
4  room project per year?
5        MR. KESSLER:  Talking about now or
6  some other time?
7     Q.  In 2004.  Annually.
8     A.  It's hard to say.  The bonus plan
9  has changed a number of times in the last --
10  well, since '95 when I started with the
11  company.  It's changed probably almost
12  annually.
13     Q.  Is five thousand dollars typical a
14  year?

15     A.  I would say that would be low,
16  very low.
17     Q.   Sometimes they can get ten?
18     A.  I would say ten and higher.
19  Fifteen.
20     Q.   Twenty?
21     A.   It would be on the high end.  But
22  depending on what bonus plan was in effect
23  at that time.
0172
 1     Q.   In 2001, what was the bonus plan;
 2  do you know?
 3     A.   No, sir.
 4     Q.   What have been the different types
 5  of bonus plans that have been in effect?
 6     A.   They started out in '95 tying
 7  bonuses to top line revenue.  Then they
 8  moved it and started tying it to bottom line
 9  revenue.
10         Then they started factoring in
11  gates that managers had to get through to
12  get bonus.  Made it more challenging,
13  difficult over time, I guess.  They factored
14  in QA inspections and other things.
15     Q.   During that freeze period, was it
16  one of the more difficult times to get a
17  bonus?
18     A.   I can't see how.
19     Q.   Bonuses were given during that
20  period?
21     A.   To the best of my recollection,
22  they were.
23     Q.   And bonuses would go from -- up to
0173
 1   -- they could be two thousand dollars;
 2  right?
 3     A.   Oh, they could be six, seven
 4  thousand, ten dollars.
 5     Q.  Each bonus?
 6     A.  Yes.
 7     Q.  Did Mr. Fetner receive bonuses?
 8     A.  I hope he has.  I'm not sure.
 9     Q.  Is there a time period before
10  you're eligible for bonuses when you start
11  as a GM?

12      A.  I'm sure there is a time period
13  for eligibility.  I'm not sure exactly what
14  that is, whether it's six months, a year.
15  I'm not sure.
16      Q.  You do remember Ms. Stough
17  receiving bonuses; is that right?
18      A.  I remember seeing a document where
19  she did receive a bonus, yes.  Bonuses were
20  paid four times a year, sometimes five.
21      Q.  Do you remember her getting
22  bonuses in 2003?
23      A.  Specifically, no, I don't.
0174
1       (Whereupon, Plaintiff's Exhibit
2   No. 4 was marked for identification.)
3       Q.  In August of 2003, did -- Does
4   this indicate Ms. Stough received a bonus,
5   this Exhibit 4?
6       A.  No, it doesn't.
7       Q.  What is that two thousand dollars
8   for?
9       A.  That could be a bonus, yes.
10      (Whereupon, Plaintiff's Exhibit
11  No. 5 was marked for identification.)
12      Q.  Is that your handwriting on
13  Exhibit 4?
14      A.  No.
15      Q.  Have you seen a document like
16  Exhibit 4 before today?
17      A.  No.
18      Q.  Exhibit 5 may help you.  And
19  that's part of -- that's for that same time
20  period.  See there.  This is the actual --
21      A.  Yes.  I see where it says bonus,
22  yes.
23      Q.  Okay.  Do you know what that eight
0175
1   beside the bonus means?
2       A.  No, I don't.
3       Q.  You do see she did receive a
4   bonus, though, for two thousand dollars;
5   right?
6       A.  That's what this says, yes, yes, sir.
7       Q.  Did you not know that she had
8   gotten a bonus working there before this

9   case started?  Did you not know she had
10  received a bonus?
11      A.  I would expect all GM's to get a
12  bonus from time to time.
13      Q.  Based on what?
14      A.  Based on if they didn't get one at
15  least from time to time, then they probably
16  weren't doing something right.
17      Q.  Ms. Stough got other bonuses other
18  than that one; right?
19      A.  I do not know that.
20      Q.  Well, if you're performing well --
21  And one of the ways the company rewards you
22  for doing a job and making the company money
23  is giving them a bonus; right?
0176
1       A.  Well, what happens, a large
2   account moves into your market and drives
3   your business up for the quarter.  And as a
4   result of that, you have good numbers and
5   you get a bonus for that.
6       Q.  Do you know if that's what
7   happened with Ms. Stough?
8       A.  I do not.
9       Q.  What's the purpose of a bonus
10  program at Jameson Inn?
11      A.  In my mind, in my eyes, the
12  purpose of it?  Is that what you're asking?
13      Q.  What have you been told is the
14  purpose of having a bonus program?
15      A.  Well, I think that's part of the
16  compensation package for our employees, our
17  general managers.  And so I've always looked
18  at it as a part of that compensation.
19      Q.  Do you understand that the purpose
20  of the bonus program is to incentivize -- is
21  to motivate the employees to make the
22  company money?
23      A.  That's fair.
0177
1       Q.  I mean, is that what you
2   understand?
3       A.  I think that's one of the
4   purposes, sure.
5           (Whereupon, Plaintiff's Exhibit

6   No. 6 was marked for identification.)
7      Q.   Here's another exhibit, Exhibit 6
8   from August 31st, 2003 to Ms. Stough.  It's
9   Plaintiff's Exhibit 6.  Received another
10  bonus; correct?
11     A.   It looks like she did.  It looks
12  like it shows a bonus, yes.
13     Q.   And under there, it's got a number
14  of fifty-six hundred.  Is that the bonus she
15  had received up until that date?
16     A.   That's what it appears to be, yes.
17     Q.   Do you know of any large amount of
18  business moving to the area that caused Ms.
19  Stough to receive bonuses in 2003?
20     A.   I think Wal-Mart probably provided
21  a line share of the revenues for that hotel
22  in 2003, yes.
23     Q.   Tell me about that.
0178
1      A.   Well, they built a new super
2   Wal-Mart in Alex City.
3      Q.   When did they build it, though?
4      A.   And I want to say --
5      Q.   And we can certainly go look and
6   talk to Wal-Mart.  But when do you remember
7   them building it?
8      A.   I want to say it was in that time
9   period.
10     Q.   Starting in the beginning of 2003?
11     A.   That would have been when the
12  hotel would have benefited from that.
13     Q.   How did the hotel benefit from
14  them building a super Wal-Mart?
15     A.   Lots of business would come in at
16  the hotel and drive up revenues.
17     Q.   When did the super Wal-Mart
18  finish?
19     A.   I'm not sure of all these dates.
20     Q.   What about in 2004, was there
21  anything that helped generate revenue in
22  Alex City?
23     A.   In 2004?
0179
1   Q.  Right.
2      A.   I would have to check the record

3  to see what took place or -- I say records.
4  I would -- It's hard to say today.  I don't
5  know.  I hope there was something that drove
6  our business in 2004.
7     Q.  Well, 2005, this last year in Alex
8  City, do you know of anything in particular?
9     A.  Anything in particular?  I mean,
10  we had -- we've got race -- Talladega races
11  that comes into the hotel from time to time
12  that will help spike revenues.
13     Q.  When is that?
14     A.  It's twice a year.
15     Q.  In like the spring and fall?
16     A.  Right.
17     Q.  How far is Talladega from Alex
18  City?
19     A.  It's just under an hour.
20     Q.  So they stay there on their way
21  there is what you're saying?
22     A.  Uh-huh.  Yes.  I'm sorry.
23     Q.  Do you want to take a break?  Are
0180
1  you getting tired?
2     A.  I'm a little tired.  But whenever
3  you're ready.
4        MR. GOLDFARB:  Why don't we eat
5  lunch.
6        (Whereupon, a lunch recess was
7  taken.)
8     Q.  Do you have any relatives in
9  Alabama that are over eighteen years of
10  age?  You've got a son?
11     A.  Yes.
12     Q.  You've got a wife?
13     A.  Yes.
14     Q.  Any other relatives?
15        MR. KESSLER:  I think the proper
16  question would be in the Middle District.
17        MR. GOLDFARB:  Well, he's not
18  going to know what the Middle District is.
19     Q.  What other relatives do you have
20  in Alabama?
21     A.  Mother.
22     Q.  Where does she live, what town?
23     A.  She lives in Ozark.

0181
1      Q.  What's her last name?
2      A.  Sneed, S-N-E-E-D.  Sister, Frances
3  Steagall, S-T-E-A-G-A-L-L.
4      Q.  Where does she live?
5      A.  Ozark.
6      Q.  Do all of your relatives in
7  Alabama live in the Ozark area?
8      A.  Brother, Birmingham.
9      Q.  Anybody else in Ozark?
10     A.  I think that's it.
11     Q.  So the last names are --
12     A.  Sneed, Steagall.
13     Q.  And Woods?
14     A.  Yes.
15     Q.  Your son lives in Ozark?
16     A.  He's a student at Troy University.
17     Q.  Is this your only marriage?
18     A.  Married before.  Thirty-one year
19  old in Birmingham.
20     Q.  What's your ex-wife's last name?
21  What's her full name now?
22         MR. KESSLER:  Current name?
23         MR. GOLDFARB:  Yes.
0182
1      A.  Williams, Sandy Williams.
2      Q.  What year were you divorced?
3      A.  Officially somewhere around '76, I
4  believe.
5      Q.  Any other marriages?
6      A.  No.
7      Q.  And you were married again what
8  year?
9      A.  December of '80.
10     Q.  Where does your ex-wife live?
11     A.  Birmingham.
12     Q.  And you have a son I've heard who
13  is in Birmingham?
14     A.  Right.
15     Q.  You had mentioned earlier the
16  organizational charts.  Are organizational
17  charts still put out by the company?
18     A.  They are.
19     Q.  How often do you receive those?
20     A.  I would say once a quarter on

21  average.
22     Q.  And you've been receiving them
23  since you've been with the company?
0183
 1     A.  Yes.  Maybe not as consistently
 2  back in these days that they do today.
 3     Q.  Because I had asked y'all for
 4  organizational charts in the discovery
 5  request.  And you gathered them and sent
 6  them to your counsel.  You didn't see the
 7  discovery request?
 8     A.  I think we sent all --
 9        MR. KESSLER:  You know, if they
10  have organizational charts, I'll get them
11  for you.
12     A.  I think it's something that's a --
13  it's an e-mail document that comes out.
14     Q.  Well, you have -- Do you know what
15  the company's record retention policy is?
16     A.  I do not.
17     Q.  Do you know what that is?  Have
18  you ever heard of that?
19     A.  Yes.
20     Q.  The organizational charts lists
21  the divisions or the regions and they say
22  who the regional manager is and the division
23     -- the DM under that regional manager is as
0184
 1  well as the hotel general managers; right?
 2     A.  Right.
 3     Q.  Does it also list assistant
 4  managers if there are assistant managers?
 5     A.  It does.
 6     Q.  And that's for all the properties?
 7     A.  Yes.
 8     Q.  When you noticed that
 9  organizational chart that prompted you to
10  change Ms. Stough from an interim to a
11  general manager, that was -- did you say
12  that was in the third quarter of 2002 or
13  somewhere around in there?
14     A.  Somewhere around in there.
15     Q.  It could have been the second
16  quarter or first quarter?  I was just
17  wondering how you know the third quarter of

18  2002.
19      A.   During that time period, I noticed
20  the interim by her name.
21      Q.   I'm just trying to get at -- Is
22  there anything that we can look at that
23  would lead you to say, yes, it was on this
0185
1   date in 2002 that I did it?
2       A.   No, sir.
3       Q.   Did you -- How did you go about
4   changing the job title to just promoted to
5   the GM?  How did you do that?
6       A.   Well, again, in my eyes, my
7   objective was simply to remove the interim.
8       Q.   Right.  How did you do that?
9       A.   I would have requested either in a
10  phone conversation with somebody at
11  corporate, Greg probably or likely, and
12  gotten permission and then called the --
13  Phillis who was the assistant.
14          She was assistant at the time.
15  Kitchen today.  But I guess I would have
16  called her and told her to make the change.
17      Q.   You didn't -- None of this is in
18  writing anywhere, no written memos to them?
19      A.   Not necessarily, no, sir.
20      Q.   Have you ever viewed Ms. Stough's
21  salary and decided -- made a decision
22  whether you should increase her pay or not?
23      A.   Well, at that time -- at that
0186
1   particular time, for me, I didn't -- there
2   were several things on the table for me at
3   that time.  I felt like she deserved an
4   opportunity to --
5       Q.   To get promoted to general
6   manager?
7       A.   To be in that position as far as
8   -- without the interim in front of it.  I
9   felt like she deserved -- I feel like she
10  had the potential if I could continue to
11  work with her to become a good manager.
12          But it was more out of a -- You
13  know, I was tied up with my hotel.  So I
14  just felt like that was the right thing to

