# Exhibit 3:
# Deposition of Greg Winey and Certain Attached Exhibits (Exhibit 1 to Deposition Filed Under Seal)

0001
1    IN THE UNITED STATES DISTRICT COURT
        MIDDLE DISTRICT OF ALABAMA
2            EASTERN DIVISION
3

    CIVIL ACTION NO.:  3:05-CV-421-W
4
5  BELINDA STOUGH,
6        Plaintiff,
7  vs.
8  JAMESON INNS, A COMPANY OWNED AND
   OPERATED BY KITCHIN HOSPITALITY,
9  L.L.C.,
10        Defendant.
11
12    DEPOSITION OF: GREGORY WINEY
            9:10 A.M.
            APRIL 21, 2006
14
15    In accordance with Rule 5(d) of The
16  Alabama Rules of Civil Procedure, as
17  Amended, effective May 15, 1988, I, Cindy
18  C. Goldman, am hereby delivering to
19  Mr. Jon C. Goldfarb the original
20  transcript of the oral testimony taken on
21  the 21st day of April, 2005, along with
22  exhibits.
23
0002
1      S T I P U L A T I O N S
2    IT IS STIPULATED AND AGREED by and
3  between the parties through their
4  respective counsel that the deposition of
5  Gregory Winey, a witness in the
6  above-entitled cause may be taken before
7  Cindy C. Goldman, a Court Reporter and
8  Notary Public for the State of Alabama,
9  at 3060 Peachtree Road, Suite 1050,
10  Atlanta, Georgia, on the 21st day of
11  April, 2006, commencing at 9:10 a.m.,
12  pursuant to the Alabama Rules of Civil
13  Procedure.
14
15
16    IT IS FURTHER STIPULATED AND AGREED

17  that the signature to and the reading of
18  the deposition by the witness is waived,
19  the deposition to have the same force and
20  effect as if full compliance had been had
21  with all laws and rules of court relating
22  to the taking of the depositions.
23
0003
1
2
3
4      S T I P U L A T I O N S
5          (continued)
6
7    IT IS FURTHER STIPULATED AND AGREED
8  that it shall not be necessary for any
9  objections to be made by counsel to any
10  questions except as to form or leading
11  questions, and that counsel for the
12  parties may make objections and assign
13  grounds at the time of trial or at the
14  time said deposition is offered in
15  evidence or prior thereto.
16
17    IT IS FURTHER STIPULATED AND AGREED
18  that the notice of filing of the
19  deposition is waived.
20
21
22
23
0004
1      A P P E A R A N C E S
2
  Appearing On Behalf Of The Plaintiff:
3      WIGGINS, CHILDS, QUINN
        & PANTAZIS
4      Mr. Jon C. Goldfarb
        420 20th Street North
5      Suite 1400
        Birmingham, Alabama 35203-3204
6
7  Appearing On Behalf Of The Defendant:
        IRVIN, STANFORD & KESSLER, L.L.P.
8      Mr. Gary R. Kessler

Ms. Ann Hale-Smith
9      One Buckhead Plaza
       3060 Peachtree Road
10       Suite 1050
       Atlanta, Georgia 30305
11
12  Reported By:
       Cindy C. Goldman
13       Freedom Court Reporting
       367 Valley Avenue
14       Birmingham, Alabama 35209
15
16
17
18
19
20
21
22
23
0005
1             I N D E X
2
3  Witness:                    Page
4
5  Examination by Mr. Goldfarb.........8
6  Examination by Mr. Kessler..........217
7  Further Examination
8         by Mr. Goldfarb.........270
9  Reporter's Certificate..............229
10
11        E X H I B I T S
12
13        PLAINTIFF'S EXHIBITS
14              Page
15  Exhibit No. 1.......................26
16  Exhibit No. 2.......................28
17  Exhibit No. 3.......................39
18  Exhibit No. 4.......................57
19  Exhibit No. 5.......................58
20  Exhibit No. 6.......................76
21  Exhibit No. 7.......................79
22  Exhibit No. 8.......................82
23  Exhibit No. 9.......................91
0006

1          PLAINTIFF'S EXHIBITS
2             (continued)
3                      Page
4    Exhibit No. 10....................99
5    Exhibit No. 11....................103
6    Exhibit No. 12....................106
7    Exhibit No. 13....................108
8    Exhibit No. 14....................163
9    Exhibit No. 15....................168
10   Exhibit No. 16....................177
11   Exhibit No. 17....................193
12   Exhibit No. 18....................215
13
14
15
16
17
18
19
20
21
22
23
0007
1          I, Cindy C. Goldman, a Court
2    Reporter and Notary Public for the State
3    of Alabama, acting as Commissioner,
4    certify that there came before me at 3060
5    Peachtree Road, Suite 1050, Atlanta,
6    Georgia, on April 21, 2006, beginning at
7    9:10 a.m., Gregory Winey, a witness in
8    the above cause, for oral examination,
9    whereupon the following proceedings were
10   had:
11
12          GREGORY WINEY
13   Having been first duly (affirmed) sworn,
14          testified as follows:
15
16   COURT REPORTER:  Usual
17   Stipulations?
18   MR. KESSLER:  Usual
19   stipulations, Jon?
20   MR. GOLDFARB:  Yes.  Which is
21   the Alabama stipulations.

22      MR. KESSLER:  Which are?
23      MR. GOLDFARB:  All objections
0008
1   are preserved except objections to form.
2   You just object to the form.
3       MR. KESSLER:  That's good.
4   Yeah.  Those are the ones over here too.
5       MR. GOLDFARB:  Okay.
6
7   EXAMINATION BY MR. GOLDFARB:
8       Q.   Okay.  It's 9:10.  Good morning.
9   Can you state your name?
10      A.   Gregory Winey.
11      Q.   And your home address?
12      A.   5449 Culzean, C-u-l-z-e-a-n,
13  Way, W-a-y, Suwanee, S-u-w-a-n-e-e,
14  Georgia.
15      MR. KESSLER:  Could you hold on
16  just a second?  I want to get one of the
17  other lawyers who's going to sit in.
18      MR. GOLDFARB:  Okay.
19      THE WITNESS:  30024.
20      (A short break was taken.)
21      Q.   (By Mr. Goldfarb) What's your
22  date of birth?
23      A.   8/07/62.
0009
1       Q.   And your Social?
2       A.   ███████████.
3       Q.   Do you plan on being there for
4   the next couple of years where you're
5   living right now?  Do you have any idea?
6       A.   I plan on that, yes.
7       Q.   Okay.
8       A.   Yes.
9       Q.   Where do you work today?
10      A.   I am employed with Pineapple
11  Management.
12      Q.   What is that?
13      A.   It's a hospitality company.
14      Q.   Is it a hotel?
15      A.   It's a hotel company as well as
16  real estate.
17      Q.   What's it called again?
18      A.   Pineapple Management.

19    Q.  And where are they located?
20    A.  Currently in Dallas, Texas.
21    Q.  Where do you work?
22    A.  I work out of the Atlanta
23  office, my home right now.  But I commute
0010
1  back and forth.
2    Q.  To Atlanta or to Dallas?
3    A.  To Dallas.
4    Q.  No plans to move there in the
5  next --
6    A.  Not currently.
7    Q.  What is -- what kind of --
8  what's the name of the motel they have?
9    A.  We have a variety of brands in
10  the portfolio, Hilton brands, Marriott
11  brands.
12    Q.  Do you manage the hotels?
13    A.  I oversee the management of the
14  hotels.
15    Q.  Okay.  Does the company own
16  the -- I'm just trying to get an
17  understanding of what this company is.
18    A.  Sure.  They have joint ventures
19  in some properties, and some properties,
20  they outright own, I believe.
21    Q.  And some of them they manage?
22    A.  It's all partnership groups as
23  well as sole ownership as I understand
0011
1  it.
2    Q.  Was that a promotion, I mean, an
3  increase in your salary to move to that
4  job from where you were?
5    A.  No, actually, it was a decrease.
6    Q.  Why did you move to that job
7  from -- you moved there from Jameson?
8    A.  Yeah, I left Jameson.  And then
9  from there, I went with Pineapple.
10    Q.  How long were you off before you
11  got the Pineapple job?
12    A.  13 months.
13    Q.  During that 13 months, were you
14  looking for work?
15    A.  Not until the third quarter of

16  this past year.  And I started an L.L.C.,
17  Northpointe Hospitality, L.L.C.  and
18  that's N-o-r-t-h-p-o-i-n-t-e Hospitality,
19  L.L.C.
20      Q.  Is that why you weren't looking
21  for work?
22      A.  Correct.  I really was getting
23  into the consulting business.
0012
 1      Q.  Why did you leave Jameson?
 2      A.  I think I accomplished all the
 3  goals that I set out to accomplish.
 4      Q.  Did you get a severance package
 5  or something?
 6      A.  Correct.
 7      Q.  How long did that last?
 8      A.  The terms are confidential.
 9      Q.  Well, I don't care about the
10  amount.  I'm just trying to get an
11  understanding.
12      A.  A year.
13      Q.  Okay.  So, after a year, you
14  needed -- if the other didn't work, you
15  started looking for work?
16      A.  Yeah, exactly.
17      Q.  Okay.  Was your -- did you
18  voluntarily leave?
19      A.  It was a mutual agreement
20  between them and me.
21      Q.  Tell me your job history at
22  Jameson.  Well, I didn't ask you this.
23  When did you leave?  What was the date?
0013
 1      A.  It was January -- actually, the
 2  last day of employment was January 31st,
 3  2005.
 4      Q.  Since then, you've had no
 5  dealings with Jameson?
 6      A.  Correct.
 7      Q.  When did you start at Jameson?
 8      A.  April 13th, 1998.
 9      Q.  When you started, what was your
10  job?
11      A.  I'm sorry, April 1st.  Excuse
12  me.

13     Q.   Okay.  What was your job title
14  when you started?
15     A.   I was regional manager.
16     Q.   Over what region?
17     A.   Georgia hotels.
18     Q.   Is that how the company is
19  divided, you have a regional manager --
20     A.   Yes.
21     Q.   -- of the Georgia, regional
22  manager of Alabama?
23     A.   The state lines can cross.  I
0014
1  mean, you can have hotels in different
2  states that you're responsible for.
3     Q.   When you were regional manager
4  over Georgia, did you have any hotels in
5  Alabama that you were over?
6     A.   No.
7     Q.   Okay.  Was there anybody else
8  that had some Georgia hotels other than
9  you?
10     A.   I don't recall offhand.  I had
11  approximately 20 properties.  I would say
12  yes to that because I believe we had in
13  upwards of 30 properties in the state of
14  Georgia.
15     Q.   Did your region have a number?
16     A.   Yes.  I think it was Region 4 is
17  what it was called.
18     Q.   Have there been changes during
19  your employment era of what hotels fit in
20  what region?
21     A.   Correct, yes.  Yes.
22     Q.   Okay.  You started as a regional
23  manager.  How long were you a regional
0015
1  manager?
2     A.   Six months to the day.
3     Q.   Okay.  So, October of '98?
4     A.   Correct, uh-huh.
5     Q.   What job did you go to?
6     A.   Director of operations.
7     Q.   And what did you do in that job?
8     A.   Oversaw the entire operations of
9  Kitchin Hospitality in regard to their

10  hotel operations.

11      Q.  Was there other directors,

12  director of some other --

13      A.  Correct, there were.

14      Q.  What were the other directors

15  of?

16      A.  Well, during the time I was

17  there, we acquired Signature Inns.  So,

18  in doing that, we acquired those

19  positions within those hotels.

20          So, there was actually a senior

21  vice president of operations with

22  Signature Inns.

23      Q.  Okay.  As Kitchin -- the hotels

0016

1  that are Kitchin Hospitality, are they

2  only Jameson?

3      A.  They're Jameson and Signature

4  Inns.

5      Q.  So, you had a director of

6  operations of Signature and a director of

7  operations --

8      A.  But, see, I had originally a

9  senior vice president of operations of

10  Signature Inn.  And then, later, it

11  became a director of operations for

12  Signature Inn, but that was a different

13  individual.

14      Q.  Okay.  Were you ever over the

15  Signature hotels also?

16      A.  Correct.  Yes, uh-huh.

17      Q.  Okay.  We'll get to that.

18      A.  Okay.

19      Q.  What were your job duties as a

20  regional manager?

21      A.  In a nutshell, ensure the

22  properties were well-maintained, clean,

23  the staff was serving the customer, i.e.,

0017

1  friendliness, and profitable.

2      Q.  When you were a regional

3  manager, did you decide raises for

4  people?

5      A.  No, because under that

6  structure, it was -- GMs were compensated

7  differently when the structure changed.
8     Q.  You mean when you were there --
9     A.  Correct.
10    Q.  -- as a regional manager?
11    A.  Yeah.
12    Q.  How was it different than when
13 you left?
14    A.  GMs were originally at a base
15 pay plus bonus that was -- that had
16 changed and evolved over time.
17    Q.  What did it change to when you
18 left?
19    A.  It was based on experience,
20 market conditions, and revenues of the
21 property.
22    Q.  Did you have a formula or
23 something?
0018
1     A.  We would do market surveys at
2 times.  You know, I don't think there was
3 any particular form that was used.  I
4 think we tried to determine salaries
5 based on the size of the property, the
6 location of the property, the revenues of
7 the property, the experience of the
8 general manager or individual in that
9 position?
10    Q.  What different sizes of
11 properties did you have?
12    A.  We had with Jameson 40 rooms and
13 60 rooms.  And later, in upwards of 80
14 rooms.  The 60 and 40 were exterior
15 corridor.  The 80s were interior
16 corridor.  And Signature Inns were
17 between 90 or so rooms and in upwards of
18 180, I believe, it was, and all interior
19 corridor properties.
20    Q.  Do you look at the pay
21 differently for a 40-room versus a
22 60-room?
23    A.  It really depended on market,
0019
1 what the market was and how well the
2 hotel was doing financially.
3     Q.  Well, if they're in the same

4  market, the 40 and the 60, you said you
5  looked at size?
6      A.  We wouldn't have two hotels in
7  the same market.
8      Q.  Same -- how do you define a
9  market?
10     A.  As an example, if you said in
11  Alabama, you would look at Oxford,
12  Alabama, as a market, and then you might
13  look at Florence, Alabama, as a market.
14  So, in terms of where they were located.
15     Q.  Located is how you define it?
16     A.  Correct.
17     Q.  Are some markets the same?
18     A.  Each market is different.
19     Q.  All right.  What decides -- what
20  difference does size make when you
21  determine a salary?  You said size
22  before.
23     A.  Again, if the market -- it
0020
1  depends on the market.  If the market has
2  a certain amount of revenues, and the
3  general manager has a certain level of
4  experience, and determining on what the
5  market would generally pay for that type
6  of position, we would make a decision
7  based on salary in regard to that.
8      Q.  Does size have anything -- any
9  factor in your decision of what to pay a
10  salary?
11     A.  It can.  It can, depending on
12  the market.
13     Q.  Okay.  Why would size factor
14  into salary?
15     A.  Again, because of the revenues
16  and our capacity to pay the general
17  manager based on the revenues of the
18  hotel.
19     Q.  Because revenue would be more
20  because you can have more people staying
21  at a larger property?
22     A.  Well, it's -- no.  It depends,
23  again, on how much demand generators are
0021

1   on that market.
2         If the hotel is running 80
3   percent occupancy versus a hotel running
4   30 percent occupancy, your capacity to
5   make that business profitable is
6   encumbered if you're running 30 percent
7   occupancy.
8     Q.  Okay.  But if you've got a
9   40-room property running 80 percent and a
10  60-room property running 80 percent, does
11  size matter?
12    A.  We would have definitely the
13  capacity to pay more in that 60-room
14  property.
15    Q.  Because it would have more
16  revenue?
17    A.  It would have more revenue,
18  correct.
19    Q.  Okay.  In October of '98, you
20  became the director of operations.  What
21  job did you move to next?
22    A.  The vice president of
23  operations.
0022
1     Q.  When was that move?
2     A.  I maintained the position for
3   three years.  So --
4     Q.  2001?
5     A.  Going backwards, yes, from when
6   I left three years prior to that.
7     Q.  October of '98 to October of
8   2001, does that sound about right?
9     A.  Three years as director of ops
10  and three years as VP.  That's
11  essentially correct.
12    Q.  How did your duties change when
13  you became the VP of operations, if at
14  all?
15    A.  It really didn't.
16    Q.  Okay.  You just got a titling
17  change?
18    A.  For the most part, correct.
19    Q.  Did your duties expand in any
20  way?
21    A.  No, not really.  In fact, they

22  contracted.
23    Q.  Why did they contract?
0023
1    A.  I was not directly over capital
2  refurbishment.
3    Q.  What does that mean?
4    A.  Hotels get capitalized.  We
5  maintain a reserve of our revenues to
6  refurbish the hotels on an annual basis.
7    Q.  What were your duties during the
8  time you were a director of operations
9  and VP of operations, excluding the
10  capital refurbishment duties?
11    A.  In a nutshell, to make the
12  hotels profitable, to drive the service
13  levels of the hotel, and to ensure the
14  product quality of the hotels was up to
15  company standard.
16    Q.  What were your duties to
17  deciding salaries for general managers?
18    A.  I would take the recommendations
19  of the regional district or area manager,
20  and they would present that to me.
21    Q.  And you would do what with it?
22    A.  99.9 percent of the time,
23  approve it.
0024
1    Q.  Was there a guideline for
2  determining salaries that the GMs use?
3    A.  None other than I mentioned,
4  size of property, experience of the GM,
5  and revenue of the hotels.
6    Q.  I mean, was there a range of
7  salaries for GMs during --
8    A.  It varied.
9    Q.  -- 2001?
10    A.  It varied.  Because, again, if
11  you ask me what we might pay a 40-room
12  general manager that has the worse
13  revenues in the company versus an
14  180-room general manager that has decent
15  revenues and much greater responsibility,
16  those salaries are going to vary greatly.
17    Q.  I mean, is there anything in
18  writing indicating how salaries should

19  be --
20      A.  Nothing to my knowledge.
21      Q.  -- arranged or anything like
22  that?
23      A.  Nothing to my knowledge.
0025
1       Q.  Do your salaries fall within any
2   range for, say, during 2001, for the
3   general managers?  I mean, is there a
4   general range that they fell within?
5       A.  In regard to size of the
6   property and location?
7       Q.  Yes.
8       A.  Yeah.  I'm sure there -- yeah,
9   if you looked at that, I'm sure there
10  would be.
11      Q.  Is there boundaries that you're
12  not supposed to pay lower than or not
13  higher than if it's a --
14      A.  Not to my knowledge.
15      Q.  Okay.  Do you have job codes for
16  different jobs such as a job code that
17  correlates with a position of general
18  manager, assistant general manager?
19      A.  The general ledgers for the
20  operating statements would probably
21  indicate that, but I don't recall any
22  particular job code.
23      Q.  Okay.  I just need some help on
0026
1   some of these documents, and I want to
2   ask you about them.
3       A.  Sure.  I understand.
4           (Plaintiff's Exhibit No. 1 was
5           marked for identification.)
6       Q.  (By Mr. Goldfarb) Exhibit 1 --
7   what's Exhibit 1 to your deposition is
8   there are some -- you gave me some labor
9   distribution reports that -- Jameson Inn
10  did in response to discovery.  And I took
11  the front page of each one -- the ones
12  for the time period that y'all gave me,
13  which was 2001 to 2006 -- April, 2001.
14  And I just really need to get an
15  understanding of these -- of some of the

16  codes in here from you.  That's all?
17     A.  I don't have any knowledge of
18  this report at all.
19     Q.  Have you ever seen this report?
20     A.  Huh-uh, never.
21     Q.  All right.  Let me just make
22  sure.  I know you've never seen the
23  report.  But under --
0027
 1        MR. KESSLER:  Let me stop you.
 2  Did you get this from us?
 3        MR. GOLDFARB:  Yeah.  Yeah, of
 4  course.
 5        MR. KESSLER:  Well, I don't see
 6  numbers on the pages.
 7        MR. GOLDFARB:  Well, you gave me
 8  some stuff without numbers.
 9        MR. KESSLER:  Okay.  All right.
10  Just making sure.
11        MR. GOLDFARB:  Yeah.  You did
12  get me some stuff without numbers, but,
13  yeah.
14     Q.  It has -- there is a department
15  code in there right here on the top at
16  the left-hand side under -- it says
17  Charles Woods, and it has his name.  You
18  know Charles Woods; right?
19     A.  Yes, I do.
20     Q.  And his job was the regional
21  manager?
22     A.  At that time, I believe that's
23  right.
0028
 1     Q.  Is there a difference between a
 2  regional and a district manager?
 3     A.  It's a level below.
 4     Q.  Regional is below district?
 5     A.  No.  No.
 6     Q.  District is below?
 7     A.  Correct.
 8     Q.  All right.  So, Charles was a
 9  regional, you think, in 2001?
10     A.  I believe that's it.
11     Q.  All right.  Was there a district
12  manage under him?

13     A.   I don't recall that there was a
14   district manager.  I don't believe so.
15     Q.   Okay.  There's a department
16   code, and it says 48100.  Do you know
17   what that means?
18     A.   No, I don't.
19          (Plaintiff's Exhibit No. 2 was
20          marked for identification.)
21     Q.   (By Mr. Goldfarb) Okay.  I'm
22   going to show you an example.  Let me
23   show you Exhibit 2.  This is just an
0029
1   example of a personnel action form.  I've
2   got the name -- Betty -- you see the name
3   Betty -- this is Betty Sutton's personnel
4   action form.
5     A.   Yes.
6     Q.   Okay.
7     A.   Okay.
8     Q.   What is a personnel action form?
9     A.   It's a personnel action form, I
10   guess.  If there's any particular changes
11   relating to an employee such as address
12   or anything that would have been related
13   to the original information they would
14   have given prior to their or during their
15   employment, it has to go to personnel.
16   So, if their addresses changes, as an
17   example, it goes to personnel.
18     Q.   And you sign off on these
19   sometimes; right?
20     A.   Sometimes.
21     Q.   Look at the second pages.
22   There's two pages there.
23     A.   Yes.
0030
1     Q.   You signed off on that?
2     A.   Yes.
3     Q.   And you're signing off why?
4     A.   Well, this would indicate
5   because there was a merit increase.
6     Q.   Right.  Okay.  And you as the
7   operations manager or the VP of
8   operations sign off on merit -- sometimes
9   you sign off on merit increases?

