3

# Salary Freeze Memos

## 2002
## 2003



PLAINTIFF'S
EXHIBIT

Winey   3

Jameson-2054

TO ALL GENERAL, DISTRICT AND REGIONAL MANAGERS:

In order to align hotel operations with changes that were instituted earlier this year for the home office for the purpose of achieving a 25% reduction in costs of operation and to establish consistent and uniform policies for all salaried personnel in the company, Kitchin Hospitality, LLC's executive management has determined that in light of current economic and business conditions, there will be no increases in annual salaries for General Managers, Assistant General Managers or Hotel Managers in calendar year 2002. This same policy was put into place for all salaried home office personnel, including department heads and executives, in January of this year. In addition, annual employee performance reviews for all General Managers, Assistant General Managers and Hotel Managers have been rescheduled for January, 2003 and will not be conducted during the remainder of 2002 so that all salaried management employees will receive their annual reviews at the same time.

Jameson-2055

# MEMORANDUM

From:  Jeff Hurley, Director of Human Resources

To:    Brian Pierce, Payroll Manager
       Mary Helen Hicks, Hotel Controller

Subj:  Clarification of Policy regarding Wage/Salary Freeze for all Operations/Field Employees

Date:  April 2, 2003

This memo will outline my understanding of clarifications issued today by Craig Kitchin regarding the company's policies regarding the "freeze" of wages and salaries for all Operations/Field employees which was announced on Monday, March 17, 2003, as follows:

1. The wage/salary freeze was effective immediately, that is on March 17, 2003. PAF's for wage/salary increases submitted to the Payroll Department on or after that date are ineffective and are "frozen".

2. Wage/salary increases are authorized only in connection with a bona fide promotion, as evidenced by a job code change. *Copies of PAF's showing pay raises for promotion of salaried personnel (or hourly to salary) which have been approved by a Regional Manager or the VP Operations are to be forwarded to Craig Kitchin for his information until further notice.*

3. Input of wage increases for employees to correct and end the improper use of temporary rates will be permitted.

3. PAF's or other submissions requesting the use of new temporary hourly or salary rates are not to be entered or honored after March 17, 2003. The only permitted exception is when an employee has been temporarily transferred to a hotel that is beyond a reasonable driving or travel distance from his or her residence or regularly assigned hotel. Temporary re-assignment from one hotel to another in a metropolitan area does not constitute an authorized temporary re-assignment justifying a temporary pay rate increase. Likewise, "increased responsibilities" in the event of an employee having to undertake additional duties as a result of a vacancy of a superior, comparable employee or subordinate position (e.g. front desk manager acting as AGM; AGM acting as GM; front desk having to work night audit or help in laundry, etc.) does not justify a temporary pay rate increase.

Jameson-2056

4/21/04

<u>"Perfect Stay . . . Every Time"</u>

## QUALITY ASSURANCE EVALUATIONS (QA)

<u>Overview:</u>
At Kitchin Hospitality, we value our guest and go out of our way to make each guest stay comfortable and enjoyable. The goal of our Quality Assurance Evaluation (QA) is to ensure our guest will receive the same level of service and product at each and every hotel.

The Quality Assurance Evaluation will do the following:

* Create consistency throughout all Kitchin Hospitality brands.
* Identify potential problems in order to quickly resolve them.
* Establish a high level of product and service quality.
* Give us a realistic snapshot of what our guests experience on a daily basis.

<u>Frequency of Evaluations:</u>
The frequency in which a hotel is evaluated is based upon prior evaluation scores. However, each hotel will be evaluated a minimum of once per calendar quarter. The maximum length of time in between evaluations for hotels that receive a "needs improvement" or "Failing" score will be no longer than 30 days.

<u>Definitions:</u>
* **Deficiency:** A deficiency is any item deemed unacceptable. This item will be marked with an "X". There are 4 categories that may define a deficiency:

  "C"    Cleanliness
  "D"    Dust and/or Debris
  "R"    Repair and or Replacement
  "S"    Standard(s) not being met.

* **Graded Area:** A graded area is a cluster of deficiencies on a particular item or in a particular section of the Quality Assurance Evaluation. Much of the overall Quality Assurance score is derived directly from "Graded Areas". On the QA, each item/section will note how many items must be marked as deficient in order for that item/section to become graded.



PLAINTIFF'S
EXHIBIT
Winey  6

QUALITY ASSURANCE EVALUATIONS (QA)

**Final Grading:**

The final grade is determined by the number of graded areas on the evaluation, as well as a select number of penalties for scoring poorly in major areas. The number of graded deficiencies determines the overall grade and is scaled according to the following:

| GRADE | NUMBER OF GRADED AREAS |
|---|---|
| * OUTSTANDING | 0-8 |
| * ABOVE AVERAGE | 9-14 |
| * AVERAGE | 15-21 |
| * NEEDS IMPROVEMENT | 22-28 |
| * FAILING | 29 Plus |

The overall score will be severely penalized if the following "major deficiencies" are recorded:

* Uniform Deficiency — Automatic Overall Fail
* Service Initiative Deficiency — Automatic Overall Fail
* Tubs/Carpets/Walls/or Spreads — Drop 1 Overall Scoring Level
  *(80 room or less: cleanliness or debris deficiency more than twice)*
  *(81 room or more: cleanliness or debris deficiency more than 3 times)*
* Continental Breakfast Graded — Drop 1 Overall Scoring Level
* Landscape Graded — Drop 1 Overall Scoring Level
* Building (Siding) Cleanliness marked as deficient — Drop 1 Overall Scoring Level
* Entire Guest Sleeping Room and/or Bathroom Fail — Drop 1 Overall Scoring Level
  *(80 room or less: cleanliness or debris marked more than twice)*
  *(81 room or more: cleanliness or debris marked more than 3 times)*
* Entire Guest Sleeping Room and/or Bathroom Graded. — 1 additional Grade each time.
  *(80 room or less: replace-repair &/or standard marked more than twice)*
  *(81 room or more: repair-replace &/or standard marked more than 3 times)*

**Notes:**

* Upon Completion of the QA the assessor will present the final evaluation to the General Manager. At that point any questions and comments can be made and noted in the perception box on the score sheet.

* <u>Receiving a "needs improvement" or "failing" score may require the GM to attend a quarterly Quality Assurance improvement class.</u>

* <u>Receiving a "failing" grade twice consecutively may lead to immediate termination of employment.</u>

* On rare occasion, the QA assessor may believe that the evaluation did not derive a score that truly resembles the quality of the property. In such instances, an Executive Committee, made up of top management, will consider the forcing of a more appropriate score. The original score will remain on the score sheet, however the Assessor will manually input the revised score in the subjective ranking box.

* The General Manager's quarterly bonus evaluation will be appropriately affected by the overall score of the Quality Assurance Evaluation.



# KITCHIN
## HOSPITALITY, LLC

January 30, 2003


Ms. Belinda Stough
General Manager
Jameson Inn
4335 Highway 280
Alexander City, AL  35950

Dear Belinda:

Congratulations for achieving bonus in the fourth quarter of 2002.  As General Manager of Jameson Inn Alexander City, your outstanding efforts are greatly appreciated.  A check is enclosed in recognition of your achievement.

Once again, congratulations and best wishes for continued success!

