# Exhibit 4:
# Deposition of Mark Fetner and
# Certain Attached Exhibits

0001

 1

     IN THE UNITED STATES DISTRICT COURT

 2        MIDDLE DISTRICT OF ALABAMA

           EASTERN DIVISION

 3

     CIVIL ACTION NO.: 3:05-CV-421-W

 4

 5  BELINDA STOUGH,

 6        Plaintiff,

 7  vs.

 8  JAMESON INNS, A COMPANY OWNED AND

   OPERATED BY KITCHIN HOSPITALITY,

9   L.L.C.,

10          Defendant.

11

12          DEPOSITION OF: JAMES M. FETNER

2:30 P.M.

APRIL 21, 2006

14

15      In accordance with Rule 5(d) of The

16   Alabama Rules of Civil Procedure, as

17   Amended, effective May 15, 1988, I, Cindy

18   C. Goldman, am hereby delivering to

19   Mr. Jon C. Goldfarb the original

20   transcript of the oral testimony

taken on

21   the 21st day of April, 2005, along with

22   exhibits.

23

0002

 1        S T I P U L A T I O N S

 2      IT IS STIPULATED AND AGREED by and

 3   between the parties through their

 4   respective counsel that the deposition of

 5   James M. Fetner, a witness in the

 6   above-entitled cause may be taken before

 7   Cindy C. Goldman, a Court Reporter and

 8   Notary Public for the State of

Alabama,

 9   at 3060 Peachtree Road, Suite 1050,

10   Atlanta, Georgia, on the 21st day of

11   April, 2006, commencing at 2:30 p.m.,

12   pursuant to the Alabama Rules of Civil

13   Procedure.

14

15

16      IT IS FURTHER STIPULATED AND AGREED

17   that the signature to and the reading of

18   the deposition by the witness is waived,

19   the deposition to have the same force and
20   effect as if full compliance had been had
21   with all laws and rules of court relating
22   to the taking of the depositions.
23
0003
 1
 2
 3
 4        S T I P U L A T I O N S
 5           (continued)
 6
 7     IT IS FURTHER STIPULATED AND AGREED
 8   that it shall not be necessary for

any

 9   objections to be made by counsel to any

10   questions except as to form or leading

11   questions, and that counsel for the

12   parties may make objections and assign

13   grounds at the time of trial or at the

14   time said deposition is offered in

15   evidence or prior thereto.

16

17    IT IS FURTHER STIPULATED AND AGREED

18   that the notice of filing of the

19   deposition is waived.

20

21

22

23

0004

1         A P P E A R A N C E S

2

   Appearing On Behalf Of The Plaintiff:

3      WIGGINS, CHILDS, QUINN

      & PANTAZIS

4     Mr. Jon C. Goldfarb

      420 20th Street North

5     Suite 1400

      Birmingham, Alabama 35203-3204

6

7  Appearing On Behalf Of The

Defendant:

     IRVIN, STANFORD &
KESSLER, L.L.P.

8     Gary R. Kessler

     Ann Hale Smith

9     One Buckhead Plaza

     3060 Peachtree Road

10     Suite 1050

     Atlanta, Georgia 30305

11

12  Reported By:

     Cindy C. Goldman

13     Freedom Court Reporting

     367 Valley Avenue

14     Birmingham, Alabama
35209

15

16

17

18

19

20

21

22

23

0005

1                    I N D E X

2

3    Witness:                    Page

4

5    Examination by Mr. Goldfarb..........6

6    Reporter's Certificate...............177

7

8              E X H I B I T S

9

10              PLAINTIFF'S EXHIBITS

11                         Page

12  Exhibit No. 19......................40

13  Exhibit No. 20......................43

14  Exhibit No. 21......................63

15  Exhibit No. 22......................118

16  Exhibit No. 23......................121

17  Exhibit No. 24......................122

18  Exhibit No. 25......................122

19  Exhibit No. 26......................128

20

21

22

23

0006

 1           I, Cindy C. Goldman, a
Court

 2   Reporter and Notary Public for the

State

3   of Alabama, acting as Commissioner,

4   certify that there came before me at 3060

5   Peachtree Road, Suite 1050, Atlanta,

6   Georgia, on April 21, 2006, beginning at

7   2:30 p.m., James M. Fetner, a witness in

8   the above cause, for oral examination,

9   whereupon the following proceedings were

10   had:

11

12              JAMES M. FETNER

13   Having been first duly (affirmed) sworn,

14        testified as follows:

15         COURT REPORTER: Usual

16   Stipulations?

17

18   EXAMINATION BY MR. GOLDFARB:

19      Q.   State your name, please.

20      A.   James Mark Fetner.

21      Q.   What's your home address?

22      A.   My permanent residence is 100

23   Harbor Place, Unit 607, Dadeville, 0007

 1   Alabama.  But I do have a place

here in

2   Atlanta too.

3       Q.   Okay.  So, your home is

4   Dadeville still?

5       A.   Legal residence, yes, sir.
I've

6   not actually transferred here to
Atlanta

7   because I've transferred my
position.

8   But I've got roommates here, and
I'm

9   living with roommates here in
Atlanta.

10      Q.   So, you still have a house
in

11   Dadeville?

12      A.   I have a condo that my

parents

13   own that my grandmother lives in, but

14   that's where I get all my mail and for my

15   car's title and all that stuff.

16      Q.   All in Dadeville?

17      A.   Yes, sir.

18      Q.   And then you're staying here

19   temporarily?

20      A.   Until I get my own place, yes,

21   sir.

22      Q.   Okay.  Where do you live in

23   Atlanta?

0008

1     A.   623 Ivy Park Lane in Norcross,

2   Georgia.

3     Q.   Do you go home with some

4   frequency to Dadeville?

5     A.   Periodically, yes, sir.

6         MR. KESSLER:  Wait until he

7   finishes his question.

8         THE WITNESS:  Oh, I'm sorry.

9     Q.   (By Mr. Goldfarb) Where were you

10   raised?

11     A.   In -- I was born in Atlanta,

12   Georgia.  When I was in second grade, we

13   moved to Lanett, Alabama.  I was

raised

14   in Lanett, Alabama.  And then when I

15   graduated high school and attended

16   Southern Union and Troy, I moved around

17   as any young person would.  And then I

18   ended up back in Dadeville, Alabama where

19   my parents are, helping run their

20   business.

21      Q.   What is your parent's names?

22      A.   Judy and Sammy Richardson.

23      Q.   And they still live

Dadeville?

0009

1    A.   Yes, sir.

2    Q.   What year did you graduate high

3   school?

4    A.   '82.

5    Q.   And when you graduated -- me

6   too.  When you graduated high school in

7   '82, what did you do?

8    A.   Went to work at Kroger, and went

9   to school at Southern Union in Wadley.

10    Q.   In Wadley?

11    A.   Uh-huh (affirmative).

12    Q.   Yes?  You need to say yes.

13    A.   Okay.  Yes.

14    Q.   Wadley.  And then where did you

15   go?

16    A.   Finished up approximately two

17   years there and then started taking

18   classes at Troy State in Phenix City.

19    Q.   They have a campus in Phenix

20   City?

21    A.   Yes, sir.

22    Q.   Did you get a degree?

23    A.   No, sir.

0010

 1    Q.   Did you go to the big Troy

2   State?

3      A.   No, sir.

4      Q.   Okay.  How many years did you go

5   to college?

6      A.   Roughly, on and off five years.

7      Q.   How far are you from getting a

8   degree?

9      A.   Probably a year, year and a

10  half.

11     Q.   What were you studying?

12     A.   Accounting.

13     Q.   And it was at Troy State that

14  you last went to college?

15     A.   Yes, sir.

16    Q.   In Phenix City?

17    A.   Yes, sir.

18     Q.   Where is that campus in Phenix

19  City?

20     A.   It's off of 43, going toward

21  Eufaula.

22    Q.   Just south of the city?

23    A.   Uh-huh (affirmative).

0011

 1    Q.   Okay.  Yes?

 2    A.   Yes.  I'm sorry.

 3    Q.   That's all right.  I'll remind

 4  you.  While you were in school, you were

 5  working, though; right?

 6    A.   Yes, sir.

 7    Q.   Where did you work?  You

told me

8   about Kroger.  Where else did you work?

9     A.  I worked at Kroger.  I worked at

10   Krystal.  I worked at Wendy's.  I worked

11   at -- the major jobs were King Ford

12   Lincoln Mercury Chrysler Plymouth Dodge.

13   I was a bookkeeper for them.  It's an

14   automobile dealership.

15     Q.  Where is that located?

16     A.  It's in Valley, Alabama.

17     Q.  Is King the owner?

18     A.  Yes, sir.

19     Q.   It's still there, isn't it?

20     A.   Yes, sir.

21     Q.   What years did you work in

22   Valley at the King Ford as a bookkeeper?

23     A.   Probably '83 through '86.  I

0012

 1   worked for them -- I actually worked for

 2   them and then went and took another job

 3   and then went back to work for them.

 4     Q.   Okay.  Where did you work in

 5   between?

 6     A.   Sim's Metal Works.

7    Q.  Where is that?

8    A.  It's in the Valley too.  And

9  it's no longer in business.

10    Q.  What did you do at Sim's?

11    A.  Accountant, office manager.

12    Q.  How long were you there?

13    A.  Probably it would be right at a

14  year because it was a family business,

15  and they closed down.

16    Q.  And then you went back to King?

17    A.  Yes, sir.

18    Q.  As a bookkeeper?

19    A.  Yes, sir.

20    Q.  And that was after, I guess,

'87

21   or '88?

22      A.   Thereabouts, yes, sir.

23      Q.   And how long were you at King

0013

1   the second time?

2      A.   Until I left there and went to

3   Cagle's.  And I'm not sure when I started

4   Cagle's.

5      Q.   What's Cagle's?

6      A.   Cagle's chicken processing

7   plant.

8      Q.   What did you do there?

9      A.   I was in accounting.

10      Q.   Where is that located?

11      A.   It's in Pine Mountain
Valley.

12      Q.   I'm sorry, what?

13      A.   Pine Mountain Valley,
Georgia.

14   And then I transferred with them
to

15   Macon, Georgia.

16      Q.   Do they have a plant in
Pine

17   Mountain Valley?

18      A.   Yes, sir.

19      Q.   And they have another
plant in

20   Macon, Georgia?

21      A.   Yes, sir.

22      Q.   And you weren't working
with the

23   chickens, you were doing accounting;

0014

 1   right?

 2      A.   Yes, sir.

 3      Q.   Then what did you do after --

 4      A.   I left there in '93.  I was

 5   there until May of '93, and I went to

 6   work for my family back in Dadeville,

 7   Alabama.

 8      Q.   So, May of '93 was your last day

 9   at Cagle's?

10      A.   Yes, sir.

11      Q.   What was your first day

12   approximately?

13      A.   I was there probably right at a

14   year and a half to two years.

15      Q.   So, '91ish?

16      A.   Yes, sir.

17      Q.   And what's the family business?

18      A.   It's a restaurant and bar on

19   Lake Martin.

20      Q.   What's that?

21      A.   And Judy's Stagecoach and Sam's

22   Saloon.

23      Q.   Is that still there?

0015

 1      A.   Yes, sir.

 2      Q.   And that's owned by your

 3   parents?

 4      A.   Yes, sir.

 5      Q.   How long did you work there when

 6   you went back?

 7      A.   Ten years.  While I was with

 8   them, I worked other jobs too.

 9      Q.   Okay.  What would you --

10   bookkeeping and other things at Judy's?

11      A.   I did bookkeeping.  I did

12   everything.  I waited tables, bar tended,

13   did whatever I needed to do to help make

14   the business run.  Got everything ready

15   for the bookkeeper, the actual
book --
16   CPA at the end of the month.
17      Q.   '93 to '03?
18      A.   Yes, sir.
19      Q.   And where else did you
work
20   during that time period?
21      A.   During that time period, I
22   was --
23         MR. KESSLER:  Wait until
he
0016
 1   finishes his question.  It's hard for
 2   Cindy to take it down.
 3         THE WITNESS:  Okay.
 4      Q.   (By Mr. Goldfarb) Go
ahead.

5      A.   During that time, I also was
6    administrator of Villas on the Harbor
7    Homeowner's Association.
8      Q.   Where is that?
9      A.   It's -- at that time, we had our
10   office in my house.
11      Q.   Oh, was this family owned?
12      A.   No, sir.  It's a condominium
13    association.  It's there at Lake Martin
14   at Still Waters.
15      Q.   What did you do for them?
16      A.   I did all of their billing for
17   their homeowners, collections for

their

18   homeowners.  I did their financial

19   statements, bank reconciliations. I also

20   oversaw the maintenance of the

21   condominium complex, the grounds, and

22   pool.  I negotiated contracts with

23   contractors to do repair work.  I did

0017

 1   basically everything.

 2      Q.   How many condos?

 3      A.   53.

 4      Q.   And what's the location of them?

 5      A.   They're located inside of Still

6    Waters.

7        Q.    Is there an office?

8        A.    I don't know where it is now,

9    sir.

10        Q.    Is it in Alabama?

11        A.    Yes, sir.

12        Q.    Where in Alabama?

13        A.    In Dadeville, Alabama.

14        Q.    Okay.  The Condominium

15    Association is in Dadeville?

16        A.    Yes, sir.

17        Q.    You're no longer in it?

18        A.    No, sir.

19        Q.    Did you own a condo in that

20    area?

21        A.    At that time, yes, sir.

22      Q.   Did you get paid for that work?

23      A.   Yes, sir.

0018

1      Q.   How did you get paid?

2      A.   I got paid -- it was a contract

3   labor.  I got paid once a month.  It

4   started out at like $800, and then I

5   ended up getting like $1000 a month.  And

6   I worked for several different change of

7   boards.  They had five-member boards that

8   were made up of homeowners, and it

9   changed several times because I

did that

10   job for approximately six years.

11      Q.   Who were the board members when

12   you left?

13      A.   There was Gary Crumpton, a Susan

14   Oliver, John Bargerhuff.

15      Q.   How do you say his last name

16   again?

17      A.   Bargerhuff.

18      Q.   B-a-r-g-e-r --

19      A.   I'm not sure how to spell it,

20   sir.

21      Q.   Okay.  Susan who again?

22      A.   Oliver.

23      Q.   Go ahead.  I'm sorry.

0019

 1      A.   John Alexander.  And I'm not

 2   sure who the other one was at that time.

 3      Q.   And these people were living in

 4   the condos?

 5      A.   Some of them didn't, no, sir.

 6   It was not a rule that you had to live

 7   there.  The majority of them did or

 8   either owned a condo there.

 9      Q.   And this was a group of people

10   that owned condos, and you would

11   handle -- you handled a lot of the

12   business for them?

13      A.   Yes, sir.

14      Q.   And you owned your own condo?

15      A.   Yes, sir.

16      Q.   Do you still own a condo there?

17      A.   No, sir.  It's deeded into my

18   parent's name.

19      Q.   Is there a lake or something

20   there?

21      A.   Yes, sir.

22      Q.   Are they on the lake?

23      A.   Some of them are.  There's

0020

 1   approximately -- it's two groups. One

 2   group is on the lake, and the other

group

 3   is -- there are five buildings that are

 4   not on the lake, but they're right across

 5   the street.

 6      Q.   Okay.  And you did that from

 7   when to when?  You said six years.

 8      A.   Approximately six years during

 9   that time.

10      Q.   Do you know when?  '93 to --

11      A.   I was still there at like

12   2000 -- towards the end of 2002, the

13   beginning of 2003.  When I actually left,

14   I moved away from Dadeville.

15      Q.   Why did you leave Cagle's?

16      A.   Because my family opened a

17   family business, and I was the only

18   sibling that was not married at the time.

19   And the business took off a lot faster

20   than they had anticipated.  And they

21   called -- my mother made a phone call to

22   me and asked me, you know, if I

would

23   come back and help them with the family

0021

 1   business.  And I thought about it, and I

 2   said yes.

 3      Q.   Is that spelled K-a-g --

 4      A.   C-a-g-l-e, apostrophe, S.

 5      Q.   Okay.  Do you know if Cagle's is

 6   still in existence?

 7      A.   To my knowledge, they are, yes.

 8      Q.   Do you know if -- is it still

 9   called Villas on the Harbor Homeowner's

10   Association?

11      A.   I believe it is, yes, sir.

12      Q.   And that's -- you think it's in

13   Dadeville?

14      A.   I don't know where their offices

15   are.  When I was doing the independent

16   contracting, and after I gave it up, they

17   went to an accounting firm that took over

18   everything, and it has changed hands

19   several times since then.

20      Q.   What accounting firm did it go

21   to then?

22      A.   I'm not sure.

23      Q.   Why did you stop working for

0022

 1   builders --

 2      A.   It was a mutual agreement

 3   between -- it got to be where it was too

 4   much, and it was a mutual agreement

 5   between me and some of the board members

 6   that I step down and let them take it

 7   over.

 8      Q.   Did they want you to step down?

 9      A.   There was one in particular

that

10   was wanting me to step down.

11      Q.   Who was that?

12      A.   Gary Crumpton.

13      Q.   Is that a lawyer, do you

know?

14      A.   No, sir.

15      Q.   He lives down there, this

Gary

16   Crumpton?

17      A.   He -- at the time, he had a

18   condo there.  I'm not sure where

he is

19   now, sir.

20      Q.   You don't know if he lives

in

21   Birmingham, do you?

22      A.   I think he did at one time.

23     Q.   Yeah.  I think I know who that

0023

 1   is.  Did you not get along with Gary?

 2     A.   No, sir.

 3     Q.   Do you know where he lives now?

 4     A.   No, sir.

 5     Q.   Have you talked to him since you

 6   left there?

