IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
MIDDLE DIVISION

BELINDA STOUGH,                          :
                                         :
       Plaintiff,                        :
                                         :
v.                                       :          CASE NO. 3:05cv421-W
                                         :
JAMESON INNS, a company                  :
owned or operated by KITCHIN             :
HOSPITALITY, LLC,                        :
                                         :
       Defendant.                        :

JAMESON'S REPLY IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

I.     STOUGH'S "JOB TITLE" ARGUMENT IS MUCH ADO ABOUT
       NOTHING

       Stough, in her response to Jameson's motion for summary judgment

(Docket No. 42), places enormous emphasis on Jameson's lack of precision

in its assignment of a job title to Stough throughout the course of her

employment.  Stough, in the course of entreating this Court to act as her

super-personnel department, parses document after document in an effort to

show that Jameson somehow "hid" a promotion from Stough in order to

deny her a salary increase.  She does so primarily by pointing to various

iterations of Jameson's organizational charts (Exh. 12, Stough Resp.) and to

Jameson's payroll records (Exh. 3 (Exh. 1, Winey Dep.), Stough Resp.).

The flaw with Stough's argument is that nowhere in the record is it established who was responsible for making the designations in question. The payroll records, for example, clearly show that Jameson contracted with ADP to process its payroll, yet there is no evidence as to who instructed ADP to change Stough's pay classification from a desk clerk classification to an assistant general manager classification and then from an assistant general manager classification to a general manager classification. There is certainly no evidence that it was Woods.

The same is true for the organizational charts. With one exception, there is simply no evidence as to who made the decisions to assign a title to Stough on the various organizational charts. The exception is Woods' testimony that, sometime during the summer of 2002, when he again became Stough's direct supervisor, he received an organizational chart showing Stough's title as Interim General Manager, that he received corporate permission – probably from Winey – to remove the "interim" designation, and that he then called an assistant named Phyllis and instructed her to make the change (Woods Dep. p. 185, ll. 3-16). Woods' objective in doing so "was simply to remove the interim" designation (*id*. at ll. 6-7). The only logical inference from this testimony, particularly given the fact that theretofore Woods had not been Stough's supervisor for some period of

time, is that it was not Woods who assigned the interim designation to start with.

Stough's argument in this regard is simply much ado about nothing and demonstrates quite clearly her effort to have this Court sit as her super-personnel department.  It is well-established that this is not the court's function.  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  Moreover, Stough has quite clearly cast Woods as the villain in this piece, the one who she claims had the requisite discriminatory animus towards women[1] and the one who visited the alleged intentional discrimination upon her.  Yet she has no evidence that Woods played any role in assigning job codes to APD or, with the noted exception, in assigning her organizational chart titles.  And the noted exception is one in which

---

[1] It is quite telling that Stough's posited reason why Woods did not particularly like her has shifted dramatically since her deposition.  During her deposition Stough was quite emphatic that Woods did not like her because she "didn't fit into the little clicks [sic]" and did not like to go out drinking at the managers' meetings (Stough Dep. 115, l. 3 – p. 116, l. 9), and that Woods liked female GM Betty Sutton better than he liked Stough because Woods and Sutton were closer friends (Stough Dep. p. 116, l. 14 – p. 117, l. 11).  Now, at the summary judgment stage, Stough posits that Woods was just biased against working women, period.  Even if Woods made the remarks Stough attributes to him, none of them concerned Stough in particular, and Woods' concededly warmer relationship with Sutton belies that he had an overall sexist attitude toward his female subordinates. Moreover, it bears repeating that Stough never complained to anyone in Jameson management about Woods' alleged remarks or that he was treating her in a sexually discriminatory manner.

Woods did Stough a *favor*, designating her as the permanent general manager rather than just the interim one.

The import of Stough's argument is that any employer subjects itself to legal liability if its procedures fall short of guaranteeing that all its business records are maintained with military precision and flawless consistency. Our employment discrimination laws do not require such exacting standards. Jameson is entitled to summary judgment on Stough's pay discrimination claim.

