FOSHEE & TURNER COURT REPORTERS

Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

CASE NUMBER: 3:05 CV421-W

BELINDA STOUGH,

    Plaintiff,

vs.

JAMESON INNS, a company

owned or operated by

KITCHIN HOSPITALITY, LLC,

    Defendant.

DEPOSITION OF BELINDA STOUGH

In accordance with Rule 5 (d) of The Alabama Rules of Federal Procedure, as Amended, effective May 15, 1988, I, ELLEN DYE, am hereby delivering to Mr. Gary R. Kessler, the original transcript of the oral testimony taken on the 24th day of February, 2006, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

fb9cf948-6ac3-4e86-a6e8-b742ad16c875

FOSHEE & TURNER COURT REPORTERS

Page 90

1  bad and was cracked. We had to bring
2  somebody in to fix the toilet because
3  obviously we were not able to do that
4  because we were not plumbers.
5     Q   Did you have a maintenance
6  person?
7     A   Not when I was there. When I
8  went to work there there was a
9  maintenance person fifteen hours a week
10 but that didn't last very long.
11    Q   So there used to be when you
12 first started working there as a front
13 desk clerk, a maintenance person who
14 worked fifteen hours a week but then that
15 person's position was eliminated?
16    A   Yes, sir. The re-budgeting
17 and all and it was not in the budget to
18 have a maintenance person.
19    Q   I understand. So to have
20 maintenance, to have something maintained
21 through maintenance would you have to
22 bring somebody in from the outside?
23    A   We had to do it or we would

Page 91

1  have to get permission. And a lot of
2  times we did it.
3     Q   Did you ever hire a
4  maintenance person during the time that
5  you were there or place somebody in a
6  maintenance position?
7     A   No, sir.
8     Q   During the entire time that
9  you were there except for this fifteen
10 hours that the person who was working
11 fifteen hours you did not have a
12 dedicated maintenance person?
13    A   No, sir, I did not.
14    Q   And as far as you know that
15 was the same at other similarly sized
16 Jameson Inns?
17       MR. GOLDFARB: Object to the
18 form.
19    A   Yes, sir.
20    Q   (BY MR. KESSLER:) Okay. I
21 mean your place was not being treated any
22 differently was it?
23       MR. GOLDFARB: Object to the

Page 92

1  form.
2     Q   (BY MR. KESSLER:) To your
3  knowledge?
4     A   Not to my knowledge.
5     Q   Housekeeping, was there a
6  housekeeping staff?
7     A   Yes, sir.
8     Q   And how many people would
9  normally be in the housekeeping staff?
10    A   It would vary. Housekeeping
11 was a very hard position to keep full.
12 You could have anywhere between five to
13 ten housekeepers at a time.
14    Q   To be fully staffed how many
15 housekeepers would you have?
16    A   You would always need at least
17 ten.
18    Q   Ten housekeepers?
19    A   For a sixty room property.
20    Q   How many -- on the average day
21 how many rooms would a housekeeper clean?
22    A   On an average day anywhere
23 between eight to ten rooms. Sometimes

Page 93

1  twelve rooms if we were short staffed.
2     Q   I see. So you need ten
3  because of vacations and off days?
4     A   Yes, sir. And it's also
5  according to your occupancy.
6     Q   All right. And then was there
7  a housekeeping supervisor?
8     A   Yes, sir.
9     Q   Okay. And the entire time
10 that you were either acting or actually
11 the general manager there was a
12 housekeeping supervisor?
13    A   No, sir, not the whole time.
14 We were able to bring one in, I believe,
15 it was 2001 -- the end of 2001, the
16 beginning of 2002.
17    Q   Who were the housekeeping
18 supervisors who worked there during the
19 time that you were either acting general
20 manager or general manager?
21    A   Her name was Thelma Gabbard.
22    Q   Did she work there the whole
23 time?

