IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

BELINDA STOUGH,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        CIVIL ACTION NO. 3:05CV421-SRW
                                   )                    (WO)
JAMESON INNS,                      )
                                   )
            Defendant.             )

**MEMORANDUM OPINION AND ORDER**

In this employment discrimination action, plaintiff brings three counts alleging:
(1) that defendant discriminated against her on the basis of her gender with regard to her pay,
evaluations/inspections, and discipline/termination (Count I); (2) that defendant retaliated
against her in violation of Title VII by refusing to increase her pay to a level above that of
her Assistant Manager, by issuing her a false cleanliness report, and by terminating her
employment (Count II); and (3) that defendant willfully paid plaintiff a lower wage than male
employees performing substantially equal work in violation of the Equal Pay Act (Count
III).[1]  This action is presently before the court on the motion for summary judgment filed by
defendant on May 26, 2006 (Doc. # 35).  Defendant contends that it is entitled to summary
judgment as to all of plaintiff's claims.  Upon consideration of the motion, the court
concludes that it is due to be granted in part and denied in part.

---

[1]  See Amended Complaint (Doc. # 16) and previous order on summary judgment (Doc.
# 31).

# BACKGROUND[2]

Plaintiff began working for defendant as a desk clerk at defendant's Alexander City Jameson Inn location in May 2000. A few months later, the general manager of the hotel was transferred to Selma. Another employee, Deborah Schweir, became the acting general manager and plaintiff became her assistant. In December 2000, Schweir resigned. Thereafter, Charles Woods began overseeing the property with plaintiff as his acting assistant manager. Woods lived in Ozark but went to the Alexander City location two or three days per week. Woods recommended to Paul Komanecki, then District Manager, and Hal Smith, Regional Manager, that plaintiff become the acting general manager and, subsequently, the general manager of the Alexander City property. In July 2001, plaintiff was promoted to the position of assistant general manager at an annual salary of $21,000, an increase from her desk clerk pay of $15,990.[3] Plaintiff was not told that she was an assistant general manager. Instead, she was told and believed at that time that she had been promoted to the position of

---

[2] As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). The court considers any objections not raised to the use or admissibility of the evidence to be waived for purposes of this motion. Davis v. Howard, 561 F.2d 565, 570 (5th Cir. 1977).

[3] Defendant suggests that, by arguing that defendant's payroll records establish the chronology of plaintiff's promotion history, plaintiff is "entreating this Court to act as her super-personnel department." (Defendant's reply, pp. 1-4). The court disagrees. The payroll records – accurate or not – constitute evidence of plaintiff's employment history. Additionally, there is evidence that defendant itself attributes significance to an employee's "job code." See Exhibit 3 to Winey depo., April 2, 2003 memo ("Wage/salary increases are authorized only in connection with a bona fide promotion as evidenced by a job code change."). On the present motion, the court is required to view the evidence in the light most favorable to plaintiff and must resolve evidentiary conflicts in the plaintiff's favor.

general manager.  In March 2002, plaintiff's "job code" was changed from 120 (assistant general manager) to 100 (general manager).  Plaintiff was not advised of this change and did not receive any increase in pay as a result of the change.  Plaintiff's base salary remained at $21,000 annually until her termination in February 2004.  (Stough depo., pp. 76-88; Woods depo., p. 49; Exhibit 1 to Winey depo., weeks 18-32 for 2001 and 1-10 for 2002; Exhibit 16 to Winey depo.; Plaintiff's Exhibits 15, 16; Stough dec. ¶¶ 2-5).

For much of 2001 until the second quarter of 2002, Woods shared supervision of plaintiff with another district manager.  Woods had sole responsibility for supervising plaintiff from the time she became general manager until her termination  in February 2004.  (Plaintiff's Exhibit 10, p. 3; Stough depo., pp. 204-05; Woods depo., pp. 162-64, 198).  Woods performed periodic Quality Assurance ("QA") inspections on plaintiff's property and completed inspection reports.  The rating scale permitted an overall rating of outstanding, above average, average, needs improvement or failure, based on the assessor's findings on individual items included in a checklist.   Plaintiff received an overall rating of "Needs Improvement" on a QA assessment in March 2003, followed by overall ratings of "Average" in September 2002 and April 2003.  On June 11, 2003, plaintiff again received an overall rating of "Needs Improvement" on her QA inspection.  Several days later, Woods placed plaintiff on a "Performance Improvement Plan," citing her QA scores and advising her that further corrective action would be taken if she continued to experience performance deficiencies.