15  do, you know.  But I had issues with her at
16  that time.
17      Q.   Did you review her salary at that
18  time?
19      A.   No, not necessarily.
20      Q.   I mean, have you ever sat down and
21  reviewed her salary while she was under you?
22      A.   As I said earlier, I've done some
23  evaluations with regards to that, yes, sir,
0187
1  I have.
2      Q.   Can you tell me a particular
3  occasion?  I mean, the way you testified
4  before, it was generally with -- you did
5  it.  You looked at it.
6          Tell me a particular occasion when
7  you reviewed Ms. Stough's salary and made
8  any decisions concerning it.
9      A.   You know, that usually was done
10  based on the performance of the hotel in
11  terms of how it was being managed, what you
12  saw at the hotel.
13          In Belinda's case, I had a lot of
14  issues with her work performance and her
15  day-to-day -- you know, she could get ready
16  for her QA's sometimes, work through the
17  night if necessary and get ready for the
18  QA.
19          But she just couldn't maintain the
20  hotel at the kind of level that is expected
21  of all GM's.  It felt like it was hurting
22  our business.
23      Q.   My question is -- I'm asking you
0188
1  for a particular occasion when you reviewed
2  Ms. Stough's salary and made a decision to
3  give her a raise or not give her a raise.
4      A.   I'm sure at that point when she
5  moved from an interim to GM, I'm sure at
6  that point, I would have looked at it.
7      Q.   Why is that?
8      A.   Well, it was actually a show of
9  confidence in her as far as -- because I
10  think that you can -- you know, I can work
11  with you and make you a better manager.

12        So I think it's -- I think that
13  was the time to look at it.  But I just
14  didn't feel like it warranted it.
15        Q.  Was she paid a general manager's
16  salary at that particular time?
17        A.  Yes.  I think she was already
18  being paid.
19        Q.  Did you have anybody else making
20  that salary?
21        A.  I'm not sure.
22        Q.  Have you ever had anybody else
23  since 2002 to 2005 make twenty-one thousand
0189
1  dollars a year in the job title of general
2  manager or interim general manager?
3        A.  Likely that there was some that
4  weren't making that kind of money in the
5  interim position.
6        Q.  And when they became general
7  manager, they get paid more?
8        A.  I don't recall any that were -- I
9  considered Belinda on the low end of the
10  GM's as well.
11        Q.  Were interim general managers --
12  There were some that were making that or
13  less is what you're saying?
14        A.  Yes, I would think.  Even today in
15  cases where that's happened.
16        Q.  When they were moved to general
17  manager, they get a bump up?
18        A.  Typically.
19        Q.  Do you know of anybody else who
20  was moved from interim to general manager
21  who has not gotten a bump up in salary?
22        A.  I do not know of any.
23        Q.  What other managers have worked as
0190
1  interim general managers other than Ms.
2  Stough?  Do you call her Stough or Stough?
3        A.  I call her Stough.
4        Q.  Okay.
5        A.  I don't recall any at this time.
6        Q.  Do you know of other people who
7  have had an interim in front of their job
8  title in any title they've had?  And I guess

9  it would be interim assistant manager.
10      You don't know of any interim
11  general managers.  Interim district manager
12  or regional manager?
13      A.  I can't -- I don't know any names
14  to give you today.
15      Q.  Okay.  You think it's happened.
16  It would be something you'd need to look at
17  the documents for; right, to figure who had
18  an interim job title?  Yes?
19      A.  Yes.
20      Q.  It would be -- In Ms. Stough's
21  case where it would say interim, would the
22  only place that would be would be in the
23  organizational charts or is it somewhere
0191
1  else it would say interim?
2      A.  That was the only place I would
3  have ever seen it, is on an organizational
4  chart.
5      Q.  Do you know anywhere else in
6  personnel they would indicate interim?
7      A.  I do not.
8      Q.  What's your role as far as the
9  payroll records go?  Do you have anything to
10  do with that, what job codes are, things
11  like that within the payroll records?
12      A.  I do not.
13      Q.  Like when you do a -- There's a
14  personal action form things.  Do you fill
15  out -- this is not even one you did.  But
16  this is like Exhibit 7 to Ms. Stough.
17      And it's -- Where it has
18  department code, is that something that you
19  write in as a general manager, that type of
20  information at the top, or is that an HR who
21  fills that out?
22      A.  It looks like this was done by
23  whoever filled it out.
0192
1      Q.  When you fill these out, do you
2  put in that information?
3      A.  That is a -- I think the two
4  hundred is a front desk person.
5      Q.  Okay.  So you do know some of the

 6  codes?
 7     A.  Yes.
 8     Q.  Y'all had sent me some
 9  verification sheets.
10        (Whereupon, Plaintiff's Exhibit
11  No. 7 was marked for identification.)
12     Q.  I want to go over a couple of
13  documents real quick.  Exhibit 7 is a
14  verification for second Plaintiff's response
15   -- Defendant's response to Plaintiff's
16  second interrogatories.  That's your
17  signature; right?
18     A.  Yes.
19     Q.  Did you read those interrogatories
20  when you signed this document and made sure
21  they were correct?
22     A.  I scanned through it, yes, sir.
23     Q.  What did you understand you were
0193
 1  doing when you verified those responses?
 2     A.  I feel like I was reviewing the
 3  document to see if there was anything in
 4  there that jumped out as being blatantly
 5  wrong or blatantly inaccurate.
 6     Q.  And you reviewed the document and
 7  made -- and nothing jumped out at you as
 8  being --
 9     A.  Right.
10     Q.  Did you see anything inaccurate?
11     A.  Not that I recollect.
12        (Whereupon, Plaintiff's Exhibit
13  No. 8 was marked for identification.)
14     Q.  Okay.  8 is Defendant's
15  supplemental responses to Plaintiff's first
16  interrogatories.  And you signed verifying
17  that you read that?
18     A.  Right.
19     Q.  And verified they were correct;
20  right?
21     A.  Yes, I did.
22        (Whereupon, Plaintiff's Exhibit
23  No. 9 was marked for identification.)
0194
 1     Q.  And then 9, I want to make sure
 2  this is also your signature.  It's

3  Defendant's responses to the first
4  interrogatories.  That's your signature
5  verifying that they are correct; right?
6      A.  That is my signature.
7      Q.  And you verified that they were
8  correct; right?
9      A.  Yes.
10     Q.  Actually there was one in the
11  first responses --
12        (Whereupon, Plaintiff's Exhibit
13  No. 10 was marked for identification.)
14     Q.  No. 10 is your responses to
15  Plaintiff's first interrogatories.  I just
16  want to -- there's a chart there.  It's got
17  Belinda making twenty-four thousand.  That
18  should be twenty-one; right?
19        MR. KESSLER:  That was my mistake.
20     Q.  Right?
21     A.  Right.
22     Q.  How frequently did you discuss
23  with Greg Winey Ms. Stough's job
0195
1  performance?
2      A.  I'll a say couple of times.
3  Several times a quarter maybe, either in
4  phone calls or --
5      Q.  Is she the only one you talked
6  about with Mr. Winey?
7      A.  No.
8      Q.  You talked about other people's
9  job performance if there are issues or if
10  there are other -- if they were doing very
11  well, you talked to him, or if they were
12  doing terrible, you talked to him; is that
13  fair?
14     A.  That's fair.
15     Q.  Did you talk to Mr. Winey about
16  everybody if there were issues going on?
17     A.  Yes.
18     Q.  Did Mr. Winey give you advice as
19  to how to handle the situation?
20     A.  He would from time to time, yes.
21     Q.  Did you walk through the property
22  with Mr. Winey where Ms. Stough worked?
23     A.  I did.

0196
1     Q.  When?
2     A.  I'm not sure of the date.
3     Q.  Okay.  You supervised Ms. Stough
4   from the time she became general manager
5   until her termination; right?
6     A.  Yes.
7     Q.  Have you had discussions with Paul
8   Komanecky about Ms. Stough?
9     A.  Yes, I have.
10    Q.  Was he the DM at the same level
11  you were a DM?
12    A.  Yes.
13    Q.  Were you a senior DM then?
14    A.  I'm not certain.  I'm not sure
15  whether that was still showing up by my name
16  or not.
17    Q.  And you haven't talked -- When's
18  the last time you talked to Mr. Komanecky?
19  You told me you talked to him since he
20  left.
21    A.  Yes.  Just a little over a month
22  ago just to find out how he was doing.
23    Q.  Did you talk about Ms. Stough?
0197
1     A.  No, sir.
2     Q.  Have you talked to him about the
3   fact that he may testify in this case?
4     A.  No, sir.
5     Q.  Have you ever talked to him about
6   Ms. Stough's lawsuit?
7     A.  I don't recall talking to him
8   about it.
9     Q.  Did you -- Was it you who decided
10  to make Ms. Stough the interim general
11  manager?
12    A.  No.
13    Q.  That was Paul Komanecky?
14    A.  It would have been Paul or Hal.
15    Q.  Okay.  Why wasn't it you?
16    A.  Because I was not -- Paul had
17  moved in as the district manager reporting
18  to Hal on that hotel.
19    Q.  Prior to that, had you worked with
20  Ms. Stough at that hotel?

21    A.  Yes, I had.
22    Q.  Did you have discussions with
23  anybody about whether she could handle the
0198
 1  job as an interim GM shortly before she was
 2  selected for that job?
 3    A.  I don't recall the discussions,
 4  no.
 5    Q.  And then did Mr. -- Shortly after
 6  Mr. Komanecky gave Ms. Stough the interim
 7  general manager job, how long was it until
 8  you began supervising Ms. Stough again?
 9    A.  Again, the second quarter of '02.
10  Possibly the third.
11    Q.  But you still were her supervisor?
12    A.  Being based out of that hotel -- I
13  was actually based out of that hotel for a
14  while.  I'd spend three days or so a week
15  there.  So I was there working during the
16  day.  What was your original question?
17    Q.  When did you start supervising Ms.
18  Stough.  I was asking you that.  I thought
19  you supervised Ms. Stough the entire time
20  she was general manager.  Do you need to
21  look at your chart?
22    A.  Yes.  I'm looking at it.
23       MR. KESSLER:  Are including
0199
 1  interim manager?
 2       MR. GOLDFARB:  General manager.
 3    A.  That would be accurate.
 4    Q.  Okay.
 5       MR. KESSLER:  You asked him that
 6  five minutes ago.
 7       MR. GOLDFARB:  Yes, I did.
 8    Q.  And when she was interim manager,
 9  you were also over her because you were her
10  district manager and you worked out of that
11  hotel, but Komanecky was over that
12  particular property as the DM; is that
13  right?
14    A.  That would be right.
15    Q.  Did you report to Komanecky?
16    A.  I did.
17    Q.  Even though he was a DM?