10    A.  Yes.  Yes.  Yes, definitely.

11    Q.  Okay.  Why do you do that?

12    A.  Various reasons.  It looks like

13  in this case, this was a request by Hal

14  Smith to increase Betty's pay --

15    Q.  All right.

16    A.  -- 3 percent.

17    Q.  And you sign off on it as the

18  approving authority?

19    A.  Validation, that, yes, it was

20  okay.

21    Q.  And there's a human resources

22  person also signing.  Is that what that

23  person is, Ms. Russ?

0031

1    A.  She was the assistant to Rose

2  Jacobs --

3    Q.  Okay.

4    A.  -- if I remember correctly.

5    Q.  And Rose Jacobs is the person

6  who signed on the front page?

7    A.  Yes, correct.

8    Q.  So, you've got Rose, and then

9  she's got assistants?

10    A.  She did, yes.

11    Q.  When the assistant signs it, is

12  that when you sign it, or do you know?

13    A.  No.  I sign it only after the

14  regional, district, or area manager has

15  made the recommendation.

16    Q.  Okay.  And there's a department

17  code there.  And it says 100.  Do you see

18  that?

19    A.  Where?  I'm sorry.

20    Q.  In the --

21    A.  Okay.

22    Q.  Yeah.  On the top of each one of

23  these.

0032

1    A.  Okay.

2    Q.  Do you know what that means?

3    A.  I don't.  I've never paid

4  attention to that.

5    Q.  Who would know what that meant?

6    A.  I suppose personnel would.

7    Q.   Which would be Ms. Jacobs or
8  Ms. Russ?
9    A.   I would presume, yes.
10    Q.   You didn't write that in there;
11  right?
12    A.   No.  Huh-uh, never.
13    Q.   Have you heard of job codes like
14  there's -- I've seen an "H."  And I
15  thought it was for housekeeping.  Have
16  you seen anything like that?
17    A.   Nothing like that, no.
18    Q.   Is that more of a personnel
19  area --
20    A.   I suppose, yes.
21    Q.   -- as opposed to what you do?
22    A.   I would assume.
23       MR. KESSLER:  Wait until he
0033
1  finishes his question.
2       THE WITNESS:  I'm sorry?
3       MR. KESSLER:  Wait until he
4  finishes his question.
5       MR. GOLDFARB:  When I talk, and
6  you're talking, it looks kind of funny.
7       MR. KESSLER:  She's good, but
8  it's hard to do.
9       THE WITNESS:  I understand.
10    Q.   Every time somebody receives a
11  salary increase, there should be a
12  personnel action form?
13    A.   Correct.
14    Q.   So, are those personnel action
15  forms kept in the personnel files of the
16  employees?
17    A.   I would assume, yeah.
18    Q.   Where are personnel files of
19  employees kept?
20    A.   In the home office, I believe.
21    Q.   Do you know if they're also kept
22  on the properties?
23    A.   No, shouldn't be, not for
0034
1  general managers.
2    Q.   When you were a regional
3  manager, did you fill out personnel

4   action forms?
5      A.  I don't recall any particular
6   one that I may have filled out, but it's
7   quite possible I did.
8      Q.  When somebody becomes a general
9   manager, is there something that triggers
10  their eligibility for receiving a raise?
11     A.  I'm not sure I understand.
12     Q.  Well, do they -- when you're a
13  general -- say you get hired today as a
14  general manager --
15     A.  Okay.
16     Q.  -- and you're paid $30,000?
17     A.  Okay.
18     Q.  When are you eligible for a
19  raise?  Do you have to have a performance
20  review?
21     A.  There were various times when
22  performance reviews were used, and there
23  were times when they weren't used.  And I
0035
1   think that it depended on whether or not
2   we had a director of HR or not.  So --
3      Q.  I mean, is there any particular
4   length of time that you generally have to
5   work after you get hired as a general
6   manager before you get a raise?
7      A.  Usually, a year --
8      Q.  Okay.
9      A.  -- is, I think, the basic, you
10  know, standard.  But there also -- we had
11  years of salary freeze too.
12     Q.  Right.
13     A.  Right.
14     Q.  But that's what I was kind of
15  getting at is that you work a year, and
16  then you get looked at for possibility of
17  a raise?
18     A.  Yes.
19        But I don't recall that being a
20  formal process every year.  I think there
21  may been a year or two that was a formal
22  process.
23     Q.  What years was it a formal
0036

1   process?
2       A.   I don't recall.
3           I would say during the time that
4   Rose Jacobs was there, she tried to
5   structure the HR department in that
6   manner.
7       Q.   When was Rose Jacobs there?
8       A.   I don't recall the dates
9   specifically.
10      Q.   Approximately when?
11      A.   I think about two years is what
12  I want to say.
13      Q.   I know she was there in 2000;
14  right?
15      A.   Yeah.  That's obvious, yeah.
16      Q.   Do you know was she there in
17  2001?
18      A.   I don't recall.  I know she was
19  there for a couple years.
20      Q.   Why did she leave?
21      A.   I don't know the exact terms of
22  her termination.
23      Q.   As director of operations, would
0037
1   you have any authority over HR?
2       A.   No.
3       Q.   That's completely separate?
4       A.   Correct.
5       Q.   Who would be over HR as a VP?
6       A.   With Rose, was Steve Curlee.
7       Q.   And what's his job?
8       A.   Legal counsel.
9       Q.   When you left, was there a
10  director of HR?
11      A.   I believe Jeff Hurley has that
12  title as well as assist with legal
13  matters.
14      Q.   Is he a lawyer?
15      A.   Yes.
16      Q.   Okay.
17      A.   Yes, sir.
18      Q.   Was he there in 2004?
19      A.   Correct.
20      Q.   After Rose left, was there
21  anybody between Rose and Jeff as HR

22  director?
23     A.  No, not to my knowledge.
0038
 1     Q.  As far as you know, Jeff took
 2  over Rose's duties?
 3     A.  Yes.
 4     Q.  Was Jeff there at the same time
 5  as Rose for a while?
 6     A.  I believe a short period of
 7  time.  I don't recall, though, quite
 8  honestly.
 9     Q.  Why did Rose leave?
10     A.  I don't know the details of her
11  departure.
12     Q.  You mentioned that there was
13  this salary freeze?
14     A.  Uh-huh (affirmative).
15     Q.  And when was the salary freeze?
16     A.  I believe it was 2001, 2002, but
17  it was right during the time of 9/11.
18     Q.  Yeah.  I've got some memos.
19     A.  And the two years, I believe,
20  after that.
21     Q.  I got some documents either last
22  night or the night before from your
23  lawyers -- as Exhibit 3.
0039
 1        (Plaintiff's Exhibit No. 3 was
 2        marked for identification.)
 3     MR. KESSLER:  Night before.
 4     MR. GOLDFARB:  Night before.
 5     MR. KESSLER:  Wednesday
 6  afternoon.
 7     Q.  (By Mr. Goldfarb) And these
 8  memos relate to --
 9     MR. KESSLER:  Are you going to
10  mark them?
11     MR. GOLDFARB:  Yeah.  I'm sorry.
12  It's Exhibit 3.
13     Q.  These memos relate to the salary
14  freeze?
15     A.  Okay.
16     Q.  Are there any other documents
17  related to the salary freeze other than
18  these?

19    A.  I wouldn't know.
20    Q.  Okay.  Did you write either of
21  these?
22    A.  No.
23    Q.  Have you seen these before
0040
1  today?
2    A.  I imagine I would have read
3  them.
4    Q.  All right.  I mean, you're over
5  the operations, which include the payment
6  of salaries?
7    A.  I'm not over HR or payroll.
8    Q.  But you have duties with respect
9  to paying salaries to your general
10  managers?
11    A.  No.  I mean, I didn't handle the
12  payment of those salaries.
13    Q.  You signed off and approved it?
14    A.  I would sign off on salaries for
15  GMs.
16    Q.  What about regional managers?
17    A.  Yes.  Yes.
18    Q.  Did you decide the salaries for
19  the regional managers?
20    A.  By and large, yes.
21    Q.  Did you decide the salaries for
22  the district managers?
23    A.  Yes.
0041
1    Q.  So, is there a regional manager
2  and a district manager in the same
3  region?
4    A.  It can be, correct.
5    Q.  Okay.
6    A.  Districts can report to regions.
7    Q.  Would the regional manager
8  decide the district manager's salary?
9    A.  They would make recommendations
10  to me, and then I would.
11    Q.  The same with the general
12  manager, they'd make a recommendation to
13  you, and you would approve it?
14    A.  Correct.  Correct.
15    Q.  Or not?

16     A.   Correct.  Rarely, I would say.
17     Q.   Well, you certainly had the
18  authority not to?
19     A.   Certainly.
20     Q.   Right.  To not approve it?
21     A.   Right.
22     Q.   You said -- well, can you think
23  of an occasion where you did not approve
0042
 1  or you made changes to a salary
 2  recommendation of a GM?
 3     A.   No.
 4     Q.   Okay.  I want to keep looking at
 5  3.
 6     A.   Sure.
 7     Q.   Do you know when this memo came
 8  out?  There's a bates label 2055 on this
 9  page.  Do you have any idea when that
10  came out?
11     A.   I don't.
12     Q.   I mean, obviously, it was -- I
13  think it was in 2002.  You don't know?
14     A.   I don't know the specifics of
15  it.
16     Q.   All right.  I guess it could
17  have been -- well, it says during the
18  remainder of 2002.  You don't know when,
19  though?
20     A.   No.
21     Q.   Okay.  Do you know who wrote
22  this memo?
23     A.   I don't.
0043
 1     Q.   It mentions at the first line:
 2  "In order to align hotel operations with
 3  changes that were instituted earlier this
 4  year."  What changes were instituted,
 5  assuming this was 2002 -- earlier in
 6  2002?
 7     A.   I don't recall specifically.
 8     Q.   Well, do you recall generally
 9  any changes that happened in early 2002?
10     A.   Nothing specific, no.  I mean, I
11  don't.
12     Q.   Generally either?

13     A.  No.  No.  I mean, we were always
14  very cost conscious.  So --
15     Q.  Do you remember some talk about
16  a 25 percent reduction in cost of
17  operations?
18     A.  I believe if it were the case,
19  that would have been related to Signature
20  Inns and the closure of their corporate
21  offices.
22     Q.  All right.  What about -- it
23  mentions also, "establishing consistent
0044
1  and uniform policies for all salaried
2  personnel in the company."  What were the
3  consistent and uniform policies for all
4  salaried personnel in the company?
5     A.  I guess, in relation to this
6  memo, that there would be no increases.
7     Q.  Well, was there a policy set up
8  to make or something set up to make
9  salaries consistent and uniform?  You
10  mentioned something with the HR director
11  at the time doing some -- Ms. Jacobs --
12     A.  Yes.
13     Q.  Jacobs?
14     A.  Yes.
15     Q.  And Ross -- is that a woman?
16     A.  Yes.
17     Q.  -- Ms. Jacobs trying to make
18  things more uniform before --
19     A.  I'm sorry?
20     Q.  -- with regard to salary?
21     A.  Right.
22     Q.  Is that right?
23     A.  I don't recall that she had any
0045
1  particular process for determining that
2  or recommendations.
3     Q.  Did you, as the operations VP,
4  know of anything that the company had
5  done at this -- in 2002 to establish
6  uniform -- establish consistent and
7  uniform policies for all salaried
8  personnel?
9     A.  None other than the salary

10  freeze when this was written.
11    Q.  Okay.  Well, that would be
12  freeze it for everybody?
13    A.  Yeah, basically.  Exactly.
14    Q.  Okay.  Okay.  And it says,
15  "Kitchin Hospitality, L.L.C. Executive
16  Management."  Would that include you?
17    A.  Correct.
18    Q.  Did you decide that there would
19  be no increases in annual salaries for
20  GMs?
21    A.  No.
22    Q.  Who decided that?
23    A.  I believe that was determined
0046
1  through the CEO and CFO.
2    Q.  Who is the CEO?
3    A.  Tom Kitchin.
4    Q.  Is he still there?
5    A.  Correct.
6    Q.  And who is the CFO?
7    A.  Craig Kitchin.
8    Q.  So, they told you that we're
9  going to have a freeze?
10    A.  I believe that's right.
11    Q.  Did you have anything to do with
12  coming up with the idea of the freeze?
13    A.  No.
14    Q.  Did the freeze affect regional
15  managers also?
16    A.  Correct.
17    Q.  Because it only says GM and
18  assistant GM.
19    A.  No, everybody.
20    Q.  Every salaried person?
21    A.  As I understand.
22    Q.  Everywhere in the country?
23    A.  As I remember.
0047
1    Q.  Were there any exceptions to the
2  freeze?
3    A.  Not that I recall.
4    Q.  I understand there's some -- if
5  you got a promotion, you'd get an
6  increase; is that right?

7    A.  That would seem right.

8    Q.  Okay.  There's a couple -- but
9  I'm talking about did anybody that's in
10  the same job receive a raise while they
11  stayed in the same job during the freeze?

12    A.  Not to my knowledge.

13    Q.  It mentions a couple of -- a
14  little further down, it says, "In
15  addition, annual employee performance
16  reviews for all general managers."  What
17  is an annual employee performance review?

18    A.  It's a review of their
19  performance.

20    Q.  And does that come out every
21  year?

22    A.  As I said, at times, it was a
23  formal process, and at other times, it

0048

1  was an informal process.

2    Q.  But that's not the same as a
3  quality assurance; right?

4    A.  It encompassed that aspect of
5  quality assurance, I believe.

6    Q.  Do you know what I'm talking
7  about when you go through there and you
8  do the quality assurance review?

9    A.  Yes.  Yes.

10    Q.  I want to make sure that that's
11  not the annual performance review?

12    A.  It's encompassed in there.

13    Q.  Or you could have five quality
14  assurance reviews in a year, I guess, or
15  three?

16    A.  In a nutshell, you would look at
17  quality assurance, you would look at
18  profitability, you would look at, you
19  know, a variety of different things.

20    Q.  All right.  This is already
21  entered as Exhibit 10 to defendant's
22  deposition.  This is a -- it's called a
23  product evaluation?

0049

1    A.  Yes.

2    Q.  That's what I understood was a
3  quality assurance review; right?

4    A.  It's a QA.
5    Q.  QA?
6    A.  Yes.
7    Q.  Okay.  You call it a QA?
8    A.  A QA, correct.
9    Q.  That's different than an annual
10   review?
11     A.  It's different.  But in an
12   annual review, this would be part of it,
13   correct.
14     Q.  Right.  Right.  But that's --
15   and it looks different, the annual
16   review, than the quality assurance
17   review, Exhibit 10, which has the -- all
18   this little particular details about
19   what's wrong with the property when you
20   go through it and inspect it; right?
21     A.  Yes.
22     Q.  Okay.  It's a different form?
23     A.  Yes.
0050
1     Q.  Okay.  Should there be one on
2    all your general managers if they've been
3    there for a few years?
4     A.  Be one what?
5     Q.  An annual review.
6     A.  There should be an annual
7    review.  I don't know if there was a
8    formal annual review.  But, again, as I
9    said earlier, there were times when that
10   was formal and times when it was not.
11     Q.  Okay.  Well, when it was not
12   formal, what would it be like?
13     A.  The regional district or area
14   manager would approach me via phone and
15   say, "You know, I think we need to
16   re-evaluate this person."
17     Q.  Do you recall any annual reviews
18   done on Belinda Stough?
19     A.  I don't recall.
20     Q.  If there's nothing in writing,
21   then the only ones that would exist would
22   have been, I guess, the informal ones
23   when somebody would talk to you?
0051

1    A.   Yes.
2    Q.   And you don't remember Charles
3   talking to you about any annual review
4   for Belinda Stough; correct?
5    A.   No.
6    Q.   Is that right?
7    A.   I don't recall any.
8    Q.   Okay.  Do you know of any reason
9   Belinda Stough would not receive an
10   annual review during the time she was a
11   general manager?
12    A.   Other than the fact if it wasn't
13   a formal process that year as far as
14   doing it in writing?
15    Q.   Any informal or formal?
16    A.   No, I don't know.
17    Q.   I mean, is it true that when
18   there's not a formal process like when
19   you have this general review -- annual
20   review form you fill out, do you have
21   a -- you would still have an informal
22   process where the regional manager would
23   call you annually and report to you on a
0052
1   particular GM; is that correct?
2    A.   Yeah.  There wasn't any specific
3   date set aside for that for, you know, a
4   GM.  But I think when it came to that
5   point, yes, the regional, district, or
6   area would call me and say, "You know,
7   I'd like to talk about this person."
8    Q.   Okay.  When it came to what
9   point?
10    A.   To your point, an annual review.
11    Q.   Okay.  And anyway, that
12   sentence -- and I didn't get very far
13   into it.  It says, "Managers have been
14   rescheduled for January 2003."  So, I
15   guess, does that mean that the annual
16   review and the performance review will be
17   in January 2003?
18    A.   Based on that memo, it would
19   seem that way.
20    Q.   Okay.  "And will not be
21   conducted during the remainder of 2002 so

22  that all salaried management employees
23  will receive their annual reviews at the
0053
1  same time."  Do you know of any reason
2  Ms. Stough would not get an annual review
3  in January 2003?
4    A.  No.
5    Q.  Okay.  But if there's a freeze
6  in effect --
7    A.  Right.
8    Q.  -- in January 2003, you can't --
9  you don't get a raise if you're not --
10  unless you change your job title or
11  something; right?
12    A.  Correct.  I assume, right.
13    Q.  The next page on this Exhibit 3,
14  there's a memo from Hurley to the payroll
15  manager and Hicks, the hotel controller.
16  Do you know if they're still working at
17  this company?
18    A.  I believe they are.
19    Q.  Did you also receive this memo?
20    A.  I don't recall the specific
21  memo, but I'm sure I would have.
22    Q.  Who is Craig Kitchin, is he the
23  CEO?
0054
1    A.  CFO.
2    Q.  CFO?
3    A.  The president.
4    Q.  Is he related to the other
5  Kitchin?
6    A.  Correct, it's his father.
7    Q.  Father?
8    A.  Uh-huh (affirmative).
9    Q.  Who's the father?
10    A.  Tom.
11    Q.  Tom.  Okay.  And the second
12  paragraph, it says, "Wage salary
13  increases are authorized only in
14  connection with bona fide evidences --
15  bona fide promotions as evidenced by a
16  job code change."
17      Do you know -- do you understand
18  that they were job codes, you just don't

19  know what they are; is that correct?
20    A.   Correct, I don't.  Again, for
21  general ledger purposes, I'm sure they
22  were there.  That's not something I ever
23  paid attention to.
0055
1     Q.   Okay.  But is this your
2  understanding that you didn't get a
3  raise -- one of the ways you could get a
4  raise, I guess, would be you would have a
5  job code raise, a promotion?
6     A.   Based on this, yes.
7     Q.   Okay.
8     A.   A promotion.
9     Q.   One of the first -- Numeral 3
10  there, it says, "Input of wage increases
11  for employees to correct and end the
12  improper use of temporary rates will be
13  permitted."  What does that mean?
14    A.   I believe this is in reference
15  in hourly employees if they were working
16  different positions in the hotel.
17    Q.   Did the freeze also affect
18  hourly employees?
19    A.   Correct, if I remember
20  correctly.
21    Q.   All right.
22       Because the only thing I've seen
23  on the previous memo mentions salaried
0056
1  employees.  So, you think it affected
2  hourly and salary, or are you just
3  guessing on that one?
4     A.   Yeah.  I don't recall offhand.
5     Q.   Do you know what the No. 3 is,
6  or are you sure that's related to hourly?
7     A.   Yeah.  That would have been
8  definitely hourly, yeah.
9     Q.   Okay.  You did not have any
10  temporary salaried wages?
11    A.   No.  Not to my knowledge, no.
12    Q.   Okay.
13       Do you know of any general
14  managers between 2001 and 2004 who were
15  paid $21,000 a year?

16     A.  I don't recall the specific
17  numbers offhand.
18     Q.  You don't remember -- do you
19  know of --
20     A.  I wouldn't know offhand, no.
21  Huh-uh.
22     Q.  You sign off on product
23  evaluations too; right?
0057
 1     A.  Attempted to.
 2        (Plaintiff's Exhibit No. 4 was
 3        marked for identification.)
 4     Q.  (By Mr. Goldfarb) Exhibit 4 are
 5  some front pages of evaluations?
 6     A.  Sure.
 7     Q.  Exhibit 4 is front pages of some
 8  evaluations --
 9     A.  Uh-huh (affirmative).
10     Q.   -- on Ms. Stough.  All I want
11  you to do is say yes -- if it is --
12     A.  Uh-huh (affirmative).
13     Q.   -- just tell me that that is
14  your signature on all those pages.
15        On the one dated 4/04/03, that's
16  your signature; right?
17     A.  Yes, it is.
18     Q.  And the one dated 12/19/03,
19  that's your signature?
20     A.  Correct, uh-huh.
21     Q.  And the one dated 11/26/03,
22  that's your signature?
23     A.  Yes.
0058
 1     Q.  And the 03/05/03, I guess,
 2  that's your signature?
 3     A.  Yes.  Yes.
 4     Q.  And the 6/11/03, that's your
 5  signature?
 6     A.  Yes.
 7     Q.  And the 8/07/03, that's you
 8  signature; correct?
 9     A.  Right, uh-huh.
10     Q.  You don't have any independent
11  recollection of going over those, do you,
12  these evaluations?