Sincerely,

Gregory W. Wiley
Vice President of Operations


Enclosure



**PLAINTIFF'S EXHIBIT**

Wiley 7

---

8 Perimeter Center East / Suite 8050 / Atlanta, GA 30346 / 770.901.9020 / Fax 770.901.9550

Stough v Jameson In  0001
Pltf Disc Docs

# Bonus Programs

# 2001, 2003, 2004



PLAINTIFF'S
EXHIBIT

WINRY 8

Jameson-2062

# JAMESON INN GENERAL MANAGER
# 2001 BONUS PROGRAM

The purposes of Jameson's 2001 General Manager Bonus Program are to: (a) motivate participants toward achieving Company financial goals that are considered key to the Company's success; and (b) reward performance with pay that varies in relation to the extent to which the Company's financial goals are achieved.

## ELIGIBILITY

In order to be eligible for this bonus program, you must be a General Manager in good standing with no disciplinary action prior to the first day of each beginning quarter. If you are in good standing, but started after the first day of the new quarter, and have hit the GOP% goal, your bonus will be pro-rated.

## BONUS DETERMINATION

The bonus program will be driven by meeting and/or exceeding Gross Operating Profit (GOP) percentage goals established for your hotel. General Managers will receive a bonus amount of $1,500 if the GOP% goal is achieved. For every percentage point you increase the GOP%, you will get an additional $100. (Examples are included as an attachment).

## FORM AND TIMING OF PAYMENT

Bonus checks will typically be distributed by the end of each of the following months: 1st Quarter-April 30th, 2nd Quarter - July 31st, 3rd Quarter – October 31st, 4th Quarter – January 31st 2002. Bonus checks will be subject to all tax withholdings required by federal, state, and local laws.

## TERMINATION OF EMPLOYMENT

If your active employment with the Company ceases by reason of death, short-term or long-term disability, family and medical leave, or military service, you will remain eligible for the bonus program. In the event of a General Manager's death prior to receipt of a bonus, the bonus shall be payable in cash to the estate of the General Manager. You will not be eligible for any bonus payments in the event you voluntary separate from the company or your employment is involuntarily terminated prior to the date bonus checks are distributed.

I understand and accept the terms and conditions of the 2001 General Manager Bonus Program.

_____          _____          _____

General Manager Signature              Property                Date

# 2001 GENERAL MANAGER BONUS PROGRAM EXAMPLES

Jameson Hospitality

2001 Bonus Program

*Sample*

| Hotel A | Jan | Feb | Mar | 1st Quarter |
|---------|-----|-----|-----|-------------|
| Budgeted GOP% | 43.5% | 48.5% | 50.3% | 47.4% |
| Actual GOP % | 44.0% | 49.0% | 51.3% | 48.1% |
| Variance | 0.5% | 0.5% | 1.0% | 0.7% |
| Bonus Mark(hit) | | | | $1,500 |
| Additional Bonus | (.70 x $100) | | | $70 |
| Total Quarterly Bonus | | | | $1,570 |

| Hotel B | Jan | Feb | Mar | 1st Quarter |
|---------|-----|-----|-----|-------------|
| Budgeted GOP% | 43.5% | 48.5% | 50.3% | 47.4% |
| Actual GOP % | 51.0% | 53.0% | 54.0% | 52.7% |
| Variance | 7.5% | 4.5% | 3.7% | 5.2% |
| Bonus Mark(hit) | | | | $1,500 |
| Additional Bonus | (5.2 x $100) | | | $520 |
| Total Quarterly Bonus | | | | $2,020 |

| Hotel C | Jan | Feb | Mar | 1st Quarter |
|---------|-----|-----|-----|-------------|
| Budgeted GOP% | 43.5% | 48.5% | 50.3% | 47.4% |
| Actual GOP % | 39.0% | 51.0% | 49.5% | 46.5% |
| Variance | -4.5% | 2.5% | -0.8% | -0.9% |
| Bonus Mark(missed) | | | | $0 |
| Additional Bonus | | | | $0 |
| Total Quarterly Bonus | | | | $0 |

Professional Memo                                                    Page 1 of 1

**Jeff Hurley**

From:    Marty Brew [mbrew@jamesoninns.com]
Sent:    Friday, February 14, 2003 9:35 AM
To:      'Mary Helen Hicks'; jhurley@jamesoninns.com
Subject: FW: Professional Memo


Martin D. Brew, CPA
Treasurer & Chief Accounting Officer
Jameson Inns, Inc./Kitchin Hospitality, LLC
www.jamesoninns.com
Phone:  770-776-5245
eFax:   973-461-4531

----Original Message----
**From:** Phyllis Davis [mailto:pdavis@jamesoninns.com]
**Sent:** Friday, February 14, 2003 9:22 AM
**To:** 'Signature Inns'; 'Jameson Hotels'; 'Scott Stuart'; 'David Shephard'; 'Jeff Moche'; Mike
Davis'; 'Sandy McGuffey'; 'Paul Komanecky'; 'Beth Harry'; 'Brett Thompson'; 'Charles Woods';
'Kim Casey'; 'Lynn Jones'
**Subject:** Professional Memo

## KITCHIN
## HOSPITALITY, LLC

# Memo

To:      General Managers, Regional Managers, and District Managers
From:    Greg Winey
cc:
Date:    **January 21, 2003**
Re:      2003 General Managers Bonus Plan

---

Attached is the *final* 2003 General Managers Bonus Plan.  If you have any
questions, please contact your Regional Manager, District Manager or me.

2/14/2003

Jameson-2065

FINAL [ APPROVED

# 2003 General Manager Bonus Program

**_Purpose:_**  The purpose of the General Manager Bonus Program is to motivate the General Manager (GM) and his/her respective staff to execute key company initiatives at optimum levels of performance. This will be determined by meeting or exceeding "Key Performance Indicators."

**_Base Bonus_**:  The targeted 2003 base bonus for all Kitchin Hospitality, LLC GM's is $2,000 per quarter. The first half of this bonus can be earned by achieving the adjusted budgeted Gross Operating Profit percentage (GOP%) for the quarter. The second half can be earned by achieving budgeted revenue goals for the quarter. Both portions of the base bonus are subject to reduction if the property receives a "Needs Improvement" QA or a Market Metrix customer service rating that is 3 points or more below the company average during the quarter. To receive any bonus, a GM must satisfy the eligibility requirements described below.

**_Eligibility:_**  The GM must be in "good standing" with no disciplinary action during quarter for which a bonus is to be paid. "Good standing" also means meeting minimal operating requirements set forth by Kitchin Hospitality, LLC. Such requirements include, but are not limited to: A "Pass" rating on any Quality Assurance Inspection and Internal Audit for that quarter, meeting the adjusted budgeted GOP% for the quarter, meeting the minimal submission requirements to Market Metrix, no written warnings or disciplinary action, absenteeism of no more than 5 business days for the quarter (unless through approved PTO), acceptable "random inspections of the property by the Regional or District Manager (non-inclusive of a formal QA), and must be employed by Kitchin Hospitality when actual bonus checks are distributed. If you are in good standing, but started after the first day of the quarter, then your bonus will be pro-rated.