 7     A.   No, sir.

 8     Q.   Any other people wanted you to

 9   step down other than Gary?

10     A.   No, sir.  As a matter of fact,

11   there was -- most of the homeowners

12   wanted me to stay.  But it was just too

13   much on me.  I was working too many jobs,

14   and I was in the process of trying to

15   leave Dadeville and move to Dalton,

16   Georgia.

17       Q.   Okay.  Did you do that?

18       A.   Yes, sir.

19       Q.   Why did you go to Dalton?

20       A.   Because I met someone and got

21   involved with them and moved in with them

22   in Dalton, Georgia.

23       Q.   Is that where you are now?

0024

 1      A.   No, sir.

 2      Q.   Okay.  Where is Dalton, Georgia?

 3      A.   It's north of the city almost on

 4   the Tennessee line.

 5      Q.   Okay.  When you went to Dalton,

 6   what did you do?

 7      A.   I went to work for the -- well,

 8   it was an account temp service.  But I

 9   went to work for the Dalton -- not the

10   Dalton -- I'm sorry.  The Chattanooga

11   Housing Authority as an accounting

12   person.

13      Q.   Okay.  How long were you there?

14      A.   Right at a year.

15      Q.   I mean, not in Dalton.  You were

16   in Dalton a year?

17      A.   I lived in Dalton and worked in

18   Chattanooga.

19      Q.   Right.  When I say "how long

20   were you there," were you answering how

21   long you were in Dalton or how long you

22   were working --

23      A.   Roughly -- both.  Right at a

0025

 1   year.

 2      Q.   Okay.  So, you worked at the

 3   Chattanooga Housing Authority through a

 4   temp service for about a year?

 5      A.   Yes, sir.

 6      Q.   But you lived in Georgia?

 7      A.   Yes, sir.  The accounting firm

 8   was Robert Half Accounting Services.  I

 9   think they've got a branch in

Birmingham

10   too.

11      Q.   H-a-l-f?

12      A.   Yes, sir.

13      Q.   Robert Half Accounting Service?

14      A.   I believe that's the name of it.

15      Q.   And that was -- and you worked

16   for that accounting firm?

17      A.   Yes, sir.

18      Q.   Were you temping for them?

19      A.   Yes, sir, but I was assigned to

20   the Chattanooga Housing Authority.

21      Q.   Okay.  Is that a temp
agency?
22      A.   Yes, sir.  It's an accounting
23   temp agency.
0026
 1      Q.   Okay.  What did you do for
the
 2   housing authority?
 3      A.   I actually reconciled -- they
 4   had several projects going on in
the
 5   Chattanooga Housing Authority.
And I
 6   actually reconciled bank
statements for
 7   them and collected some of their
late
 8   payments and things of that nature.

 9     Q.   Robert Half International, Inc.,

10   does that sound like the name?

11     A.   It sounds like it, yes, sir.

12     Q.   Okay.  What's your Social

13   Security number?

14     A.   ███████████.

15     Q.   ████████; right?

16     A.   █████████

17     Q.   Okay.

18        MR. KESSLER:  I assume you'll

19   keep that confidential.

20        MR. GOLDFARB:  Yeah.  I mean,

21   they just --

22     Q.   This company -- this is not an

23   exhibit.  But I was trying -- we sent

0027

 1   them a subpoena.  And they've got the

 2   wrong social.  And that's probably why

 3   you didn't show up on this.

 4      A.   That's not my Social Security

 5   number.

 6      Q.   Right.  I figured that out when

 7   I asked you.  But this is the company you

 8   worked for?

 9      A.   I'm almost positive that's it.

10      Q.   Okay.

11      A.   That's who my check stubs were

12   from.

13      Q.   But you spent your time at the

14   Chattanooga Housing Authority dealing

15   with all those kind of housing authority

16   issues?

17      A.   Yes, sir.

18      Q.   How did you like that?

19      A.   I liked it.  I mean, every job

20   I've ever had dealt with accounting.  I

21   like numbers, and I like working with

22   numbers.

23      Q.   What was your duties for them,

0028

 1   just trying to fix their books?

 2      A.   I was actually overflow help.  I

 3   call it overflow help.  They had other

 4   people in their office that had been with

 5   them forever, and it had gotten too much

 6   for them to handle, and I helped each

 7   individual one.  If this one needed me to

 8   help them reconcile this account, I

would

9   take it and help them reconcile that

10   account.  I did miscellaneous things.  I

11   didn't have a, per se, this is your job.

12       Q.   All right.  So you did all kind

13   of accounting work; is that fair?

14       A.   Yes, sir.

15       Q.   Anything other than accounting

16   work?

17       A.   Collections.  I mean, I took

18   payments from some of the tenants on

19   their rent, you know, Government

20   subsidized programs and stuff like

that.

21     Q.   Right.  You worked with the

22   books?

23     A.   Yes, sir.

0029

 1     Q.   All right.  How many tenants

 2   were there, do you know?

 3     A.   I wouldn't even want to guess.

 4     Q.   That wasn't your duty --

 5     A.   No.

 6     Q.   -- as far as -- you just worked

 7   with the payments?

 8     A.   No, sir.  I worked with the

 9   books.

10     Q.   Why did you leave there?

11     A.   Things did not work out with me

12   and the person I was living with, and I

13   just thought it was best to leave and go

14   back home.

15     Q.   And you went back to Dadeville?

16     A.   Yes, sir.

17     Q.   All right.  When you went back

18   to Dadeville, what did you do?

19     A.   I went to work at Kudzu & the

20   Game in Phenix City, Alabama.  It was an

21   athletic apparel place.  And I did work

22   for them also through a temp agency.

23     Q.   Doing the books again?

0030

1     A.   Yes, sir.

2     Q.   What is that place?

3     A.   What is it?

4     Q.   Yeah.  What do they do? Do they

5   sell --

6     A.   Athletic apparel.

7     Q.   Is it a retail store?

8     A.   No, sir.  It's their main

9   office.  It's their corporate offices.

10   And they actually sell -- have salesmen

11   that sell to colleges, retail stores, and

12   stuff like that.  And I worked in the

13   accounting area where we actually

14   collected money, did the accounts

15   receivable for -- like, this salesman had

16   sold business to this college bookstore.

17   You know, we did all that stuff.  They

18   had all the licensing and logos there and

19   all that stuff too.

20      Q.   Do they make clothes there?

21      A.   No, sir.  It's just a

22   distribution center.

23      Q.   Okay.  So, you worked at the

0031

1   distribution center for Kudzu?

2      A.   Right.  Well, it was their home

3   office, but it was the distribution

4   center.  The clothes, I believe, are made

5   in China.

6      Q.   And they would get it --

7      A.   Yes, sir.

8      Q.   -- and salesmen would sell it to

9   colleges and places like that?

10      A.   Yes, sir.

11      Q.   And you did the

bookkeeping

12   again?

13      A.   There was -- there was probably

14   ten of us that worked back there.

15      Q.   Okay.

16      A.   I specialized in the bank

17   deposits and the collections of some of

18   the past due accounts, accounts

19   receivable.

20      Q.   Bookkeeping work?

21      A.   Yes, sir.

22      Q.   Where did you go after that?

23      A.   I was with them and was at the

0032

1   same time, applying for jobs online, and

2   I applied for a hospitality job. And

3   that's when I applied for the job -- the

4   Jameson Inn job.  And I started

5   interviewing with them, and that's where

6   I've been ever since.

7     Q.   Have you ever been in a

8   deposition before like this?

9     A.   No, sir.

10     Q.   Have you ever testified under

11   oath?

12     A.   No, sir.

13     Q.   Been convicted of

anything?

14    A.  No, sir.

15    Q.  So, Judy's Stagecoach is your

16  folk's restaurant?

17    A.  Yes, sir.

18    Q.  And you told me that you did the

19  waiting, and you did the -- whatever you

20  needed to do there?

21    A.  Yes, sir.

22    Q.  And the Villas on the Harbor,

23  you did the bookkeeping, and you kept up

0033

 1  with the money transactions for

this
2   50-something condo --
3       A.   Yes, sir, 53.
4       Q.   -- place?  Okay.  And Cagle's,
5   you did bookkeeping?
6       A.   Yes, sir.
7       Q.   And these other places, Kroger
8   and Krystal and Wendy's, did you do
9   bookkeeping there?
10       A.   To be honest with you, those
11   were jobs when I was young.
12       Q.   Right.  So, a bagger?
13       A.   I bagged groceries at Kroger and

14   worked in the seafood department.

15   Wendy's and all them, I was like counter

16   help when I was young.

17      Q.   Krystal and Wendy's?

18      A.   Yes, sir.

19      Q.   All right.  And at King Ford,

20   you did bookkeeping?

21      A.   Yes, sir.

22      Q.   And at Sim's Metal, you did

23   bookkeeping?

0034

 1      A.   Yes, sir.

 2      Q.   And at Cagle's when you went

3   back, you did bookkeeping?

4       A.   Yes, sir.

5       Q.   Did you supervise anybody at

6   Villas on the Harbor?  Did anybody work

7   for you?

8       A.   They didn't work for me.  I

9   mean, like if the pool -- I would find

10  somebody to clean the pool, and they

11  would clean the pool, and I would make

12  sure it got done.

13      Q.   Okay.  You'd hire a contractor

14  to come clean it?

15     A.   Right, yes, sir.

16     Q.   You had your pool cleaners, and

17   they would come and clean the pool?

18     A.   Yes, sir.

19     Q.   And at Cagle's -- when you were

20   a bookkeeper at Cagle's, did you

21   supervise anyone?

22     A.   No, sir.

23     Q.   When you worked as a bookkeeper

0035

 1   at King Ford in Valley, did you supervise

 2   anyone?

 3     A.   No, sir.

 4     Q.   And when you worked at the

 5   housing authority as a temp, you didn't

 6   supervise anybody?

 7     A.   No, sir.

 8     Q.   And when you worked at the Kudzu

 9   as one of those bookkeepers, you didn't

10   supervise anybody?

11     A.   No, sir.

12     Q.   And what about -- at your

13   parent's restaurant, did you supervise

14   anybody there?

15     A.   Yes, sir.

16     Q.   Okay.  Who worked there,

your

17   mom and your dad?

18      A.   My dad didn't work there.

19      Q.   Okay.  Your mom?

20      A.   My dad's a truck driver.

21      Q.   Your mom started the restaurant?

22      A.   My mom and dad did, but he still

23   had to drive a truck.

0036

 1      Q.   Okay.  So, dad's driving while

 2   mom was running the restaurant?

 3      A.   Yes.

 4      Q.   And mom calls you and says,

 5   "Help, we're too busy"?

6     A.   Yes, sir.

7     Q.   Okay.  So, you and your mom

8   worked there?

9     A.   Yes, sir.

10     Q.   Who else?

11     A.   We were the main ones. Who else

12   worked there at the time?

13     Q.   When your mom was there and

14   called you in to help, were there any

15   other family members?

16     A.   No other family members, no,

17   sir.

18     Q.   How big -- is it a big

19   restaurant?

20       A.   It's probably about 3000 square

21   foot.  It will seat 150 people.

22       Q.   And this is what your mom does

23   now?

0037

1       A.   Yes, sir.

2       Q.   And does your dad work there too

3   or still drive?

4       A.   No, sir, he still drives.  He is

5   semiretired.

6       Q.   What kind of food is it?

7       A.   Seafood.  Steaks and seafood.

8         And, off the record, it's for

9    sale if you'd like to buy it.  She's

10   gotten too old to run it.

11      Q.   It does well, though; right?

12      A.   Yes, sir, it does well.

13      Q.   So, did you work -- you waited

14   tables, and you would -- did you

15   supervise waiters and waitresses?

16      A.   Yes, sir.  Trained them. I've

17   learned how to work in the kitchen,

18   trained new help in the kitchen.  I

19   learned how to bar tend, train them.  You

20   know, the only people that had anything

21   to do with the reconciliations and the

22   bank statements and the cash deposits and

23   all was me and my mom.

0038

 1      Q.   Did you have a title or anything

 2   there?

 3      A.   I was a manager.  They called me

 4   the manager, but when you work for your

 5   family, you know, it was just a title.

 6      Q.   Okay.  Why did you stop working

 7   there?

 8      A.   That's when I decided to move to

 9   Dalton, Georgia.

10      Q.   Okay.  Because of the

11   relationship is why you left?

12      A.   Right.

13      Q.   Why didn't you go back there?

14      A.   Because I wanted to go to

15   work -- I mean, when you work for your

16   family, it's tough.  And I wanted to go

17   to work with a growing firm, a company

18   that was growing and that I could go

19   somewhere with, somewhere that

I'd have

20   long-term benefits with.

21      Q.   Insurance and stuff like that?

22      A.   Yes, sir.

23      Q.   You didn't have it --

0039

1      A.   We had it, but I had to pay it

2   out of my own pocket.

3      Q.   How many people work at the

4   Stagecoach?

5      A.   Probably 10, 15.

6         MR. KESSLER:  Are you talking

7   about currently or when he was there?

8      Q.   (By Mr. Goldfarb) Well, when you

9   were there or now.

10     A.   Probably 10 or 15.

11     Q.   Waitresses and bartenders?

12     A.   Yes, sir.  And most everyone of

13   them have a second job -- I mean, most of

14   them have another job.  That's just their

15   part-time job to pick up money at night

16   and stuff.

17     Q.   Is it open all day?

18     A.   No, sir.

19     Q.   Just at night?

20     A.   Tuesday through Saturday

at

21   night.

22      Q.   Just serve dinner?

23      A.   Yes, sir.

0040

 1      Q.   Does that cover your work

 2   history?

 3      A.   Yes, sir.

 4         (Plaintiff's Exhibit No. 19 was

 5         marked for identification.)

 6      Q.   (By Mr. Goldfarb) Exhibit 19, is

 7   this a copy of your resume?

 8      A.   Yes, sir.

 9      Q.   And is it accurate and true?

10      A.   The education is -- I do not

11   have a BS in business

administration from

12   Troy State University.

13      Q.   Okay.

14      A.   I've studied towards that.

15      Q.   Is everything else correct and

16   true?

17      A.   To my knowledge, yes, sir.

18      Q.   Why did you say you had a BS in

19   business at Troy State and you didn't?

20      A.   It's one of those things --

21   tried to pad it to make me look a little

22   bit better, you know.  On my application,

23   I would actually put working

towards.

0041

1   You know, it's just the way I worded it.

2     Q.   But that's not correct, that

3   you've got a BS; right?

4     A.   No, sir.

5     Q.   There's campus -- where's the

6   main campus of Troy State?

7     A.   In Troy, Alabama.

8     Q.   Right.  But they have Phenix

9   City --

10     A.   Uh-huh, branch.

11     Q.    -- like kind of off branch or

12   something?

13     A.   Uh-huh (affirmative).

14     Q.   Do they teach everything there?

15     A.   At the time I was there, I mean,

16   I think it was beginning -- it was just

17   starting out to be like a four-year

18   college.

19          But, you know, I would go a

20   quarter and then -- when I went to

21   school, it was called quarters. Now, I

22   think it's semesters or vice versa.

23          But I'd go and then drop out and

0042

 1  work a little bit and then go back and

2    take another class or two.  And, you

3    know --

4        Q.   They didn't offer -- did they

5    offer a full --

6        A.   At that campus at that time?

7        Q.   Yeah.

8        A.   Yes, sir.

9        Q.   They did offer a BA?

10       A.   Yes, sir.

11       Q.   BA or -- what did you say you

12   had on here?

13       A.   A BS.

14       Q.   A BS.  Because on your resume, I

15   think you said BA?

16       A.   I said BS.

17    Q.   Not on your resume, on your
18   application.
19    A.   Yeah.
20    Q.   I think -- we're going to look.
21   Let's see.  Maybe I'm wrong.  I don't
22   know.  Yeah.  You said --
23    A.   I was working towards -- in 0043
 1   business administration.
 2    Q.   Well, you didn't say "working
 3   towards"?
 4    A.   Well, I didn't say that I
 5   graduated either.
 6    Q.   Right.  I know.  I know

what you

7   did.  But Troy State, you wrote, "major,

8   business administration"?

9      A.   Right.

10          (Plaintiff's Exhibit No. 20 was

11          marked for identification.)

12          MR. KESSLER:  It says here he

13   didn't graduate from high school.

14          THE WITNESS:  And I did graduate

15   from high school.

16      Q.   (By Mr. Goldfarb) Where did you

17   go to high school?

18      A.   Lanett High School.

19    Q.   In Lanett?

20    A.   Yes, sir.

21    Q.   All right.  On this resume, is

22   everything correct?

23    A.   On the resume?

0044

1    Q.   Not on the resume.  On the

2   application.

3    A.   It looks correct.  From looking

4   at it here, it looks correct except that

5   I did graduate from high school.

6    Q.   And it was a BS that you were

7   working towards, not a BA?

8    A.   Yes, sir.

 9          MR. KESSLER:  For the record, a

10   business administration degree is a BS.

11          MS. SMITH:  A BS in BA.

12     Q.   (By Mr. Goldfarb) Okay.

13     A.   What I meant on my application

14   was business administration was my --

15   what I was focusing in on with a minor in

16   accounting.  I was -- business

17   administration is what they called the

18   degree, a BS in business administration.

19     Q.   And you think you've got

about a

20   year and a half left?

21      A.   Yes, sir.

22      Q.   Did you only attend the
Phenix

23   City campus?

0045

 1      A.   Yes, sir.

 2      Q.   And you also attended

 3   Southern --

 4      A.   Union State Junior College.

 5      Q.   And when you were at
Southern,

 6   what did you study?