II.    THE COMPARISON TO FETNER IS UNAVAILING

The fact that Fetner was given a higher salary when he replaced Stough as GM at Alexander City is immaterial in light of Stough's discharge for poor performance and the subsequent lifting of the salary freeze. Had Stough been a good performer, and had she remained the GM with Fetner as her AGM, she cannot say with any certainty that her salary would not have increased over that of Fetner at the time the freeze was lifted. This argument is a red herring.

Likewise a red herring is Stough's emphasis on the fact that Fetner was not the ideal candidate he claimed to be and that Woods failed to learn this before he hired him. Here again is Stough's insistence that less than perfect hiring practices, in particular with regard to reference-checking, casts

a sinister pall over Woods' choice of Fetner and demonstrates pretext, thus entitling Stough to a jury trial. This is not the law. *See, e.g.*, <u>Forrester v. Rauland-Borg Corp.</u>, __ F.3d __, 2006 WL 1767760, *1 (7th Cir. June 29, 2006) (disavowing previous dictum that pretext can be shown when the employer's stated reason was insufficient to motivate the action; "question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason *was* his reason; not a good reason, but the true reason") (emphasis in original; copy attached).

III.  <u>STOUGH'S ESTABLISHMENT ARGUMENT IS UNAVAILING</u>

Stough essentially argues that the fact that Jameson has a corporate headquarters with a person responsible for overall operations means all its hotels should be treated as one "establishment" for purposes of an Equal Pay Act analysis. The authorities Stough cites do not support her position. The cases cited by Stough finding multiple locations to constitute a single establishment emphasize factors such as centralized administration of hiring, of wage determinations, of job assignments, and of work schedules. It is undisputed in this case that Stough was responsible for hiring her hotel

staff,[2] and it is likewise undisputed that, in matters in which Woods made recommendations that became effective with Winey's approval, such as GM salaries, Winey gave that approval "99.9 percent of the time" (Winey Dep. p. 23, ll. 16-23). Far from rebutting the presumption, this evidence supports the presumption that Jameson's hotels constituted separate establishments for EPA comparison purposes.

## IV.   THE SIZE OF THE ALEXANDER CITY PROPERTY WAS NOT DETERMINATIVE OF STOUGH'S SALARY

Stough attempts to convince the Court that the fact that her hotel was a sixty-room property should have automatically entitled her to a higher salary. She offers no evidence, however, to dispute Winey's testimony that GM salaries can vary greatly and are generally determined by the individual's experience, the market where the property is located, and the revenues of the property. Stough makes no effort to compare hotel markets or property revenues. Moreover, she fails to reconcile her argument with the fact that she knew that other female GMs under Woods' supervision were

---

[2] Stough even hired her own mother, Sue Gabbard, to be the housekeeping supervisor, something Woods found out about after the fact (Stough Dep. 131, l. 18 – p. 133, l. 20; Woods Dep. p. 83, l. 18 – p. 84, l. 19). Ms. Gabbard has submitted a Declaration (Exh. 7, Stough Resp.) in support of her daughter's case.

paid more than she even though they worked at smaller hotels (Stough Dep. p. 230, l. 18 – p. 235, l. 1).[3]

V.   LACK-OF-MAINTENANCE-PERSON ISSUE OR IN THE REJECTION-OF-AGM-CANDIDATES ISSUE HAVE BEEN DISMISSED FROM THE CASE AND FAIL TO DEMONSTRATE PRETEXT

Stough contends Woods set her up to fail by denying her a maintenance person and by rejecting her choices of candidates for an Assistant General Manager.  Both these issues have already been dismissed and even if considered, neither of these issues carries the weight Stough accords it.

In its Order of March 27, 2006, the Court at pp. 5-6 dismissed staffing issues from this case based on Plaintiff's disavowal of making any such claim.  Whether Jameson staffed the Alexander City hotel with a maintenance person or an Assistant General Manager is clearly a staffing issue--and an issue which has been previously dismissed.