24 (Pages 90 to 93)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35203 * www.legalink.com
1-800-888-DEPO
fb9cf848-6ec3-4e86-a6e8-b742ad16c875

FOSHEE & TURNER COURT REPORTERS

Page 114

1  property was nit-picked. There was
2  things that we -- Mr. Woods and I
3  discussed and I argued with him about
4  that I felt like was unfair.
5    Q   So you thought that he
6  nit-picked the property and that he was
7  unfair?
8    A   Yes, sir, I do. And we argued
9  quite often about that issue.
10   Q   Okay. How long had you been a
11 general manager at that time?
12   A   Two years.
13   Q   Do you know how long Mr. Woods
14 had been in the business at that time?
15   A   No, sir. I know he had been
16 with the business awhile.
17   Q   And do you have any opinion as
18 to why he nit-picked your property?
19   A   Let me think about that
20 question a minute.
21       MR. GOLDFARB: Object to form.
22   A   I don't know how you want me
23 to answer that.

Page 115

1    Q   (BY MR. KESSLER:) I just want
2  you to answer truthfully.
3    A   I just felt like that I was
4  being picked on because of the fact of
5  being a woman. And I felt like I did not
6  fit in the little group and the little
7  clicks because there was things that I
8  did not do. There was things that I did
9  not agree with within the company, within
10 our district. I felt as a woman I was
11 being discriminated against. I felt like
12 I was being picked on. I felt like
13 nothing I did was good enough.
14    And I felt this way because of
15 conversations that we had. There were
16 remarks made that some women can't handle
17 the work. They need to be home and be
18 mothers. I just felt like I didn't
19 belong. I felt like I did not fit
20 because I didn't fit into the little
21 clicks. I didn't participate in things
22 that I did not agree with such as when we
23 had managers meetings. A lot of the

Page 116

1  managers, district managers in our
2  district would get together and go
3  drinking and things and I didn't do that
4  kind of stuff and I just felt like I
5  was -- I didn't fit. I didn't belong and
6  I was being discriminated against because
7  of that fact that I was a woman and that
8  I did not participate in things that I
9  did not agree with.
10   Q   Any other reasons why you
11 believe you were being picked on or
12 discriminated against because you were a
13 woman?
14   A   Yes, sir. Incidents happened
15 that we were in Eufala, Alabama and we
16 were at a district manager's meeting. We
17 were getting ready to leave that
18 afternoon and one of the other managers
19 and myself were walking through the
20 hallway or the breezeway there and she
21 grabbed me by my shoulder and got me back
22 and she said Charles and Betty are
23 standing by the truck and she just kissed

Page 117

1  him. And I said wait a minute I want to
2  see and I leaned over and I did not see
3  him kiss her but I did see them close
4  together.
5    Q   It's Betty Sutton?
6    A   Yes, sir. I'm sorry I did not
7  know the last name. And I just feel like
8  that I just didn't fit because I didn't
9  do things that were inappropriate. I
10 didn't drink. I didn't go to bars. I
11 didn't do that kind of stuff.
12   Q   Any other reasons why you
13 believe that you were picked on because
14 you were a female?
15   A   The pay.
16   Q   Okay.
17   A   The discrimination on the pay
18 due to the fact that is when Mark Fetner
19 came there he made the same pay I did. I
20 was a manager. He was an assistant
21 manager. And later on I did find out in
22 talking with my attorney that --
23       MR. GOLDFARB: Don't tell him

30 (Pages 114 to 117)

FOSHEE & TURNER COURT REPORTERS

Page 130

1  A  Correct.
2  Q  So I'm trying to find out as
3  you look at this performance -- as you
4  look as this product evaluation what in
5  here, if anything, do you believe was
6  nit-picky or unfair?
7  A  The cleanliness issues of the
8  rooms. I mean I had clean rooms. I
9  never received guest complaints. Very
10 few, in any. My rooms were always
11 cleaned. They always smelled clean. I
12 had been to other properties where they
13 were lower than what Jameson's standards
14 would have been. I had a clean property.
15 I had guests that complimented on the
16 rooms and on the clean property. I
17 strived to be the best and to have clean
18 rooms because I would not want to be in a
19 dirty room.
20 Q  So, for example, on the first
21 page of Defendant's No. 9?
22 A  Yes, sir.
23 Q  On the part under overall