In August 2003, plaintiff received a score of "Average" on her QA inspection.  In

3

November 2003, she received a "Failure" rating.  Woods conducted a follow-up QA

inspection on December 19, 2003, rating plaintiff as "Needs Improvement."  On December

29, 2003, Woods issued a "Constructive Action Notice" to plaintiff, citing primarily the

failure to meet cleanliness standards on the two previous inspections.  The notice stated:

> Prior notices covering QA results and expectations have been sent to you.
> Please note that your property will be inspected randomly over the next three
> to six months.  Your failure to meet company cleanliness standards in any of
> these inspections and or desk coverage with insuffi[ci]ently trained staff will
> result in further action, up to and including termination of employment.

On February 6, 2004, Woods sent plaintiff a memorandum documenting a previous

conversation between Woods and plaintiff regarding "corporate standards and expectations."

(Defendant's Exhibits 9-12, 15-19, 21 to Stough depo.).

On February 14 or 15, 2000, plaintiff learned that Mark Fetner – the assistant general

manager who had just been hired by defendant on Woods' recommendation to work at

plaintiff's property – was making the same salary as plaintiff.  Plaintiff telephoned Woods

and told him that she was being sexually discriminated against in pay.  (Fetner depo., pp. 76-

82; Winey depo., pp. 106-07 and Exhibit12; Stough dec., ¶ 7).  Woods told plaintiff that he

did not have time to talk about it right then.  (Stough dec. ¶8).

On February 18, 2004, Woods performed another QA inspection of plaintiff's

property and gave plaintiff an overall rating of "Failure."  (Defendant's Exhibit 22 to Stough

depo.).  Woods told plaintiff she had failed the assessment and terminated her employment.

(Stough depo. pp. 203-08).

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact.  Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993). For issues on which the non-movant bears the burden of proof at trial, "the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility.  Instead, the moving party simply may show [ ] – that is, point[ ] out to the district court – that there is an absence of evidence to support the non-moving party's case."  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993)(quoting U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991)(en banc)).

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves. . . ."

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

## DISCUSSION

### Title VII Discrimination Claims

As noted above, plaintiff brings claims that defendant discriminated against her on the basis of her gender with regard to her pay, evaluations/inspections, and discipline/termination. Plaintiff has not argued that these claims of discrimination are

supported by direct evidence of discriminatory intent.  The <u>McDonnell Douglas</u>/<u>Burdine</u>[4] framework was established by the Supreme Court for evaluating a Title VII plaintiff's claims of discrimination against an employer where there is no direct evidence of discrimination. <u>See</u>  <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1527-28 (11th Cir. 1997).  The plaintiff must first make out a *prima facie* case of discrimination.  <u>Burdine</u>, 450 U.S. at 252-53; <u>Walker v. Mortham</u>, 158 F.3d 1177, 1183 (11th Cir.1998); <u>Combs</u>, 106 F.3d at 1527-28. "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee.  If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." <u>Id</u>. (quoting <u>Burdine</u>, 450 U.S. at 254); <u>Walker</u>, *supra*.

If the plaintiff establishes a *prima facie* case, the employer has the burden of producing "legitimate, non-discriminatory reasons for the challenged employment action." <u>Combs</u>, 106 F.3d at 1528 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).  "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." <u>Combs</u>, 106 F.3d at 1528 (quoting <u>Burdine</u>, 450 U.S. at 257).  If the employer articulates a legitimate, nondiscriminatory reason for its decision, the mandatory inference of discrimination arising from the *prima facie* case is destroyed.

---

[4]  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981).

Walker, 158 F.3d at 1184.  The plaintiff must then produce evidence "including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Combs, 106 F.3d at 1528.