18      A.  Yes.
19      Q.  All right.  So why did you report
20  to Komanecky as opposed to Komanecky
21  reporting to you when y'all were both DM's?
22      A.  At that particular time, I didn't
23  have a district and he was reporting
0200
 1  directly to Hal.  So it was his
 2  responsibility to report directly to Hal.
 3      Q.  Why didn't you have a district?
 4  Why did Komanecky get a district and you not
 5  have a district?  How did that happen?
 6      A.  When they merged region two with
 7  region one, Hal had his own district
 8  managers at that time.  And they just didn't
 9  allocate any of those hotels to me at that
10  time.
11      Q.  Had Mr. Komanecky been a DM longer
12  than you had been a DM?
13      A.  No, I don't think he had.
14      Q.  Were you upset with the fact that
15  you were a DM without any stores?
16      A.  Yes.  I wasn't too happy about
17  that.
18      Q.  So they took away your
19  responsibility?
20      A.  As far as hotels, yes.
21      Q.  And that was for almost two years?
22      A.  No.
23      Q.  How long was that for?
0201
 1      A.  For about a year it looks like.
 2      Q.  From when to when?
 3      A.  From the end of the second quarter
 4  to --
 5      Q.  Second quarter of what year?
 6      A.  Second quarter of the following
 7  year, 2002.
 8      Q.  When did -- okay.  It started --
 9      A.  When they merged their regions.
10      Q.  In 2001?
11      A.  In 2001.  Let's say mid year
12  2001.  I went back and took over Ozark in
13  the third quarter of '01.  The GM left.  And
14  I went back and took over that hotel on a

15  daily basis.
16     Q.  Let me --
17     A.  I know it's confusing.
18     Q.  In mid 2001 was a merger of the
19  regions?
20     A.  Correct.
21     Q.  And that was when you lost your --
22     A.  When I did not have any hotels,
23  yes.
0202
1      Q.  And you were not the GM either
2  over Ozark at that time; right?
3      A.  At that particular time, no.
4      Q.  Okay.  So there's mid 2001; right?
5      A.  Right.
6      Q.  What did you do?
7      A.  Well, I think they were concerned
8  about that hotel.  They wanted me to spend
9  most of my time in that hotel.
10     Q.  So you --
11     A.  I would get up and drive up to
12  that hotel and spend the better part of the
13  week and go back.
14     Q.  And that was in mid 2001?
15     A.  That was -- yes.  For a period of
16  time in the middle of '01.
17     Q.  Then what happened is, later in
18  '01, towards the end of '01 --
19     A.  Third quarter of '01.
20     Q.  Third quarter, what is that, what
21  month?
22     A.  Let's say August 1st.
23     Q.  Okay.  When did you lose your
0203
1  stores, what month?
2      A.  Ask that question again.
3      Q.  When did you lose the hotels?
4  When were they taken away from you?
5      A.  When we merged the two regions in
6  the latter part of the second quarter of
7  '01.  There was only a month or two -- a
8  month spread or so there.
9      Q.  So July?
10     A.  There you go.
11     Q.  Is that June or July?

12    A.  That's fair.  July sometime.
13    Q.  Okay.  So from July '01 to August
14  of '01, you helped out at Alex City?
15    A.  Correct.
16    Q.  And then in August of '01, you
17  take over as GM at --
18    A.  Ozark.
19    Q.  -- Ozark?  And then from August of
20   '01 until -- When were you working as GM in
21  Ozark and helping out in Alex City?
22    A.  Second quarter of '02.  Possibly
23  the third quarter.
0204
1    Q.  And then in the second quarter or
2  third quarter of '02, you got places under
3  you again; right?
4    A.  Yes.
5    Q.  What places did you get under you
6  at that point in time in the second quarter
7  of '02 or third quarter of '02?
8    A.  Eufaula, Alex City, Greenville,
9  Ozark.
10    Q.  Auburn?
11    A.  Auburn.
12    Q.  Prattville?
13    A.  That was added just a little while
14  later.  But close to that time.
15    Q.  What else?
16    A.  Greg called me and asked me to
17  take that hotel over.
18    Q.  Prattville?
19    A.  Correct.
20    Q.  Who was the GM at that time there?
21    A.  Tracey Brown.
22    Q.  And she ended up being fired?
23    A.  She did.
0205
1    Q.  Who else?  What other locations?
2    A.  That was it until 2005.  And they
3  added five additional hotels.
4    Q.  When in 2005 was that, what month?
5    A.  The second quarter of 2005.  The
6  very first of the quarter.
7    Q.  What was Tracey Brown paid, her
8  salary?  Do you have any idea?

9    A.  I don't know.
10    Q.  Did you give her a raise ever?
11    A.  I don't think I did, no.
12    Q.  Exhibit 2 to Mr. Winey's
13  deposition is -- it's one of those personal
14  action forms on Betty Sutton.  Did you sign
15  that?
16    A.  Yes.
17    Q.  Did you fill out this form,
18  everything on it?
19    A.  I don't think this -- There's a
20  couple of things I don't think I put on
21  here.  But it looks like I wrote most of
22  this, yes.
23    Q.  What about the top?  Did you fill
0206
1  that out, department code, effective date of
2  transaction?  Is that your handwriting?
3    A.  It looks like it.
4    Q.  Okay.  And the next page, do you
5  recognize that signature, Hal Smith?  Is
6  that what it says?
7    A.  That's what it looks like, Hal
8  Smith.
9    Q.  And he would have been the
10  regional manager at that time?
11    A.  Yes.
12    Q.  Did you -- So he filled -- You
13  didn't fill this out; right?
14    A.  No, I didn't.
15    Q.  Is that the period of time you
16  didn't have anybody under you, any stores
17  under you in July of '01?  I wonder why you
18  didn't fill this out.
19    A.  That would be correct.
20    Q.  All right.  You had mentioned
21  earlier about some memos on the freeze that
22  you had received.
23        I just want to confirm that these
0207
1  are the only memos you received on the
2  freeze.  This is Exhibit 3 to Mr. Winey's
3  deposition.
4    A.  I can't say that they are the only
5  memos I've ever seen, no.

6     Q.  Have you seen those at least?
7     A.  Yes.
8     Q.  You received those during 2002,
9  2003; right?
10    A.  I'm not exactly sure when I got
11  them.
12    Q.  I mean, the first time you saw
13  them wasn't part of this litigation, was it?
14    A.  No.
15    Q.  Okay.  Can you tell me about any
16  other memos you received concerning the
17  freeze?
18    A.  Well, I'm just not certain that
19  there weren't others sent.  I cannot tell
20  you about them.
21    Q.  When did you first learn that the
22  freeze was going to be lifted?
23    A.  I thought it was going to be
0208
1  lifted at the end of 2003 and relatively
2  certain I did reviews on all my managers and
3  sent them up to corporate office.  I don't
4  think we actually came out of it until later
5  in '04.
6        Nobody got anything -- nobody had
7  an adjustment in wages until sometime in '04
8  or later than '04.  I'm sorry.  Yes, that's
9  correct.
10    Q.  Why did you think that it was
11  going to end in late '03?
12    A.  Because we had -- I had done these
13  evaluations on employees.
14    Q.  On all your employees?
15    A.  Yes.
16    Q.  Including Ms. Stough?
17    A.  Including Ms. Stough.
18    Q.  Have you seen that since you've
19  done it?
20    A.  I have not.
21    Q.  You did fill out an evaluation on
22  Ms. Stough as well as everybody else that
23  worked under you; right?
0209
1     A.  To the best of my recollection.
2     Q.  And you sent it to corporate?

3      A.   I did.
4      Q.   But you don't know where those
5   are?
6      A.   That is correct.
7      Q.   Who did you send it to in
8   corporate?
9      A.   I would have been intending to
10  send it to Greg Winey.
11     Q.   And on those documents, you
12  evaluated the employee?
13     A.   Yes.
14     Q.   Did you recommend anything about a
15  specific salary number for these people?
16     A.   No.  Not that I recollect.
17     Q.   It just said annual review that
18  you did?
19     A.   Just an evaluation and -- just an
20  evaluation.  I don't recall recommending any
21  salary adjustments at all.
22     Q.   Had you been doing evaluations --
23  Did you do one the prior year?
0210
1      A.   I can't say for certain that I did
2   one the prior year.  They may not have asked
3   us to do them that year.  I may have done
4   one.  I don't recall.  I don't know.
5      Q.   I've never seen that document.
6   You have not given it to me as far as you
7   know; right?
8      A.   I've not given you that document.
9   I don't have it.
10     Q.   Have you looked for it?
11     A.   I have looked for everything I had
12  that might pertain to the case submitted to
13  my corporate office before you and you as
14  limited as it was.
15     Q.   Now, all these documents I've got
16  didn't come from your office, did they?
17     A.   No.
18     Q.   Okay.  And you've got no idea
19  where those reviews are; right?
20     A.   I do not.
21     Q.   Do you have -- Can you tell me
22  what you wrote in each of the reviews for
23  everybody?

0211
1    A.  No.
2    Q.  When you did these -- the quality
3  assurance, QA's, is this -- this Exhibit 6
4  to Mr. Winey's deposition, is this the form
5   -- is that the guide you used in order to
6  fill those quality assurances out?
7         MR. KESSLER:  What period of
8  time?
9         MR. GOLDFARB:  Whenever.
10    A.  That's an overview of what the QA
11  is, yes, sir.
12    Q.  There's a date on it that says
13  April of '04.  Was it different before or
14  after that?  Do you know if that date
15  relates to the first time this came out?
16    A.  I can't answer that.  This process
17  has changed over time.
18    Q.  In what way?
19    A.  Well, they added a lot of -- They
20  focused in on certain areas they felt like
21  were weighted heavier in hotels than others
22  and added more weight to some of those areas
23  that they felt like was important.
0212
1         They moved away from some of
2  that.  They redone the forms.  Just went
3  through a metamorphosis over time.
4    Q.  All right.  If you look at a
5  couple of these --
6         (Whereupon, Plaintiff's Exhibit
7  No. 11 was marked for identification.)
8    Q.  Exhibit 11 is a product evaluation
9  that you did on Belinda Stough; right, in
10  June of 2002?  Correct?
11    A.  Right.  Correct.
12    Q.  You did that; right?
13    A.  Yes, sir.
14         (Whereupon, Plaintiff's Exhibit
15  No. 12 was marked for identification.)
16    Q.  Exhibit 12 is another one done on
17  Ms. Stough; correct, by you?
18    A.  Correct.
19    Q.  For September of 2002.  If you
20  would walk me through.  These say that --

21  For example, there's -- under physical plan,
22  you see on both of them it has thirteen,
23  number thirteen.  What does that mean?
0213
 1      A.  It is the total number of graded
 2  areas recorded on this QA done on a certain
 3  date.
 4      Q.  What does that mean to get a
 5  graded area?
 6      A.  It's a deficiency in the hotel.
 7      Q.  Looking at this score sheet that I
 8  looked at before, it's got number of graded
 9  areas.  And if you have between a nine and a
10  fourteen, it's above average.
11      A.  Okay.
12      Q.  You see.  Is that -- Was that the
13  case in 2002?
14      A.  There is an area called major
15  guest room violations.  It's not printed on
16  this document.
17      Q.  Which one are you looking at?
18      A.  I'm looking at the 6-6-02.
19      Q.  Okay.  No. 11?
20      A.  Correct.  That obviously was
21  checked at this QA.  It dropped that score
22  from an above average score to an average
23  score.
0214
 1      Q.  How do you know that by looking at
 2  the document because it's not checked on --
 3  it should be checked on the front page;
 4  right?
 5      A.  It should be.
 6      Q.  You filled it out, though; right?
 7      A.  I did.  But this has been copied
 8  several times.
 9      Q.  Where should it have been -- Where
10  should there be a check mark on Exhibit 11?
11      A.  They are not even listed here.
12  The major carpets, tubs, bedspreads, walls
13  are not even listed there.
14      Q.  I mean, I got this from y'all.  I
15  didn't change it.  Is this -- What you're
16  saying is this document should have some
17  more information on it than what's on it?