13     A.  No.  No.  No.
14          (Plaintiff's Exhibit No. 5 was
15          marked for identification.)
16     Q.  (By Mr. Goldfarb) And Exhibit 5
17  is just some more of the same thing on
18  other people.  And I just want you to
19  tell me -- I'll call the date, and you
20  tell me that that's your signature.
21     A.  Uh-huh (affirmative).
22     Q.  3/27/03?
23     A.  Yes.
0059
1     Q.  6/27/03?
2     A.  Correct.
3     Q.  12/24/03?
4     A.  Uh-huh (affirmative).
5     Q.  Yes?  Say yes.
6     A.  Yes.
7     Q.  2/27/03?
8     A.  Yes.
9     Q.  6/18/03?
10     A.  Yes.
11     Q.  8/07/03?
12     A.  Yes.
13     Q.  10/30/03?
14     A.  Yes.
15     Q.  1/21/03?
16     A.  Yes.
17     Q.  And 4/10/03?
18     A.  Yes.
19     Q.  2/26/03?
20     A.  Yes.
21     Q.  4 -- I think I might have called
22  that one.  4/10/03?
23     A.  Yes.
0060
1     Q.  9/10/03?
2     A.  Yes.
3     Q.  And 12/11/03?
4     A.  Yes.
5     Q.  Those are all your signatures?
6     A.  Yes.
7     Q.  Why are you signing off on these
8  product evaluations?
9     A.  I attempted to review every QA

10  that was done by our assessors.
11    Q.  Why?
12    A.  To look at any details with the
13  property and ensure that what I saw, at
14  least in that evaluation, seemed
15  consistent with the details behind this
16  cover page.
17    Q.  How would you do that?
18    A.  Look page by page.
19    Q.  Okay.  So, you would study the
20  entire evaluation?
21    A.  I would attempt to, yes.
22    Q.  And compare it to?
23    A.  The overall assessment and see
0061
1  if that --
2    Q.  Would you actually compare the
3  numbers?
4    A.  No.  No.  I just looked at
5  individual line items.
6    Q.  Okay.  This Exhibit 10, for
7  example --
8    A.  Okay.
9    Q.  -- let's just kind of walk
10  through it.
11    A.  I understand, sure.
12    Q.  It says, "Percent of deficient
13  issues."  How do you read that?
14    A.  This is in black and white, so
15  you would want to --
16    Q.  Oh.  It should be in color?
17    A.  Yes.
18    Q.  Okay.  How would you read it if
19  it was in color?
20    A.  Well, depending on what we're
21  referring to -- as an example, if it were
22  cleanliness, and the biggest portion of
23  this QA's deficiency were cleanliness,
0062
1  then it would have a percentage by that
2  number.
3    Q.  You can't tell by looking at
4  this what's cleanliness because it should
5  be color?
6    A.  Yeah.

7    Q.   Okay.
8    A.   But I can see there's 27
9  cleanliness issues listed on this.
10    Q.   At the bottom down there?
11    A.   Correct.
12    Q.   Okay.  Is that a lot?
13    A.   Yes, I believe it is.
14    Q.   Is 16 a lot?
15    A.   It's less than 27.
16    Q.   I mean, is there an area where
17  you get a needs improvement?  Is it based
18  on the cleanliness?
19    A.   It would be based on
20  deficiencies such as cleanliness.
21    Q.   Guest services, is that -- is
22  this a deficiency too?  What number is on
23  that?
0063
1    A.   It says 8 on mine.
2    Q.   Okay.  And then cleanliness has
3  what number?
4    A.   27.
5    Q.   And then dust and debris, what's
6  that?
7    A.   7.
8    Q.   Is that a cleanliness issue?
9    A.   The combination of the two is
10  considered an issue.
11    Q.   Dust and debris?
12    A.   Sure.
13    Q.   And repair and replacement, is
14  that a --
15    A.   It's maintenance.
16    Q.   But if there's deficiencies
17  there, you -- you get a -- is there a
18  certain range for having too many
19  deficiencies?
20    A.   That were controllable, there
21  would be.
22    Q.   I mean, is there a number that
23  you --
0064
1    A.   I don't recall off hand.  There
2  would be a particular number of
3  deficiencies that would trigger a score.

4    Q.  All right.  And then there's
5  this -- "standards," what does that mean?
6    A.  Operating standards such as must
7  have waffles.  If the waffles weren't
8  there, then it's considered an operating
9  standard issue.
10    Q.  Okay.  Well, go to the third
11  page.
12    A.  Uh-huh.
13    Q.  It says, "Major operational
14  deficiencies."  What is that?
15    A.  Uh-huh (affirmative).
16    Q.  Is that just a listing of the
17  major operational deficiencies?
18    A.  This is something that the
19  assessor would put in writing in regard
20  to reflecting on the QA itself and type
21  this up.
22    Q.  Okay.
23    A.  As they walk, they would make
0065
1  some key notes and then put this in
2  writing.
3    Q.  When they walk through there, is
4  the GM supposed to be with them?
5    A.  Optimally, yes.
6    Q.  Why wouldn't the GM be with
7  them?
8    A.  If they were working the desk or
9  not at the property at the time.
10    Q.  Why is it -- why do you say
11  "optimally, yes"?
12    A.  You want to walk around the
13  property with the general manager when
14  you do these QAs.
15    Q.  Why is that?
16    A.  Because they need to know and
17  see everything that the QA assessor is
18  seeing.
19    Q.  Why do they need to do that?
20    A.  It appears obvious to me, if I
21  say there's debris or dirt in a room or I
22  see and operational deficiency, we want
23  that person to see that same issue.
0066

1    Q.   And it gives them the
2   opportunity to dispute it?
3    A.   Not necessarily, no.  No.  We
4   don't -- we don't debate those issues.
5   They are what they are.  A mark is on the
6   wall, then it's a mark on the wall.  We
7   don't debate whether the mark is on the
8   wall.
9    Q.   Okay.  What if there's no mark
10  on the wall?
11   A.   They're not going to write it
12  down as a deficiency.
13   Q.   All right.  And how do you know
14  that?
15   A.   I'm not sure I understand.
16   Q.   Okay.  Let's go to the next
17  page.  What is this?  It's the product
18  evaluation.  What does that one say at
19  the top?  It's just another --
20   A.   It's capital -- this is capital
21  deficiencies.
22   Q.   What does that mean?
23   A.   Things such as carpet that needs
0067
1   to be replaced, furnishings that need to
2   be replaced.
3    Q.   How do you -- if you don't have
4   the money to replace the carpet, I mean,
5   how are you supposed to do that as a GM?
6    A.   It has to be clean.  You know,
7   we look at carpeting in regard to a GM's
8   responsibility in regard to controls as
9   clean or not clean.
10   Q.   What if there's some maintenance
11  issues and things need repairing, how is
12  a GM suppose to fix it?
13   A.   The GM has a budget.  And if
14  they handle it -- if it's an issue they
15  can handle on property with the expertise
16  they have on staff, they would handle it.
17  If it's something they couldn't handle on
18  property, then they would hire or contact
19  somebody outside of the property.
20   Q.   Do the properties have a
21  maintenance person?

22    A.   Depends on the property.  Some
23  did, some did not.  But they designated
0068
1   as maintenance.
2     Q.   How would you decide which
3   properties have a maintenance person?
4     A.   I wouldn't decide that.  It was
5   primarily and almost solely based on
6   their budgets.
7     Q.   Budget are decided by whom?
8     A.   Regionals look them over, submit
9   recommendations, we view them at the
10  corporate office.  And they're approved
11  individually by the regionals and myself
12  and the CFO.
13    Q.   So, you actually go through and
14  approve or not approve a budget that's
15  submitted by the regional?
16    A.   Correct, yes.
17    Q.   Do you always approve a budget
18  submitted by the regional person?
19    A.   Yes.  I mean, we -- we'd get
20  those budgets in, but there were
21  different ways that budgets were done
22  throughout my tenure.
23    Q.   Between 2001 and 2004, did
0069
1   you -- every time a regional submitted a
2   budget, you approved it?
3     A.   I wouldn't approve it at that
4   very moment.  We would look over -- and
5   it's based on revenue growth and based on
6   gross operating profits and gross
7   operating profit margin.
8          So, depending on what we saw
9   from the prior year, we'd make a
10  determination as to whether or not that
11  appeared logical.
12    Q.   So, sometimes you would change
13  it, and sometimes you wouldn't?
14    A.   Correct.  Sometimes, yeah.  Most
15  every -- I would say every budget in a
16  first pass would be changed.  And there
17  may be several times, two or three
18  passes -- budgets before they finally get

19  approved, which is a natural process for
20  a hotel company.
21    Q.  So, the regional would submit
22  it, you'd look at it, send it back to the
23  regional?
0070
1    A.  We'd discuss it, yeah.
2    Q.  And then he'd resubmit it?
3    A.  No, he wouldn't have to resubmit
4  it.  We would just discuss it usually
5  over the phone.
6    Q.  Okay.  And then you would work
7  with the numbers?
8    A.  Correct, yeah.
9    Q.  You say "we," besides you and
10  the -- who else at corporate was
11  involved?
12    A.  Tony Maness.
13    Q.  Who is that?
14    A.  He's the current vice president
15  of operations.
16    Q.  Who is he?  What was his job
17  title when you were there?
18    A.  CIO, I believe, chief
19  information officer.
20    Q.  Would he also work with you on
21  the budget at that time?
22    A.  Yes.  Yes.
23    Q.  Anybody else at corporate?
0071
1    A.  We would present those numbers
2  as a first past to Craig Kitchin.
3    Q.  And what's his job title?
4    A.  He's the chief financial
5  officer.
6    Q.  And he would do what?
7    A.  He would review those number and
8  determine as to whether or not they were
9  viable for the next operating year.
10    Q.  For that particular property?
11    A.  No, as a whole.  As a whole.
12    Q.  But would they look at the
13  budget for each particular property?
14    A.  No.  No.
15    Q.  Okay.  You would look at the

16  budget for each particular property?
17    A.  Yes.  Yes.
18    Q.  And you would submit a package
19  to the CFO?
20    A.  A consolidation of our budgets.
21    Q.  How many properties did y'all
22  have when you were doing this?
23    A.  In upwards of 135.
0072
1    Q.  And, so, you would look at every
2  one of them?
3    A.  Ill attempt to look at every
4  one, yes.
5    Q.  And go through the process
6  you've described?
7    A.  Yes.
8    Q.  The next page is this product
9  evaluation.  What is that?
10    A.  This is the details of the
11  actual quality assurance inspection.
12    Q.  Okay.  And it goes through and
13  checks on the particular areas; right?
14    A.  Correct, yes.
15    Q.  And do they write it out by hand
16  and then come back and type it?
17    A.  Yes.  Yes.
18    Q.  Is this in some type of program?
19    A.  Excel worksheet.
20    Q.  Okay.  It's set up in Excel, and
21  then Charles would type it in?
22    A.  Correct.
23    Q.  He'd handwrite in and then come
0073
1  back and type it, I guess?
2    A.  Correct.
3    Q.  Is there a handwritten form to
4  write on?
5    A.  Not to my knowledge other than
6  the form itself.  You could use -- you
7  would be using a blank form.
8    Q.  A blank one.
9    A.  And then just mark it.
10    Q.  Uh-huh.  Where are the
11  computers, at the properties?
12    A.  In the back office.  And they

13  have laptops too as well.
14    Q.  The regionals do?
15    A.  Yes.
16    Q.  Okay.
17        Is that the same if we look
18  throughout -- all the way to the end,
19  this is just a detailed --
20    A.  Yes.
21    Q.  Well, actually, you've got this
22  chart.  What is that?  And that's --
23    A.  There are, again, noted.
0074
1     Q.  What bates -- what's the page
2  number on that Exhibit 10?  That little
3  number at the bottom there.
4     A.  13 of 16.
5     Q.  Okay.  That's fine.
6         I'm going to do this for the
7  record.  It's 570 is the page you're
8  looking at.  What is that?
9     A.  Again, details of the quality
10  assurance inspection.
11    Q.  So, the information we just went
12  over goes into this chart?
13    A.  Correct.
14    Q.  And this puts -- this goes into
15  Excel?
16    A.  This is Excel, every page.
17    Q.  Right.  And Excel calculates
18  this?
19    A.  Correct, yes.
20    Q.  Then you've got at the bottom
21  where it's graded, how does it come out
22  to be graded?
23    A.  A certain level of deficiencies
0075
1  in that particular room would determine
2  the grading status.
3     Q.  Okay.  So, a certain number, and
4  you get a grade?
5     A.  Correct.
6     Q.  How many?
7     A.  I don't recall the number.
8     Q.  Okay.  All right.  Thanks.
9         Did you make changes to the

10  product evaluations?
11      A.  They were revised over time.
12      Q.  No.
13          I mean, when you'd get one from
14  Charles, for example, would you -- and
15  you would check for consistency, would
16  you --
17      A.  No.
18      Q.  -- change the front page?
19      A.  No, never.
20      Q.  You never changed it on anybody?
21      A.  No.
22      Q.  Correct?
23      A.  Correct.
0076
 1          (Plaintiff's Exhibit No. 6 was
 2           marked for identification.)
 3      Q.   (By Mr. Goldfarb) This Exhibit 6
 4  is the quality assurance evaluation.  And
 5  it's a document that explains how quality
 6  assurance evaluations were done, I guess.
 7  And it's got a date of 4/21/04.
 8          Was the manner that quality
 9  assurance evaluations -- was there a
10  change in April of '04?
11      A.  To what degree?
12      Q.  I don't know.  It's just a got a
13  date on it.  And during the entire time
14  you were there -- you could read, you
15  know, read through this and then see if
16  this was the way that quality assurance
17  evaluations were done when you were
18  there?
19      A.  Sure, yes.
20      Q.  This is the way?
21      A.  At that time, correct.
22      Q.  And before this time?
23      A.  It would have been -- it may
0077
 1  have been different.
 2      Q.  Okay.  So, do you know if --
 3  looking at this Exhibit 6, can you tell
 4  me between 2001 and up until this date
 5  how it was different, the way the quality
 6  assurance evaluations were done?

7     A.   It evolved over time.
8     Q.   You don't know how it was
9   different?
10     A.   It would have changed based on a
11   consensus by the regional, district, or
12   area managers on how we drive performance
13   and what we want to focus on.  So, if we
14   added a standard, it would have --
15     Q.   Oh, okay.  All right.  So, this
16   may be adding or taking away standards or
17   changing the value of the standards, this
18   Exhibit 6; right?
19     A.   It could.  It could.
20     Q.   Is there a form indicating how
21   it was done prior to April of '04, the
22   quality assurance evaluations?  Something
23   like this that came out on other
0078
1   occasions, Exhibit 6.
2     A.   Not to my knowledge.  I mean, I
3   don't recall any.
4     Q.   Do you recall this memo?
5     A.   Not specifically.
6     Q.   Exhibit 6, did you ever read
7   this?
8     A.   I'm sure I did.
9     Q.   Does a quality evaluation score
10   have something to do with a general
11   manager's salary?
12     A.   No, bonus.
13     Q.   Okay.  It has to do with the
14   bonus?
15     A.   Correct.
16     Q.   Every time somebody got a bonus,
17   did you send them something like a
18   congratulations or something like that?
19     A.   I would attempt to write a
20   letter.
21     Q.   Did you do it every time they
22   got a bonus?
23     A.   I don't recall.  I don't recall
0079
1   sending everyone specifically a letter,
2   but I attempted to.
3     Q.   Okay.  Exhibit 7 is a letter you

4   wrote to Ms. Stough dated January 30th,
5   2003; right?
6          (Plaintiff's Exhibit No. 7 was
7          marked for identification.)
8          THE WITNESS:  Yes.
9      Q.   (By Mr. Goldfarb) And you get a
10  bonus by doing a good job?
11     A.   Yes, presumably.
12     Q.   I mean, you don't get a bonus if
13  you're doing a bad job, do you?
14     A.   I wouldn't think so.
15     Q.   Right.  When you get -- when you
16  wrote a letter like Exhibit 7, did you --
17  did you say anything to the -- I mean,
18  did you review the documents such as the
19  evaluations, the QAs on the person?
20     A.   The bonus structure at this time
21  may have been different during the time
22  in which we had formalized QAs.  I don't
23  recall offhand.  This bonus was more than
0080
1   likely based purely on financial
2   performance, I'm guessing at this time.
3      Q.   Operation --
4      A.   Gross operating profit.
5      Q.   GOP?
6      A.   If I -- I don't recall the
7   specifics, but this one would -- I'm
8   presuming in 2002, would have been based
9   almost purely on financials -- gross
10  operating profit margin.
11     Q.   Why do you say that?
12     A.   Because I believe that's
13  factual.
14     Q.   How -- is there a --
15     A.   The bonus criteria changed.
16     Q.   When?
17     A.   Every year it would change.
18     Q.   Sometimes it would be based on
19  profit -- profitability?
20     A.   Correct.
21     Q.   Was sometimes it not based on
22  profitability?
23     A.   They're different gates and
0081

1  different value levels.  When we were a
2  RET, operating margin was critical.
3     Q.   When you were a what?
4     A.   A RET, a real estate investment
5  trust.
6     Q.   When were you a real estate
7  investment trust?
8     A.   Throughout most of my tenure.
9     Q.   When did that change?
10    A.   '94.
11    Q.   No.  No.  When did it end?
12    A.   '94.  I mean -- sorry.  2004.
13    Q.   Okay.  So, 2004, it stopped?
14    A.   I believe that's correct, yeah.
15    Q.   And changed to what?
16    A.   A C-Corp.
17    Q.   And how did the bonus structure
18  change in 2004?
19    A.   We changed one of the base gates
20  on GOP margin and shifted it to revenue
21  growth.
22    Q.   Okay.  Did bonus have anything
23  to do with your QAs?
0082
1     A.   Yes.
2     Q.   Okay.  When did that -- what
3  years did QAs have effect on bonuses?
4     A.   I believe in 2005 and a portion
5  of 2004, but I don't recall the
6  specifics.
7     Q.   Prior to that, bonuses were
8  based on profitability?
9     A.   Primarily, yes, if I remember
10  correctly.
11       MR. KESSLER:  When you get to a
12  breaking point, can we take a break?
13       MR. GOLDFARB:  Yeah.  I'm almost
14  through with this.
15       (Plaintiff's Exhibit No. 8 was
16        marked for identification.)
17    Q.   (By Mr. Goldfarb) Let me show
18  you -- you had mentioned -- I forgot I
19  had this memo.
20    A.   Sure.
21    Q.   All right.  This is bonus

22  programs 2001, 2002 -- 2001, 3, and 4.
23  Just like you said, in 2001, bonus is
0083
 1  tied to GOP; right?
 2     A.  Correct.
 3     Q.  If you look on 2063 there?
 4     A.  Yes.
 5     Q.  And that's -- and 2064 shows how
 6  the numbers work, I guess, for the bonus?
 7     A.  Correct.
 8     Q.  Okay.  And 2065 -- I'm looking
 9  at those little numbers at the bottom.
10  Do you see there?
11     A.  Yes.
12     Q.  Those numbers are from the law
13  firm stamping it.
14     A.  I got you.
15     Q.  Okay.  You wrote this memo on
16  2065; right?
17     A.  Right, correct.
18     Q.  And this is your bonus plan.
19  And it says GOP -- but it also says QA.
20  So, you do have -- actually, in 2003, you
21  did have some bonus related to QAs?  Is
22  that -- or is this -- did you not follow
23  this memo?
0084
 1     A.  No, this would be correct.
 2     Q.  Okay.  So, you did use QAs?
 3     A.  At this time.
 4     Q.  Okay.  So, in 2003, QAs were
 5  used for the first time?
 6     A.  I don't recall if it was for the
 7  first time.
 8     Q.  Okay.  It might have been before
 9  that also?
10     A.  I don't recall to be honest.
11     Q.  All right.  Well, let's look.
12  In 2001 -- oh.  You can't have a
13  discipline?  And I guess you could get a
14  discipline if your hotel is a disaster;
15  right?
16     A.  You would think.
17     Q.  I mean, you would get
18  disciplined for --

19     A.  Poor performance, sure.
20     Q.  Right.  I mean, if your place is
21  a wreck, you're going to get a
22  discipline --
23     A.  I would think, yeah.
0085
1     Q.  -- generally?  Okay.  So, in
2  2001 -- I mean, a QA is the same as a --
3  can reflect a poorly -- a poor hotel;
4  right?
5     A.  Yes.  Yes.
6     Q.  Okay.
7     A.  In terms of product quality.
8  But you can still maintain a bonus level
9  financially and still have a dirty hotel.
10     Q.  Okay.
11     A.  Because of financial
12  performance, hitting that gate.
13     Q.  I guess, as long as you don't
14  got a discipline?
15     A.  In 2001 you're saying?
16     Q.  Right.
17     A.  Yes.  That appears, yes.
18     Q.  And there's -- I didn't see any
19  2002 bonus memo.  Do you know of one?
20     A.  No.
21     Q.  And then you wrote the 2003 one,
22  which first it puts GOP.  And that's your
23  primary concern?
0086
1     A.  Right.  Right.
2     Q.  And then it does the QA and the
3  market?
4     A.  Right.  I think if you refer to
5  2069 --
6     Q.  Right?
7     A.  -- it answers all the questions
8  regarding the bonus and why we changed
9  the bonus.  In specifics, the last
10  paragraph would give you an indication of
11  that.
12     Q.  I mean, I've read it.  Which is
13  really based on GOP?
14        MR. KESSLER:  Objection.
15     Q.  (By Mr. Goldfarb) I mean, you