**_Kickers:_**  The 2003 GM bonus program also provides enhancements and reductions to the base bonus, referred to as "kickers". Kickers will be as follows: Quality Assurance (QA's), Market Metrix and GOP%. Each kicker will have the value listed below:

- GOP% -
  - For each whole percentage point that exceeds the adjusted budgeted Gross Operating Profit percentage, an additional $100 will be paid (i.e. beat plan by 2% pts, bonus is increased by $200)

- QA's –
  - Outstanding QA = $500
  - Above Average QA = $250
  - Average QA = $0.0
  - Needs Improvement = -$500
  - Fail = $0.0 (no bonus regardless of meeting other gates)

- Market Metrix -
  - Overall Customer Service Ranking 3 pts or more above company average = $500
  - Overall Customer Service Ranking 3 pts or more below company average = -$500
  - Daily record submission must equal a minimum of 80% of possible transmission days (90 days in the quarter, a minimum of 72 days submitted). If minimal transmission % is not met, no bonus will be paid.

**Key Performance Indicators:** The determination as to whether or not the GM has met the criteria to be eligible for bonus will be determined by key performance indicators and are as follows:

- **GOP %** - The GM must hit the budgeted "adjusted gross operating profit %" (GOP%) as determined by his/her quarterly operating statements to be eligible for any bonus payout. Each quarter will be designated as follows:

  - 1st Quarter - January 1st thru March 31st
  - 2nd Quarter – April 1st thru June 30th
  - 3rd Quarter – July 1st thru September 30th
  - 4th Quarter – October 1st thru December 31st

  For each quarter in which an eligible GM achieves the targeted Gross Operating Profit percentage, the GM will earn $1,000 of the "base" bonus payout. No bonus will be paid, regardless of other met criteria unless the budgeted adjusted GOP% is met.

- **Revenue** – For each quarter in which an eligible GM achieves the budgeted revenue goals, a GM will receive an additional $1,000 of their "base" bonus payout. If revenue goals are not met, the base bonus will be reduced by ½ of the $2,000 base bonus, or by $1,000. The GM will still be eligible for the other half of his/her bonus if adjusted budgeted GOP% is met.

- **Quality Assurance Inspection (QA)** – The GM must pass his/her Quality Assurance Inspection for the quarter in which the GM is eligible. In the event of a failed inspection, the GM will not be eligible for any bonus regardless of other met criteria.

- **Market Metrix** - The GM must submit a minimum of 72 days of guest ledgers to Market Metrix each quarter (80% of potential submission days). It is up to the GM to ensure that submission is occurring on a daily basis and take corrective action when necessary. Technical problems are to be addressed directly with Market Metrix via the GM. Compliance will be reviewed on a daily basis via Market Metrix submission reports that are distributed to each GM on a daily basis.

- **No Contract or Guarantee** – This description of the manner in which a Manager will be compensated is not intended to be a contract for employment or a guarantee that a Manager will earn any commission or bonus or be eligible to receive any commission or bonus in the future. Furthermore, there is no guarantee that a Manager will continue as an employee of Kitchin Hospitality, LLC in the future, but shall at all times remain an employee at will.

Jameson-2067

*Example 1*

**Gates for Bonus eligibility**

| | Gate Met | Not Met | Bonus | MM | Bonus | GOP % | Bonus | QA |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Kickers | | |
| Revenue Budget | x | | $1,000 | +3pts | $500 | +3pts | $300 | $0 |
| GOP % Budget | x | | $1,000 | | | | | |
| Passed QA | x | | | | | | | |
| Market Metrix Submission | x | | $0 | | | | | |
| | | | | | | | | |
| Eligible for Bonus | Yes | | $2,000 | | $500 | | $300 | $0 |
| Total Bonus | $2,800 ← | | | | | | | |

*Example 2*

**Gates for Bonus eligibility**

| | Gate Met | Not Met | Bonus | MM | Bonus | GOP % | Bonus | QA |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Kickers | | |
| Revenue Budget | | x | $0 | +3pts | $500 | +3pts | $300 | |
| GOP % Budget | x | | $1,000 | | | | | |
| Passed QA-Outstanding | x | | | | | | | $500 |
| Market Metrix | x | | $0 | | | | | |
| | | | | | | | | |
| Eligible for Bonus | Yes | | $1,000 | | $500 | | $300 | $500 |
| Total Bonus | $2,300 ← | | | | | | | |

*Example 3*

**Gates for Bonus eligibility**

| | Gate Met | Not Met | Bonus | MM | Bonus | GOP % | Bonus | QA |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Kickers | | |
| Revenue Budget | | x | $0 | +3 pts | $0 | missed | $0 | $0 |
| GOP % Budget | x | | $0 | | | | | |
| Passed QA-Above Average | x | | | | | | | |
| Market Metrix | | x | $0 | | | | | |
| | | | | | | | | |
| Eligible for Bonus | No | | $0 | | $0 | | $0 | $0 |
| Total Bonus | $0 ← | | | | | | | |

## Kicker Key

**GOP% (pts above budget)**

| | 1 pt | 2 pts | 3 pts | 4 pts | 5 pts |
|---|---|---|---|---|---|
| Jameson | $100 | $200 | $300 | $400 | $500 |
| Signature | $300 | $600 | $900 | $1200 | $1500 |

**Quality Assurance**

| | Outstanding | Above Avg. | Pass | Needs Imp. | Fail |
|---|---|---|---|---|---|
| Jams/Sig | $500 | $250 | $0 | -$500 | $0 (bonus eliminated) |

**Market Metrix**

| | 3 pts Above Company Average | 3 pts Below Company Average |
|---|---|---|
| Jams/Sig | $500 | -$500 |

Jameson-2068

# Questions and Answers

Q. What if I met my adjusted GOP% budget but fail a QA?
A. You would not receive a bonus. You must pass your QA to be eligible for any bonus payout regardless of any other met or exceeded requirements.

Q. Would the prior quarters QA count against my eligibility for bonus if I had a Fail or Needs Improvement?
A. No. We will only use the most recent quarters QA, GOP%, Revenue and Market Metrix scores. You will not be penalized for the prior quarter's performance.

Q. What if I beat my revenue budget but don't hit my adjusted GOP%?
A. You would not receive a bonus. The first bonus gate you must hit is your adjusted GOP% budget. If you've done that and meet all other eligibility requirements, you may receive up to a $1,000 bonus, subject to certain possible reductions.

Q. What if I was promoted to a GM in the middle of the quarter?
A. We would "pro-rate" your bonus. You would receive a bonus based on the number of days in the GM position. As an example, let's say you were promoted on Feb 15th, and you met all your bonus requirements. The base you would receive would be $2,000/89 days (the number of days in the first quarter) x 44 days (the number of days you actually) worked in the capacity as GM for the quarter), = $989 adjusted for any other "kickers" that might apply to you. (They would also be pro-rated).

Q. Why are we changing the current bonus, it seems to be working well?
A. After a lengthy discussion with the Regional and District Managers, it was decided that we need to include revenue and some eligibility requirements as a criteria for bonus. In order to serve both the REIT (revenues) and the operator (revenues and GOP) we need to focus on both. We also wanted to add some incentives for hitting budgeted revenue goals. The total quarterly base bonus has gone up $500, but with some added liability to ensure that revenue is still a main focus. The problem with just looking at GOP% is that we can still miss the company's revenue goals by millions of dollars but still achieve our Gross Operating profit percentage. This is good but generally speaking only serves the operator reasonably well (depending on what REIT structure you're reviewing – Jameson or Signature). The REIT (which owns the hotels) really is only concerned about the operator's ability to achieve revenues.