 7      A.   Took all the basics.  Went
there

 8   straight out of high school and got
as

 9   many basics out of the way, biology,

10   accounting, history.

11      Q.   You didn't get a degree there;

12   right?

13      A.   No, sir.

14      Q.   You were there in '83?

15      A.   '83, '84.

16      Q.   Now, are you sure that you were

17   at Lake Martin Properties until --

18   between August of '02 and January of '03?

19      A.   That was one of those jobs that

20   I worked -- I was working at Villas on

21   the Harbor, Stagecoach, and Lake Martin

22   Vacation Rentals.  I was not at Lake

23   Martin Vacation Rentals but for a few

0046

 1   months.  That was a rental company that I

 2   helped Connie Burke start, and it's where

 3   we took individual homeowners that owned

 4   condos, and we rented their condos out

 5   for them.  She was a real estate broker,

 6   and I helped her with that.

7     Q.   Well, is it possible you were

8   there actually from May of 2000 until

9   early summer of 2001?

10     A.   I don't think I was there that

11   long.

12     Q.   But you've got -- what I'm

13   asking about is the dates.  You've got

14   '02 to '03.

15     A.   It could be possible, yes, sir.

16   Because, I mean, like I said, I was doing

17   two or three jobs at one time.

18     Q.   Okay.  So, that could be

wrong?

19      A.   Yes, sir.

20      Q.   Did you get along with

21   Ms. Burke?

22      A.   Yes, sir.

23      Q.   You didn't have any

0047

 1   disagreements with her?

 2      A.   No, sir.

 3      Q.   You left there, though --
why

 4   did you leave there?

 5      A.   It just was too much for me
to

 6   handle, working that many jobs.
And she

 7   was wanting me to put more time
in than

8   what I was putting in, and I just -- and

9   we -- agreement that I just not be a part

10   of it anymore.  So, I left.

11      Q.   Did you have an agreement with

12   her that you would put some money up?

13      A.  No, sir.

14         MR. KESSLER:  Did you provide us

15   with copies of those from Lake Martin

16   Vacation Rental?

17         MR. GOLDFARB:  Yes.

18         MR. KESSLER:  You did?

19         MR. GOLDFARB:

Absolutely.

20   Yeah.  I gave you everything we've got.

21      Q.   Anyway, it looks like -- who's

22   Bill Sanders?

23      A.   He owns -- used to own a florist

0048

1   there in town.

2      Q.   Were you friends with Bill?

3      A.   Yes, sir.

4      Q.   Were y'all -- did you live with

5   Bill ever?

6      A.   No, sir.

7      Q.   Because they've got a

8   recipient's address of Bill Sanders.

I
 9   mean, I'll show you.  What I'm looking at

10   is these (indicating).  Well, I got

11   Bill's name off this page here.  I mean,

12   you can read whatever you want.  But,

13   see.  I'm just wondering why she sent you

14   Bill's --

15      A.  I have no idea.  Oh.  Because he

16   cleaned part of the -- he owned a

17   florist, but at night he would clean some

18   of the condos.  He was a friend of mine.

19     Q.   Okay.  Well, I've got your --

20   she gave me a couple of W-2s for you.

21   And it looks like you were there in 2000

22   and 2001.  Any reason that's wrong?

23     A.   I mean, that could be right.

0049

1     Q.   I mean, that's what her records

2   show?

3     A.   Yeah, that could be right. Her

4   records are probably right.

5     Q.   Okay.

6     A.   I mean, she did -- I mean,

from

7   reading this, she did want me to invest

8   some money, but I didn't want to invest

9   money in it.

10     Q.   Okay.  All right.

11     A.   You know, so, I was hired as an

12   independent contractor to help her get

13   the business started.

14     Q.   Okay.

15     A.   And it was not supposed to be a

16   partnership, and there was not germs

17   between us.

18     Q.   Do you know what happened with

19   that place?  Is she still running it?

20     A.   I think she has since sold it to

21   another company.  I think it's still Lake

22   Martin properties.  But I think she's

23   not --

0050

 1     Q.   Do you know if she's there or

 2   gone or what?

 3     A.   She still owns Lake Martin

 4   Properties, but it's all in -- it's right

 5   next door to the restaurant -- my

 6   parent's restaurant.

7    Q.   Anyway, you worked there about a

8   year.  It might have been in 2000, but

9   what you did there -- this is just a

10   place you hadn't named.  And it was still

11   bookkeeping work?

12    A.  Yes, sir.

13    Q.  Okay.  All you've done is --

14   other than running the restaurant is

15   bookkeeping work?

16    A.  That's all I've done, yes, sir.

17    Q.  And the restaurant, you did

18   everything to keep the family business

19   going --

20      A.   Right.

21      Q.   -- that you needed to do?

22      A.   Yes, sir.

23      Q.   Everything from bookkeeping to

0051

1   waiting to taking the trash out to

2   cleaning up --

3      A.   Yes, sir.

4      Q.   -- to whatever you needed to do

5   to help?

6      A.   Yes, sir.

7      Q.   All right.  Okay.  And you told

8   me you worked for Chattanooga, you said,

 9   about a year?

10      A.   It was close to it.  I mean, it

11   was a stressful time in my life.

12      Q.   Okay.  I'm just trying to get

13   the dates straight, all right?

14      A.   Yes, sir.

15      Q.   I'm not trying to trick you,

16   really.  On your application, you wrote

17   you worked there four months?

18      A.   It was close to a -- I mean,

19   four months to a year.  I mean --

20      Q.   All I want to know is where you

21   worked and when.  Okay.

22      A.   Yes, sir.

23      Q.   If this is right, tell me this

0052

1   is right.

2      A.   That was three years ago.  I

3   have --

4      Q.   It's fine.  It's fine.  You're

5   not in trouble for --

6      A.   Right.

7      Q.   I'm not going to bust on you for

8   lying in your deposition.  All I want to

9   know is when you worked there.

10      A.   I went there in June of '03 and

11   probably was there until 10 of '03.

12      Q.   Okay.  So, this is correct?

13      A.   Yes, sir.

14      Q.   All right.  And you did

work at

15   Judy's for about a year on and off, and

16   whenever you needed to work there, you

17   were there?

18        A.   When I went back?

19        Q.   Right.  It was about a ten-year

20  period?

21        A.   I was at Judy's for ten years,

22   and then I left to go to Chattanooga

23   Housing Authority.  And then when I moved

0053

 1   back home, I helped out some until

I
2   could get me a job, yes, sir.
3      Q.   Right.  And it looks like you --
4   well, you couldn't have been at Villas on
5   the Harbor in July of '03 if you were at
6   Chattanooga in June.  So, you may have --
7   that may be a mistake.  I mean, it's just
8   a month off; right?
9      A.   It's suppose to probably be
10   7/02.
11      Q.   Okay.  Instead of 7/03 --
12      A.   It's supposed to be 7/02.
13      Q.   -- Villas on the Harbor

should

14   be 7/02.  Okay.  Great.

15          And Lake Martin, we think it

16   was -- I mean, you'll go with her dates?

17      A.   Yeah, that's fine.  Yes, sir.

18      Q.   Okay.  And then you were at this

19   Cagle's -- and it's got Pine Mountain,

20   Georgia.  But you were also at the other

21   location; right?

22      A.   Yes, sir.

23      Q.   In Alabama?

0054

 1      A.   Macon, Georgia.

2      Q.   Macon, Georgia.  Okay.
Got you.

3   Okay.  Are these dates right for
Cagle's,

4   '89 to '93?

5      A.   To my knowledge, yes, sir.

6      Q.   Who -- what's the guy,
Danny

7   Bridges, was that your supervisor?

8      A.   Yes, sir.

9      Q.   Okay.  And Judy
Richardson is

10   your mom?

11      A.   Yes, sir.

12      Q.   At Chattanooga, you were
paid

13   $18 an hour?

14      A.   Yes, sir.

15    Q.   And at the restaurant, you made

16   400 a week?

17    A.   Yes, sir.

18    Q.   At the end pay.  It started at

19   200 and went up to 400?

20    A.   Yes, sir.

21    Q.   And then at Villas, you went

22   from 800 to 1100 a month?

23    A.   Yes, sir.

0055

 1    Q.   Okay.  Then at Lake Martin, you

 2   got this 2 percent of net.  But you said

 3   you were contract?

 4      A.   It was off whatever commissions

 5   we collected, whatever units we rented, I

 6   got 2 percent of the net after expenses

 7   were paid.

 8      Q.   Okay.  And at Cagle's, you went

 9   from 8 bucks an hour to $14 an hour?

10      A.  Yes, sir.

11      Q.   Okay.  What -- when you applied

12   for work at Jameson, where -- what

13   location were you interested in working

14  in?

15    A.   It did not say -- the ad -- it

16  was online.  I was just interested in

17  going into hospitality.

18    Q.   Had you ever worked in

19  hospitality before?

20    A.   I would have considered Lake

21  Martin Vacation Rentals, Villas on the

22  Harbor part of hospitality.  I like

23  working with people.  And the restaurant,

0056

1  I consider that hospitality.

2    Q.   But you -- other than the

3  restaurant, you did bookkeeping at

the
 4   other places?
 5      A.   Right.
 6      Q.   Only bookkeeping?
 7      A.   Yes, sir.
 8      Q.   Did you get any -- at Troy State
 9   any hospitality hotel training or
10   anything?
11      A.   I don't recall taking any
12   classes, no, sir.
13      Q.   Okay.  Did you take any property
14   management course?
15      A.   I've taken real estate classes,
16   yes, sir.
17      Q.   Okay.  Where did you take

those?

18      A.   I took those at a real estate
19   company in Montgomery.
20      Q.   When did you do that?
21      A.   I don't recall the dates.
22      Q.   Okay.
23      A.   I mean --
0057
 1      Q.   About when, roughly?
 2      A.   During the time -- '95, '96.
 3      Q.   Where in Montgomery?
 4      A.   I think the guy's name was
 5   Robert Smith.  He was a main, big real
 6   estate person in Alabama.
 7      Q.   I guess I should have asked --
 8   what was the name of the school?

9     A.   It was named after him.

10     Q.   There's a Robert Smith school?

11     A.   I'm not sure if that's the name

12   or not.  I can look at my certificate at

13   home and tell you, but I'm not sure what

14   the name is.

15     Q.   Okay.  You got a real estate --

16   is it for selling houses and stuff like

17   that?

18     A.   Yes, sir.

19     Q.   Okay.  Do you have a real estate

20   license?

21       A.   No, sir.

22       Q.   So, you learned -- you went

23   through the course for how to sell houses

0058

 1   and stuff like that?

 2       A.   Right.

 3       Q.   You just didn't -- did you ever

 4   get the license?

 5       A.   No, sir.

 6       Q.   Did you try?

 7       A.   I tried twice.

 8       Q.   You couldn't pass that test?

 9       A.   No, sir.

10       Q.   Okay.  So, in '95, '96, you

had

11   intentions to sell real estate, and then

12   you decided not to because you didn't

13   pass the license test --

14      A.   Yes, sir.

15      Q.   -- to get the license?

16         Okay.  But that's for selling

17   real estate.  I guess what I'm asking is:

18   Did you take any courses in how to manage

19   properties?

20      A.   I mean, there was numerous

21   correspondence classes that I took along

22   the way and here and there that, you

23   know, that I would take.  It would be

0059

 1   like a weekend class that you would take.

 2      Q.   And tell me about that.  Where

 3   did you take those?

 4      A.   There was some at Montgomery

 5   that I took.

 6      Q.   What school?

 7      A.   It was at that real estate

 8   school.

 9      Q.   Okay.  So, the real estate

10   school had a property

management --

11    A.   Yes, sir.

12    Q.   Is it still in existence?

13    A.   I don't believe it is, but I'm

14  not sure.

15    Q.   Where is that located?

16    A.   It was on Interstate 85 -- right

17  off of 85 at the exit below Vaughn Road,

18  whatever exit -- Ann Street exit.

19    Q.   But you don't remember the name

20  of the school?

21    A.   It's Robert -- I believe it was

22  Robert Smith.  I'm not sure, sir.

23    Q.   You've got a certificate?

0060

1     A.   Saying that I completed his

2   course.

3     Q.   And that was for how long?

4     A.   It took about 12 weeks.  It was

5   a prerequisite to be able to take the

6   Alabama Real Estate class.

7     Q.   Oh, okay.

8     A.   The Alabama Real Estate exam.

9   You had to pass this course first.

10     Q.   Right.  What I'm interested in

11   is the property management.  Is that

12   where you did the property management

13   courses?

14      A.   Yes, sir, uh-huh.

15      Q.   Oh, okay.  What kind of property

16   management?

17      A.   Well, it was just a series of

18   the class.  Two or three of the weeks was

19   on property management.  You know, you

20   learned about property management.

21      Q.   For what?

22      A.   For like --

23      Q.   Apartments?

0061

 1      A.   Apartment complexes.  You

 2   learned condominium law.

3      Q.   Have you ever had a hotel
4   management course?
5      A.   No, sir.
6      Q.   Have you ever had any -- I don't
7   even know if they offer a thing like
8   that.  But have you ever had any courses
9   on how to work at a hotel or manage a
10   hotel?
11      A.   Previous to Jameson?
12      Q.   Yes.
13      A.   No, sir.
14      Q.   Did you -- previous to Jameson,
15   had you used Excel?

16      A.   Yes, sir.

17      Q.   In your accounting and

18   bookkeeping work?

19      A.   Yes, sir.

20      Q.   Who is William Stevens?

21      A.   William Buck Stevens. He's a

22   real good friend of mine that's a retired

23   Delta pilot.

0062

 1      Q.   Okay.  Harwell (sic) --

 2      A.   Harrell.

 3      Q.   Harrell McKinney?

 4      A.   He's a real good friend of mine,

 5   and he was one of the board members

6   during some of the time I was at Villas

7   on the Harbor.

8      Q.   And what's the last name?

9      A.   Sara.

10     Q.   Sara Crumpton?

11     A.   She was a board member and a

12   homeowner there at Villas on the Harbor.

13   And she was also -- she was the board

14   president during one of the tenures.

15     Q.   And this is the -- did you apply

16   for work at any other hotel companies?

17     A.   There was several companies
18   online that I applied for.
19     Q.   Did you apply for this one
20   online?
21     A.   Yes, sir.
22     Q.   Did you have to fill out an
23   application online or something?
0063
1     A.   It was a short questionnaire. I
2   didn't actually fill this in until the
3   first time I met -- when they called me
4   for an interview.
5     Q.   I saw some strange questionnaire
6   that you did.

 7           Oh, yeah.  There's this

 8    leadership assessment thing that was in

 9    your file.  I'm going to ask you about

10    this.  21 is a -- did you answer this?

11    Do you remember this thing?

12           (Plaintiff's Exhibit No. 21 was

13           marked for identification.)

14           THE WITNESS:  I believe on one

15    of my interviews with Mr. Woods, yes,

16    sir, I did do this.

17      Q.   (By Mr. Goldfarb) Okay.  Did he

18   talk -- so, you did this with Mr. Woods?

19      A.   Yes, sir, during one of the
20   interviews.

21      Q.   Is he the only person you
22   interviewed with?

23      A.   I interviewed with him several
0064
 1   times, and then I went to Atlanta and
 2   interviewed before I ever was hired.

 3      Q.   Who did you interview with in
 4   Atlanta?

 5      A.   There was about ten of them.  It

 6   was kind of like -- I wouldn't consider

 7   it an interview.  It was kind of like me

 8   introducing myself to them to see what

 9   their opinion was of me before I --

10   before they told Charles Woods he could

11   hire me or not.

12       Q.  Did you meet Greg Winey then?

13       A.  Yes, sir.

14       Q.  Did he talk to you in the

15   interview?

16       A.  Yes, sir.

17       Q.  Do you remember any questions

18  that he asked you?

19      A.   No, sir.

20      Q.   Who else did you meet?

21      A.   Tony Maness.

22      Q.   Who is that?

23      A.   He's the vice president of

0065

 1  operations now.

 2      Q.   Who else?

 3      A.   Steve Hurley, which was

over --

 4  no.  It was Jeff Hurley over human

 5  resources, one of the Mr. Kitchins.

I

 6  believe it was Craig that I met

briefly.

 7  They shuffled you around, you

know.

8   There was several of us up there.

9      Q.   Had you already been hired when

10   you went up there?

11      A.   No, sir.

12      Q.   Okay.  Did they talk to you

13   about -- what did they talk to you about?

14      A.   Just different -- asked me about

15   myself and just different things, if I

16   thought I would like working for the

17   hospitality industry and how hard it

18   would be.

19         And, I guess, it was just like

20   trying -- they was just trying to -- me

21   meet them and them meet me. You know,

22   one or two of them even asked me what my

23   favorite sport was or -- you know, just

0066

 1   very informal.

 2     Q.   Okay.  Was Woods there too?

 3     A.   No, sir.

 4     Q.   So, you had to drive up there

 5   and meet these folks?

 6     A.   Yes, sir.

 7     Q.   Can you remember any

other

8   names?

9      A.   Mary Helen Hicks.

10     Q.   Who's that?

11     A.   She's the controller now.  And,

12   I mean, there were several of them I met

13   with.  But there was like six or seven

14   that you actually sat down with and met

15   in their office.  I can't remember any of

16   the other ones.

17     Q.   Okay.  So, you just kind of

18   shuffled through these people's offices?

19      A.   Yes, sir.

20      Q.   And talked to them one at a

21   time?

22      A.   Yes, sir.

23      Q.   Did you meet with Winey

alone?

0067

1      A.   Yes, sir.

2      Q.   In his office?

3      A.   Yes, sir.

4      Q.   And then did you go back

and

5   interview with Woods again?