With respect to the maintenance person issue, Stough conceded at her deposition that the company made budgeting changes that eliminated a dedicated maintenance person from her budget and from the budgets of

---

[3] Thus Stough's unsupported statement at page 36 of her response brief that "[t]he defendant makes pay decisions based on the size of the property, resulting in 60 room managers making more money than managers of 40 room properties" is completely false.

similarly-sized properties, and that her hotel was not treated differently from similarly-sized Jameson hotels in this regard (Stough Dep. p. 90, l. 5 – p. 92, l. 4).

Stough also argues that, even though her property was budgeted to have an AGM, Woods refused to allow her to hire AGM candidates she proposed. No discriminatory animus is shown by this, however, as Robbie Patterson testified that Woods also rejected an AGM candidate that Patterson proposed (Patterson Dep. p. 18, l. 8 – p. 20, l. 6). Again, any inference that Woods was treating Stough differently because of her gender is simply unwarranted.

VI.    <u>WOODS' FAILURE TO HAVE STOUGH ACCOMPANY HIM ON HIS FINAL QA INSPECTION IS NOT DEMONSTRATIVE OF PRETEXT</u>

In yet another instance of Stough attempting to ascribe some sinister motive to Woods, she makes much of the fact that Stough did not accompany Woods on the failing QA inspection of February 18, 2004 that resulted in her discharge. Stough's unstated but clear implication is that things would have turned out differently had she done so; otherwise such a break from protocol is completely immaterial. Yet the record contains no basis for such an implication, because the record is quite clear that Stough *had* accompanied Woods on all previous inspections and had disagreed with

his scores every single time. Nothing in the record suggests the outcome would have been any different had Stough accompanied Woods on the final inspection.

VII. STOUGH'S ARGUMENT THAT WOODS HAD ALREADY DECIDED TO REPLACE HER WITH FETNER IS FATAL TO HER RETALIATION CLAIM

Stough attempts to make the case that the final inspection was somehow a sham because Woods had already decided to make Fetner the GM at Alexander City. She points to Regina New's Declaration that she saw Fetner wearing a name tag that said "Mark Fetner, General Manager" while Stough was on vacation in January 2004 and that the next day she overheard Betty Sutton asking Fetner how he was going to like running the property. The clear implication, according to Stough, is that Woods had every intention of replacing Stough with Fetner as the Alexander City GM when Woods hired Fetner as the Alexander City AGM, meaning that Woods was planning to discharge Stough at the time he originally hired Fetner.

Woods' testimony about this was as follows:

Q.    [By Stough's counsel] When you originally hired Mark Fetner, did you intend to put him in a GM job in Alex City?
A.    [By Woods] I felt like he was destined to be a GM and I felt like the hotel in Alex City definitely needed some help. And I had hoped he would come in and help support the hotel and move on and go somewhere else. That was my hope.
Q.    Did you – When you hired him, was it your intention to hire him for the Alex City location?

A.      Yes.  He lived in that area.  So I knew that's the hotel he probably needed to get started at.

(Woods Dep. p. 101, l. 21 – p. 102, l. 12).  Stough's counsel never asked Woods directly if he had already decided to discharge Stough and replace her with Fetner at the time he hired Fetner, and the reason Stough's counsel failed to ask this question seems obvious.  Had Woods confirmed that this was his plan, Stough's retaliation claim goes right out the window, because it is undisputed that Stough did not make her complaint to Woods about Fetner's salary until Fetner was in place and Stough had returned from her vacation.  In Clark County School District v. Breeden, 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam), the Supreme Court held:

> The latter fact [that the plaintiff's actual transfer occurred one month after the employer learned of the plaintiff's protected activity] is immaterial in light of the fact that [the employer] concededly was contemplating the transfer before it learned of the [protected activity].  Employers need not suspend previously planned transfers upon discovering that [the employee has engaged in protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.

See also Drago v. Jenne, __ F.3d __, 2006 WL 1737358, *6 (11th Cir. June 27, 2006) ("We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the

subsequent adverse employment action does not suffice to show causation.")
(copy attached).