Page 131

1  summary?
2  A  Okay.
3  Q  It says, "Failed rooms all on
4  one housekeeper run resulting in dropping
5  score one level." Do you see that?
6  A  Yes, sir.
7  Q  Is that not -- in your view is
8  that not correct?
9  A  No, sir. I do not feel that
10 it is correct. We did have an issue with
11 one. We clarified that issue with that
12 young lady.
13 Q  So when you say that young
14 lady what are you talking?
15 A  A housekeeper. I do not feel
16 that we failed the housekeeping because
17 of all her rooms. I don't feel that way.
18 Q  Well, who was your
19 housekeeping supervisor at that time?
20 A  Ms. Gabbard.
21 Q  Are you related to her in any
22 way?
23 A  Yes, sir, I am.

Page 132

1  Q  What's the relationship?
2  A  She's my mother.
3  Q  So your mother was the
4  housekeeping supervisor?
5  A  Yes, sir, she was.
6  Q  And so I guess you were
7  supervising your mother?
8  A  This is correct.
9  Q  So, when you say that you
10 don't think there were any problems with
11 the rooms you're really talking about
12 your mother being responsible for the
13 room cleaning aren't you?
14 A  Yes, sir.
15 Q  And you love your mother don't
16 you?
17 A  She is my mother, yes, sir.
18 Q  She's your mother and you love
19 your mother don't you?
20    MR. GOLDFARB: Object. Go
21 ahead.
22 A  Yes, sir, but may I answer
23 that question?

Page 133

1  Q  (BY MR. KESSLER:) Well, how
2  long -- your counsel can ask you that
3  question.
4     How long did you keep
5  your mother on the payroll as the
6  housekeeping supervisor?
7  A  She was there a year or so.
8  Q  A year or so?
9  A  Yes, sir. I can't give you
10 exact dates because I don't remember.
11 Q  Well, was she working there at
12 the time that you left?
13 A  Yes, sir, she was.
14 Q  And I think you said you hired
15 her earlier in your testimony. I think
16 you said Theresa Gabbard in 2002
17 sometime?
18 A  I believe it was in 2002 she
19 came to work. It may be a little earlier
20 but I'm going to say 2002, yes, sir.
21 Q  So most of the time you were
22 general manager your mother was the
23 housekeeping supervisor?

34 (Pages 130 to 133)

Page 190

```
 1            (Defendant's Exhibit
 2            No. 18 was marked
 3            for identification.)
 4       Q    All right. Let me hand to
 5  you Defendant's 18, which is a QA
 6  evaluation of December 19, 2003. My
 7  question is did you receive this on or
 8  about December 19, 2003?
 9       A    Yes, sir.
10       Q    Okay. And this was a
11  re-visit from Mr. Woods, right?
12       A    Correct.
13       Q    And it was an improvement from
14  the last one?
15       A    Yes, sir.
16       Q    It was a needs improvement.
17  And do you think that you should have
18  gotten a different score on this
19  evaluation?
20       A    Yes, sir, I do.
21       Q    What is the score you think
22  you should have gotten?
23       A    An average or above.
```

Page 191

```
 1       Q    Did you put anything in
 2  writing anywhere saying that you thought
 3  this evaluation was inaccurate?
 4       A    No, sir, I did not.
 5       Q    I don't think I asked you this
 6  about the previous one, Defendant's 17,
 7  the one in which you failed, the hotel
 8  failed. Did you put anything in writing
 9  saying that you believe that was
10  inaccurate?
11       A    No, sir.
12       Q    Did you keep a diary or any
13  kind of notes or anything that would in
14  any way document any of these issues that
15  you're testifying about today?
16       A    No, sir.
17       Q    Write any e-mails to friends
18  or anything like that?
19       A    No, sir, I did not.
20            (Defendant's Exhibit
21            No. 19 was marked
22            for identification.)
23       Q    Ms. Stough, let me hand you
```