Defendant argues that it is entitled to summary judgment on plaintiff's discrimination claims because it has articulated a legitimate, nondiscriminatory reason for its actions – plaintiff's performance problems – and plaintiff has no evidence that this reason is pretextual. (See Defendant's brief, Doc. # 36, § B).[5]

Woods testified that he decided to terminate plaintiff's employment, after consultation with Winey, after plaintiff failed the QA inspection on February 18, 2004.  (Woods depo., pp. 104-06; Exhibit 10 to Woods depo., response to interrogatory nos. 9, 10).   To demonstrate pretext, plaintiff relies, *inter alia*, on the following:

(1) Plaintiff testified that, when Woods came to conduct the final QA assessment, Woods told plaintiff to stay at the front desk.  Plaintiff was going to call a desk clerk in, but Woods told her that it was not necessary.  Plaintiff thought that "was very odd because that's

---

[5]  In its discussion of Count I in its initial brief, defendant explicitly states that, "[f]or purposes of this motion, Jameson assumes without conceding that Stough can establish her *prima facie* case of sex discrimination." (Defendant's brief, p. 5).  The defendant does not separately argue or analyze plaintiff's claim of discriminatory pay.  Thus, the court does not reach the issue of whether plaintiff has established a *prima facie* case of discrimination as to her pay, inspections/evaluations or discipline/termination – all of the sex discrimination claims raised in Count I.  Defendant makes arguments in its reply brief that appear to be challenges to plaintiff's ability to establish a *prima facie* case of discrimination on her termination claim.  See *e.g.*, Section IX of reply brief.  However,  since defendant expressly waived the argument for purposes of this motion in its initial brief, the court does not consider this argument.

not the normal procedure." (Stough depo., pp. 104-05; 159-60). Winey, the Vice President of Operations, testified that "optimally," the general manager should accompany the QA assessor, because the general manager "need[s] to know and see everything that the QA assessor is seeing." A general manager would not accompany the assessor, however, if the general manager were working the desk or not at the property at the time. (Winey depo., p. 65).

(2) While plaintiff was on leave in January 2004, Regina New, a Jameson Inn employee saw Mark Fetner in the BP station near the hotel. She had not seen him before, but noticed that he was wearing a Jameson Inn nametag which read "Mark Fetner, General Manager." New asked Fetner if he were taking plaintiff's place and Fetner "looked flustered, said no he was just going to be up there helping and he left." The next day, New saw Fetner walking around the hotel property with Betty Sutton, the Eufaula general manager. New overheard Sutton ask Fetner "how are you going to like running this property," and telling him that the property "was one of the cleanest properties that Jameson had." (New dec., ¶ 4). Plaintiff argues that this demonstrates that Woods made the decision to terminate plaintiff and replace her with Fetner before February 18, 2004.

(3) Plaintiff did not have two consecutive "Failure" ratings on QA assessments but, instead, the November 2003 "Failure" was followed by a December 2003 "Needs Improvement." (Defendant's Exhibits 17, 18, 22). Defendant's policy on QA evaluations states that "Receiving a 'failing' grade twice *consecutively* may lead to immediate

termination of employment."  (Exhibit 6 to Winey depo.)(emphasis added).[6]

(4) Woods made comments evidencing gender-based animus, some to plaintiff while discussing plaintiff's quality assurance ratings.  In her declaration, plaintiff states:

> I disagreed with Mr.Woods' Quality Assurance evaluations and write-ups because they were not true.  I told Mr. Woods his Quality Assurance evaluations were not true and his write-ups were not true; however, Mr. Woods would not listen to me.  Rather he would only make remarks about how women get overemotional and tend to overreact and about how some women cannot handle the work place as well as a man and should be at home and not in the work force.

(Stough dec., ¶ 16).

Sue Gabbard, plaintiff's mother, worked at the property as Housekeeping Supervisor. In early 2004, while plaintiff was on leave, Gabbard overheard Woods say, "I think women just need to stay home and take care of their families."  On another occasion in early 2004, Woods saw Gabbard and another female employee on a ladder working on a downspout. Woods asked what they were doing, and Gabbard responded that the downspout had to be fixed because a man had backed his boat into it.  Woods said that "it is a man's job to fix that."  (Gabbard dec., ¶¶ 1, 5, 6; Stough dec., pp. 132-32).

New states that in early 2004, Woods saw her on a ladder changing a light bulb outside.  He told her that she "did not need to be on that ladder because [she] was a woman." He said that plaintiff "needed to get a man to do electrical things, because women did not

---

[6] Exhibit 6 is dated April 2004, shortly after plaintiff's termination.  However, Winey read the policy and testified that the document accurately reflected the way quality assurance evaluations were done while he was at Jameson.  (Winey depo., pp. 76-77).  There is no testimony that the policy reflected in Exhibit 6 was different from the policy in place during plaintiff's employment.

need to be doing such work." New also states that in 2003 or early 2004, Woods was talking about his wife staying home and taking care of his household and that he said "that is where women should be – at home." (New dec., ¶¶ 2, 3).