18  This is not an accurate document?
19      MR. KESSLER:  Objection.  Go
20  ahead.
21      Q.  Is that what you're saying?  Is
22  there something wrong with the document?
23      A.  No.
0215
1      Q.  Well, what should be on the -- I'm
2  just trying to figure out what there should
3  be that's not on the front page of Exhibit
4  11.  Are you saying there's something
5  missing?
6      A.  Right.  Do you have others?
7      Q.  Yes.  I've got all of them.  But
8  look at No. 12.
9      A.  Okay.
10      Q.  It says major physical plant
11  violations.  It's got some stuff written in
12  here.  Are you saying there should be things
13  written in major guest room violations?
14      A.  Yes.  It appears to me that that
15  data is not there that would have reflected
16  this QA.
17      Q.  Okay.  Why is it not there?
18      A.  I don't know.  It didn't copy well
19  it looks like.
20      Q.  So you think --
21      A.  This probably should have
22  represented -- a thirteen would have
23  represented an above average QA.
0216
1      Q.  In 2002?  All I'm asking is in
2  2002 was the scoring the same?
3      A.  Why didn't you ask that?
4      Q.  Well, I am.  I did ask that.
5      MR. KESSLER:  I don't think he did
6  ask that.
7      A.  No.
8      MR. KESSLER:  You've been beating
9  around the bush.
10      MR. GOLDFARB:  No, I did.
11      Q.  What was the scoring --
12      MR. KESSLER:  Let him answer the
13  question you asked.
14      Q.  The scoring sheet I showed you is

15  the one I was talking about had the 2004
16  date on it.
17      A.  Right.  I see.  I see where you're
18  going.  I can't say for sure that it was the
19  same scoring system, no.  I can't tell you.
20      Q.  What I do not have, though, is
21  anything that indicates --
22      A.  What the score --
23      Q.  -- what the scoring system is
0217
 1  because when I asked you before, you weren't
 2  --
 3      A.  Right.
 4      Q.  I just want to know what is the
 5  scoring system so I can look at these
 6  reports and see if they are scored according
 7  to the scoring system you have.
 8          Have you seen the scoring system
 9  documents from the period of 2002?
10      A.  I'm sure I knew what they were at
11  that time.  Now, whether they have changed
12  or not, I don't know for certain.  I can't
13  say for certain.
14      Q.  Right.  Because see, this stuff
15  dated on the Winey Exhibit No. 6 --
16      A.  Right.
17      Q.  -- is April of 2004, which is
18  after Ms. Stough's employment ended.
19      A.  Right.  I see what you're saying.
20      Q.  So what I want to know is, what is
21  the scoring system for when Ms. Stough was
22  there?  Where can I get that information?
23      A.  I would say it should be -- it
0218
 1  should be in some of this I would think.  I
 2  don't know why you don't have it.  I don't
 3  know if it's the same or not.
 4          I don't know if it's exactly these
 5  numbers.  These are basically -- I think
 6  they changed today.  I'm not sure these are
 7  accurate today, in today's QA's.
 8      Q.  I thought earlier you said it was
 9  getting more difficult, the QA's?
10      A.  It is.
11      Q.  Does that mean the numbers

12  themselves are getting tougher?  Like a one
13  to -- today maybe you have to get above a
14  twelve?
15      A.  Right.
16      Q.  Is that what you're saying?
17      A.  I think so, yes.  It's just gotten
18   -- It's moved from more difficult and
19  they've figured out it's not -- probably
20  shouldn't be in there and it's taken out.
21  They've tweaked it and tweaked it all along
22  to make it serve the company best I guess.
23      Q.  Do you have a copy of Exhibit 6
0219
 1  that would be applicable during the time Ms.
 2  Stough was there?
 3      A.  No, sir.
 4      Q.  Did you use a form similar to
 5  Exhibit 6 to grade Ms. Stough, you know, to
 6  use as your guide?
 7      A.  Yes.  We would have used that form
 8  or something similar, yes.
 9      Q.  You just don't have that today;
10  right?
11      A.  Correct.
12      Q.  So you don't know what indicates a
13  one through ten, if that's a -- what that
14  means or ten through fifteen?  I mean, you
15  don't what it indicated in 2002; right,
16  exact numbers?
17      A.  Right.
18      Q.  Okay.  On the face of these two
19  exhibits, 11 and 12, there's nothing that
20  indicates that she received a down grade,
21  you know, like -- which would drop her whole
22  score from above average to average; is that
23  correct?
0220
 1      A.  On the front of this document, I
 2  don't see that, no.
 3      Q.  Okay.  Now, do you see it
 4  somewhere else on Exhibit 12?
 5      A.  I can look.
 6      Q.  I'm going to go to the other ones
 7  where there is a down grade.  Those two were
 8  not entered in Ms. Stough's deposition by

9  your attorney.  That's why I started those.

10     A.   It looks as though tubs were

11  graded on this Exhibit 12, which would drop

12  this a letter grade.

13     Q.   Okay.  Show me how I can see

14  that.

15     A.   You can look to the back page,

16  next to the last page under bath area, tubs.

17     Q.   Okay.

18     A.   And you can see that there are

19  three or more deficiencies in that category.

20     Q.   Under tubs?

21     A.   Under tub, under cleanliness.

22     Q.   Where there's eleven?  Is that

23  what you're saying?

0221

1     A.   Correct.

2     Q.   And the C means cleanliness?

3     A.   C means cleanliness.

4     Q.   So she got -- There's eleven

5  deficiencies under this C; right?

6     A.   There are on this QA, yes, sir.

7     Q.   Which means --

8     A.   Means that that area is considered

9  a major area and drops whatever the grade is

10  one grade.

11     Q.   And where does it say -- How do

12  you know that that's a major area?  Is tubs

13  a major area?  Is that what you're saying?

14     A.   It is.

15     Q.   Are there certain major areas?

16     A.   There are.

17     Q.   And tubs is one of them because --

18  Is that on the front here?

19     A.   Tubs is one of them.  Walls is one

20  of them and spreads is one of them and

21  carpet is one of them.

22     Q.   Does it say that in the document

23  somewhere, tubs, walls, spreads?

0222

1     A.   Yes, it does.  Somewhere.

2     Q.   What did you say so I can

3  remember?  Tubs, walls, spreads?

4     A.   And carpet.

5     Q.   Carpet.  Your lawyers is showing

6  you --

7      A.  There it is.

8      Q.  Well, is that applicable at the

9  time period Ms. Stough was there, what your

10  lawyer showed you?

11      A.  Based on this QA, the answer to

12  that is yes.

13      Q.  Okay.  So Exhibit 6 would have

14  been applicable in 2002?

15          MR. KESSLER:  I pointed to him on

16  the second page of Plaintiff's Exhibit No.

17  6.

18      Q.  But Exhibit 6 from Winey is

19  applicable in 2002?

20      A.  At least the major deficiencies

21  that --

22      Q.  Okay.  Tubs, walls --

23          MR. KESSLER:  Let him finish.

0223

1      A.  Tubs, carpets, walls or spreads.

2      Q.  Bedspreads; right?

3      A.  Correct.  Yes.

4      Q.  Okay.  So part of this is

5  applicable?

6      A.  Part of it is applicable based on

7  these QA's, yes.  And it may be all.  I

8  can't verify all.

9      Q.  Are all these areas major

10  deficiencies, uniform, service, breakfast,

11  landscape, building cleanliness, guest

12  sleeping rooms?  Those are all major

13  deficiencies?

14          You know, if you get graded in

15  those areas on Winey Exhibit 6, that causes

16  you to get a drop in your overall score?

17      A.  Correct.

18      Q.  Okay.  And that was true in 2002?

19      A.  It appears that it was, yes,

20  because of the way this is graded.  You

21  dropped a grade, yes.

22      Q.  Do you know if any of these have

23  been added, these major deficiencies have

0224

1  been added since Ms. Stough left in 2004?

2      A.  The automatic fail on uniform

3  deficiency has been dropped.
4      Q.  That's no longer there?
5      A.  Correct.
6      Q.  All right.  What I'm asking is,
7  have any of these been added?  Were any of
8  these added after Ms. Stough left on Exhibit
9  6, the major deficiencies listed?
10     A.  I'm not sure when they were
11  added.  I'm not sure when they were added.
12     Q.  What I'm trying to get a sense of
13  is when I go through all these product
14  evaluations, I want to have an understanding
15  what were the major deficiencies that would
16  cause you to get this drop.
17        Because I understand from you that
18  they've added some, they've taken away some.
19  I just want to know what were they in 2002
20  and 2003 and right before she left in 2004.
21  That's the list I guess I need.  Do you know
22  where I can get that?
23     A.  No, sir.
0225
1      Q.  Do you know -- Can you sit here
2  and tell me what they were during that time
3  period?
4        MR. KESSLER:  You talking about
5  the major deficiencies?
6        MR. GOLDFARB:  Right.
7      A.  No, I can't say for sure that all
8  of those were in 2002 and in 2004.  I can't
9  tell you that.  I don't know.
10     Q.  So there could have been some that
11  were not on there that were there even;
12  right?
13     A.  It could have been some added to
14  that list.  It could have been.  Most of
15  those have been around for a while.  It's
16  just that they weighted them differently
17  over time.
18     Q.  Some of them would not have been
19  automatic fails?
20     A.  Correct.  If you had X number of
21  rooms, four or more rooms that scored -- or
22  three or more rooms that scored with three
23  or more deficiencies, that would drop your

0226
1  grade as well.  And whatever the scoring
2  system was in place at the time is what it
3  was.
4      Q.  That's what you used.  Whatever
5  the scoring system was when you did the QA,
6  you just had a particular scoring system?
7      A.  Yes.
8      Q.  You just can't sit here and tell
9  me for sure what the exact scoring system
10  was for every QA you did without having the
11  scoring system; right?
12      A.  Right.
13      Q.  Okay.  How would the scoring
14  systems come to you?  You know, would
15  somebody send them from corporate saying use
16  this scoring system now and then six months
17  later, we'll get you a new one?
18      A.  Yes.  There's been a change to the
19  QA effective this date.  This has been
20  added.  These changes have been made.
21      Q.  Okay.  Here's one that was entered
22  -- Exhibit 9 to -- that's Defendant's
23  Exhibit 9 to Ms. Stough's deposition.  There
0227
1  she got a drop one level for having three or
2  more complete room fails; right?
3      A.  Yes.
4      Q.  Well, you filled this out; right?
5      A.  Yes.
6      Q.  But her score was a fourteen,
7  which would mean that she got -- if that
8  scoring system was right, the one we went
9  over, she would -- a drop would make it just
10  an average; is that right?
11      A.  Well, it looks as though had three
12  or more complete rooms fail and continental
13  breakfast was graded, also.
14      Q.  What does NA mean beside
15  continental breakfast?
16      A.  This was a sell form if you will.
17  Sometimes that didn't -- sometimes that
18  didn't change like it was supposed to.
19      Q.  You're pointing on Exhibit 9 to --
20  it should say -- besides what it says,

21  continental breakfast was graded on one or
22  more items, it should say drop one level?
23      A.  Yes, it should.  That's what it
0228
 1  appears to me to be.
 2      Q.  Show me that continental
 3  breakfast.  What page -- what number is it?
 4      A.  Page two of two.
 5      Q.  What's the Bates number at the
 6  bottom?
 7      A.  0597.
 8      Q.  Okay.  And you say on breakfast
 9  she got a --
10      A.  That's what it looks like in
11  reviewing this, yes.
12      Q.  There's a -- If you get a one
13  check X there, that drops it; is that right?
14      A.  That's right.
15      Q.  Okay.  So she got -- You gave her
16  an X on breakfast; right?
17      A.  Yes.
18      Q.  And as a result of you giving her
19  an X, somehow -- do you type this in on
20  major service violations?  Do you type that
21  in yourself?
22          Where it says continental
23  breakfast was graded on one or more items,
0229
 1  do you type that in?
 2      A.  No.  It rolls it up -- the
 3  document rolls it up to that page.
 4      Q.  Okay.  Explain to me how you do
 5  this form.  You go in the restaurant and you
 6  walk through and you hand write it out;
 7  right, on some type of form?
 8      A.  Correct.
 9      Q.  What does that form look like?
10      A.  Well, for me, it was a combination
11  of a note pad and a blank form.  And that
12  was not always the case that I had a blank
13  form with me.  Typically, that was the case
14  that you'd go.
15      Q.  Okay.  A blank form like --
16      A.  This form completely blank.
17      Q.  Exhibit 9?