16  can correct me if I'm wrong.  You wrote
17  it; right?
18      A.   What it says.  I mean, whatever
19  it says.
20      Q.   Well, it doesn't say anything
21  other than -- I mean, this paragraph is
22  only talking about -- well, it mentions
23  if you get an outstanding QA.
0087
1      A.   Right.  If you get an
2  outstanding QA.
3      Q.   You get more for profitability.
4  You get 1000 bucks for the profitability?
5      A.   Uh-huh (affirmative).  Again --
6      Q.   Right.
7      A.   --just reading it.
8      Q.   So, during the freeze -- I'm
9  sorry?
10      A.   Again, in reading this in
11  detail -- I think you have to look at all
12  of the notes in here to determine what
13  the bonus is.
14      Q.   Okay.  But during the freeze,
15  you could still get a bonus?
16      A.   Yes.
17          MR. GOLDFARB:  Do you want to
18  break?
19          MR. KESSLER:  If it's a good
20  break time, yeah.
21          MR. GOLDFARB:  Sure.
22          (A short break was taken.)
23      Q.   (By Mr. Goldfarb) All right.
0088
1  We're back after a break.  During the
2  break, no testimony was discussed; right?
3      A.   (Witness nods head negatively.)
4      Q.   Correct?
5      A.   Right, correct.
6      Q.   Okay.  Is there anything you
7  need to correct about what we were going
8  over?
9      A.   Not to my knowledge.
10      Q.   The bonus -- the 2004 bonus
11  program came in -- when did that --
12  what's the date on this, when you wrote

13  this.  January 21st, 2003 is the date.
14  When was the 2004 one put out?
15      MR. GOLDFARB:  See, it says --
16  on the front, it's -- y'all gave me this.
17  2001, 3, and 4.  And I see the 2003.  You
18  know, I just can't find the 2004.
19      MR. KESSLER:  There was -- I was
20  the one who put the pages on it.  And
21  there was one sheet for 2004, the last
22  page.  And that's all that we had.  I was
23  not provided with an explanation on the
0089
1  2004 program.
2      MR. GOLDFARB:  Okay.  Thanks.
3      Q.  The only thing I've got for 2004
4  then is this March 31st, 2004, one, which
5  happens to be after my plaintiff left.
6      A.  Okay.
7      Q.  I don't know how relevant it is.
8      A.  Okay.
9      Q.  But what changed in 2004, if
10  anything, concerning the bonus program?
11      A.  From 2003?
12      Q.  Yes.
13      A.  I don't recall offhand.  But we
14  changed -- if what I remember is
15  accurate, we put more emphasis on
16  revenues.
17      MR. GOLDFARB:  Is something
18  wrong?
19      MR. KESSLER:  We were looking at
20  the complaint.
21      Q.  (By Mr. Goldfarb) Go ahead.
22      A.  We put more emphasis on topside
23  revenues.
0090
1      Q.  Right.
2      A.  Yeah.
3      Q.  Which means what?
4      A.  More revenues, more room
5  revenue.
6      Q.  Okay.  As opposed to what?
7      A.  Gross operating profit margin.
8      Q.  Okay.  So, the more rooms you
9  sell, the more revenue you get, and the

10  more bonus you would get?
11    A.  If you still controlled your
12  costs.  It was -- if I remember
13  correctly, it was revenue driven, gross
14  operating profit driven, gross operating
15  profit margin driven, as well as QA
16  driven?
17    Q.  Those are ways that bonus was
18  driven in 2004?
19    A.  If I remember correctly.
20    Q.  So, you added another factor,
21  the revenue per room?
22    A.  If it's not stated in '03, that
23  would be correct.
0091
1        (Plaintiff's Exhibit No. 9 was
2        marked for identification.)
3    Q.  (By Mr. Goldfarb) Okay.  All
4  right.  This is a memo, which is Exhibit
5  9.  And it's the salary increases for
6  2004, which indicates -- well, you wrote
7  this; right?
8    A.  I think it was dually drafted by
9  Jeff Hurley and myself.
10    Q.  All right.  It says from you at
11  the top.
12    A.  It says from me slash and Jeff
13  Hurley.
14    Q.  Okay.  So, you and Jeff wrote
15  it?
16    A.  Yes, we would have drafted it
17  together.
18    Q.  All right.  Did you decide in
19  April of 2004 that you were going to lift
20  the freeze?
21    A.  I don't recall offhand.
22    Q.  Was there a decision in 2003 to
23  lift the freeze?
0092
1    A.  I really don't recall.
2    Q.  When was that first time salary
3  raises were given?
4    A.  After the freeze?
5    Q.  Right.
6    A.  My recollection would be 2004.

7   But, again, I don't recall specifically
8   when that might have occurred.
9      Q.   You don't know if this was
10  before April 2004?
11     A.   I don't.  I don't recall.
12     Q.   Did you send any other memos out
13  concerning salary increases before April
14  2004?
15     A.   Not to my recollection.
16     Q.   In 2004, were there performance
17  assessments done on general managers?
18     A.   I don't recall.
19     Q.   Reviews, you know?
20     A.   Right.  I don't recall to be
21  honest.
22     Q.   Well, look at the first page of
23  your memo.  It says, "Salary increases --
0093
1   No. 2 -- awarded will correlate to a
2   written evaluations of personal
3   performance, i.e., associate performance
4   assessments."  Okay.  Were there some
5   associate performance assessments done in
6   2003?
7      A.   I don't recall.
8      Q.   In order to receive a raise in
9   2004, did you have to have a performance
10  assessment done on you?
11     A.   I don't specifically remember.
12     Q.   Did you do any performance
13  assessments or review any performance
14  assessments in 2004?
15     A.   Again, I don't recall.
16     Q.   And how about in 2003?
17     A.   Not that I remember
18  specifically.
19     Q.   On the second page, it has a
20  No. 9 at the bottom, and it talks about
21  performance assessments are the
22  responsibility of the -- I can't read
23  that word -- something regional or
0094
1   district -- regional manager or director.
2   Is the regional manager responsible for
3   doing performance assessments on general

4  managers?
5    A.  If there was a formal process
6  during that time, yes.
7    Q.  Well, on the first number under
8  procedure, it says, "Each salaried
9  associate eligible to receive a salary
10  increase under the program shall be
11  evaluated in writing using the employee
12  annual assessment form"?
13    A.  Okay.
14    Q.  Do you remember that form?  Did
15  you have such a form?
16    A.  There were several forms used at
17  various times.
18    Q.  But in 2004 is what we're
19  talking about.
20    A.  I don't remember a specific
21  form.  But if Jeff provided a form, it
22  would have been in place.
23    Q.  What part of this memo did you
0095
1  write?
2    A.  I personally didn't write this
3  memo.
4    Q.  All right.  You --
5    A.  Helped draft this memo.
6    Q.  What part of it did you help
7  draft?
8    A.  I think it was through the
9  course of conversation on how we would
10  handle evaluations --
11    Q.  Right.  Would --
12    A.  -- and the percent ranking that
13  would determine salary.  And that is on
14  2060.  Jeff and I determined the range of
15  performance that would dictate the salary
16  increase.
17    Q.  Ranking according to what?
18    A.  If I remember, at the time, the
19  form that may been used would have given
20  a value to each area of performance.  The
21  combination of that equalling the overall
22  score.  The score then, equalling the
23  percentage increase that the GM might
0096

1  get.  As an example, if you -- according
2  to this, if you had 90 percent on the
3  score, you got 1 percent of base salary.
4      Q.  His score would be a
5  combinations --
6      A.  Areas of performance.
7      Q.  If you look at the last page,
8  2061, it says, "No salary increase shall
9  be awarded or bonuses effective as to
10  salaried employees in any single region
11  until such time as 95 percent of all
12  employee performance assessment forms are
13  due or required from said region have
14  properly completed and have been
15  forwarded to and received by the home
16  office in Atlanta."
17          So, the way I read that is that
18  you've got to have this form, this
19  performance assessment form filled out in
20  order to get the raise or the bonus; is
21  that right?
22      A.  Are you saying collectively or
23  individually?
0097
1      Q.  Yeah, individually.  In order to
2  get a raise --
3      A.  Right.
4      Q.  -- to put it simply, you've got
5  to have a performance assessment form
6  filled out on you?
7      A.  That would appear to be correct.
8  That was at the jurisdiction and
9  management of HR at the time.
10      Q.  So, Jeff wrote that part of it
11  at least?
12      A.  Yes.
13      Q.  Okay.
14      A.  Yes.
15      Q.  Okay.  And did you as HR -- I
16  mean, as the VP of operations, review any
17  performance assessment forms?
18      A.  I would have reviewed some of
19  them, but not all of them.
20      Q.  Do you recall reviewing any?
21      A.  Specifically, not a particular

22  one.
23     Q.  I mean, but for an employee to
0098
 1  get a raise in 2004, you had to have the
 2  performance assessment form filled out on
 3  you?
 4     A.  Yeah.  Jeff and I would have
 5  tried to dually look at that together.
 6     Q.  Right.  But in order to get a
 7  raise, you've got to have the performance
 8  assessment form in 2004 onward -- after
 9  April 2004?
10     A.  According to what he wrote, that
11  would appear to be the case.
12     Q.  Do you know of any situation
13  where you got a raise without having the
14  performance assessment filled out on you?
15     A.  I don't particularly recall any
16  case where anyone got a raise if they did
17  or didn't.
18     Q.  Do you know of any reason that
19  this memo is wrong where it says that you
20  have to have a performance assessment
21  form in order to get the raise that we
22  were just talking about?
23     A.  I don't know that it's wrong.
0099
 1     Q.  Okay.  And you don't recall --
 2  there's no memo that you know of after
 3  this one saying, "Well, that's not how
 4  we're going to do it.  Here is how we're
 5  going to do it"?
 6     A.  Not to my knowledge.
 7        (Plaintiff's Exhibit No. 10 was
 8        marked for identification.)
 9     Q.  (By Mr. Goldfarb) Sometimes
10  would you send out -- when a bonus would
11  go out, it looks like it would -- Exhibit
12  10 will show you what I'm talking about.
13  It looks like you would just send a --
14  there would just be a form letter instead
15  of writing the person's name on it from
16  you, and they'd get a letter like Exhibit
17  10 with the check?
18     A.  Yeah, that appears to be right.

19    Q.  Okay.
20    A.  I just wanted to read it.
21    Q.  Is that right?
22    A.  For this particular memo, that's
23  correct.
0100
1     Q.  Okay.  Sometimes you would put
2  their name on it, and sometimes you
3  wouldn't?
4     A.  I would make every attempt to
5  put a person's name on it.
6     Q.  Right.  But, you know, sometimes
7  you don't have time, I guess, and you'd
8  send out a letter --
9     A.  Correct, yeah.
10    Q.  All right.  What did you do to
11  prepare your deposition today?
12    A.  Not much of anything.
13    Q.  Did you look at any documents?
14    A.  Nothing in detail, no.
15    Q.  Well, did you look at any
16  documents to get prepared for your
17  deposition?
18    A.  I did not read any documents.
19    Q.  Well, did you look at any?
20    A.  I saw a document.
21    Q.  What document?
22    A.  I don't even know.
23    Q.  You saw one document?
0101
1     A.  I believe it was one.
2     Q.  And you don't know what it was?
3     A.  I don't recall.
4     Q.  When did you look at it?
5     A.  Wednesday, I guess.
6     Q.  Where did you look at it?
7     A.  At lunch.
8     Q.  Okay.  Where were you?  Were you
9  here?
10    A.  No, at lunch just offsite here.
11    Q.  Where were you?
12    A.  With Gary.
13    Q.  Anybody else?
14    A.  No.
15    Q.  Okay.  So, you looked at one

16  document at lunch to get ready on
17  Wednesday, and that's it?
18      A.  I didn't even read or -- I saw a
19  document is all I saw.
20      Q.  Did you speak with anybody to
21  get ready for your deposition?
22      A.  No, other than Gary at lunch.
23      Q.  On Wednesday, and that's it?
0102
1      A.  Yes.
2      Q.  Did you speak to Gary?
3          You're talking about your
4  lawyer, Gary -- I mean, the lawyer for
5  Jameson?
6      A.  Yes.
7      Q.  Did you speak to Gary on this
8  morning about the deposition to get
9  ready?
10     A.  Nothing in particular, no.
11     Q.  Well, generally?
12     A.  No, other than you were coming
13  today and what time.
14     Q.  So, you did not do anything to
15  get ready for your deposition?
16     A.  No.
17     Q.  Is that correct?
18     A.  Yeah, that's correct.
19     Q.  You didn't look at any -- you
20  did not read any documents?
21     A.  No, none.
22     Q.  Correct?
23     A.  Correct.
0103
1          (Plaintiff's Exhibit No. 11 was
2          marked for identification.)
3      Q.  (By Mr. Goldfarb) Okay.  Exhibit
4  11 is a couple of -- it's a few documents
5  concerning Mr. Fetner.  Do you know who
6  Mr. Fetner is?
7      A.  Yes, I do, uh-huh.
8      Q.  He was -- who was Mr. Fetner?
9      A.  He was the general manager of
10  the Alex City Jameson Inn.
11     Q.  Okay.  In order for Mr. Fetner
12  to get hired, I see Mr. Woods wrote

13  this -- well, this is actually once he's
14  already there.  In order for Mr. Fetner
15  to get promoted, for example, is a letter
16  such as this April 13th, 2004, letter, is
17  that something that you would have
18  received and reviewed?  Did you get this
19  letter?
20      A.   More than likely, I would have
21  read this, yes.
22      Q.   Okay.  For somebody to get
23  promoted, they write a letter -- a
0104
1  regional manager would write a letter to
2  you such as this; right?
3      A.   No, not necessarily.
4      Q.   Or they would call you?
5      A.   Correct.
6      Q.   Okay.
7      A.   Sometimes they'd call.
8      Q.   Sometimes they'd write a letter,
9  sometimes they'd call you?
10      A.   That's right, yeah.
11      Q.   But in order for somebody to get
12  promoted to a GM, you're involved in
13  that?
14      A.   Yes.  Yes.
15      Q.   All right.  This guy just --
16  Woods just happened to write you a
17  letter?
18      A.   He wrote me.
19      Q.   And then the next page, it's --
20  who is Phyllis?  It says, "Phyllis,
21  please have Greg review and sign the PAF
22  form."
23      A.   At that time, I believe she was
0105
1  my assistant.
2      Q.   Okay.
3      A.   But she may be -- today, she's
4  Tom Kitchin's assistant.
5      Q.   All right.  Then she would get
6  this letter, and she would -- or this 146
7  number, April 21st memo here, and she
8  would give it to you along with the PAF,
9  which is attached, for you to approve it;

10  is that right?
11    A.  Yeah, she would send the PAF to
12  me.
13    Q.  And you'd sign.  And you didn't
14  sign this one, but, generally, you would
15  sign it -- the PAF form?
16    A.  I would attempt to sign the PAF
17  forms, yes.
18    Q.  Okay.  And when you'd sign it,
19  do you review the form, the PAF form?
20    A.  Yes.  If I signed it, correct,
21  yes.
22    Q.  But you don't know what all the
23  codes mean like the department codes;
0106
1  right?
2    A.  I didn't pay any attention to
3  that, no.
4    Q.  And then on the last page, who
5  is Brian and Linda?  Are they HR or
6  payroll?
7    A.  Payroll.
8    Q.  Payroll?
9    A.  Yeah.
10      (Plaintiff's Exhibit No. 12 was
11      marked for identification.)
12    Q.  (By Mr. Goldfarb) Did you
13  receive -- this is a letter trying to get
14  James Fetner hired, Exhibit 12.  Did you
15  receive this from Mr. Woods on December
16  19th, 2003, or sometime about there?
17    A.  I believe I would have.
18    Q.  All right.
19    A.  Uh-huh, yes.
20    Q.  And what would you do -- what
21  did you do when you received that letter,
22  say okay or yea or nay?
23    A.  Smile.  And he looked like a
0107
1  great candidate.
2    Q.  That's what you did?
3    A.  Yeah.  I would look at it, and
4  say, "Great.  Let's talk with him."
5    Q.  Who decides the salary to start
6  him at?

7    A.  The regional.
8    Q.  And what's your role?  Do you
9   approve it or not approve it?
10    A.  I would approve it.
11    Q.  Okay.  You review it?
12    A.  Yes.
13    Q.  That's part of your job?
14    A.  Yes, uh-huh.
15    Q.  Okay.  When an employee
16   receives -- an assistant manager, general
17   manager receives a customer complaint,
18   are you involved in that at all?
19    A.  Not usually.
20    Q.  Well, do you have any
21   recollection of any customer complaints
22   on the Alexander City property the entire
23   time you were there?
0108
1    A.  Nothing specific that I can
2   remember.
3    Q.  Anything with Robbie Patterson?
4    A.  I don't recall anything.
5    Q.  Mark Fetner?
6    A.  No.
7    Q.  But you're not always involved
8   in a customer complaint; right?
9    A.  No.
10    Q.  Is that an area that the
11   regional manager generally handles?
12    A.  You have a million and a half
13   customers a year -- a million and a half
14   rooms sold a year in the chain.
15    Q.  Complaints happen?
16    A.  They will happen.
17       (Plaintiff's Exhibit No. 13 was
18       marked for identification.)
19    Q.  (By Mr. Goldfarb) You said
20   you've got a million and a half rooms
21   sold?
22    A.  Collectively.
23    Q.  Collectively, out of your 130
0109
1   properties?
2    A.  Properties, roughly speaking.
3    Q.  Exhibit 13, is this a list --

4   this is bates labelled 1495 through 1499.
5   This is a list of the properties?
6       A.  Yes.
7       Q.  All right.  And what I need to
8   understand.  It's divided into -- I've
9   got region -- it says Region 1, 2, 3, 4?
10      A.  Yes.
11      Q.  And it goes up to Region 8.
12      A.  Okay.
13      Q.  This says from 1/01/01 to a
14  certain date.  And you said the regions
15  have changed?
16      A.  Yes.
17      Q.  I mean, in 2004 when Ms. Stough
18  left and going back to 2002, were there
19  any changes to the regions?
20      A.  There may have been.
21      Q.  Is there documents like this
22  that would indicate -- like this Exhibit
23  13 that would indicate the regions?
0110
1       A.  Sure.  At that time, yes,
2   correct.
3       Q.  Because at this time -- whenever
4   this -- this was in 2001.  Region 1 was
5   Georgia -- Albany, Georgia and Alexander
6   City, which is where Ms. Stough worked.
7   Did this region change?
8       A.  Region 1?
9       Q.  Right.
10      A.  During this year?
11      Q.  No, up until 2004.
12      A.  It may have been.
13          MR. KESSLER:  It's Region 2.
14          THE WITNESS:  Region 2 is Alex
15  City.
16      Q.  (By Mr. Goldfarb) Are you
17  reading above it?
18      A.  Yeah.
19      Q.  I'm sorry.
20      A.  Correct.
21      Q.  So, Region 2 -- in 2004, was
22  Albany in Region 2 -- 2003?
23      A.  I don't recall.
0111

1    Q.   Do you know if all these hotels
2   above where it says Region 2 are in
3   Region 2?
4    A.   I assume if they say Region 2 at
5   this time, that's where they were.
6    Q.   Right.  I know that in 2001.
7   What I'm trying to figure out is in
8   2003 --
9    A.   Uh-huh.
10   Q.   -- 2002, 2003, 2003.
11   A.   It changed constantly, so, you
12  know.
13   Q.   Do you know off the top of your
14  head -- well, can you tell me like in
15  Albany, Georgia, is that a 60-room
16  property?
17   A.   60 room, correct, give or take a
18  few rooms.
19   Q.   Alexander City is 60-room?
20   A.   60-room, uh-huh.
21   Q.   And Bainbridge is?
22   A.   60.
23   Q.   And Crestview?
0112
1    A.   Interior corridor, right at 60
2   or so.  A little bit more maybe.
3    Q.   60-plus maybe?
4    A.   Yeah.
5    Q.   61?
6    A.   Yeah.
7    Q.   But you say 40 or 60 generally;
8   right?
9    A.   Well, it's either going to be a
10  40-room --
11   Q.   Or 80?
12   A.   -- exterior corridor hotel, a
13  60-room exterior corridor hotel or,
14  general speaking, a 60-plus interior
15  corridor hotel.
16   Q.   What was Alexander City?
17   A.   Alex City was a 60-room exterior
18  corridor hotel.
19   Q.   What's the difference between an
20  interior and an exterior?
21   A.   It's fairly significant.  The

22  building style aesthetically.  All access
23  to the rooms are through the building.
0113
 1     Q.  Let me ask it this way:  I know
 2  what it looks like, you know.
 3     A.  Okay.
 4     Q.  But in relation to budget,
 5  management, I mean, is there --
 6     A.  It's an upscale property.  The
 7  interior property is an upscale property.
 8     Q.  Okay.  So, Alexander City is an
 9  upscale property?
10     A.  No.  No.  No.  That's an
11  exterior.  Alex City is a property that
12  had an addition to it, I believe, from 40
13  to 60 rooms.
14     Q.  Okay.  So, the interior ones are
15  the upscale?
16     A.  Correct.
17     Q.  So, you charge a little more for
18  the rooms?
19     A.  We like to think so.
20     Q.  Okay.  What's Eufaula?
21     A.  40-room.
22     Q.  Greenville?
23     A.  40-room.
0114
 1     Q.  Jackson?
 2     A.  Jackson, Mississippi?
 3     Q.  Yes.
 4     A.  There's a few Jacksons.
 5     Q.  Mississippi.
 6     A.  Mississippi is an interior
 7  corridor.
 8     Q.  60, 40?
 9     A.  As I said, anything interior is
10  60-plus.
11     Q.  Okay.  It's like Crestview?
12     A.  It's interior.
13     Q.  Okay.  Meridian?
14     A.  60.
15     Q.  Ozark?
16     A.  40.
17     Q.  Pearl?
18     A.  Interior.

19    Q.  So 60?
20    A.  Plus.
21    Q.  Prattville?
22    A.  60 exterior.
23    Q.  Selma?
0115
1    A.  60 exterior.
2    Q.  Vicksburg?
3    A.  60 exterior.
4    Q.  60 exterior, is Meridian 60
5  exterior?
6    A.  Correct.
7    Q.  Okay.  Bainbridge is 60
8  exterior?
9    A.  Correct.
10    Q.  And we know Alexander City is 60
11  exterior?
12    A.  Correct.
13    Q.  And Albany is 60 exterior?
14    A.  Exterior, correct.
15    Q.  How about Albertville, Alabama?
16    A.  40-room exterior.
17    Q.  I want to do this as quickly as
18  I can.  Why don't we just -- you just
19  mark --
20    A.  You can name them.  I can tell
21  you.
22    Q.  Okay.
23    A.  Go ahead.
0116
1    Q.  All right.  I want you to tell
2  me which of these are 60 exterior.
3    A.  You got it.
4    Q.  All right.  Brunswick, Georgia?
5    A.  60-room exterior.
6    Q.  This is the stuff you know?
7    A.  Big time.
8    Q.  All right.  Douglas, Georgia?
9    A.  40-room, as I recall, exterior.
10  I know it's exterior.
11    Q.  Dublin, Georgia?
12    A.  40-room exterior.
13    Q.  Eastman, Georgia?
14    A.  40-room exterior.
15    Q.  Fitzgerald, Georgia?