Q. In a nutshell, what is the bonus program?
A. Here's the deal. If you hit your adjusted GOP% budget and meet all eligibility requirements, you immediately are eligible for half your bonus or $1,000. If you hit your revenue budget, you get an additional $1,000. You are automatically eligible for "kickers" once you have passed the GOP% margin gate. That is, if you pass your QA and send a minimum of 72 days of guest ledgers to Market Metrix. Missing either one of those criteria makes you automatically ineligible for any bonus regardless of your performance in other areas. If you get an Outstanding QA, your get an additional $500, an Above Average $250, a Pass $0, if you get a Needs Improvement you lose $500, if you FAIL you get nothing. If your Market Metrix scores are 3 pts or better than the company average you get $500, if they are 3 pts or more below company average you lose $500. If your budgeted adjusted GOP% margin beats plan by a full point, you get $100 for every point above plan. So, if you hit your adjusted GOP% margin, you get $1,000. If you hit your revenue goals you get $1,000. Get an Outstanding on your QA and you get another $500. Beat the company average for Market Metrix by 3 pts or more and you get another $500. Your bonus could easily be $3,000 if you do all the right things extremely well. It could even be better if you have a great revenue and GOP year. I think that sums it up. Please call your Regional or District Manager if you have any additional questions. Thanks, and good luck!!

Jameson-2069

# KITCHIN HOSPITALITY
## 2004 GM BONUS PROGRAM

Quarter Ending Date: _____ 03/31/04 _____

**Bonus Payout:**

| | |
|---|---|
| Revenues: | $0 |
| Adjusted GOP dollars: | $0 |
| Adjusted GOP %: | $0 |
| QA Kicker: | FALSE |
| TOTAL BONUS: | $0 |
| % of Time Worked/Qtr: | 100.0% |
| **BONUS PAY OUT:** | |

QA SCORE:   **AVERAGE**

| Adjusted GOP% | |
|---|---|
| Budgeted GOP% | 0.0% |
| Actual GOP% | 0.0% |
| Variance | 0.0% |
| % to Plan | 0.00% |

| Hotel: | |
|---|---|
| GM: | |
| GM Hire Date: | |
| Current Salary: | |
| Target % Payout: | 15% |
| Base $$ Amount: | $0 Annually |
| Base $$ Amount: | $0 Quarterly |

**Revenues**

| Budgeted Revenues | |
|---|---|
| Actual Revenues | |
| Variance | $0 |
| % to Plan | 0.00% |

**Adjusted GOP Revenues**

| Budgeted GOP Revenues | |
|---|---|
| Actual GOP Revenue | |
| Variance | $0 |
| % to Plan | 0.00% |

Regional Manager Authorization: _____    Date: _____

Director of Ops (Signature) Authorization: _____    Date: _____

Vice President of Operations Authorization: _____    Date: _____

Hotel Controller Authorization: _____    Date: _____

Jameson-2070

# Salaried Employees

# Salary Increases For 2004



PLAINTIFF'S
EXHIBIT

wiley 9

Jameson-2057

# MEMO

From:   Greg Winey, V. P. – Hotel Operations and Jeff Hurley, Director of Human Resources

To:     Area, District, and Regional Managers; Regional Directors and Director of Operations for Signature Inns

Subj:   Salaried Field (Hotel) Employees' Salary increase for 2004

Date:   April 2, 2004

---

This Memorandum outlines the program, parameters, guidelines, process and procedures to be followed for awarding Salaried Field (Hotel) personnel (Associates) a performance-based salary increase during calendar year 2004 ("Program").

1. Salary increases may be awarded to eligible hotel-level salaried employees (General Manager level and below), based on performance by the individual Associate during 2003, as measured and determined in accordance with the rules, procedures, requirements and guidelines set forth in this Memorandum.

2. Salary increases awarded will correlate to written evaluations of personal performance (i.e. Associate Performance Assessments) which occurred or which was achieved during the period January 31, 2003 to December 31, 2003, as explained below.

3. Salary increases may only be awarded to Associates who are salaried Head Maintenance, Executive Housekeeper, Front Desk Manager, Sales Manager, Assistant General Manager and General Manager personnel.

## ELIGIBILITY, REQUIREMENTS AND QUALIFICATIONS:

1. In order to receive an Employee Performance Assessment, the Associate must have been employed by the Company in a salaried position on or before December 31, 2003.

2. Associates hired or promoted subsequent to December 31, 2003 or who have received any salary increase subsequent to December 31, 2003 are not eligible to participate in this Program or receive a performance-based salary increase for the 2003 performance assessment period.

3. The Associate must be employed by the Company on the anticipated effective date of the salary increase, which currently has been established as May 23, 2004. No employee who has tendered or is working out any notice of resignation on that date or who has entered into any separation agreement with the Company on or before that date shall be awarded or receive any increase in salary. (It is anticipated that Associates will first see any increase in their net pay on paychecks issued on Friday, June 11, 2004. Due to administrative or other requirements or needs, the Company may in its discretion postpone the effective date of any salary increases.)

4. The Associate must not have been subject to any disciplinary action in calendar years 2003 or in 2004, up through and including the effective date of the salary increase

Jameson-2058

5. The Associate must not be under investigation for disciplinary action nor had his or her employment suspended on the effective date of the salary increase.

6. Nothing herein shall constitute any guaranty, entitlement, contract or agreement between the Company and any employee or group of employees as to a salary increase or change of compensation or as to the terms and conditions of "at will" employment. The timing, amount and any and all decisions made in regard to employee salary increases are and shall remain discretionary and at the sole and exclusive prerogative of the Company.

**PROCEDURE:**

1. Each salaried Associate eligible to receive a salary increase under this Program shall be evaluated in writing using the Employee Annual Assessment form provided by the Company and in accordance with the specific instructions for the use of the assessment form and the procedure for conducting the assessment. The Annual Assessment form is attached to this Memorandum.

2. Associates will be evaluated on their performance for the 11 month period January 31, 2003 (the date of the most recently completed performance review) through December 31, 2003 ("Performance Period").

3. Any employee who was first hired or promoted to a salaried field position in 2003 subsequent to January 31, 2003 will be evaluated only as to the time period he or she was a salaried employee.

4. Any Associate who may have held or been employed in more than one (1) salaried position during the period January 31, 2003 to December 31, 2003 shall be evaluated as to all such positions held using a single performance assessment form.

5. During the period April 5, 2004 to April 30, 2004, each General Manager will conduct an employee performance assessment as to the Performance Period for each subordinate salaried Associate assigned to his or her hotel as of April 1, 2004, including employees on FMLA or other Leave but excluding any Associate hired or promoted to a salaried position subsequent to December 31, 2003. During the same time period, each General Manager will be evaluated and assessed as to the Performance Period, as provided below.

6. General Managers who have had any salaried Associate transferred or re-assigned to his or her hotel on or after November 30, 2003 shall obtain the input and opinion of the Associate's former General Manager, to the extent reasonable or possible, prior to completing the performance assessment.