6      A.   Yes, sir.

7      Q.   How many times did you

interview

8   with Woods?

9      A.   Three to four times because

the

10   fourth time I told him if he couldn't

11   make me an offer, I wasn't coming back.

12      Q.   All right.  Do you remember when

13   you first interviewed?

14      A.   It was -- the interview

15   process -- he first contacted me in

16   December, I believe.

17      Q.   I saw a letter that he wrote

18   recommending you sometime in December, I

19   think.

20      A.   Because he called me and asked

21   me if I was interested in talking

with

22   him, and I had to figure out a way to get

23   off work in Phenix City and meet with

0068

1   him.  He met with me in Auburn the first

2   time at the Auburn hotel.  And then he

3   said he would do some checking on my

4   background and stuff.

5          And about three weeks later, he

6   called me back and wanted to talk to me

7   again, and he met with me in

Alexander

 8   City, Alabama.

 9          And then the third time is when

10   he met with me and told me that he wanted

11   to send me to Atlanta to meet some of

12   those guys, you know, because, I think,

13   at that time, regionals, districts could

14   not hire AGMs or GMs without them going

15   through the interview process in Atlanta.

16   So, I went to Atlanta at my own expense.

17          When I came back from Atlanta is
18   when he called me and said that, you
19   know, checked out all your references,
20   this and that, and, you know, I want to
21   see if you're still interested in coming
22   to work.
23          And I met with him, and I said,
0069
 1   you know, "What's the money going to be
 2   like?"  And he told me.  And I said, "Can

 3   I think about it for a day or two?"
And

 4   I thought about it, and I decided to
take

 5   it.

 6       Q.   What did he tell you the
money

 7   was?

 8       A.   He told me 19,000.  But,

 9   evidently, everybody else said I
was

10   making more money.  I was just
glad to

11   have a paycheck coming in.

12       Q.   Did you -- you said -- were
you

13   interviewing for a GM job?

14       A.   No, sir.  I was interviewing

for

15   an AGM.  You had -- you couldn't start

16   out as a GM.  I didn't feel like I was

17   qualified, and I don't think he did

18   either to start out as a GM.

19      Q.   Okay.  You did believe you

20   weren't ready to be a GM?

21      A.   No, sir.

22      Q.   All right.  So, when he hired

23   you, you understood you were -- you only

0070

 1   wanted to be an AGM?

 2      A.   At that time, yes, sir.

 3      Q.   Okay.  Did you tell Mr.

Woods --

 4   what do you call him, Charles or

 5   Mr. Woods?

 6       A.   I call him Charles.

 7       Q.   All right.  When you -- did you

 8   tell Mr. Woods when you met with him that

 him that

 9   you fudged on your resume --

10       A.   No, sir.

11       Q.   -- on the BS degree?

12       A.   No, sir.

13       Q.   Did you tell him you had a BS

BS

14   degree?

15       A.   Yes, sir.

16       Q.   All right.  Did you tell him --

17   so, you lied to him when you were talking

18   to him?

19      A.   Yes, sir.

20      Q.   All right.  Did you tell him you

21   had a minor in accounting?

22      A.   I don't recall telling him that

23   I had a minor.  I just told him that my

0071

 1   speciality was business administration --

 2      Q.   You told him you had --

 3      A.   -- and accounting.

 4      Q.   -- a degree in business

 5   administration?

6     A.   Yes, sir.

7     Q.   Okay.  Well, do you know why --

8   I mean, is it possible you told him you

9   had a minor in accounting?

10     A.   It's possible.

11     Q.   Okay.  Did you ever tell

12   Mr. Woods or anybody before this whole

13   deposition thing came up that you had

14   lied about the BS?

15     A.   No, sir.

16     Q.   First time is today?  Well, with

17   your lawyer or whatever?

18     A.   Yeah.

19      Q.   Okay.  How long have you known

20   Robbie Patterson?

21      A.   Four years.  Approximately four

22   years.

23      Q.   You knew him before he started

0072

 1   working at Jameson; right?

 2      A.   Probably about two or three

 3   months, I knew him.  He worked at the

 4   liquor store next door to the restaurant.

 5      Q.   Where your parent's place is?

 6      A.   Right, correct.

7      Q.   What's the name of that liquor

8   store?

9      A.   I was -- I believe the name of

10  it was Tiger Package.  It's not in

11  business anymore.

12     Q.   Okay.

13         MR. KESSLER:  I guess everything

14  down there is named after Auburn?

15         THE WITNESS:  Yes, sir.

16     Q.   (By Mr. Goldfarb) Are you an

17  Auburn fan?

18     A.   Yes, sir.

19     Q.   You're in trouble down

there if

20   you're not?

21      A.   That's right.

22      Q.   When did you take this test, do

23   you remember.

0073

 1      A.   It was during one of the

 2   interviews --

 3      Q.   With Charles?

 4      A.   I think it was the second

 5   interview with him.

 6         MR. KESSLER:  Hey.  Let him

 7   finish the answer.

 8      Q.   (By Mr. Goldfarb) The second

 9   time you met with him, you think

you took

10   the test?

11      A.   Yes, sir.

12      Q.   When you filled out your

13   application, did you read the statement

14   of understanding the whole --

15      A.   I glanced over it.

16      Q.   You didn't read it?

17      A.   No, sir.

18      Q.   All right.  Did you ever get a

19   badge that said general manager like one

20   of those name tags or something?

21      A.   I think mine just said "Mark

22   Fetner, AGM or assistant

manager."

23     Q.   Is there a place down in the

0074

 1   Alex City area where you -- a print shop

 2   that you went to to get your -- to get a

 3   card or something?

 4     A.   No, sir.

 5     Q.   Or a name tag or anything?

 6     A.   No, sir.  We ordered all of our

 7   name tags through a company called -- I

 8   ordered six of them this morning before I

 9   left work.  Some kind of badge company

10   that we order them through the company.

11      Q.   Okay.  Did you ever have a GM

12   name tag that said general manager or

13   something?

14      A.   After I was named general

15   manager, I did.

16      Q.   Did you have it before you were

17   named general manager?

18      A.   No, sir.

19      Q.   Did you have to apply to get the

20   general manager job when you got it?

21      A.   After Ms. Stough was

relieved of

22   her duties, probably two or three days

23   later, Mr. Woods contacted me and asked

0075

 1   me if I would be interested in -- did I

 2   think I could run that property. And he

 3   said -- and I said, "Well, I will sure

 4   give it my best shot."  And he said,

 5   "Well, I'm going to need you to go back

 6   to Atlanta to interview again."  And, so,

 7   I went back to Atlanta again.

 8      Q.   Who did you interview with

that

9   time?

10      A.   Basically, the same ones because

11   it kind of was a joke because, you know,

12   it was like, you know --

13      Q.   You were just there?

14      A.   Yeah.  We were just here, you

15   know, a few months ago.

16      Q.   So, you went back up there and

17   interviewed with Mr. Winey again?

18      A.   Yes, sir.

19      Q.   And who else?

20      A.   Basically, the same ones.

21     Q.   So, you had to go through a

22   whole -- why did you have to --- why did

23   Mr. Woods -- did Mr. Woods tell you why

0076

 1   you had to go up there and interview

 2   again?

 3     A.   I don't believe at that time

 4   Mr. Woods could make the decision.  It

 5   had to come from home office.  Home

 6   office had to approve of whoever he was

 7   sending up.

 8     Q.   The same with the hiring of

you

9   as an AGM?

10      A.   Correct.

11      Q.   He had to send you to home

12   office --

13      A.   Yes, sir.

14      Q.   -- for the decision?

15      A.   Yes, sir.

16      Q.   And that's when you interviewed

17   with Mr. Winey and the other folks you

18   mentioned?

19      A.   Yes, sir.

20      Q.   Can you remember anybody else

21   other than the ones you told me

about

22   already?

23      A.   Steve Curlee, Jeff Hurley, Tony

0077

1   Maness, Greg Winey, Mary Helen Hicks.  I

2   believe it was Craig Kitchins.  I believe

3   I shook hands with Mr. Kitchins both

4   times, but I don't think I actually sat

5   down with him.

6      Q.   Is that the owner?

7      A.   Yes, sir, CEO -- CFO.  The

8   mister in the company.

9      Q.   Everybody else is first

name?

10    A.   Yes, sir.

11    Q.   Who else did you talk to?  Do

12  you remember?

13    A.   I believe that's all.

14    Q.   All right.  When you -- when did

15  you go back and interview with Charles

16  again?

17    A.   Well, I guess they made the

18  decision at corporate, and they got with

19  Charles.

20    Q.   And that's when you became

21  the --
22      A.   That's when he offered me the
23   position.
0078
 1     Q.   And you accepted it?
 2     A.   Yes, sir.
 3     Q.   Did you -- when you originally
 4  got hired there, did you go through some
 5  training?
 6     A.   I went to Auburn, Alabama, for
 7  about a week.
 8     Q.   Who was there?
 9     A.   Jim Goodman.
10     Q.   What did you do with Jim?

11     A.   Basically, was introduced to the

12   company, learned how to use the

13   RoomMaster, the computer, learned a

14   little bit about the reports that are

15   required by the AGMs and GMs to do.

16   Basically, got introduced to the company

17   is what they did on a day-to-day basis.

18           After that, I went to Eufaula,

19   Alabama, for about two weeks and worked

20   with Betty Sutton.  She taught me a lot

21   about the actual reporting, what

22   reports -- how to -- what was required,

23   what was due when, how their budgets

0079

 1   read, how their business plans read, all

 2   that stuff like that.

 3      Q.   Well -- keep going.

 4      A.   And then after that time,

 5   Mr. Woods was in constant contact with me

 6   and said that he, you know, felt like he

 7   was going to go ahead and send me to

 8   Alexander City as the assistant manager

 9   to work with Belinda Stough, that he had

10   been having some problems up there, and

11   he thought, like, I would be a perfect

12   fit to get up there and work with her and

13   try to get some things straightened out.

14          So, I met him up there on a

15   Monday morning and point-blank told him,

16   I said, "You know, I'm not going to walk

17   in on that property if she don't know I'm

18   coming."  Because I didn't know

her from

19   Adam's apple.

20          So, he met me up there and

21   introduced me.  And she -- her comment to

22   me was, "Well, I knew you was coming, you

23   know, because word travels fast in a

0080

 1   small town and in a company, you know,

 2   but welcome aboard."  So, me and her

 3   started working together.

 4     Q.   No problems?

 5     A.   Yes, sir, there were problems.

6    Q.   At the beginning?

7    A.   Not -- not the first day or two.

8    Q.   Okay.  So, you -- when you were

9   originally hired, did he tell you you

10   were going to Alex City?

11    A.   He told me that there was a big

12   possibility that that's where I would be

13   going.  And he was kind of basing it on I

14   was from Dadeville, which is right there

15   at Alexander City, and he figured I would

16   be a good -- from checking out my

17   background and my references and talking

18   to people in the community, he felt like

19   I would be a good help to Belinda because

20   I was well known in the community. You

21   know, he felt like I could help her, you

22   know, solve whatever problems she was

23   having. I didn't know the problems until

0081

 1   I actually got on the property.

2     Q.   Okay.  You said you were well

3   known.  What do you mean by that, you

4   were from the area?

5     A.   It's a small town.  I mean, my

6   family was well known.  The restaurant

7   was well known.  People knew me from the

8   restaurant.

9     Q.   So, you could bring in business?

10     A.   Yes, sir.

11     Q.   Did you get into arguments with

12   Ms. Stough?

13      A.   I wouldn't call them arguments.

14   You know, I was required to work 45 hours

15   a week, and she did the scheduling.  And

16   she put me on the schedule, and I showed

17   up when I was supposed to be -- but I

18   hardly worked with her.  She was never

19   there.

20      Q.   Where was she?

21      A.   She would be at home, either

22   sick or running errands or doing

23   something -- you know, she'd call

in and

0082

1   say -- you know, if I was scheduled to be

2   there at 3:00 o'clock, I'd get there at

3   3:00 o'clock, and I'd say, "Where is

4   Belinda?"  "Oh, she left at 11:00

5   o'clock" or "She's not coming in today.

6   She called and said would you do, you

7   know, this and that."

8          You know, there was an occasion

9   that she was there and would work with

10   me, but very rare.

11      Q.   When did you start working

12   there?

13      A.   It was -- I started with the

14   company in January.  So, it was probably

15   sometime the first -- middle of February,

16   you know, or about the second or third

17   week of February.

18      Q.   That you started there?

19      A.   Yes, sir.  Because I was in

20   Auburn a week and then Eufaula two weeks

21   and then I started there three weeks --

22   it was probably the middle of February is

23   when it was.

0083

1      Q.   Do you remember her being off

2   with -- at home with her husband when he

3   was on a leave?

4      A.   I think she was on vacation the

5   week before I actually started, and one

6   or two days may have overlapped. But

7   something in my memory -- something about

8   her husband --

9      Q.   Okay.

10      A.   -- was on leave.

11      Q.   Okay.  From Iraq?

12      A.   Yes, sir.

13      Q.   Okay.  And did you know she

14   was -- I mean, did you know she was

15   terminated on February 18th?

16      A.   I don't recall the exact day,

17   but I remember it when it happened and

18   how it happened.

19      Q.   But y'all weren't -- there

20   wasn't that long of a period of time that

21   Ms. Stough was there when you were

22   there --

23      A.   No, sir.

0084

1      Q.   -- at all?

2      A.   No, sir.

3      Q.   Okay.  You said you

4   remembered -- what do you remember about

5   the 18th?

6      A.   Well, I don't remember

7   it -- now, I don't remember it was the

8   18th.  But I remember the day she was

9   terminated.

10      Q.   Okay.

11      A.   She was -- we had a QA that day,

12   and Mr. Woods came on property. And we

13   usually knew the day before or late that

14   evening or probably two or three hours

15   before he was coming that that's what he

16   was coming for.

17      Q.   How do you know that?

18      A.   They call you, the QA inspectors

19   call you.

20      Q.   Did you talk to Mr. Woods

21   yourself?

22      A.   I didn't talk to him, no, sir.

23      Q.   Who did?

0085

1    A.  I believe it was Belinda.

2    Q.  Okay.  Well, do you know for

3   sure?

4    A.  No, I don't know that for sure.

5    Q.  So, somebody found out that

6   Mr. Woods was coming?

7    A.  Correct.

8    Q.  And then what happened?

9    A.  He -- I was at work.  She was at

10   work.  We started scurrying around to

11   make sure everything, you know, was like

12   it should be.  And he showed up,

and him

13   and her went on the QA.  They actually

14   did the QA.

15          And the QA process takes

16   probably two, two and a half hours at the

17   most.  I've never -- you know, that --

18   that was the first one that I'd ever been

19   through with the company.  But I ran the

20   front desk when they went on it.

21      Q.   Okay.

22      A.   When they completed it, and he

23   completed his paperwork late that

0086

 1   afternoon, the phone rang, and she went

 2   back there to talk to him in a room, you

 3   know, because we don't have offices.  And

 4   I guess he was going over the QA with

 5   her.

 6        They called me back there.  And

 7   when I got back there, it looked like she

 8   had got emotional.  And I took it as she

 9   wasn't getting terminated, it was a

10   mutual agreement because the

comment to

11   me was, "Belinda is no longer going to be

12   with the company.  You'll -- you know,

13   you can get your keys off -- you'll have

14   to take over the property until we can

15   decide what to do."

16          And Belinda said -- out of her

17   mouth, she said, "Mark, I'll be at home.

18   If you need me for anything or can't find

19   anything, I'll be at home."

20          So, I took it as if maybe it

was

21   a mutual thing because I had been there

22   long enough in the days or the two weeks

23   or whatever to know what was going --

0087

 1   some of the things that was going on

 2   should not be going on.

 3      Q.   Is there any record of, I mean,

 4   of showing when you actually were there

 5   and when she was there?

 6      A.   No, sir, I was a salaried

 7   employee.  I didn't have to punch a

time

 8   clock, and she didn't either.

 9      Q.   Well, she said she put you on

10   the schedule?

11      A.   Yes, sir.  But we're not

12   required to keep them.  I mean, they may

13   be floating around somewhere, but --

14      Q.   What does the schedule look

15   like?

16      A.   It's just a piece of paper that

17   the manager makes up and has the names an

18   Monday, Tuesday, Wednesday,

Thursday,

19   Friday, Saturday -- and has like 8:00 to

20   5:00 or 2:00 to 3:00 or stuff like that

21   on it.

22     Q.   Does the manager write -- you're

23   a manager now; right?

0088

1     A.   Yes, sir.

2     Q.   Do you write your own name on

3   there?

4     A.   Yes, sir.

5     Q.   So, it had Belinda's name and

6   your name?

7    A.   I know it had my name. And I

8    believe, yes, sir, it had her name on

9    there.

10    Q.   And, so, you could look at the

11    schedule if it still existed and see when

12    you were scheduled to work and when she

13    was scheduled to work?

14    A.   Yes, sir.

15    Q.   Now, you think you went there

16    around the middle of February?

17    A.   It was -- I mean, if I went to

18   work for the company on January the 19th,

19   and I was in Auburn a week and Eufaula

20   two weeks, and then I went -- I don't

21   think I worked with Belinda but three or

22   four days.

23     Q.   Right.  Okay.  That's --
0089

 1     A.   You know.

 2     Q.   So -- and then -- and you

 3   remember right when started there, there

 4   was maybe a day or so that she was still

 5   lagging -- I mean, she was still on

that

6   vacation that she was on?

7      A.  If -- I think so.  I think so.

8      Q.  Yeah.  Okay.  And then Charles

9   came and did the property inspection, and

10  Belinda left, and you had to run the

11  place?