This demonstrates the logical inconsistency in Stough's arguments. If Woods was already contemplating discharging Stough at the time he hired Fetner as the AGM, which was weeks before Stough lodged her complaint about Fetner's salary, then Stough's argument that her discharge was retaliatory falls completely apart. In her attempt to throw everything she can on the wall and hope something sticks, Stough must be hoping that the Court does not take notice of such glaring inconsistencies in her arguments.

VIII.   STOUGH'S ARGUMENT ABOUT THE DATE IN THE "ACCOUNTABILITY" MEMO IS SIMPLY PETTY

That Stough argues that pretext is demonstrated by an incorrect date in Woods' February 6, 2004 "accountability" memo to her shows how many straws Stough must grasp in her attempt to convince the Court her case should not be dismissed. Again, according to Stough, there is something very sinister about the fact that Woods referenced a meeting with Stough on February 3 when Stough did not actually return to work from vacation until the next day, February 4. That is just ludicrous. Stough conceded at deposition that she received this memo from Woods on February 6, 2004 (Stough Dep. p. 197, ll. 17-21). Stough also conceded that she already knew her continued employment was in serious jeopardy (Stough Dep. p. 191, l.

23 – p. 195, l. 11; Dft. Exh. 19, Stough Dep.).  Her contention now that

Woods' immaterial error about a meeting date is demonstrative of pretext

just shows the desperate lengths to which she must go to try to keep her case

alive.

IX.    <u>BILL PLUMMER IS NOT A PROPER COMPARATOR</u>

Stough contends gender discrimination is shown in that she was

discharged for receiving two QA failures while male GM Bill Plummer was

retained after receiving two QA failures.  Her evidence in this regard

consists solely of documentary evidence showing Plummer received a

failure from Woods on June 8, 2004 (the second quarter of 2004) at the

Selma property and received a failure from evaluator Gary Houle on

February 24, 2005 (the first quarter of 2005) at the Prattville property (Exh.

14, Stough Resp.).  The burden is on Stough to show a similarity between

her conduct and that of male employees who were treated differently and not

on Jameson to disprove their similarity.  <u>Jones v. Gerwens</u>, 874 F.2d 1534,

1541 (11th Cir. 1989).  Stough fails to satisfy this burden.

Stough deposed no witnesses concerning her comparison to Plummer.

However, the documentary evidence she adduces clearly shows Stough and

Plummer were not similarly situated.  First, Stough received two consecutive

quarterly failures, in the 4th quarter of 2003 and the first quarter of 2004,

while Plummer did not.  Second, Woods did not perform Plummer's failing Prattville evaluation; someone named Gary Houle did, and the Eleventh Circuit recognizes that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."  *Id.* at 1541.  Finally, Plummer's failing evaluations must take into account the evaluator's comments that accompany them.  Woods says of the Selma failed evaluation: "There is marked improvement in this property inside and out over my past visits here.  Trying to bring the entire facility up to standards is a monumental task, however progress is being made and it shows."  Houle says of the Prattville failed evaluation: "[A]s you can see you have a lot of issues but it seems like Josh and yourself have a plan to bring the property up to a very high level."  And, indeed, the rest of this exhibit page shows that Plummer's Prattville property steadily progressed to a "needs improvement" and then an "average" grade.

This Circuit requires that "the quality and quantity of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules."  *Id.* at 1369, quoting

<u>Jones v. Bessemer Carraway Med. Ctr.</u>, 137 F.3d 1306, 1311 (11th Cir. 1998).

Stough has adduced no evidence that Plummer was considered by his superiors to be an unsatisfactory employee or that Plummer had a disciplinary history akin to that of Stough. Her evidence in this regard simply fails to satisfy Stough's burden to show that she and Plummer were similarly situated.

X.    <u>STOUGH'S RETALIATION CLAIM FAILS</u>

Stough essentially sets forth two arguments in support of her retaliation claim: (1) that her good-faith belief that Fetner's pay as compared to hers was discriminatory was both subjectively and objectively reasonable, and (2) that other female GMs who were not discharged for consecutive quarterly QA failures had not complained about discrimination. Each of these arguments is flawed.