Page 192

```
 1  what's been marked as Defendant's Exhibit
 2  No. 19 and ask if you recall receiving
 3  this Constructive Action Notice on
 4  December 29, 2003?
 5       A    Yes, sir.
 6       Q    Okay. And did Mr. Woods give
 7  this to you in person?
 8       A    I believe -- I don't
 9  recall but -- no, I don't. I'm thinking
10  it came from over the internet. I cannot
11  be sure of that.
12       Q    You think this is an e-mail?
13       A    I don't recall. I don't
14  recall.
15       Q    So, he may or may not have
16  given it to you in person?
17       A    I just don't recall. No, sir,
18  I don't.
19       Q    Is there anything in here
20  that you disagree with?
21       A    Yes, sir, the QA score.
22       Q    The what?
23       A    On the quality assurance
```

Page 193

```
 1  score.
 2       Q    Yes. All right. You've
 3  already testified about that?
 4       A    Yes, sir, I didn't agree with
 5  the score.
 6       Q    All right. He also says in
 7  here that your personnel received
 8  insufficient training or some staff
 9  members have received insufficient
10  training when working alone?
11       A    No, sir, I don't agree with
12  that.
13       Q    All right. He says, "Prior
14  noticing covering QA results and
15  expectation have been sent to you." Now
16  that is true, isn't it?
17       A    As far as him doing the QA
18  inspection, yes.
19       Q    And then giving you a copy of
20  the inspection?
21       A    Yes.
22       Q    And so you were able to keep a
23  copy of the inspection, right?
```

49 (Pages 190 to 193)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

fb9cf948-6ac3-4e88-a8e8-b742ad16c875

Page 194

1  A   There should have been copies
2  at our hotel.
3  Q   Right. It was your
4  responsibility to make sure they were
5  there weren't they?
6  A   Yes, sir. It had to stay in
7  the file.
8  Q   It had a list of stuff that
9  had be to done?
10  A   Yes.
11  Q   So you had clear notice of
12  what you had to do to get the hotel up to
13  standards?
14  A   Yes, sir.
15  Q   Then in the second to last
16  paragraph here it says that basically
17  that the hotel has not met company
18  cleanliness standards and unless it
19  improves that further action will be
20  taken up to and including termination of
21  employment?
22  A   Yes, sir.
23  Q   So, if you didn't know before

Page 195

1  at this point on December 29, '03 you
2  knew that there was a possibility that
3  your continued employment was in
4  jeopardy?
5  A   Yes, sir, but there, again, I
6  felt like it was harassment and
7  discriminatory.
8  Q   I understand. But you knew
9  regardless of the reason you knew that
10  your employment was in jeopardy?
11  A   Correct.
12  Q   Okay. And I guess at this
13  point he had been, based on your
14  testimony, discriminating against you and
15  harassing use for two years, two and a
16  half by now?
17  A   Yes, sir, that would be.
18  Q   And still not the first word
19  written down reflecting all this
20  harassment and discrimination, right?
21  A   No, sir, because I wanted to
22  keep my job. I did not want to lose my
23  job.

Page 196

1  Q   When you say "no, sir," you
2  mean you had not written anything down?
3  A   No, sir, I had not. I had not
4  at that time.
5          (Defendant's Exhibit
6           No. 20 was marked
7           for identification.)
8  Q   Let me hand you what's been
9  marked as Defendant's No. 20, Ms. Stough,
10  and is that your signature in the middle
11  left-hand side?
12  A   Yes, sir.
13  Q   This is dated the same date as
14  the constructive action notice
15  December 29, '03?
16  A   Yes, sir.
17  Q   And there were nine days that
18  you were asking off for January and the
19  3rd of February?
20  A   Yes, sir.
21  Q   Did you take those days off?
22  A   Yes, sir.
23  Q   Do you know what the dates