In 2000, Jameson employee Faye Bennett heard Woods say, "Women don't have any damn business working anyway. They need to be home with the kids. A man's place is to be working because it is a man's world." (Bennett dec., ¶ 2).

(5) Plaintiff testified that she disagreed with Woods' QA ratings because they were "totally, totally, totally, wrong." She never received any guest complaints and "had guests that complimented on the rooms and on the clean property." (Stough depo., pp. 125-30).

As defendant argues, plaintiff may not establish pretext simply by disagreeing with her employer's assessment of her performance. However,

> [c]omments or remarks that suggest discriminatory animus can be sufficient circumstantial evidence to establish pretext. Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1362 (11th Cir. 1999); Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291 (11th Cir. 1998). "[W]hether comments standing alone show pretext depends on whether their substance, context, and timing could permit a finding that the comments are causally related to the adverse employment action at issue." Bonham v. Regions Mortgage, Inc., 129 F.Supp.2d 1315, 1332 (M.D. Ala. 2001)(Thompson, J.).

Herawi v. State of Alabama Dept. of Forensic Sciences, 311 F. Supp.2d 1335, 1348 (M.D. Ala. 2004)(Thompson, J.). In this case, according to plaintiff, Woods made statements evidencing discriminatory animus while plaintiff was responding to Woods' critiques during the QA assessments which plaintiff claims are discriminatory and upon which defendant relies as the basis for plaintiff's termination. Additionally, Woods' statement to New that

11

plaintiff "needed to get a man to do electrical things, because women did not need to be doing such work" and his statement to Gabbard that it was a "man's job" to fix the downspout occurred near the time of plaintiff's final QA evaluation and termination and related to the manner in which plaintiff performed her job as general manager.

The evidence cited by plaintiff is sufficient to allow a reasonable jury to conclude that the reason advanced by defendant for its actions – plaintiff's poor performance – is pretextual.[7]  Accordingly, defendant is not entitled to summary judgment on Count I of plaintiff's complaint.

### Title VII Retaliation Claim

On February 14 or 15, 2006, a few days before she was terminated, plaintiff learned that Fetner – the new assistant general manager who reported to her – was making the same

---

[7] Defendant cites evidence in the record regarding a company-wide pay freeze from early 2002 until just after plaintiff's termination (see Jameson's statement of facts, ¶¶ 9, 34) and cites Winey's testimony that general manager salaries can vary greatly and are generally determined by the individual's experience, the market where the property is located and the revenues of the property (id., ¶ 6).  However, as noted previously, defendant makes no discrete argument in its brief regarding plaintiff's Title VII wage discrimination claim and does not argue  any legitimate reason for its actions other than plaintiff's performance.  (See n. 5, *supra*).  The court declines to consider arguments not  actually presented by the defendant in its brief in support of the present motion.  However, the court notes that defendant did not introduce any testimony from Paul Komanecki, the district manager who initially set plaintiff's salary at $21,000 in 2000, explaining the basis for his recommendation/decision. (See Woods depo., pp. 72-73; Plaintiff's Exhibit 11, second supplemental response to interrogatory no. 4, ¶¶ 9, 10).  Additionally, plaintiff has introduced evidence that her promotion to general manager, as evidenced by the job code change in March 2002, fell within an exception to the pay freeze and would have permitted a raise.  (Exhibits 3 and 14 to Winey depo.).  Plaintiff also points to evidence that male assistant general managers who were promoted to general manager during the freeze were awarded pay raises.  (Plaintiff's Exhibit 17, salary histories for Macfarlane, O'Steen, Sharpe, and Theus).  To the extent that defendant relies on Woods' testimony that he reviewed plaintiff's salary at the time that she was promoted to general manager but did not feel a raise was warranted (Woods depo., pp. 75, 187-89), the evidence, as discussed above, is sufficient to demonstrate the existence of a genuine issue of fact regarding pretext.