18    A.  Yes.
19    Q.  Defendant's Exhibit 9?
20    A.  Yes.
21    Q.  Okay.  So you would either use
22  your note pad or whatever and you'd fill out
23  the -- would you -- like for 594, did you
0230
1  fill all that out?
2    A.  You would fill that out or you
3  could take notes on a separate sheet if you
4  needed to.  Pressure wash building.
5    Q.  All right.  Then you go to 595.
6    A.  Same way.
7    Q.  And 596.
8    A.  Same way.  596?
9    Q.  Right.  Is this where you --
10    A.  Yes.  This is where you needed
11  this to go down the list and make your
12  checks.
13    Q.  Okay.  That's what you did for
14  597; right?
15    A.  Correct.
16    Q.  And then 598, you would do the
17  same thing with checks?
18    A.  Yes.
19    Q.  All the way -- The checking would
20  go all the way through the end of it; right?
21    A.  Right.
22    Q.  And then --
23    A.  Yes.
0231
1    Q.  Then what would happen is you
2  would go back to the computer and you'd type
3  in the checks?
4    A.  Correct.
5    Q.  You would do that yourself?
6    A.  I would.
7    Q.  And then what happened?  How did
8  it end up being on the front page of 592 on
9  Defendant's Exhibit 9?
10    A.  Then you would get this report
11  with -- showing a grade as to how the hotel
12  did.
13    Q.  Did you type anything on here on
14  the front page?

15    A.  The overall summary was typed in
16  by me.
17    Q.  And then the computer would fill
18  out the rest?
19    A.  It would.
20    Q.  Based on the information you
21  entered?
22    A.  Correct.
23    Q.  Did you check the front page to
0232
1  make sure it matched the back pages?
2    A.  I'm not following you.
3    Q.  Like page 592, did that spit out
4  for you after you --
5    A.  That's the -- yes.  That you went
6  to, to see how the hotel scored because you
7  don't know how the hotel scored until you
8  got to this page to look at it.
9    Q.  And then page 593 would be also
10  something the computer would spit out;
11  right?
12    A.  Right.
13    Q.  And when the hotel scored, however
14  it scored, you would see that on 592 which
15  would be also the page you typed in the
16  overall summary; right?
17    A.  Yes.  That's the one we done
18  before you're finished.
19    Q.  You would do that before you
20  finished?
21    A.  You would have to look at it and
22  then type that in.
23    Q.  Right.  So you'd get the overall
0233
1  score, then you'd type that in?
2    A.  Yes.
3    Q.  And how would you send this
4  information to corporate?
5    A.  Well, that would be e-mailed in to
6  corporate.
7    Q.  The whole form?
8    A.  The whole form.
9    Q.  Would you save a copy on your own
10  lap top?
11    A.  Yes.

12    Q.  So all of these product
13  evaluations are on the computer or were on
14  the computer because you typed it into the
15  computer and you e-mailed it to corporate?
16    A.  Yes.
17    Q.  How long did you save it on your
18  hard drive?
19    A.  Well, that varied.  I've had to
20  replace my lap top at least twice, maybe
21  three times since I've been with the
22  company.
23    Q.  Did you back it up on disk?
0234
1    A.  No, sir.
2    Q.  So your backup -- As far as you're
3  concerned, what you did is you filled it out
4  and then you e-mailed it to corporate;
5  right?
6    A.  I also sent a copy to the hotel,
7  of course.
8    Q.  A hard copy or a computer file?
9    A.  Lately computer files.  There may
10  have been a day when we were doing it the
11  other way.
12    Q.  Since 2002, how were you doing it?
13    A.  Just computer.
14    Q.  So you'd e-mail it to the hotel?
15    A.  We mailed a copy, e-mailed
16  regional and corporate.
17    Q.  Okay.  You said you have a copy,
18  an electronic copy?
19    A.  I do.
20    Q.  An electronic copy would go to
21  corporate?
22    A.  Well, when I say corporate, I
23  meant when Greg was our -- my director of
0235
1  report.  He would get a copy of that, yes.
2    Q.  And then you'd also -- What about
3  regional?  Would you send regional a copy?
4    A.  Regionals would get copies.
5    Q.  Your regional manager?
6    A.  Yes.
7    Q.  What about when you had a -- your
8  regional manager was somebody other than

9   Greg?  Did you send it right to the regional
10   manager and to the corporate office?
11       A.   Not really, no.
12       Q.   What other regional managers did
13   you send it to other than Greg?  Mr. Smith?
14       A.   He would have gotten it.
15       Q.   Did you send it --
16       A.   And Durben would have gotten it at
17   one time, Kevin Durben.
18       Q.   Your regional?
19       A.   Yes.  Sharon Register would have
20   gotten it at one time.  Sandy McGuffey would
21   have gotten it at one time when I was under
22   her.
23       Q.   Did you also -- When you were
0236
1   sending it to those people, did you also
2   send it to the corporate office?
3       A.   No.
4       Q.   So you sent it to the regional,
5   you sent to the hotel and you had your own
6   copy?
7       A.   Yes, sir.
8       Q.   Did you get any feedback when you
9   e-mailed them?
10       A.   Sometimes, yes.
11       Q.   What kind of feedback from
12   corporate or from regional?
13       A.   From regional?
14       Q.   Right.
15       A.   They might want to know what drove
16   the -- came up with the issues at the
17   hotel.  They might call and speak directly
18   to the GM about it.  They might call them up
19   and congratulate them, done a good job.
20       Q.    These things that happened, did
21   you have conversations with the DM's -- I'm
22   sorry -- the regionals concerning Ms.
23   Stough, the product evaluations you did on
0237
1   her?
2       A.   Yes, sir.  I'm sure I would have
3   had conversations, yes.
4       Q.   So just because -- and I'm looking
5   at No. 10 from Mr. -- this is another one

6  you did, Exhibit 10 from Mr. Stough.  That's
7  Exhibit 10 to Ms. Stough's deposition.
8      Just because -- Under the major
9  service violations -- this is something that
10  was confusing me on all of these.
11      Just because it says NA doesn't
12  mean that they weren't graded; right?
13    A.  That's right.
14    Q.  So it should say something?
15    A.  It should.
16    Q.  But it -- But whatever is typed in
17  there -- Do you type that out, where it says
18  landscaping graded under major physical
19  plant violations?  No?
20    A.  No.
21    Q.  The computer does that; right?
22  Yes?
23    A.  I'm trying to remember whether or
0238
1  not I had to type that in or whether the
2  computer did that.  I may -- I'm not
3  positive on those areas there.
4      I know all the numbers transferred
5  here to here and I think it transferred
6  here.  I'm not positive on that.  I just
7  don't recall whether I had to type that in.
8    Q.  Okay.  The computer may have done
9  it; you don't know?
10    A.  Correct.
11    Q.  Who's Lynn Jones?
12    A.  She was a district manager at one
13  time.
14    Q.  Was she over Auburn?
15    A.  No.  Not that I recall.
16    Q.  Well, on No. 10 it says uniform
17  deficiency, automatic fail.  It has NA.  In
18  any of these areas was Ms. Stough --
19  Defendant's Exhibit 10 -- was she graded on
20  10, No. 10?
21      MR. KESSLER:  You just asked him
22  that.  You asked him that about three
23  minutes ago.
0239
1      MR. GOLDFARB:  No, I didn't ask
2  him.  That's 10.  We did 9.  This is a

3  different one.
4     Q.  I had showed you this one before.
5  I was asking you about this one.  I'm not
6  trying to trick you or anything.
7        MR. KESSLER:  Well, you tricked
8  me.
9     A.  It looks like tubs are graded.
10    Q.  Okay.  So what I've got to do is
11  what you're doing, is go look on the back
12  pages to figure out if it's graded?
13    A.  Correct.
14    Q.  Because these -- this information
15  on the front page of the exhibit,
16  Defendant's Exhibit 10, this is just form
17  stuff.  Uniform deficiency, automatic fail,
18  that's always there; right?
19    A.  Yes.
20    Q.  And then what you've got to do is
21  go back and look and see if they were
22  actually graded in those areas; is that
23  right?
0240
1     A.  Yes.
2     Q.  Okay.  Like if you get three or
3  more with tubs, that drops you down one
4  level; right?
5     A.  Yes.
6     Q.  There's a -- Under where it says
7  totals and there's a C, a D, an R and an S
8  --
9     A.  Correct.
10    Q.  -- the C is for cleanliness?
11    A.  It is.
12    Q.  What's the D?
13    A.  Dust and debris.
14    Q.  Do you get graded for dust and
15  debris?
16    A.  Yes.
17    Q.  And R?
18    A.  Repair or replace.
19    Q.  Do you get graded for that?
20    A.  You can receive a grade for it.
21  You don't get a -- You don't get a deduction
22  for it.
23    Q.  What is the S?

0241
1    A.  Standard.  That means what's
2  supposed to be there is there.
3    Q.  Do you get a deduction for that?
4    A.  You can get graded for three marks
5  in that area.  But the drop grades are
6  restricted to cleanliness, dust and debris.
7    Q.  What if you get a two for
8  cleanliness and a one for debris, is that a
9  grade or do you have to get three
10  cleanlinesses or three debries?
11    A.  You can get a cleanliness and two
12  dust and debries and that would be --
13    Q.  A grade?
14    A.  Oh, yes.  Three cleanlinesses are
15  graded.  Three of any of them could be a
16  grade.
17    Q.  Well, you get a drop score; right?
18    A.  That's typically reserved for
19  cleanliness and dust and debris.
20    Q.  My question is this.  If you had
21  two graded names on a cleanliness on a tub
22  and one dust and debris on a tub, would that
23  drop your score?
0242
1    A.  It could, yes.  They are
2  cleanliness related.
3    Q.  Okay.  What if you get graded for
4  directions under guest room supplies?  Is
5  that a --
6    A.  Under guest room supplies?
7    Q.  Right.
8    A.  And you get graded under what?
9    Q.  Directions.
10    A.  Directions?  Directories?
11    Q.  Maybe.  Directories, yes.  What is
12  that?  That's graded?
13    A.  Yes.  It's an item that's required
14  to be in the room.
15    Q.  Is drapes -- Graded drapes, does
16  that drop your score?
17    A.  No.  It certainly could be a
18  graded area for you.
19    Q.  But what about walls, vinyl walls?
20    A.  Walls, yes.

21    Q.   Okay.  At some point, you stopped
22  doing evaluations and Pam Freeman started
23  doing them; is that right?
0243
 1    A.   That's correct.
 2    Q.   Do you do evaluations anymore,
 3  product evaluations?
 4    A.   Not on a formal QA basis, no.
 5    Q.   Why did that stop?
 6    A.   I always thought they felt it was
 7  taking too much time for us to do that.
 8    Q.   To do the evaluations?
 9    A.   Yes.  One a quarter.
10    Q.   So now there's -- But during Ms.
11  Stough's time period, you did them?
12    A.   I did.
13    Q.   Okay.  Then after Ms. Stough left
14  is when the new graders came in?
15    A.   At some point after she left, yes.
16    Q.   Okay.  Do you know of any
17  assistant managers who made the same
18  salaries as general managers that had worked
19  at Jameson?
20    A.   I personally don't, no.
21    Q.   Did somebody tell you of some?
22  You don't personally know them; is that what
23  you're saying?
0244
 1    A.   No.  I personally don't know of
 2  any.
 3    Q.   Do you know of any interim general
 4  managers who made the same salary as the
 5  assistant general manager working at the
 6  same property as them?
 7    A.   I don't know of any.
 8    Q.   Do the general managers do
 9  performance reviews on the assistant general
10  managers?
11    A.   Yes, they would.
12    Q.   Let me show you this.  This is
13  Exhibit 12 to Mr. Winey's deposition.
14  That's a letter you sent about recommending
15  Mr. Fetner for the job.  You wrote and sent
16  that; right?
17    A.   Yes.