16     A.  40-room exterior.
17     Q.  Georgetown, South Carolina?
18     A.  60 room.  40 of it is -- 40 is
19  exterior, and --
20     Q.  20?
21     A.  Yeah, it's exterior.
22     Q.  It's 60 exterior?
23     A.  Yeah.
0117
1     Q.  Okay.
2     A.  I'm sorry.
3     Q.  Jacksonville, Florida?
4     A.  Interior.
5     Q.  60?
6     A.  They're all plus, yeah, the
7  interiors.
8     Q.  Jesup, Georgia?
9     A.  Is a 60-room exterior.
10     Q.  Kingsland, Georgia?
11     A.  40-room exterior.
12     Q.  Lakeview (sic) City, Florida?
13     A.  Lake -- I'm sorry?
14     Q.  I'm sorry.  Lake City, Florida?
15     A.  That's interior.
16     Q.  60; right?
17     A.  Plus, right.
18     Q.  Lakeland, Florida?
19     A.  Interior.
20     Q.  60; correct?  Every time you say
21  interior, it's going to be 60.
22     A.  It's going to be between 50
23  and -- I'm sorry.  60, right at that
0118
1  mark, or greater.
2     Q.  For the interior ones?
3     A.  Correct.
4     Q.  Okay.  Orangeburg, South
5  Carolina?
6     A.  60-room exterior.
7     Q.  Ormond Beach, Florida?
8     A.  Interior.
9     Q.  Palm Bay Florida?
10     A.  Interior.
11     Q.  Pooler, Georgia?
12     A.  Interior.

13    Q.   Statesboro, Georgia?
14    A.   Exterior, 40-room.
15    Q.   Thomasville, Georgia?
16    A.   Exterior 40 room.
17    Q.   Valdosta, Georgia?
18    A.   60-room exterior.
19    Q.   Waycross, Georgia?
20    A.   60-room exterior.
21    Q.   Waynesboro, Georgia?
22    A.   40-room exterior.
23    Q.   Asheboro, North Carolina?
0119
1    A.   Sold.
2    Q.   What was it?
3    A.   40-room exterior.
4    Q.   Exterior?
5    A.   Yes.
6    Q.   Cheraw, South Carolina?
7    A.   60-room exterior.
8    Q.   Clayon, North Carolina -- or
9    Garner?
10    A.   Garner was a 40-room, exterior.
11    Q.   Duncan, South Carolina?
12    A.   40-room exterior.
13    Q.   Dunn, North Carolina?
14    A.   Dunn is a 40-room exterior.
15    Q.   Eden, North Carolina?
16    A.   60-room exterior.
17    Q.   Exterior; right?
18    A.   No.  Let me think about that.
19    Eden was 40-room exterior.  Excuse me.
20    Q.   Okay.  Forest City, North
21    Carolina?
22    A.   60-room exterior.
23    Q.   Gaffney, South Carolina?
0120
1    A.   60-room exterior.
2    Q.   Goldsboro, North Carolina?
3    A.   Interior.
4    Q.   Greenville, North Carolina?
5    A.   40-room exterior.
6    Q.   Harrisonburg, Virginia?
7    A.   Interior.
8    Q.   Henderson, North Carolina?
9    A.   Interior.

10   Q.  Hickory, North Carolina?
11   A.  60-room exterior.
12   Q.  Lancaster, South Carolina?
13   A.  60-room exterior.
14   Q.  Laurinburg, North Carolina?
15   A.  40-room exterior.
16   Q.  Lenoir, North Carolina?
17   A.  40-room exterior.
18   Q.  Martinsville, Virginia?
19   A.  Interior.
20   Q.  Roanoke Rapids, North Carolina?
21   A.  40-room exterior.
22   Q.  Sanford, North Carolina?
23   A.  40-room exterior.
0121
1   Q.  Smithville, North Carolina?
2   A.  40-room exterior.
3   Q.  Spartanburg, South Carolina?
4   A.  40-room exterior.
5   Q.  Union, South Carolina?
6   A.  40-room.
7   Q.  Wilson, North Carolina?
8   A.  40-room.
9   Q.  Americus, Georgia?
10   A.  60-room.  Americus was one of --
11  80-room exterior.
12   Q.  Anderson, South Carolina?
13   A.  60-room exterior.
14   Q.  Auburn?  Auburn, Alabama?  It's
15  40-room?
16   A.  Yeah.  How did you know that?
17   Q.  Commerce, Georgia?
18   A.  40-room exterior.
19   Q.  Conyers, Georgia?
20   A.  60-room exterior.
21   Q.  Covington, Georgia.
22   A.  40-room exterior.
23   Q.  Easley, South Carolina?
0122
1   A.  And the reason I'm pausing is
2  because we did additions to some of these
3  properties.  That was a 60-room exterior.
4   Q.  Greensboro, Georgia?
5   A.  40-room exterior.
6   Q.  Greenwood, South Carolina?

7    A.  60-room exterior.
8    Q.  Hartwell, Georgia?
9    A.  40-room exterior.
10   Q.  LaGrange, Georgia?
11   A.  60-room exterior.
12   Q.  Macon, Georgia?
13   A.  40 room exterior.
14   Q.  Mill --
15   A.  Milledgeville.
16   Q.  Milledgeville?
17   A.  Milledgeville was -- we sold
18  that pretty early on.
19   Q.  Okay.
20   A.  It was a 100-plus room exterior.
21   Q.  Newnan, Georgia?
22   A.  Interior.
23   Q.  Oakwood, Georgia?
0123
1    A.  40-room exterior.
2    Q.  Perry, Georgia?
3    A.  40-room exterior.
4    Q.  Seneca, South Carolina?
5    A.  Seneca was 60 rooms.
6    Q.  Exterior?
7    A.  Exterior, yeah.
8    Q.  Simpsonville, South Carolina?
9    A.  The property you mentioned
10  before the one you just mentioned?
11   Q.  Oakwood, Georgia and Perry,
12  Georgia, you said they were 40 exterior?
13   A.  Yeah, correct.
14   Q.  Okay.  Simpsonville, South
15  Carolina?
16   A.  40-room.
17   Q.  Thomaston, Georgia?
18   A.  60-room exterior.
19   Q.  Warner Robins?
20   A.  60-room exterior.
21   Q.  Washington, Georgia?
22   A.  40-room exterior.
23   Q.  Winder, Georgia?
0124
1    A.  40-room exterior.
2    Q.  Arab, Alabama?
3    A.  40-room exterior.

4     Q.   You know, that's how you
5   pronounce it.  Bessemer, Alabama?
6     A.   That's how they pronounce it.
7   60-room exterior.
8     Q.   Calhoun, Georgia?
9     A.   60-room exterior.
10    Q.   Carrolton, Georgia?
11    A.   60-room exterior.
12    Q.   Cleveland, Tennessee?
13    A.   I believe that was 60-room
14  exterior.
15    Q.   Columbia, Tennessee?
16    A.   Interior.
17    Q.   Dalton, Georgia?
18    A.   60-room exterior.
19    Q.   Decatur, Alabama?
20    A.   60-room exterior.
21    Q.   Decherd, Tennessee?
22    A.   Decherd?
23    Q.   Decherd, D-e-c-h-e-r-d.
0125
1     A.   40-room exterior.
2     Q.   Florence, Alabama?
3     A.   60-room exterior.
4     Q.   Gallatin, Tennessee?
5     A.   40-room exterior.
6     Q.   Grenada, Mississippi?
7     A.   Grenada?
8     Q.   Grenada.
9     A.   40-room exterior.
10    Q.   Jackson, Tennessee?
11    A.   Interior.
12    Q.   Jasper, Alabama?
13    A.   60-room exterior.
14    Q.   Oxford, Alabama?
15    A.   60-room exterior.
16    Q.   Rome, Georgia?
17    A.   Interior.
18    Q.   Scottsboro, Alabama?
19    A.   60-room exterior.
20    Q.   Sylacauga, Alabama?
21    A.   60-room exterior.
22    Q.   Trussville, Alabama?
23    A.   60-room exterior.
0126

1    Q.  Tullahoma, Tennessee?
2         MR. KESSLER:  Tullahoma.
3    Q.  (By Mr. Goldfarb) Tullahoma.
4    A.  40-room exterior.
5    Q.  Tupelo --
6    A.  Now, today, some of those may
7  have changed to 60 rooms.
8    Q.  It was 40?
9    A.  Right.  I think we added 20
10  rooms right at the end there.
11    Q.  Tupelo, Mississippi?
12    A.  60-room exterior.
13    Q.  And Tuscaloosa, Alabama?
14    A.  60-room exterior.
15    Q.  And Clinton, Tennessee?
16    A.  40-room exterior.
17    Q.  Greeneville, Tennessee?
18    A.  40-room exterior.
19    Q.  Johnson City, Tennessee?
20    A.  60-room exterior.
21    Q.  Kingsport, Tennessee?
22    A.  Johnson City.  Kingsport,
23  interior.
0127
1    Q.  Oakridge, Tennessee?
2    A.  Interior.
3    Q.  Knoxville, Tennessee?
4    A.  Knoxville was a Signature Inn,
5  so that was 120-room interior.
6    Q.  Bettendorf --
7    A.  These are -- you're getting into
8  Signature Inns now.
9    Q.  This is --
10    A.  All of those are --
11    Q.  Iowa and Indiana --
12    A.  Yeah.
13    Q.  Signatures?
14    A.  Yeah.
15    Q.  Ohio, Kentucky?
16    A.  All of them, yeah.
17    Q.  Okay.
18    A.  The only interior was 80-room in
19  Carmel.
20    Q.  All right.  Did you hire Charles
21  Woods?

22     A.  No.
23     Q.  Was he there when you came?
0128
1     A.  Yes.
2     Q.  What hotels was he over when you
3  came?
4     A.  I don't recall offhand.
5     Q.  Did his hotels change also under
6  him?
7     A.  At times they changed, depending
8  on regional.
9     Q.  Had you ever received any
10  complaints on Charles Woods?
11     A.  No.
12     Q.  From anybody?
13     A.  No, huh-uh.
14     Q.  Did you visit all these hotels?
15     A.  Yes.
16     Q.  How often did you go to Alex
17  City?
18     A.  How many times have I been to
19  Alex City?
20     Q.  On a yearly basis, did you go
21  more than once a year?
22     A.  I tried to get out to all of
23  them at least once a year.
0129
1     Q.  Do you -- can you tell me when
2  Ms. Stough was a manager, how many times
3  you went there?
4     A.  I believe once.
5     Q.  What year was that?
6     A.  I don't recall.
7     Q.  Did you do anything -- remember
8  anything in particular about your visit
9  there?
10     A.  I do, actually.
11     Q.  Tell me what you remember.
12     A.  Coming to the property and --
13     Q.  What year was this?
14     A.  I don't recall.
15     Q.  Do you keep a diary or a
16  calendar or anything?
17     A.  No, I don't.
18     Q.  You schedule when you're going

19  to go somewhere, though; right?

20      A.   Sometimes I do, sometimes I

21  don't.

22      Q.   Did you keep a calendar ever?

23      A.   As far as when I was going to

0130

1  visit a property?

2      Q.   Well, as far as any -- you know,

3  just keep a desk calendar, here's what

4  I've got to do today?

5      A.   Yes.  I mean, on occasion I

6  would write those in.  But the properties

7  were situated in such a manner that,

8  geographically, I could drive from Point

9  A to Point B usually in fairly quick

10  order.

11          However, depending on what I saw

12  at the property, I may stay longer, I may

13  not.  I may, you know, move on.  It all

14  depends on the view of the hotel.

15      Q.   Well, when did you go to Alex

16  City?

17      A.   I don't recall the specifics.

18      Q.   Okay.  You don't recall the

19  year?

20      A.   No.

21          MR. KESSLER:  Jon, that's the

22  third time you've asked him that.

23          THE WITNESS:  No, I don't.

0131

1          MR. GOLDFARB:  It is?

2          MR. KESSLER:  Yeah.  You've

3  asked him three times what year it was.

4  He said he didn't know each time.

5      Q.   (By Mr. Goldfarb) All right.

6  But you remember going to Alex City?

7      A.   Yes.

8      Q.   And you were the manager from --

9  I'm sorry.  You were the --

10      A.   Director of operations, I

11  believe.

12      Q.   Was it while you were the VP?

13      A.   I don't believe I was VP at the

14  time.

15      Q.   Okay.

16     A.  I think I was director of
17  operations.
18     Q.  So, you were director of
19  operations?
20     A.  Right.
21     Q.  So, it was sometime during the
22  time period you were the director of
23  operations?
0132
1     A.  Right.
2     Q.  And you went to Alex City?
3     A.  Yes.
4     Q.  And what happened?  What did you
5  see?
6     A.  What I remember of that visit is
7  going to what we call the barracks
8  building, which is -- you have a main
9  building, and you have a barracks
10  building, which is perpendicular to the
11  main building and walking with Charles
12  and looking at the barracks building and
13  reviewing rooms at that time and then
14  going from the barracks building to the
15  main building at looking at rooms there.
16     Q.  Okay.  Do you remember anything
17  that you saw that was good or bad?
18     A.  Yeah.  I remember going to the
19  barracks building, and the rooms, I
20  thought, were generally in pretty good
21  order.  And then I remember going to the
22  main building and looking at rooms, and
23  they were very dirty.
0133
1     Q.  Did you talk to anybody about
2  that?
3     A.  Yes, we did.
4     Q.  Who?
5     A.  We talked to Belinda about that.
6     Q.  Okay.
7     A.  And we showed her.
8     Q.  And this was while you were a --
9  before you became a VP; right?
10     A.  I believe that's correct.
11     Q.  Okay.  So, this would have
12  been -- you were a VP up until October of

13  2000 -- I mean, whatever you told me
14  before?
15     A.  Yeah.  Back up three years from
16  the time that I left.
17     Q.  So, this was sometime prior to
18  October of 2000?
19     A.  That would have been director of
20  ops.
21     Q.  Right.  Right.  And that's when
22  you went there?
23     A.  Yes.
0134
 1     Q.  And that's when you talked to
 2  Belinda; right?
 3     A.  Yes.
 4     Q.  Tell me what she said.
 5     MR. KESSLER:  Wait.  Wait.  On
 6  the date, ask him again on the date
 7  because --
 8     MR. GOLDFARB:  He's already
 9  answered it, Gary.  You have the --
10     MR. KESSLER:  You mislead him.
11     MR. GOLDFARB:  No, I didn't.  He
12  answered it directly.
13     MR. KESSLER:  That's fine.  I
14  will ask him on direct.
15     MR. GOLDFARB:  If you don't like
16  it, you can fix it later.
17     THE WITNESS:  Well, my records
18  are clear as to when that personnel
19  change took place.
20     Q.  (By Mr. Goldfarb) What records
21  do you have?
22     A.  Well, I would believe that
23  whenever my position -- in fact, it was a
0135
 1  press release.
 2     Q.  Okay.  There was a press release
 3  that went out to the media?
 4     A.  Yes.
 5     Q.  Like what paper could I pull it
 6  up on?
 7     A.  You can Google me.
 8     Q.  Okay.  I haven't done that yet.
 9  But somewhere in the world of Google, it

10  will say when you got this job?

11      A.   Absolutely, yes.

12      Q.   Okay.

13      A.   Promoted to on such and such

14  date.

15      Q.   But what newspapers?  Was it

16  somewhere in the Atlanta area?

17      A.   It just goes on the newswire.

18      Q.   Business news, stuff like that?

19      A.   I don't know who in particular

20  it went to.  You put it on the PR

21  newswire, and it goes out to various

22  publications and of sort.

23      Q.   All right.  Tell me -- on this

0136

1  date that we've talked about when you

2  talked to Ms. Stough, what did you say to

3  her, and what did she say to you?

4      A.   I don't recall the specific

5  conversation.  But I do recall that when

6  Charles and I walked, we walked a lot of

7  rooms.  We were concerned about the

8  cleanliness of the property, specifically

9  related to the rooms that we looked at.

10          And the buildings are built in

11  such a manner that you can exit out of

12  the manager's office and be within

13  walking distance a few steps to rooms.

14  So, it's designed that the general

15  manager can actually inspect those rooms

16  very quickly, very quickly.

17      Q.   Did she walk around with you?

18      A.   Yes.

19      Q.   The whole time?

20      A.   I don't recall that she walked

21  the barracks building, but she definitely

22  walked the main building at that time

23  with Charles and I.

0137

1      Q.   Okay.  So, she was with you the

2  first time you walked through the main

3  building?

4      A.   I believe, she, yes, looked at

5  the rooms that we had concerns about, and

6  she agreed that there were issues in

7  those rooms.
8     Q.  And did you issue anything in
9  writing to her?
10    A.  I did not specifically.
11    Q.  Did Charles?
12    A.  I don't know.
13    Q.  Did you tell him to?
14    A.  I don't specifically remember
15  telling him to put anything in writing at
16  that time either.
17    Q.  What was her job title at the
18  time?
19    A.  I don't recall.
20    Q.  Did you talk to anybody else
21  other than Belinda on that property?
22    A.  Not that I recall.
23    Q.  Do you remember seeing anybody
0138
1  other than Belinda working there?
2     A.  I don't remember seeing anybody
3  other than Belinda at that time.  There
4  may have been some housekeepers.  I'm
5  sure there were somebody cleaning those
6  rooms.
7     Q.  Right.  I'm just saying you
8  didn't speak to anybody else?
9     A.  Not that I recall, no.
10    Q.  Did you know Belinda before that
11  date?  Had you seen her before?
12    A.  I may have met her in a meeting
13  or two, but I don't recall specifically.
14    Q.  Like a meeting in Alex City?
15    A.  No.  We would have had a
16  regional meeting or a company meeting of
17  some sort.  I mean, regionals, districts,
18  areas had meetings all the time.
19    Q.  When did you have those?  Was
20  there a particular time or year?
21    A.  No, there really wasn't.
22    Q.  Did you have them every year?
23    A.  We had an annual GM conference
0139
1  ever year.
2     Q.  Where was that held?
3     A.  Various places.

4    Q.  Where was it held in 2005, your
5  last year there?  Well, you left in
6  January, didn't you?
7    A.  Yes I did.
8    Q.  2004, where was it held?
9    A.  2004.  We had regional
10  conferences that year.
11    Q.  Okay.
12    A.  So, they were within those
13  regions.  As an example, Region 1, we had
14  in Florida.  And -- so, every region had
15  a regional conference.
16    Q.  What region was -- in 2004 was
17  Alex City in?
18    A.  I don't recall.
19    Q.  What about 2003, was it a --
20    A.  I wouldn't know.
21    Q.  No.  No.  In 2003, the meeting
22  thing that you had, the annual
23  conference, was it a regional one, or was
0140
1  it everybody?
2    A.  2003?
3    Q.  It would be the year before the
4  regional one.
5    A.  Yeah.  Well, we did it so many
6  different ways from year to year.  So, it
7  may have been the Dillard house at that
8  time.
9    Q.  So, that was everybody?
10    A.  Yeah, everybody together as a
11  group.
12    Q.  Where is the Dillard house?
13    A.  Dillard, Georgia.
14    Q.  So, do you recall meeting
15  Ms. Stough then in 2003?
16    A.  No, I don't recall seeing her.
17    Q.  It would be like 130 managers?
18    A.  150 people, yeah.
19    Q.  Would assistant managers go?
20    A.  No.
21    Q.  So, it would be manager --
22  general managers and regional managers?
23    A.  Yeah.
0141

1   Q.   And district managers?
2   A.   And vendors and, you know,
3  various corporate personnel.
4   Q.   About 150 people?
5   A.   Roughly speaking.
6   Q.   In the Dillard house?
7   A.   I believe that's correct.
8   Q.   Was there any GMs who were not
9  supposed to go?
10   A.   No.  I mean, not that I know of.
11   Q.   Okay.  When the GM leaves the
12  property, who runs the property, like if
13  Ms. Stough went to the meeting?
14   A.   Probably her most senior person
15  who ran the desk.
16   Q.   Okay.  And before 2003, in 2002,
17  where was the meeting?
18   A.   I don't recall offhand because,
19  again, we had -- at different times, we
20  had regional conferences.  At one time,
21  we split the company up in half.  Another
22  time, we did Signature conferences.  So,
23  there were various conferences.
0142
1   Q.   Did some years you not have a
2  conference for the Jamesons, or did you
3  have a conference every year?
4   A.   To my recollection, we had one
5  every year.  But it was, again, in
6  varying capacities, either on a regional
7  basis or a company-wide basis.
8   Q.   Do you have a recollection of
9  talking to Ms. Stough at any meeting and
10  meeting her?
11   A.   Not any particular meeting, I
12  don't recall.
13   Q.   You think you might have met her
14  before you went down there, you're just
15  not sure?
16   A.   Yeah, that's correct.
17   Q.   Did you meet her any other time
18  other than that time you went down there
19  and maybe the meeting?
20   A.   I don't specifically recall
21  talking to her at all.