7. For those hotels without General Managers assigned as of April 1, 2004, or for hotels who have General Managers who were not assigned to that specific hotel on December 31, 2003, the Area Manager, District Manager or Regional Manager, whichever is appropriate, shall be responsible for completing the employee performance assessments as to eligible personnel that particular hotel.

8. Performance assessments as to Assistant General Managers shall be conducted by the AGM's General Manager. However, the performance assessment form shall be reviewed by and approved by the appropriate Area, District or Regional Manager as to that Assistant General Manager.

9. Performance Assessments of General Managers are the responsibility of the applicable Regional Manager or Director. A Regional Manager or Director may delegate his or her

2

responsibilities to an appropriate District or Area Manager, provided that the Regional Manager or Director shall personally review and approve all completed performance assessment reviews and evaluation forms which he or she has not personally conducted or prepared, respectively.

10. All Employee Performance Assessments and all assessment forms shall be completed on or before Friday, April 30, 2004 and shall be forwarded to the Vice President – Hotel Operations in time to be received in Atlanta not later than Friday, May 7, 2004.

**PARAMETERS AND GUIDELINES FOR SALARY INCREASES:**

1. Salary increases to be awarded will be based upon and shall correlate to an Associate's percentile ranking, as derived from the Employee Performance Assessments and numerical scores as reflected by the completed performance assessment forms after any adjustment, as provided below. Percentile rankings will be determined on a Regional basis as to each job or position classification.

2. Each Regional Manager or Director and the Vice President – Hotel Operations, upon consultation with the Director of Human Resources and the Company's executive team, in their discretion may make such adjustments to the completed performance assessments and forms, numerical scores, percentile rankings and the amount of any salary increases actually awarded or not awarded to take into consideration differences among evaluators as to assessment and scoring criteria and results and to make such other adjustments, revisions, changes and assessments as may be reasonable or appropriate to ensure that the performance evaluation process, an associate's performance assessment and any increase in salary actually awarded, if any, is, on the whole, reasonable, equitable and appropriate as to both the Company and the associate and to ensure that all salary increases to be awarded conform to the Company's parameters and financial allocation for this Program.

3. The parameters and guidelines for salary increases are as follows (after any and all adjustments, as set forth in Paragraph 2, above):

    | Percentile Ranking | Corresponding Increase |
    |---|---|
    | Top 10% | 9% of Base Salary |
    | 11 to 20% | 6% of Base Salary |
    | 21 to 35% | 4.25% of Base Salary |
    | 36 to 75% | 3.0% of Base Salary |
    | 76 to 90% | 1.0% of Base Salary |
    | Below 90% | No Salary Increase |

    *The exact amount of a salary increase, if any, as to any particular Associate cannot be determined until all adjustments have been made or implemented and all pro-rations or other calculations have been applied.*

4. The following additional pro-rations and adjustments shall be applied to the above parameters:

    A. Employees who were hired or promoted for the first time to a salaried position subsequent to January 31, 2003 and before December 31, 2003 shall have his or

3

Jameson-2060

her salary increase, if any, adjusted as follows: the dollar amount of the annual salary increase awarded shall be multiplied by a fraction (or its decimal equivalent) whose numerator shall be the number of whole months (rounded downward -- partial months shall not be considered or counted) the Associate has served as a salaried employee from the date of his or her hire or promotion to a salaried position to December 31, 2003 and whose denominator shall be 11. The resulting number shall be his or her salary increase for 2004.

B.  Associates who were employed by the Company on December 31, 2003 and who have been continually employed by the Company since that date who will otherwise receive a salary increase pursuant to this Program shall be awarded an additional salary increase equal to 1% of his or her Base Salary.

C.  It is anticipated that Associate salary increases awarded per this Memorandum will become effective on May 23, 2004 (the beginning of Pay Period PE0605) and be retroactive to April 1, 2004. The Company reserves the right to determine whether any retroactive amounts shall be paid in a lump sum, shall be prorated among the remaining pay periods in 2004, or paid under such other formula or computation as the Company in its discretion may determine.

5.  No salary increases shall be awarded or become effective as to salaried employees in any single Region until such time as ninety-five percent (95%) of all Employee Performance Assessment forms due or required from said Region have been properly completed and have been forwarded to and received by the home office in Atlanta.

6.  The terms, conditions, parameters and provisions of this Program may be revoked, amended or altered at any time in the sole discretion of the Company.

*Base Salary for the purposes of this Memorandum and Program shall be the salaried employee's base salary (i.e. salary exclusive of all bonuses, allowances, stock options, stock grants, benefits, perquisites and other discretionary payments or other compensation) as of April 1, 2004, as reflected or listed in the Company's Ceridian Source 500 Payroll System and other official Company records.

4

Jameson-2061



# KITCHIN
## HOSPITALITY, LLC

**DATE:**   5/10/2002

**TO:**   KITCHIN HOSPITALITY GENERAL MANAGER

**CC:**   CRAIG KITCHIN, TOM KITCHIN, REGIONAL MANAGER'S

**FROM:**   GREG WINEY

**RE:**   1ST QUARTER BONUS

---

Enclosed you will find a bonus check for your 1st quarter performance. I am both appreciative and proud of your accomplishments.

The hotel industry as a whole, has seen tremendous declines in Revpar and margin performance during the first quarter of this year. Your efforts, combined with your talent and resolve have proven that even despite difficult times, we can win the battle for market share and continue to optimize our results with even greater efficiencies. For this, I am very grateful to you.

I wish you and your staff the best for your continued success and look forward to an even stronger showing 2nd Quarter. Thanks Again!

GW

**PLAINTIFF'S EXHIBIT** Winey 10

5/10/2002                     Confidential                     1

Stough v Jameson In   0004
Ptlf Disc Docs



# JAMESON INN®

April 13, 2004

Letter of recommendation for James Mark Fetner, candidate for GM-AlexCity.

Mark has been with Jameson for the past three months. The first month and a half as an AGM and the past month and a half as the acting GM in AlexCity. Mark spent 1-week in Auburn and 1-week in Eufaula training before going to AlexCity and worked with the former manager in AlexCity for only a few weeks before taking over the property as acting GM.

Mark has made immediate and positive improvements to the existing staff and to the facility, and to the day to day operations of our hotel. He has been professional in his approach and has proven that he is a committed player with the talents and skills to manage this hotel. I have been impressed at how quickly he has reached a level of competency in all areas of hotel operations, including undertanding the financials.

With Mark's education, his business experience and the work ethic and professionalism demonstrated to date managing AlexCity, I am confident and strongly recommend that he be promoted to the level of General Manager as soon as possible.

Respectfully,

*Charles L. C. Woods*

Charles L. Woods
District Manager



PLAINTIFF'S
EXHIBIT

Winey 11

Slough v Jameson Inn    0143
Pltf Disc Docs



# JAMESON INN·

1360 South US Hwy 231• Ozark, AL 36360 • Tel: (334) 774-0233 • FAX: (334) 445-1900
www.jamesoninns.com
For reservations call 1-800-JAMESON (1-800-526-3766)

# FAX

April 21, 2004

**DATE:** _____

**TO:**  Phyllis Davis

**FROM:**  Charles Woods

**FAX #:**  973-461-4599

**COMPANY:** _____

**NUMBER OF PAGES INCLUDING COVER SHEET:** 2

**REMARKS:**

Phyllis-Please have Greg review and sign the PAF form on
Mark Fetner in AlexCity.
After he has approved and signed,  please hand carry to payroll so that
we can get this in on the current payroll. Linda in payroll said as long as
they have it by Tuesday 04-27 before 9:00 am. she thought they could
get it in.
I hate to ask you this, all of you were out of pocket during the week and
I am taking a PTO day Friday4-23.
Thanks so much.