12     A.  Yes, sir.

13     Q.  And Charles was there to help

14  you, though?

15     A.  Oh, yes, sir.

16     Q.  Okay.  He was at the beginning

17  when you started?  After Belinda

left,

18   Charles helped you out?

19      A.   And Betty Sutton and Jim Goodman

20   came.

21      Q.   Okay.  They all came up and

22   helped?

23      A.   Yes, sir.

0090

 1      Q.   How long -- because you don't

 2   dispute that at that point you were ready

 3   to run it as a general manager, do you,

 4   by yourself?

 5      A.   I was willing to give it my

best

6   shot.

7       Q.   Okay.  When you got hired,

8   though, you weren't ready to be a general

9   manager?

10      A.   No, sir.  I didn't want to go in

11  as a general manager.  I knew that I

12  needed to work my way up.

13      Q.   Okay.  And you had Betty there,

14  and you had Jim there, and you had

15  Charles there to help you?

16      A.   Yes, sir.

17      Q.   How long -- were they on

the

18   schedules, or were they just coming in to

19   help?

20      A.   No, sir, they were just coming

21   in to help.

22      Q.   All right.  How long did they

23   come in and help you out?

0091

 1      A.   Several days.

 2      Q.   No.  I mean, for how long of a

 3   period of time?

 4      A.   Well, they were there for

 5   several days.  And then it might go a

6   week before I'd see them.  And then

7   they'd come back, you know.

8     Q.   They wouldn't all be there

9   together, though; right?

10     A.   That first -- the second -- the

11   first day that she was not -- Belinda was

12   not there, and I was there, Charles spent

13   the night on the property that night.

14             And the next morning, he called

15   Betty to come up there and Jim to come up

16   there too to help get some of the

stuff

17   fixed that he had found in the QA, and

18   plus, try to not necessarily help me get

19   going, but just be a back support for me,

20   you know, because he knew I wasn't ready

21   to run it at that moment, you know.

22      Q.   Okay.  How long was a -- was it

23   a -- how long of a -- not, you know, how

0092

 1   many days they would come and help.  I

2   understand what would happen is they

3   would come up a few days and help and

4   then go back?

5       A.   Uh-huh (affirmative).

6       Q.   How long did that go on where

7   they would continue to come up and help

8   you?

9       A.   Probably right at a month.

10      Q.   So, after March, did that stop,

11  the helping?

12      A.   Yes, sir.

13      Q.   Okay.  So, did Betty come to

14   your property at any point in time after

15   March?

16      A.   If I called her or needed help,

17   yes, sir, she would come.

18      Q.   So, did you ask for help on the

19   phone?

20      A.   A lot on the phone.

21      Q.   Okay.  Calling Betty?

22      A.   And Jim.

23      Q.   And Jim?

0093

1      A.   I relied on a lot of them.

2      Q.   And Charles?

3      A.   Yes, sir.

4      Q.   This was after that initial

 5   month?

 6      A.   Correct.

 7      Q.   Okay.  And they helped
you?

 8      A.   Yes, sir.

 9      Q.   Okay.  And is that how you

10   learned the job, by them working
there,

11   and then you getting the help on
the

12   phone from Charles?

13      A.   That, plus being there.
Being

14   on the property and not afraid to
get my

15   hands dirty.  I was willing to
work, and

16   I wanted to move with up the

company, and

17   I wanted to prove to them that I was a

18   good worker.

19     Q.   And how long after you started

20   did Robbie start?

21     A.   I think Robbie started

22   sometime -- I got wind that Robbie had

23   worked in hotels and all, and I needed

0094

 1   some help because a lot of people -- when

 2   Belinda left, several of her family

 3   members or so-called close friends that

4   she had hired, they left, which is a

5   natural thing to do.

6          So, I got wind that Robbie had

7   worked at the Holiday Inn Express and at

8   Wingate in Birmingham.  So, I went and

9   talked to him.  I said, "Are you

10   interested in coming to work?" And his

11   comment to me, he said, "If Belinda is

12   still there, no, because I've worked with

13   her previous."  And he said, "I won't

14   work with her anymore."  And I

said,

15    "She's not there anymore.  Can you come

16    to work and at least be a desk clerk and

17    help me get started, you know, help me

18    get somebody where I can get off the desk

19    and do some of this stuff that needs

20    doing?"

21             And, so, he filled out an

22    application.  I did a background check,

23    and I hired him.

0095

 1      Q.   You hired him?

2        A.   Yes, sir.

3        Q.   Did he have to go get

4   interviewed?

5        A.   No, sir.  He was not an

AGM.  He

6   was just a desk clerk.

7        Q.   Okay.  So, you can hire

anything

8   below the AGM level?

9        A.   Yes, sir.

10       Q.   Whoever you want?

11       A.   Yes, sir.

12       Q.   Did you hire a maintenance

13   person ever?

14       A.   Towards the end of my

tenure

15   there, yes, sir.

16       Q.   Who was that?

17      A.   Charles Smith, I believe, is his

18   name.

19      Q.   And he did maintenance for you?

20      A.   Uh-huh.  In the afternoons.  He

21   had a full-time job, and he'd come in

22   four or five days a week at 5:00 o'clock

23   to do miscellaneous maintenance stuff.

0096

1      Q.   And you were entitled to hire

2   him?

3      A.   Yes, sir.

4    Q.   You didn't have to ask Charles'

5   permission?

6    A.   No, sir.  This was a

7   company-wide thing that went into effect.

8    Q.   When was that?

9    A.   They allowed us -- probably

10   towards the end of -- the beginning of

11   2005, they allowed us to hire maintenance

12   men on our properties, and we couldn't

13   give them more than 20 hours a week and

14   couldn't pay them more than $10 an hour.

15          So, we were all told to find us

16   some maintenance men because, at that

17   time, we were the maintenance people.

18      Q.   And when you left, he was still

19   there?

20      A.   Yes, sir.  And I think he's

21   still there in Alex City.

22      Q.   So, you actually went around and

23   did maintenance yourself?

0097

 1      A.   Well, anybody that you could get

 2   to do it or yourself or your desk

clerks.

3   We did it all.

4      Q.   And had you done maintenance

5   before on your other --

6      A.   Just what knowledge I had from

7   home.

8      Q.   And the restaurant?

9      A.   Yes, sir.

10      Q.   When Ms. Stough was still there,

11   did you meet Betty Sutton at the property

12   in Alexander City?

13      A.   No, sir, not before Belinda was

14   terminated.

15     Q.   I mean, she was not -- I think

16   she was on her vacation, and do you

17   remember Ms. Sutton coming up there?

18     A.   No, sir, I don't remember that.

19     Q.   Did you -- were you at

20   Ms. Stough's mother's -- did you know who

21   Ms. Stough's mother was?  She was that

22   head housekeeper.  What was her name?

23     A.   Very well.  Betty Sue Gabbard.

0098

1     Q.   Okay.  Were you at the
2   unemployment hearing with Ms.
Gabbard?
3     A.  Yes, sir.
4     Q.  Was she terminated?
5     A.  Yes, sir.
6     Q.  You fired her?
7     A.  Yes, sir.
8     Q.  For what reason?
9     A.  Not showing up for work.
10    Q.   Okay.  And did you go to
the
11   unemployment hearing?
12     A.  Yes, sir.
13    Q.   And you brought
somebody with
14   you?
15     A.  Yes, sir.

16    Q.   Who did you bring with you?

17    A.   Marilyn Hand, who was a

18   housekeeper.

19    Q.   What was Gabbard's job?

20    A.   She was the head housekeeper.

21    Q.   Have you ever seen a transcript

22   from that hearing or anything?

23    A.   I got something in the e-mail

0099

 1   telling us that she was turned down from

 2   her appeal.

 3    Q.   Did y'all win the hearing?

 4    A.   Yes, sir.

5      Q.   Okay.  So, she didn't get

6   unemployment from you?

7      A.   No, sir.

8      Q.   So, you won the hearing?

9      A.   Yes, sir.

10      Q.   So, she wasn't able to

collect?

11      A.   No, sir.  So, she filed for

12   worker's comp.

13      Q.   Did she -- do you know if

she

14   ever appealed it?

15      A.   I have no idea of that

16   knowledge, no, sir.

17      Q.   You said she was turned

down?

18      A.   Yes, sir.

19      Q.   Did you get in an argument

with

20    the mother at the unemployment hearing?

21        A.    After the hearing, yes, sir.

22        Q.    Did you call her a bitch?

23        A.    After she called me gay, yes,

0100

 1   sir, I did.

 2        Q.    All right.  She called -- she

 3   called you -- what did she say, and what

 4   did you say?

 5        A.    We were walking out of the

 6   hearing, and she come up to me, and she

 7   patted me on the back.  She said, "Mark,

 8   I still love you and probably could work

 9   for you, but you're gay."  And I turned

10   around, and I said, "Bitch, what does

11   that have -- what does you losing your

12   job have to do with me being gay?"

13      Q.   What -- losing your job --

14      A.   "Losing your job have to do with

15   me being gay."

16      Q.   Okay.  Anything else that y'all

17   talked about?

18      A.   No, sir.

19     Q.   Who was there that witnessed

20   that?

21     A.   Marilyn Hand and Belinda Stough.

22     Q.   Anybody else?

23     A.   There was -- the lady -- the

0101

 1   hearing officer kind of said -- you know,

 2   didn't really say anything.  She just --

 3   and I don't even remember her name.  We

 4   were going out of the unemployment

 5   office.

 6     Q.   All right.  And then you got

7   something that said she lost or

8   something?

9      A.  Via e-mail.  They did it all

10   e-mail and said that she lost the appeal.

11      Q.  Who did it e-mail?

12      A.  The unemployment office.

13      Q.  Oh.  You got something by

14   e-mail?

15      A.  Yes, sir.  They do that by

16   e-mail now.  You do everything by e-mail

17   now.

18      Q.  They used to send you a form.

19      A.  It's via e-mail now.  You get an

20   e-mail telling you that this person

has

21   filed for unemployment.  And you answer

22   it via e-mail or either print it out and

23   send it in.

0102

 1     Q.   And after the hearing, you got

 2   something saying that she lost?

 3     A.   Yes, sir.  It said that we had

 4   won -- that her -- she had been denied

 5   her appeal.

 6     Q.   Okay.

 7     A.   That's what it said.

 8        MR. KESSLER:  You've got to get

 9   in the 21st century.

10      Q.   (By Mr. Goldfarb) Have you ever

11   asked any employees there to sign a

12   petition?

13      A.   No, sir.  Petition regarding

14   what?

15      Q.   Gay marriages.

16      A.   No, sir, I have not.

17      Q.   Or Robbie, do you know if Robbie

18   did that?

19      A.   Not to my knowledge.

20      Q.   All right.  I mean, you're not

21   allowed to solicit, right, do any type of

22   soliciting of signatures or anything like
23   that at Jameson?
0103
 1     A.   Not to my knowledge, he wasn't.
 2     Q.   You're not allowed to do that;
 3  right?
 4     A.   I don't know.  I mean --
 5     Q.   Oh.  You don't know any rule
 6  against it?
 7     A.   No, I don't know any rule
 8  against it.
 9     Q.   Do you remember anything else
10   that happened on the day Ms.

Stough was

11   fired?

12      A.   No, sir.

13         Like I said, from what we --

14   from what -- everything that was found

15   out afterwards, cleaning out stuff and

16   all that stuff up to that point, I was

17   under the impression that it was a mutual

18   thing, that she had failed QA after QA,

19   that she had not been on property. Every

20   time Mr. Woods would call, she would not

21   be there -- previous to me being

there.

22   And I felt like it was a mutual thing the

23   way it was put to me when she was

0104

 1   terminated that day.

 2      Q.   Did she tell you she quit?

 3      A.   Well, she said, "Mark, I will be

 4   around.  And I will be at the house if

 5   you need me for anything, but I just

 6   think it's best that I leave," you know.

 7      Q.   Right.  What I'm asking is -- I

8   mean, just because you get fired --

9      A.   I didn't know.  The word

10   "terminated" was not used to me until the

11   next day.  Charles Woods said, "She was

12   terminated."

13      Q.   Okay.  But, anyway, when she

14   originally left, she was -- she told you,

15   "If you need any help, call me"?

16      A.   Right.

17      Q.   Okay.  So, that's why you took

18   it that she was --

19      A.   Because the few days that I did

20   work with her all she did was complain

21   about not wanting to work.

22      Q.   What did she say?

23      A.   Well, you just don't -- she

0105

 1   would always complain.  She didn't want

 2   to work.  She wanted to be at home.  It

 3   was too stressful.  She didn't want to

 4   work the hours that was required of us.

 5   You know, and I think at one time I even

 6   probably said to her, "Well, Belinda, why

7   don't you just quit, you know?  If you

8   don't like it that much, just quit."

9      Q.   What did she say?

10     A.   She couldn't afford to.  She

11  couldn't afford to.

12     Q.   Was anybody present with you and

13  Belinda when she made these comments?

14     A.   Not to my knowledge.  I mean,

15  there might have been some other

16  employees around.  Or her mother was

17  always around.

18     Q.   Who was the -- other than her

19   mother -- did her mother -- her mother

20   got fired.  You fired her?

21      A.  Yes, sir.

22      Q.  But you said some people left

23   when she left?

0106

1      A.  There was a girl named Felicia

2   Dean that left.

3      Q.  Felicia Dean?

4      A.  Uh-huh (affirmative).

5      Q.  Was she a Stough crony, buddy?

6      A.  Yeah.  I believe she was, yes,

7   sir.

 8      Q.   Do you know where she lives?

 9      A.   I have no idea.  I think I

10   worked with her a total of about 15

11   minutes, and she went out to get a Coke

12   and didn't ever come back.

13      Q.   What was her job?

14      A.   She was a front desk clerk.

15      Q.   Did you have problems with her?

16      A.   I didn't have a problem with

17   her.

18      Q.   I mean, did she do her job?

19      A.   Well, like I said, I worked with

20   her for about 5, 10, 15 minutes, and she

21   went out to get a Coke and left.

22      Q.   That's the only time you ever

23   saw her?

0107

1      A.   Yes, sir.

2      Q.   Okay.  Did you know her before

3   that?

4      A.   Yes, sir.

5      Q.   You just remember her name?

6      A.   Uh-huh.  There was a Steven

7   Peppers that left and went to work at a

 8   casino.

 9     Q.   When did he leave?

10     A.   He worked for me -- well, he

11   worked while I was still there probably

12   for about three or four weeks.  He was an

13   auditor.

14        But from his personal record,

15   she had had problems with him, plus, I

16   was having problems with him.

17     Q.   Why?

18     A.   He wouldn't dress.  I mean, he

19   wouldn't dress the part.  I mean,

he

20   would come in with raggedy torn up

21   clothes, and you were supposed to have on

22   white dress shirts that were pressed and

23   ironed.

0108

 1           And, you know, he also had -- I

 2   had a problem with -- evidently, he had

 3   bought a car from Belinda, and they were

 4   making the transactions -- weekly

 5   transactions through the company. Like,

 6   when he'd get paid, he'd go cash his

 7   check and put money in the safe. And I

 8   had told him that the -- it happened like

 9   that the first few days I was there.

10          And, you know, I said, "What is

11   this envelope in the safe for with

12   Belinda's name on it?"  And he told me,

13   "It's my car payment to her."  And I had

14   made a comment to her, I said, "I don't

15   think that's a good idea for y'all doing

16   outside transactions through the company

17   safe."  I said, "Because he could put it

18   in here, and if somebody else has got a

19   key to this safe, it could come up

20   missing."  And I said, "I'm not going to

21   be responsible for it."

22          So, I said, "I just think y'all

23   don't need to do that on the company lot.

0109

 1   But, there again, you're the boss. If

 2   you say do it, then I'll give you my keys

 3   to the safe, and I won't go in the safe."

 4     Q.   Did she keep doing it?

 5     A.   He did because there was a point

 6   in time that -- the last week that he was

 7   there that I had to go in the safe and

 8   get the money out and give back to him to

 9   where he could give it to her because he

10   had put it in the safe, and I'm like,

11   "Belinda is not even here," you know.

12     Q.   Well, you don't know if Belinda

13   kept doing it?

14      A.   No.

15      Q.   You didn't give her your keys

16   back?

17      A.   No.  No.

18      Q.   All right.  What about -- was

19   there anybody else that left?

20      A.   There was a housekeeper -- and I

21   cannot remember her name -- that was real

22   good friends -- I can't remember her

23   name.  She left.

0110

 1      Q.   Is there a Linda Peppers?

2      A.   She had already left before I

3   come to work there.

4      Q.   So, you didn't know Linda?

5      A.   No, sir.

6      Q.   I'm trying to think.  Is Linda

7   related to Steven?

8      A.   I have no idea.

9      Q.   All right.  Anybody else?

10      A.   That's still there or not there?

11      Q.   No.  That left with Belinda --

12   you know, when Belinda --

13      A.   No, sir.

14      Q.   You were talking about people

15   who left when Belinda left.

16    A.  Not -- huh-uh.

17    Q.  So, the only one who left when

18  Belinda left was Felicia Dean?

19    A.  Yes, sir.  Yes, sir.

20    Q.  I mean, you said you had to hire

21  Robbie because all -- I thought because

22  all these people left?

23    A.  Well, Robbie didn't get hired

0111

 1  until like a week or two later.  I mean,

 2  some of them left a week or two later.

 3  Steven left a week or two later

because

4    he went to work at a casino, cleaning up

5    a casino.  The -- Linda Peppers, I never

6    worked with her.