The Supreme Court's decision in <u>Breeden</u>, *supra*, is instructive by analogy. The plaintiff Breeden claimed that she engaged in protected activity when she complained about one isolated incident of what she subjectively believed was sexual harassment. The Supreme Court rejected this argument, holding that "[n]o reasonable person could have believed that the single incident recounted above violated Title VII's standards." 532

U.S. at 271.  In so holding, the Supreme Court tacitly reasoned, as has been long established, that citizens are presumed to know the state of the law.

In Stough's case, she was presumed to know that it is not pay discrimination, either under Title VII or the EPA, to pay Fetner the same base salary as she received, particularly given that she had the opportunity to earn bonuses while he did not.  Therefore her complaint of pay discrimination was not objectively reasonable, and this prong of her retaliation argument fails.

As regards Stough's attempt to compare herself to female GMs Barbara Rhodes and Pat Shaw, Stough has two major problems with this argument.[4]  First of all, Stough has no record evidence to support her contention that Rhodes and Shaw never complained of discrimination; she is simply asking the Court to assume that to be true.  Secondly, Stough has adduced no evidence that either Rhodes or Shaw had a progressive disciplinary record akin to hers.  It is undisputed (1) that Woods placed Stough on a performance improvement plan and issued her a written reprimand about her attendance on June 17, 2003, (2) that Woods issued Stough a written warning for poor performance indicating her employment

---

[4] It should also be noted that Rhodes and Shaw had different supervisors and evaluators than Stough (Exh. 14, Stough Resp.)*, see* <u>Jones v. Gerwens</u>, 874 F.2d at 1541.

was at risk on December 29, 2003, and (3) that Woods issued Stough another written warning again indicating her employment was at risk on February 6, 2004. Stough has failed to show that either Rhodes or Shaw had any disciplinary history, much less one as elaborate as Stough's, at the time they received consecutive QA failures. *See* <u>Maniccia</u>, *supra* at 1368 ("We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.").

Given that it is Stough's burden to establish that Rhodes and Shaw are proper comparators for purposes of her retaliation claim, her evidence in this regard completely fails.

## XI. <u>PLAINTIFF'S DAMAGES ARE LIMITED BY THE APPLICABLE STATUTE OF LIMITATIONS</u>

Plaintiff's damages for alleged discriminatory pay are substantially limited by the 180-day filing period under Title VII and the two-year (or three years if willful) limitations period under the Equal Pay Act.

Plaintiff filed her EEOC charge on August 9, 2004. At most, she can recover for alleged discriminatory wages paid to her between February 10, 2004 (180-day period to the EEOC charge) and February 18, 2004, her date of discharge. <u>See also</u> <u>Ledbetter v. Goodyear Tire and Rubber Co.</u>, 421 F.3d

1169, 1182-83 (11th Cir. 2005) (unlawful paychecks are not time-barred if issued within the limitations period).

Under the Equal Pay Act, Plaintiff brought her Equal Pay Act claim on December 5, 2005.  She can challenge wages paid to her only back to December 5, 2003, two and one-half (2 1/2) months before her termination (or December 5, 2002 if willful violation. See 29 U.S.C. § 206(d) and 29 U.S.C. § 255(a).

XII.   CONCLUSION

Stough strives mightily but falls short.  Her case is not worthy of a jury's consideration.   Jameson respectfully prays that its motion for summary judgment be granted in its entirety.

This the fifth day of July, 2006.

Respectfully submitted,

IRVIN, STANFORD & KESSLER, LLP

By:   /s/ Gary R. Kessler
Alabama Bar No. ASB-0251-L52G
3060 Peachtree Road, N.W.
Suite 1050
Atlanta, Georgia  30305
404-237-1020 (office)
404-237-1047 (facsimile)
gkessler@isklaw.com
COUNSEL FOR DEFENDANT

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day electronically filed the foregoing *Defendant's Motion For Summary Judgment* with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

    Angela J. Hill, Esq.
    Jon C. Goldfarb, Esq.
    Kell Ascher Simon, Esq.
    Maury Steven Weiner, Esq.

This the fifth day of July, 2006.

/s/ Gary R. Kessler