Page 197

1  were that your husband was on leave from
2  Iraq?
3  A   Yes, sir. He came in on, I
4  believe it was, on the 16th because I had
5  to go to Atlanta to get him.
6  Q   16th of?
7  A   January, yes, sir.
8  Q   Then when did your son get
9  married?
10  A   My son got married on the
11  28th. Well, it was on a Saturday. The
12  last Saturday of January. Excuse me. It
13  was the 24th. It was on a Saturday.
14          (Defendant's Exhibit
15           No. 21 was marked
16           for identification.)
17  Q   Ms. Stough, let me hand you
18  what's been marked as Defendant's Exhibit
19  No. 21 and ask you if this is a memo that
20  you received from Mr. Woods on or about
21  February 6, 2004?
22  A   Yes, sir.
23  Q   Okay. And he lists seven

50 (Pages 194 to 197)

Page 230

1   Q   You say in your
2   interrogatories that you think a guy
3   named Jim made more than you did?
4   A   Well, after seeing the pay
5   roster I kind of suspected so, yes, sir,
6   that he possibly was making more salary
7   than what I was, yes, sir.
8   Q   Jim Goodman?
9   A   Yes, sir.
10  Q   In Auburn?
11  A   Yes, sir. The last I knew, I
12  don't know now. I don't know if he's
13  still there or not.
14  Q   Do you know anything about his
15  qualifications or education or
16  experience?
17  A   No, sir, I do not.
18  Q   Do you know anything about
19  Betty Sutton's qualifications or
20  educational experience in the hotel
21  industry?
22  A   No, sir.
23  Q   You know Betty makes more than

Page 231

1   you did?
2   A   Correct.
3   Q   And you knew that Sam Ellis
4   made more than you?
5   A   I did not know that until
6   recently.
7   Q   You know it now don't you?
8   A   Yes, sir.
9   Q   Do you know anything about her
10  experience or background in the hotel
11  industry?
12  A   Sam and I talked. I want to
13  say she had experience before. I know
14  she had been with the company a while
15  longer than I had. I think she had been
16  there five, six years.
17  Q   Do you think it was okay in
18  your view that Sam Ellis was making more
19  than you?
20  A   I don't know.
21  Q   Well --
22  A   I mean --
23  Q   Well, Ms. Stough this is an

Page 232

1   equal pay claim. I assume you
2   thought a little bit about salaries.
3   Ms. Ellis was in your district?
4   A   Uh-hmm.
5   Q   And my question is she's
6   running a hotel just like you were and
7   she was making more than you. Do you
8   think that was okay?
9   A   Well, she was at a forty-room
10  property. I was at a sixty-room property.
11  Q   She's running a smaller hotel
12  and making more money than you. Do you
13  think that was okay?
14      MR. GOLDFARB: Object to form.
15  A   No, sir.
16  Q   (BY MR. KESSLER:) Do you think
17  that was sex discrimination?
18  A   I don't know how to answer
19  that.
20  Q   Well, just yes or no. Do you
21  think it was sex discrimination?
22      MR. GOLDFARB: Object to form.
23  A   She had been with the company

Page 233

1   longer than I have. I guess it was fine.
2   Q   (BY MR. KESSLER:) So maybe it
3   was a factor other than sex?
4   A   I don't understand. When you
5   say "factor" can you explain that?
6       MR. GOLDFARB: Object. Asking
7   for a legal conclusion.
8   Q   (BY MR. KESSLER:) The word
9   factor is hardly legal. A reason other
10  than sex that led the company to pay her
11  more than you were paid?
12      MR. GOLDFARB: Object to form.
13  It calls for a legal conclusion.
14  Q   (BY MR. KESSLER:) You don't
15  know?
16  A   I don't know.
17  Q   You don't have any idea do you?
18  A   No.
19  Q   So you really don't have any
20  idea why Jim Goodman was paid more than
21  you do you?
22  A   I never asked him to tell me
23  what he made. I never asked him his