salary as plaintiff.  She telephoned Woods and complained that she "was being sexually discriminated against because of [her] pay." (Stough dec. ¶ 7).  Plaintiff states, "I told Mr. Woods that I was being discriminated against in pay because I am a female and my male Assistant General Manager was making the same salary that I was making." (Id.).  At the time, plaintiff "had no idea what other General Managers made, and what I was supposed to be paid as a General Manager of a 60 room property." (Id., ¶ 8).[8]  Plaintiff "wanted to meet

---

[8]  In her deposition, plaintiff testified as follows:

Q.  What day is pay day?

A.  I believe it was around the 14th or 15th.  Biweekly is what pay day was when I got the payroll roster.

Q.  At that point you realized what Mr. Fetner was earning?

A.  Yes, sir.  At that point I realized what Mr. Fetner was earning.

Q.  What exactly did you say to Mr. Woods?

A.  I had called and said we need to talk.  And I don't remember what his response was but I said that I seen the pay roster and that I was aware of – that Mark was making the same pay I was and that I felt like it was sexual discrimination, pay discrimination basically.

Q.  Okay.  What did Mr. Woods say?

A.  I don't have time to talk about it right now.

Q.  Is that it?

A.  Yes, sir.

Q.  And was that the end of the conversation?

A.  Yes, sir.

with Mr. Woods and find out whether other General Managers made the same as their Assistant General Managers."  (Id.).

Plaintiff claims that, after she made this complaint, defendant retaliated against her in violation of Title VII by refusing to increase her pay, issuing a false cleanliness report and terminating her employment.  (First Amended Complaint, Count II).  The court analyzes Title VII retaliation claims using the McDonnell-Douglas framework.  See Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002).  To establish a *prima facie* case of retaliation under Title VII, plaintiff must establish, *inter alia*, that she engaged in statutorily protected expression.   See Weeks v. Harden Manufacturing Corp., 291 F.3d 1307, 1311 (11th Cir. 2002). Defendant contends that plaintiff cannot establish this element of her *prima facie* case. Specifically, defendant argues that "a claim of sex discrimination in pay is not actionable if the plaintiff and her male comparator receive the same pay" and, thus, plaintiff's complaint was not a statutorily protected expression.  (Defendant's brief, p. 9).

As plaintiff notes, "[a] plaintiff engages in 'statutorily protected activity' when he or she protests an employer's conduct which is actually lawful, so long as he or she demonstrates 'a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388

---

Q.  Did you say anything else to him about that?

A.  No, sir, because all that day when he called he wanted to speak with Mark –

(Stough depo., pp. 224-25).

(11th Cir. 1998)(quoting <u>Little v. United Technologies, Carrier Transicold Division</u>, 103 F.3d

956, 960 (11th Cir. 1997)).  However,

> [i]t is critical to emphasize that a plaintiff's burden under this standard has
> both a subjective and an objective component.  A plaintiff must not only show
> that he *subjectively* (that is, in good faith) believed that he employer was
> engaged in unlawful employment practices, but also that his belief was
> *objectively* reasonable in light of the facts and record presented.  It thus is not
> enough for a plaintiff to allege that his belief in this regard was honest and
> bona fide; the allegations and record must also indicate that the belief, though
> perhaps mistaken, was objectively reasonable.

<u>Little</u>*, supra*, 103 F.3d at 960 (emphasis in original).  Plaintiff points to her testimony that

she told Woods that she "felt like it was sexual discrimination" because she was a female

manager and her male assistant manager made the same salary.  (Plaintiff's brief, p. 52).

While this evidence satisfies the subjective component of the standard, it does not go to the

issue of whether plaintiff's subjective belief was objectively reasonable.

> The objective reasonableness of an employee's belief that her employer has
> engaged in an unlawful employment practice must be measured against
> existing substantive law.  <u>See</u> <u>Harper v. Blocbuster Entertainment Corp.</u>, 139
> F.3d 1385, 1388 n. 2 (11th Cir. 1998)(failure to charge the employee who
> opposes an employment practice with substantive knowledge of the law
> "would eviscerate the objective component of our reasonableness inquiry").

<u>Clover v. Total System Services, Inc.</u>, 176 F.3d 1346, 1351 (11th Cir. 1999).[9]  Additionally,

in evaluating the objective reasonableness of the plaintiff's belief, the court looks only to the

---

[9]    However, as noted above,"[a] plaintiff . . . need not prove the underlying
discriminatory conduct that he opposed was actually unlawful in order to establish a *prima
facie* case and overcome a motion for summary judgment." <u>Little</u>, *supra*, 103 F.3d at 960.