18    Q.  Did you send it to Mr. Winey?
19    A.  Yes, I would have.
20    Q.  Okay.  And you start off with what
21  we talked about already.  He was a graduate
22  of Troy State.  He told you that, too;
23  right?
0245
 1    A.  Let me stop and back up.  On this
 2  particular document --
 3    Q.  Winey Exhibit 12.
 4    A.  Pardon me?
 5    Q.  I'm saying things so it will look
 6  -- so when we read this deposition later,
 7  when I say things like Winey Exhibit 12, I'm
 8  referring to that.
 9    A.  Okay.
10    Q.  So we'll know what you're talking
11  about.
12    A.  Every -- Candidates were sent to
13  corporate office to interview.  And it was a
14  requirement that they be accompanied with a
15  letter of recommendation.  And in this case,
16  this is what this is.  So it may not have
17  gone directly to Mr. Winey.
18    Q.  Okay.  You may have given it to
19  Fetner to take to Winey when he interviewed
20  up there?
21    A.  Well, I think this is more
22  directed towards Phillis whose job was to
23  coordinate --
0246
 1    Q.  Okay.
 2    A.  -- the interview process.
 3    Q.  What you're saying is, you may not
 4  have sent it.  You may have given it to
 5  Fetner to send; right?
 6    A.  I may have sent it directly to
 7  Phillis is what I'm saying.
 8    Q.  Phillis?
 9    A.  Yes.
10    Q.  All right.  Did you -- You did
11  write this, though, yourself?
12    A.  Yes, I did.
13    Q.  Based on what Mr. Fetner told you?
14    A.  That is correct.

15     Q.   What he wrote?

16     A.   Based on what he told me, based on

17   a couple of interviews with him and based on

18   checking his references.

19     Q.   Did you -- You say in here

20   background check has been completed.  The

21   results are final.  What did you do to

22   conduct your background check?

23     A.   It is a outside company that you

0247

1   provide name, social security number, and

2   they do the background check for the

3   company.  They provide the company with the

4   data from that.

5     Q.   What do they check?

6     A.   They check credit and criminal

7   history.

8     Q.   Anything else?

9     A.   Such as?

10     Q.   Employment, education?

11     A.   Oh, no.  They don't check that.

12     Q.   Did you check his employment?

13     A.   I did.

14     Q.   By calling the places that he used

15   to work at?

16     A.   That is correct.

17     Q.   Did you call his parents'

18   restaurant?

19     A.   To talk with someone there?

20     Q.   His mom?

21     A.   I believe I spoke with someone

22   from the restaurant on him, yes.

23     Q.   Did he tell you that was his mom's

0248

1   restaurant?

2     A.   His parents, yes.

3     Q.   Okay.  Did you check anything else

4   on him?

5     A.   I checked his reference on the

6   condominium, administrative position at the

7   company.

8     Q.   What did they tell you he did

9   there?

10     A.   They were positive about Mark and

11   about the job he did for them there and

12  implied that he ran that fifty-three unit
13  association and took care of collecting fees
14  and had board meetings and the whole nine
15  yards.
16      Q.  Did you understand why he left?
17      A.  No.  I don't recall what he said
18  with regards to that.
19      Q.  Did you read that in the
20  deposition what happened?
21      A.  But I don't recall what that said.
22      Q.  At the time you interviewed him,
23  did you find out why he left, whether he was
0249
 1  fired or not?
 2      A.  Specifically I don't recall.
 3      Q.  You didn't talk to Mr. Jerry
 4  Chapman by chance, did you, about Mr.
 5  Fetner?
 6      A.  I just don't recall the name of
 7  the individual I spoke to.
 8      Q.  What about any of the other places
 9  that you called concerning Mr. Fetner?  Can
10  you tell me any other place you called?
11      A.  I spoke to two work related.  I
12  believe that's accurate.  And then one or
13  two otherwise that weren't necessarily tied
14  to work related.  Personal type references,
15  if you will.
16      Q.  Had Mr. Fetner had any experience
17  at any motels or hotels?
18      A.  No.  But neither had I.
19      Q.  Had he run any residential
20  properties?
21      A.  I considered his position at the
22  marina overseeing the condominiums there.
23      Q.  The one --
0250
 1      A.  It was very relevant in my
 2  decision.
 3      Q.  The one that he lived at?
 4      A.  Yes.  He actually lived there,
 5  yes.
 6      Q.  Did he tell you that --
 7      A.  Plus his college degree.
 8      Q.  Did he tell you that he was a

9    bookkeeper essentially?
10        A.   He had a lot of bookkeeping
11   experience and accounting background and had
12   worked in a capacity and level that I felt
13   was -- and after meeting the guy and talking
14   to him on at least two, maybe three times.
15        Q.   The place in Chattanooga, the
16   Housing Authority, did you call them and
17   talk to them by chance?
18        A.   I don't recall.
19        Q.   The place he just left?
20        A.   I don't recall.
21        Q.   You don't know why he left there?
22        A.   No.
23        Q.   Have you ever had anybody --
0251
1    putting Fetner aside -- that you hired not
2    tell you the truth concerning their
3    education or their reasons for leaving
4    previous jobs that you -- while they were
5    working there, you figured it out?
6         A.   No.  That I recall.
7         Q.   Anyway, Fetner did go and
8    interview in the corporate office; right?
9         A.   He did.
10        Q.   Do you know if anybody did a
11   further background check other than you at
12   the company?  Did you have some expectation
13   that they would look into it, background,
14   jobs, education?
15        A.   No, I did not.
16        Q.   In April of 2004, you sent a --
17   Exhibit 11 to Mr. Winey's deposition -- to
18    -- well, who did you send that to?
19        A.   That would have been the same
20   scenario where a GM was asked to go to
21   Atlanta and interview again.  And they
22   require a letter of recommendation.
23        Q.   And you -- Just to make sure I
0252
1    know what you're talking about, the next
2    page where it says April 21st, 2004, you
3    signed that; right?
4         A.   I did.
5         Q.   And Phillis is Phillis Davis;

6  right, in HR?
7      A.  Phillis Davis is corporate office.
8      Q.  Is she in the human resources?
9      A.  No.
10     Q.  Is she in payroll?
11     A.  No.
12     Q.  Where does she work?
13     A.  She works as an assistant to --
14  did for Greg Winey for a while.  And now Tom
15  Kitchin.
16     Q.  Greg is Greg Winey; right?
17     A.  Yes.
18     Q.  On the next page, did you fill
19  that out where it indicates the position and
20  salary?
21     A.  It looks like my handwriting, yes.
22     Q.  You wrote thirty-two K?
23     A.  It looks like my handwriting, yes.
0253
1      Q.  How did you decide thirty-two K?
2      A.  That would have been a
3  recommendation.
4      Q.  By you concerning this starting
5  salary for this man, Mr. Fetner?
6      A.  Right.  To Greg Winey.
7      Q.  Did you recommend any other
8  numbers other than thirty-two K?
9      A.  I don't believe so, no.
10     Q.  It was accepted; right?
11     A.  As far as I know, it was.
12     Q.  Did you have to assist and help
13  Mr. Fetner on a regular basis after Ms.
14  Stough left the Alexander City property?
15     A.  No more so than any other GM.
16     Q.  Did you have to do that, though?
17     A.  Again, no more than any other GM.
18  I did ask -- I did try to get him off on the
19  right foot, yes.
20     Q.  Did you think when Ms. Stough
21  left, Mr. Fetner was ready to run the place
22  by himself?
23     A.  Well, he had come in with three
0254
1  weeks training.  So he was well on his way.
2  He did have an education.  He did have work

3  experience.  And I felt very good about what
4  I thought he could do for us at that hotel.
5  So I had a lot of confidence in him.
6      Q.  My question was, did you --
7      A.  Provide help when he first
8  started?
9      Q.  My question is, did you think that
10  he was able to run that hotel after Ms.
11  Stough left by himself?
12     A.  Yes.
13     Q.  Didn't you provide help in the
14  form of Ms. Sutton and Mr. Goodman as far as
15  coming up and helping him extensively during
16  the first month after Ms. Stough left?
17     A.  I don't know what you consider
18  extensively.  But I do know that there was
19  an initial clean up period involved at the
20  hotel.
21         And then to handle side line
22  issues such as lock problems that may come
23  up and so forth, I think I called on Jim
0255
1  Goodman at Auburn since he was convenient to
2  the hotel.
3         So nothing unusual.  Nothing --
4  Nothing more than you would provide for
5  anybody else.
6      Q.  Wasn't Ms. Sutton there on a daily
7  basis?
8      A.  No, sir.
9      Q.  Was Mr. Goodman there on a daily
10  basis?
11     A.  No, sir.
12     Q.  Was Ms. Sutton there right after
13  Ms. Stough left at least once a week?
14     A.  At least once a week?
15     Q.  Yes.
16     A.  That probably would be accurate.
17     Q.  At least twice a week?
18     A.  Well, I will say once a week to go
19  up to -- again, initially I felt like we had
20  a -- we had some cleanliness issues that had
21  to be dealt with right away.  And then --
22  But certainly not on an extended or stayed
23  basis, no.

0256
1      Q.   Was Ms. Sutton at that hotel more
2   than twice a week?
3      A.   I don't think so.
4      Q.   Was she there at least twice a
5   week?
6      A.   I don't think so.
7      Q.   Was Mr. Goodman there at that
8   hotel more than twice a week?
9      A.   I would say I don't think so.
10     Q.   Was he there at least twice a
11   week?
12     A.   I don't think so.
13     Q.   Do you have records that would
14   show how often Mr. Goodman and Ms. Sutton
15   were at the property for the month following
16   Ms. Stough's last day of employment at the
17   Alexander City property?
18     A.   No.
19     Q.   Did you read Mr. Fetner's
20   deposition where he discussed about the help
21   that he received from you and Ms. Sutton and
22   Mr. Goodman when Ms. Stough left?
23     A.   Again, I looked through most of
0257
1   that.  I don't recall reading that part.
2      Q.   Were you at the Alexander City
3   property more than once a week for the month
4   following Ms. Stough leaving?
5      A.   That would probably be a good
6   average for me to be there once a week.
7      Q.   No more than once a week?
8      A.   I wouldn't think so.
9      Q.   Did you talk -- Do you talk to
10   your hotel managers at least once a day
11   everyday?
12     A.   No.
13     Q.   How often do you talk to your
14   hotel managers on the phone?
15     A.   That varies.  That varies.
16     Q.   How about in the spring of 2004?
17     A.   I don't recall.
18     Q.   Did you do it more than once every
19   other day?
20     A.   I might talk to one manager three

21  or four, five times a day.  I might talk to
22  one manager one time a week.  I might not
23  talk to a manager during the week.
0258
 1     Q.  Was there a regular procedure that
 2  you had for calling in and speaking to your
 3  managers?
 4     A.  No.
 5     Q.  You told me before when you set
 6  Mr. Fetner's salary, you did not know you
 7  were setting it at the same rate as Ms.
 8  Stough's; is that right?
 9     A.  That is right.
10     Q.  Exhibit 13 to Ms. Stough's
11  deposition, that's a reprimand you gave her;
12  is that correct?  Is that what that is?
13     A.  Yes.
14     Q.  And you were reprimanding her for
15  not notifying you about her absence from
16  work; is that correct?
17     A.  That is correct.
18     Q.  Do you know where she was, why she
19  was absent?
20     A.  I don't recall specifically why
21  this was written.
22     Q.  Okay.
23     A.  Well, hang on a secod.  Let me
0259
 1  read it.  This was becoming a reoccurring
 2  thing.
 3     Q.  Okay.  Do you know on that
 4  particular day, though, why she was not
 5  there?
 6     A.  I do not recall.
 7     Q.  Did you -- It has a line for
 8  employee signature.  Did you ask Ms. Stough
 9  to sign that?
10     A.  This is my copy.  I would assume.
11  Maybe it's my copy.  I'm not sure where this
12  -- whose copy it is.  But she would have
13  signed it or should have.
14     Q.  Do you remember her refusing to
15  sign it?
16     A.  No.
17     Q.  Is there a copy that she signed

18  somewhere?
19      A.  I'm not certain of that.
20      Q.  Do you specifically recall giving
21  it to her and asking her to sign it?
22      A.  I specifically recall, yes.
23      Q.  Do you know why there's no signed
0260
1  copy that I have?
2      A.  I don't know why.
3      Q.  Exhibit 14 may go along with
4  Exhibit 13.  Is this something you wrote up
5  and handed to Ms. Stough the same day?
6      A.  Yes.  That was to ensure that she
7  understood going forward what was expected.
8      Q.  You wanted her to give you a work
9  schedule; right?
10      A.  I did.
11      Q.  That she had to submit by e-mail
12  to you; right?
13      A.  That's correct.
14      Q.  Did she do that?
15      A.  Faithfully, no.
16      Q.  Well, did she do it some?
17      A.  I think she started out doing it
18  and stopped doing it.
19      Q.  Do you have copies of any work
20  schedules she submitted?
21      A.  No.
22      Q.  Is this an e-mail, this June 17,
23  2003 document?
0261
1      A.  That's what this looks like, yes.
2      Q.  Do you have anything that
3  indicates it was actually sent or received?
4      A.  I do not.
5      Q.  This was sent from your lap top?
6      A.  It would have been.
7      Q.  Did you CC it to anybody?
8      A.  I may have CC'd the original.
9      Q.  Well, do you know whether you did
10  or not?
11      A.  I likely could have done that.
12      Q.  In June of 2003, you were over Ms.
13  Stough again?
14      A.  Yes.  Managing.