22    Q.  At the -- what happened at these
23   meetings that you --
0143
1     A.  We kind of give a state of the
2   union for the company, the direction the
3   company was going in.  We used it
4   primarily as a vehicle to talk about
5   these things.
6     Q.  Did you do training or anything
7   like that?
8     A.  There was some training, yes.
9     Q.  What kind of training?
10    A.  Guest service training.
11    Q.  What else?
12    A.  I don't recall any other
13   specifics.
14    Q.  What's guest service training,
15   how to treat the guests?
16    A.  Yeah, correct.  And there was a
17   director of training.
18    Q.  Is it kind of the guest is
19   always right type of training or
20   something, you know, be nice to the
21   guests?
22    A.  The customer is always the
23   customer kind of training, yes.  We might
0144
1   discuss the nature of our guarantee,
2   things of that nature.
3     Q.  Have you had, like, any
4   occasions that you can think of where
5   you've had to terminate a general manager
6   other than Ms. Stough?  Do you know of a
7   general manager whose been terminated for
8   performance?
9     A.  Sure.  There were times when GMs
10   were terminated for performance.
11    Q.  Do you know of any others than
12   Ms. Stough?  Can you name them?
13    A.  If you gave me the name of the
14   property and the name of the person, I
15   could probably recollect that.
16    Q.  If you look at, like, that list
17   of all these properties, would you be
18   able to tell me somebody's name who got

19  terminated?  If you can't, that's fine.
20     A.  No, I understand.  Orangeburg, I
21  believe, we terminated that general
22  manager.
23     Q.  Orangeburg, South Carolina?
0145
1     A.  Yes.
2     Q.  For what reason?
3     A.  Improprieties.
4     Q.  Meaning he did something bad?
5     A.  Yes.  It wasn't good.
6     Q.  I mean, was it some --
7     A.  We believe he solicited an
8  employee in a room.
9     Q.  Okay.
10    A.  So, he was terminated for that.
11    Q.  You're not allowed to, if you're
12  a manager, have a sexual relationship
13  with an employee that works for you at a
14  Jameson; right?
15    A.  I should hope not, yeah.
16    Q.  Okay.  I mean, it's in your
17  policies.
18    A.  Yes.  Yes.  I mean, that's
19  correct.
20    Q.  No dating relationships with the
21  people who work for you?
22    A.  Absolutely.
23    Q.  Can you date if you're like one
0146
1  housekeeper and another housekeeper?  Is
2  that allowed?
3     A.  I don't think there was anything
4  written against that.
5     Q.  Okay.
6     A.  Yeah.  But anybody who you had
7  direct supervisory --
8     Q.  No subordinate subsidiary
9  dating?
10    A.  No.  No.
11    Q.  Correct.  Okay.  So, that's what
12  this Orange -- what did you say?
13    A.  Orangeburg.
14    Q.  Orangeburg.  Any other people --
15  managers, general managers that you know

16  of that have been fired?
17      A.  I believe Albany's general
18  manager simultaneously was, I think,
19  terminated and resigned at the same time.
20  Again, improprieties.
21      Q.  Same type of thing?
22      A.  No, huh-uh.  Money, missing
23  money.
0147
1      Q.  Missing money?
2      A.  Yes.
3      Q.  Was that a man or a woman?
4      A.  Woman.
5      Q.  And Orangeburg was a guy?
6      A.  Yes.  I believe the Prattville
7  GM for -- I don't recall if it was a
8  resignation or a termination.
9      Q.  For what reason?
10      A.  I think there was performance
11  issues.
12      Q.  Anything other than performance?
13      A.  Not that I recall.
14      Q.  Was that a man or woman?
15      A.  Man.
16      Q.  Who was that?
17      A.  I don't recall his last name.
18  First name Arthur, I believe.
19        MR. KESSLER:  By the way, at
20  about a quarter until, which is in about
21  12 minutes, can we take a ten-minute
22  break because I've got a conference call
23  I've got to do?
0148
1        MR. GOLDFARB:  Sure.
2        THE WITNESS:  Again, I don't
3  remember if it was termination or
4  resignation, but, I think, Garner, again,
5  for improprieties.
6      Q.  (By Mr. Goldfarb) Garner?
7      A.  North Carolina.
8      Q.  North Carolina.  What kind of
9  improprieties?
10      A.  I believe there was money
11  involved.  I don't recall offhand.
12      Q.  Who was the DM involved at

13  Prattville when Arthur was terminated?
14      A.   I don't recall at that time.
15      Q.   Or the GM.  Not the GM, the
16  regional manager?
17      A.   It may have been Sandy McGuffey,
18  but I don't recall specifically.
19      Q.   Is that a woman?
20      A.   Yes.
21      Q.   Sandy McGuffey?
22      A.   Yes.  Greenville, North
23  Carolina, improprieties.  He was
0149
 1  terminated.
 2      Q.   What did he do?
 3      A.   I believe it was -- well, I
 4  think there was performance plus -- and I
 5  don't want to speak out of hand, but I
 6  believe we had indications that he was
 7  intoxicated on the job.
 8      Q.   He wasn't performing well when
 9  he was intoxicated?
10      A.   He thought he was.
11          Again, I don't remember if it
12  was termination or resignation.
13  Lancaster, improprieties.
14      Q.   Do you remember what he did?  Or
15  was it a he?
16      A.   He.  I don't recall
17  specifically.
18      Q.   Lancaster --
19      A.   Property performance was bad.
20      Q.   The reason you know these that
21  you're telling me is you have to approve
22  of the termination of a GM?
23      A.   I don't have to approve it.
0150
 1  Some things are automatic termination.
 2      Q.   Right.
 3      A.   So, HR would -- if HR were in
 4  place --
 5      Q.   But performance -- you do
 6  approve it?
 7      A.   Approve?
 8      Q.   The termination.
 9      A.   Again, if it was an impropriety

10  and HR was in place, it's an automatic
11  termination --
12     Q.  A nonimpropriety?
13     A.  -- and I don't have to approve
14  it.
15     Q.  A nonimpropriety issue, like,
16  just straight performance, you approve
17  those?
18     A.  It's more a matter of making
19  sure that we handled any process in
20  regard to performance the right way.  And
21  I wanted to make sure we were fair.
22     Q.  Right.
23     A.  If someone said, "I recommend
0151
1  termination," I would ask is the property
2  clean, is it profitable, what's the
3  story?  And they would tell me.  And then
4  I would say, "Okay.  Based on your
5  recommendations."  If HR was involved or
6  if HR was there, we would have said,
7  "This is our situation."  And HR would
8  have said, "Yes, we need to terminate."
9     Q.  Right.  So, Ms. Stough, for
10  example, were you involved in approving
11  the termination of her?
12     A.  Charles would have recommended
13  termination.  And based on the
14  information he gave me, I would have made
15  a decision on that.
16     Q.  Did you go visit it before
17  you --
18     A.  No, I did not.
19     Q.  Okay.
20     A.  Yeah.
21     Q.  If Charles -- if Belinda had
22  stolen money or sexually harassed
23  somebody, you generally wouldn't be
0152
1  involved, that would be an automatic?
2     A.  I would know about it, and the
3  regional would call me.
4     Q.  But it wouldn't be the same as
5  what you just discussed?
6     A.  No, because if you had something

 7  that triggers an automatic termination --
 8    Q.  Right.  Okay.  I'm sorry.  You
 9  got to Lancaster.
10    A.  Uh-huh.  I believe Albertville
11  was a termination based on performance,
12        MR. KESSLER:  Albertville?
13        THE WITNESS:  Yeah, Albertville.
14  A gentleman, if I remember correctly.
15    Q.  (By Mr. Goldfarb) Who was that?
16    A.  I don't recall the name.
17    Q.  Who was the regional manager?
18    A.  Sandy McGuffey.
19        I want to say Tupelo was a
20  termination, although, that may, again,
21  have been a resignation based on
22  performance.  Sandy McGuffey would have
23  been the regional.
0153
 1    Q.  She was over Tupelo also?
 2    A.  Yes.
 3    Q.  Is she still at the company as
 4  far as you know?
 5    A.  Yes, uh-huh.
 6    Q.  Who was the person?
 7    A.  It was a lady, and I don't
 8  recall her name.  I think that's all I
 9  recall at this time.
10        MR. KESSLER:  Could we take that
11  break?
12        (A short break was taken.)
13    Q.  (By Mr. Goldfarb) Did you know
14  what Ms. Stough's salary was while you
15  were working there?
16    A.  I don't recall knowing her
17  salary, no.
18    Q.  Do you have an opportunity to --
19  you would review salaries when they would
20  come to you?
21    A.  Right.
22    Q.  But if --
23    A.  I would not review existing
0154
 1  salaries.
 2    Q.  And you would review the salary
 3  of a newly-hired GM?

4    A.  Correct, right.
5    Q.  But that would be the only
6  reason you would look at Ms. Stough's
7  salary if she didn't receive a raise, it
8  would just have been when she was
9  originally hired?
10    A.  Yeah.
11    Q.  Right?
12    A.  I didn't review the original
13  salaries.
14    Q.  But when they get hired, you'd
15  review it.  If a regional manager says,
16  "I'm going to bring this guy in at
17  $50,000," you would review it?
18    A.  Yes, if it's a GM, correct.
19    Q.  Did Greg -- I mean, did Charles
20  Woods come to you and discuss with
21  frequency Ms. Stough's performance?
22    A.  He would have called me
23  regarding that.
0155
1    Q.  My question is different,
2  though.  I mean, did he?  I mean, you're
3  telling me what he would have.  I want to
4  know what you really remember.  Did he
5  come to you frequently and talk to you
6  about Ms. Stough's performance?
7      MR. KESSLER:  Objection.  Go
8  ahead.
9      THE WITNESS:  I don't remember
10  specific conversations regarding that,
11  but I feel certain he would have called
12  me several times regarding -- I don't
13  remember a specific conversation, but he
14  definitely would have called me regarding
15  her performance if he was concerned about
16  it.
17    Q.  (By Mr. Goldfarb) Right.  That's
18  generally the way it happens.  I
19  understand that if a DM or a GM has --
20  I'm sorry -- a regional manager has
21  problems with a general manager's
22  performance, they would call you?
23    A.  Yes.
0156

1    Q.   That's what they're supposed to
2  do?
3    A.   Yes.  And, in particular, if
4  there was an issue with a QA for sure.
5    Q.   Right.  What your testimony
6  is -- to make sure -- you don't remember
7  specifically or generally him calling,
8  but, generally, what happens is he does
9  call?
10    A.   I remember him calling me in
11  regard to her performance on different
12  occasions, but I don't remember the
13  specifics of the conversation.
14    Q.   Do you remember anything he
15  said?
16    A.   Initially, if I remember
17  correctly, he said that he was concerned
18  and then was going to try to work with
19  her to get to where she needed to get to,
20  give that some time, come back.  And then
21  later, he said, "I don't think this is
22  working out."
23    Q.   How long before he said, "I
0157
1  don't think this is working out" and her
2  termination?
3    A.   I believe that was beyond a
4  six-month period.  Charles was very fair
5  in that regard.
6    Q.   So, you think it was longer than
7  six months when he said, "I don't think
8  this was working out," and then she was
9  fired?
10    A.   I believe he gave her definitely
11  the kind of time that would warrant a
12  turnaround -- the time to turn around.
13    Q.   Right.  I understand that.  My
14  question is:  When he said to you, "This
15  is not working out," you think that
16  was -- it was longer than six months when
17  he said that to you and she got hired?
18    A.   I don't recall the specific time
19  period, but I believe it would have been
20  over the course of probably in the range
21  of six months.

22    Q.  Did he talk to you during that
23  six months more about Ms. Stough?
0158
1     A.  He would have communicated with
2  me during that time.  As his concerns
3  elevated, he communicated.
4     Q.  And what did you say to him?
5     A.  What I would tell any regional,
6  district, or area manager.  Make sure
7  we're fair, and make sure we've reviewed
8  the areas of concern, go over them again,
9  and make sure they understand where
10  they're lacking in performance.
11    Q.  And you would have discussed the
12  areas of concern with Charles?
13    A.  In particular, that property I
14  definitely recall we had concerns with
15  cleanliness.
16    Q.  And you discussed it with him?
17    A.  Yes.
18    Q.  As you would any property --
19    A.  Yes.
20    Q.  Of any of your --
21    A.  Correct.
22    Q.  Any GM?
23    A.  Correct.
0159
1     Q.  Do you know of any general
2  manager whose received a failure -- other
3  than Ms. Stough on her or his
4  appraisal -- performance appraisal?
5     A.  There would have been.
6     Q.  There's been occasions where
7  people have gotten a failure?
8     A.  Yes.
9     Q.  When I called it the
10  "performance appraisal," I'm talking
11  about the Q & A (sic)?
12    A.  Correct.
13    Q.  Do you know of anybody whose got
14  more than one failure during their career
15  as a general manager?
16    A.  If I recall correctly, as an
17  example, I believe, Prattville would have
18  been an example of that.

19    Q.  Okay.  Any other location?
20    A.  Tupelo would have been an
21  example of that, I believe.
22    Q.  Do you remember that lady's name
23  at Tupelo?
0160
1    A.  I don't recall her name.
2    Q.  First name, last name?
3    A.  I had 135 DMs, and, you know, I
4  just --
5    Q.  All right.  Anybody else you
6  recall who had two or more failures on a
7  Q & A (sic)?  I'm sorry.  Is that what
8  it's called, a Q & A (sic)?
9    A.  QA.
10    Q.  QA.
11    A.  I don't recall, no.
12    Q.  When you entered the QA, that's
13  in Excel?
14    A.  Correct.
15    Q.  And is that kept on a computer?
16    A.  Yes.
17    Q.  So, do you keep it on the -- at
18  the time you left, I mean, were you
19  destroying old QAs for any reason off the
20  computer?
21    A.  No.
22    Q.  So, if you wanted to, could you
23  go -- while you were there at least -- go
0161
1  and see -- pull it up on the computer
2  what QA so and so received at a
3  particular date?
4    A.  If the regional had that QA
5  saved to their hard drive on their lap
6  top, I could.  I would not have access to
7  it from any remote location.
8    Q.  So, it's only stored on the
9  laptop of the individual managers, and
10  it's not sent to corporate?
11    A.  It would have been e-mailed --
12    Q.  Okay.
13    A.  -- from time to time, depending.
14    Q.  To where?
15    A.  When we had a -- we've evolved

16  to a QA director, he would have had that
17  information and stored --
18      Q.  Who is that?
19      A.  Scott Stuart.
20      Q.  When did Scott start as a QA
21  director?
22      A.  I don't recall the specific
23  date.
0162
 1      Q.  Between 2000 --
 2      A.  I think he was -- I believe it
 3  would have been after -- I'm trying to
 4  think.  Sometime in 2004.  I don't
 5  recall.
 6      Q.  She left in February of 2004.
 7  You think it was after that?
 8      A.  It may have been after that,
 9  yes.
10      Q.  Before that, there was no
11  e-mailing of QAs?
12      A.  There may have been e-mailing of
13  the QAs.  I don't recall specifically.
14      Q.  When you would sign off on a
15  Q & A (sic), how did you get it?
16      A.  Sometimes I would get it my
17  mail, sometimes it was e-mailed.
18      Q.  Okay.
19      A.  But I didn't, per se, save them
20  anywhere.  The documents, I would sign
21  and file those.
22      Q.  Where, HR?
23      A.  No.  No.  No.  We just had a
0163
 1  file called QA.  I don't know if --
 2      Q.  You had your own QA filing
 3  system?
 4      A.  My assistant did, yeah.
 5      Q.  And that was kept for all your
 6  GMs?
 7      A.  I attempted to try to do that.
 8      Q.  At your office.  Where was that,
 9  Atlanta?
10      A.  Yeah.  It was Atlanta, yeah.
11      Q.  How long had you been doing
12  that?

13    A.  Probably three years, I guess.
14    Q.  Starting in 2002?
15    A.  Somewhere in that neighborhood.
16    Q.  So, you would have had a hard
17  copy, but not the computer copy?
18    A.  Yeah.  I tried not to -- I mean,
19  it's too big of a file to try to keep
20  saving every time via e-mail.
21        (Plaintiff's Exhibit No. 14 was
22        marked for identification.)
23    Q.  (By Mr. Goldfarb)  Okay.  Let's
0164
 1  see.  Exhibit 14 is the second
 2  interrogatory responses.  You haven't
 3  seen this before, have you?
 4    A.  I have not.
 5    Q.  All right.  What I want to just
 6  ask you about is:  Response to
 7  Interrogatory No. 1, it talks about the
 8  freeze period.  If you'll look on the
 9  third page.
10    A.  Uh-huh (affirmative).
11    Q.  There was a pay freeze from
12  early 2002 until April of 2004.  When in
13  2002 -- do you know when the freeze
14  started?
15    A.  I don't recall specifically, no.
16    Q.  Would there be some documents
17  somewhere saying when?
18    A.  I don't know if there would or
19  wouldn't.
20    Q.  And then what happened in April
21  of 2004, that freeze got relaxed it says.
22  And it says 12 people got some raises.
23  Do you know who they were?
0165
 1    A.  I have no idea.
 2    Q.  You would have signed off on it,
 3  and that's about it?
 4    A.  I wouldn't have any idea.
 5    Q.  All you would have done is
 6  signed off on them?
 7    A.  Presumably, I would have.  But,
 8  again, I don't recall specifically.
 9    Q.  I'm aware of that.

10    A.  Yeah.
11    Q.  That's what I'm getting at is
12  the only thing you had do -- I mean, you
13  signed off on the raises, but you just
14  don't remember who it was?
15    A.  I wouldn't know, huh-uh.
16    Q.  Is that correct?
17    A.  Yes.
18    Q.  Okay.  Did you have anything to
19  do with the decision to institute the 3
20  percent and the 1 percent -- it talks
21  about a 3 percent raise and a 1 percent
22  raise with the seniority.  Did you
23  have --
0166
1    A.  As I stated -- oh.
2    Q.  Go ahead.
3    A.  As I stated earlier, yes, Jeff
4  and I created that matrix.
5    Q.  The 3 percent and the 1 percent?
6    A.  Yes.
7    Q.  Okay.
8    A.  Based on performance evaluation.
9    Q.  Did you keep the performance
10  evaluations also at your office?
11    A.  I believe they were sent to HR.
12    Q.  HR kept them?
13    A.  Yes.
14    Q.  Okay.  So, the GM would fill
15  them out and send them to HR?
16    A.  Not the GM.
17    Q.  I'm sorry.  The regional manager
18  would fill it out and the GM and send it
19  to HR?
20    A.  Correct.
21    Q.  You would sign off on it?
22    A.  If it was sent to me, and I saw
23  it, I would review it.
0167
1    Q.  And then send it to HR?
2    A.  Yes.
3    Q.  For storage?
4    A.  Yes.
5    Q.  Now, it says -- on page 4 at the
6  top, it talks about recommendations for

 7  raises.  And this is what we've been
 8  talking about.  Recommendations of
 9  district managers.  And it would also be
10  recommendations of regional managers;
11  right?
12     A.  Right.
13     Q.  And you would have the final
14  approval for raises; right?
15     A.  Correct.
16     Q.  Okay.  And it says also that
17  persons involved in deciding pay
18  increases prior to April 2002 -- and the
19  reason this says prior to April 2002,
20  it's my understanding there was a freeze?
21     A.  Okay.
22     Q.  Okay.  So -- were the DMs,
23  regional managers, and you; right?  Is
0168
 1  that correct?
 2     A.  Were?  I don't understand.
 3     Q.  I'm on page 4.  Because this
 4  isn't -- I'm just trying to make sure
 5  this is correct.
 6        It says, "Persons involved in
 7  deciding pay increases prior to April
 8  2002 were the particular district and
 9  regional managers and the vice president
10  of operations, Greg Winey."
11     A.  They would present those
12  increases to me.
13     Q.  And your involvement was
14  approving it?
15     A.  Correct.
16        (Plaintiff's Exhibit No. 15 was
17         marked for identification.)
18     Q.  (By Mr. Goldfarb) When somebody
19  sends an EEOC charge into the company,
20  they generally draft something like this,
21  Exhibit 15.  And this is a response to
22  Ms. Stough's charge of discrimination.
23     A.  Okay.
0169
 1     Q.  Have you seen this before?
 2     A.  I have not, no.
 3     Q.  Okay.  It was drafted by Steven

 4  Curlee, and that's the in-house counsel;
 5  is that right?
 6      A.  Correct.
 7      Q.  Did you have discussions with
 8  anybody about the fact that Ms. Stough
 9  had filed an EEOC charge?
10      A.  No, not to my recollection.
11      Q.  While you were working there,
12  did anybody else file an EEOC charge for
13  sex discrimination?
14      A.  No, not my knowledge.
15      Q.  The whole time you were there,
16  meaning, at Jameson?
17      A.  Not to my knowledge, no.
18      Q.  Okay.  Ms. -- it says in the --
19  if you look on the second page of this,
20  it talks about the fact that Ms. Stough
21  was paid a salary of $21,000 on the first
22  paragraph there.  Does that sound about
23  right for the salary of a general manager
0170
 1  to you?
 2      A.  As I said, the salaries varied
 3  from location to location.  So, there
 4  wasn't a particular number I'm accustom
 5  to as far as that goes.  It's, again, as
 6  I said, location --
 7      Q.  Right.
 8      A.  -- the general revenues of that
 9  property, and the experience level of
10  that general manager.
11      Q.  Have you seen salaries lower for
12  general managers, lower than $21,000?
13      A.  At what time?
14      Q.  Well, this says that she was a
15  general manager in August of 2000.
16      A.  I don't recall specifically.
17      Q.  And, I think, the documents will
18  show that it was actually 2001 --
19      A.  Right.
20      Q.  This is an error.
21      A.  Okay.
22      Q.  -- that she became a general
23  manager.
0171

1    A.  Okay.
2    Q.  But you don't recall anybody
3  being made -- who got a salary less than
4  $21,000 as a general manager?
5    A.  I don't recall.
6    Q.  Okay.  There were people who got
7  salaries more than 21,000 as general
8  managers?
9    A.  Yes, I'm sure.
10    Q.  Do you remember Mr. Fetner being
11  hired as an assistant general manager?
12    A.  Yes.
13    Q.  Okay.  And we talked about that.
14  And when he was hired, was the intention
15  to make him the general manager of the
16  Alex City location?
17    A.  Of a property.  We weren't sure
18  where.
19    Q.  Was there any discussion to make
20  him the general manager of the Alex City
21  location?
22    A.  Not specifically.  I think what
23  we talked about was getting him ramped up
0172
1  to become a general manager.  And then we
2  talked about the possibility of him
3  actually transferring at some time.
4    Q.  Did you have any location --
5    A.  No, no location.
6    Q.  That was not a problem with him?
7    A.  Not that I recall at the time.
8    Q.  Do you know where he lived at
9  that time?
10    A.  I want to say he lived in the
11  general area, but I don't recall.
12    Q.  But he indicated it would be no
13  problem going anywhere?
14    A.  I know he had family in that
15  immediate area, so I don't recall that
16  that was an obstacle.
17    Q.  Okay.  He had family, but you
18  don't recall him saying he's not going to
19  go anywhere?
20    A.  No.  I don't recall that,
21  huh-uh.