*Chares*

Slough v Jameson Inn   0146
Pltf Disc Docs

**"A PERFECT STAY, EVERY TIME."** SM
Complimentary continental breakfast and USA TODAY newspaper.  Free local calls,
HBO at most locations, swimming pools. Separate fitness centers, corporate rates.

# PERSONNEL ACTION FORM
### *Confidential Employee Transaction*
## Jameson Hospitality, LLC
*(This form must be completed for all employee transactions and provided/faxed to Human Resources and Payroll)*

## BASIC INFORMATION
### *(This section must be completed)*

| | |
|---|---|
| Employee Name: JAMES MARK fetner | Inn Number/Name: 019 /Alex City, AL. |
| Social Security Number: | Department Code: 100 |
| Employee/File Number: 36836 | Effective Date of Transaction: 4-4-04 |

## REQUESTED TRANSACTION
### *(Please check all that apply)*

| ☐ New Hire/Rehire | ☐ Termination of Employment | ☒ Payroll Adjustment |
|---|---|---|
| ☐ Change of Address | ☐ Ethnic Group | ☐ Leaves of Absence |

### New Hire/Rehire

Position Title: GENERAL MANAGER

| Hire Date: | Rehire Date: |
|---|---|

Hourly Wage (non-exempt): $ _____

Annual Salary (exempt): $ _____

Car Allowance $ _____ *(per month)*

Bonus Amount $ _____

Employment Status:
☐ Full-time Regular (over 35 hours per week)
☐ Part-time Regular (less than 35 hours per week)

Supervisor's Name: Charles R. Wood

Employee Address: 100 Harbor PLACE #607
Dadeville, AL 36853

Home Phone Number: 256-749-6032

Date of Birth:

US Citizen (I-9 must be attached): ☐ Yes  ☐ No

Tax Filing: *(tax forms must be sent as back up)*
Marital Status _____ FED _____ STATE _____ LOC _____
Extra Tax $ Taken Out: FED _____ STATE _____ LOC _____

### Termination of Employment

Date of Termination *(last day worked)*:

Would you Rehire: ☐ Yes  ☐ No

Unused PTO Balance: _____
*(must have been employed at least 12 months)*

Reason for Termination:
☐ Voluntary
☐ Involuntary *(please explain below)*

### Ethnic Group *(for EEO purposes)*

☐ Black    ☐ Hispanic    ☐ White
☐ Asian/Pacific Islander ☐ American Indian/ Alaskan Native

### Payroll Adjustment

Effective Date: Payroll ending 4-24-04

New Hourly Rate (non-exempt): $ _____

New Annual Salary (exempt): $ 32 K

Percent Increase _____ %

Dollar Amount Increase $ _____

Pay Change Reason:
☒ Promotion          ☐ Full-time to Part-time
☐ Demotion           ☐ Part-time to Full-time
☐ Merit increase     ☐ Other _____

Lump Sum Payment: $ _____

Payment to be delivered on _____

Reason for Lump Sum:
☐ Bonus              ☐ Spot Award (Recognition)
☐ Severance Payment  ☐ Other _____

### Leaves of Absence

☐ Paid Leave:  From: _____ To: _____
☐ Unpaid Leave: From: _____ To: _____

Reason for Leave:
☐ Medical Leave      ☐ Military Leave
☐ FMLA               ☐ Personal Leave
☐ STD /LTD           ☐ Bereavement Leave
☐ Other _____      ☐ Jury Duty

*Note: proper documentation must be provided in order to be eligible for a leave of absence.*

Stough v Jameson Inn    0147
Pltf Disc Docs

| ✓ | 4-4-04 | | |
|---|---|---|---|
| Supervisor's Signature | Date | Human Resources Signature | Date |

2/25/00



# JAMESON INN·

1360 South US Hwy 231• Ozark, AL 36360 • Tel: (334) 774-0233 • FAX: (334) 445-1900
www.jamesoninns.com
For reservations call 1-800-JAMESON (1-800-526-3766)



April 21, 2004

**DATE:** _____

**TO:**  Linda Taylor/Brian Pierce          **FROM:**   Charles Woods

**FAX #:**    973-461-4507

**COMPANY:** _____    **NUMBER OF PAGES INCLUDING COVER SHEET:** _2_

**REMARKS:**

Brian/Linda
I am sending you a PAF form on Mark Fetner who has been promoted
from AGM to GM on our AlexCity property.
I have faxed a copy of this PAF to Phyllis Davis for Greg's approval
and signature and asked her to please deliver to your department before
9:00 am. Tuesday 04/27 as per instructions from Linda.
Thanks for your help.
Charles

Stough v Jameson Inn   0148
Plif Disc Docs

**"A PERFECT STAY, EVERY TIME."**℠
Complimentary continental breakfast and USA TODAY newspaper.  Free local calls,
HBO at most locations, swimming pools. Separate fitness centers, corporate rates.



# K·I·T·C·H·I·N
## HOSPITALITY, LLC

December 19, 2003

Letter of recommendation for James Mark Fetner, candidate for AGM-AlexCity.

Mark is a graduate of Troy State University, where he received his B.S. Degree in Business Administration with a Minor in Acounting. He has extensive Restaurant Management experience and has a working knowledge of inventory management,quality control, payroll and accounting, and profit margin achievement.

His background and experience as Administrator over a 53 unit Condominium Complex Has given him an opportunity to gain additional experience in the areas of maintenance, budgeting, bank reconciliation, and meeting property owner expectations. In addition, Mark has computer experience in excel, windows xp and assorted other computer programs.

I have interviewed Mark on two separate occasions and found him to be straight forward and extremely personable. He has expressed a strong desire to join a team where he can demonstrate his desire and abilities and earn growth opportunities in the process. He is also mobile and willing to relocate now and in the future.

Mark's former employers and references spoke of him in the highest regards and leave little doubt of his good character and of their confidence in him as an excellent person who would do an excellent job and be an asset to our Company.

In addition a background check has been completed and the results are fine for employment with Jameson Inn.

It is my recommendation that Mark Fetner be interviewed and hired for the Assistant General Manager position in AlexCity, Alabama to begin as soon as possible.

Respectfully,

*Charles Woods*
Charles Woods
District Manager



PLAINTIFF'S EXHIBIT
Winey 12

UNITED STATES DISTRICT COURT
MIDDLE DISTRIT OF ALABAMA
EASTERN DIVISION

BELINDA STOUGH,                    :
                                   :
        Plaintiff,                 :
                                   :
v.                                 :        CASE NO. 3:05cv421-W
                                   :
JAMESON INNS, a company            :
owned or operated by               :
KITCHIN HOSPITALITY, LLC,          :
                                   :
        Defendant.                 :

---

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## SECOND INTERROGATORIES

Defendant Jameson Inns ("Jameson" or "Defendant") responds to Plaintiff's Second Interrogatories as follows:

### GENERAL OBJECTIONS

1.    Defendant objects to the definitions of "identify" with respect to a person as overly broad and unduly burdensome. Defendant will provide certain identifying information within its possession for persons in the first interrogatory in which a person is identified.