7        Q.   Okay.

8        A.   Lisa -- I forgot Lisa's last --

9    Lisa Queen.

10       Q.   Okay.

11       A.   She stayed, and she's still

12   working there.  She's still the night

13   auditor.

14       Q.   What I'm trying to figure out is

15   you said these people left, and you hired

16    Robbie.  Is the people you're talking

17    about, that would be Felicia Dean and

18    Steven Peppers?

19        A.   Yes, sir.

20        Q.   Okay.  Did you hire anybody

21    else?

22        A.   I hired Robbie, and I hired a

23    girl named Angela.  I hired a girl named

0112

 1    Leah, and they're all still there.

 2        Q.   Angela?

 3        A.   Angela Golden.

 4        Q.   Golden?

5    A.   Yes, sir.

6    Q.   Who else?

7    A.   Leah Harmon, H-a-r-m-o-n. And

8    there was two or three that I hired that

9    didn't stay long.  I'm trying to think

10    who's that -- Jacob was my weekend

11    auditor, and he moved and went to school.

12    There was several people I hired.

13    Q.   What is an auditor?

14    A.   They actually close your books

15    down at night.  They balance the books

16   and run the process and change the dates

17   in the computer and have everything

18   packed up for the general managers to

19   balance the next morning.

20       Q.   How long did you work at that

21   property?

22       A.   Until 10 -- until October of

23   last year.

0113

 1       Q.   And when you left, who took

 2   over?

 3       A.   Robbie.

 4       Q.   Did you recommend him?

5      A.   Yes, sir.

6      Q.   Robbie Patterson took over?

7      A.   Yes, sir.

8      Q.   Did Robbie get promoted to

9   assistant general manager at some point?

10      A.   Yes, sir.

11      Q.   How did that happen?

12      A.   I recommended him.  The 60-room

13   properties are budgeted for AGMs.  So, we

14   had kind of decided that I would run the

15   property for a year without an AGM to try

16   to make up for some of the money

-- or

17   the revenues that had been lost at that

18   property to see what I could do with it

19   for a year.

20          And, after that year, I saw the

21   need to promote him.  He was dedicated.

22   So, I talked with Charles, and I said,

23   "Why don't we go ahead and promote Robbie

0114

 1   to AGM?"  He interviewed with Robbie

 2   twice, and sent Robbie to Atlanta

to go
3   through the process.
4     Q.   And he interviewed with
them?
5     A.   Yes, sir.
6     Q.   And did you -- who told
you that
7   60-room properties were budgeted
for
8   AGMs?
9     A.   That was a company
standard.
10    Q.   Okay.  Since you've been
there?
11    A.   Yes, sir.
12    Q.   Did Robbie get overtime
under
13   you?

14      A.   Some weeks, yes, sir.

15      Q.   I mean, could you decide how

16   much time he worked?

17      A.   Yes, sir.

18      Q.   Did other people get overtime?

19      A.   Some of them, yes, sir.

20      Q.   Was Robbie one of your highest

21   paid employees?

22      A.   Probably, yes, sir.

23      Q.   Was he the highest paid?

0115

1      A.   I believe so, yes, sir.

2      Q.   Who decided his pay?

3      A.   I did.

4      Q.   Why was he paid more than

the

 5   others?

 6      A.   Because he worked.  He was

 7   there.  He worked when I needed him.  He

 8   would stay until -- I mean, he would work

 9   24 hours if I needed him.

10            During the hurricanes, he was

11   there 24 hours.  You know, we both took

12   turns.  He was there.  He was mature, and

13   he was in a position where he wanted a

14   job, and he wanted to go

somewhere with

15   the company.

16          So, he was dedicated and

17   willing.  So, I'm the type person that I

18   reward my employees if I see they deserve

19   it.

20      Q.   Okay.  Was Robbie ever written

21   up?

22      A.   Yes, sir.  There was a customer

23   complaint, and he was written up at one

0116

 1   point.

 2      Q.   You wrote him up?

3      A.   Yes, sir.

4      Q.   What did you write him up for?

5      A.   For -- he -- misunderstanding

6   with a guest and bad customer service.

7      Q.   What was that about?

8      A.   We were full one night. The

9   hotel was full one night.  And it was a

10   bunch of fishermen, and they had their

11   boats parked everywhere.  And the man got

12   mad because he couldn't park right in

13   front of his room.  And then the next

14   morning when he checked out and was

15   talking to Robbie, he got real ugly with

16   Robbie and threw a pen in Robbie's face.

17   And, naturally, Robbie lashed out.

18      Q.   Robbie call him a name or

19   something?

20      A.   I was not there and did not see.

21   I got the man's story.  And I got

22   Robbie's story.

23      Q.   Well, what did -- you said

0117

 1   Robbie -- you wrote him up for

something?

2      A.   Uh-huh (affirmative).

3      Q.   What did you write him up

for?

4      A.   For being abusive to a

guest,

5   not following customer service

policies.

6      Q.   What did he do that was

abusive?

7      A.   Well, I think he did -- he

8   yelled out at the man and told the

man

9   not to ever throw a pen at him

again and

10   that he could leave, you know,

just as

11   fast as he come in that door.  And

the

12   man -- the guest actually went out the

13   door and tore the hinges off the door.

14      Q.   Did he curse the guy?

15      A.   I was not there, sir.  The man

16   said he did.

17      Q.   Robbie -- did Robbie admit he

18   cursed him?

19      A.   No, he never -- he said he did

20   not --

21      Q.   Okay.

22      A.   -- but, you know.

23      Q.   What happens if you curse

0118

1   somebody, anything different than what

2   you did?

3       A.   No, sir.

4       Q.   I think these (indicating) are

5   the ones you're talking about.

6       A.   There were pictures on the

7   e-mail.

8       Q.   Yeah.  I can't see the pictures.

9   I know what you're talking about.

10          All right.  I've got Exhibit 22.

11  And it's called, less than a perfect

12  stay.  Is this what you're talking about?

13          (Plaintiff's Exhibit No. 22

was

14       marked for identification.)

15       THE WITNESS:  Yes, sir.

16    Q.   (By Mr. Goldfarb) All right.

17   So, who did -- this went to you, I guess?

18    A.   Yeah.  Well, it went to Lynna

19   Gron in Calhoun, which is our customer

20   service department.

21    Q.   Okay.

22    A.   And then it came to me.

23       MR. KESSLER:  Was does this --

0119

 1   this is a year after your woman

was

2   terminated.  What does this have to do

3   with this case?

4          MR. GOLDFARB:  I can ask

5   whatever questions I want to.

6          MR. KESSLER:  Well, I

7   understand --

8          MR. GOLDFARB:  But it has to do

9   with you terminated her for

10   performance-related issues, and I'm going

11   to get into performance-related issues

12   with every -- with the managers we've got

13   here and the other ones that we're

14   going -- I'm going to talk to you about

15   it.  But I'm going to end up filing a

16   motion to compel on all this other stuff

17   I've been asking you about after that

18   last deposition.

19          MR. KESSLER:  Well, you can ask

20   whatever you want.  I can stop and file a

21   motion for a protective order.

22          MR. GOLDFARB:  Do it. If you

23   want to do that, you're wasting your

0120

1   time.

2          MR. KESSLER:  Jon --

3          MR. GOLDFARB:  I'm not going to

4   spin --

5          MR. KESSLER:  Jon, can I say

6   something?

7          MR. GOLDFARB:  What do you want

8   to say?

9          MR. KESSLER:  You are absolutely

10   abusing your position.  Don't interrupt

11   me when I want to say something.  I'm

12   going to let you ask him the questions,

13   but you did this in the last deposition.

14   And when I want to say something -- and I

15   don't say much -- but let me say it.

16          MR. GOLDFARB:  Don't yell at me.

17          MR. KESSLER:  I'm not yelling at

18   you.

19          MR. GOLDFARB:  Yes, you are.

20          MR. KESSLER:  Go ahead and ask

21   your --

22          MR. GOLDFARB:  You

can practice

23   the way you want to in Atlanta, but you

0121

 1   know this is a court in Alabama, and

 2   we're courteous to each other. Keep your

 3   voice down.

 4        MR. KESSLER:  Jon, don't

 5   interrupt me, please.

 6        MR. GOLDFARB:  Don't yell at me.

 7        MR. KESSLER:  I am not yelling

 8   at you, Jon.

 9        MR. GOLDFARB:  All right.  I'm

10   not going to spend that much time with

11   this.

12          (Plaintiff's Exhibit No. 23 was

13          marked for identification.)

14     Q.   (By Mr. Goldfarb) Exhibit 23,

15   this is another part of the -- is this

16   the same thing with Robbie?

17     A.   Yes, sir.

18     Q.   Now, who is -- but this is a

19   customer complaint; right?

20     A.   Yes, sir.

21     Q.   Okay.  Is this how they come?

22   They get e-mailed generally?

23     A.   Yes, sir.  Some of them

come

0122

 1   straight to us.

 2     Q.   What is this thing?  This is

 3   a --

 4     A.   That's a picture of the boat

 5   parking in the parking lot.

 6     Q.   Exhibit 24?

 7         (Plaintiff's Exhibit No. 24

was

 8         marked for identification.)

 9         THE WITNESS:  Yes, sir.

10     Q.   (By Mr. Goldfarb) All

right.  We

11   can't see the picture.  Okay.  Is

this --

12   25, is this Robbie's response?

13         (Plaintiff's Exhibit No. 25

was

14          marked for identification.)

15          THE WITNESS:  Yes, sir.
He was

16   requested to write up his response.

17      Q.   (By Mr. Goldfarb) All
right.  Is

18   that all the documents on it?

19      A.   Yes, sir.

20          MR. GOLDFARB:  Did I
give you

21   everything?

22          THE WITNESS:  Uh-huh

23   (affirmative).

0123

 1      Q.   (By Mr. Goldfarb) No, your

 2   lawyer.

 3          MR. KESSLER:  Let me

have 25

 4   too.

 5         MR. GOLDFARB:  All right.

 6     Q.   Well, he did say -- he called --

 7   he said to the guy -- and this is

 8   Robbie's writing in 25; right?

 9     A.   Yes, sir.

10     Q.   He says he's going to call the

11   police and have your ass removed?

12     A.   Yes, sir.

13     Q.   Is that the only customer

14   complaint that you've gotten on Robbie?

15     A.   To my knowledge, sir.  I

mean,

16   we have customer complaints everyday.  If

17   you checked my file, my file is probably

18   as big as that one right there

19   (indicating).

20     Q.   With customer complaints?

21     A.   Well, it's part of a customer

22   satisfaction, customer service.  It's a

23   day-to-day thing.

0124

 1     Q.   You've had customer complaints?

 2     A.   Yes, sir.

 3     Q.   Okay.  And your other managers

 4   have had customer complaints?

 5       A.   Yes, sir.

 6       Q.   And they send them in to the

 7   general office or wherever?

 8       A.   Usually.  Or either there's a

 9   comment card that they give to us, and we

10   are required to send them in to home

11   office.  And home office looks at them

12   and decides which way to go with them and

13   then they send them back to us.

14       Q.   Is there a box where you put

15   the -- you know, some hotels have

a box

16   to put complaints.

17      A.   No, sir.  I think there was at

18   one time.  There's some kind of box

19   bolted to the desk in Alexander City back

20   in the back office, but I don't know

21   where the key is to it and don't know

22   what's in it.

23      Q.   Well, what's a comment card?

0125

 1      A.   When they check into the hotel,

2   it's a card that says -- has their room

3   number on it.

4       Q.   Oh, okay.

5       A.   And they can fill it out. When

6   they leave, they can leave it with us or

7   either they can stick it in the mail.

8   There's no postage due on it.

9           But, you know, some customer

10   complaints start at our level, and

11   we're -- you know, we give them a perfect

12   stay.  You know, I'm not going to stand

13   there and argue with a guest over

14   something silly and minute.

15        There's some crazy people out

16   there, so I just give them a free stay

17   and send them on their way and tell them

18   I'm sorry it happened.

19      Q.   You just give them a free room?

20      A.  Yes, sir.

21      Q.   Do you remember any customer

22   complaints on Ms. Stough?

23      A.   I wasn't there long enough. I

0126

 1   know that the -- something after

the

2   fact.  There was something to do with an

3   ant bite situation that the man was

4   raising cane about Ms. Stough not

5   performing what she should do.  I wasn't

6   there at that time, so I can't say.

7      Q.   Who told you about that?

8      A.   It was company -- I mean,

9   everybody knew in the company that it was

10   going on.  I mean, I got subpoenas when I

11   was in Alexander City about an ant bite

12   and lawyers calling me, and I didn't know

13   nothing about it.

14      Q.   Okay.  You're talking about the

15   guy who sued the company?

16      A.   Yes.

17      Q.   Do you know what happened with

18   that when Ms. Stough was there?

19      A.   No, sir, I was not there.

20      Q.   But you didn't have to testify

21   in that?

22      A.   No, sir.

23      Q.   Okay.  Did Robbie tell you how

0127

 1   the interview went when he had to go up

 2   there and interview?

 3      A.   He asked me, like, questions --

 4   what they were going to ask because he

 5   knew I had been, you know.  But Robbie

 6   was a good help, and I don't regret --

 7   don't regret hiring him.

 8      Q.   All I said is:  Did he tell you

 9   what happened when he -- after he got

10   back?

11      A.   Yeah.  He briefly said, you

12   know, Tony asked me this or this one

13   asked me that, you know.  "I feel like it

14   went real well" is what he said.  And I

15   said, "Well, I hope so.  Let's keep our

16   fingers crossed."

17      Q.   Did he say that he interviewed

18   with the same group that you did?

19      A.   He told me their names, but some

20   of them people that I interviewed with

21   were not there anymore.

22      Q.   Do you know -- well, let me ask

23   you this:  Did you have to fill out

a

0128

1   sheet for Robbie to get promoted?

2       A.   Uh-huh.  I had to recommend him.

3   Every raise -- there was several raises

4   that he got that I had to write up a

5   recommendation for.  I couldn't just

6   like, say, here --

7       Q.   That's what I'm talking about,

8   those --

9       A.   PAFs.

10      Q.   -- PAF forms, right?  And you

11   would fill out a PAF form?

12      A.   Yes, sir.

13      Q.   Okay.  Exhibit 26, is this --

14   what I've attached here is some PAF forms

15   on him, on Robbie.

16           (Plaintiff's Exhibit No. 26 was

17           marked for identification.)

18           THE WITNESS:  Uh-huh

19   (affirmative).

20      Q.   (By Mr. Goldfarb) Is this your

21   writing?

22      A.   Yes, sir.

23      Q.   All right.  The one that's Bates

0129

 1   stamped 1423, you wrote that?

2      A.   Which one are you looking at?

3      Q.   I'm looking at the bottom
4   number.

5      A.   Right here?

6      Q.   Here (indicating).

7      A.   Yes, that's my name.

8      Q.   You see the number?

9      A.   Yes, sir.

10      Q.   Okay.  And you filled -- did you

11   fill out this whole form?

12      A.   Yes, sir, that's my handwriting.

13      Q.   The whole thing?

14      A.   Yes, sir.

15      Q.   Okay.  What does department code

16   200 mean?

17      A.   That used to be the front desk

18   code.

19      Q.   Okay.

20      A.   That's where his hours are coded

21   to.

22      Q.   What's 100?

23      A.   100?  I don't think there's a

0130

 1   100.

 2      Q.   All right.  Well -- all right.

 3   Look at the next one.  You filled that

 4   out.  It's 1424.

 5      A.   Department code "O."

 6      Q.   I'm not asking about the

7  department code.

8      A.  Okay.

9      Q.  Do you know what that is, "O" or

10  zero?

11      A.  During the course of all this,

12  they were changing payroll systems,

13  changing department codes, so -- no.

14  That's a "D."  I'm sorry.  That's a "D"

15  for desk.

16      Q.  Desk?

17      A.  It changed from 200 to desk --

18  "D."

19      Q.   Okay.  Did you get a code sheet

20   that showed you what the codes meant?

21      A.   Yes, sir.

22      Q.   Do you know what code 120 means?

23   Do you remember that one?

0131

1      A.   Huh-uh (negative).  No.

2      Q.   So, you hired him at $8 or

3   something -- or $7, I guess, and he got a

4   90-day review to 8 bucks on the first

5   page; is that right?

6      A.   Yes.

7      Q.   And then he went to 8.25 --

8      A.   Yes.

9      Q.   -- several months later. And

10   then he went to 8.65 in January?

11      A.   Yes.

12      Q.   And then he went to -- and then

13   he was promoted to AGM?

14      A.   Yes.

15      Q.   At 21,000?

16      A.   Yes.

17      Q.   Did you fill in that pay rate at

18   21,000?

19      A.   Mr. Woods asked me to fill out

20   everything and fax it to him.

21      Q.   So, you did fill in it?

22      A.  Yes, sir.

23      Q.  How did you know to put the

0132

 1   21,000?

 2      A.  Because I had to call Mr. Woods

 3   and ask him what the annual salary was

 4   going to be.

 5      Q.  Okay.  Did he tell you how he

 6   came up with that number?

 7      A.  No, sir.  He just told me the

 8   figure.

 9      Q.  And then he went to GM.  Were

10   you there when he went to GM, or

is that

11   when you left?

12      A.   That was during the period when

13   I left.  I could not leave Alexander City

14   until we found someone to succeed me.

15   And we recommended Robbie.  And I think

16   Robbie went back to Atlanta again to

17   interview again with everybody for that

18   position.

19      Q.   Okay.  So, the AGM and the GMs

20   got interviewed --

21     A.  Yes, sir.

22     Q.  -- in Atlanta?

23     A.  Right now, they don't have to

0133

 1  be.  The AGM is up to the discretion of

 2  your regional managers.  They don't have

 3  to be sent to Atlanta now.  They used to

 4  be.  The general managers -- all general

 5  managers have to be sent to Atlanta.