59 (Pages 230 to 233)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

fb9cf948-6ac3-4e86-a6e8-b742ad16c876

Page 234

```
1   background. I didn't feel like that was
2   my place.
3       Q    I understand but the point
4   that I'm making is you don't have any
5   opinion about whether Sam Ellis should or
6   should not have made more money than you
7   do you?
8       A    I don't know what to say to
9   that. I've never thought about it. I
10  guess. I don't know what to --
11          MR. GOLDFARB: Object to form.
12  I don't understand where this is going.
13      A    I don't understand the
14  question period. I don't understand.
15      Q    (BY MR. KESSLER:) Well, let
16  me restate it differently. I apologize.
17  And Sam Ellis is a female, right?
18      A    Correct.
19      Q    And based on the information
20  you've seen she made more than you did?
21      A    Yes, sir.
22      Q    And she was working at a
23  smaller hotel?
```

Page 235

```
1       A    Correct.
2       Q    Okay. Did you have a problem
3   with the fact that she earned more than
4   you did though she was working at a
5   smaller hotel?
6           MR. GOLDFARB: Object to form.
7       A    I never knew what she made.
8       Q    (BY MR. KESSLER:) Now that you
9   know do you have a problem with it?
10      A    Do I have a problem with it?
11      Q    Yeah. Do you think it's
12  unfair that she made more money than you
13  did?
14      A    At this point I mean I don't
15  know how to answer that because I just
16  never knew what her pay was. I never
17  asked her what her pay was.
18      Q    But now you know. Now you
19  know that she was making more than you
20  were, okay? As you're sitting here you
21  know today on February 24, 2006 that she
22  was making more than you were in early
23  2004. And my question is do you think
```

Page 236

```
1   that was unfair?
2           MR. GOLDFARB: Object to form.
3   Asked and answered.
4       Q    (BY MR. KESSLER:) As you sit
5   here today do you think that was unfair?
6           MR. GOLDFARB: Object to form.
7       A    I never thought about it.
8       Q    (BY MR. KESSLER:) Jim Goodman
9   made more than you did and he was working
10  at a smaller property. Do you think that
11  that was unfair?
12      A    Yes, because he had been there
13  less time than I had been there.
14      Q    Do you know what his
15  background was in the industry?
16      A    No, sir, I do not.
17      Q    So, the basis for your belief
18  that Jim Goodman was -- you were treated
19  unfairly in comparison to Jim Goodman was
20  he was general manager for a shorter time
21  than you were?
22          MR. GOLDFARB: Object to form.
23      A    He's a male.
```

Page 237

```
1       Q    (BY MR. KESSLER:) He's a male?
2       A    Correct.
3       Q    What about Betty Sutton, you
4   know what Betty Sutton's salary is now
5   don't you?
6       A    Yes, sir.
7       Q    And you're aware that all
8   these salary figures are confidential,
9   right?
10      A    Yes.
11      Q    You can't talk to people about
12  that?
13      A    No, sir, I will not do that.
14      Q    Betty Sutton is a female,
15  right?
16      A    Correct.
17      Q    She ran Eufala?
18      A    Yes.
19      Q    Eufala had forty rooms?
20      A    Yes, sir.
21      Q    You know now that Betty Sutton
22  earned more than you did, correct?
23      A    Correct.
```

60 (Pages 234 to 237)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

fb9cf948-6ac3-4e86-a6e8-b742ad18c875

December 29, 2003

Constructive Action Notice

This is notice of unsatisfactory performance for Belinda Stough, General Manager of the Jameson Inn of AlexCity, Alabama.

Results from the 4th Quarter Quality Assurance Inspection on your property were "fail". A follow up inspection was done 30 days later and the results of that inspection were "Needs Improvement". Cleanliness standards were not met on either inspection.

In addition, an evaluation of personnel at your facility revealed insufficient training with some staff members working shifts alone. This cannot happen. No one is to work a shift unless they are thoroughly trained in the fundamental areas of guest service.

Prior notices covering QA results and expectations have been sent to you. Please note that your property will be inspected randomly over the next three to six months. Your failure to meet company cleanliness standards in any of these inspections and or desk coverage with insufficiently trained staff will result in further action, up to and including termination of employment.

If you have any questions concerning this notice, please let me know.

Charles Woods
District Manager



DEFENDANT'S EXHIBIT
19

Jameson-0047