15

conduct the person opposed[10] and not to conduct of which the plaintiff was unaware. Id. at

1352 ("For opposition clause purposes, the relevant conduct does not include conduct that

actually occurred . . . but was unknown to the person claiming protection under the clause.

Instead, what counts is only the conduct that the person opposed, which cannot be more than

what she was aware of.  Additional conduct or allegations unknown to the opposing person

are not relevant to the opposition clause inquiry.").

"Under the McDonnell Douglas/Burdine approach, a female Title VII plaintiff

establishes a *prima facie* case of sex discrimination by showing that she occupies a job

similar to that of higher paid males."  Meeks v. Computer Associates International, 15 F.3d

1013, 1019 (11th Cir. 1994)(citing Miranda v. B & B Cash Grocery Store, 975 F.2d 1518,

1528 (11th Cir. 1992)).  Plaintiff complained to Woods that she was being discriminated

against on the basis of her pay after she learned from the payroll roster that Fetner, her male

assistant general manager, "was making the same salary that [she] was making."  (Stough

dec., ¶ 7).  However, plaintiff was aware that her compensation was not limited to her base

salary.  In calendar year 2003, plaintiff had earned $5,600 in compensation, in addition to her

base salary, through defendant's bonus program for general managers.  (Woods depo., pp.

173-77 and Exhibits 4-6; Winey depo., p. 79 and Exhibit 7).  Additionally, at the time she

made the complaint, plaintiff  "had no idea what other General Managers made, and what

[she] was supposed to be paid as a General Manager of a 60 room property."  (Stough dec.,

---

[10] Plaintiff's retaliation claim arises under the opposition clause of Title VII's anti-retaliation
provision,  42 U.S.C. § 2000e-3(a).

¶ 8).  She also did not then know whether other general managers were paid the same salaries as their assistant managers.  (Id.).

When she complained to Woods, plaintiff had no knowledge or evidence that defendant was paying her less than any male occupying a similar job.    Instead, plaintiff knew that she was paid the *same* salary as a male with fewer responsibilities, without taking plaintiff's potential bonus compensation into account.  This was the conduct "opposed" by plaintiff in her complaint to Woods.  Measured against the substantive requirement of a discriminatory pay claim that the plaintiff demonstrate that she occupies a job similar to that of a higher paid male, plaintiff's belief that the facts then known to her constituted discrimination was not objectively reasonable.  Therefore, as defendant argues, plaintiff did not engage in statutorily protected opposition when she made her complaint to Woods.  Since plaintiff has not established the existence of a genuine issue of material fact as to this element of her *prima facie* case, defendant is entitled to summary judgment on plaintiff's Title VII retaliation claim.

### Equal Pay Act Claim

In Count III of her amended complaint, plaintiff alleges that defendant discriminated against her by paying her a lower wage than male employees performing substantially equal work in violation of the Equal Pay Act, 29 U.S.C. § 206(d).

> An employee demonstrates a prima facie case of an Equal Pay Act violation by showing that the employer paid employees of opposite genders different wages for equal work for jobs which require " 'equal skill, effort, and responsibility, and which are performed under similar working conditions.' " Irby v. Bittick, 44 F.3d 949, 954 (11th Cir.1995) (quoting Corning Glass

> Works v. Brennan, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) and 29 U.S.C. § 206(d)(1)). Once the employee presents a prima facie case, the employer may avoid liability by proving by a preponderance of the evidence that the pay differences are based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) . . . any other factor other than sex." 29 U.S.C. § 206(d)(1). The burden to prove these affirmative defenses is heavy and must demonstrate that " 'the factor of sex provided *no basis* for the wage differential.' " Irby, 44 F.3d at 954 (quoting Mulhall v. Advance Sec., Inc., 19 F.3d 586, 590 (11th Cir.1994)). Further, the employer must show that none of the decision-makers, whether in middle or upper management, were influenced by gender bias.

Steger v. General Elec. Co., 318 F.3d 1066, 1077-78 (11th Cir. 2003).