15    Q.  How long have you been over her
16  managing that hotel and others at that point
17  in time?
18    A.  We're looking at somewhere around
19  a year.
20    Q.  Is this the first write-up you
21  have given her since you had been directly
22  over her?
23    A.  Is this the first write-up?
0262
1    Q.  Right.  On this date, the June of
2  2003 one.
3    A.  Yes, I would say so.
4    Q.  Okay.  The 15th is the same day as
5  June 17th.
6    A.  Uh-huh.
7    Q.  Did you ask her to sign that,
8  also?
9    A.  I would have.
10    Q.  Any reason why it's not signed,
11  this copy?
12    A.  I don't know.
13    Q.  Do you think there's a signed copy
14  somewhere?
15    A.  Yes.
16    Q.  Is it -- You say here her --
17  talking about her two needs improvement.  Is
18  it your standard procedure that everytime
19  somebody receives two needs improvement
20  scores, they receive -- they receive a
21  write-up?
22    A.  In most cases, they would, yes,
23  sir.
0263
1    Q.  Okay.
2    A.  This problem with Belinda of being
3  at work got to a point where it was
4  affecting the hotel.
5    Q.  Do you know if she was at the
6  doctor?  One of them mentioned something
7  about the dentist and a doctor?
8    A.  Well, those are legitimate reasons
9  not to be at work.  I'm not concerned about
10  those.  I'm talking about over a period of
11  time not being at work and not being able to

12  reach the manager at the hotel when you're
13  making calls during the day.
14          So it became a flagrant problem
15  that I had to address.  And I had to make
16  sure she understood what I expected of her.
17  So that's why these documents came about
18  with regard to absenteeism and not being at
19  work on time.
20      Q.  You couldn't get her is what
21  you're saying?
22      A.  Over a long course of time
23  throughout most of the year.  And it just
0264
1  became to where she wasn't at work like she
2  should be.  And the work performance showed.
3      Q.  Do you know where she was?
4      A.  Well, there were some cases where
5  after the fact she would produce a
6  legitimate doctor's excuse, which was fine.
7  That was not an issue.
8          But there was some cases where I
9  would call to talk about the business or
10  things company related and Belinda would not
11  be at work.
12      Q.  Okay.  You answered this I think.
13  When you get two needs improvement scores,
14  what is it that you do as a DM?  Is there a
15  procedure that you do?
16      A.  Well, they like for us to get back
17  to the hotel pretty quickly to do a
18  follow-up QA to see if they have improved
19  that because it's a below accepted score on
20  QA.
21          And so they like for us to get
22  back into the hotels to see that the GM has
23  done something about that.  Have they
0265
1  rectified the problem.
2      Q.  Do you write them up when they get
3  two in a row or just two?
4      A.  No.  Two in a row.  A pattern is
5  what you're looking for out of a GM.
6      Q.  What if they have -- or needs
7  improvement, they get better and then they
8  get another needs improvement, do you write

9  them up for that?
10     A.  Very likely.  It's a pattern that
11  you're looking at.  It's a pattern of
12  visiting the hotel and what your
13  observations are.  A pattern of QA's mixed
14  in with that and so forth.
15     Q.  So if I go through other QA's on
16  other folks that you've done and generally
17  when I see two QA's either together or
18  shortly within a period of time, two QA's
19  that are a needs improvement, there's going
20  to be a memo from you, a corrective action
21  memo like Ms. Stough got; is that correct?
22     A.  Very likely you could see a memo
23  from me, yes.
0266
 1     Q.  Any reason there wouldn't be one?
 2     A.  There might be some reasons.
 3  Could be extenuating circumstances.  One GM
 4  may have not been there and another GM had
 5  come in.
 6        So I think you have to weigh all
 7  the factors.  I look for the trends of these
 8  QA's and the performance of the hotel.
 9     Q.  Okay.  Exhibit 19 is dated
10  December 29, 2003.  That's another
11  corrective action you had done on Ms.
12  Stough; correct?
13     A.  It is.
14     Q.  And you had already interviewed
15  Mr. Fetner at that time; right?
16     A.  When did Mr. Fetner -- What was
17  his start date; do you know?
18     Q.  No, sir.  You had already
19  interviewed him in December.  That's dated
20  -- Exhibit 19 is December 29th.  And I
21  think it was on December 19th that you wrote
22  that letter on Mr. Fetner?
23     A.  Okay.  Okay.  Fair.  I
0267
 1  understand.  Yes.
 2     Q.  All right.
 3     A.  Okay.
 4     Q.  Ms. Stough is out on vacation
 5  according to Exhibit 20, at least about a

6  week and a half, January to early February.
7  Is that correct, that document Exhibit 20?
8  Is that accurate?
9     A.  As far as I know, yes.
10    Q.  That's what you were talking about
11  earlier when she was out.  Is that about
12  right?
13    A.  I would say.  It looks fine to me.
14       MR. KESSLER:  Object.  Are you
15  asking whether she was out of work or
16  whether that's what the document says?
17    Q.  Well, do you know if she was at
18  work when -- Do you have a specific
19  recollection of anything being wrong with
20  this, you know, she was actually there on
21  these days that she was not there on Exhibit
22  20?
23    A.  No.  I thought it was legitimate
0268
1  dates as far as I can tell.
2     Q.  And that's what she's supposed to
3  do, is fill out a --
4     A.  Absolutely.  That's perfectly
5  fine.  That's never been my issue.  That
6  would never be a problem.
7     Q.  And then on Exhibit 21 is -- You
8  wrote this document; correct?
9     A.  I did.
10    Q.  And you e-mailed -- Is that your
11  handwriting there; do you know?
12    A.  It looks like it.
13    Q.  You e-mailed it on February 6th?
14    A.  Okay.  Yes, sir.
15    Q.  Did you meet with her on February
16  the 3rd according to this?
17    A.  That's what it states.
18    Q.  She was out according to that one
19  we just looked at on February the 3rd.  Did
20  you call her in from vacation to meet with
21  you?
22    A.  No.  There must be an error in
23  either this date --
0269
1  Q.  Or your date?
2  A.  -- and then my date.

3     Q.  Is there something that would show
4  what the date was you actually met with her?
5     A.  I don't know of anything that
6  would, no, sir.
7     Q.  The AGM, assistant general
8  manager, was he on that property as of
9  February 4th, 2004?
10     A.  Was the AGM --
11     Q.  Fetner, yes.  Was he there
12  actually working on that property then?
13     A.  On February the 6th?
14     Q.  Well, on number three it says with
15  an AGM now on property effective 2-4-04.  Do
16  you know if he was actually there then?
17     A.  That would have been the effective
18  date.  Yes.  That would have been about the
19  time that he would have started working at
20  that hotel, yes.
21     Q.  Was he there with Ms. Stough?
22     A.  For a while, yes.
23     Q.  Were you also there?
0270
1     A.  Maybe part of that time.
2     Q.  Why were you there?
3     A.  I could have been there for any
4  number of reasons.
5     Q.  Were you there more than usual?
6     A.  No.  I was there a lot more than
7  usual over time, yes.
8     Q.  Where?
9     A.  Doing follow-up QA's and trying to
10  get Belinda on the right track, trying to
11  show her what she needed to do to keep her
12  job.
13     Q.  Who was there on the final day on
14  February 18th when you met with Ms. Stough
15  and fired her?
16     A.  Mark Fetner was there.  Belinda
17  was there.  And there may have been a
18  housekeeper.
19     Q.  Was Belinda's mom there?
20     A.  I'm not sure.
21     Q.  Do you know what she looks like?
22     A.  I do.
23     Q.  Was she fired?

0271
1     A.   Who?
2     Q.   Belinda's mom.
3     A.   She was subsequently fired, yes.
4     Q.   Why?
5     A.   She was fired by Mr. Fetner, I
6  believe.
7     Q.   Why?
8     A.   My recollection is that her
9  failure to report to work.
10    Q.   Okay.  Was there a hearing for
11  unemployment?
12    A.   I believe there was.
13    Q.   Have you seen anything that came
14  out of that hearing?
15    A.   Is it part of these documents that
16  we've seen?
17    Q.   No.
18    A.   No.
19    Q.   Do you know if she won or lost or
20  the company won or lost?
21    A.   Not particularly.
22    Q.   You don't know anything about it?
23    A.   No.
0272
1     Q.   Are you currently now over Newnan,
2  LaGrange, Americus and Albany?
3     A.   I am.
4     Q.   Was Mark Fetner allowed to hire
5  Rodney Patterson without your approval?
6     A.   No, sir.
7     Q.   You had to approve it?
8     A.   Let me think for a second.  Yes.
9  I'm sure he would have sent me the
10  documentation on it.  He would have had to
11  have gone to interview in Atlanta.
12    Q.   Mr. Goodman, did he assist Mr.
13  Fetner with maintenance?
14    A.   Did Mr. Goodman?
15    Q.   Yes.
16    A.   He may have.  I don't personally
17  recall.
18    Q.   Did Ms. Sutton assist Mr. Fetner
19  with housekeeping?
20    A.   Yes.

21    Q.  Did you decide to raise Mr. Fetner
22  to forty thousand dollars a year base
23  salary?
0273
 1    A.  No, sir.
 2    Q.  Who did decide -- Who made that
 3  decision?
 4        MR. KESSLER:  Objection.  Go
 5  ahead.
 6    A.  I'm sure that would have been a
 7  recommendation by the regional manager that
 8  he went to work for.
 9    Q.  Did you know that his salary
10  increased to forty, from thirty-two to
11  forty?
12    A.  I found that out after the fact.
13    Q.  How did you find that out?
14    A.  Guess.
15    Q.  This lawsuit?
16    A.  No.  Mark.
17    Q.  What do you mean?
18    A.  He told me.
19    Q.  Do you still stay in contact with
20  Mark?
21    A.  Yes.  Now, for a while, his hotel
22  -- Newnan would have reported to another
23  region.  That region is no longer with the
0274
 1  company.
 2    Q.  Is that a standard salary for a
 3  general manager now, around forty base?
 4    A.  It depends on a lot of things.  I
 5  think hotel size, markets and things like
 6  that.
 7    Q.  Is it a sixty room property,
 8  Newnan?
 9    A.  It's an interior corridor hotel.
10  And it probably has somewhere in that
11  neighborhood, sixty, sixty-five.
12    Q.  Interior corridor hotels, does a
13  GM make a higher salary in those?
14    A.  Some of those.
15    Q.  Is that the rule?
16    A.  I don't know about a rule.  But
17  it's a -- revenue potential is expected to

18  be higher in those hotels.
19    Q.  Because they are upgraded and
20  nicer?
21    A.  They command a little bit higher
22  rate.
23    Q.  Have you had any discussions with
0275
 1  Marilyn Hand about Ms. Stough in the last
 2  year?
 3    A.  In the last year?  Not formal
 4  discussion, no.
 5    Q.  What did y'all talk about?
 6    A.  I think she was aware that there
 7  was a lawsuit filed by Belinda.  And she may
 8  have asked if -- how things were going, if
 9  everything was all right, is that settled.
10  Something like that.
11    Q.  Anything else you discussed with
12  her?
13    A.  Not that I recall.
14    Q.  Concerning Ms. Stough.
15    A.  Not that I recall.
16    Q.  In order to get a raise, must you
17  have a performance assessment form filled
18  out on a manager?
19    A.  I would say the answer to that
20  would be yes.  Payroll would have to have
21  that.
22    Q.  Did Ms. Stough complain to you
23  about the fact that Mr. Fetner was making
0276
 1  the same salary as she was making?
 2    A.  No.
 3    Q.  Did Ms. Stough ever complain to
 4  you about her salary?
 5    A.  Not that I recall, no.  I think
 6  she was proud to be in that position.
 7    Q.  Why do you say that?
 8    A.  She worked as a front desk clerk
 9  at the hotel and had an opportunity to run a
10  couple million dollar asset.
11    Q.  Any other reasons you say that?
12    A.  No.
13    Q.  Did you ever massage Ms. Stough's
14  shoulders?