22    Q.  Okay.  And the last paragraph
23  states on the -- I'm sorry.  On page 2,
0173
 1  it says, in 2003 -- you see there --
 2    A.  Yes.
 3    Q.  -- at the bottom.
 4    A.  The respondent reviewed -- the
 5  respondent means Jameson.  Okay.
 6    Q.  Reviewed its compensation
 7  policies for general managers and
 8  assistant general managers at all of its
 9  Jameson Inns.  Were you aware of -- you
10  were aware of this review in late 2003 of
11  all of its compensation policies for
12  general managers?
13    A.  What I remember is that we
14  changed base pay for some of the general
15  managers because we changed the bonus
16  structure for the company during that
17  time.
18    Q.  How was the base pay changed?
19    A.  To my knowledge, base pay had
20  been, for quite some time, $18,000 for
21  all general managers.
22    Q.  Uh-huh.
23    A.  And it changed to be geared
0174
 1  toward level of experience, location of
 2  the hotel, and what the market might pay
 3  for a hotel like that.  And, again,
 4  general revenues of that property.
 5    Q.  So --
 6    A.  More market -- it was market --
 7  it changed to market-driven is what we
 8  did.
 9    Q.  Prior to late 2003, base pay for
10  a general manager 18,000, is that what
11  you're saying?
12    A.  I believe that's correct.
13    Q.  When you say "base pay," is
14  there something added to it?
15    A.  Plus bonus.
16    Q.  Okay.  Well, if Ms. Stough was
17  hired at an annual salary of 21,000 --
18    A.  Are you saying we overpaid her?

19    Q.  I'm asking.
20    A.  I don't know what her actual
21  salary was.
22    Q.  So, it's your testimony that up
23  until -- and I want to make sure I'm
0175
1  clear on this.
2    A.  Sure.
3    Q.  -- until the end of 2003, the
4  base salary for general managers was
5  18,000?
6    A.  No.  What I'm saying is there
7  was a -- when I began with the company --
8    Q.  In '98?
9    A.  Yes.  -- there was a period of
10  time that the base salary from general
11  mangers was 18,000 up to a period of
12  time, and I don't recall the specific
13  time period.
14        And then we reevaluated that,
15  and we began looking at wages based on
16  market-driven circumstance and experience
17  of the general manager.
18    Q.  Do you know how long in terms of
19  years before that change from your hire
20  date of '98 --
21    A.  I don't recall.
22    Q.  So, you don't know if that was
23  before or after 2003?
0176
1    A.  Yeah, I don't recall.
2    Q.  But we could --
3    A.  I know that when I began, that
4  had been the particular policy in place
5  for quite some time prior to me.
6        And after I began -- after I was
7  promoted to director of operations, we
8  reviewed that, and were wanting to make
9  that market-driven plus change the bonus
10  portion of their pay.
11    Q.  But you don't know when that
12  was?
13    A.  No, I don't recall.
14    Q.  But you think it was after --
15  the base salary went above $18,000

16  after -- it wasn't until after you got
17  promoted?
18      A.  I believe that's correct, yes.
19      Q.  Okay.  And, so, all new-hire
20  GMs, the pay would be $18,000 up until
21  that point; is that correct?
22      A.  Correct, yes.
23      Q.  Regardless of your experience?
0177
1       A.  Correct.
2       Q.  Okay.
3       A.  Yes.
4       Q.  So, everybody would be at 18,
5  and then it changed?
6       A.  Yes.
7          (Plaintiff's Exhibit No. 16 was
8           marked for identification.)
9       Q.  (By Mr. Goldfarb) Okay.  And
10  then, for example, Exhibit 16 is -- I've
11  got a couple of salary documents at this
12  point.  And Exhibit 16 indicates that
13  Mr. Goodman was hired in January of '03?
14      A.  Uh-huh (affirmative).
15      Q.  And his salary at that time was
16  $30,000?
17      A.  Uh-huh (affirmative).
18      Q.  Does that indicate to you that
19  the $18,000 was no longer in place --
20      A.  Correct.
21      Q.  -- at that time?
22      A.  Yes.
23      Q.  And then Betty Sutton, her
0178
1  salary was $28,000 from April of 2000 to
2  June of 2001.  And as of April of 2000,
3  does that indicate to you that the
4  $18,000 base is no longer in place?
5       A.  If, in fact, this is base salary
6  and not base plus bonus compensation.
7       Q.  Okay.  So, this could be base
8  plus bonus?
9       A.  I don't know if it is or isn't.
10      Q.  Okay.  So, when somebody gets
11  offered a salary, can they offer them a
12  salary of base plus bonus?

13    A.   Our bonus programs were written
14  as you have given me, and that was the
15  criteria by which you achieve bonus.
16    Q.   Right.  So, it's unknown.  You
17  can't really offer a bonus?
18    A.   It's not a guarantee.
19    Q.   Right.  I mean, it indicates
20  here that Ms. Sutton was -- from April
21  until June, was 28,000.  Does that
22  sound -- I mean, to me, that sounds like
23  a pretty round number to be bonus -- to
0179
1  include bonus.  Does it to you?
2    A.   I would agree, yes.  Yes.
3    Q.   Okay.  On this -- now, it goes
4  on to say, this review resulted in plans
5  to implement significant increases in the
6  base -- I'm sorry.  I'm back on Exhibit
7  15, the EEOC?
8    A.   Okay.
9    Q.   This is the one we were just
10  looking at.  It's on the second page.  It
11  says on the bottom paragraph, "This
12  review resulted in plans to implement
13  significant increases in the base salary
14  of its general managers and assistant
15  general managers such as at a 60-room
16  Jameson Inn, the range of the base salary
17  for the general managers was increased in
18  most locations to (sic) 26,000 to 32,000.
19  And for assistant general managers, the
20  salary range was increased from 18 to
21  $24,000."
22       For this, it's talking about a
23  $26,000 base.  So, at some point, do you
0180
1  remember that happening?
2    A.   Not in those specific terms, no.
3    Q.   Well, do you remember a $32,000
4  base --
5    A.   No.
6    Q.   -- coming into play?
7    A.   No.
8    Q.   Or a $26,000 base?
9    A.   No.  No.  No.

10    Q.  Well, it talks about a 60-room.
11  Was there another package for the 40-room
12  property?
13    A.  It was, again, based on the
14  three criteria I mentioned before.
15    Q.  Right.  Well, is this incorrect
16  as far as you remember where it says --
17  the way it's written here, "The salary of
18  many of the general managers or assistant
19  general managers is such that a 60-room
20  Jameson Inn in the range of a base salary
21  for the general manager was increased in
22  most locations to (sic) 26 to 32"?
23    A.  Well, as it states, in most
0181
1  locations, that may be factual at that
2  time.  I don't know.
3    Q.  Do you know which locations that
4  was attributed to?
5    A.  I have no idea.  No idea.
6    Q.  I mean, you were the director of
7  operations?
8    A.  Right.
9    Q.  And, actually, the VP of
10  operations --
11    A.  Correct.
12    Q.  -- in late 2003; is that right?
13    A.  One of the two, yes.
14    Q.  But you're not familiar with
15  this?
16    A.  Not these specific ranges, no.
17  No.  Again, it's based on the three
18  criteria I mentioned.
19    Q.  Do you know where that came
20  from?  Do you have any idea who would
21  have come up with those numbers here?
22    A.  The regional, district, or area
23  manager would make salary
0182
1  recommendations.
2    Q.  No, sir.  I'm talking about -- I
3  mean, obviously, this was written by
4  Mr. Curlee.  Do you know -- is Mr. Curlee
5  the person who decides the ranges?
6    A.  No, I don't think.

7   Q.  He's in legal or HR?
8   A.  Right.  Right.
9   Q.  Okay.
10   A.  I think in any location there's
11  a competitive wage, and that's what we
12  look at.
13   Q.  Have you got -- do you look at
14  other hotels in the area?
15   A.  We would ask regional or
16  district or area to try to do that.  And
17  most -- many times, competitors won't
18  divulge that information.
19   Q.  Do you recall receiving anything
20  from Mr. Woods on the Alex City location?
21   A.  No, I don't.
22   Q.  I mean, is it sent to you in
23  writing?
0183
1   A.  No.  No.  No.
2   Q.  No.  Do you know whether
3  Ms. Stough was told about this decision
4  in late 2003 to review the compensation
5  policy and make the changes?
6   A.  No, I don't.  I have no idea.
7   Q.  Do you have documents indicating
8  this review -- or did you have -- you
9  went through some -- did you go through
10  some documents in late 2003 when you
11  reviewed the compensation policy --
12   A.  No.
13   Q.  -- for general managers?
14   A.  No, not that I recall.
15   Q.  How did you do it without
16  looking at anything?
17   A.  Well, as I mentioned -- as far
18  as determining compensation for GMs?
19   Q.  No.  No.  No.  What I'm talking
20  about is it talks about you reviewing the
21  compensation policies for general
22  managers.  What policies did you review?
23       MR. KESSLER:  Well, if he did.
0184
1   Q.  (By Mr. Goldfarb) Well, you were
2  the director -- the VP of operations, I
3  mean, who else do you of that would

 4  review --
 5     A.  HR would have done that.
 6     Q.  Okay.  That's an HR function --
 7     A.  Yes.
 8     Q.  -- reviewing compensation
 9  policies?
10     A.  Yes, absolutely.
11     Q.  Not -- not your area?
12     A.  All recommendations would come,
13  as I mentioned.
14     Q.  Okay.  Were you involved in a
15  review in late 2002 of the compensation
16  policies?
17     A.  I don't remember anything
18  specifically given to me that I reviewed
19  that said, "This is our compensation
20  policy."
21     Q.  Or do you remember discussing
22  the compensation policy --
23     A.  No, I don't.
0185
 1     Q.  Let me finish -- for general
 2  managers in late 2003 with anybody?
 3     A.  No, I don't recall that being a
 4  specific conversation.
 5     Q.  All right.  Let me ask it this
 6  way:  Did you have a conversation with
 7  anybody in late 2003 concerning
 8  compensation policies in general --
 9     A.  No.  No.
10     Q.  -- for general managers?
11     A.  No.  No, not that I recall.
12     Q.  Okay.  You certainly didn't talk
13  to Ms. Stough about the company's
14  general -- the company's policy on
15  changing the compensation structure for
16  general managers?
17     A.  No.  No.
18     Q.  There where it speaks about
19  plans to implement significant increases
20  in the base salary of many of its general
21  managers, sitting here today is this the
22  first time you've heard anything about
23  such a plan in late 2003?
0186

1    A.  I don't recall any specific plan
2  in 2003, but what I definitely recall is
3  that we changed the base and bonus
4  structure as I mentioned.
5    Q.  Right.  You told me about the
6  $18,000 base being changed.
7    A.  Right.
8    Q.  And you don't remember when that
9  was?
10    A.  No, I don't recall that.
11    Q.  But what I'm focused on is --
12  because I don't even know if Ms. Stough
13  was there at that particular time.  Do
14  you know if she was even there when you
15  had the $18,000 --
16    A.  I don't recall that.
17    Q.  Right.  I mean, it could have
18  been before she was there?
19    A.  I suppose.
20    Q.  Okay.  What I'm asking and
21  trying to focus you on is this late 2003
22  compensation decision.  You have no
23  memory --
0187
1        MR. KESSLER:  Objection to form.
2  I'm sorry.  I should have let you finish.
3    Q.  (By Mr. Goldfarb) My
4  understanding is you don't remember
5  anything about a late 2003 plan to
6  implement significant increases in the
7  base salary of many of the general
8  managers?
9    A.  Not at that time period, no.
10    Q.  Right.  The only thing you know
11  is that one we already talked about, the
12  $18,000?
13    A.  Yeah.  Absolutely, yeah.
14    Q.  Okay.  Who was it who made the
15  decision as to how the districts were
16  divided, you know, District 1 includes
17  this, you know, that chart that we went
18  through?
19    A.  Right.
20    Q.  Who made those decisions?
21    A.  I would make those decisions

22  with the district manager as well as any
23  regional manager that might be affected.
0188
1  And we would collectively decide if that
2  was a manageable situation.
3      Q.  For the regional manager?
4      A.  Correct.  Or, you know,
5  sometimes we would have a region pick up
6  a hotel or lose a hotel.
7      Q.  And it would be in writing when
8  you would assign hotels to a manager; is
9  that right?
10     A.  Not necessarily.
11     Q.  Is there anything that you could
12  look at to tell me in 2001 how the
13  regions were situated, in 2002, 3, and 4?
14     A.  I wouldn't recall that.  I
15  wouldn't recall that.
16     Q.  I know you won't remember.
17     A.  Oh, okay.
18     Q.  What I want to know is there --
19  like the document that I showed you --
20  Exhibit -- where we wrote down all those
21  names.
22     A.  Right here.
23     Q.  Yeah.  Exhibit 13, that's called
0189
1  a daily report?
2      A.  Yes, I think we called it that.
3      Q.  Okay.  Any reason those wouldn't
4  still exist today?
5      A.  No.  They would be broken down
6  by regions, correct.
7      Q.  Okay.  So, that's something you
8  could look at to determine breakdown of
9  the regions?
10     A.  Yes.
11     Q.  And how the hotels are situated?
12     A.  Correct.
13     Q.  For each period of time?
14     A.  Correct.
15     Q.  Okay.  And that would be
16  something -- did you actually create the
17  daily reports?
18     A.  No, not in its original form.

19  It revised over time, and we were able to
20  get more statistical information.  And I
21  did assist with that format.
22     Q.  And is that kept in Excel?
23     A.  No.
0190
1     Q.  How is that --
2     A.  I don't know the actual
3  database, what it's called.
4     Q.  It's on the computer, though;
5  right?
6     A.  It's pulled from the hotels.
7  That information is pulled from the
8  hotels every morning after night audit is
9  done.
10     Q.  And you have the opportunity to
11  review it?
12     A.  I looked at statistics every
13  morning, yes.
14     Q.  Okay.  So, you could see how
15  well your particular hotels were doing in
16  every region?
17     A.  Absolutely.
18     Q.  Okay.  Are assistant general
19  managers paid lower salaries than the
20  general managers?
21     A.  Yes.
22     Q.  Did you used to do inspections
23  of hotels?
0191
1     A.  Yes.
2     Q.  Did you still do -- after you
3  got promoted above regional manager?
4     A.  Say it again.
5     Q.  After you got promoted above
6  regional manager.
7     A.  Yes, absolutely.
8     Q.  How long does it take you to do
9  an inspection of a 60-room interior --
10  exterior property?
11     A.  Exterior property.  It really
12  depends on what I see during that
13  process.
14     Q.  What do you do?  Do you go
15  through every room?

16     A.   Not every room, but a large
17  sampling of rooms.  I look at the rooms.
18  I would say it this way in a nutshell:
19  From books to beds.
20     Q.   How long does it typically take
21  to do a full, thorough investigation of a
22  property?
23     A.   Three to four hours, maybe less,
0192
 1  depending on the occupancy of the hotel.
 2     Q.   Including going through the
 3  books and everything?
 4     A.   If I were going through the
 5  books at that time.
 6     Q.   Who decides the particular staff
 7  that's assigned to a hotel, like, whether
 8  you have a maintenance person, whether
 9  you have a supervisor of housekeeping?
10     A.   Budget would determine that.
11     Q.   Does the general manager have
12  the authority to decide to hire as many
13  people as he or she wants?
14     A.   Within budgetary restrictions.
15     Q.   Okay.  So, as long as they're
16  within the budget, they can hire as many
17  people as they want?
18     A.   Yes.
19     Q.   And they don't need any
20  approval; is that correct?
21     A.   They would make decisions based
22  on line level employees.
23     Q.   What's that mean?
0193
 1     A.   Hourly.
 2     Q.   Okay.
 3     A.   Based on the salary ranges that
 4  were prescribed in the budgets.
 5     Q.   For the particular position?
 6     A.   Yes.
 7     Q.   So, there's an assigned range
 8  for the housekeeping person?
 9     A.   There generally would be, yes.
10  Yes.
11     Q.   And for a maintenance person?
12     A.   That varied market on market as

13  do the desk positions or housekeeping
14  positions.  Those are all market-driven
15  too.
16        (A short break was taken.)
17    Q.  (By Mr. Goldfarb) Okay.  We've
18  been talking about these operating
19  statements.
20        (Plaintiff's Exhibit No. 17 was
21        marked for identification.)
22        THE WITNESS:  Yes.
23    Q.  (By Mr. Goldfarb) I want to make
0194
 1  sure I understand how to read these
 2  things.  Exhibit 17 is the operating
 3  statement for the fourth quarter of 2001.
 4  And I understand that these are
 5  summarized in the dailies originally.  I
 6  mean, you get a form of this in your
 7  dailies; right?
 8    A.  Not in a consolidated form.
 9    Q.  Okay.
10    A.  The dailies are just for that
11  day.
12    Q.  All right.  Looking at this
13  document, it says -- is this something
14  that you do get and are able to review?
15    A.  Yes.
16    Q.  Do you receive these on a
17  monthly report?
18    A.  Monthly.  Usually, probably
19  third to fourth week after the month
20  closes.
21    Q.  Do these come out always -- I
22  mean, is this something that comes out
23  every month?
0195
 1    A.  Yes.
 2    Q.  Okay.  So, for Alex City, I
 3  should have -- there should be an
 4  operating statement for every month?
 5    A.  Correct.
 6    Q.  Okay.  And do you know why there
 7  wouldn't be?  Do you know of any reason
 8  there wouldn't be?
 9    A.  No.

10     Q.   Just like for every time
11   somebody receives a raise or a change in
12   salary, there should be a -- what is that
13   thing called?
14     A.   PAF.
15     Q.   -- a PAF.  Performance --
16        MS. SMITH:  Personnel.
17        THE WITNESS:  Personnel
18   authorization form.
19     Q.   (By Mr. Goldfarb) Yeah.  Thank
20   you.  Personnel authorization form.
21        There should be something like
22   that for every --
23     A.   Yes, by practice, there should
0196
1   be.
2     Q.   Okay.  So, starting in -- we're
3   looking at the fourth quarter of 2001.
4   There really should be one for every
5   month in 2001?
6     A.   Correct.
7     Q.   Of the operating statements?
8     A.   Yes.
9     Q.   And then is it summarized in
10   quarters?
11     A.   Yes, as well as annually.
12     Q.   Okay.  So, there's an annual one
13   for every year also.
14     A.   You'll see that year-to-date on
15   this calendar.
16     Q.   I do.  Okay.  So, for the fourth
17   quarter -- this is only the one for the
18   fourth quarter of 2001, though; right?
19     A.   Fourth quarter and, being that
20   it is the fourth quarter --
21     Q.   You get your annual?
22     A.   Uh-huh (affirmative).
23     Q.   Okay.  The room revenue means
0197
1   the sale of the rooms, right, the income
2   generated off the rooms?
3     A.   It's a combination of rooms sold
4   by the average daily rate.
5     Q.   And what else?
6     A.   That's it.

7    Q.   Okay.  And this one -- I just
8  pulled this randomly, but this is the
9  actual -- what does the actual mean in
10  that column?
11    A.   That is actually the revenues
12  that this property would have achieved
13  for that quarter.
14    Q.   All right.  And the budgeted,
15  what does that mean?
16    A.   That is what we anticipated the
17  revenues to be for that quarter.
18    Q.   Okay.  So, the actual above the
19  budget is good?
20    A.   Yes.
21    Q.   And then you have a variance of
22  24, and that means a positive 24,000?
23    A.   Correct.
0198
1    Q.   And then prior year, that was
2  the actual revenue that previous year?
3    A.   Yes.
4    Q.   So, it grew 9 percent, 9.07
5  percent?
6    A.   I'm sorry.  Where do you see
7  that?  Yes, that's correct.
8    Q.   Okay.  And then it says "actual
9  percent of revenue."  What does that
10  mean?
11    A.   Where are you looking?
12    Q.   I went over to the next column.
13    A.   It's the percentage of the
14  overall revenues for that property
15  inclusive of telephone and miscellaneous
16  revenue.  So, room revenue represents 99
17  percent of the total revenues achieved
18  for that particular quarter.
19    Q.   Is that a good number, or does
20  it matter?
21    A.   It's immaterial.
22    Q.   Okay.  Good.  I like immaterial
23  numbers.  The next one is --
0199
1    A.   You got it.
2    Q.   -- is DUDT a percent of --
3    A.   Percent of budget.

4    Q.   Okay.  Does that number matter?

5    A.   It's not material.

6    Q.   Okay.  What about quarter POR,

7  what does that mean?

8    A.   It's essentially the ADR or

9  average daily rate.  If you follow that

10  all the way over to ADR at the very

11  bottom of the page to your left-hand --

12  very bottom of the page, left-hand,

13  you'll see ADR is exactly the same,

14  60.31, 60.31.

15    Q.   Where are you looking?  I'm

16  sorry.

17    A.   Average daily rate, 60.31 and

18  here (indicating).

19    Q.   Okay.  It's the same as this

20  (indicating)?

21    A.   Yeah, that's all it is.

22    Q.   So, what does that mean, average

23  daily rate?

0200

1    A.   It's the average amount that

2  customers paid for that room.

3    Q.   60 --

4    A.   The average customer paid 60.31

5  for a room in Alex City during that time.