2.    As discovery is in the early stages, Defendant, while having gathered certain information which appears to be related to Plaintiff's claims, has not completed its investigation related to the claims. Accordingly, these responses are

1



necessarily preliminary and may require refinement and supplementation as discovery continues.

3.   Defendant objects to providing or disclosing any information protected by the attorney-client privilege.

4.   Defendant objects to providing or disclosing any information constituting trial preparation materials or materials otherwise encompassed within the work product doctrine without and unless Plaintiff makes the requisite showing required by Rule 26 of the Federal Rules of Civil Procedure.

5.   Defendant objects to each request to the extent that it seeks to require disclosure of any confidential information.

6.   Defendant objects to each request that (i) is unreasonably cumulative or duplicative; (ii) seeks material obtainable from some other source that is more convenient, less burdensome, or less expensive; or (iii) otherwise constitutes an abuse of discovery under Rule 26(b)(1) of the Federal Rules of Civil Procedure.

Subject to the foregoing General Objections, Defendant responds to each of the following interrogatories as follows:

### INTERROGATORIES

Interrogatory No. 1:   In your response to the EEOC, you stated that "In late 2003, Respondent reviewed its compensation policies for the General Managers and Assistant General Managers

2

at all of its Jameson Inns. This review resulted in plans to implement significant increases in the base salary of many of its General Managers and Assistant General Managers, such that a 60-room Jameson Inn the range of the base salary for the General Manager was increased in most locations to $26,000 to $32,000, and for Assistant General Managers the salary range increased to $18,000 to $24,000." Please explain what prompted the defendant to conduct this review, identify (by name, job title and dates of employment) all persons involved in conducting this review and state in detail what role each person had in conducting this review and the conclusions they reached.

Response To Interrogatory No. 1: Except for promoted employees or those managers transferred to larger properties, Kitchin Hospitality General Managers experienced a pay freeze from early 2002 through April 2004 due to the long-term impact of September 11 on Jameson's earnings and business. In April 2004, the pay freeze was relaxed but in the first seven (7) months of 2004, only twelve (12) managers received pay increases. In August 2004, General Managers who had no adjustments to salary in at least a year were given three percent (3%) pay raises, plus an additional one percent (1%) based on seniority. Certain General Managers who had performed well, especially at the smaller forty (40) and sixty (60) room

3

hotels, were given an additional increase based on recommendations of District Managers and final approval by Vice President of Operations, Greg Winey.

Persons involved in deciding pay increases prior to April 2002 were the particular District and Regional Managers and Vice President of Operations, Greg Winey. Mr. Winey worked with Jameson from 1998 through February 2005 as Director of Operations and then Vice President of Operations.


Interrogatory No. 2: Please explain in detail how bonus payments to General Managers are determined and identify by name and job title all persons involved in deciding to pay bonuses to each and every employee over which VP Greg Winey had some supervisory oversight and control from 1/1/00 to the present.

Response To Interrogatory No. 2: Defendant objects to providing this information since bonuses do not constitute salary but are other "terms, conditions and privileges of employment." This claim was dismissed by the Court in its March 27, 2006 Order. Nonetheless, without waiving this objection, Defendant states that bonus payments were made to General Managers based on satisfying specific written criteria. Attached to Defendant's Response To Plaintiff's Second Request For Production are bonus programs for 2001, 2003 and 2004.

4

This 19th day of April, 2006.

IRVIN, STANFORD & KESSLER, LLP

By: _____
Gary R. Kessler
Alabama Bar No. ASB-0251-L52G
IRVIN, STANFORD & KESSLER, LLP
3060 Peachtree Road, N.W.
Suite 1050
Atlanta, Georgia 30305
404-237-1020 (office)
404-237-1047 (facsimile)
gkessler@isklaw.com
COUNSEL FOR DEFENDANT

5

UNITED STATES DISTRICT COURT
MIDDLE DISTRIT OF ALABAMA
EASTERN DIVISION

BELINDA STOUGH,                          :

      Plaintiff,                     :

                              :

v.                                       :       CASE NO. 3:05cv421-W

JAMESON INNS, a company                  :
owned or operated by                     :
KITCHIN HOSPITALITY, LLC,                :

      Defendant.                      :

## CERTIFICATE OF SERVICE

    This is to certify that I have this day served counsel for Plaintiff with a copy of the foregoing DEFENDANT'S RESPONSE TO PLAINTIFF'S SECOND INTERROGATORIES by e-mail and by depositing same in the United States Mail, adequate first-class postage affixed thereto, and addressed as follows:

    Angela J. Hill, Esq.
    139 Broadnax Street
    Dadeville, Alabama  36853
    ajhill_law@bellsouth.net

    Jon C. Goldfarb, Esq.
    Wiggins, Childs, Quinn & Pantazis, L.L.C.
    The Kress Building
    301 19th Street North
    Birmingham, Alabama 35203
    jgoldfarb@wcqp.com

    This 19th day of April, 2006.

                                          Gary R. Kessler

6

# Kitchin Hospitality, LLC

Steven A. Curlee

Vice President - Legal and General Counsel

◆ 8 Perimeter Center East, Suite 8050 ◆ Atlanta, GA 30346-1604 ◆ (770) 901-9020 ◆ FAX (770) 901-9203 ◆

◆ [illegible email] ◆

**Via Facsimile & First-Class Mail**

Ron Lyas
Investigator
Equal Employment Opportunity Commission
Birmingham District Office
1130 22nd Street, South
Birmingham, AL 35205

|       |                    |                                                                              |
|-------|--------------------|------------------------------------------------------------------------------|
| Re:   | Charging Party:    | Belinda Stough                                                               |
|       | Respondent:        | Kitchin Hospitality, LLC d/b/a Jameson Inn, Alexander City, Alabama         |
|       | Charge No.:        | 130 2004 03980                                                               |
|       | Date of Charge:    | August 18, 2004                                                              |

Dear Mr. Burris:

This letter constitutes the Respondent's Statement of Position to the Charge of Discrimination made by Ms. Belinda Stough ("Ms. Stough" or "Complainant") as to alleged discrimination based upon her gender (female). As explained below, Kitchin Hospitality, LLC, is the proper Respondent who should have been named in the above referenced matter. As shown by the facts presented and discussed below, it is the position of the Respondent that the Complainant was not treated in a discriminatory or disparate manner on the basis of her gender. As clearly shown by the facts, Respondent's compensation decisions were not discriminatory and were based on valid, reasonable criteria. For the reasons stated below, the Charges of Discrimination filed by the Complainant with the Commission should be dismissed or administratively closed.