 6     Q.  For interviews?

 7     A.  Yes, sir.

 8     Q.  All right.  What's Charles

 9   Woods' job title?

10      A.   He's a regional manager now.

11      Q.   When you started there, what was

12   he?

13      A.   He was the regional manager.

14      Q.   Do you know of any time that he

15   was anything other than regional manager?

16      A.   I think previous to my

17   employment, he was a district manager

18   under Paul Komanecky at one time.  And

19   then he was made regional

manager.

20      Q.   Do you remember a lady --
what

21   was her name?  She was over
Prattville.

22      A.   Sandy McGuffey?

23      Q.   Yeah.  Do you remember
her being

0134

 1   a regional manager?

 2      A.   Uh-huh (affirmative).

 3      Q.   Over who?

 4      A.   She was over a different
region.

 5   And then during my time at
Alexander

 6   City, she was over Charles at one
time.

7      Q.   When you were there?

8      A.   Yes, sir.

9      Q.   Had she been over Charles before

10   that?

11      A.   I don't know if she had been

12   over him before or not.  But during that

13   time -- she was not over me or him.  And

14   during that period of time I was in

15   Alexander City, she became the regional

16   manager, and he was under her as a

17   district manager.

18      Q.   Okay.

19    A.  So, he was my boss, and she was

20   my boss.  And they moved everything

21   around again.

22    Q.  So, when you started, it was

23   just Charles?

0135

1    A.  Yes, sir.

2    Q.  And then she wasn't there?

3    A.  Right.

4    Q.  And then she came there?

5    A.  Yes, sir.

6    Q.  And then she left, and Charles

7   got promoted?  Well, no.  But I thought

8   you said --

9       A.   He took on his own region. They

10   changed regions around.

11      Q.   I'm confused.  When you started

12   there, Charles was already a regional

13   manager?

14      A.   No, sir.  He was a district

15   manager --

16      Q.   Okay.

17      A.   -- under Paul Komanecky.

18      Q.   Okay.

19      A.   But I answered to Charles.  I

20   never even -- I met Mr. Komanecky, but

21   never actually -- he wasn't there. He

22   got demoted shortly after that to just a

23   general manager.

0136

 1     Q.   When you were there?

 2     A.   Yes, sir.

 3     Q.   Okay.  So, I want to make sure

 4   we're straight --

 5     A.   It's confusing to me too.

 6     Q.   When you started, you reported

 7   to Charles?

 8     A.   Yes, sir.

 9     Q.   There was a Paul --

10     A.   Komanecky.

11    Q.   How do you spell that?

12    A.   It's with a "K."

13   K-a-l-m-a-c-k-e-y (sic), I believe.

14    Q.   Okay.  So, it was Charles and

15   then Paul?

16    A.   Right.

17    Q.   And then at some point,

18   Charles -- Paul gets demoted?

19    A.   And Charles becomes a regional

20   manager.

21    Q.   Okay.  And where does Sandy fit

22   in?

23    A.   Then Charles -- then they moved

0137

 1   regions around.

 2      Q.   Okay.

 3      A.   And Sandy was over Charles.

 4      Q.   Even though Charles was a

 5   regional manager?

 6      A.   Yes, sir.  They moved us back

 7   into Sandy's region briefly, probably for

 8   three or four weeks.

 9      Q.   And she was regional manager?

10      A.   Yes, sir.

11      Q.   And he was regional manager?

12      A.   Yeah.  I don't know how to

13   explain how they did it.  But they

was

14   both -- she was the boss, and then he was

15   right up under her.

16      Q.   Both of them was regional

17   managers?

18      A.   Yes.

19      Q.   Okay.

20      A.   And then they moved -- split us

21   back out again.

22      Q.   Okay.

23      A.   And we were back in Region 2 by

0138

 1   ourselves, and Charles was our boss.

 2      Q.   All right.  Okay.  So, you

never

3   actually reported directly to Sandy?

4      A.   No, sir.  I knew she was an

5   authoritative figure, and she visited

6   Alex City at one time for one day. And I

7   knew to say yes, ma'am and no, ma'am to

8   her.

9      Q.   Did you get reviewed by somebody

10   named Pam?

11      A.   Pam Freeman?

12      Q.   Yes.

13      A.   She was a quality control

14   person.

15      Q.   Okay.  You had mentioned before

16   that the quality control people were

17   coming --

18      A.   Uh-huh (affirmative).

19      Q.   -- and Belinda knew the -- was

20   Charles a quality control person?

21      A.   Yes, at one time, he was.  And

22   I've been reviewed by him before too.

23   But at one time, they were letting the

0139

 1   district managers do their own

 2   properties.  And they changed it

after

3   Belinda left.

4              And several weeks or
months

5   after I was there, they brought in a

6   quality assurance department and
said,

7   "These two people are going to do
them."

8   But they were still letting regionals
and

9   districts do them because two
people

10   doing 122 hotels, it was kind of

11   impossible for them to do that
many

12   hotels in three months.

13              But, now, at this point, those

14   two people do it.  You can't do your own

15   properties anymore.

16      Q.   Okay.  So, now, it's a third

17   person coming in to do the QAs?

18      A.   Correct.

19      Q.   A third party.  And it's just

20   two?

21      A.   Two people in the company.

22      Q.   And that's all they do is they

23   do the QAs?

0140

 1      A.   That's all they do.

 2      Q.   And is it Pam Freeman?

 3      A.   She has just taken -- she's gone

4   to be a regional manager.

5      Q.   It used to be Pam Freeman?

6      A.   It used to be Pam Freeman.

7      Q.   And --

8      A.   Gary Hoyle.

9      Q.   Hoyle?

10      A.   Hoyle.

11      Q.   I mean, you might be saying it

12   right.  I don't even know --

13      A.   It's Hoyle, H-o-y-l-e.

14      Q.   Okay.

15      A.   They used to do them every 90

16   days, but now they're doing them every

17   four months.

18         MR. KESSLER:  There's no

19   question pending.

20           THE WITNESS:  Okay.  I'm sorry.

21      Q.   (By Mr. Goldfarb) When you

22   started -- well, you don't know how long

23   they were doing them before you got

0141

 1   there, do you?

 2      A.   I was told that they did QAs

 3   every three months.

 4      Q.   Every three months.  And now

 5   it's every --

 6      A.   Three times as year.

 7      Q.   Three times?

8     A.   Every four months.

9     Q.   Every four months.  But it's
10   always this QA department folks
now?

11     A.   Yes, sir.

12     Q.   What region -- when you
were in
13   Charles' region -- this might be a
messy
14   question too.

15          When you were in Charles'
16   region, what hotels when you
started
17   there were in Charles' region?

18     A.   Alexander City, Auburn.

19     Q.   Alex City?

20     A.   Auburn, Prattville,
Greenville,

21   Eufaula.  That's all.  There was five of

22   us.

23      Q.   Did it change?

0142

 1      A.   At some point in time, we took

 2   on Selma and Sylacauga and Thomasville,

 3   Georgia.

 4      Q.   Under Charles?

 5      A.   Yes, sir.

 6      Q.   Any others?

 7      A.   Now, we've got a bunch more

 8   because when I left and went to Newnan, I

 9   was under David Shepard.  And --

10      Q.   I'm interested in Charles'
11   hotels.
12      A.   Now?  Do you want everybody
13   that's in it now?
14      Q.   Yes.  Yes.
15      A.   Add to the list Newnan.
16      Q.   Newnan, Alabama?
17      A.   Georgia.
18      Q.   N-e-w --
19      A.   N-a-n.
20      Q.   -- n-a-m?
21      A.   N-e-w-n-a-n.
22      Q.   Sorry.
23      A.   Newnan, Georgia.
0143
 1      Q.   Uh-huh.
 2      A.   LaGrange, Georgia.

 3      Q.   Uh-huh.

 4      A.   Albany, Georgia; and Thomaston,

 5   Georgia.

 6      Q.   Okay.  That's under Charles?

 7      A.   Yes, sir.

 8      Q.   And Alex City is 60-room?

 9      A.   62.

10      Q.   62?

11      A.   Yes, sir.

12      Q.   Exterior?

13      A.   Yes, sir.

14      Q.   Auburn is 40-room?

15      A.   Exterior.

16      Q.   Exterior?

17      A.   Yes, sir.

18      Q.   Prattville is 60?

19    A.  62.

20    Q.  62 exterior?

21    A.  Exterior.

22    Q.  And Greenville?

23    A.  Is 40 exterior.

0144

1    Q.  And Eufala?

2    A.  40 exterior.

3    Q.  Selma?

4    A.  Selma has 60 exterior.

5    Q.  Sylacauga?

6    A.  60 exterior.

7    Q.  Thomasville?

8    A.  40 exterior.

9    Q.  Newman (sic)?

10    A.  Newnan, we have 67, interior.

11    Q.  That's you now?

12     A.   That's me.  And who's next?

13     Q.   LaGrange.

14     A.   They have 60, exterior.

15     Q.   Albany?

16     A.   Albany has 57, I think.

17     Q.   Exterior?

18     A.   Exterior.

19     Q.   And Thomaston?

20     A.   Thomaston is going through a

21   redo, and they have 40.  And I'm sorry.

22   I needed to add two more.  Americus,

23   Georgia has 87 exterior; and Crestview,

0145

 1  Florida.  They have 67, and they're an

 2  interior.

 3    Q.  How many is Americus?

 4    A.  Americus has 87.

 5    Q.  Okay.  Now, are you under

 6  Charles now?

 7    A.  Yes, sir.

 8    Q.  So, all this is Charles, and

 9  you're under Charles?

10    A.  Yes, sir.

11    Q.  Have you been under -- but

12  you've been under somebody other than

13  Charles?

14    A.  That's just happened in the last

15  two weeks.

16     Q.   That you moved back?

17     A.   Yes, sir.

18     Q.   This got rearranged?

19     A.   I was in Region -- when I moved

20   to Newnan, I was originally in Region 4.

21   And they split up -- they disband Region

22   4 and took David Shepard, which was our

23   regional manager.  He is now the QA

0146

 1   assessor.  He's over the QA department.

 2   They took Pam Freeman and moved her to a

 3   regional manager up in Tennessee and all,

 4   and they took part of the hotels that

 5   were originally in Region 4 and put them

 6   in Sandy McGuffey's region and Jeff

 7   Muckle's (phonetic) region.  And the rest

 8   of us, they put in Charles Woods' region?

 9     Q.   And do you have a district

10   manager that you report to under Charles?

11     A.   Betty Sutton.  I don't report --

12   I report to Charles.  Betty Sutton

has

13   just been promoted to district manager,

14   but she's over Eufaula --

15     Q.   Betty's over?

16     A.   Eufaula, Americus, Albany,

17   LaGrange, Thomaston.  Is that five?

18   Thomaston.

19     Q.   Got it.  Thank you.

20     A.   Is that five of them?

21     Q.   Yes, sir.  One, two, three, four

22   five.

23     A.   She's over five.

0147

 1     Q.   And when was she

promoted?

2      A.   Approximately, two weeks ago.

3      Q.   Who promoted -- would Charles

4   have promoted her?

5      A.   I guess Charles promoted her.

6      Q.   He's her boss; right?

7         MR. KESSLER:  Don't guess.  Just

8   testify to what you know.

9         THE WITNESS:  Yes, sir.

10     Q.   (By Mr. Goldfarb) Okay.  And

11   Betty used to be over which location?

12     A.   Eufaula.

13     Q.   And somebody took over Eufaula

14   recently?

15     A.   No, sir, she's still responsible

16   for Eufaula.

17     Q.   Okay.  Is there an assistant

18   manager at Alex City now?

19     A.   No, sir.

20     Q.   Just Robbie?

21     A.   Yes, sir.

22     Q.   How about does Pratville have an

23   assistant manager?

0148

1     A.   Yes, sir.

2     Q.   And Selma?

3     A.   No, sir.  She just quit.

4    Q.   But did have one?

5    A.   Yes, sir.

6    Q.   Sylacauga?

7    A.   Yes, sir.

8    Q.   Newman (sic)?

9    A.   No, sir.

10    Q.   LaGrange?

11    A.   No, sir.

12    Q.   Has it had one?

13    A.   No, sir.

14    Q.   You've got an assistant?

15    A.   No, sir.

16    Q.   Okay.  You're Newman (sic);

(sic);

17   right?

18    A.   Yes, sir.

19    Q.   Albany?

20    A.   I'm not sure Albany has

enough

21   rooms for an AGM.  I could be --
Albany

22   could be a 40-room property.

23     Q.   Okay.  You said 57?
0149

 1     A.   Yeah.  They're probably a
40.

 2   I'm not sure.  Some of them --
they're

 3   all different, but I don't think
Albany

 4   is budgeted for an AGM.

 5     Q.   Crestview?

 6     A.   I think they have just
recently

 7   hired one down there.  I'm not
sure.

 8      Q.   And Americus?

 9      A.   They don't have a general

10   manager or an AGM.

11      Q.   Who runs that?

12      A.   Everybody that can right now is

13   helping run it.

14      Q.   Did it have both before?

15      A.   Yes, sir.  Well, it had a

16   general manager.  He retired.

17      Q.   Is that a purchased property or

18   something that's got 87 rooms?

19      A.   No, sir.  It's just got three

20   buildings.  We own it.

21      Q.   When you were at Alex City,

22   Robbie was an AGM at some

point?

23      A.   Well, for a few months, yes,

0150

 1   sir.

 2      Q.   Has Robbie ever had an AGM?

 3      A.   Experience?

 4      Q.   No.  No.  Has he ever had one

 5   working with him?

 6      A.   No, sir.

 7      Q.   Is it budgeted for an AGM?

 8      A.   Yes, sir.  I think the jobs are

 9   posted everywhere.  We're trying to find

10   the right person.

11      Q.   Okay.  You're trying to fill

it

12   with an AGM?

13      A.   Yes, sir.

14      Q.   Did you -- have you run into

15   Ms. Stough and had any confrontations

16   with her or anything since she left?

17      A.   No, sir.  I try to go the other

18   way if I've seen her in Wal-Mart. I'm

19   not a confrontational person, no, sir.

20   The only time was that one time at the

21   unemployment office.

22    Q.   Well, that was with the mother?

23    A.   Yeah, that was with her mother.

0151

1    Q.   I mean, have you had a

2    confrontation with Ms. Stough ever?

3    A.   No, sir.

4    Q.   I mean, you and Ms. Stough

5    didn't have any personal issues that I

6    know of -- I mean, did you -- fights,

7    problems, or anything?

8    A.   No, sir.

9    Q.   Okay.

10    A.   No, sir.

11     Q.   I mean, you didn't have anything

12   to do with Ms. Stough leaving, did you?

13     A.   To my knowledge, no, sir.

14     Q.   Well, you didn't participate in

15   the decision to get rid of her?

16     A.   No, sir.

17     Q.   Mr. Woods didn't ask you what

18   you thought should happen to Ms. Stough,

19   did he?

20     A.   No, sir.

21     Q.   And you didn't offer any advice

22   to Mr. Woods concerning Ms.

Stough, did

23   you --

0152

1      A.   No, sir.

2      Q.   --what to do with her?

3      A.   No, sir.

4      Q.   Is there any -- when you said --

5   when you started working there, did you

6   have to -- when Charles was there --

7   well, what was Charles doing when he was

8   at the property with you when you

9   started?

10     A.   He was introducing me to her.

11    Q.  No.  No.  No.  I'm sorry.  After

12   she left and he was helping you out, what

13   was he doing?

14    A.   He was tending to e-mails, and

15   he was getting calls from other

16   properties.  He was helping us try to

17   figure out what was what, what keys fit

18   to what, you know, and trying to figure

19   out where to go and how to keep the

20   property manned to keep the doors open.

21     Q.   Okay.  Because you didn't know

22   how to do it at that moment?

23     A.   I didn't feel comfortable

0153

 1   enough, and he didn't either to leave me

 2   by myself.

 3     Q.   And then what did -- who did you

 4   say came in?

 5     A.   Betty Woods and Jim Goodman.

 6     Q.   Betty Sutton?

 7     A.   Betty Sutton.  I'm sorry.

 8     Q.   What did Betty Sutton do?

 9     A.   She came and helped do some of

10   the paperwork, clean out some files and

11   go through stuff like that and helped try

12   to get stuff organized.  And she helped

13   interview some people to try to, you

14   know, hire housekeepers and stuff like

15   that.

16     Q.   So, she helped you?

17     A.   Yes, sir.

18     Q.   All right.  And then what did --

19     A.   Jim Goodman.

20     Q.   -- Jim Goodman do?

21     A.   He came and helped do

some

22   maintenance stuff.  He helped us try to

23   get some contractors for this and

0154

 1   contractors to help get the pool -- the

 2   pool was -- there was something wrong

 3   with the pool, so he tried to help us.

 4   He tried to oversee -- trying to get that

 5   stuff done.

 6      Q.   So, Jim did the maintenance, and

 7   Betty helped with the housekeeping and

8   paperwork?

9       A.   The paperwork and housekeeping,

10   yes, sir.

11      Q.   Did Jim do anything else?

12      A.   Jim would do anything you'd ask

13   him to do.

14      Q.   Is he still -- does he still --

15      A.   He's still with the company,

16   yes, sir.

17      Q.   Auburn?

18      A.   Yes, sir.

19      Q.   Your salary when you started was

20   21, and then it went to 28?

21      A.   Yes, sir.

22      Q.   When you became a GM. And then

23   it went to 32?