Defendant advances three arguments in support of its motion for summary judgment on plaintiff's Equal Pay Act claim: (1) that plaintiff cannot prevail on the claim by comparing her salary to that of Fetner's because plaintiff's base salary was the same as Fetner's and plaintiff had the opportunity to earn bonus compensation; (2) with regard to comparator general managers at other locations, plaintiff cannot establish that they work at the same "establishment" as plaintiff; (3) with regard to comparator Jim Goodman, "plaintiff concedes she knows nothing of his qualifications, education or experience;" (4) GM salaries are determined by the individual's experience, the market where the property is located and the property's revenues, *i.e.* factors other than sex. (Defendant's brief, pp. 12-15). Defendant is not entitled to prevail on the present motion on the basis of these arguments.

Fetner as comparator. It is undisputed that Fetner replaced plaintiff as general manager at the Alexander City location and that his starting salary in that position was $32,000. (Fetner depo., pp. 157-58; Exhibits 11 and 16 to Winey depo.). As plaintiff argues, "[t]he Equal Pay Act also clearly applies when a plaintiff alleges an inequality between her

pay and that of her successor." Arrington v. Cobb County, 139 F.3d 865, 876 n. 22 (11th Cir. 1998)(citation omitted); see also Ramsey v. State of Alabama Public Service Commission, 86 F.Supp.2d 1124, 1127-28 (M.D. Ala. 2000). Thus, plaintiff may establish a *prima facie* case under the Equal Pay Act using Fetner as the comparator.

Single establishment. In order to establish a claim under the Equal Pay Act, plaintiff must establish that she and her comparator work in the same "establishment." Mulhall v. Advance Security, Inc., 19 F.3d 586, 590 (11th Cir. 1994)(Brennan v. Goose Creek Consolidated Indep. Sch. Dist., 519 F.2d 53, 57 (5th Cir. 1975)).

> The term "establishment" is defined by the Secretary of Labor as "a distinct physical place of business rather than . . . an entire business or 'enterprise' which may include several separate places of business." 29 C.F.R. § 1620.9(a) (1993). Nonetheless, the former Fifth Circuit recognized in Goose Creek that there are situations in which a single establishment can include operations at more than one physical location. Goose Creek, 519 F.2d at 56. A contrary result obtained through narrow construction of the word "establishment" could "make proof of discrimination more difficult, thus frustrating congressional intent." Id. at 57. Goose Creek set a widely followed standard recognizing that central control and administration of disparate job sites can support a finding of a single establishment for purposes of the EPA. The hallmarks of this standard are centralized control of job descriptions, salary administration, and job assignments or functions. Brownlee v. Gay and Taylor, Inc., 642 F.Supp. 347, 352 (D.Kan.1986).

Mulhall, 19 F.3d at 591 (footnote omitted). In Brownlee, the court concluded – in analyzing the Equal Pay Act claim of a female district manager with no counterpart at her geographic location – that a genuine issue of material fact existed regarding whether the district offices of an insurance adjusting firm which were under the supervision of a particular regional vice

president constituted a single establishment.  The court stated, "where central supervision exists and where pay standards apply for an entire business entity regardless of where the employee is located,[11] individuals should be compared on the basis of their employment function and not geographic location."  Brownlee, 642 F.Supp. at 352.  The court found it "most reasonable to compare the pay of individuals performing the same or similar functions regardless of the geographic location where the employees work so long as there is central control of job descriptions, salary administration, and job assignments or functions."  Id.

Similarly, in Vickers v. International Baking Co., 2000 WL 1804612 (N.D. Tex. Dec. 7, 2000), the court determined that the salary of the plaintiff – a female district sales manager in the defendant's Dallas/Fort Worth facility – could be compared to the salaries of other district sales managers in the state of Texas for purposes of plaintiff's Equal Pay Act claim. The court held that "[m]anagerial employees, such as [plaintiff], who work under the superintendence of a single supervisor, perform similar work, and are employed by the same corporation can naturally be considered to be working in the same establishment as their peers for the purposes of comparing unequal salaries under the EPA."  Id. at *5.