15      A.  There was one occasion behind the
16  front desk with a desk clerk at the front
17  desk five feet away where after listening to
18  Belinda complain about being so stressed,
19  that I did put my hands on her neck for a
20  matter of about ten seconds.  But I guess
21  you could say rubbed her neck.
22      Q.  Did you do that to any other
23  employees?
0277
1      A.  No, sir.
2      Q.  Ever done that to any male
3  employees?
4      A.  I may have.
5      Q.  Who?
6      A.  I don't know.
7      Q.  Have you hugged any employees?
8      A.  I'm sure over time I have, yes.
9      Q.  Who?
10      A.  A greeting hug?  Is that what
11  you're asking?
12      Q.  Yes.
13      A.  Probably quite a few maybe,
14  including corporate office staff and things
15  of that sort.
16      Q.  Have you kissed any employees?
17      A.  No, sir.
18      Q.  Let me go over one thing real
19  quick.
20      A.  Does it count if another employee
21  kissed me on the cheek?
22      Q.  Who kissed you on the cheek?
23      A.  My wife and I gave Betty Sutton a
0278
1  teddy bear after the death of her son.
2      Q.  And she kissed you on the cheek
3  when you gave it to her?
4      A.  Around Christmas time, yes.
5      Q.  Did anybody see that?
6      A.  I don't know.
7      Q.  Did she hug you and kiss you on
8  the cheek?
9      A.  I don't recall her ever even
10  kissing me.  She said she did as a thank
11  you.

12      Q.   You asked her if she ever did?
13      A.   I did.
14      Q.   After Belinda's deposition?
15      A.   I did.
16      Q.   You went up to her and said did
17  you ever kiss me and she said yes?
18      A.   She said no.  And then she called
19  me back and said yes, I did kiss you one
20  time and told me.
21      Q.   Do you get copies of the operating
22  statements to review?
23      A.   I do.
0279
 1      (Whereupon, Plaintiff's Exhibit
 2  No. 13 was marked for identification.)
 3      Q.   13 is the operating statement for
 4  -- I just pulled one actually.  It's
 5  December 31st, 2004.  This is after Ms.
 6  Stough was there.  This would have been when
 7  Mr. Fetner was there; right?
 8      A.   Right.
 9      Q.   On this document, it indicates --
10  Is this something you received regularly?
11      A.   Yes.
12      Q.   How often do you get it?
13      A.   You're supposed to get it every
14  month.
15      Q.   It comes out every month?  Yes?
16      A.   Yes.
17      Q.   And when you get it, what do you
18  do with it?
19      A.   Review it, take a look at it.
20      Q.   Anything else?
21      A.   You know, if there are problem
22  areas, talk with the GM's about their
23  problem areas.  Ask them to explain why
0280
 1  there's a variance in certain categories and
 2  so forth.
 3      Q.   When you look at operating
 4  expenses in -- for the quarter ending
 5  December 31st of 2004, you can see what --
 6  you can see the room expense, thirty-six
 7  thousand, and it was budgeted at twenty-six
 8  thousand.  So this person exceeded the

9  budget for room expense; is that right?
10    A.  That is correct.
11    Q.  And the year before, the room
12  expense was thirty thousand; right?
13    A.  That is correct.
14    Q.  That would have been Ms. Stough
15  the year before; right?
16    A.  It would have.
17    Q.  And what is room expense?  Is that
18  -- That's all the expenses; right, that go
19  into operating the property for the quarter?
20    A.  Or in this case, for the quarter
21  ending December.
22    Q.  Well, actually you look at total
23  operating expenses to figure out the total?
0281
1    A.  Right.  Expenses, you can see on
2  the next page.
3    Q.  It specifies it?
4    A.  Talks about salaries, housekeeping
5  salaries, cleaning chemicals, laundry, linen
6  cost.
7    Q.  You had an increase in salaries;
8  right?  Where it says is -- Is one of the
9  key factors you look at on this document
10  GOP?
11    A.  It's certainly something that you
12  look at, yes.
13    Q.  GOP is the gross operating profit;
14  right?
15    A.  Right.
16    Q.  And Ms. Stough's profit was
17  seventy-nine eight eighty-one and Mr.
18  Fetner's profit is eighty-one five
19  forty-six; is that right?
20    A.  That's right.
21    Q.  And you get the rev part by
22  dividing the total revenue by the available
23  rooms; correct?
0282
1    A.  Correct.
2    Q.  And you receive these on all the
3  managers that report to you every month; is
4  that correct?
5    A.  That is correct.  Most of the

6  time.
7     Q.   And when there's -- When they do
8  poorly on these operating statements, what
9  do you do with that?  How do you take action
10  when you see somebody who is performing
11  poorly on their operating statement?
12     A.   I think what you do is utilize
13  that information to find out where the
14  deficiencies are in the hotel.
15     Q.   Would you reprimand your employees
16  for having poor --
17     A.   Not necessarily.
18     Q.   -- operating statements?
19     A.   It may be -- There may be
20  legitimate reasons to have a down month
21  sometimes.
22     Q.   Do you know of any reason that
23  would cause the Alex City in 2004 to -- I'm
0283
1  sorry -- in 2003 -- Do you remember any
2  events happening in 2003 that would cause it
3  to be a lower year than the prior year of
4  2002 in Alexander City like, fishing
5  tournaments, corporate events, anything like
6  that come to mind?
7     A.   Now, the only reason why 2003 was
8  what?
9     Q.   A less profitable year in Alex
10  City than the prior year of 2002.
11     A.   Off the top of my head, no.
12     Q.   Was 2002 the Wal-Mart year that
13  they were building the Wal-Mart?
14     A.   I believe my recollection was
15  2003.  But this is just a -- one area of the
16  hotel you're looking at, the financial.
17        You're not seeing the day in and
18  day out management of that hotel by looking
19  at this statement.  It doesn't tell you
20  anything.
21     Q.   You're the person who goes in and
22  -- when you're doing the product
23  evaluations, the Q and A's -- and determines
0284
1  the day in and day out status of the hotel;
2  is that correct?

3     A.   That's another tool that's
4   utilized to determine that, yes.
5     Q.   Well, you're the person who grades
6   it; right?
7     A.   I am.
8     Q.   Based on what you see?
9     A.   That is correct.  But you can't
10  look at this and say, well, this looks
11  good.  This must be a GM.  That doesn't
12  match.
13    Q.   Exhibit 13?
14    A.   Exhibit 13.  That doesn't match
15  up.  That doesn't match up with this one or
16  any other for that matter.
17    Q.   And that could be the same for --
18  When it's a bad time, you can't necessarily
19  look at Exhibit 13 and say that's a bad GM;
20  right?
21    A.   Correct.  This is actually an
22  improvement over the prior year on a year to
23  day basis if you look through it.  It shows
0285
1   -- growth, it shows a trend in the positive
2   direction.
3        Naturally, you would probably be
4   -- if I were a GM coming to a dirty hotel,
5   I would probably drive some cleaning
6   expenses up in trying to get it cleaned up.
7        Room supplies might go up when I
8   try to put the right items in my room and
9   get them back up to our standards and so
10  forth.
11    Q.   Did you allow Ms. Stough to order
12  as much supplies and have as much help as
13  she wanted to have?
14    A.   Yes, I did.
15    Q.   You never told her that she could
16  not have an assistant general manager; is
17  that correct?
18    A.   That is correct.  It's her
19  business to run.  She has to make that
20  decision.  And that was part of Belinda's
21  problem.
22    Q.   When you hired -- But didn't
23  Belinda have the right to hire who she

0286
1   wanted as an assistant manager?
2       A.   She did.  And I gave her plenty of
3   opportunity to do that.  She could not make
4   that happen.  She didn't make it happen.  So
5   I had to help in the process.  Sometimes
6   that occurs.
7       Q.   But you wouldn't let her hire who
8   she wanted to hire as assistant manager;
9   right?
10      A.   No.  And there were legitimate
11  reasons.  Because she just said that I would
12  like to make this person assistant general
13  manager.  We were looking for AGM's that
14  could run our hotels.  And I didn't feel
15  like they were at that level to handle that.
16      Q.   But you wouldn't let her hire the
17  two women that she suggested as AGM's;
18  correct?
19      A.   Yes.  I decided with her, that
20  that was not a good thing to do.  They were
21  not the right people.
22      Q.   Did she agree with you, that they
23  were not good people for those jobs?
0287
1       A.   I guess so.
2       Q.   Was anybody present other than the
3   two of y'all when she told you that?
4       A.   Not that I recall.
5       Q.   Where are you working out of now?
6   Where's your base?
7       A.   Ozark.
8       MR. GOLDFARB:  I don't have
9   anything else.  Sorry it's so late.  Thank
10  you.
11      MR. KESSLER:  I have no
12  questions.  Well, wait a minute.  Let me
13  just ask him this.  I'm not sure whether
14  this was on the record.
15  EXAMINATION BY MR. KESSLER:
16      Q.   For general managers during the
17  time period that Belinda still worked as
18  general manager, general managers were
19  entitled to be considered for bonuses?
20      A.   They were.

21      Q.   And assistant general managers,
22   were they entitled --
23      A.   No.
0288
 1      Q.   Let me finish my question.
 2      A.   I'm sorry.
 3      Q.   Were they entitled to be
 4   considered for bonuses?
 5      A.   No, they were not.
 6      Q.   And interim or acting general
 7   managers, were they entitled to be
 8   considered for bonuses?
 9      A.   I don't think so.
10         MR. KESSLER:  Those are all my
11   questions.  Thank you.
12   EXAMINATION BY MR. GOLDFARB:
13      Q.   What's the difference between an
14   acting and interim GM, if anything?
15      A.   I'm not sure I know.
16      Q.   Is there an official job title
17   acting GM that you have seen or interim GM
18   that you have seen?  Is there something
19   written that explains the difference?
20      A.   Again, back to the --
21      Q.   That's okay.
22      A.   No.
23      Q.   Okay.
0289
 1         MR. GOLDFARB:  Thank you.
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17

18
19
20
21
22
23
0290
1           C E R T I F I C A T E
2
3   STATE OF ALABAMA )
4   MONTGOMERY COUNTY)
5
6           I hereby certify that the above
7   and foregoing deposition was taken down by
8   me in stenotype, and the questions and
9   answers thereto were transcribed by means of
10   computer-aided transcription, and that the
11   foregoing represents a true and correct
12   transcript of the testimony given by said
13   witness upon said hearing.
14           I further certify that I am
15   neither of counsel, nor of kin to the
16   parties to the action, nor am I in any wise
17   interested in the result of said cause.
18
19
20       ----------------
21           CINDY WELDON
22
23