6    Q.   And the budget was $56?

7    A.   Correct.

8    Q.   So, that's good?

9    A.   That is good.

10    Q.   Okay.  And then your total

11  revenue expenses.  685 was the actual.

12  Does that mean that's how much came in

13  for the year?

14    A.   Correct.

15    Q.   And the budgeted was 659?

16    A.   Correct.

17    Q.   And, so, this property brought

18  in more than budgeted?

19    A.   Correct.

20    Q.   Okay.  And then the next thing

21  is the year total POR; right?

22    A.   Per occupied room, correct.

23    Q.   Okay.  And they charged a little

0201

1  more than was budgeted, $1.57?
2     A.  Correct.  They were able to
3  achieve a higher number than budget.
4     Q.  How do you charge more than
5  budget?  How does that happen?
6     A.  It's not that you necessarily
7  charge more for budget.  You may reduce
8  your discounting, so your asking rate is
9  the achieved rate.  Or you can increase
10  your asking rate and get it, you know,
11  get an achieved rate because of that.
12     Q.  Room expense, what does that
13  mean?
14     A.  The cost of selling that room in
15  the room's department, which if you flip
16  this page, you'll see the first page of
17  what encompasses all of those expenses,
18  which will tie back to that number.
19     Q.  Okay.  So, the room expense
20  number is tied to --
21     A.  Correct.
22     Q.  -- the back page?
23     A.  So, 36 -- in this case 36,646
0202
1  will tie to the very bottom number.
2     Q.  Of the second page?
3     A.  Of 36,640, right.
4     Q.  Okay.  That's where that number
5  comes from?
6     A.  Correct.
7     Q.  And the budgeted number also
8  comes from the back page?
9     A.  Correct.
10     Q.  And what does that mean, room
11  expense?
12     A.  P & L's are departmentalized.
13  Profit and loss statements are
14  departmentalized in hotels.  And rooms
15  expense would encompass all the line
16  items that by virtue of established
17  charted accounts for hotel operating
18  statistics where those expenses ought to
19  fall.
20     Q.  And which are listed on the next
21  page?

22     A.  Correct.
23     Q.  All right.  So, this room
0203
1  expense was lower than actual, which is
2  good; right?
3     A.  That's correct, yes.  Yes.
4     Q.  And then total operating expense
5  is lower, which is good?
6     A.  Correct.
7     Q.  Then you go to -- what is
8  general and administrative?  Are these
9  expenses?
10     A.  These are expenses.
11     Q.  Okay.
12     A.  This is generally overhead that
13  the general manager can't control for the
14  most part or has very little control
15  over.
16     Q.  All right.  So, the general
17  manager has control over the room
18  expense?
19     A.  Correct.
20     Q.  Is that right?
21     A.  Yes, by and large.
22     Q.  But does not have control over
23  the general and administration and
0204
1  maintenance and repair and utility?
2     A.  Well, they do, but to a lesser
3  degree, a much lesser degree.  As an
4  example, if you have, you know, FICA,
5  that's driven by labor.  They don't
6  control those percentages.
7     Q.  Okay.  But they're still
8  evaluated on that?
9     A.  Yes.
10     Q.  Is that right?
11     A.  And there are line items within
12  that department, G & A, that they do
13  control.
14     Q.  Okay.
15     A.  Such as bad debt would be a
16  great example.
17     Q.  Okay.  And then you get your
18  total overhead expense, and that's from

19  your -- the ones with the general and
20  administrative, those items; right?
21     A.  It's a combination of G & A,
22  M & R for maintenance and repair,
23  utilities, sales, and marketing,
0205
1  reservation expenses is your total.
2     Q.  And then you get total overhead
3  and operating expenses, that's that 74
4  number?
5     A.  Correct, a combination of your
6  operating and overhead expenses.
7     Q.  Where is this -- how do you get
8  the general operating profit?
9     A.  It's called gross operating.
10     Q.  Gross operating, where does that
11  come from?
12     A.  You take your revenues, minus
13  your expenses, equal your GOP.
14     Q.  Okay.  So, you take subtract the
15  74 from the 154, and get the 80?
16     A.  Correct.  If you were to divide
17  that into that number, you would also
18  then get a percentage of GOP.
19     Q.  Where is that done?
20     A.  To the right-hand column where
21  you see actual --
22     Q.  Percent --
23     A.  -- percent of revenue.
0206
1     Q.  Right.
2     A.  Go all the way down to the GOP
3  line, and you'll see 51.9 versus 46.
4     Q.  Okay.  I'm with you.  So, you
5  had an actual GOP of 51?
6     A.  .9 versus 46.0.
7     Q.  So, they brought in more than
8  they were budgeted?
9     A.  Correct.  Correct.
10     Q.  What about this utility
11  surcharge, what is that?
12     A.  That was a surcharge that was
13  implemented and expensed to each room
14  sold.  That was, at this time, a $3
15  surcharge.

16    Q.  Right.
17    A.  And as you see here, $2.83 of
18  the $3 that we were attempting to get
19  from each guest was captured.  So, when
20  you checked into a hotel, there was an
21  additional cost of the surcharge on top
22  of your room charge.
23    Q.  Do you still do that?
0207
 1    A.  No.
 2    Q.  Did they have to stop that?
 3    A.  They didn't have to stop it.
 4  They chose to stop it.
 5    Q.  All right.  So, I mean, are they
 6  graded on that, getting the utility --
 7    A.  Well, yes, because, essentially,
 8  you could adjust that off.
 9    Q.  Okay.  The general manager has
10  the flexibility to do that?
11    A.  They weren't suppose to adjust
12  it off unless we had national accounts
13  where we negotiated the fact that they
14  would not be charged a surcharge.
15    Q.  Okay.  You add that to -- so you
16  get your adjusted GOP?
17    A.  Correct.  Correct.  By default,
18  the GM would have received that surcharge
19  by virtue of the fact that it was charged
20  to every room.  The question is:  How
21  much adjustment took place from the $3.
22  And in this case, they captured $2.83 on
23  the $3 charged.
0208
 1    Q.  So, it helps their GOP?
 2    A.  Absolutely.
 3    Q.  And then the next line -- and
 4  the next item is available rooms?
 5    A.  Correct.
 6    Q.  What does that mean?
 7    A.  If you take the number of
 8  rooms -- and in this case, around about
 9  60 -- multiplied by the number of days in
10  the period, that's your available rooms.
11  And that's used to determine occupancy of
12  the hotel.

13     Q.   So, 60 times whatever the fourth
14  quarter is?
15     A.   91 days or so.
16     Q.   That's where your number comes
17  from?
18     A.   Correct.
19     Q.   So, that would -- I guess,
20  sometimes you may have -- the rooms may
21  be down or something?
22     A.   No.  If you took -- as an
23  example in this case, for the fourth
0209
 1  quarter, you have 31 days in October, you
 2  have 30 days in November, and 31 days in
 3  December.  There's essentially 92 days.
 4  92 days multiplied by the 60 rooms that
 5  are available every day equals your total
 6  available for that quarter.
 7     Q.   No.  I'm with you there.
 8     A.   Okay.
 9     Q.   I'm just wondering why you've
10  got an actual and a budgeted.  So,
11  sometimes it's going to be -- your
12  budgeted is your total rooms?
13     A.   Yeah.  As you note, there's no
14  variance been the available rooms and the
15  budgeted available rooms because the
16  room -- the available room count didn't
17  change.  We maintained 60 rooms.  We
18  didn't knock out a room.  We didn't close
19  down a room, per se.
20     Q.   Right.  That's what I was
21  getting at.
22     A.   Yeah.
23     Q.   So, that number would change
0210
 1  when you've got a room that has a
 2  problem, and you have to close it down?
 3     A.   No.  The available room count
 4  stays.  We literally would have had to
 5  demolition a room, eliminate a room.
 6     Q.   Okay.  So, you still would use
 7  it no matter what?
 8     A.   Yes.
 9     Q.   So, those numbers are the same

10  always?
11    A.  They're static.
12    Q.  Okay.
13    A.  They're static generally
14  speaking.
15    Q.  And then the rooms sold is just
16  how many rooms you sell versus the
17  budget?
18    A.  You got it, correct.
19    Q.  And then the percent growth --
20  all the rest -- okay.  It's 6.96.  So,
21  you grew from the previous year?
22    A.  Yes.  If you look at this,
23  you'll see that for this particular
0211
1  quarter, we had 7 percent increase or 267
2  rooms divided into the 2372 would equal
3  the 7 percent growth in rooms.
4    Q.  Where did you get the 260 -- oh,
5  okay.
6    A.  Variance.
7    Q.  The variance.
8    A.  Well, the budget is 267.  But
9  267 into how many were sold the prior
10  year equal your percent growth.
11    Q.  And you look for a positive
12  number there; right?
13    A.  Absolutely, yes.
14    Q.  And then the next line is
15  occupancy.  What is that?
16    A.  It's the amount of rooms sold
17  versus the amount of rooms available or
18  divided by the rooms available.
19        So, in this case, you would take
20  200 -- or 2,537 divided by 5520,
21  the available room count, and that equals
22  your occupancy.
23    Q.  Okay.
0212
1    A.  In this case, 45.96 versus a
2  budget of 41.
3    Q.  You got that 45 number how?
4    A.  You take the rooms sold, 2537,
5  divided by 5520 is going to equal 45.9.
6        In other words, if you had 100

7   available rooms and you sold 50 of them,
8   you take the 50 into the 100, equaling 50
9   percent occupancy.  So the hotel sold --
10      Q.   45.9 percent occupancy.
11      A.   -- essentially, 46 percent of
12  its available rooms.
13      Q.   Right.  It's a percentage is
14  what that is?
15      A.   That's correct.
16      Q.   Okay.
17      A.   So, 46 percent of its available
18  rooms versus a budget of 41 percent.
19      Q.   Right.  And then what is ADR?
20      A.   Average rate achieved.  The
21  average daily rate achieved on a daily
22  basis based, again, on what your
23  customers are paying you.  So, you would
0213
1   take your revenue, divide that by your
2   rooms sold, and you will get the ADR or
3   average daily rate.
4       Q.   60 bucks?
5       A.   Correct.
6       Q.   And then rev-par, what is that?
7       A.   That's called rev-par, which is
8   revenue per available room.  And that's
9   the industry measurement for revenue
10  performance.  So, if you take the room's
11  revenue, divided by the available rooms,
12  you're going to get the rev-par.
13      Q.   I lost you there.
14      A.   You take 153,000 on the very top
15  line, divide that by the available room
16  count of 5520, you're going to come up
17  with a rev-par of 27.72 versus a budget,
18  in this case, of 23.28.  And that equals
19  9 percent growth.  That is an industry
20  measurement.
21      Q.   I mean, is there any -- what's
22  the key -- are there any key factors that
23  you look at when you look at this
0214
1   operating statement?
2       A.   You just went over them.
3       Q.   Okay.  Well, that's good.

4     A.   You know what you're doing.
5     Q.   No, I don't.  But does a rev-par
6   sum it all up?
7     A.   No.
8     Q.   Okay.
9     A.   No.
10     Q.   So, you've got to go through
11   what we went through when you analyze
12   this?
13     A.   You really do.  You have to look
14   at the revenues you make versus the
15   revenues you take to the bank.
16     Q.   And the next page is just --
17   it's expense.
18     A.   Again, departmentalized and
19   broken down.  So, all these pages will
20   tie back to the cover page.
21     Q.   And they remain the same -- I
22   mean, I don't have every month, but these
23   remained the same, it's my understanding,
0215
1   up until the time you left?
2     A.   Essentially, they're the same.
3     Q.   The format of it?
4     A.   Absolutely.
5     Q.   You may have taken off this
6   utility surcharge or something like that?
7     A.   Correct.  Correct.  And we've
8   added year-to-date per occupied room
9   statistics or POR statistics.
10          (Plaintiff's Exhibit No. 18 was
11          marked for identification.)
12     Q.   (By Mr. Goldfarb) The last one I
13   have while she was there -- Exhibit 18.
14   This is about the same?
15     A.   It is.
16     Q.   Same thing?
17     A.   Yeah.
18     Q.   So, while she was there, we've
19   covered the way the operating statement
20   worked as far as you know during
21   Ms. Stough's employment?
22     A.   Correct.
23     Q.   All right.  Did you have
0216

1  discussions with anybody concerning
2  Ms. Stough's rate of pay, her salary that
3  you can tell me about today?
4     A.  Not to my recollection.
5        (A short discussion was had.)
6     Q.  (By Mr. Goldfarb) Have you ever
7  testified like in a deposition before?
8     A.  No, I have not.
9     Q.  Have you ever been in court or
10 anything like that?
11    A.  No.
12    Q.  Never testified under oath?
13    A.  No.
14    Q.  What's your -- before you went
15 to this company, did you -- have you had
16 a history of working in hotels?
17    A.  Yes.  Yes.
18    Q.  How long have you been in the
19 hotel business?
20    A.  Approximately 25 years.
21    Q.  Did you know Charles Woods
22 before you went to work at Jameson?
23    A.  No.
0217
1     Q.  Mark Fetner?
2     A.  No.
3     Q.  You never met -- not Belinda
4  Stough, I know that?
5     A.  No.
6        MR. GOLDFARB:  Well, it's 1:15.
7  I think Mr. Fetner is here, so I'm going
8  to end.
9
10 EXAMINATION BY MR. KESSLER:
11    Q.  While you were -- just a couple
12 questions.  Mr. Goldfarb was having you
13 look at the list of hotels that Jameson
14 had and asking you to go through and --
15 here it is.  Plaintiff's No. 13 -- asking
16 your recollection --
17    A.  Right.
18    Q.  -- of people who have been
19 terminated for various reasons; right?
20    A.  Right.
21    Q.  The list that you were able to

22  provide, was that a complete list, or was
23  that just based on your best
0218
 1  recollection?
 2      A.  Just based on my recollection.
 3  The things that you remember most are the
 4  improprieties.  That's what stands out
 5  the most.
 6      Q.  Do you recall during the time
 7  Belinda Stough worked for the company how
 8  many hotels Charles Woods had supervisory
 9  responsibility for?  To the best of your
10  recollection.
11      A.  Again, I want to remember that
12  he was -- I believe he was district
13  manager, I guess.  I may have said
14  regional, but district.  Eufaula,
15  Greenville, Oxford, and the particular
16  property.  And I think there was an
17  additional added later, which was
18  Prattville.
19      Q.  During the time that you were
20  there as the director of operations and
21  VP of operations, did the hotel that
22  Mr. Woods had responsibility for change?
23          MR. GOLDFARB:  Object to form.
0219
 1  Asked and answered.
 2          THE WITNESS:  What's that?  I'm
 3  sorry.
 4          MR. GOLDFARB:  I objected.  You
 5  already answered.
 6          THE WITNESS:  Oh.
 7      Q.  (By Mr. Kessler) He objected to
 8  the form.  Go ahead and answer.
 9      A.  Again, just, I think, we added
10  the Prattville property.
11      Q.  Okay.  And do you know who
12  Mr. Woods reported to?
13      A.  There were different times, but
14  at much of the time, it was Sandy
15  McGuffey directly.
16      Q.  And her position was what?
17      A.  She was regional manager at the
18  time.

19     Q.  And did Mr. Woods ever report
20  directly to you?
21     A.  Yes.
22     Q.  And when -- did Sandy McGuffey
23  ever report to you?
0220
1     A.  Yes, the entire time during her
2  tenure she did.
3     Q.  Okay.
4          MR. KESSLER:  I have no further
5  questions.
6
7  FURTHER EXAMINATION BY MR. GOLDFARB:
8     Q.  In 2000 -- tell me when Woods
9  was a regional manager.  When did he get
10  the regional title?
11     A.  I don't know when he got the
12  regional title.  I did not give him the
13  regional title.
14     Q.  Was it before you got there?
15     A.  I believe that may have been the
16  case.
17     Q.  Okay.  So, district is under
18  regional?
19     A.  Correct.
20     Q.  But you came in '98?
21     A.  Correct.
22     Q.  Woods was already there?
23     A.  Yes.
0221
1     Q.  When you got hired, Woods was
2  there?
3     A.  Yes.
4     Q.  Okay.  So, he was -- would he
5  have been -- would Sandy have been over
6  him?
7     A.  Sandy would have been over him.
8     Q.  My understanding is you said
9  that sometime that Woods reported to
10  Sandy.  When Woods was a regional
11  manager, would he report to Sandy?
12     A.  I don't know because I don't
13  recall.
14          We moved Sandy McGuffey out of
15  the region to run the Signature Inns as

16  director of operations.  When we made
17  that move, then he reported directly to
18  me.
19     Q.  When was that?  When did y'all
20  get the Signature?
21     A.  2000, I believe.
22     Q.  Okay.  So --
23     A.  It may have been '99ish, around
0222
 1  that same time.
 2     Q.  Sandy leaves to go to Iowa or
 3  Ohio?
 4     A.  Well, not at that time.
 5     Q.  Okay.
 6     A.  Because that was -- she ran the
 7  Signature operations for approximately a
 8  year, and that was during the 2005
 9  operating year.
10     Q.  Okay.
11     A.  Or 4.  Excuse me.  I'm sorry.
12     Q.  2004?
13     A.  Correct.  Correct.
14     Q.  All right.  So, I'm trying to
15  get --
16     A.  Yeah.
17     Q.  -- to work with you.
18     A.  Yeah.  Yeah.
19     Q.  2004, Sandy is in Ohio or
20  something?
21     A.  She's in Indianapolis.
22     Q.  Indianapolis?
23     A.  Yes.  Yes.
0223
 1     Q.  Okay.  Before 2004, you said you
 2  did not make Charles the regional
 3  manager, he was a regional manager when
 4  you got there?
 5     A.  I don't recall his official
 6  title when I got there.
 7     Q.  Did you ever promote Charles?
 8     A.  Not to regional.  Not that I
 9  recall.
10     Q.  But he -- okay.  So, at some
11  point, he was regional.  You know he was
12  regional when you were there?

13    A.  I don't recall that he was.
14    Q.  All right.  I think we've got
15  it.  I know it says in one of these
16  things, and I'll show you.
17         So, do you think he could have
18  been the district manager?
19    A.  That may be right.
20    Q.  Not the regional manager?
21    A.  That may be correct, yeah.
22    Q.  Okay.  Was there a regional
23  manager over him?
0224
 1    A.  Sandy McGuffey.
 2    Q.  Okay.  But there was some time
 3  that Sandy wasn't there?
 4    A.  Then he reported directly to me.
 5  That region reported directly to me.
 6    Q.  Okay.  Let me look -- so, if you
 7  didn't make him regional manager, you
 8  think he was just the district manager?
 9    A.  I believe that's correct, yes.
10    Q.  Okay.  What was Sandy's role
11  with regard to Charles and deciding the
12  salary of GMs?
13    A.  It would be the same process
14  where he would make recommendations to
15  her, and then she would then have made
16  recommendations to me.
17    Q.  And she still works there today?
18    A.  Yes.
19    Q.  And she's in Alabama?
20    A.  I think she's back now, yeah.
21    Q.  And her name is Sandy McGuffey?
22    A.  Correct?
23    Q.  Have you had discussions with
0225
 1  Sandy McGuffey concerning Belinda Stough?
 2    A.  No.  No.
 3    Q.  Well, you had discussions
 4  with -- you told me you had discussions
 5  with Woods concerning Belinda Stough?
 6    A.  Her performance.
 7    Q.  Right.  Was discussed with
 8  frequency --
 9    A.  Yes.

10    Q.  -- her performance?
11    A.  Yes.
12    Q.  Why is he discussing it with you
13  as opposed to Sandy?
14    A.  At that time, she may have not
15  been the regional manager.
16    Q.  Okay.  When did she become the
17  regional manager?
18    A.  I don't recall the specific time
19  period.  I think it was a couple of years
20  after I started.
21    Q.  All right.  If Woods is
22  discussing Stough's performance with
23  frequency with you --
0226
1    A.  Right.
2    Q.  -- during -- when those
3  discussions are happening, Sandy would
4  not be the regional manager?
5    A.  At that time.
6    Q.  Correct?
7    A.  Yes.  That's correct, yeah.
8    Q.  Okay.  Have you ever talked to
9  Sandy McGuffey about Belinda Stough?
10    A.  Not to my recollection.
11    Q.  Is Woods allowed -- I mean, if
12  Sandy's there as a regional manager, can
13  he go around her and talk to you if he
14  wants, or is there a chain of command?
15    A.  There is a change of command,
16  yes.
17    Q.  So, if Sandy McGuffey is there,
18  Woods needs to go to Sandy --
19    A.  Absolutely.
20    Q.  -- before he goes to you?
21    A.  Absolutely, yes.
22    Q.  So, if he's going to you,
23  Sandy's not there?
0227
1    A.  Presumably, yes, correct.  Yes.
2    Q.  I mean, you don't know of any
3  reason he would go around Sandy?
4    A.  No.  No.  No.  I would deflect
5  it back to the regional if that were the
6  case.

7    Q.  Okay.  Thanks.
8    A.  Okay.
9    Q.  That's all.
10    A.  Okay.  Lines changed.  So, it's
11  just --
12    Q.  What?
13    A.  Lines of authority has changed
14  over time.
15    Q.  Right.  I understand.  When
16  you've got the regional, then you go
17  through the regional?
18    A.  Right.
19    Q.  When the regional is not there,
20  it comes directly to you?
21    A.  Absolutely.  Absolutely.
22    Q.  Okay.  At some point, Prattville
23  was under Charles?
0228
1    A.  Correct.
2    Q.  Do you know when?
3    A.  It was for -- I want to say a
4  one and a half, maybe two-year period,
5  somewhere in that neighborhood.
6    Q.  Was it when Stough was there?
7    A.  I don't recall if that was the
8  same time period.
9    Q.  Okay.  Thanks.
10      MR. KESSLER:  No questions.
11        ~~oOo~~
12      The deposition of
13      Gregory Winey
14      concluded at 1:35 p.m.
15      on April 21, 2006
16        ~~oOo~~
17
18
19
20
21
22
23