## THE RESPONDENT'S BUSINESS AND WORKPLACE

The respondent named in the Charge of Discrimination, Jameson Inn® is not a legal entity but a registered trademark used as a brand name. The Jameson Inn Inn® hotel, 4335 Highway 280, Alexander City, Alabama ("Hotel"), is a limited service hotel and a unit of the Jameson Inn® hotels division of Kitchin Hospitality, LLC, a subsidiary of Atlanta, Georgia based Jameson Inns, Inc. There are 96 hotels leased and operated by Kitchin Hospitality, LLC under the Jameson Inns® brand name, most of which are located in the Southeast. The Hotel is managed by a general manager who reports to a district manager and a regional manager. All management personnel, supervisors, and hotel staff at the Hotel were, at the time of the alleged incidents complained of, employees of Kitchin Hospitality, LLC. All non-management hotel staff hiring, promotion, job assignment or termination decisions and actions for the Hotel, except in extraordinary circumstances, are made by the Hotel's general manager.

PLAINTIFF'S EXHIBIT

Wines 15

Mr. Ron Lyas
December 1, 2004
Page 2

## THE CIRCUMSTANCES REGARDING THE COMPLAINING PARTY'S COMPENSATION

Complainant began her employment as a Front Desk Associate at the Hotel on May 10, 2000 and her employment was terminated on or about February 18, 2004. She was hired by former General Manager, William Plummer (male), and was paid on an hourly basis at the rate of $5.75 per hour. Her hourly rate was later increased to $6.50. Mr. Plummer was subsequently transferred to another Jameson Inn, and in August 2000 Complainant was promoted to General Manager of the Hotel by Charles Woods, the District Manager who supervised the district that included the Hotel. Upon promotion to General Manager, Complainant was paid an annual salary of $21,000.00 and was eligible to receive performance based bonuses. The decision to terminate Ms. Stough's employment at the Hotel was made by Mr. Woods.

During her tenure as General Manager of the Hotel, Complainant's work performance was not satisfactory on several occasions. She was given a written reprimand on June 17, 2003 (Exhibit A) for excessive absenteeism and for not notifying Mr. Woods of her absences. She was also given a reprimand on that same day for the Hotel having received its second consecutive poor score on a quality assurance inspection (Exhibit B). On December 29, 2003, Mr. Woods wrote another corrective action notice to Complainant (Exhibit C) regarding poor scores on subsequent quality assurance inspections and inadequate training at the Hotel, both of which are the responsibility of the General Manager.

By December 2003, it was apparent that the Hotel was not being properly managed and that additional management skills were needed for the Hotel. Mr. Woods began searching for a candidate for the Assistant General Manager position at the Hotel who could improve the management strength of the hotel. In January 2004, Mr. James Mark Fetner was hired as an Assistant General Manager at the Alexander City Jameson Inn to assist in improving the operation and management of that hotel, and ultimately to serve as a General Manager of a Jameson Inn. Based on Mr. Fetner's employment experience and the fact that he had a college degree, Mr. Fetner was given a salary equal to Complainant's salary at the time. He was not, however, eligible to participate in the bonus plan provided for General Managers.

In late 2003, Respondent reviewed its compensation policies for the General Managers and Assistant General Managers at all of its Jameson Inns. This review resulted in plans to implement significant increases in the base salary of many of its General Managers and Assistant General Managers, such that at a 60-room Jameson Inn the range of the base salary for the General Manager was increased in most locations to $26,000 to $32,000, and for Assistant General Managers the salary range was increased to $18,000 to $24,000. The salary paid to any particular General Manager depended upon the hotel location, the tenure of the General Manager and the education and overall experience of the General Manager. Gender was not a factor. In fact, most of the Respondent's General Managers are female. In reviewing the compensation paid to Complainant, a decision was made not to adjust her salary due to her lack of experience and the poor management

Mr. Ron Lyas
December 1, 2004
Page 3

results observed at the Hotel. When Mr. Fetner was hired as Assistant General Manager for the Hotel, he was paid a salary that was within the range being paid to other newly hired Assistant General Managers.

On February 3, 2004, Mr. Woods had a conversation with Complainant regarding deficiencies previously noted in the management and condition of the hotel and performance standards she needed to meet. He sent her an email three days later to remind her of the actions she needed to take. On February 18, 2004, Mr. Wood decided to terminate Ms. Stough's employment based on her inability to manage the Hotel properly and the failure by the hotel of its quality assurance inspection that day. This was the forth time the hotel received a below average grade on an inspection since December 2003.

## ANALYSIS AND DISCUSSION

The facts surrounding the series of events clearly show that there is no evidence of discrimination in compensation based on Complainant's gender, and no evidence is cited by Complainant in support of her allegation. Complainant experienced performance deficiencies soon after her promotion to General Manager. In light of her apparent inability to handle the responsibilities of the position, Respondent had no intention of increasing her compensation. When the decision was made to strengthen the management team for the Hotel, Respondent hired an individual who was more qualified, better educated and more experienced than Respondent.

## CONCLUSION

For the reasons stated above, there is no evidence of any discrimination in compensating Complainant. This is a case of poor job performance and Complainant's failure to properly manage the Hotel under he supervision. While other General Managers at similar Jameson Inns were paid more than Complainant, a valid business decision was the reason for that disparity, not her gender. Respondent's reasons for paying Mr. Fetner the same salary it paid Complainant was also based on valid business reasons. Complainant's poor job performance resulted in her salary level being maintained at a constant level. Her poor performance did not require Respondent to refrain from adhering to its new compensation policy when hiring new employees such as Mr. Fetner. Based on the foregoing, Kitchin respectfully requests that the Charge of Discrimination filed against it by Complainant be dismissed as not being based on good cause. Please call me if I can provide you with any additional information.

Very truly yours,

Steven A. Curlee

SAC:sc

### JAMESON INNS
### CHARLES WOODS' DISTRICT: GENERAL MANAGERS'
### AND ASSISTANT GENERAL MANAGERS' SALARIES
### July 1, 2000 – December 31, 2005

**Auburn:** (0050)

James Goodman (GM)

| | |
|---|---|
| 01/06/2003 – 07/31/2004 | $30,000 |
| 08/01/2004 – 02/24/2005 | 31,000 |
| 02/25/2005 – | 33,500 |

**Eufala:** (0033)

Betty Sutton (GM)

| | |
|---|---|
| 04/01/2000 – 06/30/2001 | $28,000 |
| 07/01/2001 – 07/31/2004 | 30,000 |
| 08/01/2004 – 12/03/2005 | 32,700 |
| 12/04/2005 – | 34,450 |

**Greenville:** (0039)

Ezena Ellis (GM)

| | |
|---|---|
| 04/01/2000 – 08/21/2000 | $24,000 |
| 08/22/2000 – 07/31/2004 | 27,000 |
| 08/02/2004 – 10/12/2005 | 28,500 |

**Alexander City:** (0019)

Belinda Stough (GM)

| | |
|---|---|
| 08/01/2000 – 02/18/2004 | $21,000 |

Mark Fetner

| | |
|---|---|
| 01/19/2004 – 04/11/2004 (AGM) | $21,000 |
| 04/12/2004 – 10/02/2005 (GM) | 32,000 |
| 10/03/2005 (GM) | 40,000 |

Robbie Patterson

| | |
|---|---|
| 06/05/2005 – 10/02/2005 (AGM) | $8.51/hour |
| 10/03/2005 – (GM) | $30,000 |

**Ozark:** (0022)

Charles Woods (District Manager)
Joy Knodel (GM)

| | |
|---|---|
| 07/11/2005 – | $30,000 |



PLAINTIFF'S
EXHIBIT

Winfrey 16