0155

 1      A.   Yes, sir.

 2      Q.   Did you ask for the raises?

 3      A.   The only one I asked for -- I

 4   asked what was going to be is what the

 5   rate increase would be from AGM to GM.

 6   And then when I went from Alex City to

 7   Newnan, you know, I had a ballpark in my

 8   head of what to ask for, you know.

 9      Q.   Well, was it at -- then it went

10   to 40; right?

11      A.   Yes, sir.

12      Q.   Okay.  That's Newman (sic)?

13      A.   That's what I'm making now, yes,

14   sir.

15      Q.   Did you get 40 at Alex City?

16      A.   No, sir.

17      Q.   Okay.  So, you didn't get that

18   bump up until you went to Newman (sic)?

19      A.   That's right, I didn't get the

20   bump up until Newnan.

21         MR. KESSLER:  Newnan.

22         MR. GOLDFARB:

Newnan.  Sorry.

23          MR. KESSLER:  Yeah.

0156

1          MR. GOLDFARB:  I don't know why

2   I'm calling in Newman.

3          THE WITNESS:  Newnan.

4      Q.   (By MR. Goldfarb) All right.

5   So, you didn't ask for the 32 bump up?

6      A.   To be completely honest with

7    you, I don't remember making 32.

8      Q.   Okay.  Maybe you didn't.

9      A.   You know.  I may have gotten a

10   raise in there I didn't know about.

11         MR. KESSLER:  You need to

12   testify to what you remember --

13         THE WITNESS:  Okay.

14         MR. KESSLER:  -- and not just

15   agree with him.

16     Q.   (By Mr. Goldfarb) I think you

17   did.  Maybe it was Robbie.  You gave --

18   Robbie was 28, I know that.

19         MR. GOLDFARB:  Didn't I enter

20   this?

21         MR. KESSLER:  I don't think you

22   did.

23          MR. GOLDFARB:  I didn't?

0157

 1          MR. KESSLER:  What is it?

 2          MR. GOLDFARB:  I thought I asked

 3   Winey about that.

 4          MR. KESSLER:  You did. You

 5   introduced this through Winey.

 6          MR. GOLDFARB:  Okay.

 7      Q.   All right.  The reason I said

 8   32, if we look at Exhibit 11 -- I think

 9   you were at 32.  Were you ever -- you

10   were at --

11      A.   I don't think I was at 28.

12      Q.   You're right.  You weren't

at

13   28.  You went right to 32.  Robbie was at

14   28.  I got mixed up.  So, what happened

15   is you bumped up from 21 to 32?

16       A.   Correct.

17       Q.   Okay.  Did you ask for the 32?

18       A.   I told Charles -- I gave Charles

19   Woods a range after I had been there, you

20   know, several weeks and saw what was

21   entailed and what it was going to take

22   to, you know, get the property

back up to

23   what I classified as standards and what

0158

 1   the company was expecting.

 2      Q.   What did you tell him?

 3      A.   I gave him a range of 30 to 35.

 4      Q.   Okay.  And he gave you 32?

 5      A.   Yes, sir.

 6      Q.   Did he ask you what you wanted?

 7      A.   No, sir.  I basically told him.

 8   He didn't ask me what I wanted.  I told

 9   him -- I said, "In order for me to

take

10   this position, I need at least 30 to 35."

11      Q.   Okay.  And you got 32?

12      A.   Yes, sir.

13      Q.   And you took the job?

14      A.   Yes, sir.

15      Q.   There's the end number -- 019

16   does that mean -- is that the name of the

17   hotel?

18      A.   Each property has a code, a

19   number.  And Alex City is 019.

20      Q.   Do you know what Ms. Stough

21   made?

22      A.   Who?

23      Q.   Belinda Stough.

0159

1      A.   Oh.  I know Belinda Stough.

2      Q.   No.  What she made, how much her

3   salary was.

4      A.   Oh.  No, sir, I have no idea

5   what she made.

6      Q.   Now, these other documents --

7   had you ever seen the front page -- this

8   letter on Exhibit 11, any of this stuff?

9   Have you ever seen any of this stuff that

10   goes with this exhibit?

11      A.   No, sir, not until today.

12      Q.   Okay.  Did you do anything to

13   prepare for your deposition today?

14      A.   The only thing I did was meet

15   with Mr. Kessler.

16      Q.   Did you look at any documents?

17      A.   Yes, sir, there were several

18   documents that I looked at.

19      Q.   What did you look at?

20      A.   Different depositions and some

21   of these forms that you've showed me

22   today I've seen.

23      Q.   Did you read parts of --

which

0160

 1   depositions?

 2     A.   I guess, it was Belinda Stough's

 3   deposition.

 4     Q.   You read the deposition?

 5     A.   Not the entire thing.

 6     Q.   And you -- earlier on in your

 7   testimony, you spoke about -- what do you

 8   remember reading in their deposition that

 9   was wrong?

10          MR. KESSLER:  Well, object to

11   the question.  Go ahead and

answer it if

12  you can.

13     Q.   (By Mr. Goldfarb) There's

14  something you had talked -- do you

15  remember reading anything in her

16  deposition --

17     A.   There was several things in

18  there that, you know, that she commented

19  on that was not true.

20     Q.   Okay.  Tell me about that.

21     A.   About her always being at the

22  property, you know, and about her --

23     Q.   The thing about --

0161

 1          MR. KESSLER:  Let him finish his
 2   answer.  He's in the middle of it.
 3          MR. GOLDFARB:  I'm trying to
 4   help him, Gary.
 5          MR. KESSLER:  Well, that's fine.
 6     Q.   (By Mr. Goldfarb) Okay.  Go
 7   ahead.
 8          MR. KESSLER:  But let him
 9   finish, and then you can help him.
10          THE WITNESS:  There was several
11   things.  There was a part in there
12   something about me not working, me not

13   being there, you know, me -- there was

14   something to the effect of -- that she

15   couldn't work with me.  And there was,

16   you know, minor things like that. Like,

17   you know, she had asked for help and

18   stuff like that.

19      Q.   (By Mr. Goldfarb) Okay.  I

20   realize you can't remember the whole

21   deposition.  And I'm not trying --

22          MR. KESSLER:  Yeah. This is --

23   the deposition, I think, is about is

0162

 1   about 230 pages.

 2       MR. GOLDFARB:  No.  I'm not

 3   asking that.

 4       MR. KESSLER:  Let me finish.

 5   And to say what was wrong in the

 6   deposition, I think, is a highly improper

 7   question.  So, on that basis, I object to

 8   it.

 9       MR. GOLDFARB:  Okay. That's

10   fine.

11     Q.   The part of the deposition, I

12   think, that you -- I gather that you read

13   was -- the whole thing at the front --

14   when you said you were at the front -- on

15   the day of the 18th or whatever the day

16   was that she got fired.  And she

17   testified that she did not go around with

18   the audit.  Do you remember reading that?

19       A.   Yes, sir, I remember that.

20       Q.   Okay.  Because you gave long

21   testimony about that?

22       A.   Yes, sir.

23      Q.   Do you remember -- she says that

0163

 1   she didn't go around with the guy -- with

 2   Charles when he did the audit, and you

 3   testified she went around with the audit.

 4   Do you remember reading that testimony?

 5      A.   Yes, sir, I remember.

 6      Q.   Okay.  And you don't agree with

 7   that?

 8      A.   I do not agree with it.

 9      Q.   Okay.  You say that you were at

10   the desk?

11       A.   Yes, sir.

12       Q.   And she did go around
with him?

13       A.   Yes, sir, she did.

14       Q.   For the two hours that he
was

15   there?

16       A.   Yes, sir.

17           MR. KESSLER:  Objection.
Go

18   ahead.

19       Q.   (By Mr. Goldfarb) I mean,
was he

20   there for two, two and a half
hours?

21       A.   Roughly, yes, sir.

22       Q.   Doing the audit?

23    A.  Yes, sir.  Well, QA. 0164

1    Q.  QA.  Doing the QA.  Did you --

2  was there anybody other than you that was

3  there that you can tell me about that

4  witnessed --

5    A.  Her mother was there.

6    Q.  Wait.  Let me finish --

7  Ms. Stough going around with Mr. Woods?

8    A.  Her mother was there. Marilyn

9  Hand was there.  Melissa -- I do not know

10  Melissa's last name.  She was

there.

11    Q.   Marilyn Hand, the lady that went

12   to the unemployment hearing with you?

13    A.   Yes, sir.

14    Q.   Melissa who?

15    A.   Burdette.

16    Q.   Is she still there?

17    A.   No, sir.

18    Q.   When did she leave?

19    A.   She left probably within the

20   last three or four months.

21    Q.   Was she there the day that

22   Ms. Stough went around?

23    A.   Yes, sir.

0165

1     Q.   How do you know that?

2     A.   Because they all worked for

3   Belinda.  And her mother was there

4   because she was the head housekeeper, and

5   they were about the only housekeepers we

6   had.

7         And I plainly remember Ms. Sue

8   Gabbard coming up to me after Belinda

9   left that afternoon and saying something

10   to the effect of, "I hope you're not

11   going to fire me."  And I said, "I don't

12   have that choice.  I'm not the general

13   manager."

14      Q.   Sue came up to you and said

15   that?

16      A.   Yes, sir.

17      Q.   When?

18      A.   It was probably the next morning

19   after she found out that night -- the

20   night before that Belinda had lost her

21   job because Sue came the next day.  And,

22   you know --

23      Q.   What I'm asking about is at

the

0166

 1   time of the hearing -- not the hearing --

 2   the time of the audit, it's your

 3   testimony that Sue was there and Melissa

 4   was there and Belinda was there and

 5   Marilyn was there?

 6      A.   Yes, sir.

 7      Q.   And, I guess, there would have

 8   been a schedule at some point, but you

 9   don't know if that exists?

10      A.   No, sir, I don't know if it

11   exists.  Usually, it was done on

the

12   computer, printed out, hung up on the

13   bulletin board.  And at the end of the

14   week, it was disposed of.  We were not

15   required to keep schedules.

16       Q.   What happens to it in the

17   computer?

18       A.   The next week, you just go over

19   it -- click over it and change it.

20       Q.   It gets deleted?

21       A.   Yes, it gets deleted.

22       Q.   Okay.  You just save over it?

23       A.   Yes, sir, you save over it.

0167

1     Q.   Nobody else was there that day?

2     A.   To my knowledge, no, sir.

3     Q.   I mean, don't you have

4   housekeeping?

5     A.   They were -- Belinda -- Sue

6   Gabbard and all them that I gave you the

7   names of were housekeepers.

8     Q.   Sue and Melissa and Marilyn?

9     A.   Yes, sir.

10     Q.   How many housekeepers does a

11   hotel like that have?

12     A.   It depends on how many you can

13   find, sir.

14      Q.   Well, approximately how many did

15   you have?

16      A.   When I was there, we had --

17   usually kept five or six on hand.

18      Q.   They wouldn't all be there at

19   the same time?

20      A.   No, sir.  It's according to your

21   occupancy the night before.  Most of the

22   time -- when I first started in Alex

23   City, Belinda would have them call

0168

 1   everyday -- housekeepers and see if they

 2   needed to work.

 3       Q.   Okay.  That's why you said it

 4   depends on the occupancy the night

 5   before?

 6       A.   Yes.

 7       Q.   If that -- was that still the

 8   practice after Belinda left?

 9       A.   I changed it and everybody --

10   all the other general managers have gone

11   back to giving them a schedule because we

12   feel it's only fair to them that they

13   know when they're going to work. You

14   know, sometimes they will be scheduled to

15   be off, and we'll have to call them in if

16   we ended up filling up the night before.

17   But that's just -- you know, that's how

18   we hire them.

19      Q.   Okay.  Did any of the

20   housekeepers have any complaints to you

21   about Ms. Stough?

22      A.   Marilyn.

23      Q.   Anybody other than Marilyn?

0169

1    A.   Melissa complained from time to

2   time.

3    Q.   About Ms. Stough?

4    A.   Uh-huh (affirmative).

5    Q.   When did Marilyn complain about

6   her?

7    A.   From time to time, even

8   before -- you know, when I first met

9   Marilyn.  You know, they were so excited

10   to see somebody that was going to be

11   there, you know, because their comments

12   to me is Belinda was never there. I was

13   not there, so I did not know, you know.

14         But just a lot of things that

15   was found out after the fact, you know,

16   that goes back to make me believe what,

17   you know, they were coming and

18   complaining and saying they couldn't work

19   with Belinda, they couldn't work with Sue

20   because Sue was Belinda's momma, and this

21   and that, you know.

22      Q.   Well, what did Melissa

say?

23    A.   Melissa just -- Melissa was one

0170

 1   of these country girls that one minute

 2   she'd say I love working for you. And

 3   the next day, she's going to be puffed up

 4   about something and not like it. So, I

 5   kind of took what she said with a grain

 6   of salt, you know.

 7    Q.   All right.  All I -- do you

 8   remember anything she said about --

9       A.   Not particularly, no, sir.

10      Q.   Let me finish.  Do you remember

11   anything she said about Belinda?

12      A.   No, sir.

13      Q.   Do you remember in particular

14   anything Marilyn said about Belinda?

15      A.   Belinda (sic) did not like the

16   fact that Belinda and her mother worked

17   so close together, and she knew that Sue

18   was covering for Belinda at times.

19      Q.   Marilyn didn't like it?

20      A.   Marilyn didn't like it.

21    Q.   Anything else?

22    A.   No, sir.

23    Q.   And anybody else say anything

0171

1   else about Belinda after the fact?

2    A.   No, sir.

3    Q.   Have you ever been disciplined?

4    A.   With Jameson Inns?

5    Q.  Right.

6    A.   I've -- Charles Woods has gotten

7   on to me before if I wasn't meeting my

8   numbers and stuff, but I don't think

9   nothing's ever been written up.

10    Q.   At the Alex City property?

11      A.   Yes, sir.

12      Q.   What did you do to help the

13   property get more profitable?

14      A.   I worked about 80 hours a week,

15   cleaning up, getting involved with the

16   Chamber of Commerce.  Me and Ms. Sutton

17   made a visit to the Chamber of Commerce

18   shortly after I was named general

19   manager.  I asked her to come up there

20   and go with me on some sales calls.  And

21   when we walked into the

Chamber of

22   Commerce, the lady asked her if she was

23   Belinda Stough because they said, "We've

0172

 1   never met Belinda Stough."  I was put on

 2   the Tourism Board, which helped promote

 3   tourism in the area.  I had to go to

 4   monthly meetings for that.  We

 5   participated in -- we did advertising to

 6   let people know that we were there.  We

 7   cleaned up the property.  I complained

 8   and complained and complained until I --

 9   the old saying, "make the squeaky wheel

10   turn," I was one of them managers.  You

11   know, if we needed new carpet, I

12   complained until we got new carpet.

13      Q.   Complained to?

14      A.   To everybody that I needed to

15   complain to.

16      Q.   Which is?

17      A.   Charles Woods would be first,

18   and then the capital department would be

19   second.

20      Q.   What's the capital department?

21      A.   It's who does the capital

22   budgets every year and tells the

23   regionals how much money they can spend

0173

 1   over and above their regular budgets in

 2   capital expenditures.

 3      Q.   And who else did you complain

 4   to, if anybody?

 5      A.   Just other general managers and

 6   everything like that, you know, just in

7   conversations.

8       Q.   What else did you do?

9       A.   We did an after-hours --
hosted

10   a business after hours for the
Chamber of

11   Commerce, which means that all
the

12   Chamber members were invited to
it.  And

13   they were introduced to me as the
new

14   general manager.  And this was --

15       Q.   You and Betty did this?

16       A.   Charles helped me with it,
and

17   some of the other general
managers helped

18   me with it.  And the Chamber was very
19   helpful.
20      Q.   Charles Woods showed up?
21      A.   Yes, sir.
22      Q.   And he helped you?
23      A.   Yes, sir.
0174
1      Q.   Anything else?
2      A.   No, sir.
3      Q.   Okay.  Have you gotten any
4   written disciplines?
5      A.   No, sir.
6      Q.   Have you given -- did you ever
7   give Robbie any -- other than the
8   complaint, any written disciplines?

9      A.   I believe that was the only one

10   that I ever gave him.

11      Q.   And where -- you said that

12   everybody gets customer complaints, and

13   they're sent in to the home office?

14      A.   Some of them are.  Some of

15   them -- our customer service department

16   is based out of Calhoun, Georgia, out of

17   that property.

18          When you call the 800 number,

19   that's who you'll get.  And Lynna Gron

20   usually gets most of them and tries to

21   handle them from her end and then advises

22   us how to handle it from our end.

23      Q.   Do you -- sometimes you comp

0175

 1   rooms and stuff like that to people?

 2      A.   You can't comp rooms. You give

 3   them a perfect stay, which means we

 4   refund them their money if they paid cash

 5   or either we credit their credit card and

6   charge it to a perfect stay adjustment.

7        Q.   What is a perfect stay

8   adjustment?

9        A.   It's a code where -- our

10   guarantee is we guarantee you a perfect

11   stay or your money back.

12            It's the code we use to code it

13   back to -- to let the computer know and

14   let accounting know that we had a perfect

15   stay adjustment.

16            And we have to document all

17   that, and it has to go in the

monthly
18   perpetual book.
19      Q.   And you've never met Linda
20   Peppers?
21      A.   No, sir.
22         MR. GOLDFARB:  Okay.  I don't
23   have any other questions.
0176
 1         MR. KESSLER:  I don't have any
 2   questions either.  Thank you very much.
 3              ~~oOo~~
 4          The deposition of
 5           James M. Fetner
 6          concluded at 5:25 p.m.

7          On April 21, 2006
8              ~~oOo~~
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23