In this case, there is evidence that hiring and promotion recommendations for general managers were made by the district manager and approved by the corporate office.  (See Exhibits 11 and 12 to Winey depo.; Fetner depo., pp. 62-68, 74-77 (Fetner required to travel to Atlanta for interviews at corporate office before he was hired as assistant general manager

---

[11]  In Brownlee, the employer had established "salary ranges for the various positions within the company."  642 F. Supp. at 349.

and before he was promoted to general manager)).   Additionally, the base salary for all of

defendant's new general managers for some period of time after 1998 was a uniform rate of

$18,000.  (Winey depo., pp. 173-78).   Plaintiff also notes that, in late 2003, defendant

established a range of base salaries for its general managers ($26,000 to $32,000) and

assistant general managers ($18,000 to $24,000).  (Exhibit 15 to Winey depo.; Exhibit 6 to

Doc. # 24).  Salaries for defendant's general managers were recommended by the district or

regional managers and approved by the director of operations.  (Woods depo., pp. 99-100;

Winey depo., pp. 23-24, 103-07 and Exhibits 11 and 14 (answer to interrogatory no. 1)).

Additionally, when performance-based salary increases were instituted for 2004, it was

according to a policy and formula established by the corporate office.  (Winey depo., pp. 91-

93 and Exhibit 9).[12]

Viewed in the light most favorable to plaintiff, the evidence of record is sufficient to

permit a reasonable trier of fact to conclude that the "establishment" – for purposes of

plaintiff's equal pay act claim – extends beyond the Alexander City location.  See Vickers

and Brownlee, *supra*.  Therefore, defendant is not entitled to summary judgment on the basis

of its "establishment" argument.

Goodman as comparator.  Defendant argues that plaintiff cannot base her Equal Pay

Act claim on the salary of Jim Goodman, the general manager at the Auburn property

---

[12]  This particular policy was instituted shortly after plaintiff's termination.  However, it
constitutes additional evidence that the corporate office maintained a level of control over salaries
for general managers.

because she "concedes she knows nothing of his qualifications, education or experience." (Defendant's brief, p. 14).  However, "[t]o establish a *prima facie* case, a plaintiff need only demonstrate that the jobs at issue are substantially similar; a plaintiff does not have to show that the skills or qualifications of the actual male and female employees holding the positions are also substantially equivalent."  <u>Arrington</u>, *supra*, 139 F.3d at 876 (citing <u>Miranda v. B & B Case Grocery Store, Inc.</u>, 975 F.2d 1518, 1533 (11th Cir. 1992)); <u>see also</u> <u>Mulhall</u>, *supra*,  19 F.3d at 592 ("In Equal Pay Act cases, we compare the jobs, not the individual employees holding those jobs.")(citing <u>Miranda</u>, 975 F.2d at 1533).  Thus, defendant is not entitled to prevail on the basis of plaintiff's inability to prove Goodman's "qualifications, education or experience."

        <u>General manager salaries determined by experience, market and revenue, *i.e.*, factors other than sex</u>. Defendant cites evidence that "GM salaries can vary greatly and are generally determined by the individual's experience, the market where the property is located, and the revenues of the property." (Defendant's statement of material facts, ¶ 6)(citing Winey depo., pp. 17-24).   Defendant also points to plaintiff's testimony that she knows nothing of the qualifications, education or experience of Goodman.  (Defendant's brief, Doc. # 36, p. 14).

        However, defendant bears the burden of proof on this issue.  Winey's testimony regarding the factors which are considered when setting salaries generally is not sufficient to meet defendant's burden on the present motion.  Defendant must demonstrate that the pay differential between plaintiff and the specific comparators are based on "any other factor other than sex."  29 U.S.C. § 206(d)(1).  As noted above, defendant's burden is heavy and

requires that it demonstrate that "'"the factor of sex provide *no basis* for the wage differential,"'" and, further, that "none of the decision-makers, whether in middle or upper management, were influenced by gender bias."  <u>Steger</u>, *supra*, 318 F.3d at (11th Cir. 2003)(emphasis in original)(citations omitted).  Defendant is not entitled to summary judgment on plaintiff's Equal Pay Act claim on the basis of defendant's affirmative defense.

## CONCLUSION

For the foregoing reasons, it is

ORDERED that defendant's motion for summary judgment is GRANTED as to plaintiff's Title VII retaliation claim (Count II), and that claim is hereby DISMISSED.

It is further ORDERED that the motion is DENIED as to plaintiff's Title VII discrimination claim (Count I) and as to her Equal Pay Act claim (Count III).

DONE, this 17th day of July, 2006.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

23